UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                                :
KOLO, LLC,                                      :
                                                :
                    Plaintiff,                  :
                                                :
                                                :    No.: 07-Civ.-10653 (CM)
          v.                                    :
                                                :
                                                :
                                                :
KATE'S PAPERIE, LTD.,                           :
                                                :
                    Defendant.                  :
                                                :
                                                :


# DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

David S. Versfelt (DV 8935)
Elizabeth M. Harris (EH 4368)
KIRKPATRICK & LOCKHART
 PRESTON GATES ELLIS LLP
599 Lexington Avenue
New York, New York 10022
Telephone: 212.536.3900
Facsimile: 212.536.3901

Attorneys for Defendant Kate's Paperie, Ltd.

## DEFENDANT'S PROPOSED FINDINGS OF FACT

Kate's Paperie, Ltd. ("Kate's"), by and through its counsel, Kirkpatrick &
Lockhart Preston Gates Ellis LLP, respectfully submits the following proposed findings of fact
and conclusions of law regarding the motion of defendant Kolo, LLC ("Kolo") for a preliminary
injunction enjoining Kate's from acting to remove the Kolo Shop-in-Shop from Kate's Spring
Street store.

## PROPOSED FINDINGS OF FACT

### A.    The Parties

1.    Kate's is a New York corporation that specializes in selling stationery and
paper products such as journals, gift wrap, photo albums and fine writing instruments. Kate's
currently operates five stores in New York City and one in Greenwich, Connecticut.

2.    Kolo is a Delaware LLC that specializes in wholesale and retail sales of
photo albums and photo album accessories. Until recently, Kolo supplied goods to Kate's.

3.    Mr. Lionel Flax is a son of the founder of Kate's. From April 2007
through November 2007, Lionel Flax was the "de facto" president of Kate's and acted on behalf
of Kate's in connection with the Kolo shop-in-shop proposal and the Letter of Intent. See
Witness Statement of Lionel Flax ("Flax Witness Statement"), at ¶¶ 3, 6.

4.    Keith Werner ("Mr. Werner") is now the President of Kolo. During the
period from April, 2007 through December 31, 2007, Mr. Werner was the Executive Vice
President of Kolo. See Defendant's Exhibit Supplement to Proposed Findings of Fact and
Conclusions of Law (hereafter "Def.'s Suppl."), Exhibit H (Werner Tr. at 6:5-7:9).

5.    By March 2007, Kate's was experiencing financial difficulties. In an
attempt to avoid bankruptcy, a Vendors Committee was formed of its creditors. Kolo was

represented on the Vendors Committee by Mr. Werner.  Mr. Flax met Mr. Werner for the first time through the Vendors Committee.  <u>See</u> Def.'s Suppl., Ex. A (Werner Tr. at 37:25-44:21); <u>see also</u> Flax Witness Statement, at ¶ 8.

**B.**    <u>**The Shop-in-Shop Written Proposal**</u>

6.    During March 2007, Kate's and Kolo discussed the idea of Kolo setting up a shop-in-shop at Kate's Spring Street store, and possibly in Kate's other Manhattan stores.  <u>See</u> Def.'s Suppl., Ex. H (Werner Tr. at 46:8-13).

7.    In April 2007, Kolo presented Kate's with a 9-page PowerPoint proposal for the shop-in-shop idea.  The proposal focused on the Spring Street store as the initial location for launching the Shop-in-Shop.  <u>See</u> Def.'s Suppl., Ex. A; Def.'s Suppl., Ex. H (Werner Tr. at 198:19-199:14).

8.    Kolo's PowerPoint proposal consisted of three illustrations of the suggested floor plan for approximately 450 square feet of the Spring Street location; basic terms regarding lease options, Kate's termination rights, and Kolo payments; and projections of anticipated revenue.  <u>See</u> Def.'s Suppl., Ex. A.

9.    Immediately behind the floor diagrams, the proposal contains a page entitled "SOHO Proposal (Basic Terms)" that outlines the following:

- a lease term of one year, with 3 one-year renewal options;

- a "Right to Terminate:" Kate's could terminate the lease after the first year unless Kolo "continues to pay Kate's a minimum of $140 Per Square Foot, plus 6% Royalty";

- Kolo would provide Kate's with monthly point-of-sale ("POS") data;

- Kolo would make "monthly" rental and "monthly" royalty payments, with the dollar amounts of each based on certain sales levels shown in the "Financial Proposal" page; and

- Kate's would obtain a landlord consent and non-disturbance agreement.

See Def.'s Suppl., Ex. A.

10.    The following page, entitled "Financial Proposal," provides that Kolo will pay a "Starting Rent" of $75 per square foot and a "Starting Royalty" of 6%. Royalty rate increases and rent increases are set forth for rising net sales levels. See Def.'s Suppl., Ex. A. The "Starting Royalty" line does <u>not</u> state that the obligation to pay royalty will not begin to accrue until Kolo's net sales reached any particular level.

## C.    <u>The Letter of Intent</u>

11.    Prior to May 6, 2007, Mr. Werner and his attorney drafted a two-page letter of intent relating to the Shop-in-Shop proposal (the "LOI"). See Def.'s Suppl., Ex. H (Werner Tr. at 54:1-59:18; 121:11-122:12).

12.    On May 6, 2007, Mr. Werner sent Mr. Flax the following e-mail text, in which Mr. Werner referred to the LOI as a "draft" and the PowerPoint document as a "proposal":

> Sorry we were unable to talk again the other day. I will be arriving back to the US this weekend and plan to be at the creditors meeting on Monday, 5/7. Also, enclosed please find a draft of the letter of intent. Sorry for the delay as you can imagine my schedule has been extremely busy. Please review it and let me know if we are on the same page. The reference to the addendum is the proposal that I had originally sent you so if you have any question about it then you can refer to the original <u>proposal</u>. We are full steam ahead for getting everything ready for Spring in June. I will try calling you over the weekend. Maybe we can get together after the meeting on Monday.

Mr. Werner attached the LOI to this email. See Def.'s Suppl., Ex. C. There is only one version of the LOI, as neither party modified or edited its text after Mr. Werner sent it to Mr. Flax. See Id. at Ex. H (Werner Tr. at 85:7-89:21).

13.     Mr. Flax did not show the LOI to anyone at Kate's because he did not think it was a formal document, but thought that the parties would nonetheless begin to implement the Shop-in-Shop idea. <u>See</u> Flax Witness Statement at ¶ 21.

14.     Mr. Werner testified that he understood, even after he signed the agreement, that the parties would engage in further negotiations. <u>See</u> Def.'s Suppl., Ex. H (Werner Tr. at 121:11-123:124:25).

15.     On May 8, 2007, Mr. Werner sent Mr. Flax an e-mail asking Mr. Flax whether he had signed the LOI. <u>See</u> Def.'s Suppl., Ex. D.

16.     The same day, Mr. Flax responded: "I just sent this through signed." <u>See</u> Def.'s Suppl., Ex. D.

17.     Mr. Werner testified that he remembers receiving at least the signature page of the LOI bearing Mr. Flax's signature. <u>See</u> Def.'s Suppl., Ex. H (Werner Tr. at 105:19-106:12).

18.     Mr. Werner testified that he may have himself signed the LOI, but he was not certain. <u>See</u> Def.'s Suppl., Ex. H (Werner Tr. at 83:24-84:2; 112:8-113:12).

19.     Mr. Werner did not discuss the specific wording or the terms of the LOI with Mr. Flax <u>at any time</u> prior to Mr. Flax reporting that he had signed it. <u>See</u> Def.'s Suppl, Ex. H (Werner Tr. at 85:7-89:21).

20.     On Saturday, May 12, 2007, Mr. Werner sent Mr. Flax an e-mail saying that he had received the "faxed LOI" and that he would "bring a copy of the signed one" to a lunch meeting the following Tuesday, May 15. <u>See</u> Def.'s Suppl., Ex. G.

21.     On Tuesday, May 15, Mr. Werner and Mr. Flax, along with others, met at the Mercer Café for lunch. Mr. Werner testified that he cannot recall whether he brought the

LOI to the lunch meeting.  <u>See</u> Def.'s Suppl., Ex. A (Werner Tr. at 117:3-119:19).  According to

Mr. Flax, Mr. Werner did not bring the LOI to that meeting.  <u>See</u> Flax Witness Statement, at ¶

26.

22.    Mr. Flax has no recollection, one way or the other, of having signed the

draft LOI.  <u>See</u> Flax Witness Statement, at ¶ 22.

23.    Neither party has a signed copy of the LOI.  <u>See</u> Def.'s Suppl., Ex. H

(Werner Tr. at 119:3-120:18); see also Flax Witness Statement at ¶ 23.

24.    The LOI was not modified by either party after Mr. Flax received it.  <u>See</u>

Def.'s Suppl., Ex. I (Flax Tr. at 94:8-95:9).

25.    On or about June 1, 2007, Kolo set up a shop-in-shop at the Spring Street

Store.  <u>See</u> Def.'s Suppl., Ex. H (Werner Tr. at 216:21-217:16).

26.    Mr. Flax testified that Kolo moved into the Spring Street space did not

alter his expectation that the parties would continue to negotiate and execute a formal lease

agreement, as contemplated by the LOI.  <u>See</u> Def.'s Suppl., Ex. I (Flax Tr. at 86:8-22).

27.    Mr. Werner testified that he does not remember what many of the terms in

the LOI and in the PowerPoint proposal were intended to mean at the time that they were written.

<u>See</u> Def.'s Suppl., Ex. H (Werner Tr. at 121:11-164:12).

**D.**    **<u>Findings As To Interpretation Of The LOI</u>**

29.    Addendum (A) of the LOI provides floor plans for the Spring Street

location <u>only</u>.  There is nothing in the LOI identifying floor plans or diagrams for any other

store.  <u>See</u> Def.'s Suppl., Ex. H (Werner Tr. at 139:14-141:11).

30.     The page entitled "SOHO Proposal (Basic Terms)" in Addendum (A) refers to the Spring Street location only. That page does not refer to any other store. See Def.'s Suppl., Ex. H (Werner Tr. at 148:21-150:13).

31.     The page entitled "Financial Proposal" in Addendum (A) refers to the Spring street location only. That page does not relate to any other store. See Def.'s Suppl., Ex. H (Werner Tr. at 150:14-152:14).

32.     The LOI is ambiguous and in many ways confusing:

- The very first line of the LOI states that the "following confirms the understanding for which the parties have agreed to in principal to enter into a contract …."

- The last sentence of the first paragraph of the LOI states that Kate's and Kolo intend to "enter into a more formal agreement on the following terms of the contract within a reasonable time."

- The final sentence of Paragraph 1 of the LOI states that "at the same time as this Agreement is entered into, the parties will also conclude a rental agreement."

- Just above the signature lines on page 2 of the LOI, it says that by "signing below each party agrees and consents [sic] to the above mention [sic] terms and agrees to act in good faith to complete the negotiations for additional terms which will be set forth in the Agreement."

Def.'s Suppl., Ex. B; Ex. H (Werner Tr. at 121:11-164:12).

33.     Paragraph 8 of the LOI reads as follows:

**Term** – The term of each sub-lease will be for one year from the commencement date. Kolo shall retain the right to renew each sub-lease for an additional one year period, and each year thereafter as it becomes due by giving 60 day notice to Kate's prior to the termination date.

Def.'s Suppl., Ex. B. The "Basic Terms" page of Addendum (A) provide for a "one year" lease term with three one year options. Id., Ex. A. Paragraph 8 of the LOI and the Basic Terms page of Addendum (A) are inconsistent.

34.     The "Basic Terms" page of Addendum (A) contains a termination provision that is not included in the LOI. That "Right to Terminate" states that "Kate's has the right to terminate the agreement after the first year, and each year thereafter, unless Kolo continues to pay Kate's a minimum of $140/Per Square Foot plus 6% Royalty." See Def.'s Suppl., Ex. A.

35.     In the "Basic Terms" of Addendum (A), Kolo is required to provide Kate's with monthly POS data. See Def.'s Suppl., Ex. A; see also Ex. H (Werner Tr. at 175:5-176:15)

36.     The LOI contains a number of open-ended provisions. For example, the LOI refers to a "rental agreement" to be negotiated, "future addendums" to be negotiated, and "additional terms' that "will be set forth in the Agreement." See Def.'s Suppl., Ex. B.

37.     The LOI does not define "default." See Def.'s Suppl., Ex. B.

38.     The LOI does not include a "cure" provision. See Def.'s Suppl., Ex. H (Werner Tr. at 172:20-173:3); see also Ex. B.

39.     The LOI does not define "material breach." See Def.'s Suppl., Ex. B.

40.     According to the "Basic Terms" of Addendum (A), Kate's has a right to terminate Kolo's shop in the Spring Street store "unless Kolo is, by the end of the first year of its possession, continuing to pay at a rate of at least $140 per square foot and a royalty of 6% on all of Kolo's net sales." See Def.'s Supp., Ex. A; see also Ex. H (Werner Tr. at 205:10-206:11).

**E.     Kolo's Material Breach Of The Letter of Intent**

40.     Kolo has paid "rent" only for the months of June, July and August 2007. See Flax Witness Statement at ¶ 30; Ex. H (Werner Tr. at 216:13-217:18).

41.    On November 7, 2007, Kolo advised that it would be placing its rent into escrow "until the existing differences between the parties are resolved." See Def.'s Suppl., Ex. G. Thus, since September 2007 Kolo has paid nothing for its use of the space in the Spring Street store.

42.    Kolo did not provide POS data from November 2007 through February 12, 2008. On February 13, 2008, following the deposition of Mr. Werner, Kolo produced POS data for the period June 1, 2007 through February 10, 2008. See Def.'s Suppl., Ex. F.

43.    Kolo has never paid royalties at any time while it has occupied space at Spring Street. See Def.'s Suppl., Ex. H (Werner Tr. at 178:6-180:10; 215:24-216:12). But, the Financial Proposal of Addendum (A) provides for "Starting Royalty – 6%" without any such qualification. See Def.'s Suppl., Ex. A.

44.    Addendum (A) shows a photo album bar in its diagrams for the Spring Street space. See Def.'s Suppl., Ex. A. Kolo has never established a photo album bar. Instead, Kolo set up three computers that can only permit customers to purchase Kolo products via the Internet. Kolo's POS data does not capture those sales, and so Kolo's POS data is lower than its actual sales level. See Flax Witness Statement at ¶ 33.

45.    Kolo's failures to abide by the terms of Addendum (A) constitute material breaches for which Kate's should be permitted to terminate any leasehold interest that Kolo may have.

## CONCLUSIONS OF LAW

1.    The Court finds that Kolo and Kate's did not come to a meeting of the minds so as to form a binding contract and, therefore, no valid lease exists. In order to form a contract, parties must come to a meeting of the minds. Foster v. Clifford, 42 Misc. 496, 499, 86

N.Y.S. 28 (N.Y. Sup. App. Term. 1904). Because Kate's contemplated further negotiation and the execution of a formal document, the LOI and Addendum (A) constitute only a preliminary agreement, not a binding contract. See Brown v. Cara, 420 F.3d 148, 153 (2d Cir. 2005) (holding that where parties "'contemplate[d] further negotiations and the execution of a formal instrument, a preliminary agreement d[id] not create a binding contract'").

2.    The Court finds that where an agreement is unclear or ambiguous, its terms should be construed against the drafter. Arkwright-Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co., 695 F. Supp. 156, 160 (S.D.N.Y. 1988) (construing ambiguous agreement against defendant drafter); In re Fidelity Mortgage Investors, 12 B.R. 641, 645 (S.D.N.Y. 1981) (stating that "any ambiguity that might exist must be resolved against the draftsmen of the documents"). It is undisputed that the LOI and its Addendum were drafted entirely by Kolo, and their texts were never edited or modified by any representative of Kate's. Thus, to the extent that the terms of the LOI or Addendum (A) are unclear or ambiguous, they should be construed against Kolo.

3.    The Court finds that when there is some doubt as to the existence of an executed document, the party asserting its existence must provide an adequate explanation for failing to produce the document. Nicosia v. Muller, 229 A.D.2d 964, 965, 645 N.Y.S.2d 385, 386 (N.Y. App. Div. 4th Dep't 1996). A sworn statement that a writing existed, on its own, is insufficient. Webb & Knapp v. United Cigar-Whelan Stores Corp., 276 A.D. 583, 584, 96 N.Y.S.2d 359 (N.Y. App. Div. 1st Dep't 1950). Kolo has failed to provide a sufficient explanation for its failure to produce an executed LOI.

4.    The Court finds that the parties did not enter into any enforceable agreement at all with regard to the 3rd Avenue and 57th Street stores because neither the LOI nor Addendum (A) contain essential terms for those locations. The parties must agree upon essential

terms before an agreement can constitute an enforceable lease or sublease. Davis v. Dinkins, 206 A.D.2d 365, 366-67, 613 N.Y.S.2d 933, 935 (N.Y. App. Div. 2d Dep't 1994) (stating that "[i]n order for an agreement . . . to be enforceable as a lease, all the essential terms must be agreed upon"); see Harlow Apparel, Inc. v. David Pik Int'l, Inc., 106 A.D.2d 345, 345, 483 N.Y.S.2d 258, 260 (N.Y. App. Div. 1st Dep't 1984).

5.      The essential terms of a lease or sublease include (1) the area to be leased, (2) the duration of the lease, and (3) the price to be paid. Davis, 206 A.D.2d at 367, 613 N.Y.S.2d 935 (stating that "[i]f any of these essential terms are missing and are not otherwise discernible by objective means, a lease has not been created"); see also Harlow Apparel, Inc., 106 A.D.2d at 345, 483 N.Y.S.2d at 260. Given the fact that neither the LOI nor Addendum (A) set forth a specific start date, a particularized location, or financial terms for any location other than 72 Spring Street, there can be no binding sublease for any location other than 72 Spring Street.

6.      To the extent that the LOI and Addendum (A) can be construed to constitute a sublease with regard to the Spring Street store, it is undisputed that Kolo has materially breached its terms. The Court finds that Kolo's failure to pay rent for a period of at least seven months constitutes a "breach of a material term" of the LOI and Addendum (A). Fifty States Management Corp. v. Pioneer Auto Parks, Inc., 46 N.Y.2d 573, 575, 415 N.Y.S.2d 800 (N.Y. Ct. App. 1979); see also NL Indus., Inc. v. PaineWebber Inc., 720 F.Supp. 293, 299 (S.D.N.Y. 1989). The Court further finds that Kolo's failure to pay any royalty in connection with the operation of the Spring Street shop-in-shop also constitutes "a material breach." Awards.com v. Kinko's, Inc., 42 A.D.3d 178, 187, 834 N.Y.S.2d 147 (N.Y. App. Div. 1st Dep't 2007).

7.    The Court finds that Kolo's material breaches of the terms of the LOI and Addendum (A) justify immediate termination of the agreement between Kate's and Kolo. A lease may be terminated based on one party's material breach. City of New York v. Skyway-Dyckman, Inc., 22 A.D.2d 506, 509, 256 N.Y.S.2d 840 (N.Y. App. Div. 1st Dep't 1965); Fifty States Mgmt. Corp., 46 N.Y.2d at 578, 415 N.Y.S.2d 800.

8.    Kolo's repeated failure to pay rent constitutes a sufficient ground for termination of a lease. NL Indus., Inc., 720 F. Supp. at 299. Kolo's failure to pay any royalties in connection with the operation of the shop-in-shop also constitutes "a material breach, justifying contract termination." Awards.com, 42 A.D.3d at 187, 834 N.Y.S.2d 147 (citations omitted); see also S.E. Nichols, Inc. v. Am. Shopping Ctrs., Inc., 130 A.D.2d 855, 856-57, 515 N.Y.S.2d 638 (N.Y. App. Div. 3d Dep't 1987). Based on Kolo's repeated failure to pay rent and its failure to pay any royalties in connection with the operation of the shop-in-shop, immediate termination of the agreement between Kate's and Kolo is justified. Awards.com, 42 A.D.3d at 187.

9.    The Court finds no basis upon which to imply a right for Kolo to cure its material breaches. Absent any right to cure in the subject commercial lease, the law will not imply a right to cure. RPAPL Section 753, which gives a residential tenant ten days to cure a default, is inapplicable to commercial leases. Grand Liberte Coop., Inc. v. Bilhaud, 126 Misc.2d 961, 964, 487 N.Y.S.2d 250 (N.Y. App. Term 1st Dep't 1984). Similarly, a tenant's right to obtain a stay of eviction by depositing the rent pursuant to RPAPL 751(1) "has been held to apply only to summary proceedings brought to enforce a condition subsequent that terminates a lease." NL Indus., Inc., 720 F.Supp. at 299. This case involves a commercial lease, and is not a summary proceeding; hence, Kolo has no statutory right to cure.

10.    Kolo's material breaches of the terms of the LOI and Addendum (A) regarding the Spring Street store warrant a judgment awarding possession of the Kolo space in the Spring Street store to Kate's.

Dated:   February 15, 2008
         New York, New York

Respectfully submitted,

By:   _David S. Versfelt_
      David S. Versfelt (DV 8935)
      Elizabeth M. Harris (EH 4368)

      KIRKPATRICK & LOCKHART
      PRESTON GATES ELLIS LLP
      599 Lexington Avenue
      New York, NY  10022-6030
      212-536-3900
      212-536-3901 (fax)

      *Attorneys for Defendant Kate's Paperie, Ltd.*

- 12 -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

KOLO, LLC,                                  :
                                            :
                    Plaintiff,              :
                                            :         No.: 07-Civ.-10653 (CM)
          v.                                :
                                            :
                                            :
                                            :
KATE'S PAPERIE, LTD.,                       :
                                            :
                    Defendant.              :
                                            :

## DEFENDANT'S EXHIBIT SUPPLEMENT TO
## PROPOSED FINDINGS OF FACT

David S. Versfelt (DV 8935)
Elizabeth M. Harris (EH 4368)
KIRKPATRICK & LOCKHART
 PRESTON GATES ELLIS LLP
599 Lexington Avenue
New York, New York 10022
Telephone: 212.536.3900
Facsimile: 212.536.3901

Attorneys for Defendant Kate's Paperie, Ltd.

# EXHIBIT A





**Kolo Store at the new SOHO location**

April 2007

KP 0033



KP 0034

# SOHO layout proposal (illustration #1)



KO

KP 0035



SOHO layout proposal (illustration #2)

KP 0036

# SOHO Proposal (Basic Terms)

1. Lease Term – One Year

2. Lease Options – Kolo has the right to (3) One Year Options.

3. Right to Terminate – Kate's has the right to terminate the agreement after the first year, and each year thereafter, unless Kolo continues to pay Kate's a minimum of $140/Per Square Foot plus 6% Royalty.

4. Kolo will provide Kate's with monthly POS Data.

5. Kolo will pay Kate's monthly rental payments according to the financial prosposal enclosed.

6. Kolo will pay Kate's monthly royalty payments according to the financial proposal enclosed.

7. Kate's will provide Kolo with landlord's consent to the sub-lease and a non-disturbance.

KO

KP 0037

KP 0038

# Financial Proposal

1. Starting Rent Per Square Foot - $75.00

2. Starting Royalty - 6%

3. Royalty Increases – Royalties increase according to the following revenue schedule;
   Net Sales of $250,000 to $449,000 – 6%
   Net Sales of $450,000 to $649,000 – 10%
   Net Sales of $$650,00 and up – 11%

4. Rent Increases – Rent increases according to the following revenue schedule;
   Net Sales of $250,000 – $75/Sq.Ft.
   Net Sales of $350,000 – $79/Sq.Ft.
   Net Sales of $450,000 – $83/Sq.Ft.
   Net Sales of $550,000 – $90/Sq.Ft.
   Net Sales of $650,000 – $100/Sq.Ft.
   Net Sales of $750,000 – $135/Sq.Ft.

# Financial Forecast

## Escalations

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Annual Retail Sales | | | $250,000 | $350,000 | $450,000 | $550,000 | $650,000 | $750,000 |
| Sales/sq. ft | | | $556 | $778 | $1,000 | $1,222 | $1,444 | $1,667 |
| Rent/Sq.Ft. | | | $75 | $79 | $83 | $90 | $100 | $135 |
| Royalty | | | 6% | 6% | 10% | 10% | 11% | 11% |

KP 0039



KP 0040

# Comparative analysis of net income projections

| | $250,000 | $350,000 | $450,000 | $550,000 | $650,000 | $750,000 |
|---|---|---|---|---|---|---|
| Annual Retail Sales *Kolo Sales at Spring $1* | $250,000 | $350,000 | $450,000 | $550,000 | $650,000 | $750,000 |
| Annual Net Retail Sales | $242,500 | $339,500 | $436,500 | $533,500 | $630,500 | $727,500 |
| Kates Total Revenues (Roy. & Rent) | $48,300 | $55,808 | $80,859 | $93,850 | $114,355 | $140,775 |
| Kates Operating Expenses | $62,487 | $62,487 | $62,487 | $62,487 | $62,487 | $62,487 |
| **Kates Net Operating Income** | **-$14,187** | **-$6,680** | **$18,372** | **$31,363** | **$51,868** | **$78,288** |
| Kolo Gross Profit | $126,382 | $176,935 | $210,028 | $256,701 | $297,069 | $342,771 |
| Kolo Operating Expenses | $151,703 | $167,455 | $183,292 | $200,648 | $219,213 | $249,028 |
| **Kolo Net Income** | **-$33,654** | **$1,146** | **$18,402** | **$47,719** | **$69,522** | **$85,410** |



Net Retail Sales

$242,500   $436,500   $533,500   $630,500   $727,500

Legend: Kate's Net Income, Kolo Net Income

Axis: $100,000 / $80,000 / $60,000 / $40,000 / $20,000 / $0 / -$20,000 / -$40,000

KO
KP 0041

# EXHIBIT B

**Letter of Intent**

between

**Kate's Paperie LTD and Affiliates.,**

hereinafter named "Kate's"
and

**Kolo Retail, LLC,**

hereafter named "Kolo"

The following confirms the understanding for which the parties have agreed to in principal to enter into a contract hereinafter called ("Agreement") for Kolo to lease retail space from Kate's Paperie, LLC and to operate a retail store within each of three Kate's stores. It is intended that the parties will enter into a more formal agreement on the following terms of the contract within a reasonable time.

1. **Locations and Demised Premises -** Kate's commits to Kolo to provide rental space in the following three of it's Manhattan, NY locations; Spring Street, 3rd Avenue, and 57th Street. Kolo Retail, LLC is hereby committing to displaying and selling products only within the dedicated space. The size of each location shall vary between 250 square feet to 450 square feet. The attached Addendum (A) defines the agreed upon space at the Spring Street Store. Layout and drawings showing such dedicated space is attached hereto in Addendum (A). Together with and at the same time as this Agreement is entered into, the parties will also conclude a rental agreement, and Kate's will provide Kolo a consent from the current landlord(s) for such rights to sub-lease.

2. **Fixtures, Furnishings & Equipment -** Fixtures, furnishings and equipment such as displays, computers, tables, etc. shall be completely provided by and owned by Kolo. Other improvements or build out shall be discussed and agreed upon between the parties at a later date.

3. **Commencement -** The commencement of the first Kolo retail store within the Kate's store concept will begin on or around June 1ˑ 2007 located on Spring Street. The other locations, 3rd Avenue and 57th Street, will commence approximately one month thereafter. Both parties shall begin discussions to come to a mutual agreement to the specific locations for the 3rd Avenue and 57th Street locations by June 1, 2007. Notwithstanding the above, should both parties fail to mutually agree to the locations of the other Kate's stores then Kolo shall have the right to terminate the Agreement, vacating the Spring Street location, by giving a 30 day notice to Kate's.

4. **Staff and Payroll Expenses -** Kolo shall provide its own representatives, employees and staff to operate each store within Kate's store. Both parties have agreed that in the event it becomes necessary to utilize Kate's staff, whether on a part-time or full-time basis, Kolo shall reimburse Kate's for any payroll expenses.

**KP 0028**

5. **Inventory -** Upon commencement of each location, starting with the Spring Street location, Kolo will agree to accept responsibility of the current inventory that Kate's provides to Kolo for that location. All inventory must be in saleable condition when provided by Kate's. At the time of commencement, for each additional store, Kolo will issue a credit memo to Kate's for receiving such qualified inventory.

6. **Insurance -** Kolo will agree to insure all contents inside the demised premises.

7. **Compensation -** Each location shall have its own profit and loss projections and compensation schedule which will describe the amount to be paid to Kate's. It is agreed that each compensation schedule will be attached as an additional addendum and made apart of the Agreement. The compensation schedule for Spring Street is also attached hereto in Addendum (A). Kolo shall compensate Kate's according to the compensation schedule set forth in Addendum (A) for the Spring Street location and according to future addendums for the other locations as they are agreed upon. Each location shall have its own projections and compensation schedule which shall describe the amount to be paid to Kate's. It is agreed that each compensation schedule will be attached as an additional addendum and made apart of the Agreement. Compensation to Kate's will be in the form of base rental income plus an additional royalty income which formula is also set forth in the compensation schedule and attached to the Agreement.

8. **Term -** The term of each sub-lease will be for one year from the commencement date. Kolo shall retain the right to renew each sub-lease for an additional one year period, and each year thereafter as it becomes due by giving 60 day notice to Kate's prior to the termination date.

9. **Confidentiality -** Both parties agree to keep all information about the terms of this Agreement confidential. Both parties also acknowledge that they have signed a Mutual Confidentiality Agreement prior to entering into this Agreement stating to keep all information confidential.

By signing below each party agrees and consents to the above mention terms and agrees to act in good faith to complete the negotiations for addtional terms which will be set forth in the Agreement.

Kolo Retail, LLC

_____
By it's                                           Date

Kate's Paperie LTD and Affilitates

_____
By it's                                           Date

# EXHIBIT C



Kates_V4.ppt (582
KB)

```
From: master file flax <lionel.flax@gmail.com>
Date: Wed, 3 Oct 2007 20:30:25 -0400
Subject: Fwd: KAte's proposal
To: "Flax, Leonard" <lflax@katespaperie.com>, "John A. Golieb"
<jag@mggpclaw.com>

---------- Forwarded message ----------
From: Keith Werner <kkw@kolo-usa.com>
Date: May 6, 2007 8:59 PM
Subject: RE: KAte's proposal
To: Lionel Flax <lionel.flax@gmail.com>

Hi Lionel,

Here is the original proposal. Let me know if you want to get together tommorrow in the
`ity.

Thanks,

Keith




-----Original Message-----
From: Lionel Flax [mailto:lionel.flax@gmail.com]
Sent: Sunday, May 06, 2007 3:08 PM
To: kw@kolo-usa.com
Subject: KAte's proposal

Keith, I think you hand delivred me the proposal.  I left it in the office and would like
to look at it today.  If you get this please send it to me electronically.
Regards

On 5/6/07, Keith Werner <kkw@kolo-usa.com> wrote:
> Hi Lionel,
>
> Sorry we were unable to talk again the other day.  I will be arriving
> back to the US this weekend and plan to be at the creditors meeting on
> Monday, 5/7.  Also, enclosed please find a draft of the letter of
> intent. Sorry for the delay as you can imagine my schedule has been
  extremely busy.  Please review it and let me know if we are on the
  same page.  The reference to the addendum is the proposal that I had
> originally sent you so if you have any question about it then you can
> refer to the original proposal.  We are full steam ahead for getting
> everything ready for Spring in June.  I will try calling you over the
```

KP 0031

```
> weekend. Maybe we can get together after the meeting on Monday ?
>
> Best regards,
>
.
.
> Keith Werner
> Executive Vice President
> KOLO, LLC.
> kkw@kolo-usa.com
> 860-547-0367 Ext 222
> 860-547-0598 FAX
> www.kolo.com
>
>
>
>
>
```

```
--
Lionel Flax
Chief Executive Officer
Kate's Paperie
646-352-1297
```

KP 0032

# EXHIBIT D

From: Lionel Flax <lionel.flax@gmail.com>
Date: Thu, 10 May 2007 13:50:26 -0400
Subject: Re:
To: kw@kolo-usa.com

Did u find it?

On 5/10/07, Keith Werner <kkw@kolo-usa.com> wrote:
> Thank you Lionel ! I will look for it now.
>
> Keith
>
> -----Original Message-----
> From: Lionel Flax [mailto:lionel.flax@gmail.com]
> Sent: Wednesday, May 09, 2007 2:36 PM
> To: kw@kolo-usa.com
> Subject: Re:
>
> I just sent this through signed.
>
> On 5/8/07, Keith Werner <kkw@kolo-usa.com> wrote:
> >
>  >
> > >
> > > Hi Lionel,
> > >
> > > Just checking in with you to see how you are doing with signing the
> > > LOI. I am going to be putting my staff together with Zelma to
> > > coordinate the setup of the shop in shop.  We are planning on
> > > sending a team down next week for the show and I thought we could
> > > get everyone together at that time to go over the setup. I will also
> > > be having my inventory management team touch base with the Kate's
> > > person in charge of purchasing Kolo so we can begin to transition
> > > the inventory for the new store.  Could you please let me know who
> > > that person would be and how
> > to contact them as soon as possible.
> > >
> > > Talk to you soon.
> > >
> > >
> > > Keith Werner
> > Executive Vice President
> > KOLO, LLC.
> >  kkw@kolo-usa.com
> >  860-547-0367 Ext 222
> >  860-547-0598 FAX
> >  www.kolo.com
> > >
> > >
> > >
> `

> --
> Lionel Flax
> Chief Executive Officer
> Kate's Paperie

KP 0044

1

```
> 646-352-1297
>
>

--
Lionel Flax
Chief Executive Officer
Kate's Paperie
646-352-1297
```

KP 0045

# EXHIBIT E

From: Keith Werner <kkw@kolo-usa.com>
Date: Sat, 12 May 2007 03:36:50 -0400
Subject:
To: Lionel Flax <lionel.flax@gmail.com>

Hi Lionel,

I did received your faxed LOI. Thank you very much. I will bring a copy of the signed one
to you on Tuesday. I thought we could meet around 1pm at the Mercer Café for lunch if that
is ok with you ? Remember we will be meeting with Akira Ito - President of Ito-Ya Japan
and Shin Ueno - Senior Manager of Sourcing Exports.

Did you get any where with the issue of the leases today. I could not get a hold of John
Scholte. But I will try him on Monday.

Regards,

Keith Werner
Executive Vice President
KOLO, LLC.
kkw@kolo-usa.com
960-547-0367 Ext 222
60-547-0598 FAX
www.kolo.com

**KP 0049**

1

# EXHIBIT F

# Daily Sales by Store

6/1/2007 - 12/31/2007

2 - Kolo Soho

| Fri - 06/01/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| | | 0.00 | 0.00 | 0.00 | 0.00 |
| Sat - 06/02/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 0.30 | 98.70 | 5.92 | 104.62 |
| Sun - 06/03/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 47.55 | 837.45 | 50.30 | 887.75 |
| Mon - 06/04/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 13.85 | 643.15 | 38.61 | 681.76 |
| Tue - 06/05/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 30.10 | 724.90 | 43.50 | 768.40 |
| Wed - 06/06/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 5.85 | 729.15 | 43.75 | 772.90 |
| Thu - 06/07/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 15.93 | 558.57 | 33.53 | 592.10 |
| Fri - 06/08/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 32.78 | 993.22 | 59.60 | 1,052.82 |
| Sat - 06/09/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 29.65 | 633.35 | 43.10 | 676.45 |
| Sun - 06/10/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 21.30 | 392.70 | 23.45 | 416.15 |
| Mon - 06/11/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 29.55 | 1,176.45 | 86.24 | 1,261.69 |
| Tue - 06/12/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 24.58 | 631.92 | 46.84 | 678.76 |
| Wed - 06/13/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 8.15 | 678.85 | 56.85 | 735.70 |
| Thu - 06/14/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 29.98 | 956.81 | 80.14 | 1,036.95 |
| Fri - 06/15/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 120.84 | 1,315.25 | 110.13 | 1,425.38 |
| Sat - 06/16/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 65.85 | 1,312.65 | 109.94 | 1,422.59 |
| Sun - 06/17/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 25.30 | 692.70 | 58.02 | 750.72 |
| Mon - 06/18/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 36.10 | 840.90 | 70.43 | 911.33 |
| Tue - 06/19/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 36.63 | 1,106.87 | 92.68 | 1,199.55 |
| Wed - 06/20/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 9.49 | 831.34 | 69.63 | 900.97 |
| Thu - 06/21/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 45.15 | 802.85 | 67.24 | 870.09 |
| Fri - 06/22/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 11.00 | 831.00 | 69.62 | 900.62 |

| | | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Sat - 06/23/2007 | # of Trans | 35.70 | 1,025.30 | 85.83 | 1,111.13 |
| Sun - 06/24/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 28.05 | 981.95 | 82.23 | 1,064.18 |
| Mon - 06/25/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 18.70 | 649.30 | 54.37 | 703.67 |
| Tue - 06/26/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 17.85 | 425.15 | 35.63 | 460.78 |
| Wed - 06/27/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 4.00 | 535.50 | 44.86 | 580.36 |
| Thu - 06/28/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 43.05 | 1,278.95 | 107.07 | 1,386.02 |
| Fri - 06/29/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 23.70 | 1,180.30 | 98.87 | 1,279.17 |
| Sat - 06/30/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 13.55 | 410.45 | 34.39 | 444.84 |
| Sun - 07/01/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 9.65 | 418.35 | 35.06 | 453.41 |
| Mon - 07/02/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 10.58 | 308.92 | 25.86 | 334.78 |
| Tue - 07/03/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 27.80 | 429.20 | 35.96 | 465.16 |
| Wed - 07/04/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 6.45 | 202.55 | 16.96 | 219.51 |
| Thu - 07/05/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 14.10 | 502.40 | 42.08 | 544.48 |
| Fri - 07/06/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 45.23 | 1,200.77 | 100.57 | 1,301.34 |
| Sat - 07/07/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 18.20 | 562.80 | 47.12 | 609.92 |
| Sun - 07/08/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 12.10 | 705.90 | 59.16 | 765.06 |
| Mon - 07/09/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 44.85 | 954.65 | 79.92 | 1,034.57 |
| Tue - 07/10/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 34.25 | 740.75 | 62.07 | 802.82 |
| Wed - 07/11/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 50.35 | 886.65 | 74.23 | 960.88 |
| Thu - 07/12/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 42.90 | 1,379.10 | 115.49 | 1,494.59 |
| Fri - 07/13/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 53.13 | 1,187.37 | 99.41 | 1,286.78 |
| Sat - 07/14/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 17.65 | 672.35 | 56.30 | 728.65 |
| Sun - 07/15/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 17.05 | 625.95 | 52.41 | 678.36 |
| Mon - 07/16/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |

| | | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Tue - 07/17/2007 | # of Trans | 28.79 | 1,095.21 | 91.71 | 1,186.92 |
| Wed - 07/18/2007 | # of Trans | 7.88 | 650.12 | 54.46 | 704.58 |
| Thu - 07/19/2007 | # of Trans | 15.25 | 561.75 | 47.06 | 608.81 |
| Fri - 07/20/2007 | # of Trans | 63.90 | 1,175.10 | 98.42 | 1,273.52 |
| Sat - 07/21/2007 | # of Trans | 19.58 | 845.92 | 70.84 | 916.76 |
| Sun - 07/22/2007 | # of Trans | 48.00 | 965.00 | 80.83 | 1,045.83 |
| Mon - 07/23/2007 | # of Trans | 10.65 | 305.35 | 25.57 | 330.92 |
| Tue - 07/24/2007 | # of Trans | 22.10 | 533.90 | 44.72 | 578.62 |
| Wed - 07/25/2007 | # of Trans | 74.98 | 1,675.02 | 140.32 | 1,815.34 |
| Thu - 07/26/2007 | # of Trans | 52.90 | 655.60 | 54.92 | 710.52 |
| Fri - 07/27/2007 | # of Trans | 40.20 | 1,107.80 | 92.76 | 1,200.56 |
| Sat - 07/28/2007 | # of Trans | 10.20 | 254.80 | 21.34 | 276.14 |
| Sun - 07/29/2007 | # of Trans | 23.15 | 906.35 | 75.90 | 982.25 |
| Mon - 07/30/2007 | # of Trans | 21.25 | 383.75 | 32.14 | 415.89 |
| Tue - 07/31/2007 | # of Trans | 60.35 | 1,391.65 | 116.54 | 1,508.19 |
| Wed - 08/01/2007 | # of Trans | 23.55 | 955.45 | 80.02 | 1,035.47 |
| Thu - 08/02/2007 | # of Trans | 7.25 | 833.75 | 69.82 | 903.57 |
| Fri - 08/03/2007 | # of Trans | 36.25 | 1,084.75 | 90.88 | 1,175.63 |
| Sat - 08/04/2007 | # of Trans | 22.00 | 1,132.00 | 94.75 | 1,226.75 |
| Sun - 08/05/2007 | # of Trans | 32.45 | 980.55 | 82.13 | 1,062.68 |
| Mon - 08/06/2007 | # of Trans | 5.05 | 243.95 | 20.43 | 264.38 |
| Tue - 08/07/2007 | # of Trans | 17.00 | 412.00 | 34.51 | 446.51 |
| Wed - 08/08/2007 | # of Trans | 2.50 | 478.50 | 40.07 | 518.57 |
| Thu - 08/09/2007 | # of Trans | 0.90 | 177.10 | 14.83 | 191.93 |

| | | 16.70 | 512.30 | 42.89 | 555.19 |
|---|---|---|---|---|---|
| Fri - 08/10/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 14.15 | 363.85 | 30.46 | 394.31 |
| Sat - 08/11/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 26.55 | 1,067.21 | 89.38 | 1,156.59 |
| Sun - 08/12/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 10.60 | 377.40 | 31.62 | 409.02 |
| Mon - 08/13/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 31.63 | 755.37 | 63.23 | 818.60 |
| Tue - 08/14/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 23.45 | 677.55 | 56.73 | 734.28 |
| Wed - 08/15/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 27.15 | 867.85 | 72.68 | 940.53 |
| Thu - 08/16/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 22.33 | 742.67 | 62.19 | 804.86 |
| Fri - 08/17/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 24.45 | 1,032.55 | 86.47 | 1,119.02 |
| Sat - 08/18/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 10.95 | 306.30 | 25.65 | 331.95 |
| Sun - 08/19/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 18.60 | 763.40 | 63.93 | 827.33 |
| Mon - 08/20/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 20.40 | 570.60 | 47.77 | 618.37 |
| Tue - 08/21/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 20.45 | 719.05 | 60.23 | 779.28 |
| Wed - 08/22/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 18.30 | 759.70 | 63.64 | 823.34 |
| Thu - 08/23/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 18.10 | 901.90 | 75.54 | 977.44 |
| Fri - 08/24/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 116.35 | 1,726.65 | 144.58 | 1,871.23 |
| Sat - 08/25/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 47.13 | 1,094.37 | 91.60 | 1,185.97 |
| Sun - 08/26/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 32.65 | 1,064.35 | 89.12 | 1,153.47 |
| Mon - 08/27/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 19.78 | 862.22 | 72.21 | 934.43 |
| Tue - 08/28/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 25.05 | 963.95 | 80.72 | 1,044.67 |
| Wed - 08/29/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 68.69 | 1,366.26 | 113.76 | 1,480.02 |
| Thu - 08/30/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 72.50 | 1,198.45 | 99.72 | 1,298.17 |
| Fri - 08/31/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 74.28 | 842.22 | 70.54 | 912.76 |
| Sat - 09/01/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 38.95 | 1,010.05 | 84.58 | 1,094.63 |

| Date | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Sun - 09/02/2007 | | | | | |
| Mon - 09/03/2007 | | 20.15 | 429.85 | 35.97 | 465.82 |
| Tue - 09/04/2007 | | 45.05 | 1,043.95 | 87.44 | 1,131.39 |
| Wed - 09/05/2007 | | 42.75 | 1,765.20 | 147.25 | 1,912.45 |
| Thu - 09/06/2007 | | 53.75 | 1,189.20 | 99.04 | 1,288.24 |
| Fri - 09/07/2007 | | 50.15 | 1,039.80 | 86.45 | 1,126.25 |
| Sat - 09/08/2007 | | 444.30 | 1,618.65 | 135.01 | 1,753.66 |
| Sun - 09/09/2007 | | 25.85 | 719.15 | 60.22 | 779.37 |
| Mon - 09/10/2007 | | 22.73 | 840.27 | 70.35 | 910.62 |
| Tue - 09/11/2007 | | 86.35 | 736.65 | 61.74 | 798.39 |
| Wed - 09/12/2007 | | 213.95 | 476.05 | 39.84 | 515.89 |
| Thu - 09/13/2007 | | 35.77 | 992.73 | 83.14 | 1,075.87 |
| Fri - 09/14/2007 | | -259.95 | 707.45 | 59.23 | 766.68 |
| Sat - 09/15/2007 | | 36.05 | 882.95 | 73.95 | 956.90 |
| Sun - 09/16/2007 | | 5.75 | 764.25 | 64.01 | 828.26 |
| Mon - 09/17/2007 | | 68.35 | 1,669.65 | 139.79 | 1,809.44 |
| Tue - 09/18/2007 | | 8.00 | 1,037.90 | 85.78 | 1,123.68 |
| Wed - 09/19/2007 | | 22.30 | 838.70 | 70.24 | 908.94 |
| Thu - 09/20/2007 | | -25.82 | -192.68 | -16.13 | -208.81 |
| Fri - 09/21/2007 | | 10.45 | 367.55 | 30.75 | 398.30 |
| Sat - 09/22/2007 | | 30.30 | 812.70 | 68.08 | 880.78 |
| Sun - 09/23/2007 | | 9.50 | 819.50 | 68.64 | 888.14 |
| Mon - 09/24/2007 | | 28.15 | 798.85 | 66.90 | 865.75 |
| Tue - 09/25/2007 | | 9.95 | 662.55 | 55.51 | 718.06 |

| Date | | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Wed - 09/26/2007 | # of Trans | 27.10 | 864.90 | 72.42 | 937.32 |
| Thu - 09/27/2007 | # of Trans | 16.83 | 1,602.23 | 118.60 | 1,720.83 |
| Fri - 09/28/2007 | # of Trans | 2.50 | 509.50 | 42.69 | 552.19 |
| Sat - 09/29/2007 | # of Trans | 13.15 | 661.85 | 55.44 | 717.29 |
| Sun - 09/30/2007 | # of Trans | 17.65 | 1,021.95 | 85.60 | 1,107.55 |
| Mon - 10/01/2007 | # of Trans | 7.25 | 502.75 | 42.12 | 544.87 |
| Tue - 10/02/2007 | # of Trans | 19.60 | 1,667.55 | 136.83 | 1,804.38 |
| Wed - 10/03/2007 | # of Trans | 16.15 | 629.85 | 52.71 | 682.56 |
| Thu - 10/04/2007 | # of Trans | 6.30 | 638.65 | 52.92 | 691.57 |
| Fri - 10/05/2007 | # of Trans | 15.07 | 1,233.43 | 103.30 | 1,336.73 |
| Sat - 10/06/2007 | # of Trans | 59.45 | 1,587.55 | 132.98 | 1,720.53 |
| Sun - 10/07/2007 | # of Trans | 34.45 | 1,204.55 | 100.87 | 1,305.42 |
| Mon - 10/08/2007 | # of Trans | 13.80 | 736.20 | 61.65 | 797.85 |
| Tue - 10/09/2007 | # of Trans | 15.95 | 899.05 | 75.31 | 974.36 |
| Wed - 10/10/2007 | # of Trans | 32.10 | 981.25 | 80.63 | 1,061.88 |
| Thu - 10/11/2007 | # of Trans | 14.80 | 618.20 | 51.75 | 669.95 |
| Fri - 10/12/2007 | # of Trans | 15.58 | 753.87 | 62.56 | 816.43 |
| Sat - 10/13/2007 | # of Trans | 20.80 | 857.09 | 71.78 | 928.87 |
| Sun - 10/14/2007 | # of Trans | 18.60 | 1,174.40 | 98.39 | 1,272.79 |
| Mon - 10/15/2007 | # of Trans | 8.60 | 329.40 | 27.61 | 357.01 |
| Tue - 10/16/2007 | # of Trans | 23.25 | 651.70 | 53.99 | 705.69 |
| Wed - 10/17/2007 | # of Trans | 122.48 | 612.02 | 51.28 | 663.30 |
| Thu - 10/18/2007 | # of Trans | 8.60 | 999.47 | 81.85 | 1,081.32 |
| Fri - 10/19/2007 | # of Trans | 32.45 | 921.55 | 77.13 | 998.68 |

| Date | | Sale Disc | Subtotal | Sale Tax | Sale Total |
|------|---|-----------|----------|----------|------------|
| Sat - 10/20/2007 | # of Trans | 4.45 | 512.55 | 42.96 | 555.51 |
| Sun - 10/21/2007 | # of Trans | 47.82 | 1,192.08 | 92.95 | 1,285.03 |
| Mon - 10/22/2007 | # of Trans | 19.70 | 1,083.30 | 90.72 | 1,174.02 |
| Tue - 10/23/2007 | # of Trans | 2.95 | 217.05 | 18.21 | 235.26 |
| Wed - 10/24/2007 | # of Trans | 11.40 | 338.10 | 28.33 | 366.43 |
| Thu - 10/25/2007 | # of Trans | 3.75 | 597.25 | 50.05 | 647.30 |
| Fri - 10/26/2007 | # of Trans | 6.25 | 658.75 | 55.17 | 713.92 |
| Sat - 10/27/2007 | # of Trans | 41.80 | 1,136.65 | 85.77 | 1,222.42 |
| Sun - 10/28/2007 | # of Trans | 31.90 | 1,373.10 | 115.02 | 1,488.12 |
| Mon - 10/29/2007 | # of Trans | 0.75 | 858.25 | 71.91 | 930.16 |
| Tue - 10/30/2007 | # of Trans | 4.70 | 584.30 | 48.94 | 633.24 |
| Wed - 10/31/2007 | # of Trans | 19.40 | 952.55 | 79.20 | 1,031.75 |
| Thu - 11/01/2007 | # of Trans | 9.80 | 384.15 | 31.61 | 415.76 |
| Fri - 11/02/2007 | # of Trans | 20.35 | 907.65 | 76.02 | 983.67 |
| Sat - 11/03/2007 | # of Trans | 37.38 | 942.07 | 72.04 | 1,014.11 |
| Sun - 11/04/2007 | # of Trans | 26.53 | 825.97 | 69.17 | 895.14 |
| Mon - 11/05/2007 | # of Trans | 9.25 | 456.75 | 38.25 | 495.00 |
| Tue - 11/06/2007 | # of Trans | 24.70 | 548.80 | 45.96 | 594.76 |
| Wed - 11/07/2007 | # of Trans | 19.30 | 1,282.70 | 107.48 | 1,390.18 |
| Thu - 11/08/2007 | # of Trans | 5.65 | 538.35 | 45.09 | 583.44 |
| Fri - 11/09/2007 | # of Trans | 49.20 | 1,635.75 | 133.87 | 1,769.62 |
| Sat - 11/10/2007 | # of Trans | 24.23 | 1,091.27 | 91.42 | 1,182.69 |
| Sun - 11/11/2007 | # of Trans | 1.80 | 791.20 | 66.30 | 857.50 |
| | | 52.60 | 1,217.40 | 101.96 | 1,319.36 |

| Date | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Mon - 11/12/2007 |  | 19.45 | 1,104.05 | 92.46 | 1,196.51 |
| Tue - 11/13/2007 |  | 40.95 | 1,241.55 | 104.00 | 1,345.55 |
| Wed - 11/14/2007 |  | 18.55 | 1,118.35 | 92.51 | 1,210.86 |
| Thu - 11/15/2007 |  | 78.35 | 1,990.34 | 161.00 | 2,151.34 |
| Fri - 11/16/2007 |  | 28.75 | 1,265.70 | 105.41 | 1,371.11 |
| Sat - 11/17/2007 |  | 45.75 | 2,322.25 | 194.46 | 2,516.71 |
| Sun - 11/18/2007 |  | 20.60 | 1,052.40 | 88.12 | 1,140.52 |
| Mon - 11/19/2007 |  | 88.00 | 2,448.95 | 204.60 | 2,653.55 |
| Tue - 11/20/2007 |  | 5.55 | 1,246.40 | 103.84 | 1,350.24 |
| Wed - 11/21/2007 |  | 6.70 | 2,113.75 | 176.49 | 2,290.24 |
| Fri - 11/23/2007 |  | 37.55 | 1,279.35 | 72.25 | 1,351.60 |
| Sat - 11/24/2007 |  | 31.75 | 987.25 | 82.69 | 1,069.94 |
| Sun - 11/25/2007 |  | 5.85 | 1,150.15 | 96.33 | 1,246.48 |
| Mon - 11/26/2007 |  | 15.25 | 789.75 | 66.17 | 855.92 |
| Tue - 11/27/2007 |  | 25.60 | 1,016.35 | 84.54 | 1,100.89 |
| Wed - 11/28/2007 |  | 16.30 | 1,447.70 | 121.30 | 1,569.00 |
| Thu - 11/29/2007 |  | 25.60 | 661.40 | 55.42 | 716.82 |
| Fri - 11/30/2007 |  | 18.30 | 666.70 | 55.87 | 722.57 |
| Sat - 12/01/2007 |  | 58.13 | 2,182.37 | 182.80 | 2,365.17 |
| Sun - 12/02/2007 |  | 6.45 | 700.50 | 58.10 | 758.60 |
| Mon - 12/03/2007 |  | 23.11 | 1,128.89 | 94.61 | 1,223.50 |
| Tue - 12/04/2007 |  | 36.10 | 1,320.90 | 110.62 | 1,431.52 |
| Wed - 12/05/2007 |  | 23.10 | 945.85 | 74.41 | 1,020.26 |
| Thu - 12/06/2007 |  |  |  |  |  |

| Date | | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Fri - 12/07/2007 | # of Trans | 26.55 | 1,509.45 | 126.42 | 1,635.87 |
| Sat - 12/08/2007 | # of Trans | 2.35 | 843.65 | 70.70 | 914.35 |
| Sun - 12/09/2007 | # of Trans | 34.35 | 1,989.65 | 166.63 | 2,156.28 |
| Mon - 12/10/2007 | # of Trans | 79.85 | 2,218.15 | 185.81 | 2,403.96 |
| Tue - 12/11/2007 | # of Trans | 27.80 | 1,006.20 | 84.25 | 1,090.45 |
| Wed - 12/12/2007 | # of Trans | 31.15 | 1,421.85 | 116.99 | 1,538.84 |
| Thu - 12/13/2007 | # of Trans | 30.90 | 1,680.10 | 140.73 | 1,820.83 |
| Fri - 12/14/2007 | # of Trans | 50.30 | 2,197.65 | 180.67 | 2,378.32 |
| Sat - 12/15/2007 | # of Trans | 40.25 | 2,076.75 | 173.92 | 2,250.67 |
| Sun - 12/16/2007 | # of Trans | 84.90 | 3,191.55 | 266.75 | 3,458.30 |
| Mon - 12/17/2007 | # of Trans | 23.15 | 1,389.85 | 112.35 | 1,502.20 |
| Tue - 12/18/2007 | # of Trans | 69.78 | 2,536.67 | 191.84 | 2,728.51 |
| Wed - 12/19/2007 | # of Trans | 68.23 | 2,872.77 | 232.69 | 3,105.46 |
| Thu - 12/20/2007 | # of Trans | 199.35 | 2,789.27 | 238.57 | 3,027.84 |
| Fri - 12/21/2007 | # of Trans | 59.45 | 2,722.50 | 227.48 | 2,949.98 |
| Sat - 12/22/2007 | # of Trans | 108.10 | 2,751.90 | 230.50 | 2,982.40 |
| Sun - 12/23/2007 | # of Trans | 218.65 | 2,056.35 | 172.30 | 2,228.65 |
| Mon - 12/24/2007 | # of Trans | 5.70 | 1,294.80 | 108.48 | 1,403.28 |
| Wed - 12/26/2007 | # of Trans | 174.85 | 847.15 | 71.00 | 918.15 |
| Thu - 12/27/2007 | # of Trans | 8.60 | 697.40 | 58.41 | 755.81 |
| Fri - 12/28/2007 | # of Trans | 11.75 | 750.25 | 62.86 | 813.11 |
| Sat - 12/29/2007 | # of Trans | 14.70 | 763.30 | 63.95 | 827.25 |
| Sun - 12/30/2007 | # of Trans | 18.55 | 904.45 | 75.73 | 980.18 |
| Mon - 12/31/2007 | # of Trans | 6.45 | 838.55 | 70.23 | 908.78 |

|  |  | 19.80 | 597.94 | 50.07 | 648.01 |
|---|---|---|---|---|---|
|  | 4,272 | 6,787.39 | 207,339.85 | 17,077.92 | 224,417.77 |
| **Grand Totals** | 4,272 | 6,787.39 | 207,339.85 | 17,077.92 | 224,417.77 |

# Daily Sales by Store

1/1/2008 - 1/31/2008

2 - Kolo Soho

| Wed - 01/02/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| | | 36.30 | 553.20 | 46.29 | 599.49 |
| Thu - 01/03/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 21.05 | 587.90 | 39.00 | 626.90 |
| Fri - 01/04/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 46.40 | 1,919.60 | 160.81 | 2,080.41 |
| Sat - 01/05/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 14.95 | 802.55 | 67.22 | 869.77 |
| Sun - 01/06/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 21.46 | 1,025.55 | 85.88 | 1,111.43 |
| Mon - 01/07/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 10.55 | 974.06 | 78.74 | 1,052.80 |
| Tue - 01/08/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 0.00 | 323.00 | 27.03 | 350.03 |
| Wed - 01/09/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 72.35 | 1,060.65 | 88.82 | 1,149.47 |
| Thu - 01/10/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 9.05 | 386.95 | 32.42 | 419.37 |
| Fri - 01/11/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 37.70 | 735.30 | 61.60 | 796.90 |
| Sat - 01/12/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 49.03 | 1,282.47 | 107.41 | 1,389.88 |
| Sun - 01/13/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 18.30 | 977.70 | 81.91 | 1,059.61 |
| Mon - 01/14/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 34.50 | 721.50 | 60.44 | 781.94 |
| Tue - 01/15/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 35.70 | 1,663.20 | 113.03 | 1,776.23 |
| Wed - 01/16/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 51.20 | 1,270.80 | 106.42 | 1,377.22 |
| Thu - 01/17/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 3.90 | 268.10 | 22.44 | 290.54 |
| Fri - 01/18/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 12.15 | 681.85 | 57.12 | 738.97 |
| Sat - 01/19/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 76.55 | 1,247.45 | 104.47 | 1,351.92 |
| Sun - 01/20/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 15.25 | 1,621.75 | 135.82 | 1,757.57 |
| Mon - 01/21/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 12.00 | 897.00 | 75.14 | 972.14 |
| Tue - 01/22/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 5.75 | 582.20 | 48.20 | 630.40 |
| Wed - 01/23/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 10.00 | 152.00 | 12.74 | 164.74 |

|  | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Thu - 01/24/2008 |  | 5.45 | 352.55 | 29.53 | 382.08 |
| Fri - 01/25/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|  |  | 25.15 | 906.85 | 75.97 | 982.82 |
| Sat - 01/26/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|  |  | 37.30 | 1,051.70 | 79.71 | 1,131.41 |
| Sun - 01/27/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|  |  | 15.05 | 850.95 | 71.28 | 922.23 |
| Mon - 01/28/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|  |  | 28.10 | 723.85 | 60.06 | 783.91 |
| Tue - 01/29/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|  |  | 12.00 | 633.00 | 53.02 | 686.02 |
| Wed - 01/30/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|  |  | 11.15 | 395.85 | 33.19 | 429.04 |
| Thu - 01/31/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|  |  | 20.35 | 1,008.65 | 72.56 | 1,081.21 |
|  | 516 | 748.68 | 25,658.18 | 2,088.27 | 27,746.45 |
| **Grand Totals** | 516 | 748.68 | 25,658.18 | 2,088.27 | 27,746.45 |

## Daily Sales by Store

2/1/2008 - 2/10/2008

2 - Kolo Soho

| | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Fri - 02/01/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 12.50 | 82.50 | 6.92 | 89.42 |
| Sat - 02/02/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 16.45 | 897.55 | 75.20 | 972.75 |
| Sun - 02/03/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 0.00 | 544.00 | 45.59 | 589.59 |
| Mon - 02/04/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 59.75 | 1,844.20 | 153.90 | 1,998.10 |
| Tue - 02/05/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | -5.00 | 351.00 | 29.38 | 380.38 |
| Wed - 02/06/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 38.44 | 1,177.76 | 98.05 | 1,275.81 |
| Thu - 02/07/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 4.80 | 807.70 | 67.66 | 875.36 |
| Fri - 02/08/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 24.75 | 1,356.20 | 113.04 | 1,469.24 |
| Sat - 02/09/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 20.75 | 672.25 | 56.31 | 728.56 |
| Sun - 02/10/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 5.50 | 561.50 | 47.03 | 608.53 |
| | 152 | 177.94 | 8,294.66 | 693.08 | 8,987.74 |
| **Grand Totals** | **152** | **177.94** | **8,294.66** | **693.08** | **8,987.74** |

# EXHIBIT G

O'CONNELL, FLAHERTY & ATTMORE, L.L.C.

ATTORNEYS AT LAW

280 TRUMBULL STREET
HARTFORD, CONNECTICUT 06103-3598
TELEPHONE (860) 548-1300
FACSIMILE (860) 548-0023
WWW.OFALAW.COM

OTHER OFFICES

1350 MAIN STREET, SPRINGFIELD, MA 01103
22 MAIN STREET, MOOSUP, CT 06354
56 NEWTOWN ROAD, DANBURY, CT 06810
65 LASALLE ROAD, WEST HARTFORD, CT 06107

MICHAEL D. O'CONNELL
E-Mail: MOCONNELL@OFALAW.COM

November 7, 2007

*Via Facsimile No. 212.977.5133*

John A. Golieb
Muchnick, Golieb and Golieb, P.C.
200 Park Avenue South
Suite 1700
New York, NY 10003

*Re:     Kolo Retail, LLC/Kate's Paperie LTD*

Dear Attorney Golieb:

      As you are aware, I represent Kolo Retail, LLC ("Kolo"), in connection with its dealings with Kate's Paperie, LTD. Please be advised that until the existing differences between the parties are resolved, Kolo will transmit its monthly rental payments for the Spring Street shop to our firm, to be held in escrow. Upon receipt of each payment, I will forward you a copy of the rental check so there is no confusion as to the timeliness of the payments. Enclosed is a copy of the check for the November 2007 rent.  Please contact me as soon as possible if you have any issues or concerns with this arrangement.  Thank you.

                              Very Truly Yours,

                              O'CONNELL, FLAHERTY
                              & ATTMORE, L.L.C.

                              Michael D. O'Connell

cc:     Keith Werner

Enclosure

1653

**KOLO RETAIL LLC (STORE)**
241 ASYLUM ST., 6TH FLOOR
HARTFORD, CT 06103

SOVEREIGN BANK
6-7515-110

November 01, 2007

PAY
TO THE
ORDER OF

O'CONNELL, FLAHERTY & ATTMORE, LLC

Two thousand eight hundred twelve and 50 / 100 Dollars

DATE

•••••••••••••2,812.50
AMOUNT

O'CONNELL. FLAHERTY & ATTMORE. LLC
280 Trumbull Street
Hartford. CT 06103-3598
USA

Escrow
Kate's Paperie Ltd

⑈0016531⑈ ⑆0110751501⑆ 50104946186⑈

---

**KOLO RETAIL LLC (STORE)**

1653

| VENDOR: | OCONNELL | | | | | | |
| REMIT TO: | O'CONNELL, FLAHERTY & ATTMORE, LLC | | CHECK: 0000001653 | | DATE: | 11/1/2007 | |
| | | | COMMENT: | | | | |

| INVOICE | DATE | VOUCHER | COMMENT | AMOUNT | DISCOUNT | NET AMOUNT |
|---------|------|---------|---------|--------|----------|------------|
| Escrow 11/07 | 11/1/2007 | 0000001235 | Escrow 11/07 Rent-----Kate's Paperie LTD | 2,812.50 | 0.00 | 2,812.50 |
| | | | TOTALS | 2,812.50 | 0.00 | 2,812.50 |

KP 0123

# EXHIBIT H

1

2     UNITED STATES DISTRICT COURT

      SOUTHERN DISTRICT OF NEW YORK

3     - - - - - - - - - - - - - - - -x

      KOLO, LLC,

4

                        Plaintiff,

5

            -v-                          Index No.

6                                        07 Civ. 10653

                                         (CM)

7     KATE'S PAPERIE, LTD.,

8                        Defendant.

      - - - - - - - - - - - - - - - -x

9

10

11        DEPOSITION of KEITH WERNER, taken by

12    Defendant, at the offices of Goldberg Segalla, 111

13    John Street, New York, New York, pursuant to

14    Order, on February 12, 2008, commencing at 10:10

15    a.m., before Jeffrey Benz, a Certified Realtime

16    Reporter, Registered Merit Reporter and Notary

17    Public within and for the State of New York.

18

19

20

21

22

23

24

25

Page 6

Werner

1
2    A.  Yes.  I do.
3    Q.  And what is that?
4    A.  President.
5    Q.  And do you have a position at Kolo, LLC,
6    the parent?
7    A.  Yes, I do.
8    Q.  And what is that?
9    A.  President.
10   Q.  So you're -- and first, with regard to
11   Kolo International, Ltd., do you have a position
12   with that entity?
13   A.  No.
14   Q.  What's the ownership structure of Kolo
15   International, Ltd.?  Who owns it?
16   A.  It's a wholly owned sub of Kolo, LLC.
17   Q.  I see.  As president of Kolo, LLC,
18   you're in a position to be aware of the operations
19   and activities of Kolo International, Ltd., right?
20   A.  Yes.
21   Q.  For how long have you been president of
22   Kolo Retail, LLC?
23   A.  Approximately two years.
24   Q.  What years would that be?
25   A.  That would be 2000 -- mid year 2006,

Page 7

Werner

1
2    approximately, through today.
3         MR. VARGA:  Sorry, is that Kolo Retail
4    or just Kolo?
5         MR. VERSFELT:  This was Kolo Retail.
6    A.  Uh-huh.
7    Q.  And for how long have you been president
8    of Kolo, LLC?
9    A.  As of January 1, 2008.
10   Q.  Okay.  When did you start your
11   employment with Kolo Retail, LLC?
12   A.  Since the inception.
13   Q.  When was that?
14   A.  I think it's been four years now.
15   Approximately four years.  I don't know the
16   specific date of the incorporation, but from the
17   inception of when we incorporated.
18   Q.  And when you say we, who do you refer
19   to?
20   A.  Kolo, LLC.
21   Q.  Were you employed at Kolo, LLC before
22   Kolo Retail was incorporated?
23   A.  Yes.
24   Q.  How long had you been with Kolo, LLC?
25   A.  Since 1998.

Page 8

Werner

1
2    Q.  And at what position did you start with
3    Kolo, LLC?
4    A.  Executive vice president.
5    Q.  Okay.  All right.  Give me a brief
6    sketch of your schooling, please.
7    A.  I graduated from the University of
8    Massachusetts.
9    Q.  What year?
10   A.  I think it was 1985.
11   Q.  You're not sure what class you graduated
12   in?
13   A.  Not necessarily.
14   Q.  What do you mean, not necessarily?
15   A.  I don't remember.
16   Q.  Well, do you go back to alumni events?
17   A.  No.
18   Q.  You really don't remember what class you
19   were in when you graduated from college?
20   A.  I really don't.
21   Q.  Do you remember your birth date?
22   A.  Yes.
23   Q.  Okay, what was that?
24   A.  9/13/62.
25   Q.  What did you major in at the University

Page 9

Werner

1
2    of Massachusetts?
3    A.  Psychology.
4    Q.  Any where did you go to high school,
5    Mr. Werner?
6    A.  William Howard Taft, in Woodland Hills,
7    California.
8    Q.  Did you grow up in California?
9    A.  Partly.
10   Q.  Which part?
11   A.  The latter part.
12   Q.  What years?
13   A.  1977 through approximately 1982.
14        I graduated high school in 1980.
15   Q.  Okay.  And what were you doing during
16   the fall immediately after your graduation from
17   high school?
18   A.  I don't recall.
19   Q.  Did you go immediately to college?
20   A.  Yes.
21   Q.  What college?
22   A.  Santa Barbara.
23   Q.  Is that the full name?
24   A.  Santa Barbara College, yes.
25   Q.  Is that located in Santa Barbara?

3 (Pages 6 to 9)

Page 14

Werner

1  
2      A. I was studying psychology. I had to
3  take an art course. I had to take -- I was
4  involved in a course, metallurgy.
5          MR. VARGA: As in dealing with metal?
6          THE WITNESS: It was a requirement,
7  science requirement.
8      A. That's as much as I can recall right
9  now.
10     Q. Okay. So did you get your degree from
11 the University of Massachusetts in the early part
12 of 1985?
13     A. I believe it was.
14     Q. So this all refreshes your recollection
15 that you graduated in 1985?
16     A. Yes.
17     Q. Armed with your new degree, did you --
18     A. Can I clarify something?
19     Q. Of course. Let me say for the record,
20 you can always clarify something.
21     A. I went through ceremony in the summer,
22 or the May of 1984, and then finished courses at
23 the end of December 1985. That's why it's -- I
24 can't recall exactly when the degree was. But
25 that's more or less the chronology of it.

Page 15

Werner

1  
2          MR. VARGA: So you had the -- the degree
3  ceremony, so to speak, the graduation, before
4  you actually finished.
5          THE WITNESS: Yes, yeah, yeah.
6      Q. How did you manage that?
7      A. I don't know.
8      Q. Did they give you the degree at your May
9  of 1984 ceremony?
10     A. I don't think they did, actually.
11     Q. Okay. Was it a last-minute decision not
12 to give you a degree?
13     A. No. No.
14     Q. Okay.
15         Now, in our chronology, we're going
16 through your educational background, you're armed
17 with a degree from the University of
18 Massachusetts, it's in or around the beginning of
19 1985. Did you continue -- my question is, did you
20 continue your education?
21     A. Yes.
22     Q. And where did you go?
23     A. I've taken -- I've taken a course at
24 Harvard.
25     Q. The executive continuing education

Page 16

Werner

1  
2  program?
3      A. Yes.
4      Q. And could you briefly describe that.
5      A. That was advanced financial analysis.
6      Q. A rigorous program, I assume.
7      A. Yeah. Yes.
8      Q. For how long is the course of study?
9      A. This was only for one semester.
10     Q. Okay. And when was that?
11     A. I'm not -- I'm not sure. I want to say
12 it had to be sometime between 1989 and 1990,
13 something like that. I'm sorry. I don't recall.
14     Q. And have you had any other continuing
15 educational initiatives since then?
16     A. No.
17     Q. Okay. Now, in terms of your -- have you
18 ever taught a course in connection with any
19 educational institution?
20     A. No.
21     Q. Okay. Now, then, in terms of your work
22 history, when did you start working a full-time
23 job after September -- I'm sorry, after January of
24 1985?
25     A. I think it was right after, or -- maybe

Page 17

Werner

1  
2  three months, somewhere in April of 1986.
3      Q. Where was that?
4      A. That was in Los Angeles, working for a
5  mortgage banking company.
6      Q. What did you do at that mortgage banking
7  company?
8      A. Originate and underwrite loans.
9      Q. What was the name of the company?
10     A. Cort Financial, C-O-R-T.
11     Q. In connection with your originating and
12 underwriting mortgage loans, did you work with the
13 paperwork requirements for mortgage lending?
14     A. Can you rephrase that?
15     Q. Okay. Did you work with the federal
16 paperwork requirements in connection with the
17 mortgage loans that you originated and underwrote
18 while at Cort Financial?
19     A. No, that --
20         MR. VARGA: Objection to form.
21     A. No.
22     Q. You are aware, aren't you, that there
23 are federal forms for Fannie Mae or Ginnie Mae
24 qualifying mortgages?
25     A. I'll clarify. Yes. Yes, I did.

5 (Pages 14 to 17)

Page 22

```
 1                    Werner
 2        MR. VARGA:  Objection to form.
 3    Q.  Let me rephrase it.
 4        Please tell me the name of that company.
 5    A.  Werner & Company.
 6    Q.  And what did Werner & Company do?
 7    A.  We managed assets, mostly real estate,
 8  and we were involved with turning around
 9  nonperforming assets.
10    Q.  Any particular types of nonperforming
11  assets?
12    A.  It would include real estate, mostly,
13  but at times other businesses that were related to
14  the client.
15    Q.  How many employees at Werner & Company?
16    A.  At which time?
17    Q.  When you opened up the company.
18    A.  Just two.
19    Q.  You and?
20    A.  One other person.
21    Q.  In what capacity?
22        What capacity did that other person have
23  at the company?
24    A.  Oh.  Mostly in sales.
25    Q.  You did have a title at Werner & Company
```

Page 23

```
 1                    Werner
 2  when you opened it?
 3    A.  I did.
 4    Q.  What was that?
 5    A.  President.
 6    Q.  Okay.  Can you give with me an idea of
 7  what the dollar value was of the assets that you
 8  were managing, at the time?
 9    A.  Are you asking about the beginning or
10  when -- at what point in time?
11    Q.  First the beginning.
12    A.  The beginning was zero.
13    Q.  Okay.  What did it ultimately get up to?
14    A.  Somewhere in the neighborhood of about 5
15  to 7 million.
16    Q.  When you reached 5 to 7 million, in
17  assets under management, at Werner & Company,
18  about what time would that have been?  About what
19  date would that have been?
20    A.  I think it was around 1994 or '95,
21  somewhere in there.
22    Q.  Okay.  Did you leave Werner & Company in
23  the time frame of 1994 to 1995?
24    A.  No.
25    Q.  How did you separate from the company?
```

Page 24

```
 1                    Werner
 2  Or did you separate from the company?
 3    A.  I did not.
 4    Q.  Are you still a principal at Werner &
 5  Company?
 6    A.  I am.
 7    Q.  And how many employees does the company
 8  have now?
 9    A.  Just one.
10    Q.  Who is that?
11    A.  I'm sorry, two.  Myself and one other
12  person.
13    Q.  Are you still the president?
14    A.  Yes.
15    Q.  And is the other person still in sales?
16    A.  No.
17    Q.  What does the other person do now?
18    A.  Manage day-to-day operations of
19  properties.
20    Q.  And what dollar value of real estate
21  assets are under your management today?
22    A.  Just for clarification, are you asking
23  third-party assets, third-party managed assets, or
24  in total?
25    Q.  In total.
```

Page 25

```
 1                    Werner
 2    A.  In total.
 3        About 4 million.
 4    Q.  And what about third-party managed
 5  assets?
 6    A.  Zero.
 7    Q.  Of the 5 to 7 million in the 1994 to '95
 8  period that you mentioned, what proportion would
 9  have been third-party managed assets?
10    A.  Almost a hundred percent.
11    Q.  Did you have contracts with those third
12  parties who were managing real estate?
13    A.  Yes.
14    Q.  Okay.  Who negotiated those contracts?
15    A.  At times I would.
16    Q.  Who would negotiate them if you were not
17  the person negotiating for your --
18    A.  The salesperson I mentioned.
19    Q.  Okay.  Did you negotiate the larger
20  contracts, typically?
21    A.  Not necessarily by size, no.
22    Q.  The more important contracts?
23    A.  Not necessarily.  It was just a
24  relationship decision.
25    Q.  Okay.  And when you had negotiated a
```

7 (Pages 22 to 25)

Page 30

Werner

1
2    two -- three entities. Kolo. Or are we
3    just --
4        MR. VERSFELT: That's why I
5    intentionally used Kolo.
6        Q. I mean that the 95 percent of your time
7    that is not spent on Werner & Company is spent on
8    one or more of the Kolo entities.
9        A. That's correct.
10       Q. All right. How much of it is spent on
11   Kolo, LLC?
12       A. Currently, you're asking?
13       Q. Yes.
14       A. It's approximately 90 percent.
15       Q. And how do you divide the other 10
16   percent of this 95 percent?
17       A. There's an allocation that we use, and
18   that would be -- I believe it's 8 percent to
19   Retail, and the extra 2 percent to International.
20       Q. So that's an allocation that's applied
21   to your time for accounting purposes?
22       A. Not just accounting purposes.
23       Q. What other purposes?
24       A. Well, just for responsibility,
25   performance issues, financial issues.

Page 31

Werner

1
2        Q. Okay. So is it fair to say that you and
3    Peter Dunn founded Kolo, LLC on or about 1998?
4        A. Yes, sir.
5        Q. And what is Peter Dunn's position at
6    Kolo, if he has one?
7        A. Currently he's the chief executive
8    officer.
9        Q. And what was he before he was -- became
10   CEO?
11       A. President of Kolo.
12       Q. So he was president when you were
13   executive vice president, he became CEO when you
14   became president?
15       A. Yes.
16       Q. Okay. Was there a CEO prior to Peter
17   Dunn, at the company?
18       A. No.
19       Q. You just didn't have a CEO.
20       A. We did not.
21       Q. So Peter Dunn has always been the senior
22   officer of the company?
23       A. Yes.
24       Q. How -- okay.
25           Now, at Werner & Company, where you

Page 32

Werner

1
2    remain the president, do you still do turn-around
3    work?
4        A. No.
5        Q. When was -- what was the last
6    turn-around situation that you worked on with
7    Werner & Company?
8        A. Would you like me to describe the
9    client, or name the client?
10       Q. Both.
11           MR. VARGA: To the extent there is no
12   confidentiality issues in disclosing the
13   client, go ahead. That would be my only
14   concern.
15           THE WITNESS: I don't believe there is.
16   But thank you.
17       A. I think the last client was Moonrise
18   LLC. And I'm sorry, that was a family,
19   predominantly family-owned company that was
20   involved in developing an assisted living project.
21       Q. Where was the project that the family
22   was trying to develop?
23       A. In Connecticut.
24       Q. Where in Connecticut?
25       A. Weathersfield, Connecticut.

Page 33

Werner

1
2        Q. And should I assume it didn't go well
3    for the family?
4        A. That's right. Yes.
5        Q. And Werner & Company came in to turn it
6    around?
7            MR. VARGA: Objection to the prior
8    question.
9        A. Yes.
10       Q. And did you give me a time frame for
11   this yet?
12       A. No. I did not. I -- I think it's
13   sometime between 1997 through 1998. It may have
14   been the latter part of '96, I'm not sure.
15       Q. Fair enough. Did Werner & Company take
16   a stake in Moonrise LLC in connection with the
17   workout?
18       A. Yes. Yes, sir.
19       Q. What percentage did it take?
20       A. 30 percent.
21       Q. Was that pursuant to a contract?
22       A. That was -- no, that was not. No.
23       Q. There was no writing in connection to
24   your taking 30 percent of the company?
25       A. Well, I believe you said contract. We

9 (Pages 30 to 33)

Page 38

Werner

1
2  committee?
3      A. Yes.
4      Q. Tell me, when was the vendor committee
5  set up?
6      A. I don't know the exact date. It must
7  be -- it had to be between February and March of
8  2007.
9      Q. How many creditors, approximately, were
10  represented on the vendors committee?
11      A. I want to say there had to be six, maybe
12  seven, I'm not sure.
13      Q. And you were one of them.
14      A. Correct.
15      Q. You -- when I say you, there, I meant
16  Kolo.
17      A. Yes.
18      Q. But you were the representative of
19  Kolo -- strike that. You are the representative
20  of Kolo that had served on the vendor committee;
21  is that right.
22      A. Yes, as did Peter Dunn.
23      Q. Okay.
24      · Well, when you say there were six or
25  seven representatives on the vendor committee, are

Page 39

Werner

1
2  you saying that you and Peter were two of the six
3  or seven?
4      A. No, I was -- I was referring to
5  companies.
6      Q. Okay. Six or seven companies on the
7  vendor committee, and you and Peter Dunn
8  represented Kolo on the vendor committee.
9      A. That's correct.
10      Q. How often did the vendor committee meet?
11      A. Not often. It went mostly over the
12  phone, two or three times, maybe, in April. It
13  stopped for -- between March and April sometime
14  they had two or three meetings, and then it fell
15  apart where there was nothing that the committee
16  needed to meet again on, till, I want to say,
17  September. There was a big span between the time
18  that they were meeting more frequently to the time
19  that they actually began again.
20      Q. When they were meeting more frequently
21  in March and April, what was the purpose of the
22  meetings?
23      A. To evaluate a proposal given to the
24  committee by Kate's.
25      Q. A proposal to achieve what?

Page 40

Werner

1
2      A. Well, what they wanted to achieve was to
3  get the vendor committee to agree to a -- a
4  reduced amount of a payoff, or some type of
5  workout, on payments, toward the balance --
6  outstanding balances.
7      Q. About what dollar value can you recall
8  the outstanding balances to have been at that
9  time?
10      A. In total?
11      Q. Yes.
12      A. Of the committee.
13      Q. Yes.
14      A. Approximately 1.9.
15      Q. Units?
16      A. Million, sorry.
17      Q. Million.
18      MR. VARGA: You have to finish the
19  sentence.
20      And Mr. Versfelt, you said, "at that
21  time," and I'm just not clear.
22      MR. VERSFELT: I meant, when I asked the
23  question, at the time of March and April of
24  2007.
25      Q. Is that how you understood the question?

Page 41

Werner

1
2      A. I did.
3      Q. Okay. Of that 1.9 -- strike that. Of
4  the approximately 1.9 million that Kate's owed,
5  how much did Kate's owe to Kolo's?
6      A. Approximately $30,000.
7      Q. And that was for goods that Kate's had
8  purchased directly from Kolo.
9      A. That's correct.
10      Q. What sorts of goods does Kolo sell to
11  Kate's, or was Kolo selling to Kate's at that
12  time?
13      A. Photo albums, books, boxes, photo boxes,
14  accessories that work -- that I guess -- go with
15  the product line. Accessories like photo corners
16  and so forth.
17      Q. Okay. During this period of March and
18  April of 2007, when the vendor committee was
19  meeting, were Kate's representatives present at
20  those meetings?
21      A. There was only one meeting that I
22  remember, that Kate's attended, and that was
23  previous, I believe it was sometime between
24  February and March. All other subsequent meetings
25  of the committee, to my knowledge, was done via

11 (Pages 38 to 41)

Page 46

Werner

1
2  the discussion at that dinner?
3      A.  I think it was just to get to know them,
4  what their interests were, what their experience
5  was, what their involvement was, in the company,
6  background on their mother, the beginnings of
7  Kate's, how it started.
8      Q.  Okay. now, let me move into the April
9  time period.  I want to focus on April 2007.  Did
10  there come a time in April when you made a
11  proposal to Kate's, with regard to Kolo and Kate's
12  shops?
13      A.  Yes.
14      Q.  And when was that?
15      Can you narrow it down more specifically
16  than just April of 2007?
17      A.  It was sometime between, I want to say
18  the 5th through the 20th of April.  I think that's
19  what the dates were.
20      Q.  And was the proposal that you made an
21  oral proposal?
22      A.  Not at that time.
23      Q.  What form did it take, then?
24      A.  It was one of the exhibits we saw
25  yesterday.

Page 48

Werner

1
2  proposal in April?
3      A.  I do not know.
4      Q.  Okay.  When you say you don't know, you
5  mean that it is possible that someone else from
6  Kolo made a proposal to Kate's, in the time period
7  prior to your submitting a written proposal in
8  April of 2007, correct?
9      A.  Yes.
10      Q.  So -- okay.
11      Now, tell me what you recall about your
12  submitting a proposal -- a written proposal to
13  Kate's, when you first did so.
14      A.  It -- it preceded a meeting, and it was
15  requested by Kate's that I present them with a
16  proposal.  The way that the proposal conversation
17  came up, and the shop-in-shop, was that Lionel and
18  Leonard met with Peter and I, and they had showed
19  us their idea of what the new store would be,
20  incorporate other shop-in-shops.  They had a
21  diagram that they had indicated that they're
22  already interested in doing shop-in-shops.  And so
23  I subsequently thereafter, and I don't know
24  exactly when, I proceeded with sending Lionel a
25  proposal, as he requested.

Page 47

Werner

1
2      Q.  Okay.  We'll get to that.
3      You said it wasn't oral at that time?
4      A.  It was not.
5      Q.  Did you make an oral presentation at any
6  other time?
7      A.  I did not.
8      Q.  Okay.  So you've never made an oral
9  presentation to --
10      A.  No.
11      Q.  -- Kate's, with regard to a Kolo
12  arrangement with Kate's shops.
13      A.  Not that I can recall, no.
14      Q.  So it's always been paper.
15      A.  Yes.
16      Q.  Okay.  Well, let's go off the record.
17      (A recess was taken.)
18      Q.  Mr. Werner, I want to make sure I
19  understand you correctly.  I believe you just
20  testified before the break that you had not made a
21  proposal to Kate's prior to a written proposal
22  that you submitted to them in April.
23      A.  That's correct.
24      Q.  Did anyone else from Kolo's make a
25  proposal to Kate's, prior to your submission of a

Page 49

Werner

1
2      Q.  Okay.  Let me put before you,
3  Mr. Werner, a document that was marked in a
4  deposition yesterday as Plaintiff's Exhibit 1.
5  Are there -- my question to you is, are there
6  pages in that document that constitute the
7  proposal that you submitted that you've just
8  testified about?
9      A.  Yes.
10      Q.  And can you describe what those pages
11  are, in that exhibit?
12      A.  These pages describe the terms and
13  conditions that we were discussing with Lionel and
14  the Kate's organization.
15      Q.  What pages are you --
16      MR. VARGA:  He's asking --
17      Q.  My question is what pages.
18      MR. VARGA:  What pages.
19      A.  Sorry.  How do you want me to number?
20      MR. VARGA:  This would be the equivalent
21  of third, and the way we described it
22  yesterday, so it would be 3, it would be --
23  the third page to the end.
24      A.  So 7 -- the seventh page --
25      MR. VARGA:  The -- he's asking for the

13 (Pages 46 to 49)

Page 54

Werner
1
2     Q. Okay. Did you write it?
3     A. Write?
4     Q. Did you write the draft letter of intent
5  that appears on pages KP 0028 and KP 0029?
6     A. No.
7     Q. Who did?
8     A. Our attorney.
9     Q. This was prepared by your attorney?
10    A. Uh-huh.
11    Q. And what's that attorney's name? Who is
12  that?
13    A. Paul Aparo.
14    Q. Can you spell that, please?
15    A. Yes, A-P-A-R-O.
16    Q. Where does Paul Aparo practice?
17    A. Connecticut.
18    Q. Is he with a firm?
19    A. He is, O'Connell Flaherty & Attmore.
20    Q. Okay.
21    A. I want to clarify something.
22    Q. Okay.
23    A. I'm not certain if he drafted it or if
24  he read it, after I gave it to him. I really -- I
25  have to think how it went. I don't remember if he

Page 55

Werner
1
2  gave me the original document, and I looked at it,
3  or if I gave him the original document to review.
4     Q. You gave him the original document,
5  where would you have gotten it?
6     A. I probably have a file that was similar
7  to the -- the form.
8     Q. So is this draft similar to a form -- a
9  document in a form file that you keep in your
10  office?
11    A. Yes.
12    Q. Okay. Have you used that -- a form
13  similar to this, in the past?
14    A. Not necessarily with Kolo, and not
15  necessarily with regard to shop-in-shop, no.
16    Q. Can you recall when you might have used
17  a form similar to this?
18    A. I've used letters of intent in other
19  business transactions such as acquisitions,
20  before. Acquiring a company, if -- interest,
21  something to that extent.
22    Q. Let me ask again. Do you recall using a
23  form similar to this, in any of those past
24  situations?
25    A. Yes.

Page 56

Werner
1
2     Q. And so is it fair to say that this form
3  is one that you had derived over time in
4  connection with prior transactions?
5        MR. VARGA: Objection to form.
6     A. I don't know, to be honest with you. I
7  just don't know if that -- if the letter of intent
8  that we're looking at was used in any other
9  transaction, if that's your question, I'm not -- I
10  don't think it has been.
11    Q. My question is this: You've testified
12  here this morning that this letter of intent
13  either came from you and was reviewed by Mr. Paul
14  Aparo, or came from Mr. Paul Aparo and was
15  reviewed by you.
16    A. Correct.
17    Q. You've also -- that's correct, right?
18    A. Yes.
19    Q. You've also testified that this draft
20  letter of intent corresponds to the type of letter
21  of intent that you have used in prior
22  transactions; is that correct?
23    A. Yes, it is.
24    Q. Would those prior transaction have been
25  Kolo transactions?

Page 57

Werner
1
2     A. Not necessarily.
3     Q. Werner & Company transactions?
4     A. Possibly.
5     Q. So was Mr. Paul Aparo the attorney for
6  Werner & Company?
7     A. Yes.
8     Q. So it's possible -- well, let me ask it
9  this way: Do you recall whether Mr. Paul Aparo
10  drafted a letter of intent form similar to this
11  draft letter of intent, in connection with prior
12  transactions of Werner & Company?
13    A. I don't recall.
14    Q. Okay. If you had drafted this -- strike
15  that.
16        If you had prepared this draft letter of
17  intent and then submitted it to Paul Aparo for his
18  review, where would you have gotten the words?
19    A. Someone might have given it to me, as a
20  document that they were using, which I then
21  applied to this situation.
22    Q. Okay. And who would that someone have
23  been?
24    A. A party to another transaction.
25    Q. Okay. So it's -- I take it your

15 (Pages 54 to 57)

Page 62

```
1              Werner
2   the word draft.  That's your testimony, right?
3      A.  I do.  Yes.
4      Q.  Okay.  You do?
5      A.  Sorry.  I do not remember having any
6   significance, using the word draft.
7      Q.  Okay.  Now, that was -- according to the
8   date on the e-mail, Mr. Werner, that is the first
9   page of Plaintiff's Exhibit 9, that draft letter
10  of intent went to Lionel Flax on Sunday, May 6.
11  Correct?
12     A.  Yes.
13     Q.  Okay.  Now --
14         MR. VERSFELT:  Is 30 one of the exhibits
15  here?
16         MR. VARGA:  I don't know if that was
17  marked.
18         MR. VERSFELT:  Well, we'll mark it now.
19         Please mark this as Defendant's A.
20         (E-mail exchange between Mr. Werner and
21  Lionel Flax, with Bates number KP 0030, was
22  marked Defendant's Exhibit A for
23  identification, as of this date.)
24     Q.  I've had put before you, Mr. Werner, a
25  document that's been marked as Defendant's Exhibit
```

Page 63

```
1              Werner
2      A.  It's got a Bates number on it of KP 0030.  Do
3   you have that document?
4      A.  Yes.
5      Q.  Can you tell me what it is?
6      A.  It appears that this is an e-mail
7   starting from Lionel, to myself, and below that it
8   appears that there's an e-mail from Lionel -- I'm
9   sorry, from myself to Lionel.
10     Q.  Yeah.  Now, maybe we can shorten things
11  by comparing the e-mail on the bottom of
12  Defendant's Exhibit A with the e-mail that is on
13  Plaintiff's Exhibit 9.
14         Let me put the first page of Plaintiff's
15  Exhibit 9, let me put this before you.
16         MR. VARGA:  Is it KP 0027?
17         MR. VERSFELT:  Yes.  And KP 0030.
18     Q.  Do you see that the e-mail that is the
19  lower e-mail on Defendant's Exhibit A is the same
20  e-mail as appears on Plaintiff's Exhibit 9?
21     A.  It appears that the body of this one --
22     Q.  Which one?
23     A.  Sorry, Exhibit A.
24     Q.  Yes.
25     A.  The body of my e-mail to Lionel seems to
```

Page 64

```
1              Werner
2   be similar to Exhibit-- Exhibit 9.
3         MR. VARGA:  Plaintiff's Exhibit 9.
4      A.  Sorry, Plaintiff's Exhibit 9.
5      Q.  Is it the same e-mail?
6      A.  It appears that -- I would have to go
7   through word by word.  It appears that it is.
8      Q.  Okay.  That's fair enough.  I'll
9   represent to you that it is.
10     A.  Okay.
11     Q.  It's the same.
12         One came out of your computer and one
13  came out of our computer.
14     A.  Okay.
15     Q.  But the text of the e-mail itself is
16  identical.  And does that refresh your
17  recollection that on Defendant's Exhibit A, the
18  e-mail that is above your e-mail, is Lionel's
19  response to your e-mail?
20         MR. VARGA:  Objection to form.
21     A.  Can you rephrase, please?
22     Q.  Sure.  When you look at Defendant's
23  Exhibit A, now, is the top e-mail from Lionel Flax
24  to you?
25     A.  Yes.
```

Page 65

```
1              Werner
2      Q.  Is it in response to the e-mail that you
3   sent to him that appears immediately below it?
4      A.  I -- I don't know.  It -- it looks like
5   it could be, but I don't know if it was cut and
6   pasted.  What's not clear -- it doesn't seem like
7   it's a string that flows.
8      Q.  Well, let's do it this way.
9      A.  Okay.
10     Q.  Do you see in your e-mail, it's -- you
11  can look at either exhibit, because the e-mail
12  from you is the same on both of them.  We've --
13  we've established that.  Now, I would like to --
14         MR. VARGA:  The body of the language.
15     Q.  The body of the e-mail.  Yes.
16         I understand that the attachment that is
17  on Plaintiff's Exhibit 9 --
18         MR. VARGA:  And also the tag, the date
19  and all that, so if you want to clarify that.
20         MR. VERSFELT:  I accept that.
21     Q.  The body of the typed text of the e-mail
22  is identical.
23         MR. VARGA:  The message.
24     Q.  Correct?
25     A.  It -- it -- that's what you're saying,
```

17 (Pages 62 to 65)

Page 70

Werner

1    Werner
2    Q.  Okay.  Let me put before you a -- I'll
3    have the court reporter please mark as Defendant's
4    Exhibit B.
5         (Document with Bates numbers KP 0031
6         through 0041 was marked Defendant's Exhibit B
7         for identification, as of this date.)
8         (Discussion off the record.)
9    Q.  Mr. Werner, I've had the court reporter
10   mark an exhibit, Defendant's Exhibit B, and place
11   it in front of you.  Have you had a chance to look
12   that over?
13   A.  No.
14   Q.  Well, please do so.
15        (The witness read.)
16   MR. VARGA:  Also, for the record,
17   Defendant's B is also KP 0031 through 0041.
18   KP 0041.
19   MR. VERSFELT:  Agreed.
20   A.  Okay.
21   Q.  Okay?  You've had a chance to review it?
22   A.  Yes.
23   Q.  So you can see that this appears to be
24   another e-mail string, right?
25   A.  It appears to be, yes.

Page 71

1    Werner
2    Q.  And this e-mail string -- wait a second.
3    Okay.  This e-mail string has the two
4    e-mails that are set forth in Defendant's Exhibit
5    A, plus another one up top.  Is that correct?
6    A.  Yes.
7    Q.  Okay.  Now, is the e-mail toward the top
8    dated May 6, at 8:59 p.m., is that an e-mail from
9    you?
10   MR. VARGA:  You mean in the middle of
11   the page.
12   Q.  Well --
13   A.  It's not at the top.
14   Q.  Where would you say that?  On KP 0031,
15   on the middle of the page.
16   A.  It's not at the top.  It's almost in the
17   middle.  It starts off with forwarded message.
18   Q.  Okay.  We're talking about the same
19   e-mail.  Is that an e-mail from you?
20   A.  Yes, it is.
21   Q.  And what did you say in it?
22   A.  "Here's the original proposal, let me
23   know if you want to get together tomorrow in the
24   city."
25   Q.  Right.  Now were you -- there is an

Page 72

1    Werner
2    attachment at the very top of the exhibit page, KP
3    0031, a -- an electronic marker for an attachment.
4    Do you see that?
5    A.  Yes.
6    Q.  And do you see pages KP 0033 to KP 0041?
7    A.  Yes.
8    Q.  Is that the attachment?
9    A.  That's not the attachment.
10   Q.  It's not.
11   A.  No, it is not.
12        That's not necessarily what I sent.
13   Q.  Okay.  Tell me what makes you think that
14   you didn't send that e-mail.
15   A.  Because the above reference here is from
16   Lionel to Leonard and John Golieb, on October 3,
17   2007.  So I -- I do not believe that was my
18   attachment.  That's not indicative of what I would
19   have expected to see.
20   Q.  Okay.  On the very top, you're pointing
21   out that it -- the entire e-mail string was
22   forwarded on October 3, 2007.
23   A.  No.  I'm not indicating that.
24   Q.  What are you indicating?
25   A.  I'm indicating up to the point of -- on

Page 73

1    Werner
2    Defendant's Exhibit B, where it says forwarded
3    message, from Keith Werner to Lionel, that's what
4    I agree, that that was a string that originated
5    below that, not above that.  It had nothing to do
6    with the above, that I can recall.
7    Q.  Oh, okay.  Maybe you've clarified
8    your -- the misunderstanding -- the
9    miscommunication between you.
10        Do you agree that the message you sent
11   on May 6, 2007, the message that appears just
12   above the middle of the page, on this exhibit, and
13   that says, here is the original proposal, included
14   an attachment?
15   A.  I can't tell, because the -- there is no
16   indication that the attachment was in this e-mail.
17   Q.  Okay.  Could you look at pages KP 0033
18   through 0041.
19        (The witness read.)
20   Q.  Have you reviewed those pages?
21   A.  I have.
22   Q.  Are those pages the original proposal
23   that you submitted to Kate's, for a shop-in-shop
24   at the Soho store?
25   A.  I don't know.

19 (Pages 70 to 73)

Page 78

1           Werner
2      **Q. You sent a proposal to him on May 6.**
3   **Correct?**
4      A. No. I'm not certain of that.
5      **Q. Okay. May I see the e-mails?**
6      A. Yes.
7      **Q. Let me just check here.**
8          **Okay. You sent him an e-mail on May 6**
9   **at 8:59 p.m. that said, Here is the original**
10  **proposal. Correct?**
11     A. That's what I wrote in the e-mail, but
12  whether the proposal as an attachment was attached
13  to that e-mail, I do not know.
14     **Q. So it's possible you sent an e-mail that**
15  **referred to an original proposal that did not have**
16  **an attachment. Is that what you're saying?**
17     A. It's possible that the attachment did
18  not go through, yes.
19     **Q. Fair enough.**
20         **Now that we got that nailed down. But**
21  **you intended to send a proposal to Lionel Flax at**
22  **and about that time, correct?**
23     A. No. I intended to give him the
24  addendum, which contained the information in the
25  proposal that he was referring to, when he said, I

Page 79

1           Werner
2   left it in the office.
3      **Q. Right. You intended to send him the**
4   **addendum that was the proposal. And can you find**
5   **on this table, in any of these marked exhibits,**
6   **the pages that constitute the proposal that you**
7   **intended to send to him?**
8      A. This Plaintiff's --
9          MR. VARGA: 1.
10     A. -- 1, page starting at page 3, to the
11  end, is what I would have intended to give him as
12  an addendum to the LOI.
13     **Q. Good. Thank you.**
14     A. You're welcome.
15     **Q. And did you follow up with him, at or**
16  **about the time of the first week in May, to**
17  **determine whether he had received the proposal**
18  **that you intended to send to him?**
19     A. I don't recall that.
20     **Q. Do you know whether he ever received it?**
21     A. I know that he received it because he
22  referred to it in conversations on the phone.
23     **Q. When were those conversations?**
24     A. Sometime after May 6.
25     **Q. Okay. How much after?**

Page 80

1           Werner
2      A. I don't recall. I really don't recall.
3      **Q. Okay. Now, let me put before you, or**
4   **let me ask the court reporter now to mark an**
5   **exhibit as Defendant's Exhibit C.**
6          (Document with Bates stamp KP 0042 was
7      marked Defendant's Exhibit C for
8      identification, as of this date.)
9      **Q. So Mr. Werner, we have put before you**
10  **Defendant's Exhibit C, which is a single-page**
11  **Bates KP 0042. Can you tell me what that is, sir?**
12     A. This is an e-mail from myself to Lionel.
13     **Q. When is it dated?**
14     A. It's dated May 8.
15     **Q. And what do you say in the first**
16  **sentence of that e-mail, sir?**
17     A. "Just checking in with you to see how
18  you are doing with signing the LOI."
19     **Q. Okay. Now, what was the purpose of your**
20  **asking after the LOI in that first sentence?**
21     A. The purpose of me asking that was to
22  find out if he's reviewed it and if he's ready to
23  sign it, because he had indicated to me that
24  there's a huge urgency to get the shop-in-shop up
25  and running by June 1.

Page 81

1           Werner
2      **Q. Right, okay. So you wanted -- you sent**
3   **it to -- you sent the LOI to him on May 6,**
4   **correct?**
5      A. I believe that to be true. I have to
6   look back here on the dates. There was an
7   attachment here in one of the exhibits that I
8   actually -- I don't see it here. Here it is, yes,
9   it's May 6. I sent the letter of intent to him.
10     **Q. Sunday, May 6.**
11     A. Correct.
12     **Q. Correct. Okay. So Tuesday, you're**
13  **asking how he's doing with it, right?**
14     A. Correct. Tuesday, May 8, yes.
15     **Q. Now, I think this is a Plaintiff's**
16  **exhibit.**
17         MR. VARGA: Which one is that? 41?
18         MR. VERSFELT: 44, KP 44. Well, we will
19     do it this way. We'll mark it. I'll ask the
20     court reporter to mark as the next exhibit a
21     document Bates-numbered KP 0044.
22         (E-mail string, Bates-numbered KP 0044
23     and 0045, was marked Defendant's Exhibit D
24     for identification, as of this date.)
25         MR. VARGA: KP 14?

21 (Pages 78 to 81)

Page 86

```
 1              Werner
 2      I would like you to go through your
 3  e-mails and identify it, if there is one, any
 4  e-mail that suggests you discussed the substance
 5  of your proposal with Lionel Flax between the time
 6  of May 8, when you sent it -- I'm sorry, May 6,
 7  correct that -- May 6, when you sent it to him,
 8  when you sent the LOI to him, and May 10, when he
 9  asked you, did you find it.
10      A.  Are you only referring to e-mail
11  communication?
12      Q.  You have testified this morning that you
13  did not orally discuss the proposal with him.  So
14  I'm asking for e-mail confirmation, one way or the
15  other --
16      A.  No, you did not ask -- excuse me,
17  counselor, you did not ask me about that.  You
18  asked me about the proposal.
19      Q.  Okay.  Where were you on May 6?
20      A.  Where was I?
21      Q.  Yes.
22      A.  I don't recall where I was.
23      Q.  Didn't you just testify this morning
24  that you were in Hong Kong or maybe Japan.
25      A.  I would have to go back in, to be honest
```

Page 87

```
 1              Werner
 2  with you.  There was a -- an e-mail here.
 3      MR. VARGA:  Plaintiff's 9.
 4      A.  Uh-huh.
 5      But what is your question?
 6      Q.  My question is, where were you on or
 7  about May 6 of 2007?  Where, physically, were you?
 8      A.  It appears that I was outside the
 9  country.
10      Q.  Yes, you testified this morning that you
11  were in -- you thought Hong Kong.  First you
12  said --
13      MR. VARGA:  Or Japan.
14      Q.  Remember you said first, I was in Asia.
15  I said, Can you narrow it down?  And you said you
16  thought maybe Hong Kong or maybe Japan, but you
17  were not in this country at that time.  Right?
18      A.  Correct.
19      Q.  And do you recall when you came back?
20      A.  I don't recall the date, no.
21      Q.  Do you recall the e-mail that I've
22  showed you today that said you hoped to get back
23  for the May 7th vendors committee?
24      A.  Yes, I see that.
25      MR. VARGA:  Plaintiff's 9, for the
```

Page 88

```
 1              Werner
 2  record.
 3      MR. VERSFELT:  Very good.  Thank you.
 4      Q.  Now, I'm asking you, did you have a
 5  conversation with Lionel Flax between the time
 6  period of May 6 and May 10?  I want to know
 7  whether you had an oral conversation with him.
 8      A.  I don't recall.
 9      Q.  Okay.  Now I will ask you, can you point
10  to any e-mail that you produced, whether in front
11  of you on the table right now, or otherwise, that
12  will confirm that you had any discussions
13  whatsoever with Lionel Flax as to the substance of
14  your proposal during the time period of May 6 to
15  May 10, 2007?
16      MR. VARGA:  Via e-mail.
17      Q.  That's who I've asked.  I think we've
18  just confirmed that he has no recollection of oral
19  discussions.  Now I want to see if there's any
20  e-mail that might possibly refresh your
21  recollection.
22      A.  Yeah.  According to Defendant's
23  Exhibit D, it doesn't appear that way.
24      Q.  I'm asking a broader question.  I agree
25  with you, that none of the exhibits that are in
```

Page 89

```
 1              Werner
 2  front of you --
 3      MR. VARGA:  He's asking, basically, if
 4  anything on the table --
 5      MR. VERSFELT:  Please, I would like to
 6  finish.
 7      Q.  I'll submit to you, and I think you
 8  agree, that none of the exhibits that we have used
 9  this morning suggest that you had a conversation
10  with Lionel Flax during the period of May 6 to
11  May 10.
12      What I'm asking you now is, do you have
13  any e-mail that I have not put before you this
14  morning that suggests to you that you had a
15  conversation with Lionel Flax about the substance
16  of your proposal, or the LOI, between May 6 and
17  May 10, 2007?
18      A.  I would have to check my records.  As of
19  right now, I have nothing that would indicate
20  that, but I would have to go and check my records
21  again.
22      Q.  Okay.
23      MR. VERSFELT:  Do you have a set of the
24  documents you produced?
25      MR. VARGA:  Yeah.
```

23 (Pages 86 to 89)

Page 94

Werner

1
2      Q.  Just put Plaintiff's Exhibit 1, and then
3  2, and then 3, up to 9, in front of the witness.
4  And then if he wishes to look at the Defendant's
5  exhibits, which he's already said this morning do
6  not refresh his recollection, that's fine with me,
7  too.  I don't think it will take that long.
8  They're only nine exhibits.
9          MR. VARGA:  Once you're done with the
10     document, let us know, and then I'll give you
11     the other one.
12     A.  But you're asking whether or not
13  specifically if there was an e-mail exchange of
14  communication between the 8th and the 10th --
15         MR. VARGA:  The 6th and the 10th.
16     A.  Sorry, the 6th and the 10th, that
17  pertained to the substance of either the addendum,
18  proposal, LOI.  And I'm saying, I'll be happy to
19  look at anything you have, but that doesn't
20  exclude that there may be another e-mail that I
21  may or may not have that would indicate, yes,
22  there was a conversation around substance.
23         I don't know exactly what you mean by
24  that, but I have a feeling that you're looking to
25  see if we discussed the details of any one of the

Page 95

Werner

1
2  three references.
3         So, the answer is, I would be happy to
4  look through it.  That doesn't mean that I would
5  agree that that's the only one.  It's a chance
6  that I might have missed an e-mail.
7         MR. VARGA:  All right.  You have
8  Plaintiff's 2 in front of you.
9         THE WITNESS:  Yeah.
10     This is after that.  This is not in the
11  period that counsel is asking.  This is
12  May 12.  So he's asking between the 6th and
13  the 10th.
14         MR. VARGA:  Well --
15         THE WITNESS:  Is that right?
16         MR. VARGA:  For the record, Plaintiff's
17  Exhibit 2 contains several pages, and take a
18  look through all of them just to make sure,
19  because he's asking you a broad question.
20     A.  Okay, I've seen this one.  That one we
21  just discussed, this e-mail string.
22         MR. VARGA:  Page 2, Plaintiff's 2.
23         MR. VERSFELT:  Robert, do you want to go
24  off the record?
25         MR. VARGA:  No.  Let's have it on the

Page 96

Werner

1
2  record so that his answer is on the record.
3  So are you done with Plaintiff's 2?
4         THE WITNESS:  Yes.
5         MR. VARGA:  Okay.  Plaintiff's 3, one
6  page, it's KP 0124.
7         So that you identify it for the record,
8  if there are any dates in the e-mails, you
9  should tell that, too, so that it gives it a
10  reference.
11     A.  So Plaintiff's Exhibit 3 is referring to
12  e-mails in August -- on August 20.  It's not that
13  area.
14         MR. VARGA:  Plaintiff's Exhibit 4, for
15  the record, contains one page.  It's KP 0125.
16     A.  And then, here again, this is an e-mail
17  during August 17 --
18         MR. VARGA:  Let the record reflect that
19  the witness pointed to the bottom half
20  portion of Plaintiff's Exhibit 4.
21         Go ahead.
22     A.  And then, as you go up, this is an
23  e-mail, again, not involving myself.  This is
24  August 17 between Kim and Lionel.  Kim Hassler and
25  Lionel.  And then the final top of the page --

Page 97

Werner

1
2  actually, I can't tell what that is because --
3         MS. HARRIS:  KP 0124 and 125 go
4  together.  We had discussed that yesterday.
5         MR. VARGA:  So Plaintiff's 3 and 4 go
6  together.  So we established yesterday
7  that --
8     A.  So all of those, Plaintiff's Exhibit 3
9  and 4, are e-mails in August.  It's not in the
10  question.
11         MR. VARGA:  Okay.  I'm putting in front
12  of you Plaintiff's Exhibit 5, which contains
13  three pages.  It is marked KP 003, KP 004,
14  and KP 005.
15     A.  Okay.  These are -- this is an e-mail
16  string in March -- on March 30 and 29th.  So
17  again, this is not relative to what the question
18  is.
19         MR. VARGA:  Putting in front of you
20  Plaintiff's Exhibit 6, which contains two
21  pages, KP 006 and KP 007.
22     A.  Okay.  So these -- this is an e-mail
23  string, I guess you'd say, in March, on March 30
24  and April 2.  So again, nothing's in that period.
25         MR. VARGA:  So that was Plaintiff's 6.

25 (Pages 94 to 97)

Page 102

Werner

1
2    whether or not you had any conversations with
3    Lionel Flax, during the period May 6 to May 10,
4    with regard to the substance of the LOI or the
5    proposal?
6        A.  It does not refresh my memory.
7        Q.  Okay.  For the record, since you,
8    Mr. Werner, have raised the possibility that you
9    might have an e-mail at home or at your office,
10   that you have not yet produced in this action, I
11   want to direct to Mr. Varga, your attorney, the
12   demand that we receive every e-mail relevant to
13   this action, and that we receive it as soon as
14   possible.
15       I say as soon as possible, Robert,
16   because as you know, we're under time pressures,
17   and as you know, both parties were ordered by the
18   court to produce their e-mails prior to Saturday
19   at noon.  Last Saturday.
20       MR. VARGA:  Correct.  The deadline was
21   last Saturday by noon, and just for the
22   record, I had received the fourth pack, the
23   last package from you, from actually
24   Elizabeth, Sunday afternoon, which was past
25   the deadline.

Page 104

Werner

1
2    hundred percent sure.  I want to confirm that
3    there's nothing else out there, and then I
4    respond.
5        MR. VERSFELT:  No, he did respond.
6        MR. VARGA:  Well, he did respond.
7        MR. VERSFELT:  He said, based on
8    everything he's seen, and based on his
9    recollection as it now stands, he has no
10   recollection of a discussion of the substance
11   of the LOI or the proposal with Lionel Flax,
12   during the period May 6, 2007, to May 10,
13   2007.
14       Q.  Correct?
15       A.  Yes.
16       Q.  Okay.  Okay.
17       MR. VARGA:  So --
18       Q.  Let me --
19       MR. VARGA:  Just for the record, my
20   client will conduct a search to determine if
21   there are any e-mails that were potentially
22   missed between -- in this deadline, between
23   5/6 and 5/10.  Agreed?
24       MR. VERSFELT:  Yes.  And if there are
25   any such e-mails, you will produce them super

Page 103

Werner

1
2        MR. VERSFELT:  Yes, indeed.
3        MR. VARGA:  And I don't want to make an
4    issue about it.
5        MR. VERSFELT:  No, I'm not going to make
6    an issue out of it either, but I'm just
7    telling you, I want the record clear that if
8    Mr. Werner had an e-mail that pertains to a
9    communication with anyone at Kate's, I should
10   have had it by Sunday afternoon, when you got
11   our last production, or earlier, and I
12   definitely want it now.
13       MR. VARGA:  Just to clarify, you said
14   all.  All.
15       MR. VERSFELT:  All relating to these
16   shop-in-shop agreement, the proposal, the
17   LOI.  You know perfectly well what I'm
18   talking about.
19       MR. VARGA:  But for now, what he
20   testified to is that --
21       MR. VERSFELT:  What he testified to is
22   on the record.
23       MR. VARGA:  Exactly.  But your question
24   defined the scope between 5/6 and 5/10, and
25   his testimony is basically, I am not a

Page 105

Werner

1
2    pronto.
3        MR. VARGA:  Agreed.
4        MR. VERSFELT:  Okay.
5        MR. VARGA:  Off the record.
6        MR. VERSFELT:  Off the record.
7        (Discussion off the record.)
8        MR. VERSFELT:  Let me ask the court
9    reporter to mark a single document as an
10   exhibit.  It's Bates-stamped KP 0049, and it
11   will be Defendant's Exhibit E.
12       (E-mail from Mr. Werner to Lionel Flax
13   on May 12, 2007, Bates-numbered KP 0049, was
14   marked Defendant's Exhibit E for
15   identification, as of this date.)
16       (The witness reads.)
17       MR. VARGA:  Let us know when --
18       A.  I am.  Yes, I'm ready.
19       Q.  Mr. Werner, can you tell us what this
20   exhibit is?
21       A.  This is an e-mail from myself to Lionel
22   on Saturday, May 12.
23       Q.  And what do you say in your first
24   sentence?
25       A.  "I did receive your faxed LOI."

27 (Pages 102 to 105)

Page 110

Werner

1
2    A.  Because I believe he signed a
3  confidentiality agreement before that.
4    Q.  Okay.  So you're confident that Lionel's
5  signature was on it.
6    A.  Yes.
7    Q.  Had Lionel dated it?
8    A.  I don't remember.
9    Q.  Had Lionel signed -- see under the
10  signature line, where it says, "By its"?
11    A.  Yes, he did sign that.  He put -- yeah.
12    Q.  He put what?
13    A.  I believe he put "president," but I'm
14  not sure, but there was something there.
15    Q.  Yes, okay.  And what did your receipt of
16  that page indicate to you?
17    A.  It indicated that he signed the letter
18  of intent.
19    Q.  Okay.  Now, what did you do with that
20  page?
21    A.  I don't recall.
22    MR. VARGA:  Just --
23    Q.  Well --
24    MR. VARGA:  You --
25    MR. VERSFELT:  Is that an objection?

Page 111

Werner

1
2    MR. VARGA:  Yes.  Objection to form.
3    MR. VERSFELT:  Okay.
4    Q.  What did you do with the page that you
5  received?
6    A.  I don't recall, and I would be
7  speculating if --
8    Q.  Well, I don't know as I want you to
9  speculate.
10    MR. VARGA:  No.
11    A.  Okay.
12    Q.  Did you put it in a file?
13    A.  I don't recall.
14    Q.  Did you put it on your desk?
15    A.  I'm sure I put it on my desk.
16    Q.  Did you sign the document yourself?
17    A.  I did sign it.
18    Q.  It wasn't signed when you sent it to
19  Lionel originally, right?
20    A.  It was not.
21    Q.  But once you got Lionel's signature, I
22  take it your testimony is you signed it?
23    A.  Yes.
24    Q.  And did you sign on the same page that
25  you had received back, via fax, from him?

Page 112

Werner

1
2    A.  I -- I think I did, yes.
3    Q.  So --
4    MR. VARGA:  In other words, you're
5  asking the faxed copy?  He signed the faxed
6  copy?
7    MR. VERSFELT:  Yes.  It's in English.
8    Q.  So your testimony is you sign the same
9  page you received back, the page that would have
10  had his faxed signature on it.
11    A.  I believe so.  I'm not totally sure, but
12  I -- yes.
13    Q.  Well, could there be any other page?
14    A.  No, no other page.
15    Q.  So that if you signed a page that had a
16  signature on it, it had to be his faxed signature,
17  didn't it?
18    A.  I don't recall if I signed it in my
19  office, if that's what you're asking, and I
20  received it.
21    Q.  No, it's not what I'm asking.
22    A.  Okay.
23    Q.  I'm asking whether you signed a page
24  that had his signature as a faxed signature.
25    A.  I did sign it, yes.  Whatever I signed

Page 113

Werner

1
2  had his signature on it, that I know.
3    Q.  His faxed signature on it.  We're
4  confirming that, aren't we?
5    A.  Yes, we are.
6    Q.  Okay.  So you received back the page,
7  and it was signed by him in a faxed signature, and
8  you signed it.
9    A.  I believe I did.
10    Q.  Is it possible you didn't sign it?
11    A.  It's not -- it's possible, but I
12  strongly believe that I signed it.
13    Q.  Okay.  Is it possible that you have lost
14  it because you didn't sign it?
15    A.  No.
16    Q.  Okay.  So it's possible that you lost it
17  for some other reason, then.
18    A.  No.
19    MR. VARGA:  Objection.
20    Q.  Where is it, Mr. Werner?  This is a
21  contract that you say you signed.  Where is it?
22    A.  I don't know.
23    Q.  Okay.  Now I want you to speculate.
24    A.  Okay.
25    Q.  Where might you have put it?

29 (Pages 110 to 113)

Page 118

```
1              Werner
2      A.  Yes.
3      Q.  Do you recall that Lionel arrived late?
4      A.  Yes, I do.
5      Q.  Do you recall then that you and the two
6  Japanese gentlemen -- well, strike that.
7          How much time did you and the Japanese
8  gentlemen spend in the presence of Lionel at that
9  lunch?
10     A.  I really don't know.  An hour.  For
11 lunch, maybe.
12     Q.  What was the topic of discussion at the
13 lunch?
14     A.  Oh, it was general conversation about
15 Ito-Ya, about the history of Kate's.
16         MR. VARGA:  I'm sorry, what was that?
17     A.  Ito-Ya is the retailer, I-T-O Y-A.
18     Q.  Kolo has shop-in-shop arrangements with
19 Ito-Ya.
20     A.  No, they do not.
21     Q.  What is the arrangement that Kolo has
22 with Ito-Ya?
23     A.  We sell our products to them.
24     Q.  For mutual benefit, right?
25     A.  Yes.
```

Page 120

```
1              Werner
2      A.  Correct.
3      Q.  And have you searched your home?
4      A.  I have to some degree, yes.
5      Q.  You've searched wherever you felt you
6  might find it.
7      A.  Yes.
8      Q.  Wherever you felt it possible that you
9  might find it.
10     A.  Uh-huh.  It could have accidentally been
11 thrown out as well.  That's what -- I just cannot
12 figure out why we don't have it.  It's very
13 unusual for us not to have it.
14     Q.  It's very unusual for anyone not to have
15 a document that they consider a binding contract.
16         But you don't have it.  Your testimony
17 is today, you just don't have it, correct?
18     A.  That's correct.
19         (Luncheon recess at 12:46 p.m.)
20
21
22
23
24
25
```

Page 119

```
1              Werner
2      Q.  Okay.
3          Now, let me ask you this, Mr. Werner.
4  You have understood the significance of documents
5  since your days originating mortgages.  You have
6  been a senior executive of Werner & Company, and
7  Kolo, for the better part of a decade, both.
8          Is it your testimony that you would
9  have -- you could have taken your only copy of the
10 LOI and given it away?
11     A.  Is that my testimony?  Is that the
12 question?
13     Q.  Is that your testimony, yes.
14     A.  It's possible that I could have given my
15 only copy out.  It's possible.  It's also possible
16 that I could have lost that.
17     Q.  Where might you have lost it?
18     A.  It could be -- I don't know.  I really
19 don't know.  I -- I truly do not know.
20     Q.  But I take it you have searched your
21 office at Kolo.
22     A.  Yes.
23     Q.  And you've searched your -- whatever
24 area you used for your Werner & Company work,
25 right?
```

Page 121

```
1              Werner
2  A F T E R N O O N   S E S S I O N
3  (1:49 p.m.)
4  KEITH WERNER
5      resumed, having been previously duly
6      sworn by a Notary Public, was
7      examined and testified further
8      as follows:
9  CONTINUED EXAMINATION BY MR. VERSFELT:
10         MR. VERSFELT:  Back on the record.
11     Q.  Mr. Werner, I've put before you the
12 document that was marked yesterday as Plaintiff's
13 Exhibit 1.
14         Now, do I understand your testimony
15 correctly that you do not recall whether or not
16 you prepared this from a preexisting template, or
17 whether your lawyer might have done so?
18     A.  I do not recall it.
19     Q.  So did I accurately reflect your
20 testimony?
21     A.  I think you did.
22     Q.  And is it also your -- accurate for me
23 to say your testimony is -- strike that.
24         Is it also your testimony that if you
25 prepared it, you had your lawyer review it, and if
```

31 (Pages 118 to 121)

Page 126

Werner

1
2          Let me ask particularly with regard to
3   the time frame of May of 2007. In or about early
4   May of 2007, was it your understanding that the
5   agreement that is referred to in the first
6   sentence, with a capital A, is referring to a
7   later, more formal agreement, as referred to in
8   the second sentence of that first paragraph?
9          A.  So your question, to clarify, is, does
10  this word, in quotations --
11         Q.  Agreement.
12         A.  -- "agreement," mean the same thing as
13  formal agreement?
14         Q.  What was your understanding in May of
15  2007, is what I'm asking. Was it your
16  understanding that the word "agreement" there in
17  the first sentence was referring to a more formal
18  agreement in the second sentence?
19         A.  I don't recall. I don't know.
20         Q.  Okay. Now, let me ask this way: Could
21  you look at the paragraph numbered 1. Could you
22  look at the last sentence of that paragraph
23  numbered 1. Maybe, so we're clear, you could read
24  it into the record.
25         A.  "Together with and at the same time as

Page 127

Werner

1
2   this agreement is entered into, the parties will
3   also conclude a rental agreement and Kate's will
4   provide Kolo a consent from the current landlords
5   for such rights to sublease."
6          Q.  Okay. Now, my question to you is, is --
7   strike that.
8          In May of 2007, did you understand that
9   there would be a rental agreement entered into
10  between Kate's and Kolo?
11         A.  No.
12         Q.  Okay. Then can you tell me what is
13  referred to by the words "rental agreement" in
14  that last sentence of paragraph 1?
15         A.  Yeah. So it says, "together with," and
16  at the same time as this agreement is entered, the
17  parties will also conclude a rental agreement. So
18  if I understand your question, did I expect to
19  have a rental agreement?
20         Q.  Well, my question was -- let me try to
21  restate it.
22         In or about May of 2007, what did you
23  intend the term there, "rental agreement," to
24  mean?
25         A.  I don't remember. In fact, as I read

Page 128

Werner

1
2   this, there's language in here that I don't
3   remember putting in, so I don't know.
4          Q.  Okay.
5          A.  Okay?
6          Q.  It may have been put in by your lawyer?
7          A.  Could be, yes.
8          Q.  Was there anyone else at Kolo that
9   worked on the document?
10         A.  No. No. It could have been discussed
11  with our lawyer.
12         Q.  Okay. And I'm not asking about the
13  substance of those discussions. But we have
14  already established, haven't we, that the document
15  that's before you was prepared by Kolo, either
16  Kolo or Kolo's lawyer.
17         A.  Yes.
18         Q.  In collaboration of some sort that you
19  don't recall the details on. So somebody at Kolo
20  put in the words "rental agreement," correct?
21         A.  Or our attorney.
22         Q.  I'm sorry, you are right, or your
23  attorney. And you do not recall what you intended
24  those words to mean at the time you sent this
25  thing to Lionel Flax, right?

Page 129

Werner

1
2          A.  I do not recall.
3          Q.  Okay. Let me ask you this: Does the
4   capital word -- the capitalized A agreement, in
5   the third-to-last line of paragraph 1 of this
6   document, does that word "agreement" mean the same
7   as the word "agreement" in the second line of the
8   first paragraph?
9          A.  I don't know. It's possible. I just
10  don't know.
11         Q.  Okay.
12         A.  I would think that this would be in the
13  same way done in the -- in the document, but I
14  don't know.
15         Q.  Okay.
16         A.  It's ambiguous, to be honest with you.
17  I don't -- I don't know what that means.
18         Q.  Okay. Let me ask the same question with
19  regard to the word "agreement" that is capitalized
20  in paragraph 7 of the document. It's on the
21  second page.
22         My question to you -- do you see that
23  paragraph 7?
24         A.  Yes.
25         Q.  The word "agreement" appears there about

33 (Pages 126 to 129)

Page 134

Werner

1
2  you may have put on those terms in May of 2007.
3  Is that correct?
4      A.  Rephrase.  I don't know what your
5  question is.
6      Q.  Okay.  My question is that your
7  testimony, in looking at the document today, is
8  based on your reading of the document today,
9  rather -- is that correct?
10     A.  If your question is, what is the
11  distinction between --
12     MR. VARGA:  That's not the question.
13     A.  I'm sorry.
14     Q.  Let me just try to rephrase it clearly.
15     My question to you, Mr. Werner, is, in
16  looking at the document today and giving your
17  interpretation of it, you're basing your
18  interpretation of the document today on your
19  reading of the document today.
20     A.  That's correct.
21     Q.  And I think -- is your testimony that
22  you have no recollection of what you intended the
23  terms to mean in May of 2007?
24     A.  No, that's not true.
25     Q.  Okay.  Well, tell me what you

Page 135

Werner

1
2  intended --
3      A.  Okay.
4      Q.  -- the....
5      A.  Starting --
6      Q.  In 2007.
7      A.  Starting with which part?  "By signing
8  below, each party agrees"?
9      Q.  Yeah.
10     A.  "By signing below, each party agrees and
11  consents to the above...."
12     (Discussion off the record.)
13     (The witness read.)
14     A.  My recollection when reading this is
15  that there were -- there was a -- additional
16  agreement that would set forth additional terms
17  that this agreement did not necessarily cover.
18  That's what the intent was, as I read it now, and
19  I recall that.  So there were additional terms
20  that were not stated in this document that the
21  parties were going to enter into.
22     Q.  And what were those additional terms?
23     A.  There were just these terms, nothing
24  specific.  It was never discussed at any time what
25  the specific terms were.  It was that if we didn't

Page 136

Werner

1
2  cover additional terms, that we would agree in
3  good faith to enter into a more formal agreement
4  that had additional terms.  That's what I remember
5  now.
6      Q.  Okay.  Okay.
7      MR. VARGA:  Off the record.
8      (Discussion off the record.)
9      Q.  So what's your recollection -- is it
10  fair to say that what you anticipated was that the
11  parties would negotiate additional terms through
12  negotiation?
13     MR. VARGA:  Objection.
14     A.  No.
15     Q.  Well, tell me what you recollection is,
16  Mr. Werner, please.
17     A.  My recollection is that we were willing
18  to address additional terms that they had, or that
19  we might have, to enter into another agreement,
20  that those terms were not in this document.  This
21  allowed us to move forward in -- moving our
22  property into that space.
23     Q.  What space?
24     A.  Into the -- sorry.  Into the 72 Spring
25  Street, Soho store space.

Page 137

Werner

1
2      Q.  Okay.  And if there were other terms
3  that the parties considered significant, either
4  party could raise it, and those terms could be
5  negotiated and put into a subsequent agreement.
6      A.  Yes.  That's true.
7      Q.  Okay.
8      Was any such subsequent agreement ever
9  negotiated?
10     A.  No.  It was my recollection that I
11  waiting for Kate's to produce any type of document
12  that they felt should -- well, for us to review, I
13  guess, with additional terms.
14     Q.  And how long did you wait?
15     A.  Well, I'm still waiting.
16     Q.  Okay.
17     A.  I don't mean to be, you know, wise guy,
18  but I'm just saying, I'm still waiting.
19     Q.  I didn't take it as a wise guy answer.
20  There -- the -- so the bottom line is, there
21  was -- there has been no subsequent negotiation of
22  additional terms in the year and a half since this
23  LOI was circulating around in May of 2007,
24  correct?
25     A.  That's absolutely correct.  There's no

35 (Pages 134 to 137)

Page 142

Werner

1
2 for commencement of the Kolo Retail store in the
3 Spring Street location, correct?
4     A.  It says that it will commence
5 approximately one month.  Not specifically.
6 Approximately.
7     Q.  Approximately June 1.
8     A.  No.  It says, "will commence
9 approximately one month thereafter."  For the
10 other two stores.
11     MR. VARGA:  No --
12     Q.  My question is for the Spring Street
13 store, does it give a date?
14     A.  Yes, it does.
15     Q.  And it -- the day is defined as on or
16 around June 1, 2007.
17     A.  That's correct.
18     Q.  For the other locations, it does not
19 give a specific date, correct?
20     A.  It does not give a specific date.
21     Q.  Okay.  It says, "approximately one month
22 thereafter."  Correct?
23     A.  Yes.
24     Q.  Could you look at paragraph 5 of the
25 LOI, please.

Page 143

Werner

1
2     What was the -- strike that.
3     What did you intend to convey by
4 paragraph 5?
5     A.  We were working toward a solution that
6 helped Kate's use their current inventory as a
7 starting inventory for any shop-in-shop, so that
8 both companies didn't have to purchase more or too
9 much inventory, and that we would accommodate
10 Kate's by using their inventory and offering them
11 a credit to some -- you know, a credit for that
12 product that they directly bought from Kolo.
13     Q.  Is that what is meant here by the -- the
14 phrase, "Kolo will agree to accept responsibility
15 of the current inventory"?
16     A.  Yes, it is.
17     Q.  That you would provide Kate's with a
18 credit for the inventory that they currently held
19 of Kolo goods.
20     A.  It was implied.
21     Q.  Implied?
22     A.  It -- that's -- when you say credit, we
23 didn't specifically say credit, but that's
24 basically what I would -- I would agree to.
25     And I would have agreed to.

Page 144

Werner

1
2     Q.  And is that a term that you could have
3 worked out with Kate's, subsequently?
4     A.  Easily enough.  That's an acceptable
5 practice.  It's called a return, so that would
6 have been a return back to Kolo, and we would have
7 just basically given them a credit for what they
8 purchased in the past.
9     Q.  I see.  So paragraph 5 does not -- if I
10 understand you correctly, paragraph 5 does not
11 itself provide them with a credit.
12     A.  No.
13     Q.  It -- but I take it your testimony is
14 that it makes clear that the handling of their
15 inventory is a term that can be negotiated between
16 the parties.  Is that correct?
17     A.  I don't know what your question is on
18 that point.
19     Q.  Okay.  Well, I'm just trying to make
20 sure I understand what you've testified about.  I
21 think we're both clear that the word "credit" does
22 not appear in paragraph 5.
23     A.  Yes.
24     Q.  Okay.  And is -- is it your testimony
25 that what was intended by paragraph 5 was that

Page 145

Werner

1
2 Kolo and Kate's would work out in an inventory
3 arrangement that would benefit both parties by not
4 requiring excessive purchases?
5     A.  Yes.  And let me clarify --
6     MR. VARGA:  Objection to form.
7     Go ahead.
8     A.  And let me clarify.  In the last
9 sentence, it does say, "Kolo will issue a credit
10 memo to Kate's for receiving such qualified
11 inventory."  So it was intended to provide them
12 with a credit memo, should we have received a -- a
13 return of that inventory.
14     MR. VARGA:  So to the extent your prior
15 statement that there were -- the word
16 "credit" does not appear is incorrect.  It is
17 in paragraph 5.
18     Q.  Well, let me clarify.  Let me clarify my
19 question.  The word "credit" does not appear with
20 respect to Spring Street location in that
21 paragraph; isn't that right?
22     MR. VARGA:  Objection to form.
23     Q.  Well, if the word "credit" appears in
24 that paragraph, in connection with the Spring
25 Street location, please tell me where it is.

37 (Pages 142 to 145)

Page 150

Werner

1
2  or the 57th Street store?
3      Third Avenue store or the 57th Street
4  store.
5      (The witness read.)
6      A.  There's no reference to Third or 57th
7  Street stores on this page.
8      Q.  Right.  Just so we're clear, because --
9  I was pointing and your lawyer was pointing,
10 there's no reference to any location other than
11 Soho on this page that's entitled Soho Proposal
12 Basic Terms.  That's correct, right?
13     A.  That's correct.
14     Q.  Okay.  Now, let's turn to the next page.
15     What's the title of that page, sir?
16     A.  Financial Proposal.
17     Q.  Okay.  Can you point to any reference to
18 the Third Avenue location or the 57th Street
19 location on that page?
20     A.  No.
21     Q.  Okay.  So the answer is the same as with
22 the prior page, there's no reference to either of
23 those other stores on that page.
24     A.  Correct.
25     Q.  That page is intended to address the

Page 151

Werner

1
2  Soho location.  Correct?
3      A.  Not necessarily.
4      Q.  Well, what does it say?
5      A.  It doesn't say anything about Soho here,
6  actually.
7      Q.  But it doesn't say anything about the
8  other stores.
9      A.  But that doesn't imply that it meant
10 only the Soho store.
11     Q.  Well, let's look back at paragraph 7 of
12 the letter of intent.
13     Could you read me the third sentence of
14 paragraph 7.
15     A.  Starting with, "The compensation
16 schedule"?
17     Q.  Please, read that sentence and the next
18 sentence, please.
19     A.  "The compensation schedule for Spring
20 Street is also attached hereto in Addendum A.
21 Kolo shall compensate Kate's according to the
22 compensation schedule set forth in Addendum A for
23 the Spring Street location, and according to
24 future addendums for the other locations as they
25 are agreed upon."

Page 152

Werner

1
2      Q.  Correct.  Now, does that refresh your
3  recollection that the financial proposal page that
4  we were looking on -- excuse me, that we were
5  looking at, is a compensation schedule for the
6  Spring Street location?
7      A.  It would appear so.
8      Q.  Thank you.
9      There is -- I apologize if I've already
10 asked you this question, but just so we're clear,
11 that financial proposal page that is in Addendum A
12 does not refer to the Third Avenue location or the
13 57th Street avenue location.
14     A.  It does not.
15     Q.  Okay.
16     And now that you've reviewed
17 paragraph 7, do you agree that paragraph 7
18 explicitly defines Addendum A as containing
19 compensation schedule and a profit and loss
20 protection -- strike that.
21     MR. VARGA:  I was about to ask where did
22     you read that.  So we're on the same page.
23     Q.  Let me ask it this way.  And we now all
24 agree that the compensation schedule contained in
25 Addendum A was addressed to the Spring Street

Page 153

Werner

1
2  store only.
3      A.  It appears that way, yes.
4      Q.  Thank you.
5      And you intended that to be that way in
6  May of 2007, correct?
7      A.  No.
8      Q.  No?
9      A.  I can't say that.
10     Q.  You can't.
11     A.  No, I don't recall that.
12     Q.  Okay.  Well, do you recall that at the
13 time you sent this LOI and Addendum A to Lionel
14 Flax, that you disagreed with the statement in
15 paragraph 7 that the compensation schedule for
16 Spring Street is attached hereto as Addendum A?
17     A.  I do not recall disagreeing to it.
18     Q.  Okay.  Do you have any recollection at
19 all of your thinking at the time you sent the
20 compensation schedule to Lionel Flax in May of
21 2007 that the compensation schedule did not accord
22 with the language of paragraph 7?
23     A.  I -- I don't understand the question.
24     Q.  What don't you understand about it?
25     A.  Can you rephrase that question?

39 (Pages 150 to 153)

Page 158

1               Werner
2      A.  Sorry.  In paragraph 8 it does not say
3   three years.
4      Q.  What does it say in paragraph 8?
5      A.  It says, "The term of each sublease will
6   be for one year from the commencement date, Kolo
7   shall retain the right to renew each sublease for
8   an additional one year, and each year thereafter
9   as it becomes due, by giving 60 days' notice to
10  Kate's prior to termination."
11          So it does indicate that we have the
12  ability to renew for more than one year.
13     Q.  For how many years?  More than one year?
14     A.  For two years.  One -- two more years.
15     Q.  Where does it say that?
16     A.  Retain the right to renew each sublease
17  for an additional one-year period, and each year
18  thereafter.  So the first, the second, and each
19  year thereafter.
20     Q.  Oh, so your reading of the words of
21  paragraph 8 is that Kolo could not stay in that
22  space beyond three years, even if it wanted to.
23  Is that correct?
24     A.  No, I'm not saying that.  Kolo shall
25  retain the right to renew each sublease for an

Page 159

1               Werner
2   additional one year, and each year thereafter as
3   it becomes due, by giving 60-day notice.  It
4   doesn't have a total completion date, a maximum
5   time limit.  It just says, in each year
6   thereafter.
7      Q.  Yeah.  Sometimes it's called an
8   evergreen clause.
9      A.  Yeah.
10     Q.  You understand that term?
11     A.  No.
12     Q.  Okay.  But there is no end date in
13  paragraph 8, is there?
14     A.  There's no specific date, no.
15     Q.  Yeah.  So that if Kolo wanted to stay in
16  the space in the Spring Street store for ten
17  years, and if each year 60 -- it gave at least
18  60-day notice in timely fashion, it could stay,
19  according to the terms of paragraph 8.  Is that
20  correct?
21     A.  And according to the other terms of
22  the -- of this agreement, yes.
23     Q.  Well, what other terms of the agreement?
24     A.  Well, there's other terms here.
25          Well, it also refers to the addendum, so

Page 160

1               Werner
2   you have to bring the addendum into this.
3      Q.  Right.
4          And how would you -- how did you
5   anticipate that that should be done in May of
6   2007?
7      A.  Well, according to the addendum entitled
8   Soho Proposal, it says, in number 2, Lease
9   Options, "Kolo has the right to three one-year
10  options."
11          It also goes to say that we -- in -- in
12  paragraph 3, "Right to terminate," and states that
13  Kolo -- if Kolo continues to pay Kate's, a
14  minimum -- okay, I'll start from the beginning.
15          Paragraph 3, "Right to terminate.
16  Kate's has the right to terminate the agreement
17  after the first year, and each year thereafter,
18  unless Kolo continues to pay Kate a minimum of
19  $140 per square foot plus a 6 percent royalty."
20          So those are the terms I'm referring to,
21  in addition to paragraph 8.
22     Q.  Right.  Those paragraphs 2 and 3 there,
23  on the page that's entitled Soho Proposal Basic
24  Terms, are intended to be a part of the LOI,
25  aren't they?

Page 161

1               Werner
2      A.  They are.
3      Q.  Now -- and it's your understanding that
4   if they are more restricted than the terms in --
5   than the words -- strike that.
6          Let me start over.
7          And is it your understanding that if the
8   basic terms of the Soho Proposal are more
9   restrictive than the words in the first two pages
10  of this exhibit, the LOI, that the more
11  restrictive provision would control?
12     A.  No.
13     Q.  Okay.  Tell me what was your
14  understanding of --
15     A.  I didn't have an understanding until you
16  just raised it right now.  I never thought about
17  it.
18     Q.  You never thought about that.
19     A.  No.
20     Q.  Did you read the addendum at the time
21  that you sent it to Kate's Paperie?
22     A.  Not -- maybe not at the time, but I've
23  read it, yes.
24     Q.  Did you read the addendum at the time
25  you sent the LOI to Kate's Paperie?

41 (Pages 158 to 161)

Page 166

```
1              Werner
2       Q.  And that was in April.
3       A.  Yes.
4       Q.  So that was -- does that refresh your
5    recollection that it was before you sent the pages
6    that are the addendum, as a proposal dated
7    April 2007?
8       A.  I don't remember if we had sent this
9    addendum or proposal to them before we met them at
10   the -- at the store. I just don't remember.
11      Q.  Okay. So if you sent it before you met
12   them at the store, you came up with the 140. Is
13   that right?
14      A.  The only way I could have come up with
15   the 140 is based on what they told me their
16   current rental rate was. That's the only way I
17   could come up with it. That I know came from the
18   Flaxes.
19      Q.  At this walk-through meeting?
20      A.  I think it was at the walk-through
21   meeting, yes.
22      Q.  So if the 140 came from them at the
23   walk-through meeting, tell me how it could -- the
24   140 could have gotten in here, if you sent the
25   proposal before the walk-through meeting? I'm
```

Page 167

```
1              Werner
2    confused.
3       A.  Yeah. I don't know if the -- that's
4    what I was saying. I don't know if this proposal
5    was sent to them before that meeting or after.
6    I'd have to go back and look at my -- the time and
7    dates.
8           It's very possible. There was a time --
9       Q.  What's very possible?
10      A.  It's very possible that we had that
11   meeting, and this number, $140 per square foot,
12   came from that meeting. It's very possible.
13          Yup.
14      Q.  I agree that it's possible. Indeed, if
15   the -- if the number 140 came from them, I think
16   it's probable that the number 140 was discussed
17   before you sent the proposal.
18      A.  No. That's not what I'm saying, because
19   we have -- we had an ongoing dialogue. It didn't
20   mean that it came from that meeting. That's what
21   I'm saying.
22      Q.  Okay. Okay.
23          Focusing on the walk-through meeting in
24   April, where it was you and Peter Dunn for Kolo,
25   and it was Leonard and Lionel Flax for Kate's, do
```

Page 168

```
1              Werner
2    you recall other substantive discussions about the
3    possible shop-in-shop arrangement at that
4    walk-through meeting?
5       A.  After it, or during it?
6       Q.  During it.
7       A.  Subsequent, you used the word. Can you
8    rephrase that? I thought you said subsequent.
9          MR. VERSFELT: Let me have it read back.
10   If it's confusing, I'll rephrase it.
11         (Discussion off the record.)
12         (The record was read back.)
13      A.  There was more discussions than the $140
14   per square foot at that meeting. We had more
15   discussions involving the shop-in-shop.
16      Q.  What do you recall about those
17   discussions?
18      A.  I remember Leonard discussing his
19   expectations of what the shop-in-shop should be.
20      Q.  And what were those expectations that
21   you recall?
22      A.  I remember him saying that he wanted to
23   see Kate's create more shop-in-shops within that
24   space, and that Kolo would be a nice addition to
25   what he -- what he envisions Kate's will
```

Page 169

```
1              Werner
2    eventually evolve to, shop-in-shops. I also
3    remember Lionel being very specific about he
4    was -- he was the person making the decision. And
5    he referred to his father during that meeting,
6    that he had the decision, and it was not
7    necessarily his father. That was one thing.
8          In addition, he also referred to how
9    quickly we needed to move in order for this to be
10   ready to be executed, by the time they opened up
11   that store.
12      Q.  Anything else?
13      A.  There was other discussions about where
14   Kate's was going and how they compete with Papyrus
15   at the time, and how Kolo's shop-in-shop would
16   benefit Kate's, by having a Kolo shop-in-shop, and
17   Papyrus across the street wouldn't.
18         We talked about how it was beneficial to
19   Kolo to have the shop-in-shop in Kate's, because
20   of the value that Kolo would receive by having a
21   lot of retailers come through Kolo, and see --
22   sorry, come through Kate's and see Kolo there.
23   That was very significant. And we agreed to that.
24         So there was a -- sort of a meeting of
```

43 (Pages 166 to 169)

Page 174

Werner

1
2  venture to say yes, that would be it.
3      Q.  And that would be derived from just
4  general attitudes of fundamental fairness, if it
5  isn't set forth in the agreement itself, right?
6      A.  If there was something specific that
7  Kolo was not doing that was spelled out in the LOI
8  and the addendum, I would agree that they probably
9  have the right to terminate, yes.
10     Q.  And would they have a right to terminate
11  at the time of the default?
12     A.  No.
13     Q.  When would they have a right to
14  terminate?
15     A.  It's unspecified.
16     Q.  It doesn't say.
17     A.  It does not say.
18     Q.  So we don't know when they would have a
19  right to terminate.
20     A.  That's right.
21     Q.  Now, let's look at paragraph 4 of the
22  basic terms.
23      Could you read that, please.
24      MR. VARGA:  Paragraph 4 --
25     Q.  Of the basic terms, I'm sorry, of -- let

Page 175

Werner

1
2  me rephrase my question.  I'm looking at the page
3  of Addendum A entitled Soho Proposal Basic Terms.
4      MR. VARGA:  Thank you.
5      Q.  I would like you to look at paragraph 4,
6  please.
7      A.  Okay.
8      Q.  Could you read it?
9      A.  "Kolo will provide Kate's with monthly
10  POS data."
11     Q.  Has Kolo provided Kate's with monthly
12  P0S data since June 1 of 2007?
13     A.  Up until yesterday, I believe we did.
14  According to Lionel's testimony was the first time
15  that I heard that he was unable to go and get the
16  POS, as we arranged for him to do that.
17     Q.  Okay.
18     A.  Okay?
19      (Counsel conferred with the witness.)
20     A.  Yeah.  Well, I don't know -- I say never
21  notified.
22     Q.  So I take it that, as you sit here
23  today, you have been under the impression that
24  Kate's had been able to receive Kolo's monthly POS
25  data.

Page 176

Werner

1
2      A.  Absolutely.
3      Q.  And just for the record, what does POS
4  mean?
5      A.  Point of sale.
6      Q.  That means the point of sale in the Kolo
7  store.
8      A.  That's correct.
9      Q.  And I take it if Kate's can show you
10  that they're not able to access the monthly POS
11  data, you would take the position that you would
12  fix that.
13     A.  If they can't -- if they cannot access
14  the POS data as we have given them in the past, I
15  would absolutely fix it.
16     Q.  Okay.  And looking at paragraph 5,
17  please --
18     A.  Okay.
19     Q.  -- it says, Kate's will pay monthly
20  rental payments.
21      MR. VARGA:  Kolo.
22     Q.  I'm sorry, it says, "Kolo will" Kate --
23  "will pay Kate's monthly rental payments according
24  to the financial proposal enclosed."
25      Did I read that correctly?

Page 177

Werner

1
2      A.  Yes.
3      Q.  And what's the financial proposal that
4  it refers to?
5      A.  Exhibit-- Plaintiff's Exhibit 1.
6      Q.  Let me help you.  Is it the next page
7  following the basic terms page?
8      A.  Yes.
9      MR. VARGA:  Just call the title.
10     A.  Okay, financial proposal.
11     Q.  Financial proposal page.  It comes
12  immediately following the basic terms page.
13      And so Kolo, under the basic terms,
14  commits to pay monthly rental payments in
15  accordance with the page that follows.  Correct?
16     A.  Yes.
17     Q.  Okay.  And the starting rent per square
18  foot is?
19     A.  $75 per square foot.
20     Q.  Okay.  Is that to be paid monthly?
21     A.  Yes.
22     Q.  Okay.  The starting royalty on the
23  financial proposal.  The paragraph 2 on the
24  financial proposal, it says, "Starting royalty,
25  6 percent."

45 (Pages 174 to 177)

Page 182

Werner

1
2       A.  Right.
3       Q.  What does paragraph 2 mean?
4       A.  Paragraph 2 just states the starting
5    royalty.
6       Q.  Well --
7       A.  But it doesn't --
8       Q.  Go ahead.
9       A.  It doesn't state when it's calculated.
10       Q.  What does the word "starting" mean to
11    you?
12       A.  When we hit $250,000.
13       Q.  Okay.  Then why are there two
14    paragraphs, a paragraph 2 and then a paragraph 3?
15       A.  I don't know why.
16       Q.  You wrote this, didn't you?
17       A.  I collaborated on it, yes.
18       Q.  Fair enough.  And it does not -- we can
19    agree, can't we, that there is nothing in
20    paragraph 2 that explicitly says that the
21    6 percent royalty doesn't kick in on Dollar 1?
22       A.  It doesn't say whether it does or it
23    doesn't, correct.
24       Q.  Right.  And you wrote it or collaborated
25    on it, and -- and paragraph 2 does use the word

Page 183

Werner

1
2    "starting" in the two-word paragraph, "Starting
3    royalty," doesn't it?
4       A.  It's redundant.  It's redundant.
5       Q.  Which is redundant?
6       A.  It's redundant from paragraph 2, and in
7    paragraph 3.
8       Q.  It's only redundant, sir, if the way you
9    were interpreting it today is the way that it was
10    intended in May of 2007.  Isn't that right?
11       A.  It's not --
12       Q.  Will you answer that question, please.
13       A.  No.  I was going to ask you to rephrase
14    it, because I don't know what you --
15       Q.  Okay, let me rephrase it this way.  It's
16    not redundant at all, is it, if the starting
17    royalty is supposed to be 6 percent from Dollar 1?
18       A.  If that's when it was -- if that is how
19    you're interpreting it, yes.  I don't believe
20    that's how the parties agreed to it.
21       Q.  How do you know?
22       A.  I know that because of Lionel's request
23    to me in several of the e-mails we saw today, that
24    he was not expecting a royalty during the first
25    months, because we did not hit 250,000.

Page 184

Werner

1
2       Q.  Oh, well, we'll look at those e-mails.
3       A.  Okay.
4       Q.  Let me put before you, Mr. Werner, two
5    exhibits from yesterday's deposition that you
6    attended.
7       A.  Uh-huh.
8       Q.  Plaintiff's Exhibit 3 and Plaintiff's
9    Exhibit 4.
10       A.  Uh-huh.
11       Q.  Okay.  Let me direct your attention to
12    the e-mail that -- let me use my finger, if I may.
13    Let me point to this e-mail that starts with
14    "Lionel."  It's on Plaintiff's Exhibit 3, that is
15    page KP 0124, just below the word "cool."
16       Okay?
17       A.  Uh-huh.
18       Q.  Now, is it the case that you sent that
19    e-mail that I'm directing your attention to on or
20    about August 20, 2007?
21       A.  It appears I did.
22       Q.  Does that e-mail say anything about your
23    not having to pay royalties until you reach
24    250,000 in sales?
25       A.  It doesn't -- it's not specific.

Page 185

Werner

1
2       Q.  It was when Lionel was asking for
3    royalties, wasn't it?
4       A.  Uh-huh.
5       Q.  And you didn't respond to him saying,
6    Oh, but Lionel, there -- you've misunderstood, we
7    don't pay royalties in 250,000 net sales, did you?
8       A.  I did tell him that, according to the
9    financial proposal, we had to be at $250,000.
10       Q.  Where did you tell him that?
11       A.  I told him on the phone.
12       Q.  Oh, and here, what did you say here?
13    You want to read it into the record?
14       A.  Sure, I would be happy to read it.
15       Q.  Sure.
16       A.  "You're welcome.  At the end of this
17    month, we will be looking to make a royalty
18    payment according to our recent agreement to pay
19    royalties on a quarterly basis, according to
20    minimum annual sales in the proposal."
21       So based on that, we were going to
22    evaluate it each quarter.  That's my intention in
23    that e-mail.
24       Q.  Okay.  And what did you mean by the
25    phrase "at the end of this month"?  This was

47 (Pages 182 to 185)



Page 190

Werner

1
2      Q.  You agreed with him to modify the -- the
3  basic terms of the Soho proposal, didn't you?
4      A.  That was -- that was what he asked me, I
5  agreed to it, yes.  Absolutely.
6      Q.  And there's nothing in the LOI that says
7  it can't be modified by verbal understanding, is
8  there?
9      A.  No.
10     Q.  Do you know what a merger clause is?
11     A.  No.
12     Q.  There's no -- you may feel free to look
13 through the first two pages.  There's nothing in
14 it that says it cannot be modified by the parties,
15 except in a writing.  Is there?
16     A.  Not that I can see, no.
17     Q.  And there's nothing in the proposal, the
18 Addendum A, that says it cannot be modified by the
19 parties; isn't that right?  By mutual agreement.
20     A.  It doesn't say anything like that.
21     Q.  Right.  So at any time, Kate's and Kolo
22 could verbally agree to change the terms of
23 Plaintiff's Exhibit 1; is that correct?
24     A.  We agreed to change --
25     Q.  That's not my question.  I can have it

Page 191

Werner

1
2  read back, but I would like an answer to my
3  question.
4      A.  Read back, please.
5      MR. VERSFELT:  Please.
6      (The record was read back.)
7      A.  I don't know if that's correct.  It
8  doesn't state whether we could or we can't.  It
9  doesn't say.
10     Q.  It doesn't say you can't.
11     A.  And it doesn't say you can.
12     Q.  And you did, with regard to royalty
13 payments.  Isn't that right?
14     A.  We came to an agreement, I think, that
15 agreed to -- to make quarterly royalty payments,
16 yes.
17     Q.  You changed the terms of the --
18     A.  Based on a minimum annual sales as
19 stated in the proposal.  That's what I was saying.
20     Q.  You changed the basic terms of the
21 agreement, from monthly to quarterly --
22     A.  Upon his request, I agreed to make
23 quarterly payments.
24     Q.  Answer my question, please.
25     A.  Yes.

Page 192

Werner

1
2      MR. VARGA:  He did.
3      Q.  Is it correct that you changed the terms
4  of the LOI and the addendum, by mutual agreement
5  with Lionel, subsequent to the execution of the
6  LOI?
7      A.  Yes.
8      Q.  Okay.  And you did so without a writing.
9      A.  No, because there's the writing right
10 there, in e-mail.
11     Q.  No.  That records that you and he --
12     A.  No, that's the writing.  That's the
13 writing.
14     Q.  Okay.  So you could do it by e-mail.  So
15 you could do it by e-mail, right, sir?
16     A.  That's right.
17     Q.  Okay.
18     MR. VARGA:  Just to clarify, you -- you
19 used the word "you changed," but he testified
20 that to -- you mean to ask, you, as in him
21 himself, and nobody else, or including
22 Lionel?  Because it came at Lionel's request.
23     So if -- to the extent you're trying to
24 paint a picture about something else, so I
25 just want to clarify, when you said you

Page 193

Werner

1
2  personally, as opposed to including Lionel.
3      Q.  Who made the agreement to modify the
4  royalty payment schedule from monthly to
5  quarterly?
6      A.  Both Lionel and I.
7      Q.  Thank you.
8      A.  You're welcome.
9      Q.  Now, where was I?
10     Paragraph 7 of the basic terms.  You
11 have the basic terms, okay, paragraph 7.
12     "Kate's will provide" -- could you read
13 it, please.
14     A.  "Kate's will provide Kolo with
15 landlord's consent to the sublease and"
16 non-disturbance -- "and a non-disturbance."
17     Q.  Okay.  Did you ever get a landlord's
18 consent that you saw?
19     A.  Not that I've seen.
20     Q.  Did you ever get a non-disturbance?
21     A.  Not that I've seen.
22     Q.  What did you mean by non-disturbance?
23     A.  I don't know.  That's what I got from
24 our attorney.  He told me to make sure it's in
25 there.

49 (Pages 190 to 193)

Page 198

Werner

1
2      Q.  Does that say monthly?
3      A.  It says monthly rental payments.  It
4  doesn't say per square foot per month.  That's a
5  major difference.
6      Q.  It does say monthly rental payments,
7  does it?
8      A.  It says monthly rental payments.
9      Q.  And then when you turn the page, it
10  says, "The starting rent per square foot is $75."
11      A.  But there's no relevance to that.
12  Absolutely no relevance.  No one in their right
13  mind would pay $75 per month at the present time
14  the market rent as stated by your client was $140
15  per year.  Per square foot.
16      And I would ask that your client clarify
17  that, because that's what I agreed to and that's
18  what they agreed to.
19      Q.  Well, Mr. Werner, you wrote this.  You
20  and your lawyer wrote this.  Right?
21      A.  Go ahead.
22      Q.  Yes or no?
23      A.  We drafted it.
24      Q.  You and your lawyer prepared this Soho
25  Proposal Basic Terms and the financial proposal

Page 199

Werner

1
2  page.  Correct?
3      A.  Yes.
4      Q.  And you sent it to Kate's, correct?
5      A.  Yes.
6      Q.  All right.  And you -- and Kate's didn't
7  write it, right?
8      Kate's didn't write the starting rent
9  per square foot, paragraph 1, on your financial
10  proposal, did it?
11      A.  They didn't write anything.  They didn't
12  change anything.
13      Q.  They didn't.
14      A.  We didn't change anything.
15      Q.  That's right.
16      A.  And that's what they will agree to, that
17  was $140 per square foot per year.  I can tell you
18  with definitively that's what we agreed to.
19      Q.  I'm not talking about the $140 per
20  square foot in the termination provision.  I'm
21  talking about 75 per square foot in the financial
22  proposal, paragraph 1.
23      A.  Per year.
24      Q.  So your testimony, now that you've
25  discussed it with your counsel, is that those are

Page 200

Werner

1
2  per year numbers.
3      A.  $75 per year, per square foot, was the
4  factor that we used to arrange for the monthly
5  payment.  That's what we agreed to, that's what
6  we've been paying, from June till the time up
7  until, you know, whatever the -- our attorney
8  said.
9      Q.  Yeah.
10      A.  Yeah.
11      Q.  And you saw the e-mail yesterday where
12  Lionel Flax said, That seems way off, didn't you?
13      A.  I don't recall that.  Maybe you want to
14  show me that.
15      Q.  Sure.
16      MR. VARGA:  You're referring to
17  Plaintiff's 4, or which one is it?
18      MR. VERSFELT:  I don't know.  You've got
19  them over there.
20      MR. VARGA:  Because Plaintiff's 4 talks
21  about --
22      MR. VERSFELT:  Well, this -- let me see
23  if this is the one.
24      MR. VARGA:  That way off language?  I
25  don't know.  I don't recall the way off

Page 201

Werner

1
2  language.  I think that was his
3  characterization.
4      MR. VERSFELT:  No, here it is.
5      Q.  Allow me.  He said, "Entirely off."
6      The rent check that he received was
7  entirely off.
8      A.  Uh-huh.
9      MR. VARGA:  Would you read it, please.
10  Plaintiff's 4.
11      A.  Sure.
12      "Can you let me know how you're deriving
13  at that number?  It seems entirely off in terms of
14  dollars per square foot."
15      Q.  Right.  Now --
16      A.  And I clarified it.
17      Q.  Yes, you responded, I know.  And you may
18  feel free to read the rest of the e-mail string,
19  which we went over yesterday in the deposition of
20  Mr. Flax.
21      MR. VARGA:  So go ahead.  Read it.
22      Q.  Let me know when you've read it.
23      A.  I understood this to be an agreed-upon
24  amount.  I was not involved in the discussions
25  regarding rent.

51 (Pages 198 to 201)

Page 206

```
1            Werner
2      A.  Plus 6 percent.
3      Q.  Right.  So you're going to pay 140 per
4  square foot, plus 6 percent, regardless of your
5  level of sales, or regardless of the rental owed
6  according to the financial proposal, or Kate's has
7  the option of terminating your lease, your
8  arrangement.  Strike that.
9          Or Kate has the option of terminating
10 the arrangement.
11     A.  Yes.
12         MR. VERSFELT:  Could I have the question
13 and answer read back.  I just want to make
14 sure that -- just want to make sure that it
15 flowed smoothly.
16         (The record was read back.)
17         MR. VERSFELT:  Please strike the whole
18 question, because I don't think it flows.
19         MR. VARGA:  Well --
20         MR. VERSFELT:  I move to strike.  I'll
21 restate it.
22         MR. VARGA:  It's not on the record that
23 he moved to strike.
24         MR. VERSFELT:  Pardon?
25         MR. VARGA:  I don't know if you have the
```

Page 207

```
1            Werner
2  ability to simply have that deleted.
3          MR. VERSFELT:  I'm going to restate it.
4  It's going to be different, and it's going to
5  take out my little addendum in the middle.
6          MR. VARGA:  Right.
7      Q.  So Mr. Werner, if -- if there is a lease
8  under the terms of Plaintiff's Exhibit 1, then
9  when May 31 of this year rolls around, Kolo is
10 going to have paid $140 per square foot, plus
11 250,000 royalty, or Kate's will have the
12 authority to terminate the arrangement.  Is that
13 correct?
14     A.  You're not being specific.  It's $140
15 per square foot, per year, plus 6 percent.  That's
16 what we would -- we will do.  Once you -- income.
17         MR. VARGA:  Well, his question was, if
18 you don't -- if you don't do those, what's
19 going to happen?  Am I in --
20         MR. VERSFELT:  Yeah.
21         MR. VARGA:  If you --
22     Q.  And you agreed, you will either do that,
23 or Kate's has the authority to terminate --
24     A.  Has the right to terminate.
25     Q.  Has the right to terminate.
```

Page 208

```
1            Werner
2      A.  That's right.
3          Are we clear about the $140 per square
4  foot per year?
5      Q.  Oh, no, on the 140?  We're not clear
6  about the dollar numbers on the square foot.  No,
7  not at all.  I mean, we had testimony yesterday,
8  and then we had testimony today, that was all
9  consistent, and now we've had some inconsistent
10 testimony, and a few, in the last half hour.
11         But we'll just have to agree to disagree
12 on that.
13         (A recess was taken.)
14     Q.  Mr. Werner, let's finish up with
15 Plaintiff's Exhibit 1.
16         Looking at the page that's entitled
17 Financial Forecast.  I think it's the third page
18 from the back.  Right?  You have it, right?
19         MR. VARGA:  Yeah.  The one that reads on
20 top, Financial Forecast.
21     Q.  And it sets forth escalations -- well,
22 tell me what this page sets forth.
23     A.  This is a schedule that shows, as
24 revenue increases, so does rent per square foot,
25 per year, and so does royalty per year.
```

Page 209

```
1            Werner
2      Q.  Okay.  Does it say -- does it say --
3  well, in May of 2007, what did you think the
4  sales, annual retail sales, of the Kolo
5  shop-in-shop would be after a year, say?
6      A.  What did I think?
7      Q.  Yeah.  What did you expect that
8  shop-in-shop was going to do in sales once it got
9  established?
10     A.  Within 12 months we were expecting to do
11 250,000.  That was the whole reason why Kate's
12 wanted us to do that, because they had never
13 received revenues from Kolo in retail sales more
14 than $150,000.
15     Q.  So $250,000 in retail sales, in the Kolo
16 shop-in-shop, was going to be a success, by your
17 thinking.
18     A.  Success?  I don't think that I would
19 describe it or define it as a success, no.
20     Q.  Well, you just told me you expected it
21 was going to be $250,000 in annual retail sales.
22     A.  But that doesn't mean it's a success.
23     Q.  Okay.  Where -- let me ask it this way:
24 If you hoped at the end of a year you would have
25 250,000 in retail sales, why did you have five
```

53 (Pages 206 to 209)

Page 214

Werner

1
2  this, there are two components in terms of dollars
3  to the right to terminate, as you set forth on the
4  basic terms page of the Soho proposal that is
5  Addendum A. Okay? Two components.
6      A.  Uh-huh.
7      Q.  The first component is, $140 per square
8  foot.
9      A.  Annual per square foot.
10     Q.  For purposes of this question, I'm not
11  going to argue with you. It's -- it's annual per
12  square foot this afternoon to you, so that's fine
13  with me.
14         And the other component is 6 percent
15  royalty.
16     A.  Annual -- 6 percent on the sales in the
17  one year, yes.
18     Q.  Okay. Now, when 6 percent royalty paid
19  on your sales during that year.
20     A.  That's correct.
21     Q.  Okay. That's what I meant by Dollar 1.
22     A.  Okay.
23     Q.  It's 6 percent royalty. If you have
24  only $60,000 of sales that year, the royalty
25  required to avoid the right to terminate is

Page 215

Werner

1
2  6 percent of that 60,000 net sales.
3      A.  Yes.
4      Q.  Okay. And if it were a hundred thousand
5  dollars net sales, it would be 6 percent of that
6  hundred thousand dollars net sales.
7      A.  Yes.
8      Q.  And it were $249,000 net sales, it would
9  be 6 percent of that.
10     A.  Yes.
11     Q.  So that's what I meant by, from first
12  dollar.
13         So that even if the financial proposal
14  says that somebody's percent rate kicks in at 250
15  to 449 --
16     A.  Uh-huh.
17     Q.  -- then Kolo has to pay 6 percent on the
18  dollars below 250,000 to avoid its right to
19  terminate.
20     A.  I agree with that.
21     Q.  Okay.
22         I agree, you agree.
23     A.  We finally agree.
24     Q.  Now, who at Kolo would know whether or
25  not you have paid any royalties to Kate's Paperie

Page 216

Werner

1
2  since May of 2007?
3      A.  Our accounts payable department.
4      Q.  And who might that be?
5      A.  Our accounts payable administrator is
6  Nyiesha Carrington. And Kim Hassler would also
7  probably know.
8         MR. VARGA: What was the last name,
9  Carrington?
10     A.  C-A-R --
11     Q.  C-A-R-R-I-N-G-T-O-N?
12     A.  Yes.
13     Q.  And is it your understanding,
14  Mr. Werner, that the rent checks that are being
15  paid in escrow, pursuant to the letter that is
16  Defendant's Exhibit F, continue to be paid in
17  escrow?
18     A.  It's my understanding, yes. That's what
19  my direction was to my staff.
20     Q.  Okay.
21         And do you know whether rent checks --
22  do you know whether a rental payment, defined
23  however you want to define it, was paid between
24  August of 2007 and November of 2007?
25     A.  I don't -- I don't know for sure.

Page 217

Werner

1
2  I would have check my records.
3      Q.  Who would know?
4      A.  Our accounting department.
5      Q.  Would be the same ladies that you just
6  gave us?
7      A.  Yes.
8      Q.  Nyiesha Carrington and Kim Hassler?
9      A.  Yes.
10     Q.  But without checking with them, your
11  testimony today, based on your understanding at
12  this time, is that rental payments are being paid
13  into escrow, and that the sales of Kolo -- Kolo
14  net sales in your shop-in-shop, are not yet to a
15  level requiring a payment of royalties. Is that
16  correct?
17     A.  I don't know. I don't know. I have to
18  look at the sales. I don't know.
19     Q.  You don't know whether the sales are yet
20  at 250.
21     A.  That's correct.
22     Q.  Okay. But when they get to 250, you're
23  going to pay royalties; is that your --
24     A.  I would intend to pay it, yes --
25     Q.  All right.

55 (Pages 214 to 217)

Page 222

Werner

1
2  Exhibit 10, so we're using 11 today.
3      So this is just for the record, that we
4  have no ten other prior exhibits today that we
5  marked, as this is the first one.
6      I want you to take a look at Plaintiff's
7  Exhibit 11, and tell me if you recognize this
8  document.
9      MR. VARGA: Just for the record,
10  Plaintiff's Exhibit 11 is also marked KP 0089
11  through KP 0118.
12     A.  Are you asking if I've ever seen that?
13     Q.  Just take a look, and tell us if you
14  recognize this document in the first place.
15     A.  I recognize it's a lease between Kate's
16  and Propeller Company, LLC.  Yeah, I recognize it,
17  that it's a lease.
18     Q.  Have you ever seen this before?
19     A.  No.
20     Q.  By the way, you should flip through it
21  just to make sure your statement is correct,
22  because you just looked at the first two pages.
23     A.  Yeah. · It's hard to read the print, the
24  small print, but yes.
25     Oh, actually --

Page 223

Werner

1
2      (The witness read.)
3      A.  Okay.
4      Q.  Is your answer still the same?
5      A.  I have never seen that document.
6      Q.  I represent to you that this document
7  was produced to us by Kate's Paperie's attorneys,
8  and that's why it contains the KP marking on it,
9  89 through 118.
10     MR. VERSFELT: And you need not be the
11  only one to make that representation.  I
12  could make the same representation.  We
13  produced it, sure.
14     Q.  Now, I want you to take a look at
15  KP 0095, and can you tell me if there's indication
16  for -- you know, the -- what appears to be like an
17  annual rental rate for this particular lease.
18  That's Plaintiff's Exhibit 11.
19     A.  Yes.  The annual rental rates are stated
20  in Schedule A, starting in 12/1/05 through
21  11/30/2015, and it states an annual rental rate,
22  in dollars, starting with $687,150, annual rate.
23  Rental rate.  And then it states a monthly rate of
24  $557,262.50 per month.
25     Q.  Okay.  So in this -- just to be clear,

Page 224

Werner

1
2  it says, commencing 12/01/2005 through 11/30/06,
3  the annual rental rate that you just read pertains
4  to that period, correct?
5      A.  That's correct.
6      Q.  And then in the following period, which
7  is 12/1/06 through 11/30/07, what is the annual
8  rental rate for that?
9      A.  The annual rental rate is $687.150.
10     687,150.
11     Per year.  Annual rental rate.
12     Q.  And a monthly?
13     A.  And the monthly rate is $57,262.50 per
14  month.
15     Q.  Now, do you have an understanding of
16  approximately, or even if you don't, specifically,
17  how many square feet there are in Kate's Paperie
18  store at Spring Street location?
19     A.  I think there's between -- my
20  understanding from speaking to Lionel, there was
21  between 5- and 6,000 square feet, something like
22  that.
23     Q.  Okay.  Now, if -- would you take the
24  calculator, please, and if you divide this total
25  that you mentioned, 687,150, by --

Page 225

Werner

1
2      A.  6,000 square feet.
3      Q.  By 6,000 square feet?
4      A.  Would be $114 per square foot per year.
5  $114.53, to be exact, per square foot per year.
6      Q.  Per year.  And that's not per month.
7      A.  It is not per month.
8      MR. VERSFELT: Wait, what's not per
9  month?
10     MR. VARGA: The $114.52, that's not a
11  per month rate, but it's a per year rate.
12     Q.  Is that your testimony?
13     A.  That's correct.  That's my testimony.
14     Q.  Would you have ever agreed to pay either
15  $75 or $140, per square foot, per month, for the
16  shop-in-shop arrangement?
17     A.  Absolutely not.
18     Q.  Why not?
19     A.  Because there is no -- there's -- I
20  don't even think there's a market rent in the
21  world that's equal to that, on an annualized
22  basis.
23     Q.  What do you mean by that?
24     A.  What I mean is if you take $75 per
25  square foot times 12 --

57 (Pages 222 to 225)

Page 230

Werner

1
2      A.   Actually, it's not consistent,
3   counselor.
4      Q.   Does it use the word "annual" and "per
5   month" in every entry on that page?
6      A.   In every entry, it states an annual
7   rental rate in dollars, and then it says, in
8   writing, and then it says, in dollars per month.
9   So it's not explicit in -- in its entirety.
10     Q.   Now, let's look at the Soho Proposal
11  Basic Terms page in the Addendum A of Plaintiff's
12  Exhibit 1, please.
13         Now, direct your attention to
14  paragraph —
15         MR. VARGA:  Not with this one.  This
16     one.  Basic terms?
17     Q.   Basic terms.  Directing your attention
18  to paragraph 5.  Does paragraph 5 say anything
19  about annual rent?
20     A.   No.
21     Q.   Okay.  Does it speak explicitly of,
22  quote, monthly rental payments, end quote?
23     A.   It explicitly states that we will --
24  that Kolo will pay Kate's monthly rental payments.
25     Q.   Thank you.  Now, could you turn the

Page 231

Werner

1
2   page.  I would like to direct your attention to
3   the financial proposal page that follows the basic
4   terms page.
5         In paragraph 1, where it says, "Starting
6   rent per square foot -- $75."  You see that?
7      A.   Yes.
8      Q.   Does it say "annual rent"?
9      A.   No.
10     Q.   Now, let's look at paragraph 4, where it
11  says, "Rent increases," and has the schedule of
12  square footage payments for levels of net sales.
13         My question to you, sir, is, anywhere in
14  that paragraph 4, does it say, annual rental rate?
15     A.   It does not.
16     Q.   Okay.  Thank you.
17         MR. VARGA:  All right, let me just
18     clarify something.
19  EXAMINATION BY MR. VARGA:
20     Q.   Paragraph 4, same page, the --
21  Plaintiff's 1 entitled Financial Proposal,
22  would -- would Kolo been -- would it have been
23  possible for Kolo to reach $250,000 sales in one
24  month?
25     A.   No.

Page 232

Werner

1
2      Q.   How about $350,000 in a month?
3      A.   Absolutely not.
4      Q.   How about $450,000 a month?
5      A.   No.
6      Q.   How about $550,000 a month?
7      A.   No.
8      Q.   How about $650,000 a month?
9      A.   No.
10     Q.   How about $750,000 a month?
11     A.   Absolutely not.
12     Q.   So would these, in the column
13  indicating the net sales, and $250,000 and 350-,
14  et cetera, tied with these increases in the square
15  footage?
16     A.   That was -- that was an annual number
17  for sales and per square foot.
18     Q.   And did the Flaxes understand this to be
19  on an annual basis or a monthly basis?
20     A.   Absolutely.  Yes.
21     Q.   Which one?
22     A.   They -- they understood it to be annual.
23     Q.   Did they ever communicate to you, prior
24  to signing the LOI, that they had an expectation
25  that Kolo would reach, let's say at a minimum,

Page 233

Werner

1
2   $250,000 each month?
3      A.   No.
4         MR. VERSFELT:  I object to form.
5      A.   No.
6   EXAMINATION BY MR. VERSFELT:
7      Q.   Mr. Werner, your counsel's questions
8   were just now phrased in terms of Kate's Paperie.
9   I want to ask you in terms of Lionel Flax.  Right?
10        What's the basis for your assertion that
11  Lionel Flax understood the numbers for rent in the
12  financial proposal to be annual numbers?
13     A.   Rephrase that.
14     Q.   Okay.  What is your basis for your
15  testimony asserting that Lionel Flax understood
16  the $75 per square foot number on the financial
17  proposal page of Addendum A, as an annual number?
18     A.   With all the conversations that we've
19  had leading up to this, e-mails, e-mail
20  communication, he always indicated that he
21  understood that the annual sales numbers that were
22  in here also corresponded to the rent per square
23  foot per year.
24     Q.   And the e-mail that you're referring to
25  in your answer is the e-mail that we looked at

59 (Pages 230 to 233)

Page 238

Werner

1
2      A.  I believe it -- I believe I received
3  this, yes.
4      Q.  It's -- could you find your e-mail
5  address on there?
6      A.  Yes.  Actually, it was forwarded to me
7  by Peter Dunn.  So he must have received it and
8  forwarded it to me.
9      Q.  And when did Peter Dunn forward that?
10     A.  Oh.  January 16, 2008.
11     Q.  Right, in connection with this
12  litigation.
13     A.  Yes, but let me -- excuse me, counsel.
14     Q.  Surely, look it over, because my
15  question to you is, did you ever see it before
16  your preparation for your deposition.
17     A.  Yes, I did see it, actually.  I did see
18  it.  And I need to check my e-mail, because I
19  remember seeing that, and I responded back, after
20  he sent this to me, with another e-mail.
21     Q.  You, Mr. Dunn?
22     A.  No, Lionel Flax.
23     Q.  Okay.
24        MR. VARGA:  Hold on, so -- off the
25  record.

Page 240

Werner

1
2      A.  No, not saying.
3      Q.  Okay.  Let me ask the question so we're
4  both clear on it.  Did you know what their monthly
5  rent totaled for all of their stores?
6      A.  Their monthly rent, no.  I did not.
7      Q.  All right.
8        MR. VERSFELT:  I'm done.
9        MR. VARGA:  All right.  We're done.
10        MR. VERSFELT:  Are we all done?  We're
11  done.
12     (Discussion off the record.)
13        MR. VARGA:  We're back on the record.
14  Just to reflect the off-the-record
15  conversation concerning the production of
16  these transcripts, both plaintiff's
17  transcript and defendant's transcript,
18  plaintiff agrees to produce the transcript of
19  Mr. Lionel by --
20        MR. VERSFELT:  Mr. Lionel Flax.
21        MR. VARGA:  Mr. Lionel Flax, by
22  8:00 p.m. tonight, so that I have time to get
23  back to my office, because I --
24        MR. VERSFELT:  You just told me that
25  your secretary is prepared to send it off to

Page 239

Werner

1
2        MR. VERSFELT:  Wait.  Why is this off
3  the record?
4        MR. VARGA:  All right.
5        Off the record, let me just say
6  something.
7     (Discussion off the record.)
8      Q.  Mr. Werner, do you know what the total
9  rent paid by Kate's Paperie is for all of their
10  stores in Manhattan?
11     A.  Do I know?
12     Q.  Yes, do you know?
13     A.  No, I don't exactly know.  No.
14     Q.  Did you know then?
15     A.  I had an idea, yes.
16     Q.  Do you know -- did you know then that a
17  calculation of $33,000 per month is 9 percent of
18  their total rent for all their stores?
19     A.  Did I know then?
20     Q.  Yes.
21     A.  The answer is yes, I approximated that,
22  yes.
23     Q.  So $33,000 --
24     A.  Per year.
25     Q.  Per month.  Is their --

Page 241

Werner

1
2  me.
3        MR. VARGA:  Right.  If she's going to
4  get it by 5:00, so then by 6:00 p.m., as will
5  counsel have the same option, by tomorrow, he
6  will produce me a PDF version of the
7  deposition transcript of today's deposition
8  by 6:00 p.m.
9        So again, to recap, plaintiff will
10  produce Lionel Flax's deposition transcript
11  by 6:00 p.m. today, and defendant will
12  produce deposition transcript of Mr. Werner's
13  deposition by 6:00 p.m. tomorrow, so that the
14  parties can act on executing the transcript.
15  Is that fair?
16        MR. VERSFELT:  That sounded right to me.
17        MR. VARGA:  Okay, great.  Thank you.
18     (Time noted: 4:46 p.m.)
19
20
21
22
23
24
25

61 (Pages 238 to 241)

**A**

abide 173:15
ability 93:8 158:12
    172:3 207:2
able 175:24 176:10
    219:13,22
about 13:10,23
    21:24 23:9,14,18
    23:18 25:3,4
    26:15,18 31:3
    37:3 40:7 43:2,8
    45:3,4,6,15 48:11
    49:8 51:25 52:2
    61:5 67:10 68:9
    71:18 74:3,19
    78:22 79:16 85:13
    86:17,18 87:7
    89:15 93:10 100:7
    103:4,18 116:11
    116:17,18,21,24
    118:14,15 123:10
    124:19 126:3
    127:22 128:12
    129:25 132:5
    144:20 151:5,7
    152:21 153:24
    154:8 155:6
    157:18 161:16,18
    162:7,14,20
    164:11 165:4,5
    168:2,16 169:4,14
    169:19 170:15
    172:9,19 178:18
    178:19 184:20,22
    189:2 192:24
    199:19,21 200:21
    208:3,6 229:19
    230:19 232:2,4,6
    232:8,10
above 64:18 72:15
    73:5,6,12 77:6
    101:6 132:7 133:2
    135:11 194:11
    202:7
above-mentioned
    133:7
absolutely 18:8
    107:2 108:14
    137:25 176:2,15
    187:10 189:15
    190:5 196:20
    198:12 204:11
    220:8 221:2
    225:17 227:11,19
    227:24 229:10
    232:3,11,20
accept 65:20 143:14
    146:5 147:5

acceptable 92:17
    144:4
access 176:10,13
    219:13,22 220:5,6
    220:15,17
accessories 41:14
    41:15
accidentally 120:10
accommodate 143:9
accord 153:21
    154:4
accordance 170:20
    177:15 187:22
according 62:7
    77:15,21 88:22
    151:21,23 157:21
    159:19,21 160:7
    175:14 176:23
    178:7 185:8,18,19
    188:2,11 197:24
    206:6 212:24
accountant 42:9
accounting 30:21
    30:22 217:4
accounts 216:3,5
accurate 121:22
accurately 121:19
achieve 39:25 40:2
Acquiring 55:20
acquisitions 55:19
across 169:18
act 133:7 241:14
action 37:18,20
    102:10,13 243:16
activities 6:19
actually 12:19 15:4
    15:10 28:3 29:3
    39:19 44:4 81:8
    97:2 102:23 117:6
    151:6 222:25
    230:2 234:5 238:6
    238:17
added 59:11
addendum 67:9
    68:7 69:6,16,17
    69:19 78:24 79:4
    79:12 94:17
    138:17,21,23
    139:3,7,11,15,25
    140:2 147:20,24
    148:7,12,12
    151:20,22 152:11
    152:18,25 153:13
    153:16 154:13,16
    155:18 156:14,19
    156:20,20,20,24
    156:25 157:11
    159:25 160:2,7

161:20,24 162:3
    162:10 163:24
    164:9,14 166:6,9
    170:18 173:16,19
    174:8 175:3
    190:18 192:4
    207:5 214:5
    230:11 233:17
addendums 151:24
    155:24 156:2,6,7
    156:16
addition 10:11
    160:21 168:24
    169:9
additional 133:8
    135:15,16,19,22
    136:2,4,11,18
    137:13,22 138:12
    138:13 146:14,16
    154:24 156:16
    158:8,17 159:2
    171:18
address 4:11,14,17
    136:18 150:25
    221:16 238:5
addressed 152:25
    155:14 156:15
administer 3:11
administrator
    216:5
advanced 16:5
advice 60:10
affairs 29:17
after 9:16 11:16
    16:23,23,25 21:17
    37:22 45:11 54:24
    67:7 69:22 79:24
    79:25 80:20 95:10
    101:9 116:3
    117:18 122:7
    123:25 124:4
    160:17 167:5
    168:5 181:18
    203:19,22 209:5
    210:6 238:19
afternoon 102:24
    103:10 214:12
again 19:8 28:16
    39:16,19 51:24
    55:22 58:11 69:11
    77:3 89:21 96:16
    96:23 97:17,24
    98:5,9 100:25
    132:23 138:16
    154:5 196:23
    211:13 212:5
    241:9
ago 187:14

agonized 84:25
agree 40:3 73:4,10
    88:24 89:8 95:5
    123:14 136:2
    143:14,24 146:5
    147:5 152:17,24
    155:23 156:16,25
    167:14 174:8
    182:19 190:22
    199:16 208:11
    215:20,22,22,23
agreed 3:2,6,9
    70:19 104:23
    105:3 143:25
    146:10 147:12
    151:25 156:3
    164:24 169:24
    183:20 188:18
    190:2,5,24 191:15
    191:22 196:24,25
    198:17,18 199:18
    200:5 207:22
    210:12 225:14
    227:6
agreed-upon
    138:23 201:23
agreeing 91:3,4
agreement 34:5,12
    34:14 103:16
    110:3 122:20,22
    123:3,5,10,13,15
    123:20 124:5,21
    124:23 125:15,17
    125:19 126:5,7,11
    126:12,13,16,18
    127:2,3,9,13,16
    127:17,19,23
    128:20 129:4,6,7
    129:19,25 130:8
    130:13 131:5,6,25
    131:25 132:9,12
    133:2,9,11,14,15
    135:16,17 136:3
    136:19 137:5,8
    139:6 156:6,8,9
    157:13 159:22,23
    160:16 164:19
    165:3 170:25
    174:5 185:18
    189:23 190:19
    191:14,21 192:4
    193:3 202:19,22
    204:6 218:13
agrees 133:6,7
    135:8,10 240:18
ahead 32:13 96:21
    145:7 182:8
    194:25 198:21

201:21 237:16
    Akira 117:22
    album 187:17,19
    albums 41:13
    allocated 29:17
    allocation 30:17,20
    allow 172:13,16
    201:5
    allowed 136:21
    almost 18:10 25:10
    71:16
    already 13:3 43:15
    48:22 90:23 94:5
    128:14 152:9
    220:9
    Althea 27:18
    altogether 5:6
    alumni 8:16
    always 14:20 31:21
    47:14 61:13
    233:20
    ambiguous 129:16
    America 5:14,19
    amount 40:4 201:24
    227:17 229:7
    amounts 197:16
    analysis 16:5
    Angeles 17:4 19:3
    21:19 28:18
    announced 44:25
    annual 185:20
    191:18 209:4,21
    210:2,7 212:14
    213:2,4 214:9,11
    214:16 223:17,19
    223:21,22 224:3,7
    224:9,11 229:3,6
    229:11,13,17,23
    230:4,6,19 231:8
    231:14 232:16,19
    232:22 233:12,17
    233:21
    annualized 225:21
    annually 197:13
    226:3
    another 18:19
    27:13 57:24 58:7
    70:24 71:5 94:20
    99:21 101:6
    136:19 194:17
    204:5 234:4
    238:20
    answer 12:16 60:20
    84:16,17 92:18
    95:3 96:2 101:16
    137:19 138:8
    150:21 172:18
    183:12 191:2,24

behalf 44:2
behind 59:25
being 34:2 35:14
  132:18 169:4
  207:14 216:14
  217:12 234:9
  236:13
believe 11:4,23 12:3
  12:25 14:13 27:9
  30:18 32:15 33:25
  34:12,18 35:2,8
  35:16 36:22 41:23
  44:25 45:18 47:19
  51:17 52:9 53:6
  72:17 75:19 81:5
  108:18 110:2,13
  112:11 113:9,12
  171:4 173:11
  175:13 178:25
  183:19 186:16
  188:23 194:13
  203:8 220:9 238:2
  238:2
believed 194:10
  196:18
belonged 109:13
below 63:7 65:3
  73:5 100:10,16
  133:6 135:8,10
  184:15 215:18
beneficial 169:19
  211:11
benefit 118:24
  145:3 169:17
  236:12
benefits 170:2
  234:9,19 236:7,8
benz 1:15 4:4 243:7
  243:23
besides 117:21,23
best 75:11,12 93:8
  178:22,23
better 76:10,13
  77:9 119:7
between 3:3 16:12
  27:15 33:13 38:7
  39:13,17 41:23
  46:17 62:20 73:9
  85:14 86:5 88:5
  89:16 91:2,10
  92:4 94:14 95:12
  96:24 98:10
  103:24 104:22,22
  127:10 131:24
  134:11 144:15
  157:6 162:8
  164:20 170:12
  180:12 210:13

216:23 218:6
  221:18 222:15
  224:19,21 244:11
  244:22
beyond 158:22
big 39:17
binding 120:15
birth 8:21
bit 21:24
blood 243:16
body 63:21,25
  65:14,15,21
books 41:13
both 32:10 65:12
  102:17 107:13
  119:7 123:3,14
  124:21 132:19
  133:18 143:8
  144:21 145:3
  170:2 193:6
  210:17,25 211:3
  211:16,20,21
  240:4,16
bottom 63:11 66:15
  75:16 77:5 96:19
  109:16,16 137:20
  203:13
bought 143:12
boxes 41:13,13
brain 116:6
break 47:20 66:6
  85:25 140:7
brief 8:5
briefly 16:4
bring 160:2 205:18
broad 95:19
broader 88:24
brought 29:3,7
  114:3,6,8 117:6
  117:13 162:11
  170:6
Brown 27:19
business 4:10,14,17
  10:14,17,19 11:10
  13:16 29:17 45:23
  55:19
businesses 22:13

**C**

C 2:2 80:5,7,10
  100:18 156:20
  242:3 243:2,2
  244:14
Caf 114:3 117:7,16
calculate 213:14
calculated 182:9
calculation 213:12
  239:17

calculator 224:24
  228:7
California 9:7,8
call 52:24 92:20
  125:12 163:17
  177:9
called 4:3 11:5
  53:24 59:20 60:17
  61:9 122:20 144:5
  156:19 159:7
  221:23
calls 163:4
came 27:13 33:5
  48:17 56:13,14
  64:12,13 83:16
  87:19 166:12,17
  166:22 167:12,15
  167:20 170:15
  189:24 191:14
  192:22
capacity 22:21,22
capital 126:6 129:4
  130:9 132:9,13
capitalized 129:4
  129:19
care 90:9
careful 21:5
Carrington 216:6,9
  217:8
case 90:20 92:10
  146:8 147:20
  155:22 184:18
  188:23
center 130:2
CEO 31:10,13,16
  31:19
ceremony 14:21
  15:3,9
certain 54:23 77:24
  78:4 92:17 108:12
  181:13 221:5
certainly 60:22 61:8
  91:11 220:25
Certified 1:15
  243:7
certify 242:7 243:10
  243:15
cetera 232:14
chance 60:12 70:11
  70:21 95:5 114:2
change 53:3 61:13
  61:14 156:24
  157:5,10 190:22
  190:24 199:12,14
  192:3,19
changed 26:21
  59:13 191:17,20
  192:3,19
changes 122:4,10

characterization
  201:3
chart 75:15,17
  76:21
charts 77:4
check 66:5 78:7
  89:18,20 90:14
  91:6 179:25
  181:12 188:20
  201:6 202:16
  203:8 217:2
  220:25 238:18
checking 80:17
  83:11 217:10
checks 216:14,21
chief 31:7
chronology 14:25
  15:15
circulating 137:23
circumstances 92:8
city 28:10 71:24
Civ 1:6
clarification 24:22
  204:10
clarified 73:7
  201:16 203:17,24
clarify 14:18,20
  17:25 28:12 29:24
  54:21 65:19
  103:13 126:9
  140:25 145:5,8,18
  145:18 192:18,25
  196:7,23 198:16
  231:18
class 8:11,18
clause 159:8 190:10
clear 40:21 65:6
  103:7 126:23
  144:14,21 147:16
  148:5 150:8
  152:10 195:19
  205:11 208:3,5
  223:25 229:11
  240:4
clearly 76:19,22
  100:2 132:20
  134:14
client 22:14 32:9,9
  32:13,17 44:2
  104:20 198:14,16
close 181:14
CM 1:6
Co 163:14
collaborated 59:7,9
  182:17,24
collaboration
  128:18
college 8:19 9:19,21

9:24 10:6,22 11:3
  11:17
column 77:5 232:12
columns 75:17
come 36:8 45:3
  46:10 166:14,17
  169:22,23 202:10
comes 66:21 177:11
comfort 68:2
commence 141:23
  142:4,8
commencement
  141:16,19 142:2
  146:2,14 158:6
commencing 1:14
  224:2
comments 61:10
commit 91:9
commits 177:14
committee 38:2,4
  38:10,20,25 39:7
  39:8,10,15,24
  40:3,12 41:18,25
  42:5 45:9,12,21
  87:23
communicate
  232:23
communication
  84:20 86:11 94:14
  103:9 218:6
  233:20
companies 5:4 39:5
  39:6 143:8 210:13
company 4:18,23
  5:18 17:5,7,9
  18:19,20 21:4,22
  21:23,24,25 22:4
  22:5,6,15,17,23
  22:25 23:17,22,25
  24:2,5,7 26:6 27:5
  27:11,14,20,25
  28:4,13,13 29:11
  29:14,17 30:7
  31:17,22,25 32:7
  32:19 33:5,15,24
  42:11,24 44:23
  46:5 55:20 57:3,6
  57:12 61:6 91:19
  119:6,24 221:19
  222:16 244:22
compare 74:9
comparing 63:11
  77:3
compensate 151:21
compensation
  147:22 148:6
  151:15,19,22
  152:5,19,24

184:5 201:19
238:16 241:7,7,10
241:12,13 242:9
242:12
**derived** 56:3 174:3
**deriving** 201:12
**derogatory** 58:10
**describe** 16:4 32:8
49:10,12 130:15
209:19
**described** 49:21
155:18
**describes** 236:7
**Description** 244:9
**desirable** 211:23
**desk** 111:14,15
115:23
**despite** 205:19
**details** 94:25 128:19
**determine** 75:6,12
76:25 79:17 83:25
85:2 104:20
**determined** 82:10
202:8
**develop** 32:22
**developing** 32:20
**diagram** 48:21
. 141:9
**dialogue** 167:19
**dicker** 77:9
**difference** 43:22
131:24 132:4
198:5
**different** 67:19
74:12,13 154:7
207:4
**difficulties** 36:9
37:6,21
**dinner** 45:17,19
46:2
**direct** 5:16 35:25
68:5 102:11
122:14 184:11
194:3 230:13
231:2
**directed** 154:23
156:21 194:20
228:19
**directing** 184:19
230:17
**direction** 216:19
**directly** 5:19 34:2
41:8 143:12
**disagree** 76:16,18
181:23 188:21
208:11
**disagreed** 153:14
**disagreeing** 91:5

153:17
**disclosing** 32:12
**discrepancy** 202:11
**discuss** 61:21 84:22
85:18 86:13
**discussed** 85:10
86:4 94:25 95:21
97:4 128:10
135:24 138:12,14
163:8 167:16
188:17 199:25
**discussing** 45:6
49:13 131:21
168:18 196:11
**discussion** 46:2 70:8
104:10 105:7
118:12 135:12
136:8 138:4
165:16 168:11
186:8 203:19,21
218:12 219:9
227:14 234:18
239:7 240:12
**discussions** 35:4
88:12,19 128:13
168:2,13,15,17
169:14 201:24
**distinct** 106:14,16
106:17
**distinction** 28:7,8,9
132:24 134:11
**distinctly** 106:18
**distributed** 34:3
**distributor** 35:21
36:5
**district** 1:2,2 28:10
**divide** 30:15 224:24
**document** 19:21
34:4,8,9 49:3,6
51:8,10 53:5,7,17
53:21 55:2,3,4,9
57:20 58:6 61:9
61:14,20 62:25
63:3 70:5 80:6
81:21 83:5 94:10
98:20 99:7 100:18
100:23 105:9
106:11,13,14
111:16 116:12
120:15 121:12
122:11,13 124:18
128:9,14 129:6,13
129:20 130:14,16
130:20 131:7,11
131:20 132:6,11
132:16,21,21
133:18 134:7,8,16
134:18,19 135:20

136:20 137:11
141:3 170:17
173:3,4 179:3,4
222:8,14 223:5,6
235:24 244:13,14
244:19
**documentation**
20:6 34:10
**documents** 19:25
20:8,11,14,21
75:13 89:24 91:16
93:9 101:25 119:4
**doing** 9:15 19:6
48:22 80:18 81:13
83:12 174:7
**dollar** 23:7 24:20
40:7 182:21
183:17 197:16
204:12 208:6
213:16,20,21
214:21 215:12
229:7,17,18
**dollars** 201:14
214:2 215:5,6,18
223:22 229:8,11
229:11,12,12,14
230:7,8
**done** 19:9 41:25
58:15 94:9 96:3
116:11,25 121:17
129:13 160:5
213:13 240:8,9,10
240:11
**down** 46:15 67:10
78:20 87:15 114:3
130:2 147:17
157:9
**downtown** 28:10
**draft** 52:19,22,24
53:4,13,24 54:4
55:8 56:19 57:11
57:16 58:15 59:20
59:22,25 60:15,17
60:22 61:9,14,19
62:2,6,9 122:5
154:9
**drafted** 54:23 57:10
57:14 124:5
198:23 229:3
**drawing** 139:21
140:2,13,17
**drawings** 139:2,16
**due** 158:9 159:3
171:20
**duly** 4:4 121:5
243:12
**Dunn** 29:9 31:3,17
31:21 38:22 39:7

165:23 167:24
238:7,9,21
**Dunn's** 31:5
**during** 9:15 41:17
88:14 89:10 93:17
96:17 102:3
104:12 165:8
168:5,6 169:6
170:7 183:24
214:19 242:11

### E

**E** 2:2,2 105:11,14
121:2,2 242:3,3,3
243:2,2 244:17
**each** 45:21 135:6
135:8,10 146:2,14
146:16 158:5,7,8
158:16,17,18,25
159:2,5,17 160:17
171:18,19 185:22
229:6,10,16 233:2
**earlier** 100:7
103:11 122:10
196:17
**earliest** 66:14
**early** 14:11 126:3
**easier** 67:25
**Easily** 144:4
**education** 11:18
13:14 15:20,25
**educational** 15:16
16:15,19
**effect** 3:12
**eight** 138:7,8
**either** 5:3 56:13
65:11 67:17 94:17
103:6 106:10
128:15 137:3
150:22 170:11
172:2 180:17
203:23 205:22
207:22 225:14
**electronic** 72:3
**electronically** 68:21
69:22
**elizabeth** 2:12
102:24
**ELLIS** 2:8
**employed** 7:21
**employees** 22:15
24:7 27:16
**employment** 7:11
**enclosed** 57:19
176:24 197:25
**encompass** 124:6,6
**encouraging** 169:3
**end** 14:23 49:23

50:10,13 69:13,14
79:11 85:4 123:3
133:3,5 139:11
148:15,18 159:12
180:4 185:16,25
186:24 187:2
189:18 209:24
213:13,13 230:22
**ending** 98:9
**English** 112:7
**enough** 27:17 33:15
52:12 64:8 67:23
78:19 141:6 144:4
182:18
**enter** 122:19 125:14
135:21 136:3,19
**entered** 127:2,9,16
**enterprises** 5:5
**entire** 50:2,8 72:21
106:12,15 203:11
203:15
**entirely** 201:5,7,13
**entirety** 230:9
**entities** 30:2,8
**entitled** 141:15
148:22 149:20
150:11 160:7,23
175:3 195:8
208:16 231:21
**entity** 6:12
**entries** 229:2,6,10
229:17,24
**entry** 230:5,6
**envisions** 168:25
**equal** 225:21
236:17
**equivalent** 49:20
236:17
**error** 180:8,9
**escalations** 208:21
**escrow** 179:13,21
180:19 216:15,17
217:13
**escrowing** 178:16
**ESQ** 2:6,11,12
**essence** 227:4
**Essentially** 234:20
236:12
**established** 65:13
67:17 97:6 128:14
139:10 209:9
**estate** 22:7,12 24:20
25:12
**et** 232:14
**evaluate** 39:23
185:22
**even** 61:19 158:22
173:4 187:15

210:3,9,10 211:6
**forget** 42:8 74:19
**forgot** 202:17
**form** 3:7 12:15
  17:20 19:17 20:13
  22:2 46:23 55:7,8
  55:9,12,17,23
  56:2,5 57:10
  58:16 59:17 64:20
  92:12 111:2
  140:23 145:6,22
  154:14 227:9
  233:4
**formal** 37:10
  125:15,17 126:7
  126:13,17 136:3
**formally** 36:10,13
  36:14 37:4
**forms** 17:23 58:16
**forth** 41:16 71:4
  133:9,11 135:16
  140:20 141:8,25
  151:22 154:12
  173:19 174:5
  195:3,7,9 208:21
  208:22 214:3
  229:3 243:12
**forward** 136:21
  155:3 205:18
  210:18 238:9
**forwarded** 71:17
  72:22 73:2 238:6
  238:8
**found** 28:4
**founded** 31:3
**four** 7:14,15 117:25
  130:2 165:24
  235:17
**fourth** 37:7 102:22
**four-page** 235:24
**four-year** 10:23
**frame** 23:23 33:10
  126:3
**frankly** 67:16
**Fred** 18:21,23,25
  20:16 21:17,18
**free** 26:21 190:12
  201:18
**frequently** 39:18,20
**freshman** 11:21
**from** 7:16 8:7,19
  9:16 11:2 12:13
  13:4 14:10 15:17
  21:21 23:25 24:2
  35:25 37:17 41:8
  42:3 45:8,8,20
  47:24 48:5 50:3
  51:14 56:13,14

58:6,7,17 63:7,8,9
  64:23 65:12 67:4
  71:8,19 72:15
  73:3 80:12 84:7
  84:18 99:8,9
  100:4,14,21 101:2
  101:20 102:23,23
  105:12,21 106:14
  107:18 111:25
  114:15 121:16
  127:4 143:12
  148:15 156:24
  158:6 160:14
  166:17,22 167:12
  167:15,20 174:3
  180:23 183:6,17
  184:5 191:21
  193:4,23 200:6
  202:4 205:5
  208:18 209:13
  213:16 215:11
  218:24 219:18,21
  219:24 221:5,6
  224:20 228:22,25
  235:7 236:5
  244:17,24
**front** 70:11 88:10
  89:2 92:4 94:3
  95:8 97:11,19
  114:9 194:18
  196:14
**full** 9:23
**full-time** 16:22
**fundamental** 174:4
**further** 3:6,9 121:7
  243:15
**future** 132:21
  148:19 149:22
  151:24 154:17,18
  154:19,20,22
  155:24 156:2,6
**F-R-E-D** 18:23

**G**

G 242:3
**GATES** 2:8
**gave** 54:24 55:2,3,4
  84:10,23 159:17
  217:6
**general** 13:14,15
  66:18 118:14
  173:4 174:4
**generated** 58:14
  237:25
**gentleman's** 42:8
**gentlemen** 118:6,8
**getting** 108:8
**Ginnie** 17:23

**give** 8:5 15:8,12
  23:6 33:10 60:20
  78:23 79:11 82:22
  84:14 90:20 91:13
  91:14 92:23 94:10
  114:3 142:13,19
  142:20
**given** 39:23 57:19
  59:10,11,15,16
  60:11 119:10,14
  144:7 176:14
  197:16 242:13
  243:14
**gives** 96:9
**giving** 53:2 134:16
  158:9 159:3
  171:20 178:17
**go** 8:16 9:4,19 15:22
  20:19 21:21 32:13
  33:2 41:14 47:16
  64:6 78:18 82:9
  86:2,25 89:20
  90:14,15 93:22
  95:23 96:21,22
  97:3,5 99:5 145:7
  155:3 167:6
  175:15 181:15
  182:8 194:25
  198:21 201:21
  205:5 218:15
  237:16
**goes** 68:19 160:11
  195:18,20
**going** 15:15 26:16
  26:20 59:19 69:13
  69:14 77:8 82:14
  103:5 124:12
  125:4 135:21
  146:17 157:17
  164:22 169:15
  183:13 185:21
  187:21 205:18,22
  206:3 207:3,4,4
  207:10,19 209:8
  209:16,21 214:11
  217:23 219:4
  241:3
**goldberg** 1:12 2:3
**Golieb** 42:7 43:8,10
  44:9,12 72:16
  100:5
**good** 79:13 88:3
  124:17 133:7
  136:3 219:10
  221:2
**goods** 41:7,10
  143:19
**gotten** 55:5 57:18

**166**:24
**graduated** 8:7,11
  8:19 9:14 12:18
  14:15 195:9
**graduation** 9:16
  15:3
**great** 241:17
**grids** 74:13,14
**grow** 9:8
**guess** 41:14 61:11
  97:23 137:13
  157:8 173:24
  202:15 203:11
  221:10,13
**guy** 137:17,19
**guys** 93:8

**H**

**half** 90:8 96:19
  137:22 138:6,9
  208:10
**Hamilton** 2:4
**hand** 243:20
**handed** 117:7
**handing** 236:3
**handling** 144:14
**hand-delivered**
  68:14
**happen** 207:19
**happened** 84:2
  116:3 219:16
**happens** 210:16
**happy** 93:18 94:18
  95:3 185:14
  211:21,22 221:14
**hard** 76:24 222:23
**HARRIS** 2:12 82:2
  82:5,8 97:3
**Hartford** 4:12
  27:24 28:2,6,9,11
  28:14,21
**Harvard** 15:24
**Hassler** 96:24 202:4
  216:6 217:8
**having** 4:3 58:18
  62:5 115:25 121:5
  169:17,21 184:23
  236:25
**headquartered**
  27:23
**hear** 34:19 35:3
  36:8,13 37:5
**heard** 36:10 37:3
  91:24 125:9
  175:15 189:9
  219:24
**held** 143:18
**help** 154:2 177:6

**188**:7
**helped** 143:6
**her** 44:2
**hereinafter** 122:20
  123:23 124:17
**hereinbefore**
  243:12
**hereto** 139:3 151:20
  153:16
**hereunto** 243:19
**high** 9:4,14,17
  195:13
**higher** 67:2 194:15
  202:16 205:8,14
  210:3
**Hills** 9:6
**him** 26:9,11 29:25
  53:2,10,14 54:24
  55:3,4 59:12,15
  59:16 60:11 65:3
  67:5,7 78:2,8,23
  79:3,7,11,15,18
  81:3,9 86:7,8,13
  88:7 90:8,21 91:9
  91:13,25 92:4,15
  92:18,23 111:25
  113:7 114:15
  117:9 124:11,12
  164:25 165:4,5
  168:22 175:16
  185:5,8,10,11
  189:3,6,11,13
  190:2 192:20
**himself** 60:10
  192:21
**hired** 18:18
**history** 16:22
  118:15
**hit** 182:12 183:25
  210:8
**Hold** 219:20 238:24
**home** 102:9 120:3
**honest** 56:6 60:16
  60:18,19 86:25
  129:16 162:24
  220:20
**Hong** 52:9,9,11
  86:24 87:11,16
**hope** 60:19
**hoped** 87:22 209:24
  210:6
**horizontal** 76:20,22
**hour** 90:8 118:10
  208:10
**Howard** 9:6
**huge** 80:24 180:12
**Huh-huh** 141:13
**hundred** 5:22 25:10

less 14:25 21:20
29:19 67:21
180:25 211:23,23
211:24
let 14:19 22:3 46:8
49:2 51:7 55:22
57:8 63:14,15
70:2 71:22 78:7
80:3,4 82:23 90:3
90:8,11 92:18
93:24 94:10 96:18
99:10 104:18
105:8,17 108:3
115:18 117:14
119:3 125:24
126:2,20 127:20
129:3,18 131:2
132:5 134:14
145:5,8,18,18
152:23 161:6
168:9 174:25
177:6 178:24,24
180:11 181:3
183:15 184:4,11
184:12,13 189:10
196:3 197:3
200:22 201:12,22
203:8 209:23
218:21 219:20
221:15 231:17
237:22 238:13
239:5 240:3
letter 51:16,17,19
52:20,22,25 54:4
56:7,12,20,20
57:10,11,16 58:15
59:20 60:23 62:9
81:9 84:9 110:17
122:15 138:16
151:12 216:15
letters 55:18 58:16
let's 4:9 47:16 51:21
65:8 67:8 82:9,17
91:16 93:20,22
95:25 99:3,5
122:13 138:15
141:14 147:17
148:21 150:14
151:11 157:12
174:21 181:15
186:17 188:4
195:6 208:14
212:4 218:15
221:16 226:2
230:10 231:10
232:25 234:13
236:2,22
level 206:5 217:15

levels 231:12
Lexington 2:9
like 16:13 26:23
32:8 41:15 53:23
65:4,6,13 66:7
68:17 86:2 89:5
100:3,11 175:5
190:20 191:2
194:3,22 220:17
221:4 223:16
224:21 227:15
231:2
likely 156:23
limit 141:2 159:5
line 41:15 67:19,21
92:17 100:17
109:17 110:10
122:19 123:10
129:5,7 130:13
132:7 133:3,19
137:20
lines 67:10 76:20,22
130:2
Lionel's 64:18
109:21,22 110:4
111:21 175:14
183:22 192:22
202:20
listed 133:15
litigation 238:12
little 21:24 51:3
207:5
live 28:24
living 32:20
LLC 1:3 4:20 5:8,8
5:15,17,18,20,20
5:25 6:5,16,17,22
7:8,11,20,21,24
8:3 29:2 30:11
31:3 32:18 33:16
34:2,6,10 132:7
221:19 222:16
244:22
LLCs 5:5
LLP 2:3,8
loan 18:7
loans 17:8,12,17
19:25 20:5,6,12
locate 114:5
located 9:25 18:25
141:21
location 139:22
140:12,16,20
142:3 145:20,25
146:3,3,7 147:3,5
147:23 148:4
150:10,18,19
151:2,23 152:6,12

152:13 165:18
181:7 224:18
235:17
locations 141:22
142:18 151:24
155:24 156:3,7
157:10
LOCKHART 2:8
logo 77:6
LOI 79:12 80:18,20
81:3 83:12 85:8
86:8 89:16 92:10
93:16 94:18 101:3
102:4 103:17
104:11 105:25
106:3,12,15,19
107:14 114:8,12
119:10 122:15
137:23 141:25
142:25 153:13
154:9 160:24
161:10,25 162:4,9
163:23 164:7
171:8 172:12,20
172:24,25 173:16
173:18 174:7
190:6 192:4,6
227:21 232:24
London 12:20,24
13:3,23
long 6:21 7:7,24
10:5 16:8 18:9
21:18 94:7 137:14
140:25 157:22
170:25 171:2
longer 219:13 221:7
look 51:21 58:20
64:22 65:11 67:8
67:25 68:18 70:11
73:17 74:20 77:8
81:6 83:15 90:3,8
93:13,20 94:4,19
95:4,18 99:3,19
100:2,19,24 101:8
122:13 125:3
126:21,22 138:15
141:14 142:24
148:21 151:11
157:12 164:13
165:18 167:6
174:21 175:5
179:7 184:2 188:4
190:12 195:6
212:4 217:18
222:6,13 223:14
230:10 231:10
234:7,13 235:10
238:14

looked 55:2 82:21
82:22 83:3 222:22
233:25
looking 51:11 56:8
67:24 69:8,11
74:7 94:24 122:17
134:7,16 147:17
149:3,23 152:4,5
175:2 176:16
185:17 186:24
194:2 205:3
208:16
looks 53:23 65:4
66:2 76:10,13
Los 17:4 19:3 21:19
28:18
lose 20:14
loss 148:6 152:19
lost 113:13,16
119:16,17
lot 169:22
Lowell 42:7 45:10
lower 63:19
ltd 1:7 5:9,11 6:11
6:15,19
lunch 117:15,20
118:9,11,13
196:18
Luncheon 120:19
L.A 19:4

_____

**M**

M 2:12 242:3
made 46:10,20 47:8
47:20 48:6 50:6
115:16 122:10
193:3
Mae 17:23,23
mailbox 115:22
major 8:25 198:5
majoring 10:3
make 45:22 47:5,18
47:24 60:11 95:18
103:3,5 108:3
122:4 144:19
163:17 185:17
186:17,24 191:15
191:22 193:24
205:11,22 206:13
206:14 220:12
222:21 223:11,12
makes 72:13 74:4
144:14 229:10
making 115:19
169:5
manage 15:6 24:18
managed 22:7
24:23 25:4,9

management 23:17
24:21 42:24 43:5
managing 23:8
25:12
Manhattan 239:10
many 5:4 22:15
24:7 38:9 108:25
139:10 158:13
224:17 229:7
March 38:7 39:13
39:21 40:23 41:17
41:24 97:16,16,23
97:23 98:5
Marilyn 36:16,17
37:17 42:7 43:15
44:5
mark 62:18,19 70:3
70:10 80:4 81:19
81:20 83:18,19
101:10,11 105:9
218:23 221:16
234:23,23
marked 49:3 51:8
62:17,22,25 70:6
79:5 80:7 81:23
97:13 98:7,12
99:6,16,18 100:23
105:14 121:12
179:4 221:20,22
222:5,10 234:11
234:14 235:8,23
marker 72:3
market 29:4 196:25
198:14 225:20
226:5
marketing 10:20
11:13 13:20 29:5
29:7
marking 98:3 223:8
marriage 243:17
Massachusetts 8:8
9:2 11:20 12:2,7
12:10 13:4,7,17
13:18 14:11 15:18
Master 100:14
matched 66:3
math 226:2 228:10
matter 243:18
maximum 159:4
maybe 16:25 37:8
38:11 39:12 63:10
73:7 74:17,17
85:24 86:24 87:16
87:16 90:2,7
118:11 126:23
155:2 156:19
161:22 200:13
mean 8:14 19:20

37:11,17,17 98:24
158:9 159:3,18
171:20 219:15,18
220:3
notified 175:21
November 216:24
number 49:19
62:21 63:2 160:8
165:14 167:11,15
167:16 201:13
211:6 220:24
232:16 233:16,17
244:9,11
numbered 126:21
126:23
numbers 70:5 75:4
75:7 76:23,25
77:2 200:2 208:6
210:2 221:24
229:15 233:11,12
233:21 244:13
Nyiesha 216:6
217:8

**O**

O 121:2,2,2 242:3
oath 3:12 242:8
object 163:3 233:4
objection 12:15
17:20 19:17 20:13
22:3 33:7 56:5
58:8 64:20 92:12
110:25 111:2
113:19 136:13
140:23 145:6,22
154:14 227:9
objections 3:7
obligated 180:15
obtained 58:17
obviously 43:4
occasion 116:22
occupied 226:9
occurred 12:23
October 72:16,22
off 12:21 47:16 70:8
71:17 95:24 105:5
105:6,7 123:22
135:12 136:7,8
138:3,4 168:11
186:7,8 200:12,24
200:25 201:5,7,13
218:15 219:9
234:17,18 238:24
239:2,5,7 240:12
240:25
offered 18:18
offering 143:10
office 55:10 68:17

79:2 90:15 102:9
112:19 119:21
240:23
officer 3:11 31:8,22
offices 1:12
off-the-record
240:14
often 39:10,11
oh 22:24 51:5 73:7
114:9 115:4,4
118:14 158:20
165:7 184:2 185:6
185:12 208:5
220:8 222:25
235:14 238:10
once 37:16 94:9
111:21 157:9
194:11,14 207:16
209:8
one 11:14,24 16:9
22:20 24:9,11
30:8 31:6 38:13
41:21 42:8 44:3
46:24 56:3 62:14
63:21,22 64:12,12
67:15,17 71:5
74:25 76:2 81:7
81:17 82:22 86:3
86:14 92:18,22
93:3 94:11,25
95:5,20,20 96:5
96:15 98:2,6,18
99:9 106:11,13,13
107:17 109:4,5
114:21 115:2,7,9
116:22 131:21
141:23 142:5,9,21
149:2 158:6,8,12
158:13,14 159:2
169:8 172:23
188:8 198:12
200:17,23 208:19
211:5 212:7
214:17 218:24
222:5 223:11
229:6,24 230:15
230:16 231:23
232:21 234:6,8,25
235:3 236:2
ones 10:16
one-page 98:20
99:7 100:18
one-semester 11:11
one-year 158:17
160:9 171:19
205:20
ongoing 167:19
only 16:9 32:13

41:21 53:19 86:10
94:8 95:5 99:11
119:9,15 140:20
141:2,8,11 151:10
153:2 166:14,16
179:15,17,20
180:6 181:18
183:8 205:11
214:24 223:11
Oops 219:2
open 28:2
opened 21:22 22:17
23:2 27:25 28:13
28:13 169:11
operating 34:12,14
operations 5:11
6:18 24:18
opinion 162:24
163:19
opportunity 53:2
61:14,21 91:13
92:23
opposed 44:2 67:21
132:21 193:2
option 206:7,9
241:5
options 160:9,10
oral 46:21 47:3,5,8
88:7,18
orally 86:13
order 1:14 93:22
99:5 169:10
ordered 90:22
102:17
organization 19:24
49:14
original 55:2,3,4
59:10,12,12,14,15
68:10 71:22 73:13
73:22 74:5 78:9
78:15
originally 28:2 68:8
111:19
Originate 17:8 59:6
originated 17:17
20:2,5,12 58:3,5
73:4
originating 17:11
19:8 119:5
origination 20:23
other 4:22,22 16:14
22:13,20,22 24:11
24:15,17 26:8,12
26:16,17 27:3,16
30:15,23 41:24
45:21 47:6 48:20
51:24 55:18 56:8
86:15 91:9 94:11

106:19,20 108:22
112:4,13,14
113:17 137:2
139:21 140:3,5
141:22 142:10,18
148:18 150:10,23
151:8,24 155:6,15
155:24 156:3,6
159:21,23,24
168:2 169:14
172:12 197:17
214:14 218:5,12
222:4
others 235:2
otherwise 88:11
ought 163:15
out 36:15,21,22
64:12,13 66:14,20
66:21 67:2 72:21
80:22 103:6 104:3
115:22 119:15
120:11,12 144:3
145:2 164:21
170:4 174:7 180:7
189:23 207:5
235:2
outcome 243:18
outlined 170:23
outside 5:13 43:6
85:20 87:8
outstanding 40:6,8
over 39:11 56:3
70:12 77:9 82:21
82:22 83:3 90:21
115:6 116:7 161:6
164:8 194:5
200:19 201:19
221:12 238:14
owe 41:5 188:24
194:12
owed 41:4 206:5
own 5:20 21:22
owned 6:16
ownership 5:22
6:14 43:6
owns 6:15
O'Connell 54:19

**P**

P 2:2,2
pack 102:22
package 102:23
pages 49:6,10,12,15
49:17,18 50:13
54:5 69:9 72:6
73:17,20,22 74:4
79:6 85:4 95:17
97:13,21 98:12

99:17 106:19
107:14 108:23,25
114:13 115:10
122:14 139:14,15
141:10 148:18
161:9 166:5
190:13 222:22
paid 164:24 177:20
207:10 213:5
214:18 215:25
216:15,16,23
217:12 227:4,8,10
239:9
paint 192:24
paper 47:14 106:7,9
106:10
paperie 1:7 34:20
36:9 37:5,22
109:14 139:22
140:13,18 161:21
161:25 164:6
212:22 215:25
224:17 227:18
233:8 239:9
Paperie's 211:25
223:7
paperwork 17:13
17:16 18:2,6
19:13,16 21:15
26:4
Papyrus 169:15,18
paragraphs 160:22
182:14
Pardon 26:10
206:24
parent 5:18 6:6
parentheses 122:23
parenthetical
125:19
part 9:10,11 14:11
19:15 20:25 21:10
33:14 37:18 100:3
119:7 135:7
160:24 180:8,9
210:24
participate 37:25
particular 22:10
52:8 61:25 223:17
234:6
particularly 126:2
parties 3:3 20:19
25:12 26:3 34:5
102:17 123:3,12
123:19 124:21
125:14 127:2,17
135:21 136:11
137:3 144:16
145:3 170:2

protection 152:20
provide 127:4
    143:17 144:11
    145:11 147:13,15
    175:9 193:12,14
    220:6 221:10
provided 124:21
    146:13 175:11
provides 146:7
providing 148:9
provision 161:11
    162:8,9 172:20,25
    199:20 212:17
    213:12
provisions 163:23
psychology 9:3 10:4
    10:12 13:8,14
    14:2
public 1:17 4:5
    121:6 242:22
    243:9
purchase 36:5
    143:8
purchased 41:8
    144:8
purchases 145:4
purchasing 35:18
    35:20,25
purpose 39:21
    45:19 80:19,21
    148:18
purposes 30:21,22
    30:23 213:11
    214:10
pursuant 1:13
    33:21 216:15
push 92:19
pushed 20:5
pushing 92:16
put 49:2 51:7 59:2
    62:24 63:14,15
    70:2 80:3,9 89:13
    92:4 94:2 110:11
    110:12,13 111:12
    111:14,15 113:25
    121:11 128:6,20
    134:2 137:5
    178:24,24 184:4
    189:10 196:12
    228:16
putting 97:11,19
    115:23 128:3
    194:17
P-O-T-T-E-R 27:7
p.m 71:8 78:9
    120:19 121:3
    240:22 241:4,8,11
    241:13,18

P0S 175:12

——————
Q
——————
qualified 145:10
    146:16
qualifying 17:24
quality 75:10,20,22
    76:7
quarter 37:7,8
    185:22 189:18
quarterlies 189:25
quarterly 185:19
    187:22 188:17
    189:5,24 191:15
    191:21,23 193:5
question 3:7 15:19
    26:14 33:8 34:22
    40:23,25 43:11
    49:5,17 56:9,11
    68:9 75:18 83:18
    83:19 87:5,6
    88:24 92:18,22
    93:3,25 95:19
    97:10,17 98:22
    101:10,11 103:23
    115:13,14 116:10
    119:12 124:13,14
    124:15 126:9
    127:6,18,20
    129:18,22 130:6
    131:2 134:5,6,10
    134:12,15 139:24
    142:12 144:17
    145:19 152:10
    153:23,25 172:18
    175:2 183:12
    186:11,13,15,22
    189:10 190:25
    191:3,24 206:12
    206:18 207:17
    210:5 214:10
    219:20 231:13
    238:15 240:3
questioning 101:2
    218:17
questions 4:10
    91:24 93:2 157:17
    233:7
quibble 115:6
quick 140:7
quickly 140:7
    169:10
quotation 131:24
quotations 126:10
quote 180:2,4
    230:22,22

——————
R
——————

R 2:2 121:2 243:2
racked 116:6
raise 137:4
raised 102:3 161:16
rate 166:16 181:17
    195:3 205:21
    215:14 223:17,21
    223:22,23,23
    224:3,8,9,11,13
    225:11,11 229:3,7
    229:13,14,18,18
    230:7 231:14
    236:17
rates 223:19
rather 134:9
reach 180:25
    184:23 231:23
    232:25
reached 23:16
    156:7 189:20
reaching 180:25
    189:17
read 34:23,24 52:18
    54:24 58:23 66:9
    67:12 68:6,11
    70:15 73:19 74:11
    82:4 83:2,9 98:17
    99:10,12 105:16
    124:15,16,18
    126:23 127:25
    130:15 132:2,15
    132:19 133:4,23
    135:13,18 138:22
    141:17 150:5
    151:13,17 152:22
    154:9 157:19
    161:20,23,24
    162:16,18,19
    163:7 168:9,12
    171:15 174:23
    175:8 176:25
    179:10 185:13,14
    186:18,19,20
    191:2,4,6 193:12
    196:15 197:22
    201:9,18,21,22
    206:13,16 222:23
    223:2 224:3
    228:22,25 236:15
    236:16 242:7
reading 130:17,23
    130:25 134:8,19
    135:14 158:20
reads 208:19
ready 80:22 105:18
    169:11
real 22:7,12 24:20
    25:12 140:7

really 8:18,20 54:24
    61:12 80:2 107:11
    116:10 118:10
    119:18 138:6
    157:8,9 165:7,8,9
    165:12 172:14
Realtime 1:15 243:7
realtor 18:24,25
    20:16 21:4,17,18
Realtors 18:21
reason 28:23
    113:17 114:4
    164:25 188:23
    209:11
recall 9:18 14:8,24
    16:13 40:7 42:4
    45:25 47:13 48:11
    51:24 55:16,22
    57:9,13 58:2
    59:25 69:25 73:6
    79:19 80:2,2
    86:22 87:19,20,21
    88:8 106:12 107:7
    107:12,14,15,16
    108:4,6,8,19,21
    108:22,24,24
    109:3,20,21
    110:21 111:6,13
    112:18 115:19,20
    117:4,5,9,12
    118:3,5 121:15,18
    122:6,8,9 126:19
    128:19,23 129:2
    132:3 133:25
    135:19 153:11,12
    153:17 154:15
    162:2 163:21
    164:11,19 165:7
    168:2,16,21
    200:13,25 218:9
    218:11
recalls 115:2
recap 241:9
receipt 61:20
    110:15
receive 102:12,13
    105:25 106:2
    169:21 175:24
    189:13 219:25
received 79:17,20
    79:21 102:22
    106:3 107:18
    109:5 111:5,25
    112:9,20 113:6
    114:15 115:23
    117:19 122:5
    145:12 147:10,11
    201:6 209:13

219:17,21 238:2,7
receiving 60:10
    108:19,22 145:10
    146:15
recent 67:2 185:18
    189:23
recess 47:11 120:19
    140:10 208:13
    218:16
recognize 222:7,14
    222:15,16
recollection 14:14
    50:23 64:17 88:18
    88:21 93:14 94:6
    101:25 104:9,10
    116:3 117:15
    122:7 134:22
    135:14 136:9,15
    136:17 137:10
    152:3 153:18
    154:8 156:18
    166:5 170:7
    195:23,24
record 14:19 29:23
    34:24 47:16 67:13
    70:8,16 75:14
    77:3 82:10 88:2
    93:21 95:16,24
    96:2,2,7,15,18
    100:9 102:7,22
    103:7,22 104:19
    105:5,6,7 109:15
    121:10 124:16
    126:24 135:12
    136:7,8 138:3,4
    168:11,12 176:3
    185:13 186:7,8,18
    191:6 196:3 202:2
    206:16,22 218:15
    219:9 220:13
    222:3,9 234:17,18
    234:22 235:22
    238:25 239:3,5,7
    240:12,13 242:10
    242:12 243:14
records 89:18,20
    192:11 217:2
reduced 40:4
redundant 183:4,4
    183:5,6,8,16
reevaluate 210:18
refer 7:18 68:9
    122:23 123:18
    125:5 148:3 149:6
    149:11,14 152:12
    162:3 171:15
reference 68:6,7
    72:15 96:10 99:11

188:21,22 189:4
191:19 211:12
240:2
says 73:2,13 83:15
101:8 110:10
122:19 127:15
131:8 133:10
142:4,8,21 146:2
149:23 158:5
159:5 160:8
176:19,22 177:24
181:21,23 182:20
188:24 190:6,14
190:18 198:3,8,10
212:18 215:14
224:2 229:6 230:7
230:8 231:5,11
234:12
scale 195:9
schedule 147:22
148:7,10,11
151:16,19,22
152:5,19,24
153:15,20,21
154:11,15 155:19
193:4 205:4,16
208:23 223:20
228:23 231:11
school 9:4,14,17
schooling 8:6
science 14:7
scope 5:10 103:24
screen 66:19,21
sealing 3:4
search 104:20
searched 119:20,23
120:3,5
second 27:14 51:16
71:2 82:9,11
90:10 101:13
107:24 108:2
109:9,17 122:18
122:19 123:10
126:8,18 129:7,21
130:13 158:18
202:17 219:7
secretary 240:25
see 6:17 20:20
43:21 52:12 60:24
63:18 65:10 70:23
72:4,6,19 74:12
78:5 80:17 81:8
83:11 85:9 87:24
88:19 93:13 94:25
110:9 115:4
122:18 125:13
129:22 132:6
144:9 148:2

168:23 169:22,23
186:9 190:16
200:22 202:11
205:5 211:16
231:6 235:19
238:15,17,17
seeing 106:18
238:19
seem 65:6
seems 63:25 131:10
200:12 201:13
seen 53:17,21 95:20
104:8 193:19,21
222:12,18 223:5
235:15
segalla 1:12 2:3
sell 41:10 118:23
selling 41:11
sells 5:12,16,19
semantics 155:2
semester 11:14
12:18,19,23 16:9
send 61:19 68:20
72:14 78:21 79:3
79:7,18 240:25
sending 48:24 52:21
senior 31:21 119:6
sent 36:15,21,22
50:14,23 53:10
60:22 61:8 65:3
67:5 68:8 72:12
73:10 77:13,24,25
78:2,8,14 81:2,3,9
83:14 85:8 86:6,7
86:8 101:5 111:18
122:8 128:24
153:13,19 154:10
161:21,25 165:10
166:5,8,11,24
167:5,17 184:18
199:4 236:5
237:19,24 238:20
sentence 40:19
52:16,17 67:8,12
68:3,5,12,16
80:16,20 83:9
105:24 122:18
125:3,13,18,20
126:6,8,17,18,22
127:14 131:6,10
133:4,4 138:22,25
145:9 146:10
151:13,17,18
sentences 139:4
141:17
separate 23:25 24:2
September 12:13,14
12:25 16:23 35:16

35:24 39:17
served 38:20
set 38:5 71:4 89:23
133:9,11 135:16
140:20 141:8
151:22 154:12
173:18 174:5
195:3,7,9 214:3
229:3 243:12,19
sets 141:25 208:21
208:22
seven 38:12,25 39:3
39:6
seventh 49:24
several 27:16 75:17
95:17 183:23
196:16 229:2
shares 34:2
sharing 93:8
sheet 107:4
Shin 117:22
shop 140:14,18
180:4,17 181:7
shops 46:12 47:12
shop-in-shop 48:17
55:15 73:23 80:24
84:22 103:16
118:18 139:6
143:7 165:19
168:3,15,19
169:16,17,20
173:14 187:9
209:5,8,16 210:7
210:19 211:16
217:14 225:16
shop-in-shops
48:20,22 168:23
169:2
shorten 63:10
shotgun 92:25
show 76:19 123:7
139:14,15 176:9
200:14
showed 48:18 87:22
showing 139:2
shown 77:15,19
140:16
shows 76:22 208:23
sign 53:10 80:23
110:11 111:16,17
111:24 112:8,25
113:10,14 123:12
123:15,20 124:22
signature 82:5,8
106:7,11,17,25
107:18,21,22
108:13,17 109:6
109:10,12,16,19

109:22 110:5,10
111:21 112:10,16
112:16,24,24
113:2,3,7 114:7
114:16,22 115:7
115:15,15,16,21
132:7 133:3,5,19
signed 3:10,12
83:14,25 84:3
101:3,4,5 110:2,9
110:17 111:18,22
112:5,15,18,23,25
113:7,8,12,21
117:10,11,11,19
124:5
significance 21:14
59:24 61:25 62:6
119:4
significant 61:12
137:3 169:24
significantly 210:3
signing 20:22 80:18
83:12 92:9,9
115:24 123:4
124:2,4 133:5
135:7,10 232:24
similar 19:11,12,15
55:6,8,13,17,23
57:10 64:2 66:2
139:20 162:9
Simon 36:19 37:17
42:8 43:15 44:5
simply 207:2
since 4:15 7:12,25
16:15 35:10 102:7
116:14,21 119:5
137:22 138:10,11
175:12 189:21
216:2 218:7
single 105:9 107:9
114:16
single-page 80:10
sir 31:4 33:18 80:11
80:16 85:22
117:20 150:15
183:8 189:3
192:15 196:16
231:13
sit 61:24 175:22
situation 32:6 57:21
situations 55:24
six 38:11,24 39:2,6
67:10 187:15
size 25:21 226:7,8
sketch 8:6
slow 37:14
small 222:24
smoothly 206:15

Soho 73:24 136:25
140:3,5 148:3,17
148:22 149:4,6,11
149:14,17,20,23
150:11,11 151:2,5
151:10 154:16
156:21 157:23
160:8,23 161:8
164:8,13 165:17
170:23 175:3
180:16 181:7
190:3 197:21
198:24 204:13
212:8 214:4
230:10
solution 143:5
some 4:9 27:10 40:4
43:5 59:13 75:6
113:17 114:4
116:17 120:4
128:18 143:11
157:17 170:11
180:8,12 208:9
218:10
somebody 128:19
somebody's 215:14
221:11
someone 48:5 57:19
57:22 60:22 61:8
61:19
something 14:18,20
16:13 51:6 54:21
55:21 90:13
110:14 163:18
174:6 192:24
220:21 224:21
227:15 231:18
239:6
sometime 16:12
18:13 33:13 35:2
35:16 37:7 39:13
41:23 46:17 79:24
Sometimes 159:7
somewhat 141:4
somewhere 17:2
23:14,21 37:9
soon 102:13,15
189:8,12
sophomore 11:22
11:23
sorry 5:2 7:3 10:18
16:13,23 20:3
24:11 32:18 34:21
36:12,16 40:16
49:19 50:3,6,7
51:5,23 52:9 58:4
62:5 63:9,23 64:4
77:22 86:6 94:16

T 121:2 242:3 243:2
243:2
table 79:5 88:11
89:4 93:12
Taft 9:6
tag 65:18
take 10:11,14 14:3
14:3 33:15,19
37:20 46:23 57:25
58:14 61:20 66:4
66:5,6 74:8 82:25
85:25 90:3,8 94:7
95:17 99:3,19
100:19,24 111:22
116:6 119:20
137:19 139:6
140:7 144:13
147:6 165:11,16
175:22 176:9,11
179:7 180:14
207:5 222:6,13
223:14 224:23
225:24
taken 1:11 13:13
15:23,23 47:17
116:11 119:9
140:10 208:13
218:16 242:8
taking 33:24 115:22
talk 51:23,25 155:5
165:5 219:6
talked 85:13 169:19
talking 26:17 51:25
61:5 71:18 93:10
103:18 155:2
165:3 178:18,18
199:19,21 203:10
talks 200:20
Tammy 27:5,8,10
target 35:5
taught 16:18
tell 21:24 22:4
26:21 28:4 38:4
48:11 51:12 58:23
63:5 72:13 73:15
80:11 83:4 96:9
97:2 105:19
115:20 127:12
134:25 136:15
145:25 154:4
161:13 166:23
179:8 185:8,10
199:17 205:10
208:22 211:13
219:17 222:7,13
223:15 236:3
telling 103:7 186:20
187:14 189:6,11

189:13
template 121:16
122:5
ten 90:3,5 159:16
189:20,22 222:4
229:24
term 127:23 139:25
144:2,15 157:12
157:17 158:5
159:10
terminate 160:12
160:15,16 164:16
164:22 165:2
170:5,14,22,24
171:7 172:3,5,6
172:14,16 173:14
173:22 174:9,10
174:14,19 205:25
207:12,23,24,25
211:19,19,25
212:17,23 213:3
213:17 214:3,25
215:19
terminating 206:7,9
termination 98:25
158:10 171:10,21
171:23,24 199:20
terms 12:13 16:17
16:21 20:20 49:12
50:4,8 123:13
124:6 133:7,9
134:2,23 135:16
135:19,22,23,25
136:2,4,11,18,20
137:2,4,13,22
138:12,13 148:17
148:19,22 149:4
149:24 150:12
156:24 157:5
159:19,21,23,24
160:20,24 161:4,8
164:8,14 170:24
171:5,22 172:12
172:24 173:15,17
173:22 174:22,25
175:3 177:7,12,13
178:4,7 188:4,9
190:3,22 191:17
191:20 192:3
193:10,11 197:21
198:25 201:13
207:8 212:4,7,8
214:2,4 218:8
230:11,16,17
231:4 233:8,9
testified 4:6 47:20
49:8 56:11,19
84:21 86:12 87:10

100:7 103:20,21
114:24 121:7
144:20 192:19
194:7 196:16
testify 86:23 131:19
testimony 35:19
50:22 58:2,22
62:2 103:25
111:22 112:8
117:3 119:8,11,13
120:16 121:14,20
121:23,24 130:22
130:22,24 133:13
134:7,21 144:13
144:24 147:7
162:6,12,15
173:10,13 175:14
180:14 189:9
194:10 199:24
202:20 203:18
208:7,8,10 212:10
213:25 217:11
219:11 225:12,13
233:15 242:8
243:14
text 64:15 65:21
67:20 100:10
thank 32:16 34:25
36:20 50:5 79:13
83:15 88:3 101:7
152:8 153:4 175:4
193:7 202:18
218:19,20,21
228:3 230:25
231:16 235:10
241:17
their 19:7 46:4,4,5
46:6 48:19 102:18
143:6,10 144:14
166:15 198:12
220:24 237:9,11
239:9,18,18,25
240:4,5,6
thereabouts 203:25
thing 126:12 128:25
157:8 169:8
things 59:13 63:10
164:20 173:18
think 7:14 8:10
10:21,24,25 11:6
12:17 15:10 16:25
23:20 26:24 28:17
29:5 32:17 33:12
37:7,15 46:3,18
52:10 53:22,22
54:25 56:10 59:2
59:6,24 61:25
68:14 72:13 74:4

81:15 85:3 88:17
89:7 94:7 98:5
112:2 114:2,14
116:11 121:21
129:12 130:23
132:16 134:21
138:5 139:9
144:21 146:23,24
162:7,14 166:20
167:15 179:23,24
191:14 194:5
195:25 201:2
206:18 208:17
209:3,6,18 213:25
220:10 224:19
225:20 228:23
234:6,11 235:2
thinking 12:17
58:24 60:16
116:17 153:19
164:11 209:17
210:25 211:3
third 25:11 49:21
49:23 51:18
139:10 140:13
141:22 148:7
149:6,11,25 150:3
150:6,18 151:13
152:12 208:17
third-party 24:23
24:23 25:4,9
third-to-last 129:5
though 181:14
thought 60:9 87:11
87:16 116:18,21
116:24 161:16,18
162:20 168:8
172:19 186:14,25
187:5 189:16
thousand 215:4,6
three 5:6 17:2 30:2
39:12,14 77:19
95:2 97:13 98:12
157:24,25 158:3
158:22 160:9
234:21 236:14
threw 202:15
through 7:2 9:13
14:21 15:16 20:5
33:13 35:21 36:5
46:18 50:3,6,8,10
50:13 64:7 70:6
70:17 73:18 74:7
78:18 83:14 84:19
85:4,14 86:2 90:3
90:9 93:13 95:4
95:18 99:18 101:5
136:11 139:10

148:15 165:17
169:22,23 190:13
221:19 222:11,20
223:9,20 224:2,7
234:7 244:13,23
throughout 26:20
throwing 12:20
123:22
thrown 120:11
tie 178:3
tied 232:14
till 18:12 39:16
61:11 200:6
time 3:8 4:11 18:15
18:16 22:16 23:8
23:10,18,23 29:10
29:16,19 30:6,21
33:10 35:3,19
36:25 37:14 39:17
39:18 40:9,21,23
41:12 42:12 43:9
43:12 44:21,23
45:2,3,4,4,5,6
46:9,10,22 47:3,6
48:6 56:3 66:4,6
74:8 78:22 79:16
82:25 84:19 85:17
85:19 86:5 87:17
88:5,14 92:23
102:16 115:8
116:11,17 118:7
122:9 126:3,25
127:16 128:24
131:9 135:24
146:13 147:12
153:13,19 159:5
161:20,22,24
163:22 164:24
167:6,8 169:11,16
172:17,25 174:11
175:14 190:21
194:11 196:18
198:13 200:6
217:12 218:18
219:23 220:20
237:20,24 240:22
241:18
timely 159:18
times 22:13 25:15
39:12 61:2,4
77:20 139:10
196:17 225:25
title 22:25 42:19
148:16 150:15
177:9
today 7:2 24:21
29:14 61:11 68:18
87:22 99:16

159:15 168:22
196:15 209:12
211:16
**wants** 26:24 90:13
**wasn't** 21:7 47:3
53:5 59:23 106:16
111:18 170:4
185:3 188:21
203:22 204:15,17
**way** 48:16 49:21
53:15,16 57:9
65:8 81:19 84:19
86:14 88:23 90:11
99:25 126:20
129:13 152:23
153:3,5 164:12
166:14,16 180:11
183:8,9,15 196:24
197:3 200:12,24
200:25 209:23
222:20 227:13
243:17
**Weathersfield**
32:25
**Wednesday** 101:4
**week** 79:16
**weekend** 52:5
**weekends** 37:10
**weekly** 187:8
**weeks** 37:22
**welcome** 79:14
185:16 193:8
**well** 8:16 11:15
21:18 26:20 30:24
33:2,25 35:4,9
37:13 38:24 40:2
43:25 44:18 47:16
51:13 57:8 58:10
62:18 65:8 67:16
70:14 71:12 74:23
76:18 81:18 84:21
90:5,7,10 92:7
93:11 95:14
100:17 103:17
104:6 110:23
111:8 112:13
114:10,19 115:18
115:18 116:10,18
118:6 120:11
122:9,13 123:8,23
125:3 127:20
130:22 131:21
134:25 136:15
137:12,15 138:22
144:19 145:18,23
146:19 148:20
151:4,11 153:12
157:15 159:23,24

159:25 160:7
164:19 171:5
175:20 180:2,11
181:16 182:6
184:2 189:2,10
196:10 198:19
200:22 205:3,10
206:19 207:17
208:21 209:3,20
210:20 212:4
235:25
**went** 11:20 13:2
14:21 34:2 39:11
54:25 62:10 194:5
201:19
**weren't** 84:4 91:21
**Werner's** 241:12
**West** 28:6,11,14,21
**we'll** 47:2 62:18
77:9,10 81:19
93:23 125:12
184:2 186:24
208:11
**we're** 15:15 56:8
69:11 71:18 82:13
85:3 99:14,15
102:16 113:3
126:23 144:21
148:13 150:8
152:10,22 155:2
157:8 194:2
195:18 203:10
208:5 222:2 240:3
240:9,10,13
**we've** 26:17 27:15
45:6 65:12,13
67:17 82:10 84:25
88:17 101:19,22
139:9 163:8
178:16,16,17
200:6 208:9
233:18
**whatsoever** 88:13
116:3
**WHEREOF** 243:19
**while** 13:16,20,25
17:18 18:5 19:6
20:4
**White** 2:5
**whoa** 186:12,12,12
**whole** 91:21 114:8
114:12 206:17
209:11
**wholly** 6:16
**wider** 67:20
**William** 9:6
**willing** 136:17
220:3,7,10,14

221:2
**wise** 137:17,19
226:21
**wishes** 94:4
**witness** 4:3 10:19
14:6 15:5 27:7,9
32:15 66:9 70:15
73:19 74:11,12,17
74:21 75:2 76:3
82:4 83:2 94:3
95:9,15 96:4,19
98:24 100:9
101:14,17 105:16
131:15 135:13
141:13 150:5
157:19 164:4
175:19 179:10
196:4 219:6 223:2
227:2 234:25
235:19 237:15
243:11,14,19
**woman** 27:4
**Woodland** 9:6
**word** 58:11 59:25
61:12 62:2,6 64:7
64:7 66:5 69:5
122:22 123:10,23
124:17 126:10,16
129:4,6,7,19,25
130:8,13 131:4,6
132:6 144:21
145:15,19,23
168:7 182:10,25
184:15 192:19
197:13,15 230:4
**wording** 66:24
162:8,9
**words** 57:18 91:9
112:4 127:13
128:20,24 154:7
157:21 158:20
161:5,9 164:7
197:7 229:23
**work** 16:21 17:12
17:15 18:2 19:9
32:3 41:14 119:24
145:2 164:21
171:25
**worked** 19:7 27:4
32:6 128:9 144:3
**working** 16:22 17:4
143:5 170:4
**workout** 33:17 40:5
43:16,19,20
163:14
**works** 221:7
**world** 225:21 226:5
**wouldn't** 44:3

101:17 116:16
154:25 169:18
210:17 212:2
**write** 54:2,3,4 199:7
199:8,11
**writes** 202:14
**writing** 33:23
190:15 192:8,9,12
192:13 230:8
**written** 47:21 48:7
48:12 84:24 85:2
85:3 132:2 133:20
**wrong** 220:23
**wrote** 52:6 58:21,24
59:5,5,6 78:11
164:15 182:16,24
187:25 197:6
198:19,20 202:7
236:22

---

**X**

x 1:3,8

---

**Y**

**yeah** 4:25 15:5,5
16:7 19:5 27:9
34:16 53:6,24
63:10 66:7 74:10
75:2 88:22 89:25
95:9 99:11,13
100:20 110:11
127:15 135:9
148:2 155:10,13
159:7,9,15 167:3
170:15 171:4,9
175:20 186:21
187:24 188:4
196:7 200:9,10
203:6,10,19 204:2
207:20 208:19
209:7 211:4
222:16,23 227:12
235:14,20 237:16
**year** 6:25 8:9 11:24
12:12 21:20 28:16
36:11 137:22
138:6,9 158:6,8,8
158:12,13,17,19
159:2,2,5,17
160:17,17 170:25
171:19 196:8,9
197:7 198:15
199:17,23 200:2,3
202:10,23 205:14
205:24 207:9,15
208:4,25,25 209:5
209:24 210:6,16
211:5,9 212:25

213:14 214:17,19
214:24 224:11
225:4,5,6,11
226:4,15,16
227:17 228:12
233:23 236:19
239:24
**yearly** 237:9,12
**years** 6:23,24 7:14
7:15 9:12 10:7,8
12:3,4,9 18:10
157:24,25 158:3
158:13,14,14,22
159:17
**yesterday** 46:25
49:4,22 51:8
91:18 93:5 97:4,6
101:20 121:12
175:13 200:11
201:19 202:21
208:7 218:25
219:12,23 220:20
221:6,25
**yesterday's** 184:5
**york** 1:2,13,13,17
2:5,10,10 4:6
242:4,5 243:4,5,9
**Yup** 167:13
**Y-A** 118:17

---

**Z**

**Z** 156:20
**Zama** 235:8 236:6
244:24
**zero** 23:12 25:6

---

**$**

**$114** 225:4
**$114.52** 225:10
**$114.53** 225:5
**$135** 195:20
**$140** 160:19 164:23
167:11 168:13
171:3 195:13
196:25 198:14
199:17,19 204:13
207:10,14 208:3
212:25 213:14
214:7 225:15
**$150,000** 209:14
**$249,000** 215:8
**$250,000** 181:6
182:12 185:9
188:3 209:15,21
210:4,15 218:4
231:23 232:13
233:2
**$250,001** 181:18

**5:00** 241:4
**550** 210:10
**57th** 140:17 141:23
  149:14 150:2,3,6
  150:18 152:13
**599** 2:9

---
**6**
---

**6** 50:7 62:10 71:8
  73:11 77:14 78:2
  78:8 79:24 81:3,9
  81:10 85:8 86:6,7
  86:19 87:7 88:6
  88:14 89:10,16
  91:10 92:5,8
  93:17 97:20,25
  98:16,17 99:8,21
  102:3 104:12
  139:18 160:19
  164:23 171:3
  177:25 178:4,7,9
  178:12 180:15,23
  180:24 181:17,22
  182:21 183:17
  188:7,9 194:12
  206:2,4 207:11,15
  212:11,19,21
  213:2,4,15 214:14
  214:16,18,23
  215:2,5,9,17
**6th** 94:15,16 95:12
  98:10,15
**6,000** 224:21 225:2
  225:3 226:20
**6:00** 241:4,8,11,13
**60** 158:9 159:17
**60,000** 215:2
**60-day** 159:3,18
  171:20
**62** 244:11
**650** 210:10
**687,150** 224:10,25

---
**7**
---

**7** 23:15,16 25:7
  49:24 50:3,7
  52:14 98:2 129:20
  129:23 130:18,21
  131:5,14,18
  132:13,19 133:15
  133:18 147:18
  148:15 151:11,14
  152:17,17 153:15
  153:22 155:18
  193:10,11
**7th** 87:23
**7-1/2** 226:22
**70** 227:25 244:13

**72** 136:24 148:3
**75** 196:19 199:21
  228:11
**750** 205:2
**750,000** 204:23
  205:14

---
**8**
---

**8** 30:18 50:7 80:14
  81:14 83:7 86:6
  92:5,8 98:5,6
  100:20,25 157:13
  157:16,21 158:2,4
  158:21 159:13,19
  160:21 164:7
  171:10,25 172:7
  234:20 236:13,17
  236:19,23,24
  237:2
**8th** 91:2 94:14
**8:00** 240:22
**8:59** 71:8 78:9
**80** 244:14
**81** 244:15
**82** 12:13
**83** 12:14,14
**84** 12:14
**86** 18:11
**88** 18:13
**89** 223:9

---
**9**
---

**9** 50:7 51:9,13 62:9
  63:13,15,20 64:2
  64:3,4 65:17
  67:14,20 68:4
  87:3,25 94:3
  98:11 101:4 219:2
  227:2,5,10 234:20
  236:13,19,23
  237:2 239:17
**9/13/62** 8:24
**90** 30:14
**900** 226:13
**95** 23:20 25:7 30:6
  30:16
**96** 33:14

# EXHIBIT I

ORIGINAL

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -x

KOLO, LLC,

                         Plaintiff,

          -against-                CASE NO:

                                07-CIV-10653

KATE'S PAPERIE, LTD,

                         Defendant.

- - - - - - - - - - - - - - - - - - - -x

                         February 11, 2008

                         10:17 a.m.

DEPOSITION of LIONEL FLAX, a witness on behalf
of the Defendant herein, taken pursuant to
Court Order, and held at the offices of
Kirkpatrick & Lockhart Preston Gates Ellis, LLP,
599 Lexington Avenue, New York, New York, before
Mary T. Slavik, RPR, a Certified Court Reporter
and Notary Public of the State of New York.

DALCO Reporting, Inc.
court reporting • legal video • videoconferencing
170 Hamilton Avenue, White Plains, NY 10601
914.684.9009  Fax 914.684.6561  212.679.6095
800.DAL.8779  dalcoreporting.com

LIONEL FLAX

85

1       Q.    Still the second page.

2       A.    "Did you find it?"

3       Q.    And that is dated May 10th, 2007?

4       A.    Yes.  Okay.  I'm following you.

5       Q.    Now, if you flip to the first page.

6       A.    Okay.  Exhibit 2, the first page with the

7    sticker, yes.

8       Q.    If you look down three inches roughly from

9    the top, you will see it starts, message, Keith Werner

10   wrote, "Hi, Lionel, I did receive your faxed LOI," do

11   you have that?

12      A.    Yes, that is what he wrote.

13      Q.    Right.  And now if you sent -- do you have

14   any doubt at this point now that you read that he

15   responded to you, yes, I did receive your faxed LOI,

16   at this point, do you have any doubt that you signed

17   any other document other than the LOI?

18      A.    I don't see here that he specifically says, I

19   signed the LOI.

20      Q.    Okay.  But earlier, page two.

21      A.    Okay.

22      Q.    You say on May 9th, 2007, page two, "I just

23   sent this through signed," and you indicated to me

24   earlier that you sent it through via fax, through fax;



LIONEL FLAX

86

1    correct?

2        A.    Correct.

3        Q.    And then he says on the first page, "that I

4    did receive your faxed LOI." At this point, now you

5    read this sentence or even now or when you read it

6    back whenever in May 2007 --

7        A.    Yes.

8        Q.    -- did you have any doubt that you signed

9    some other document other than the letter of intent?

10       A.    Considering I never have seen a signed copy

11   of the letter of intent by both of us, I do have some

12   doubt, but it's very possible I could have sent him a

13   signed one.

14       Q.    Okay.

15       A.    But if I did, it was a letter of intent.  I

16   was simply acknowledging, if you will, his RFP or

17   request for proposal which was a way to begin the

18   discussions to enter into something later.  So it is

19   possible.

20       Q.    You mean like something later, a formal

21   agreement later; right?

22       A.    Yeah.

23       Q.    Okay.  So, Mr. Werner states on page one,

24   5/12/07, so after he says, "I did receive your faxed



LIONEL FLAX

87

1    LOI, thank you very much," then he says, "I will bring

2    the copy of the signed one to you on Tuesday."

3         Do you know if there was any kind of meeting

4    between you and Mr. Werner on whatever Tuesday he is

5    referring to?

6        A.    On the Tuesday he was referring to Mr. Werner

7    was entertaining two very prominent business clients

8    of his from Japan.  We were in the basement of a

9    crowded fancy restaurant.  I believe I was running

10   late, and I do not recall him bringing or giving me a

11   signed copy of anything.  He says here he intends to,

12   but I don't recall ever getting that.  And, the fact

13   that he had two clients who had been successful with

14   the shop-in-shop model, indicated to me that he was

15   still selling and promoting the idea, and I didn't

16   receive a signed copy by both of us, no.

17       Q.    But you attended that meeting on Tuesday that

18   he is referring to; correct?

19       A.    I attended, yes, I was there, I met them for

20   lunch.

21       Q.    And what was the location?

22       A.    The Mercer Cafe or Mercury Cafe.

23       Q.    Now, when you responded on the top of

24   Plaintiff's 2, "yes, we are making some progress, I



LIONEL FLAX

88

1    think, can we meet at the MC at 1:30 p.m.," when you

2    say MC, is that the cafe you just mentioned earlier?

3        A.    Yes, but what -- this is May 12, what

4    proceeds it, this might not even be the same strand.

5    I don't understand the question.

6        Q.    My question is simply when you say in your

7    e-mail, can we meet at the MC at 1:30 p.m., right, you

8    wrote that?

9        A.    Yes, that's right because he had previously

10   told me that, you know, we're going to have lunch with

11   the guys at the cafe, yes.

12       Q.    And that is basically the message below, his

13   message dated May 12, 2007, where it says, "I thought

14   we could meet around 1 p.m. at the Mercer Cafe for

15   lunch if that is okay with you"?

16       A.    Yes.

17       Q.    So you read that?

18       Q.    And then you responded with the message above

19   that says, "can we meet at the MC at 1:30 p.m."

20       A.    Correct.

21       Q.    All right.  Now, at that point when you

22   responded, "can we meet at the MC at 1:30 p.m.," by

23   the time you read that statement when he says, "I did

24   receive your faxed LOI," right?



LIONEL FLAX

89

1          MR. VERSFELT:  Can I have that question read

2     back?

3

4          (Requested question was read back by the

5     court reporter.)

6

7     A.   The question is?

8     Q.   The question is basically when you wrote in

9     response to Mr. Werner's e-mail, "can we meet at the

10    MC at 1:30 p.m.," by that time when you wrote this

11    message you already read his message below?

12    A.   Yes, seemingly, but there is kind of a non

13    sequitur there.

14    Q.   I understand, but apparently you're

15    responding to his meeting request?

16    A.   Yeah, I'm responding to his meeting request

17    and we meet.

18    Q.   Do you have a recollection of reading when he

19    states, "I did receive your faxed LOI"?

20    A.   Yes.

21    Q.   And did you have any reason to question why

22    he wrote that?

23         In other words, did you have any reason to

24    question that he was referring to a document that you



LIONEL FLAX

90

1     don't know about?

2        A.    No, but, no.

3        Q.    No question at all?

4        A.    Well, it's not clear that I, a; signed it.

5     It's very possible in my busy world that I faxed it

6     and forgot to sign it.  "I did receive your faxed

7     LOI," he is saying he received something, that is what

8     he is saying.

9        Q.    Right.  He doesn't say he received something,

10    he says, "I did receive your faxed LOI," he doesn't

11    say just something?

12       A.    Okay.  All right.  Okay.

13       Q.    Now, you said earlier that it's possible that

14    you signed something else.  If that's possible, would

15    he have sent you that statement, "I did receive your

16    faxed LOI"?

17       A.    I can't read his mind.

18       Q.    But did you have any conversation with

19    Mr. Werner or anybody from KOLO after May 9th 2007

20    that you sent a wrong document to KOLO, that you sent

21    the wrong signed document to KOLO?

22            MR. VERSFELT:  I object to the form.  This

23            exhibit is what you refer to as the LOI.

24            MR. VARGA:  Yeah.



LIONEL FLAX

91

1          MR. VERSFELT:  It's 12 pages long.

2          MR. VARGA:  Yes.

3          MR. VERSFELT:  Now, the issue here is not who

4      sent what e-mail to whom, but what was meant by

5      the term LOI in each of those e-mails.  That's

6      the issue.  So I think you're badgering the

7      witness trying to say, well, did you send this

8      e-mail after this e-mail.  Of course the e-mail

9      record is clear, it's incomplete in this exhibit

10     but it's clear.

11        Q.    But my question is different.  My question is

12     after May 9th, 2007, did anybody from KOLO ever tell

13     you you sent them a wrong document signed?

14        A.    Not that I can recall.  I never saw a signed

15     copy by both parties of what Mr. Werner calls a draft

16     of a proposal and here it refers to as the LOI.  I

17     have never seen that.

18        Q.    You've never seen one signed by both parties?

19        A.    Signed by myself or by him.  It's clear that

20     I might have signed it, but I don't have it, and I

21     certainly don't have one that both of us signed, and

22     I've never seen one that both of us signed.

23        Q.    Okay.  That's fair.

24        MR. VARGA:  Should we take a lunch break



LIONEL FLAX

92

1      now?

2           MR. VERSFELT:  Sure.

3

4           (A lunch break was had at 12:53 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



LIONEL FLAX

93

1              A F T E R N O O N   S E S S I O N

2

3              MR. VARGA:  We're back on.

4

5    BY MR. VARGA:

6        Q.   Mr. Flax, we're back on the record.  We just

7    had our lunch; I just want to remind you that

8    you're still under oath --

9        A.   Okay.

10       Q.   -- as we continue with the deposition.

11            Before we were talking about the letter of

12   intent, the two pages, which are Plaintiff's 1.

13            MR. VERSFELT:  For the record, the two pages

14       are the first two pages of Plaintiff's 1.

15            MR. VARGA:  That's what I said.

16       A.   The LOI is the first two pages; right?

17       Q.   Yes, we made that clear on the record.

18            Now, do you remember when you received these

19   two pages, the letter of intent, Plaintiff's 1?

20       A.   Haven't we gone over that?

21       Q.   I don't know, did I ask that?

22            MR. VERSFELT:  Yes, but I have no problem

23       with him answering again to get us going.

24       A.   Ready?



LIONEL FLAX

94

1       Q.   Yes.

2       A.   My recollection is that I received the LOI at

3   either the end of April or beginning of May.

4       Q.   I apologize, I did ask that.

5            That was hand-delivered by Mr. Werner;

6   correct?

7       A.   Yes.

8       Q.   From the time you received it up until June

9   1st, 2007, did you at any time indicate your

10  dissatisfaction with any of the terms contained

11  therein to Mr. Werner or anybody at KOLO?

12      A.   We never got into any formal or informal

13  conversations that continue -- that would continue

14  moving towards an agreement.  So I do not believe I

15  did.

16      Q.   So there were no counterproposals to any of

17  the terms that were set forth in the two pages of the

18  LOI in Plaintiff's 1; correct?

19      A.   There was never a follow-up discussion about

20  taking what the LOI stated and to turn it into a

21  formal agreement.

22      Q.   That is not what I asked.

23      A.   Okay.  Can you please repeat the question?

24      Q.   I understand what you're saying so far that



LIONEL FLAX

95

1    you intend to -- actually Kate's intended to have a

2    formal agreement later on.  What I'm focusing on right

3    now is these two pages, and my question is specific.

4           At any time between late April I believe or

5    early May, whenever you received it, up until June 1st,

6    2007, did you ever say to Mr. Werner or anybody else

7    from KOLO that you're not in agreement with any of the

8    proposed terms therein?

9        A.   No.

10       Q.   Did there come a time that KOLO moved into

11   the Spring Street location?

12       A.   Yes.

13       Q.   When did that happen?

14       A.   That happened, I believe, around Memorial Day

15   weekend and the time leading up to June 1st.

16       Q.   Would it be one week or more before June 1st

17   2007, that KOLO moved in roughly?

18       A.   Roughly more.

19       Q.   More than one week?

20       A.   Two weeks, I would say roughly.

21       Q.   Okay.  Did KOLO open a store so it was fully

22   functional at the Spring Street location beginning

23   June 1st, 2007?

24       A.   The store was functional except for the fact

