UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

KOLO, LLC,

                  Plaintiff,

        v.

KATE'S PAPERIE, LTD.,

               Defendant.

No.: 07-Civ.-10653 (CM)

-------------------------------------------------------x

## **DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

David S. Versfelt (DV 8935)
Elizabeth M. Harris (EH 4368)
KIRKPATRICK & LOCKHART
  PRESTON GATES ELLIS LLP
599 Lexington Avenue
New York, New York 10022
Telephone: 212.536.3900
Facsimile: 212.536.3901

Attorneys for Defendant Kate's Paperie, Ltd.

## DEFENDANT'S PROPOSED FINDINGS OF FACT

Kate's Paperie, Ltd. ("Kate's"), by and through its counsel, Kirkpatrick &

Lockhart Preston Gates Ellis LLP, respectfully submits the following proposed findings of fact

and conclusions of law regarding the motion of defendant Kolo, LLC ("Kolo") for a preliminary

injunction enjoining Kate's from acting to remove the Kolo Shop-in-Shop from Kate's Spring

Street store.

## PROPOSED FINDINGS OF FACT

### A.    The Parties

1.    Kate's is a New York corporation that specializes in selling stationery and

paper products such as journals, gift wrap, photo albums and fine writing instruments. Kate's

currently operates five stores in New York City and one in Greenwich, Connecticut.

2.    Kolo is a Delaware LLC that specializes in wholesale and retail sales of

photo albums and photo album accessories. Until recently, Kolo supplied goods to Kate's.

3.    Mr. Lionel Flax is a son of the founder of Kate's. From April 2007

through November 2007, Lionel Flax was the "de facto" president of Kate's and acted on behalf

of Kate's in connection with the Kolo shop-in-shop proposal and the Letter of Intent. See

Witness Statement of Lionel Flax ("Flax Witness Statement"), at ¶¶ 3, 6.

4.    Keith Werner ("Mr. Werner") is now the President of Kolo. During the

period from April, 2007 through December 31, 2007, Mr. Werner was the Executive Vice

President of Kolo. See Defendant's Exhibit Supplement to Proposed Findings of Fact and

Conclusions of Law (hereafter "Def.'s Suppl."), Exhibit H (Werner Tr. at 6:5-7:9).

5.    By March 2007, Kate's was experiencing financial difficulties. In an

attempt to avoid bankruptcy, a Vendors Committee was formed of its creditors. Kolo was

represented on the Vendors Committee by Mr. Werner.  Mr. Flax met Mr. Werner for the first time through the Vendors Committee.  See Def.'s Suppl., Ex. A (Werner Tr. at 37:25-44:21); see also Flax Witness Statement, at ¶ 8.

**B.    The Shop-in-Shop Written Proposal**

6.    During March 2007, Kate's and Kolo discussed the idea of Kolo setting up a shop-in-shop at Kate's Spring Street store, and possibly in Kate's other Manhattan stores.  See Def.'s Suppl., Ex. H (Werner Tr. at 46:8-13).

7.    In April 2007, Kolo presented Kate's with a 9-page PowerPoint proposal for the shop-in-shop idea.  The proposal focused on the Spring Street store as the initial location for launching the Shop-in-Shop.  See Def.'s Suppl., Ex. A; Def.'s Suppl., Ex. H (Werner Tr. at 198:19-199:14).

8.    Kolo's PowerPoint proposal consisted of three illustrations of the suggested floor plan for approximately 450 square feet of the Spring Street location; basic terms regarding lease options, Kate's termination rights, and Kolo payments; and projections of anticipated revenue.  See Def.'s Suppl., Ex. A.

9.    Immediately behind the floor diagrams, the proposal contains a page entitled "SOHO Proposal (Basic Terms)" that outlines the following:

- a lease term of one year, with 3 one-year renewal options;

- a "Right to Terminate:" Kate's could terminate the lease after the first year unless Kolo "continues to pay Kate's a minimum of $140 Per Square Foot, plus 6% Royalty";

- Kolo would provide Kate's with monthly point-of-sale ("POS") data;

- Kolo would make "monthly" rental and "monthly" royalty payments, with the dollar amounts of each based on certain sales levels shown in the "Financial Proposal" page; and

- Kate's would obtain a landlord consent and non-disturbance agreement.

See Def.'s Suppl., Ex. A.

10.    The following page, entitled "Financial Proposal," provides that Kolo will pay a "Starting Rent" of $75 per square foot and a "Starting Royalty" of 6%. Royalty rate increases and rent increases are set forth for rising net sales levels. See Def.'s Suppl., Ex. A. The "Starting Royalty" line does not state that the obligation to pay royalty will not begin to accrue until Kolo's net sales reached any particular level.

C.    **The Letter of Intent**

11.    Prior to May 6, 2007, Mr. Werner and his attorney drafted a two-page letter of intent relating to the Shop-in-Shop proposal (the "LOI"). See Def.'s Suppl., Ex. H (Werner Tr. at 54:1-59:18; 121:11-122:12).

12.    On May 6, 2007, Mr. Werner sent Mr. Flax the following e-mail text, in which Mr. Werner referred to the LOI as a "draft" and the PowerPoint document as a "proposal":

> Sorry we were unable to talk again the other day. I will be arriving back to the US this weekend and plan to be at the creditors meeting on Monday, 5/7. Also, enclosed please find a draft of the letter of intent. Sorry for the delay as you can imagine my schedule has been extremely busy. Please review it and let me know if we are on the same page. The reference to the addendum is the proposal that I had originally sent you so if you have any question about it then you can refer to the original proposal. We are full steam ahead for getting everything ready for Spring in June. I will try calling you over the weekend. Maybe we can get together after the meeting on Monday.

Mr. Werner attached the LOI to this email. See Def.'s Suppl., Ex. C. There is only one version of the LOI, as neither party modified or edited its text after Mr. Werner sent it to Mr. Flax. See Id. at Ex. H (Werner Tr. at 85:7-89:21).

13.    Mr. Flax did not show the LOI to anyone at Kate's because he did not think it was a formal document, but thought that the parties would nonetheless begin to implement the Shop-in-Shop idea. <u>See</u> Flax Witness Statement at ¶ 21.

14.    Mr. Werner testified that he understood, even after he signed the agreement, that the parties would engage in further negotiations. <u>See</u> Def.'s Suppl., Ex. H (Werner Tr. at 121:11-123:124:25).

15.    On May 8, 2007, Mr. Werner sent Mr. Flax an e-mail asking Mr. Flax whether he had signed the LOI. <u>See</u> Def.'s Suppl., Ex. D.

16.    The same day, Mr. Flax responded: "I just sent this through signed." <u>See</u> Def.'s Suppl., Ex. D.

17.    Mr. Werner testified that he remembers receiving at least the signature page of the LOI bearing Mr. Flax's signature. <u>See</u> Def.'s Suppl., Ex. H (Werner Tr. at 105:19-106:12).

18.    Mr. Werner testified that he may have himself signed the LOI, but he was not certain. <u>See</u> Def.'s Suppl., Ex. H (Werner Tr. at 83:24-84:2; 112:8-113:12).

19.    Mr. Werner did not discuss the specific wording or the terms of the LOI with Mr. Flax <u>at any time</u> prior to Mr. Flax reporting that he had signed it. <u>See</u> Def.'s Suppl, Ex. H (Werner Tr. at 85:7-89:21).

20.    On Saturday, May 12, 2007, Mr. Werner sent Mr. Flax an e-mail saying that he had received the "faxed LOI" and that he would "bring a copy of the signed one" to a lunch meeting the following Tuesday, May 15. <u>See</u> Def.'s Suppl., Ex. G.

21.    On Tuesday, May 15, Mr. Werner and Mr. Flax, along with others, met at the Mercer Café for lunch. Mr. Werner testified that he cannot recall whether he brought the

LOI to the lunch meeting. See Def.'s Suppl., Ex. A (Werner Tr. at 117:3-119:19). According to Mr. Flax, Mr. Werner did not bring the LOI to that meeting. See Flax Witness Statement, at ¶ 26.

22.    Mr. Flax has no recollection, one way or the other, of having signed the draft LOI. See Flax Witness Statement, at ¶ 22.

23.    Neither party has a signed copy of the LOI. See Def.'s Suppl., Ex. H (Werner Tr. at 119:3-120:18); see also Flax Witness Statement at ¶ 23.

24.    The LOI was not modified by either party after Mr. Flax received it. See Def.'s Suppl., Ex. I (Flax Tr. at 94:8-95:9).

25.    On or about June 1, 2007, Kolo set up a shop-in-shop at the Spring Street Store. See Def.'s Suppl., Ex. H (Werner Tr. at 216:21-217:16).

26.    Mr. Flax testified that Kolo moved into the Spring Street space did not alter his expectation that the parties would continue to negotiate and execute a formal lease agreement, as contemplated by the LOI. See Def.'s Suppl., Ex. I (Flax Tr. at 86:8-22).

27.    Mr. Werner testified that he does not remember what many of the terms in the LOI and in the PowerPoint proposal were intended to mean at the time that they were written. See Def.'s Suppl., Ex. H (Werner Tr. at 121:11-164:12).

**D.    Findings As To Interpretation Of The LOI**

29.    Addendum (A) of the LOI provides floor plans for the Spring Street location only. There is nothing in the LOI identifying floor plans or diagrams for any other store. See Def.'s Suppl., Ex. H (Werner Tr. at 139:14-141:11).

30.    The page entitled "SOHO Proposal (Basic Terms)" in Addendum (A) refers to the Spring Street location <u>only</u>.  That page does not refer to any other store.  <u>See</u> Def.'s Suppl., Ex. H (Werner Tr. at 148:21-150:13).

31.    The page entitled "Financial Proposal" in Addendum (A) refers to the Spring street location <u>only</u>.  That page does not relate to any other store.  <u>See</u> Def.'s Suppl., Ex. H (Werner Tr. at 150:14-152:14).

32.    The LOI is ambiguous and in many ways confusing:

- The very first line of the LOI states that the "following confirms the understanding for which the parties have agreed to in principal to enter into a contract …."

- The last sentence of the first paragraph of the LOI states that Kate's and Kolo intend to "enter into a more formal agreement on the following terms of the contract within a reasonable time."

- The final sentence of Paragraph 1 of the LOI states that "at the same time as this Agreement is entered into, the parties will also conclude a rental agreement."

- Just above the signature lines on page 2 of the LOI, it says that by "signing below each party agrees and consents [sic] to the above mention [sic] terms and agrees to act in good faith to complete the negotiations for additional terms which will be set forth in the Agreement."

Def.'s Suppl., Ex. B; Ex. H (Werner Tr. at 121:11-164:12).

33.    Paragraph 8 of the LOI reads as follows:

**Term** – The term of each sub-lease will be for one year from the commencement date.  Kolo shall retain the right to renew each sub-lease for an additional one year period, and each year thereafter as it becomes due by giving 60 day notice to Kate's prior to the termination date.

Def.'s Suppl., Ex. B.  The "Basic Terms" page of Addendum (A) provide for a "one year" lease term with three one year options.  <u>Id</u>., Ex. A.  Paragraph 8 of the LOI and the Basic Terms page of Addendum (A) are inconsistent.

34.    The "Basic Terms" page of Addendum (A) contains a termination provision that is not included in the LOI. That "Right to Terminate" states that "Kate's has the right to terminate the agreement after the first year, and each year thereafter, unless Kolo continues to pay Kate's a minimum of $140/Per Square Foot plus 6% Royalty." See Def.'s Suppl., Ex. A.

35.    In the "Basic Terms" of Addendum (A), Kolo is required to provide Kate's with monthly POS data. See Def.'s Suppl., Ex. A; see also Ex. H (Werner Tr. at 175:5-176:15)

36.    The LOI contains a number of open-ended provisions. For example, the LOI refers to a "rental agreement" to be negotiated, "future addendums" to be negotiated, and "additional terms' that "will be set forth in the Agreement." See Def.'s Suppl., Ex. B.

37.    The LOI does not define "default." See Def.'s Suppl., Ex. B.

38.    The LOI does not include a "cure" provision. See Def.'s Suppl., Ex. H (Werner Tr. at 172:20-173:3); see also Ex. B.

39.    The LOI does not define "material breach." See Def.'s Suppl., Ex. B.

40.    According to the "Basic Terms" of Addendum (A), Kate's has a right to terminate Kolo's shop in the Spring Street store "unless Kolo is, by the end of the first year of its possession, continuing to pay at a rate of at least $140 per square foot and a royalty of 6% on all of Kolo's net sales." See Def.'s Supp., Ex. A; see also Ex. H (Werner Tr. at 205:10-206:11).

**E.    Kolo's Material Breach Of The Letter of Intent**

40.    Kolo has paid "rent" only for the months of June, July and August 2007. See Flax Witness Statement at ¶ 30; Ex. H (Werner Tr. at 216:13-217:18).

41.     On November 7, 2007, Kolo advised that it would be placing its rent into escrow "until the existing differences between the parties are resolved." See Def.'s Suppl., Ex. G. Thus, since September 2007 Kolo has paid nothing for its use of the space in the Spring Street store.

42.     Kolo did not provide POS data from November 2007 through February 12, 2008. On February 13, 2008, following the deposition of Mr. Werner, Kolo produced POS data for the period June 1, 2007 through February 10, 2008. See Def.'s Suppl., Ex. F.

43.     Kolo has never paid royalties at any time while it has occupied space at Spring Street. See Def.'s Suppl., Ex. H (Werner Tr. at 178:6-180:10; 215:24-216:12). But, the Financial Proposal of Addendum (A) provides for "Starting Royalty – 6%" without any such qualification. See Def.'s Suppl., Ex. A.

44.     Addendum (A) shows a photo album bar in its diagrams for the Spring Street space. See Def.'s Suppl., Ex. A. Kolo has never established a photo album bar. Instead, Kolo set up three computers that can only permit customers to purchase Kolo products via the Internet. Kolo's POS data does not capture those sales, and so Kolo's POS data is lower than its actual sales level. See Flax Witness Statement at ¶ 33.

45.     Kolo's failures to abide by the terms of Addendum (A) constitute material breaches for which Kate's should be permitted to terminate any leasehold interest that Kolo may have.

## CONCLUSIONS OF LAW

1.     The Court finds that Kolo and Kate's did not come to a meeting of the minds so as to form a binding contract and, therefore, no valid lease exists. In order to form a contract, parties must come to a meeting of the minds. Foster v. Clifford, 42 Misc. 496, 499, 86

N.Y.S. 28 (N.Y. Sup. App. Term. 1904). Because Kate's contemplated further negotiation and the execution of a formal document, the LOI and Addendum (A) constitute only a preliminary agreement, not a binding contract. See Brown v. Cara, 420 F.3d 148, 153 (2d Cir. 2005) (holding that where parties "'contemplate[d] further negotiations and the execution of a formal instrument, a preliminary agreement d[id] not create a binding contract'").

    2.    The Court finds that where an agreement is unclear or ambiguous, its terms should be construed against the drafter. Arkwright-Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co., 695 F. Supp. 156, 160 (S.D.N.Y. 1988) (construing ambiguous agreement against defendant drafter); In re Fidelity Mortgage Investors, 12 B.R. 641, 645 (S.D.N.Y. 1981) (stating that "any ambiguity that might exist must be resolved against the draftsmen of the documents"). It is undisputed that the LOI and its Addendum were drafted entirely by Kolo, and their texts were never edited or modified by any representative of Kate's. Thus, to the extent that the terms of the LOI or Addendum (A) are unclear or ambiguous, they should be construed against Kolo.

    3.    The Court finds that when there is some doubt as to the existence of an executed document, the party asserting its existence must provide an adequate explanation for failing to produce the document. Nicosia v. Muller, 229 A.D.2d 964, 965, 645 N.Y.S.2d 385, 386 (N.Y. App. Div. 4th Dep't 1996). A sworn statement that a writing existed, on its own, is insufficient. Webb & Knapp v. United Cigar-Whelan Stores Corp., 276 A.D. 583, 584, 96 N.Y.S.2d 359 (N.Y. App. Div. 1st Dep't 1950). Kolo has failed to provide a sufficient explanation for its failure to produce an executed LOI.

    4.    The Court finds that the parties did not enter into any enforceable agreement at all with regard to the 3rd Avenue and 57th Street stores because neither the LOI nor Addendum (A) contain essential terms for those locations. The parties must agree upon essential

terms before an agreement can constitute an enforceable lease or sublease. <u>Davis v. Dinkins</u>, 206
A.D.2d 365, 366-67, 613 N.Y.S.2d 933, 935 (N.Y. App. Div. 2d Dep't 1994) (stating that "[i]n
order for an agreement . . . to be enforceable as a lease, all the essential terms must be agreed
upon"); <u>see</u> <u>Harlow Apparel, Inc. v. David Pik Int'l, Inc.</u>, 106 A.D.2d 345, 345, 483 N.Y.S.2d
258, 260 (N.Y. App. Div. 1st Dep't 1984).

     5.    The essential terms of a lease or sublease include (1) the area to be leased,
(2) the duration of the lease, and (3) the price to be paid. <u>Davis</u>, 206 A.D.2d at 367, 613
N.Y.S.2d 935 (stating that "[i]f any of these essential terms are missing and are not otherwise
discernible by objective means, a lease has not been created"); <u>see also</u> <u>Harlow Apparel, Inc.</u>,
106 A.D.2d at 345, 483 N.Y.S.2d at 260. Given the fact that neither the LOI nor Addendum (A)
set forth a specific start date, a particularized location, or financial terms for any location other
than 72 Spring Street, there can be no binding sublease for any location other than 72 Spring
Street.

     6.    To the extent that the LOI and Addendum (A) can be construed to
constitute a sublease with regard to the Spring Street store, it is undisputed that Kolo has
materially breached its terms. The Court finds that Kolo's failure to pay rent for a period of at
least seven months constitutes a "breach of a material term" of the LOI and Addendum (A).
<u>Fifty States Management Corp. v. Pioneer Auto Parks, Inc.</u>, 46 N.Y.2d 573, 575, 415 N.Y.S.2d
800 (N.Y. Ct. App. 1979); <u>see also</u> <u>NL Indus., Inc. v. PaineWebber Inc.</u>, 720 F.Supp. 293, 299
(S.D.N.Y. 1989). The Court further finds that Kolo's failure to pay any royalty in connection
with the operation of the Spring Street shop-in-shop also constitutes "a material breach."
<u>Awards.com v. Kinko's, Inc.</u>, 42 A.D.3d 178, 187, 834 N.Y.S.2d 147 (N.Y. App. Div. 1st Dep't
2007).

7.     The Court finds that Kolo's material breaches of the terms of the LOI and Addendum (A) justify immediate termination of the agreement between Kate's and Kolo. A lease may be terminated based on one party's material breach. City of New York v. Skyway-Dyckman, Inc., 22 A.D.2d 506, 509, 256 N.Y.S.2d 840 (N.Y. App. Div. 1st Dep't 1965); Fifty States Mgmt. Corp., 46 N.Y.2d at 578, 415 N.Y.S.2d 800.

8.     Kolo's repeated failure to pay rent constitutes a sufficient ground for termination of a lease. NL Indus., Inc., 720 F. Supp. at 299. Kolo's failure to pay any royalties in connection with the operation of the shop-in-shop also constitutes "a material breach, justifying contract termination." Awards.com, 42 A.D.3d at 187, 834 N.Y.S.2d 147 (citations omitted); see also S.E. Nichols, Inc. v. Am. Shopping Ctrs., Inc., 130 A.D.2d 855, 856-57, 515 N.Y.S.2d 638 (N.Y. App. Div. 3d Dep't 1987). Based on Kolo's repeated failure to pay rent and its failure to pay any royalties in connection with the operation of the shop-in-shop, immediate termination of the agreement between Kate's and Kolo is justified. Awards.com, 42 A.D.3d at 187.

9.     The Court finds no basis upon which to imply a right for Kolo to cure its material breaches. Absent any right to cure in the subject commercial lease, the law will not imply a right to cure. RPAPL Section 753, which gives a residential tenant ten days to cure a default, is inapplicable to commercial leases. Grand Liberte Coop., Inc. v. Bilhaud, 126 Misc.2d 961, 964, 487 N.Y.S.2d 250 (N.Y. App. Term 1st Dep't 1984). Similarly, a tenant's right to obtain a stay of eviction by depositing the rent pursuant to RPAPL 751(1) "has been held to apply only to summary proceedings brought to enforce a condition subsequent that terminates a lease." NL Indus., Inc., 720 F.Supp. at 299. This case involves a commercial lease, and is not a summary proceeding; hence, Kolo has no statutory right to cure.

10.     Kolo's material breaches of the terms of the LOI and Addendum (A) regarding the Spring Street store warrant a judgment awarding possession of the Kolo space in the Spring Street store to Kate's.

Dated:   February 15, 2008
         New York, New York

Respectfully submitted,

By:   _David S. Versfelt_
      David S. Versfelt (DV 8935)
      Elizabeth M. Harris (EH 4368)

      KIRKPATRICK & LOCKHART
      PRESTON GATES ELLIS LLP
      599 Lexington Avenue
      New York, NY 10022-6030
      212-536-3900
      212-536-3901 (fax)

      *Attorneys for Defendant Kate's Paperie, Ltd.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

KOLO, LLC,                              :
                                        :
                    Plaintiff,          :
                                        :        No.: 07-Civ.-10653 (CM)
        v.                              :
                                        :
                                        :
                                        :
KATE'S PAPERIE, LTD.,                   :
                                        :
                    Defendant.          :
                                        :

## **DEFENDANT'S EXHIBIT SUPPLEMENT TO PROPOSED FINDINGS OF FACT**

David S. Versfelt (DV 8935)
Elizabeth M. Harris (EH 4368)
KIRKPATRICK & LOCKHART
 PRESTON GATES ELLIS LLP
599 Lexington Avenue
New York, New York 10022
Telephone: 212.536.3900
Facsimile: 212.536.3901

Attorneys for Defendant Kate's Paperie, Ltd.

# EXHIBIT A





**Kolo Store at the new SOHO location**

April 2007

KP 0033



SOHO floor plan

ALBUM BAR

KP 0034



SOHO layout proposal (illustration #1)

KP 0035



SOHO layout proposal (illustration #2)

KP 0036

# SOHO Proposal (Basic Terms)

1. Lease Term – One Year

2. Lease Options – Kolo has the right to (3) One Year Options.

3. Right to Terminate – Kate's has the right to terminate the agreement after the first year, and each year thereafter, unless Kolo continues to pay Kate's a minimum of $140/Per Square Foot plus 6% Royalty.

4. Kolo will provide Kate's with monthly POS Data.

5. Kolo will pay Kate's monthly rental payments according to the financial prosposal enclosed.

6. Kolo will pay Kate's monthly royalty payments according to the financial proposal enclosed.

7. Kate's will provide Kolo with landlord's consent to the sub-lease and a non-disturbance.

KO

KP 0037

# Financial Proposal

1. Starting Rent Per Square Foot - $75.00

2. Starting Royalty - 6%

3. Royalty Increases – Royalties increase according to the following revenue schedule;
   Net Sales of $250,000 to $449,000 – 6%
   Net Sales of $450,000 to $649,000 – 10%
   Net Sales of $$650,00 and up – 11%

4. Rent Increases – Rent increases according to the following revenue schedule;
   Net Sales of $250,000 – $75/Sq.Ft.
   Net Sales of $350,000 – $79/Sq.Ft.
   Net Sales of $450,000 – $83/Sq.Ft.
   Net Sales of $550,000 – $90/Sq.Ft.
   Net Sales of $650,000 – $100/Sq.Ft.
   Net Sales of $750,000 – $135/Sq.Ft.

KO

KP 0038

# Financial Forecast

## Escalations

| | | | | | | |
|---|---|---|---|---|---|---|
| Annual Retail Sales | $250,000 | $350,000 | $450,000 | $550,000 | $650,000 | $750,000 |
| Sales/sq. ft | $556 | $778 | $1,000 | $1,222 | $1,444 | $1,667 |
| Rent/Sq.Ft. | $75 | $79 | $83 | $90 | $100 | $135 |
| Royalty | 6% | 6% | 10% | 10% | 11% | 11% |

KP 0039

# Comparison of Kate's profitability under the existing vs. new model



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sales | $ 155,000 | $ 250,000 | $ 350,000 | $ 450,000 | $ 550,000 | $ 650,000 | $ 750,000 | 97% |
| Net Sales | $ 150,350 | $ 242,500 | $ 339,500 | $ 436,500 | $ 533,500 | $ 630,500 | $ 727,500 | |
| Gross Margin | $ 78,182 | $ 126,100 | $ 176,540 | $ 226,980 | $ 277,420 | $ 327,860 | $ 378,300 | 52% |
| **Operating Expenses** | | | | | | | | |
| Store Operating Expenses | $ 48,112 | $ 77,600 | $ 108,640 | $ 139,680 | $ 170,720 | $ 201,760 | $ 232,800 | 32% |
| Corporate Overhead | $ 16,539 | $ 26,675 | $ 37,345 | $ 48,015 | $ 58,685 | $ 69,355 | $ 80,025 | 11% |
| Total Operating Expenses | $ 64,651 | $ 104,275 | $ 145,985 | $ 187,695 | $ 229,405 | $ 271,115 | $ 312,825 | 43% |
| EBITDA | $ 13,532 | $ 21,825 | $ 30,555 | $ 39,285 | $ 48,015 | $ 56,745 | $ 65,475 | 9% |
| Depreciation & Amortization | $ 3,007 | $ 4,850 | $ 6,790 | $ 8,730 | $ 10,670 | $ 12,610 | $ 14,550 | 2% |
| EBIT | $ 10,525 | $ 16,975 | $ 23,765 | $ 30,555 | $ 37,345 | $ 44,135 | $ 50,925 | 7% |
| Other Income and Expenses | $ 4,511 | $ 7,275 | $ 10,185 | $ 13,095 | $ 16,005 | $ 18,915 | $ 21,825 | 3% |
| Net Income | $ 6,014 | $ 9,700 | $ 13,580 | $ 17,460 | $ 21,340 | $ 25,220 | $ 29,100 | 4% |
| Future Net Income | $ (6,014) | $ (14,187) | $ (6,680) | $ 912 | $ 10,023 | $ 26,648 | $ 49,188 | |
| Difference | $ (23,887) | $ (20,260) | $ 18,372 | $ 31,363 | $ 51,868 | $ 78,288 | | |
| Future Net Income % | 4% | 6% | 8% | | | | 11% | |

Chart — *Net Income under existing model* / *Net Income under new model*

y-axis: $100,000; $80,000; $60,000; $40,000; $20,000; $-; $(20,000); $(40,000)

x-axis (Net Retail Sales): $242,500; $339,500; $436,500; $533,500; $630,500; $727,500

Data labels: $9,700; $13,580; $17,480; $21,340; $25,220; $29,100

KP 0040

# Comparative analysis of net income projections

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Annual Retail Sales *kolo sales at 5pm sf* | $250,000 | $ 350,000 | $ 450,000 | $ 550,000 | $ 650,000 | $ 750,000 | |
| Annual Net Retail Sales | $ 242,500 | $ 339,500 | $ 436,500 | $ 533,500 | $ 630,500 | $ 727,500 | |
| | | | | | | | |
| Kates Total Revenues (Roy. & Rent) | ($48,300) | $55,808 | $80,859 | $93,850 | $114,355 | $ 140,775 | |
| Kates Operating Expenses | $62,487 | $62,487 | $62,487 | $62,487 | $62,487 | $62,487 | |
| **Kates Net Operating Income** | **-$14,187** | **-$6,680** | **$18,372** | **$31,363** | **$51,868** | **$78,288** | |
| Kolo Gross Profit | $126,382 | $176,935 | $210,028 | $256,701 | $297,069 | $342,771 | |
| Kolo Operating Expenses | $151,703 | $167,455 | $183,292 | $200,648 | $219,213 | $249,028 | |
| **Kolo Net Income** | **-$33,654** | **$1,146** | **$18,402** | **$47,719** | **$69,522** | **$85,410** | |



KP 0041

# EXHIBIT B

## Letter of Intent

between

## Kate's Paperie LTD and Affiliates.,

hereinafter named "Kate's"
and

## Kolo Retail, LLC,

hereafter named "Kolo"

The following confirms the understanding for which the parties have agreed to in principal to enter into a contract hereinafter called ("Agreement") for Kolo to lease retail space from Kate's Paperie, LLC and to operate a retail store within each of three Kate's stores. It is intended that the parties will enter into a more formal agreement on the following terms of the contract within a reasonable time.

1. **Locations and Demised Premises -** Kate's commits to Kolo to provide rental space in the following three of it's Manhattan, NY locations; Spring Street, 3rd Avenue, and 57th Street. Kolo Retail, LLC is hereby committing to displaying and selling products only within the dedicated space. The size of each location shall vary between 250 square feet to 450 square feet. The attached Addendum (A) defines the agreed upon space at the Spring Street Store. Layout and drawings showing such dedicated space is attached hereto in Addendum (A). Together with and at the same time as this Agreement is entered into, the parties will also conclude a rental agreement, and Kate's will provide Kolo a consent from the current landlord(s) for such rights to sub-lease.

2. **Fixtures, Furnishings & Equipment -** Fixtures, furnishings and equipment such as displays, computers, tables, etc. shall be completely provided by and owned by Kolo. Other improvements or build out shall be discussed and agreed upon between the parties at a later date.

3. **Commencement -** The commencement of the first Kolo retail store within the Kate's store concept will begin on or around June 1 2007 located on Spring Street. The other locations, 3rd Avenue and 57th Street, will commence approximately one month thereafter. Both parties shall begin discussions to come to a mutual agreement to the specific locations for the 3rd Avenue and 57th Street locations by June 1, 2007. Notwithstanding the above, should both parties fail to mutually agree to the locations of the other Kate's stores then Kolo shall have the right to terminate the Agreement, vacating the Spring Street location, by giving a 30 day notice to Kate's.

4. **Staff and Payroll Expenses -** Kolo shall provide its own representatives, employees and staff to operate each store within Kate's store. Both parties have agreed that in the event it becomes necessary to utilize Kate's staff, whether on a part-time or full-time basis, Kolo shall reimburse Kate's for any payroll expenses.

**KP 0028**

5. **Inventory -** Upon commencement of each location, starting with the Spring Street location, Kolo will agree to accept responsibility of the current inventory that Kate's provides to Kolo for that location. All inventory must be in saleable condition when provided by Kate's. At the time of commencement, for each additional store, Kolo will issue a credit memo to Kate's for receiving such qualified inventory.

6. **Insurance -** Kolo will agree to insure all contents inside the demised premises.

7. **Compensation -** Each location shall have its own profit and loss projections and compensation schedule which will describe the amount to be paid to Kate's. It is agreed that each compensation schedule will be attached as an additional addendum and made apart of the Agreement. The compensation schedule for Spring Street is also attached hereto in Addendum (A). Kolo shall compensate Kate's according to the compensation schedule set forth in Addendum (A) for the Spring Street location and according to future addendums for the other locations as they are agreed upon. Each location shall have its own projections and compensation schedule which shall describe the amount to be paid to Kate's. It is agreed that each compensation schedule will be attached as an additional addendum and made apart of the Agreement. Compensation to Kate's will be in the form of base rental income plus an additional royalty income which formula is also set forth in the compensation schedule and attached to the Agreement.

8. **Term -** The term of each sub-lease will be for one year from the commencement date. Kolo shall retain the right to renew each sub-lease for an additional one year period, and each year thereafter as it becomes due by giving 60 day notice to Kate's prior to the termination date.

9. **Confidentiality -** Both parties agree to keep all information about the terms of this Agreement confidential. Both parties also acknowledge that they have signed a Mutual Confidentiality Agreement prior to entering into this Agreement stating to keep all information confidential.

By signing below each party agrees and consencts to the above mention terms and agrees to act in good faith to complete the negotiations for addtional terms which will be set forth in the Agreement.

Kolo Retail, LLC

_____
By it's                                    Date

Kate's Paperie LTD and Affilitates

_____
By it's                                    Date

**KP 0029**

# EXHIBIT C


Kates_V4.ppt (582 KB)

From: master file flax <lionel.flax@gmail.com>
Date: Wed, 3 Oct 2007 20:30:25 -0400
Subject: Fwd: KAte's proposal
To: "Flax, Leonard" <lflax@katespaperie.com>, "John A. Golieb"
<jag@mggpclaw.com>

---------- Forwarded message ----------
From: Keith Werner <kkw@kolo-usa.com>
Date: May 6, 2007 8:59 PM
Subject: RE: KAte's proposal
To: Lionel Flax <lionel.flax@gmail.com>

Hi Lionel,

Here is the original proposal. Let me know if you want to get together tommorrow in the
`ity.

Thanks,

Keith




-----Original Message-----
From: Lionel Flax [mailto:lionel.flax@gmail.com]
Sent: Sunday, May 06, 2007 3:08 PM
To: kw@kolo-usa.com
Subject: KAte's proposal

Keith, I think you hand delivred me the proposal.  I left it in the office and would like
to look at it today.  If you get this please send it to me electronically.
Regards

On 5/6/07, Keith Werner <kkw@kolo-usa.com> wrote:
> Hi Lionel,
>
> Sorry we were unable to talk again the other day.  I will be arriving
> back to the US this weekend and plan to be at the creditors meeting on
> Monday, 5/7.  Also, enclosed please find a draft of the letter of
> intent. Sorry for the delay as you can imagine my schedule has been
> extremely busy.  Please review it and let me know if we are on the
> same page.  The reference to the addendum is the proposal that I had
> originally sent you so if you have any question about it then you can
> refer to the original proposal.  We are full steam ahead for getting
> everything ready for Spring in June.  I will try calling you over the

1

KP 0031

```
> weekend. Maybe we can get together after the meeting on Monday ?
>
> Best regards,
>
 .
> Keith Werner
> Executive Vice President
> KOLO, LLC.
> kkw@kolo-usa.com
> 860-547-0367 Ext 222
> 860-547-0598 FAX
> www.kolo.com
>
>
>
>
>

--
Lionel Flax
Chief Executive Officer
Kate's Paperie
646-352-1297
```

KP 0032

# EXHIBIT D

From: Lionel Flax <lionel.flax@gmail.com>
Date: Thu, 10 May 2007 13:50:26 -0400
Subject: Re:
To: kw@kolo-usa.com

Did u find it?

On 5/10/07, Keith Werner <kkw@kolo-usa.com> wrote:
> Thank you Lionel ! I will look for it now.
>
> Keith
>
> -----Original Message-----
> From: Lionel Flax [mailto:lionel.flax@gmail.com]
> Sent: Wednesday, May 09, 2007 2:36 PM
> To: kw@kolo-usa.com
> Subject: Re:
>
> I just sent this through signed.
>
> On 5/8/07, Keith Werner <kkw@kolo-usa.com> wrote:
> >
>   >
> >
> > Hi Lionel,
> >
> > Just checking in with you to see how you are doing with signing the
> > LOI. I am going to be putting my staff together with Zelma to
> > coordinate the setup of the shop in shop.  We are planning on
> > sending a team down next week for the show and I thought we could
> > get everyone together at that time to go over the setup. I will also
> > be having my inventory management team touch base with the Kate's
> > person in charge of purchasing Kolo so we can begin to transition
> > the inventory for the new store.  Could you please let me know who
> > that person would be and how
> to contact them as soon as possible.
> >
> > Talk to you soon.
> >
> >
> > Keith Werner
> > Executive Vice President
> > KOLO, LLC.
> >  kkw@kolo-usa.com
> >  860-547-0367 Ext 222
> >  860-547-0598 FAX
> >  www.kolo.com
> >
> >
> >
>  `

> --
> Lionel Flax
> Chief Executive Officer
> Kate's Paperie

KP 0044

1

```
> 646-352-1297
>
>

--
Lionel Flax
Chief Executive Officer
Kate's Paperie
646-352-1297
```

**KP 0045**

# EXHIBIT E

From: Keith Werner <kkw@kolo-usa.com>
Date: Sat, 12 May 2007 03:36:50 -0400
Subject:
To: Lionel Flax <lionel.flax@gmail.com>

Hi Lionel,

I did received your faxed LOI. Thank you very much. I will bring a copy of the signed one
to you on Tuesday. I thought we could meet around 1pm at the Mercer Café for lunch if that
is ok with you ? Remember we will be meeting with Akira Ito - President of Ito-Ya Japan
and Shin Ueno - Senior Manager of Sourcing Exports.

Did you get any where with the issue of the leases today. I could not get a hold of John
Scholte. But I will try him on Monday.

Regards,

Keith Werner
Executive Vice President
KOLO, LLC.
kkw@kolo-usa.com
960-547-0367 Ext 222
 50-547-0598 FAX
www.kolo.com

KP 0049

# EXHIBIT F

# Daily Sales by Store

6/1/2007 - 12/31/2007

2 - Kolo Soho

| | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Fri - 06/01/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 0.00 | 0.00 | 0.00 | 0.00 |
| Sat - 06/02/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 0.30 | 98.70 | 5.92 | 104.62 |
| Sun - 06/03/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 47.55 | 837.45 | 50.30 | 887.75 |
| Mon - 06/04/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 13.85 | 643.15 | 38.61 | 681.76 |
| Tue - 06/05/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 30.10 | 724.90 | 43.50 | 768.40 |
| Wed - 06/06/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 5.85 | 729.15 | 43.75 | 772.90 |
| Thu - 06/07/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 15.93 | 558.57 | 33.53 | 592.10 |
| Fri - 06/08/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 32.78 | 993.22 | 59.60 | 1,052.82 |
| Sat - 06/09/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 29.65 | 633.35 | 43.10 | 676.45 |
| Sun - 06/10/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 21.30 | 392.70 | 23.45 | 416.15 |
| Mon - 06/11/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 29.55 | 1,176.45 | 86.24 | 1,261.69 |
| Tue - 06/12/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 24.58 | 631.92 | 46.84 | 678.76 |
| Wed - 06/13/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 8.15 | 678.85 | 56.85 | 735.70 |
| Thu - 06/14/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 29.98 | 956.81 | 80.14 | 1,036.95 |
| Fri - 06/15/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 120.84 | 1,315.25 | 110.13 | 1,425.38 |
| Sat - 06/16/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 65.85 | 1,312.65 | 109.94 | 1,422.59 |
| Sun - 06/17/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 25.30 | 692.70 | 58.02 | 750.72 |
| Mon - 06/18/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 36.10 | 840.90 | 70.43 | 911.33 |
| Tue - 06/19/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 36.63 | 1,106.87 | 92.68 | 1,199.55 |
| Wed - 06/20/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 9.49 | 831.34 | 69.63 | 900.97 |
| Thu - 06/21/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 45.15 | 802.85 | 67.24 | 870.09 |
| Fri - 06/22/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 11.00 | 831.00 | 69.62 | 900.62 |

| Date | | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Sat - 06/23/2007 | # of Trans | 35.70 | 1,025.30 | 85.83 | 1,111.13 |
| Sun - 06/24/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 28.05 | 981.95 | 82.23 | 1,064.18 |
| Mon - 06/25/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 18.70 | 649.30 | 54.37 | 703.67 |
| Tue - 06/26/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 17.85 | 425.15 | 35.63 | 460.78 |
| Wed - 06/27/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 4.00 | 535.50 | 44.86 | 580.36 |
| Thu - 06/28/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 43.05 | 1,278.95 | 107.07 | 1,386.02 |
| Fri - 06/29/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 23.70 | 1,180.30 | 98.87 | 1,279.17 |
| Sat - 06/30/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 13.55 | 410.45 | 34.39 | 444.84 |
| Sun - 07/01/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 9.65 | 418.35 | 35.06 | 453.41 |
| Mon - 07/02/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 10.58 | 308.92 | 25.86 | 334.78 |
| Tue - 07/03/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 27.80 | 429.20 | 35.96 | 465.16 |
| Wed - 07/04/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 6.45 | 202.55 | 16.96 | 219.51 |
| Thu - 07/05/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 14.10 | 502.40 | 42.08 | 544.48 |
| Fri - 07/06/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 45.23 | 1,200.77 | 100.57 | 1,301.34 |
| Sat - 07/07/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 18.20 | 562.80 | 47.12 | 609.92 |
| Sun - 07/08/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 12.10 | 705.90 | 59.16 | 765.06 |
| Mon - 07/09/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 44.85 | 954.65 | 79.92 | 1,034.57 |
| Tue - 07/10/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 34.25 | 740.75 | 62.07 | 802.82 |
| Wed - 07/11/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 50.35 | 886.65 | 74.23 | 960.88 |
| Thu - 07/12/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 42.90 | 1,379.10 | 115.49 | 1,494.59 |
| Fri - 07/13/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 53.13 | 1,187.37 | 99.41 | 1,286.78 |
| Sat - 07/14/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 17.65 | 672.35 | 56.30 | 728.65 |
| Sun - 07/15/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 17.05 | 625.95 | 52.41 | 678.36 |
| Mon - 07/16/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |

| Date | | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Tue - 07/17/2007 | # of Trans | 28.79 | 1,095.21 | 91.71 | 1,186.92 |
| Wed - 07/18/2007 | # of Trans | 7.88 | 650.12 | 54.46 | 704.58 |
| Thu - 07/19/2007 | # of Trans | 15.25 | 561.75 | 47.06 | 608.81 |
| Fri - 07/20/2007 | # of Trans | 63.90 | 1,175.10 | 98.42 | 1,273.52 |
| Sat - 07/21/2007 | # of Trans | 19.58 | 845.92 | 70.84 | 916.76 |
| Sun - 07/22/2007 | # of Trans | 48.00 | 965.00 | 80.83 | 1,045.83 |
| Mon - 07/23/2007 | # of Trans | 10.65 | 305.35 | 25.57 | 330.92 |
| Tue - 07/24/2007 | # of Trans | 22.10 | 533.90 | 44.72 | 578.62 |
| Wed - 07/25/2007 | # of Trans | 74.98 | 1,675.02 | 140.32 | 1,815.34 |
| Thu - 07/26/2007 | # of Trans | 52.90 | 655.60 | 54.92 | 710.52 |
| Fri - 07/27/2007 | # of Trans | 40.20 | 1,107.80 | 92.76 | 1,200.56 |
| Sat - 07/28/2007 | # of Trans | 10.20 | 254.80 | 21.34 | 276.14 |
| Sun - 07/29/2007 | # of Trans | 23.15 | 906.35 | 75.90 | 982.25 |
| Mon - 07/30/2007 | # of Trans | 21.25 | 383.75 | 32.14 | 415.89 |
| Tue - 07/31/2007 | # of Trans | 60.35 | 1,391.65 | 116.54 | 1,508.19 |
| Wed - 08/01/2007 | # of Trans | 23.55 | 955.45 | 80.02 | 1,035.47 |
| Thu - 08/02/2007 | # of Trans | 7.25 | 833.75 | 69.82 | 903.57 |
| Fri - 08/03/2007 | # of Trans | 36.25 | 1,084.75 | 90.88 | 1,175.63 |
| Sat - 08/04/2007 | # of Trans | 22.00 | 1,132.00 | 94.75 | 1,226.75 |
| Sun - 08/05/2007 | # of Trans | 32.45 | 980.55 | 82.13 | 1,062.68 |
| Mon - 08/06/2007 | # of Trans | 5.05 | 243.95 | 20.43 | 264.38 |
| Tue - 08/07/2007 | # of Trans | 17.00 | 412.00 | 34.51 | 446.51 |
| Wed - 08/08/2007 | # of Trans | 2.50 | 478.50 | 40.07 | 518.57 |
| Thu - 08/09/2007 | # of Trans | 0.90 | 177.10 | 14.83 | 191.93 |

| Day | | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Fri - 08/10/2007 | # of Trans | 16.70 | 512.30 | 42.89 | 555.19 |
| Sat - 08/11/2007 | # of Trans | 14.15 | 363.85 | 30.46 | 394.31 |
| Sun - 08/12/2007 | # of Trans | 26.55 | 1,067.21 | 89.38 | 1,156.59 |
| Mon - 08/13/2007 | # of Trans | 10.60 | 377.40 | 31.62 | 409.02 |
| Tue - 08/14/2007 | # of Trans | 31.63 | 755.37 | 63.23 | 818.60 |
| Wed - 08/15/2007 | # of Trans | 23.45 | 677.55 | 56.73 | 734.28 |
| Thu - 08/16/2007 | # of Trans | 27.15 | 867.85 | 72.68 | 940.53 |
| Fri - 08/17/2007 | # of Trans | 22.33 | 742.67 | 62.19 | 804.86 |
| Sat - 08/18/2007 | # of Trans | 24.45 | 1,032.55 | 86.47 | 1,119.02 |
| Sun - 08/19/2007 | # of Trans | 10.95 | 306.30 | 25.65 | 331.95 |
| Mon - 08/20/2007 | # of Trans | 18.60 | 763.40 | 63.93 | 827.33 |
| Tue - 08/21/2007 | # of Trans | 20.40 | 570.60 | 47.77 | 618.37 |
| Wed - 08/22/2007 | # of Trans | 20.45 | 719.05 | 60.23 | 779.28 |
| Thu - 08/23/2007 | # of Trans | 18.30 | 759.70 | 63.64 | 823.34 |
| Fri - 08/24/2007 | # of Trans | 18.10 | 901.90 | 75.54 | 977.44 |
| Sat - 08/25/2007 | # of Trans | 116.35 | 1,726.65 | 144.58 | 1,871.23 |
| Sun - 08/26/2007 | # of Trans | 47.13 | 1,094.37 | 91.60 | 1,185.97 |
| Mon - 08/27/2007 | # of Trans | 32.65 | 1,064.35 | 89.12 | 1,153.47 |
| Tue - 08/28/2007 | # of Trans | 19.78 | 862.22 | 72.21 | 934.43 |
| Wed - 08/29/2007 | # of Trans | 25.05 | 963.95 | 80.72 | 1,044.67 |
| Thu - 08/30/2007 | # of Trans | 68.69 | 1,366.26 | 113.76 | 1,480.02 |
| Fri - 08/31/2007 | # of Trans | 72.50 | 1,198.45 | 99.72 | 1,298.17 |
| Sat - 09/01/2007 | # of Trans | 74.28 | 842.22 | 70.54 | 912.76 |
| | | 38.95 | 1,010.05 | 84.58 | 1,094.63 |

| Date | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Sun - 09/02/2007 | | 20.15 | 429.85 | 35.97 | 465.82 |
| Mon - 09/03/2007 | | 45.05 | 1,043.95 | 87.44 | 1,131.39 |
| Tue - 09/04/2007 | | 42.75 | 1,765.20 | 147.25 | 1,912.45 |
| Wed - 09/05/2007 | | 53.75 | 1,189.20 | 99.04 | 1,288.24 |
| Thu - 09/06/2007 | | 50.15 | 1,039.80 | 86.45 | 1,126.25 |
| Fri - 09/07/2007 | | 444.30 | 1,618.65 | 135.01 | 1,753.66 |
| Sat - 09/08/2007 | | 25.85 | 719.15 | 60.22 | 779.37 |
| Sun - 09/09/2007 | | 22.73 | 840.27 | 70.35 | 910.62 |
| Mon - 09/10/2007 | | 86.35 | 736.65 | 61.74 | 798.39 |
| Tue - 09/11/2007 | | 213.95 | 476.05 | 39.84 | 515.89 |
| Wed - 09/12/2007 | | 35.77 | 992.73 | 83.14 | 1,075.87 |
| Thu - 09/13/2007 | | -259.95 | 707.45 | 59.23 | 766.68 |
| Fri - 09/14/2007 | | 36.05 | 882.95 | 73.95 | 956.90 |
| Sat - 09/15/2007 | | 5.75 | 764.25 | 64.01 | 828.26 |
| Sun - 09/16/2007 | | 68.35 | 1,669.65 | 139.79 | 1,809.44 |
| Mon - 09/17/2007 | | 8.00 | 1,037.90 | 85.78 | 1,123.68 |
| Tue - 09/18/2007 | | 22.30 | 838.70 | 70.24 | 908.94 |
| Wed - 09/19/2007 | | -25.82 | -192.68 | -16.13 | -208.81 |
| Thu - 09/20/2007 | | 10.45 | 367.55 | 30.75 | 398.30 |
| Fri - 09/21/2007 | | 30.30 | 812.70 | 68.08 | 880.78 |
| Sat - 09/22/2007 | | 9.50 | 819.50 | 68.64 | 888.14 |
| Sun - 09/23/2007 | | 28.15 | 798.85 | 66.90 | 865.75 |
| Mon - 09/24/2007 | | 9.95 | 662.55 | 55.51 | 718.06 |
| Tue - 09/25/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |

| Date | | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Wed - 09/26/2007 | # of Trans | 27.10 | 864.90 | 72.42 | 937.32 |
| Thu - 09/27/2007 | # of Trans | 16.83 | 1,602.23 | 118.60 | 1,720.83 |
| Fri - 09/28/2007 | # of Trans | 2.50 | 509.50 | 42.69 | 552.19 |
| Sat - 09/29/2007 | # of Trans | 13.15 | 661.85 | 55.44 | 717.29 |
| Sun - 09/30/2007 | # of Trans | 17.65 | 1,021.95 | 85.60 | 1,107.55 |
| Mon - 10/01/2007 | # of Trans | 7.25 | 502.75 | 42.12 | 544.87 |
| Tue - 10/02/2007 | # of Trans | 19.60 | 1,667.55 | 136.83 | 1,804.38 |
| Wed - 10/03/2007 | # of Trans | 16.15 | 629.85 | 52.71 | 682.56 |
| Thu - 10/04/2007 | # of Trans | 6.30 | 638.65 | 52.92 | 691.57 |
| Fri - 10/05/2007 | # of Trans | 15.07 | 1,233.43 | 103.30 | 1,336.73 |
| Sat - 10/06/2007 | # of Trans | 59.45 | 1,587.55 | 132.98 | 1,720.53 |
| Sun - 10/07/2007 | # of Trans | 34.45 | 1,204.55 | 100.87 | 1,305.42 |
| Mon - 10/08/2007 | # of Trans | 13.80 | 736.20 | 61.65 | 797.85 |
| Tue - 10/09/2007 | # of Trans | 15.95 | 899.05 | 75.31 | 974.36 |
| Wed - 10/10/2007 | # of Trans | 32.10 | 981.25 | 80.63 | 1,061.88 |
| Thu - 10/11/2007 | # of Trans | 14.80 | 618.20 | 51.75 | 669.95 |
| Fri - 10/12/2007 | # of Trans | 15.58 | 753.87 | 62.56 | 816.43 |
| Sat - 10/13/2007 | # of Trans | 20.80 | 857.09 | 71.78 | 928.87 |
| Sun - 10/14/2007 | # of Trans | 18.60 | 1,174.40 | 98.39 | 1,272.79 |
| Mon - 10/15/2007 | # of Trans | 8.60 | 329.40 | 27.61 | 357.01 |
| Tue - 10/16/2007 | # of Trans | 23.25 | 651.70 | 53.99 | 705.69 |
| Wed - 10/17/2007 | # of Trans | 122.48 | 612.02 | 51.28 | 663.30 |
| Thu - 10/18/2007 | # of Trans | 8.60 | 999.47 | 81.85 | 1,081.32 |
| Fri - 10/19/2007 | # of Trans | 32.45 | 921.55 | 77.13 | 998.68 |

| Date | | Sale Disc | Subtotal | Sale Tax | Sale Total |
|------|------|-----------|----------|----------|------------|
| Sat - 10/20/2007 | # of Trans | 4.45 | 512.55 | 42.96 | 555.51 |
| Sun - 10/21/2007 | # of Trans | 47.82 | 1,192.08 | 92.95 | 1,285.03 |
| Mon - 10/22/2007 | # of Trans | 19.70 | 1,083.30 | 90.72 | 1,174.02 |
| Tue - 10/23/2007 | # of Trans | 2.95 | 217.05 | 18.21 | 235.26 |
| Wed - 10/24/2007 | # of Trans | 11.40 | 338.10 | 28.33 | 366.43 |
| Thu - 10/25/2007 | # of Trans | 3.75 | 597.25 | 50.05 | 647.30 |
| Fri - 10/26/2007 | # of Trans | 6.25 | 658.75 | 55.17 | 713.92 |
| Sat - 10/27/2007 | # of Trans | 41.80 | 1,136.65 | 85.77 | 1,222.42 |
| Sun - 10/28/2007 | # of Trans | 31.90 | 1,373.10 | 115.02 | 1,488.12 |
| Mon - 10/29/2007 | # of Trans | 0.75 | 858.25 | 71.91 | 930.16 |
| Tue - 10/30/2007 | # of Trans | 4.70 | 584.30 | 48.94 | 633.24 |
| Wed - 10/31/2007 | # of Trans | 19.40 | 952.55 | 79.20 | 1,031.75 |
| Thu - 11/01/2007 | # of Trans | 9.80 | 384.15 | 31.61 | 415.76 |
| Fri - 11/02/2007 | # of Trans | 20.35 | 907.65 | 76.02 | 983.67 |
| Sat - 11/03/2007 | # of Trans | 37.38 | 942.07 | 72.04 | 1,014.11 |
| Sun - 11/04/2007 | # of Trans | 26.53 | 825.97 | 69.17 | 895.14 |
| Mon - 11/05/2007 | # of Trans | 9.25 | 456.75 | 38.25 | 495.00 |
| Tue - 11/06/2007 | # of Trans | 24.70 | 548.80 | 45.96 | 594.76 |
| Wed - 11/07/2007 | # of Trans | 19.30 | 1,282.70 | 107.48 | 1,390.18 |
| Thu - 11/08/2007 | # of Trans | 5.65 | 538.35 | 45.09 | 583.44 |
| Fri - 11/09/2007 | # of Trans | 49.20 | 1,635.75 | 133.87 | 1,769.62 |
| Sat - 11/10/2007 | # of Trans | 24.23 | 1,091.27 | 91.42 | 1,182.69 |
| Sun - 11/11/2007 | # of Trans | 1.80 | 791.20 | 66.30 | 857.50 |
| | | 52.60 | 1,217.40 | 101.96 | 1,319.36 |

| Date | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Mon - 11/12/2007 | | 19.45 | 1,104.05 | 92.46 | 1,196.51 |
| Tue - 11/13/2007 | | 40.95 | 1,241.55 | 104.00 | 1,345.55 |
| Wed - 11/14/2007 | | 18.55 | 1,118.35 | 92.51 | 1,210.86 |
| Thu - 11/15/2007 | | 78.35 | 1,990.34 | 161.00 | 2,151.34 |
| Fri - 11/16/2007 | | 28.75 | 1,265.70 | 105.41 | 1,371.11 |
| Sat - 11/17/2007 | | 45.75 | 2,322.25 | 194.46 | 2,516.71 |
| Sun - 11/18/2007 | | 20.60 | 1,052.40 | 88.12 | 1,140.52 |
| Mon - 11/19/2007 | | 88.00 | 2,448.95 | 204.60 | 2,653.55 |
| Tue - 11/20/2007 | | 5.55 | 1,246.40 | 103.84 | 1,350.24 |
| Wed - 11/21/2007 | | 6.70 | 2,113.75 | 176.49 | 2,290.24 |
| Fri - 11/23/2007 | | 37.55 | 1,279.35 | 72.25 | 1,351.60 |
| Sat - 11/24/2007 | | 31.75 | 987.25 | 82.69 | 1,069.94 |
| Sun - 11/25/2007 | | 5.85 | 1,150.15 | 96.33 | 1,246.48 |
| Mon - 11/26/2007 | | 15.25 | 789.75 | 66.17 | 855.92 |
| Tue - 11/27/2007 | | 25.60 | 1,016.35 | 84.54 | 1,100.89 |
| Wed - 11/28/2007 | | 16.30 | 1,447.70 | 121.30 | 1,569.00 |
| Thu - 11/29/2007 | | 25.60 | 661.40 | 55.42 | 716.82 |
| Fri - 11/30/2007 | | 18.30 | 666.70 | 55.87 | 722.57 |
| Sat - 12/01/2007 | | 58.13 | 2,182.37 | 182.80 | 2,365.17 |
| Sun - 12/02/2007 | | 6.45 | 700.50 | 58.10 | 758.60 |
| Mon - 12/03/2007 | | 23.11 | 1,128.89 | 94.61 | 1,223.50 |
| Tue - 12/04/2007 | | 36.10 | 1,320.90 | 110.62 | 1,431.52 |
| Wed - 12/05/2007 | | 23.10 | 945.85 | 74.41 | 1,020.26 |
| Thu - 12/06/2007 | | | | | |

| | | 26.55 | 1,509.45 | 126.42 | 1,635.87 |
|---|---|---|---|---|---|
| Fri - 12/07/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 2.35 | 843.65 | 70.70 | 914.35 |
| Sat - 12/08/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 34.35 | 1,989.65 | 166.63 | 2,156.28 |
| Sun - 12/09/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 79.85 | 2,218.15 | 185.81 | 2,403.96 |
| Mon - 12/10/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 27.80 | 1,006.20 | 84.25 | 1,090.45 |
| Tue - 12/11/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 31.15 | 1,421.85 | 116.99 | 1,538.84 |
| Wed - 12/12/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 30.90 | 1,680.10 | 140.73 | 1,820.83 |
| Thu - 12/13/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 50.30 | 2,197.65 | 180.67 | 2,378.32 |
| Fri - 12/14/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 40.25 | 2,076.75 | 173.92 | 2,250.67 |
| Sat - 12/15/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 84.90 | 3,191.55 | 266.75 | 3,458.30 |
| Sun - 12/16/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 23.15 | 1,389.85 | 112.35 | 1,502.20 |
| Mon - 12/17/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 69.78 | 2,536.67 | 191.84 | 2,728.51 |
| Tue - 12/18/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 68.23 | 2,872.77 | 232.69 | 3,105.46 |
| Wed - 12/19/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 199.35 | 2,789.27 | 238.57 | 3,027.84 |
| Thu - 12/20/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 59.45 | 2,722.50 | 227.48 | 2,949.98 |
| Fri - 12/21/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 108.10 | 2,751.90 | 230.50 | 2,982.40 |
| Sat - 12/22/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 218.65 | 2,056.35 | 172.30 | 2,228.65 |
| Sun - 12/23/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 5.70 | 1,294.80 | 108.48 | 1,403.28 |
| Mon - 12/24/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 174.85 | 847.15 | 71.00 | 918.15 |
| Wed - 12/26/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 8.60 | 697.40 | 58.41 | 755.81 |
| Thu - 12/27/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 11.75 | 750.25 | 62.86 | 813.11 |
| Fri - 12/28/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 14.70 | 763.30 | 63.95 | 827.25 |
| Sat - 12/29/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 18.55 | 904.45 | 75.73 | 980.18 |
| Sun - 12/30/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 6.45 | 838.55 | 70.23 | 908.78 |
| Mon - 12/31/2007 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |

|  |  | 19.80 | 597.94 | 50.07 | 648.01 |
|---|---|---|---|---|---|
|  | 4,272 | 6,787.39 | 207,339.85 | 17,077.92 | 224,417.77 |

| **Grand Totals** | 4,272 | 6,787.39 | 207,339.85 | 17,077.92 | 224,417.77 |
|---|---|---|---|---|---|

# Daily Sales by Store

1/1/2008 - 1/31/2008

2 - Kolo Soho

| Wed - 01/02/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| | | 36.30 | 553.20 | 46.29 | 599.49 |
| Thu - 01/03/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 21.05 | 587.90 | 39.00 | 626.90 |
| Fri - 01/04/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 46.40 | 1,919.60 | 160.81 | 2,080.41 |
| Sat - 01/05/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 14.95 | 802.55 | 67.22 | 869.77 |
| Sun - 01/06/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 21.45 | 1,025.55 | 85.88 | 1,111.43 |
| Mon - 01/07/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 10.55 | 974.06 | 78.74 | 1,052.80 |
| Tue - 01/08/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 0.00 | 323.00 | 27.03 | 350.03 |
| Wed - 01/09/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 72.35 | 1,060.65 | 88.82 | 1,149.47 |
| Thu - 01/10/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 9.05 | 386.95 | 32.42 | 419.37 |
| Fri - 01/11/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 37.70 | 735.30 | 61.60 | 796.90 |
| Sat - 01/12/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 49.03 | 1,282.47 | 107.41 | 1,389.88 |
| Sun - 01/13/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 18.30 | 977.70 | 81.91 | 1,059.61 |
| Mon - 01/14/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 34.50 | 721.50 | 60.44 | 781.94 |
| Tue - 01/15/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 35.70 | 1,663.20 | 113.03 | 1,776.23 |
| Wed - 01/16/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 51.20 | 1,270.80 | 106.42 | 1,377.22 |
| Thu - 01/17/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 3.90 | 268.10 | 22.44 | 290.54 |
| Fri - 01/18/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 12.15 | 681.85 | 57.12 | 738.97 |
| Sat - 01/19/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 76.55 | 1,247.45 | 104.47 | 1,351.92 |
| Sun - 01/20/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 15.25 | 1,621.75 | 135.82 | 1,757.57 |
| Mon - 01/21/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 12.00 | 897.00 | 75.14 | 972.14 |
| Tue - 01/22/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 5.75 | 582.20 | 48.20 | 630.40 |
| Wed - 01/23/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 10.00 | 152.00 | 12.74 | 164.74 |

| | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Thu - 01/24/2008 | | 5.45 | 352.55 | 29.53 | 382.08 |
| Fri - 01/25/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 25.15 | 906.85 | 75.97 | 982.82 |
| Sat - 01/26/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 37.30 | 1,051.70 | 79.71 | 1,131.41 |
| Sun - 01/27/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 15.05 | 850.95 | 71.28 | 922.23 |
| Mon - 01/28/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 28.10 | 723.85 | 60.06 | 783.91 |
| Tue - 01/29/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 12.00 | 633.00 | 53.02 | 686.02 |
| Wed - 01/30/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 11.15 | 395.85 | 33.19 | 429.04 |
| Thu - 01/31/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 20.35 | 1,008.65 | 72.56 | 1,081.21 |
| | 516 | 748.68 | 25,658.18 | 2,088.27 | 27,746.45 |
| **Grand Totals** | 516 | 748.68 | 25,658.18 | 2,088.27 | 27,746.45 |

## Daily Sales by Store

2/1/2008 - 2/10/2008

2 - Kolo Soho

| | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
|---|---|---|---|---|---|
| Fri - 02/01/2008 | | 12.50 | 82.50 | 6.92 | 89.42 |
| Sat - 02/02/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 16.45 | 897.55 | 75.20 | 972.75 |
| Sun - 02/03/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 0.00 | 544.00 | 45.59 | 589.59 |
| Mon - 02/04/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 59.75 | 1,844.20 | 153.90 | 1,998.10 |
| Tue - 02/05/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | -5.00 | 361.00 | 29.38 | 380.38 |
| Wed - 02/06/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 38.44 | 1,177.76 | 98.05 | 1,275.81 |
| Thu - 02/07/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 4.80 | 807.70 | 67.66 | 875.36 |
| Fri - 02/08/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 24.75 | 1,356.20 | 113.04 | 1,469.24 |
| Sat - 02/09/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 20.75 | 672.25 | 56.31 | 728.56 |
| Sun - 02/10/2008 | # of Trans | Sale Disc | Subtotal | Sale Tax | Sale Total |
| | | 5.50 | 561.50 | 47.03 | 608.53 |
| | 152 | 177.94 | 8,294.66 | 693.08 | 8,987.74 |
| **Grand Totals** | **152** | **177.94** | **8,294.66** | **693.08** | **8,987.74** |

# EXHIBIT G

# O'CONNELL, FLAHERTY & ATTMORE, L.L.C.

### ATTORNEYS AT LAW

280 TRUMBULL STREET
HARTFORD, CONNECTICUT 06103-3598
TELEPHONE (860) 548-1300
FACSIMILE (860) 548-0023
WWW.OFALAW.COM

OTHER OFFICES

1350 MAIN STREET, SPRINGFIELD, MA 01103
22 MAIN STREET, MOOSUP, CT 06354
50 NEWTOWN ROAD, DANBURY, CT 06810
65 LASALLE ROAD, WEST HARTFORD, CT 06107

MICHAEL D. O'CONNELL
E-Mail: MOCONNELL@OFALAW.COM

November 7, 2007

*Via Facsimile No. 212.977.5133*

John A. Golieb
Muchnick, Golieb and Golieb, P.C.
200 Park Avenue South
Suite 1700
New York, NY 10003

*Re:    Kolo Retail, LLC/Kate's Paperie LTD*

Dear Attorney Golieb:

As you are aware, I represent Kolo Retail, LLC ("Kolo"), in connection with its dealings with Kate's Paperie, LTD. Please be advised that until the existing differences between the parties are resolved, Kolo will transmit its monthly rental payments for the Spring Street shop to our firm, to be held in escrow. Upon receipt of each payment, I will forward you a copy of the rental check so there is no confusion as to the timeliness of the payments. Enclosed is a copy of the check for the November 2007 rent. Please contact me as soon as possible if you have any issues or concerns with this arrangement. Thank you.

Very Truly Yours,

O'CONNELL, FLAHERTY
& ATTMORE, L.L.C.

Michael D. O'Connell

cc:    Keith Werner

Enclosure

1653

**KOLO RETAIL LLC (STORE)**
241 ASYLUM ST., 6TH FLOOR
HARTFORD, CT 06103

SOVEREIGN BANK
5-7515-110

November 01, 2007

PAY
TO THE
ORDER OF

O'CONNELL, FLAHERTY & ATTMORE, LLC

DATE

•••••••••••••2,812.50
AMOUNT

Two thousand eight hundred twelve and 50 / 100 Dollars

O'CONNELL, FLAHERTY & ATTMORE, LLC
280 Trumbull Street
Hartford, CT  06103-3598
USA

Escrow
Kate's Paperie Ltd

⑈0016531⑈ ⑈011075150⑈ 50104946186⑈

**KOLO RETAIL LLC (STORE)**

1653

| VENDOR:<br>REMIT TO: | OCONNELL<br>O'CONNELL, FLAHERTY & ATTMORE, LLC | | CHECK: 0000001653<br>COMMENT: | | DATE: | 11/1/2007 | |
|---|---|---|---|---|---|---|---|
| INVOICE | DATE | VOUCHER | COMMENT | AMOUNT | DISCOUNT | NET AMOUNT | |
| Escrow 11/07 | 11/1/2007 | 0000001235 | Escrow 11/07 Rent-----Kate's Paperie LTD | 2,812.50 | 0.00 | 2,812.50 | |
| | | | TOTALS | 2,812.50 | 0.00 | 2,812.50 | |

KP 0123

# EXHIBIT H

Page 1

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   - - - - - - - - - - - - - - -x
    KOLO, LLC,
4

                    Plaintiff,
5

            -v-                          Index No.
6                                        07 Civ. 10653
                                         (CM)
7   KATE'S PAPERIE, LTD.,

8                   Defendant.
    - - - - - - - - - - - - - - -x
9

10

11       DEPOSITION of KEITH WERNER, taken by

12  Defendant, at the offices of Goldberg Segalla, 111

13  John Street, New York, New York, pursuant to

14  Order, on February 12, 2008, commencing at 10:10

15  a.m., before Jeffrey Benz, a Certified Realtime

16  Reporter, Registered Merit Reporter and Notary

17  Public within and for the State of New York.

18

19

20

21

22

23

24

25

Page 2

```
1
2   A P P E A R A N C E S:
3
    GOLDBERG SEGALLA LLP
4     Attorneys for Plaintiff
        170 Hamilton Avenue
5       White Plains, New York  10601-1717
6   BY:  ROBERT VARGA, ESQ.
7
8
    KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
9     Attorneys for Defendant
        599 Lexington Avenue
10      New York, New York  10022-6030
11  BY:  DAVID S. VERSFELT, ESQ.
12      ELIZABETH M. HARRIS, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2       IT IS HEREBY STIPULATED AND AGREED by and
3   between the attorneys for the respective parties
4   herein that filing and sealing be and the same are
5   hereby waived.
6       IT IS FURTHER STIPULATED AND AGREED that all
7   objections, except as to the form of the question,
8   shall be reserved to the time of the trial.
9       IT IS FURTHER STIPULATED AND AGREED that the
10  within deposition may be signed and sworn to
11  before any officer authorized to administer an
12  oath with the same force and effect as if signed
13  and sworn to before the Court.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1               Werner
2   KEITH WERNER,
3       called as a witness, having been first
4       duly sworn by Jeffrey Benz, a Notary
5       Public within and for the State of New
6       York, was examined and testified as
7       follows:
8   EXAMINATION BY MR. VERSFELT:
9       Q.  Mr. Werner, let's start with some
10  background questions.  What's your business
11  address at this time?
12      A.  241 Asylum Street, Hartford,
13  Connecticut.
14      Q.  And has that been your business address
15  since, say, January of 2007?
16      A.  Yes.
17      Q.  And is that business address for Kolo,
18  the company Kolo?
19      A.  Yes.
20      Q.  Kolo Retail, LLC?
21      A.  Yes.
22      Q.  Any other -- are there any other
23  iterations of the company of Kolo?
24      A.  Can you rephrase?
25      Q.  Yeah.
```

Page 5

```
1               Werner
2       MR. VARGA:  Sorry, I didn't understand
3       that either.
4       Q.  Okay.  There -- how many companies or
5   LLCs are there in the Kolo family of enterprises?
6       A.  Three, altogether.
7       Q.  And what are they?
8       A.  Kolo, LLC, Kolo Retail, LLC, and Kolo
9   International, Ltd.
10      Q.  Okay.  And what is the scope of the
11  operations of Kolo International, Ltd.?
12      A.  Kolo International sells to
13  international retailers, anything outside North
14  America.
15      Q.  And Kolo Retail, LLC?
16      A.  Kolo Retail sells direct to consumers.
17      Q.  And Kolo, LLC?
18      A.  Kolo, LLC is the parent company that
19  sells directly to retailers in North America.
20      Q.  Does Kolo, LLC own Kolo Retail, LLC?
21      A.  Yes.
22      Q.  Hundred percent ownership?
23      A.  Yes.
24      Q.  And do you have a position at Kolo
25  Retail, LLC?
```

2 (Pages 2 to 5)

Page 6

Werner

1
2     A.  Yes.  I do.
3     Q.  And what is that?
4     A.  President.
5     Q.  And do you have a position at Kolo, LLC,
6  the parent?
7     A.  Yes, I do.
8     Q.  And what is that?
9     A.  President.
10    Q.  So you're -- and first, with regard to
11 Kolo International, Ltd., do you have a position
12 with that entity?
13    A.  No.
14    Q.  What's the ownership structure of Kolo
15 International, Ltd.?  Who owns it?
16    A.  It's a wholly owned sub of Kolo, LLC.
17    Q.  I see.  As president of Kolo, LLC,
18 you're in a position to be aware of the operations
19 and activities of Kolo International, Ltd., right?
20    A.  Yes.
21    Q.  For how long have you been president of
22 Kolo Retail, LLC?
23    A.  Approximately two years.
24    Q.  What years would that be?
25    A.  That would be 2000 -- mid year 2006,

Page 7

Werner

1
2  approximately, through today.
3     MR. VARGA:  Sorry, is that Kolo Retail
4  or just Kolo?
5     MR. VERSFELT:  This was Kolo Retail.
6     A.  Uh-huh.
7     Q.  And for how long have you been president
8  of Kolo, LLC?
9     A.  As of January 1, 2008.
10    Q.  Okay.  When did you start your
11 employment with Kolo Retail, LLC?
12    A.  Since the inception.
13    Q.  When was that?
14    A.  I think it's been four years now.
15 Approximately four years.  I don't know the
16 specific date of the incorporation, but from the
17 inception of when we incorporated.
18    Q.  And when you say we, who do you refer
19 to?
20    A.  Kolo, LLC.
21    Q.  Were you employed at Kolo, LLC before
22 Kolo Retail was incorporated?
23    A.  Yes.
24    Q.  How long had you been with Kolo, LLC?
25    A.  Since 1998.

Page 8

Werner

1
2     Q.  And at what position did you start with
3  Kolo, LLC?
4     A.  Executive vice president.
5     Q.  Okay.  All right.  Give me a brief
6  sketch of your schooling, please.
7     A.  I graduated from the University of
8  Massachusetts.
9     Q.  What year?
10    A.  I think it was 1985.
11    Q.  You're not sure what class you graduated
12 in?
13    A.  Not necessarily.
14    Q.  What do you mean, not necessarily?
15    A.  I don't remember.
16    Q.  Well, do you go back to alumni events?
17    A.  No.
18    Q.  You really don't remember what class you
19 were in when you graduated from college?
20    A.  I really don't.
21    Q.  Do you remember your birth date?
22    A.  Yes.
23    Q.  Okay, what was that?
24    A.  9/13/62.
25    Q.  What did you major in at the University

Page 9

Werner

1
2  of Massachusetts?
3     A.  Psychology.
4     Q.  Any where did you go to high school,
5  Mr. Werner?
6     A.  William Howard Taft, in Woodland Hills,
7  California.
8     Q.  Did you grow up in California?
9     A.  Partly.
10    Q.  Which part?
11    A.  The latter part.
12    Q.  What years?
13    A.  1977 through approximately 1982.
14       I graduated high school in 1980.
15    Q.  Okay.  And what were you doing during
16 the fall immediately after your graduation from
17 high school?
18    A.  I don't recall.
19    Q.  Did you go immediately to college?
20    A.  Yes.
21    Q.  What college?
22    A.  Santa Barbara.
23    Q.  Is that the full name?
24    A.  Santa Barbara College, yes.
25    Q.  Is that located in Santa Barbara?

3 (Pages 6 to 9)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Werner

1
2    A.  Yes.
3    Q.  What were you majoring in?
4    A.  Psychology.
5    Q.  For how long were you at Santa Barbara
6    College?
7    A.  Approximately two years.
8    Q.  Did you complete two years of study
9    there?
10   A.  Yes, I did.
11   Q.  Did you take courses in addition to
12   psychology courses?
13   A.  Yes, I did.
14   Q.  Take any business courses?
15   A.  Yes, I did.
16   Q.  Which ones?
17   A.  Business law.
18       MR. VARGA:  I'm sorry?
19       THE WITNESS:  Business law.
20   A.  There might have been a marketing
21   course, I think I took.
22   Q.  Okay.  Was Santa Barbara College a
23   two-year institution or a four-year institution?
24   A.  I think it was two-year.
25       Not sure, but I think it was two-year.

Werner

1
2    Q.  Okay.  So did you get a degree from
3    Santa Barbara College?
4    A.  I believe I did.
5    Q.  Okay.  What is the degree called?
6    A.  I think it's an associate's.
7    Q.  Okay.  And would that have been in May
8    of 1982?
9    A.  Approximately, yes.
10   Q.  Was the business law course that you
11   took a one-semester course?
12   A.  Yes.
13   Q.  And the marketing course?
14   A.  One semester course.
15   Q.  So, did you -- well, what did you do
16   after your two-year stint at Santa Barbara
17   College?
18   A.  What did I do in education?
19   Q.  Yes.
20   A.  I went to University of Massachusetts.
21   Q.  Okay.  Did you start as a freshman or as
22   a sophomore?
23   A.  I believe it was a sophomore.
24   Q.  So you got one year of credit for your
25   Santa Barbara Associate's Degree at the University

Werner

1
2    of Massachusetts?
3    A.  I believe it was two years.
4    Q.  You got two years of credit.
5    A.  Yes.
6    Q.  So you would have started at the
7    University of Massachusetts as a junior.
8    A.  Yes, that's true.
9    Q.  So you spent two years at the University
10   of Massachusetts.
11   A.  Yes.
12   Q.  And would those -- would those year
13   terms have been from September of '82 to May of
14   '83, and September '83 to May of '84?
15       MR. VARGA:  Objection to form.
16   Q.  You can answer.
17   A.  I think it was, but I'm thinking that
18   there was an extra semester there, and I graduated
19   in -- actually, my last semester was at the
20   University of London.  That's what's throwing me
21   off with the dates.  Okay.
22   Q.  When would -- when would that have
23   occurred, your semester at the University of
24   London?
25   A.  I believe it was the September of 1985.

Werner

1
2    Q.  Okay.  Now, when you went to the
3    University of London, did you already have a
4    degree from the University of Massachusetts?
5    A.  No, I did not.
6    Q.  Okay.  What did you study at the
7    University of Massachusetts?
8    A.  Psychology.
9    Q.  And what else?
10   A.  Course -- you're asking about the
11   courses, specifically?
12   Q.  Yes.
13   A.  Okay, so I've taken statistics, all of
14   the psychology requirements, general education,
15   those were the general courses.
16   Q.  Any business courses while at the
17   University of Massachusetts?
18   A.  Not at the University of Massachusetts,
19   no.
20   Q.  Okay.  Any marketing courses while
21   there?
22   A.  No.
23   Q.  How about at the University of London?
24   What did you -- what was your course of study
25   while there?

Page 14

Werner

1
2    A.  I was studying psychology.  I had to
3  take an art course.  I had to take -- I was
4  involved in a course, metallurgy.
5        MR. VARGA:  As in dealing with metal?
6        THE WITNESS:  It was a requirement,
7    science requirement.
8    A.  That's as much as I can recall right
9  now.
10    Q.  Okay.  So did you get your degree from
11  the University of Massachusetts in the early part
12  of 1985?
13    A.  I believe it was.
14    Q.  So this all refreshes your recollection
15  that you graduated in 1985?
16    A.  Yes.
17    Q.  Armed with your new degree, did you --
18    A.  Can I clarify something?
19    Q.  Of course.  Let me say for the record,
20  you can always clarify something.
21    A.  I went through ceremony in the summer,
22  or the May of 1984, and then finished courses at
23  the end of December 1985.  That's why it's -- I
24  can't recall exactly when the degree was.  But
25  that's more or less the chronology of it.

Page 15

Werner

1
2        MR. VARGA:  So you had the -- the degree
3    ceremony, so to speak, the graduation, before
4    you actually finished.
5        THE WITNESS:  Yes, yeah, yeah.
6    Q.  How did you manage that?
7    A.  I don't know.
8    Q.  Did they give you the degree at your May
9  of 1984 ceremony?
10    A.  I don't think they did, actually.
11    Q.  Okay.  Was it a last-minute decision not
12  to give you a degree?
13    A.  No.  No.
14    Q.  Okay.
15        Now, in our chronology, we're going
16  through your educational background, you're armed
17  with a degree from the University of
18  Massachusetts, it's in or around the beginning of
19  1985.  Did you continue -- my question is, did you
20  continue your education?
21    A.  Yes.
22    Q.  And where did you go?
23    A.  I've taken -- I've taken a course at
24  Harvard.
25    Q.  The executive continuing education

Page 16

Werner

1
2  program?
3    A.  Yes.
4    Q.  And could you briefly describe that.
5    A.  That was advanced financial analysis.
6    Q.  A rigorous program, I assume.
7    A.  Yeah.  Yes.
8    Q.  For how long is the course of study?
9    A.  This was only for one semester.
10    Q.  Okay.  And when was that?
11    A.  I'm not -- I'm not sure.  I want to say
12  it had to be sometime between 1989 and 1990,
13  something like that.  I'm sorry.  I don't recall.
14    Q.  And have you had any other continuing
15  educational initiatives since then?
16    A.  No.
17    Q.  Okay.  Now, in terms of your -- have you
18  ever taught a course in connection with any
19  educational institution?
20    A.  No.
21    Q.  Okay.  Now, then, in terms of your work
22  history, when did you start working a full-time
23  job after September -- I'm sorry, after January of
24  1985?
25    A.  I think it was right after, or -- maybe

Page 17

Werner

1
2  three months, somewhere in April of 1986.
3    Q.  Where was that?
4    A.  That was in Los Angeles, working for a
5  mortgage banking company.
6    Q.  What did you do at that mortgage banking
7  company?
8    A.  Originate and underwrite loans.
9    Q.  What was the name of the company?
10    A.  Cort Financial, C-O-R-T.
11    Q.  In connection with your originating and
12  underwriting mortgage loans, did you work with the
13  paperwork requirements for mortgage lending?
14    A.  Can you rephrase that?
15    Q.  Okay.  Did you work with the federal
16  paperwork requirements in connection with the
17  mortgage loans that you originated and underwrote
18  while at Cort Financial?
19    A.  No, that --
20        MR. VARGA:  Objection to form.
21    A.  No.
22    Q.  You are aware, aren't you, that there
23  are federal forms for Fannie Mae or Ginnie Mae
24  qualifying mortgages?
25    A.  I'll clarify.  Yes.  Yes, I did.

5 (Pages 14 to 17)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 18

Werner

1
2    Q.  You did work with those paperwork
3  requirements.
4    A.  Yes.
5    Q.  So you understood while at Cort
6  Financial that the paperwork could be a critical
7  component of a mortgage loan.
8    A.  Absolutely.
9    Q.  For how long were you at Cort Financial?
10   A.  I want to say almost two years.
11   Q.  So that would be approximately April '86
12 till when?
13   A.  To sometime in '88.
14   Q.  And did you leave Cort Financial at that
15 time?
16   A.  Yes, at this time.
17   Q.  Why?
18   A.  I was hired -- I was offered a job at
19 another company.
20   Q.  Which company?
21   A.  This was Fred Sands Realtors.
22   Q.  Could you spell that?
23   A.  Yes, Fred, F-R-E-D, last name is
24 S-A-N-D-S, realtor.
25   Q.  Where was Fred Sands Realtor located, in

Page 19

Werner

1
2  1988?
3    A.  Los Angeles.
4    Q.  Still in L.A.
5    A.  Yeah.
6    Q.  And what were you doing while there?
7    A.  I worked for their mortgage subsidiary.
8  Originating, again.
9    Q.  The same type of work you had done for
10 Cort Financial?
11   A.  Very similar.
12   Q.  With similar requirements with respect
13 to paperwork and mortgages?
14   A.  Yes.
15   Q.  And similar understanding on your part
16 of paperwork in connection with mortgages?
17     MR. VARGA:  Objection to form.
18   A.  Yes.
19   Q.  Okay.
20     I mean, a mortgage is a contract, right?
21   A.  Mortgage -- the mortgage document, yes.
22   Q.  Okay.
23     Did Cort Financial have a -- have
24 requirements for the organization and preservation
25 of the documents in connection with the loans that

Page 20

Werner

1
2  you originated?
3    A.  Rephrase, I'm sorry.
4    Q.  Okay. While you were at Cort Financial,
5  you originated loans.  As you pushed through the
6  documentation on those loans, did Cort Financial
7  have policies as to what you should do with those
8  documents?
9    A.  Yes.
10   Q.  They would -- and did those policies
11 instill in you a respect for keeping the documents
12 of the mortgage loans that you originated?
13     MR. VARGA:  Objection to form.
14   A.  We were not to lose documents.
15   Q.  Right.  Okay.  And the same would be
16 true at Fred Sands Realtor, correct?
17   A.  Correct.
18   Q.  That -- where it's a contract on a
19 mortgage, and the parties might later want to go
20 back and see what the terms were, you have to keep
21 the documents, right?
22   A.  I was not involved with the signing of
23 mortgages.  Just the origination, and
24 applications, that you were referring to.
25   Q.  And the applications are part of the

Page 21

Werner

1
2  mortgage file, are they not?
3    A.  Yes, they are.
4    Q.  And a realtor company underwriting
5  mortgages is careful to keep the mortgage file so
6  that it can be referred to later.
7    A.  Correct, but I wasn't involved with the
8  processing.
9    Q.  All right, but you understood that the
10 mortgage file was an important part of the
11 mortgage itself?
12   A.  Yes.
13   Q.  Okay.
14     And you understood the significance
15 attached to keeping that paperwork.
16   A.  Yes.
17   Q.  Okay.  Now, after Fred Sands Realtor --
18 well, how long were you at Fred Sands Realtor in
19 Los Angeles?
20   A.  Less than a year.
21   Q.  And where did you go from there?
22   A.  I opened up my own company.
23   Q.  And what was the name of that company?
24 Tell me a little bit about that company, please.
25   A.  Werner & Company.

6 (Pages 18 to 21)

Page 22

Werner

1
2        MR. VARGA:  Objection to form.
3    Q.  Let me rephrase it.
4        Please tell me the name of that company.
5    A.  Werner & Company.
6    Q.  And what did Werner & Company do?
7    A.  We managed assets, mostly real estate,
8  and we were involved with turning around
9  nonperforming assets.
10    Q.  Any particular types of nonperforming
11  assets?
12    A.  It would include real estate, mostly,
13  but at times other businesses that were related to
14  the client.
15    Q.  How many employees at Werner & Company?
16    A.  At which time?
17    Q.  When you opened up the company.
18    A.  Just two.
19    Q.  You and?
20    A.  One other person.
21    Q.  In what capacity?
22        What capacity did that other person have
23  at the company?
24    A.  Oh.  Mostly in sales.
25    Q.  You did have a title at Werner & Company

Page 23

Werner

1
2  when you opened it?
3    A.  I did.
4    Q.  What was that?
5    A.  President.
6    Q.  Okay.  Can you give with me an idea of
7  what the dollar value was of the assets that you
8  were managing, at the time?
9    A.  Are you asking about the beginning or
10  when -- at what point in time?
11    Q.  First the beginning.
12    A.  The beginning was zero.
13    Q.  Okay.  What did it ultimately get up to?
14    A.  Somewhere in the neighborhood of about 5
15  to 7 million.
16    Q.  When you reached 5 to 7 million, in
17  assets under management, at Werner & Company,
18  about what time would that have been?  About what
19  date would that have been?
20    A.  I think it was around 1994 or '95,
21  somewhere in there.
22    Q.  Okay.  Did you leave Werner & Company in
23  the time frame of 1994 to 1995?
24    A.  No.
25    Q.  How did you separate from the company?

Page 24

Werner

1
2  Or did you separate from the company?
3    A.  I did not.
4    Q.  Are you still a principal at Werner &
5  Company?
6    A.  I am.
7    Q.  And how many employees does the company
8  have now?
9    A.  Just one.
10    Q.  Who is that?
11    A.  I'm sorry, two.  Myself and one other
12  person.
13    Q.  Are you still the president?
14    A.  Yes.
15    Q.  And is the other person still in sales?
16    A.  No.
17    Q.  What does the other person do now?
18    A.  Manage day-to-day operations of
19  properties.
20    Q.  And what dollar value of real estate
21  assets are under your management today?
22    A.  Just for clarification, are you asking
23  third-party assets, third-party managed assets, or
24  in total?
25    Q.  In total.

Page 25

Werner

1
2    A.  In total.
3        About 4 million.
4    Q.  And what about third-party managed
5  assets?
6    A.  Zero.
7    Q.  Of the 5 to 7 million in the 1994 to '95
8  period that you mentioned, what proportion would
9  have been third-party managed assets?
10    A.  Almost a hundred percent.
11    Q.  Did you have contracts with those third
12  parties who were managing real estate?
13    A.  Yes.
14    Q.  Okay.  Who negotiated those contracts?
15    A.  At times I would.
16    Q.  Who would negotiate them if you were not
17  the person negotiating for your --
18    A.  The salesperson I mentioned.
19    Q.  Okay.  Did you negotiate the larger
20  contracts, typically?
21    A.  Not necessarily by size, no.
22    Q.  The more important contracts?
23    A.  Not necessarily.  It was just a
24  relationship decision.
25    Q.  Okay.  And when you had negotiated a

7 (Pages 22 to 25)

Page 26

Werner

1
2   contract and the contract had been executed by the
3   parties, what would you do with it?
4       A.   The paperwork?
5       Q.   Yes.
6       A.   It would be retained within the company.
7       Q.   Okay.
8           Is the other person that --
9           MR. VARGA:  Can we identify him?
10          MR. VERSFELT:  Pardon me?
11          MR. VARGA:  Can we identify him?  You're
12      referring to the other person, so we know who
13      it is.
14          MR. VERSFELT:  That's the question I'm
15      about to ask.
16      Q.   Who was the other person, I was going to
17      say, the other person that we've been talking
18      about?  Can you identify who it is?
19      A.   Currently, are you asking?
20      Q.   Well, I'm going to ask you throughout,
21      so if it changed, feel free to tell me.
22      A.   Yes, it did, and the person -- would you
23      like the name of the person?
24      Q.   I think Mr. Varga wants the name.  So do
25      I.

Page 27

Werner

1
2       MR. VARGA:  Because we kept referring to
3       the other person.
4       A.   The woman that worked for me at the
5       beginning of the company was Tammy Potter.
6       MR. VARGA:  Potter?
7       THE WITNESS:  Potter, P-O-T-T-E-R.
8       MR. VARGA:  Is that two "M"s, Tammy?
9       THE WITNESS:  I believe it is, yeah.
10      Q.   And at some point, Tammy Potter left the
11      company.
12      A.   Yes.
13      Q.   And another person came in to be the
14      second person at Werner & Company?
15      A.   Yes, but between then and now we've had
16      several other employees.
17      Q.   Fair enough.  Who is it now?
18      A.   The name of the person is Althea,
19      A-L-T-H-E-A, Brown.
20      Q.   Okay.  Where is Werner & Company
21      incorporated, do you know?
22      A.   Connecticut.
23      Q.   And is -- where is it headquartered?
24      A.   In Hartford.
25      Q.   When you opened the company, did you

Page 28

Werner

1
2   open it originally in Hartford?
3       A.   No, actually, I did not.
4       Q.   Where did you found the company?  Tell
5   me.
6       A.   West Hartford.
7           There's a distinction.
8       Q.   What is that distinction?
9       A.   The distinction is that Hartford is the
10  downtown district, the city, and then there was
11  the suburbs, which are West Hartford.
12      Q.   Okay, so to clarify, when you first
13  opened Werner & Company, you opened the company in
14  West Hartford, correct?
15      A.   Correct.
16      Q.   And that was what year, again?
17      A.   I think it was 1989.
18      Q.   Now, you had been in Los Angeles prior
19  to that.
20      A.   Yes.
21      Q.   But you moved to West Hartford.
22      A.   Uh-huh.
23      Q.   Was there a reason for that?
24      A.   I wanted to live there.
25      Q.   Okay.  When did you first learn of Kolo,

Page 29

Werner

1
2   LLC?
3       A.   Learn of Kolo.  I was actually brought
4   Kolo as a concept, as a market plan -- in a
5   marketing plan, in 1998.  I think it was the
6   beginning of 1998.
7       Q.   You were brought a marketing plan by
8   whom?
9       A.   By Peter Dunn.
10      Q.   And you were at the time still -- you
11  were still president of Werner & Company.
12      A.   Yes.
13      Q.   And you're still president of Werner &
14  Company today.
15      A.   Yes.
16      Q.   What proportion of your time spent on
17  business affairs is allocated to Werner & Company,
18  would you say?
19      A.   Less than 5 percent of my time.
20      Q.   And is the rest with Kolo?
21      A.   Yes.
22      Q.   So --
23          MR. VARGA:  For the record, and you said
24      the rest for Kolo.  Would you clarify,
25      perhaps you can ask him, because there are

8 (Pages 26 to 29)

Page 30

Werner

1
2    two -- three entities. Kolo. Or are we
3    just --
4        MR. VERSFELT: That's why I
5    intentionally used Kolo.
6        Q. I mean that the 95 percent of your time
7    that is not spent on Werner & Company is spent on
8    one or more of the Kolo entities.
9        A. That's correct.
10       Q. All right. How much of it is spent on
11   Kolo, LLC?
12       A. Currently, you're asking?
13       Q. Yes.
14       A. It's approximately 90 percent.
15       Q. And how do you divide the other 10
16   percent of this 95 percent?
17       A. There's an allocation that we use, and
18   that would be -- I believe it's 8 percent to
19   Retail, and the extra 2 percent to International.
20       Q. So that's an allocation that's applied
21   to your time for accounting purposes?
22       A. Not just accounting purposes.
23       Q. What other purposes?
24       A. Well, just for responsibility,
25   performance issues, financial issues.

Page 31

Werner

1
2        Q. Okay. So is it fair to say that you and
3    Peter Dunn founded Kolo, LLC on or about 1998?
4        A. Yes, sir.
5        Q. And what is Peter Dunn's position at
6    Kolo, if he has one?
7        A. Currently he's the chief executive
8    officer.
9        Q. And what was he before he was -- became
10   CEO?
11       A. President of Kolo.
12       Q. So he was president when you were
13   executive vice president, he became CEO when you
14   became president?
15       A. Yes.
16       Q. Okay. Was there a CEO prior to Peter
17   Dunn, at the company?
18       A. No.
19       Q. You just didn't have a CEO.
20       A. We did not.
21       Q. So Peter Dunn has always been the senior
22   officer of the company?
23       A. Yes.
24       Q. How -- okay.
25           Now, at Werner & Company, where you

Page 32

Werner

1
2    remain the president, do you still do turn-around
3    work?
4        A. No.
5        Q. When was -- what was the last
6    turn-around situation that you worked on with
7    Werner & Company?
8        A. Would you like me to describe the
9    client, or name the client?
10       Q. Both.
11           MR. VARGA: To the extent there is no
12   confidentiality issues in disclosing the
13   client, go ahead. That would be my only
14   concern.
15           THE WITNESS: I don't believe there is.
16   But thank you.
17       A. I think the last client was Moonrise
18   LLC. And I'm sorry, that was a family,
19   predominantly family-owned company that was
20   involved in developing an assisted living project.
21       Q. Where was the project that the family
22   was trying to develop?
23       A. In Connecticut.
24       Q. Where in Connecticut?
25       A. Weathersfield, Connecticut.

Page 33

Werner

1
2        Q. And should I assume it didn't go well
3    for the family?
4        A. That's right. Yes.
5        Q. And Werner & Company came in to turn it
6    around?
7            MR. VARGA: Objection to the prior
8    question.
9        A. Yes.
10       Q. And did you give me a time frame for
11   this yet?
12       A. No. I did not. I -- I think it's
13   sometime between 1997 through 1998. It may have
14   been the latter part of '96, I'm not sure.
15       Q. Fair enough. Did Werner & Company take
16   a stake in Moonrise LLC in connection with the
17   workout?
18       A. Yes. Yes, sir.
19       Q. What percentage did it take?
20       A. 30 percent.
21       Q. Was that pursuant to a contract?
22       A. That was -- no, that was not. No.
23       Q. There was no writing in connection to
24   your taking 30 percent of the company?
25       A. Well, I believe you said contract. We

9 (Pages 30 to 33)

Page 34

```
 1              Werner
 2   went directly into an LLC with shares being
 3   distributed.
 4        Q.  Okay.  Was there a document reflecting
 5   the agreement of the parties to award you
 6   30 percent of an LLC?
 7        A.  No.
 8        Q.  No document at all?
 9        A.  No document at all.
10        Q.  You kept the documentation for the LLC,
11   right?
12        A.  Yes.  The operating agreement, I believe
13   we have, yes.
14        Q.  The operating agreement is a contract,
15   isn't it?
16        A.  Yeah.  Yes, it is.
17        Q.  And you have that.
18        A.  I believe I do.
19        Q.  Okay.  When did you first hear of Kate's
20   Paperie, Mr. Werner?
21            MR. VARGA:  I'm sorry, what was the
22   question?
23            MR. VERSFELT:  Read it back.
24            (The record was read back.)
25            MR. VARGA:  Thank you.
```

Page 35

```
 1              Werner
 2        A.  I believe it was sometime in 1999.
 3        Q.  What did you hear at that time?
 4        A.  Well, I was involved in discussions with
 5   our salespeople, who identified Kate's as a target
 6   customer for Kolo.
 7        Q.  Did Kate's become a customer of Kolo's?
 8        A.  In 1999, yes, I believe it did.
 9        Q.  And it -- well, has it been a customer
10   of Kolo's since?
11        A.  Yes.
12        Q.  Is it a customer of Kolo's now?
13        A.  No, it is not.
14        Q.  When did it stop being a customer of
15   Kolo's?
16        A.  Sometime, I believe, in September of
17   2007.  But I'm not sure of the exact date.
18        Q.  But Kate's is not purchasing Kolo
19   products at this time, that's your testimony?
20        A.  That's not true.  They are purchasing
21   Kolo products through a distributor.
22        Q.  Okay.  But they are -- so when you say
23   that they were -- started to not be a customer of
24   Kolo's, in approximately September of 2007, what
25   you mean is they stopped purchasing direct from
```

Page 36

```
 1              Werner
 2   Kolo.
 3        A.  That's correct.
 4        Q.  Okay.  They do, so far as you know, they
 5   purchase Kolo products through a distributor of
 6   Kolo's?
 7        A.  As far as I know, yes.
 8        Q.  When did you first come to hear that
 9   Kate's Paperie was in financial difficulties?
10        A.  Formally, I heard in February.
11        Q.  Of what year?
12        A.  I'm sorry.  Of 2007.
13        Q.  You say formally, how did you hear
14   formally?  What do you mean by that?
15        A.  It was notice that was sent out by
16   Marilyn -- sorry, I don't remember the attorney's
17   name representing Kate's.  Marilyn -- she's a
18   bankruptcy attorney.
19        Q.  Simon.
20        A.  Thank you.
21        Q.  And the notice was sent out to whom?
22        A.  I believe it was sent out to all
23   creditors.
24        Q.  And was Kolo's a creditor of Kate's at
25   that time?
```

Page 37

```
 1              Werner
 2        A.  Yes, we were.
 3        Q.  Now, you said you heard about that
 4   formally in February of 2007.  When did you first
 5   hear informally that Kate's Paperie might be in
 6   financial difficulties?
 7        A.  Sometime, I think quarter -- the fourth
 8   quarter of 2006, maybe the January of 2007,
 9   somewhere in there.
10        Q.  In the weekends leading up to the formal
11   notice.
12        A.  Yes.
13        Q.  And how did you -- well, was Kate's at
14   the time slow paying Kolo?
15        A.  Yes.  I think they were.
16        Q.  So -- okay.  Now, once you got the
17   notice from Marilyn Simon, did the notice suggest
18   any course of action on your part?
19        A.  No.
20        Q.  Did you take any course of action in
21   connection with the financial difficulties of
22   Kate's Paperie, in the weeks after February of
23   2007?
24        A.  No.
25        Q.  Did you participate on a vendor
```

Page 38

Werner

1
2  committee?
3      A.  Yes.
4      Q.  Tell me, when was the vendor committee
5  set up?
6      A.  I don't know the exact date.  It must
7  be -- it had to be between February and March of
8  2007.
9      Q.  How many creditors, approximately, were
10  represented on the vendors committee?
11      A.  I want to say there had to be six, maybe
12  seven, I'm not sure.
13      Q.  And you were one of them.
14      A.  Correct.
15      Q.  You -- when I say you, there, I meant
16  Kolo.
17      A.  Yes.
18      Q.  But you were the representative of
19  Kolo -- strike that.  You are the representative
20  of Kolo that had served on the vendor committee;
21  is that right.
22      A.  Yes, as did Peter Dunn.
23      Q.  Okay.
24      Well, when you say there were six or
25  seven representatives on the vendor committee, are

Page 39

Werner

1
2  you saying that you and Peter were two of the six
3  or seven?
4      A.  No, I was -- I was referring to
5  companies.
6      Q.  Okay.  Six or seven companies on the
7  vendor committee, and you and Peter Dunn
8  represented Kolo on the vendor committee.
9      A.  That's correct.
10      Q.  How often did the vendor committee meet?
11      A.  Not often.  It went mostly over the
12  phone, two or three times, maybe, in April.  It
13  stopped for -- between March and April sometime
14  they had two or three meetings, and then it fell
15  apart where there was nothing that the committee
16  needed to meet again on, till, I want to say,
17  September.  There was a big span between the time
18  that they were meeting more frequently to the time
19  that they actually began again.
20      Q.  When they were meeting more frequently
21  in March and April, what was the purpose of the
22  meetings?
23      A.  To evaluate a proposal given to the
24  committee by Kate's.
25      Q.  A proposal to achieve what?

Page 40

Werner

1
2      A.  Well, what they wanted to achieve was to
3  get the vendor committee to agree to a -- a
4  reduced amount of a payoff, or some type of
5  workout, on payments, toward the balance --
6  outstanding balances.
7      Q.  About what dollar value can you recall
8  the outstanding balances to have been at that
9  time?
10      A.  In total?
11      Q.  Yes.
12      A.  Of the committee.
13      Q.  Yes.
14      A.  Approximately 1.9.
15      Q.  Units?
16      A.  Million, sorry.
17      Q.  Million.
18      MR. VARGA:  You have to finish the
19  sentence.
20      And Mr. Versfelt, you said, "at that
21  time," and I'm just not clear.
22      MR. VERSFELT:  I meant, when I asked the
23  question, at the time of March and April of
24  2007.
25      Q.  Is that how you understood the question?

Page 41

Werner

1
2      A.  I did.
3      Q.  Okay.  Of that 1.9 -- strike that.  Of
4  the approximately 1.9 million that Kate's owed,
5  how much did Kate's owe to Kolo's?
6      A.  Approximately $30,000.
7      Q.  And that was for goods that Kate's had
8  purchased directly from Kolo.
9      A.  That's correct.
10      Q.  What sorts of goods does Kolo sell to
11  Kate's, or was Kolo selling to Kate's at that
12  time?
13      A.  Photo albums, books, boxes, photo boxes,
14  accessories that work -- that I guess -- go with
15  the product line.  Accessories like photo corners
16  and so forth.
17      Q.  Okay.  During this period of March and
18  April 2007, when the vendor committee was
19  meeting, were Kate's representatives present at
20  those meetings?
21      A.  There was only one meeting that I
22  remember, that Kate's attended, and that was
23  previous, I believe it was sometime between
24  February and March.  All other subsequent meetings
25  of the committee, to my knowledge, was done via

11 (Pages 38 to 41)

Page 42

Werner
1
2  phone conference.
3      Q.  Okay.  Who from Kate's attended the
4  meeting that you recall, where Kate's attended the
5  vendor committee?
6      A.  Joe -- Joe Barreiro, Leonard Flax,
7  Lionel Flax, Lowell Flax, John Golieb, Marilyn
8  Simon, and one of -- I forget the gentleman's
9  name, he was the accountant for Kate's.
10     Q.  Okay.  Now, what was your understanding
11 of Joe Barreiro's role at the company at that
12 time?
13     A.  I didn't have an understanding.
14     Q.  Did you know who he was before he walked
15 into the meeting?
16     A.  I knew who he was, I didn't know what
17 his position was.
18     Q.  You didn't know what his position was.
19 By that do you mean you didn't know what his title
20 was?
21     A.  I didn't know what his responsibilities
22 were.
23     Q.  But you knew he was involved in the
24 management of the company.
25     A.  Yes, yes.

Page 43

Werner
1
2      Q.  How about Leonard Flax?
3      A.  I didn't know how involved Leonard was
4  obviously, I knew that he was involved with the
5  management to some degree, and that he had an
6  ownership interest in Kate's.  But outside of
7  that, I had no idea his involvement.
8      Q.  Okay.  How about John Golieb?
9      A.  I had no idea at the time who he was.
10 Attorney Golieb was representing them.
11     Q.  That was my next question.  You knew at
12 the time that he was an attorney representing
13 Kate's.
14     A.  Yes.
15     Q.  And Marilyn Simon, you already mentioned
16 to me, you knew that she was a workout attorney.
17     A.  That's correct.
18     MR. VARGA:  Bankruptcy, he mentioned
19 before, attorney.  You said workout attorney.
20     Q.  I did say workout attorney.  And you
21 said bankruptcy attorney?  Do you see a
22 difference?
23     A.  There is.
24     Q.  Explain, please.
25     A.  Well, my understanding is that she would

Page 44

Werner
1
2  file a petition on behalf of her client as opposed
3  to one that wouldn't.
4      Q.  So if it actually got to bankruptcy,
5  your understanding was that Marilyn Simon would
6  represent the bankrupt.
7      A.  Yes.
8      Q.  But if it didn't get to bankruptcy, was
9  it your understanding that John Golieb would be
10 the attorney?
11     A.  I didn't know.
12     Q.  But you knew that John Golieb
13 represented the interests of Kate's?
14     A.  Yes.
15     Q.  And that's why he was there.
16     A.  Yes.
17     Q.  And Lionel Flax, you mentioned that he
18 was there as well.
19     A.  Uh-huh.
20     Q.  Had you ever met Lionel Flax before?
21     A.  Not before that time.
22     Q.  And did you have an understanding at
23 that time what his involvement with the company
24 was?
25     A.  I believe in that meeting they announced

Page 45

Werner
1
2  that he was the president of Kate's at the time.
3      Q.  Okay.  Did there come a time, at about
4  this time -- strike that.  At about this time --
5      MR. VARGA:  Which time?
6      Q.  At about the time we've been discussing,
7  did you have a meeting with any of these
8  individuals from Kate's, apart from the vendor
9  committee?
10     A.  I had met with Lionel and Lowell,
11 subsequently after we -- had the vendor
12 committee -- the committee meeting.  Yes.
13     Q.  Right.  When you say subsequently, do
14 you mean within a day or two?
15     A.  No, I'm speaking about the evening, that
16 evening.
17     Q.  You had dinner with them?
18     A.  I believe we did, yes.
19     Q.  And what was the purpose of that dinner
20 meeting, from your standpoint?
21     A.  Just to get to know each other.
22     Q.  Did you make a proposal to them at that
23 business meeting?
24     A.  I did not.
25     Q.  Do you recall any of the substance of

12 (Pages 42 to 45)

Page 46

Werner

1
2    the discussion at that dinner?
3       A.  I think it was just to get to know them,
4    what their interests were, what their experience
5    was, what their involvement was, in the company,
6    background on their mother, the beginnings of
7    Kate's, how it started.
8       Q.  Okay. now, let me move into the April
9    time period.  I want to focus on April 2007.  Did
10   there come a time in April when you made a
11   proposal to Kate's, with regard to Kolo and Kate's
12   shops?
13      A.  Yes.
14      Q.  And when was that?
15          Can you narrow it down more specifically
16   than just April of 2007?
17      A.  It was sometime between, I want to say
18   the 5th through the 20th of April.  I think that's
19   what the dates were.
20      Q.  And was the proposal that you made an
21   oral proposal?
22      A.  Not at that time.
23      Q.  What form did it take, then?
24      A.  It was one of the exhibits we saw
25   yesterday.

Page 47

Werner

1
2       Q.  Okay.  We'll get to that.
3          You said it wasn't oral at that time?
4       A.  It was not.
5       Q.  Did you make an oral presentation at any
6    other time?
7       A.  I did not.
8       Q.  Okay.  So you've never made an oral
9    presentation to --
10      A.  No.
11      Q.  -- Kate's, with regard to a Kolo
12   arrangement with Kate's shops.
13      A.  Not that I can recall, no.
14      Q.  So it's always been paper.
15      A.  Yes.
16      Q.  Okay.  Well, let's go off the record.
17          (A recess was taken.)
18      Q.  Mr. Werner, I want to make sure I
19   understand you correctly.  I believe you just
20   testified before the break that you had not made a
21   proposal to Kate's prior to a written proposal
22   that you submitted to them in April.
23      A.  That's correct.
24      Q.  Did anyone else from Kolo's make a
25   proposal to Kate's, prior to your submission of a

Page 48

Werner

1
2    proposal in April?
3       A.  I do not know.
4       Q.  Okay.  When you say you don't know, you
5    mean that it is possible that someone else from
6    Kolo made a proposal to Kate's, in the time period
7    prior to your submitting a written proposal in
8    April of 2007, correct?
9       A.  Yes.
10      Q.  So -- okay.
11          Now, tell me what you recall about your
12   submitting a proposal -- a written proposal to
13   Kate's, when you first did so.
14      A.  It -- it preceded a meeting, and it was
15   requested by Kate's that I present them with a
16   proposal.  The way that the proposal conversation
17   came up, and the shop-in-shop, was that Lionel and
18   Leonard met with Peter and I, and they had showed
19   us their idea of what the new store would be,
20   incorporate other shop-in-shops.  They had a
21   diagram that they had indicated that they're
22   already interested in doing shop-in-shops.  And so
23   I subsequently thereafter, and I don't know
24   exactly when, I proceeded with sending Lionel a
25   proposal, as he requested.

Page 49

Werner

1
2       Q.  Okay.  Let me put before you,
3    Mr. Werner, a document that was marked in a
4    deposition yesterday as Plaintiff's Exhibit 1.
5    Are there -- my question to you is, are there
6    pages in that document that constitute the
7    proposal that you submitted that you've just
8    testified about?
9       A.  Yes.
10      Q.  And can you describe what those pages
11   are, in that exhibit?
12      A.  These pages describe the terms and
13   conditions that we were discussing with Lionel and
14   the Kate's organization.
15      Q.  What pages are you --
16          MR. VARGA:  He's asking --
17      Q.  My question is what pages.
18          MR. VARGA:  What pages.
19      A.  Sorry.  How do you want me to number?
20          MR. VARGA:  This would be the equivalent
21   of third, and the way we described it
22   yesterday, so it would be 3, it would be --
23   the third page to the end.
24      A.  So 7 -- the seventh page --
25          MR. VARGA:  The -- he's asking for the

13 (Pages 46 to 49)

Page 50

```
 1              Werner
 2   entire proposal.
 3       A.  Okay, sorry, so from 3 through 7
 4   included all the terms within the proposal.
 5       Q.  Okay.  Thank you.
 6       A.  Sorry, 3 through 10.  I made a mistake.
 7           3, 4, 5, 6, 7, 8, 9, 10, 11.  Sorry, 3
 8   through 11 contains the entire terms within the
 9   proposal.
10       Q.  That's 3 through the end of the exhibit.
11       A.  Yes.
12           MR. VARGA:  Plaintiff's 1.
13       Q.  And to confirm, pages 3 through the end
14   constitute the proposal that you sent to Lionel,
15   Kate's, in or -- April of 2007; is that correct?
16       A.  Approximately, yes.  Approximately the
17   dates that you're referring to.
18       Q.  Okay.  What is the date on page 3 there?
19       A.  April.
20       Q.  April 2007.
21       A.  Yes.
22       Q.  Is it your testimony -- is it your
23   recollection that you would have sent it at
24   approximately the date that's on it?
25       A.  Approximately in April, yes.
```

Page 51

```
 1              Werner
 2       Q.  Okay.  Fine.
 3           MR. VARGA:  Just a little correction,
 4   you said Lionel Kate's.  Lionel Flax.
 5           MR. VERSFELT:  Oh, I'm sorry.
 6           Is that something we can correct?
 7       Q.  Okay.  Now, let me put before you,
 8   Mr. Werner, a document that was marked yesterday
 9   as Plaintiff's Exhibit 9.
10           Do you have that document?
11       A.  Yes, I am looking at it.
12       Q.  Can you tell me what it is?
13       A.  Well, Plaintiff's Exhibit 9 includes an
14   e-mail, first page is an e-mail from me to Lionel,
15   with an attachment.  The attachment is Kate's
16   letter of intent.  Second page is the beginning of
17   the letter of intent, which I believe is the
18   attachment to this e-mail.  And the third page is
19   the final page of the letter of intent.  Of KP
20   0029.
21       Q.  Right.  Okay.  Now let's look at your
22   e-mail to Lionel, Mr. Werner, please.
23           You say, "Sorry we were unable to talk
24   again the other day."  Do you recall what you were
25   talking about, or what you were unable to talk
```

Page 52

```
 1              Werner
 2   about?
 3       A.  No.
 4       Q.  Okay.  Then you say, "I will be arriving
 5   back to the U.S. this weekend."  Where were you
 6   when you wrote this e-mail?
 7       A.  Asia.
 8       Q.  Any particular spot in Asia?
 9       A.  Sorry, Hong Kong.  I believe it was Hong
10   Kong.  It could have been Japan, but I think it
11   was Hong Kong.
12       Q.  Fair enough, and do you see in this
13   e-mail that you plan to be in the creditor meeting
14   on Monday, May 7?
15       A.  That's what I said in the e-mail, yes.
16       Q.  And what does your next sentence say?
17           The next sentence in the e-mail, could
18   you read it, please?
19       A.  "Also, enclosed please find a draft of
20   the letter of intent."
21       Q.  Okay.  Now, why were you sending
22   Mr. Flax a draft of the letter of intent?
23       A.  Because he requested it.
24       Q.  Okay.  And why did you call it a draft
25   of a letter of intent?
```

Page 53

```
 1              Werner
 2       A.  Because I was giving him the opportunity
 3   to review it and if he needed to change anything.
 4   I was indicating that it was a draft, that it
 5   wasn't a final document.
 6       Q.  Yeah, you didn't believe it was the
 7   final document, did you?
 8       A.  I -- that's not true.  I didn't know if
 9   it would be or not.
10       Q.  Did you sign it when you sent it to him?
11       A.  No.
12       Q.  Okay.  So you expected that he would
13   consider it a draft, didn't you?
14       A.  I -- I didn't expect him, I just --
15   that's a natural way I would have phrased it.
16       Q.  It's a natural way, because this was the
17   first iteration of the document that he had seen,
18   correct?
19       A.  It was -- the first and only.
20       Q.  It was the first version of this
21   document that he had ever seen.  Is that correct?
22       A.  I think it is.  I think it is correct.
23   I don't know for sure, but it looks like it.
24       Q.  Yeah, and you called it a draft.
25       A.  Uh-huh.
```

14 (Pages 50 to 53)

Page 54

Werner

1
2    Q.  Okay.  Did you write it?
3    A.  Write?
4    Q.  Did you write the draft letter of intent
5  that appears on pages KP 0028 and KP 0029?
6    A.  No.
7    Q.  Who did?
8    A.  Our attorney.
9    Q.  This was prepared by your attorney?
10    A.  Uh-huh.
11    Q.  And what's that attorney's name?  Who is
12  that?
13    A.  Paul Aparo.
14    Q.  Can you spell that, please?
15    A.  Yes, A-P-A-R-O.
16    Q.  Where does Paul Aparo practice?
17    A.  Connecticut.
18    Q.  Is he with a firm?
19    A.  He is, O'Connell Flaherty & Attmore.
20    Q.  Okay.
21    A.  I want to clarify something.
22    Q.  Okay.
23    A.  I'm not certain if he drafted it or if
24  he read it, after I gave it to him.  I really -- I
25  have to think how it went.  I don't remember if he

Page 55

Werner

1
2  gave me the original document, and I looked at it,
3  or if I gave him the original document to review.
4    Q.  You gave him the original document,
5  where would you have gotten it?
6    A.  I probably have a file that was similar
7  to the -- the form.
8    Q.  So is this draft similar to a form -- a
9  document in a form file that you keep in your
10  office?
11    A.  Yes.
12    Q.  Okay.  Have you used that -- a form
13  similar to this, in the past?
14    A.  Not necessarily with Kolo, and not
15  necessarily with regard to shop-in-shop, no.
16    Q.  Can you recall when you might have used
17  a form similar to this?
18    A.  I've used letters of intent in other
19  business transactions such as acquisitions,
20  before.  Acquiring a company, if -- interest,
21  something to that extent.
22    Q.  Let me ask again.  Do you recall using a
23  form similar to this, in any of those past
24  situations?
25    A.  Yes.

Page 56

Werner

1
2    Q.  And so is it fair to say that this form
3  is one that you had derived over time in
4  connection with prior transactions?
5      MR. VARGA:  Objection to form.
6    A.  I don't know, to be honest with you.  I
7  just don't know if that -- if the letter of intent
8  that we're looking at was used in any other
9  transaction, if that's your question, I'm not -- I
10  don't think it has been.
11    Q.  My question is this:  You've testified
12  here this morning that this letter of intent
13  either came from you and was reviewed by Mr. Paul
14  Aparo, or came from Mr. Paul Aparo and was
15  reviewed by you.
16    A.  Correct.
17    Q.  You've also -- that's correct, right?
18    A.  Yes.
19    Q.  You've also testified that this draft
20  letter of intent corresponds to the type of letter
21  of intent that you have used in prior
22  transactions; is that correct?
23    A.  Yes, it is.
24    Q.  Would those prior transaction have been
25  Kolo transactions?

Page 57

Werner

1
2    A.  Not necessarily.
3    Q.  Werner & Company transactions?
4    A.  Possibly.
5    Q.  So was Mr. Paul Aparo the attorney for
6  Werner & Company?
7    A.  Yes.
8    Q.  So it's possible -- well, let me ask it
9  this way:  Do you recall whether Mr. Paul Aparo
10  drafted a letter of intent form similar to this
11  draft letter of intent, in connection with prior
12  transactions of Werner & Company?
13    A.  I don't recall.
14    Q.  Okay.  If you had drafted this -- strike
15  that.
16      If you had prepared this draft letter of
17  intent and then submitted it to Paul Aparo for his
18  review, where would you have gotten the words?
19    A.  Someone might have given it to me, as a
20  document that they were using, which I then
21  applied to this situation.
22    Q.  Okay.  And who would that someone have
23  been?
24    A.  A party to another transaction.
25    Q.  Okay.  So it's -- I take it your

15 (Pages 54 to 57)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 58

Werner

1
2  testimony is you don't recall whether or not it
3  originated with you or with Mr. Paul Aparo?
4      A.  I'm sorry, I don't.
5      Q.  But if it originated with you, you could
6  have cribbed, if you will, from a document you got
7  from another party.
8          MR. VARGA:  Objection.
9      A.  Rephrase that?
10     Q.  Well, I don't mean anything derogatory
11 by the word cribbed.  But -- I'll try it again.
12         MR. VARGA:  Cut and paste?
13         MR. VERSFELT:  Yes.
14     Q.  I take it, if you had generated this
15 draft letter of intent, you might have done so by
16 cutting and pasting a form or forms of letters of
17 intent that you had obtained from prior
18 transactions, having nothing to do with Kate's.
19     A.  It's possible, yes.
20     Q.  Okay, but you don't remember as you look
21 at this whether you wrote it.  That's your
22 testimony?
23     A.  You know, as I read it, I have to tell
24 you, it -- I'm thinking that our attorney wrote
25 it, but I'm not sure.  There's language in here

Page 59

Werner

1
2  that I don't think I would have put in there, but
3  I'm not sure.
4      Q.  Okay.  And so you don't know whether you
5  wrote it or Mr. Paul Aparo wrote it?
6      A.  Originate versus wrote it, I think we
7  probably -- we could have collaborated on it.
8      Q.  What do you mean when you say you could
9  have collaborated on it?
10     A.  He could have given me the original, and
11 I could have added to it, or I could have given
12 him the original -- the original, and he could
13 have changed some things in it.
14     Q.  Okay, and when you say the original, if
15 you had given him the original, what you mean by
16 that is, you would have given him your
17 cut-and-paste of a prior form.
18     A.  That's correct.
19     Q.  Okay.  Now, going back to the e-mail,
20 you called it a draft letter of intent, correct?
21     A.  In the e-mail I did.
22     Q.  Yes.  Because it was a draft, in your
23 mind, wasn't it?
24     A.  I don't think there was significance
25 behind the word draft, that I can recall.

Page 60

Werner

1
2      Q.  You typed it.
3      A.  Of course.
4      Q.  And what did you intend Mr. Lionel Flax
5  to do with it?
6      A.  Review it.
7      Q.  And what do you mean when you say review
8  it?
9      A.  I thought that he would review it
10 himself, and with whoever he was receiving advice
11 or counsel on, it was given to him to make sure
12 that, you know, he had a chance to understand it
13 and review it.
14     Q.  Fine.  And that's why, isn't it, you
15 considered it a draft?
16     A.  I don't know, to be honest, and thinking
17 back, I don't know why I called it a draft, to be
18 honest with you.  I just don't.
19     Q.  Mr. Werner, I hope you're honest with me
20 in every answer that you give in this deposition.
21     A.  And I am.
22     Q.  Certainly, if someone sent you a draft
23 of a letter of intent, you would review it with
24 those you felt should see it, including your
25 lawyer, right?

Page 61

Werner

1
2      A.  Not necessarily.  There are times where
3  I don't have my attorney review it.  There are
4  times where I do.
5      Q.  When you're talking about Werner &
6  Company?
7      A.  No, no, Kolo.
8      Q.  Okay.  But certainly, if someone sent
9  you a document that they called a draft, you would
10 understand that to invite your comments.
11     A.  I -- I guess up till today, I've never
12 really considered it a significant word to reflect
13 on.  I get to change it or not.  I always consider
14 any document my opportunity to change it.  Draft
15 does not necessarily define that, for me.
16     Q.  Okay.
17     A.  Okay.
18     Q.  That's fair.
19         Even if someone didn't send you a draft,
20 you would take receipt of a document as an
21 opportunity to review it, and to discuss it, if
22 there were need for such.
23     A.  That's right.
24     Q.  Okay.  And that as you sit here, you
25 don't think you had a particular significance in

16 (Pages 58 to 61)

Page 62

Werner

1
2   the word draft. That's your testimony, right?
3       A. I do. Yes.
4       Q. Okay. You do?
5       A. Sorry. I do not remember having any
6   significance, using the word draft.
7       Q. Okay. Now, that was -- according to the
8   date on the e-mail, Mr. Werner, that is the first
9   page of Plaintiff's Exhibit 9, that draft letter
10  of intent went to Lionel Flax on Sunday, May 6.
11  Correct?
12      A. Yes.
13      Q. Okay. Now --
14      MR. VERSFELT: Is 30 one of the exhibits
15  here?
16      MR. VARGA: I don't know if that was
17  marked.
18      MR. VERSFELT: Well, we'll mark it now.
19  Please mark this as Defendant's A.
20      (E-mail exchange between Mr. Werner and
21  Lionel Flax, with Bates number KP 0030, was
22  marked Defendant's Exhibit A for
23  identification, as of this date.)
24      Q. I've had put before you, Mr. Werner, a
25  document that's been marked as Defendant's Exhibit

Page 63

Werner

1
2       A. It's got a Bates number on it of KP 0030. Do
3   you have that document?
4       A. Yes.
5       Q. Can you tell me what it is?
6       A. It appears that this is an e-mail
7   starting from Lionel, to myself, and below that it
8   appears that there's an e-mail from Lionel -- I'm
9   sorry, from myself to Lionel.
10      Q. Yeah. Now, maybe we can shorten things
11  by comparing the e-mail on the bottom of
12  Defendant's Exhibit A with the e-mail that is on
13  Plaintiff's Exhibit 9.
14      Let me put the first page of Plaintiff's
15  Exhibit 9, let me put this before you.
16      MR. VARGA: Is it KP 0027?
17      MR. VERSFELT: Yes. And KP 0030.
18      Q. Do you see that the e-mail that is the
19  lower e-mail on Defendant's Exhibit A is the same
20  e-mail as appears on Plaintiff's Exhibit 9?
21      A. It appears that the body of this one --
22      Q. Which one?
23      A. Sorry. Exhibit A.
24      Q. Yes.
25      A. The body of my e-mail to Lionel seems to

Page 64

Werner

1
2   be similar to Exhibit-- Exhibit 9.
3       MR. VARGA: Plaintiff's Exhibit 9.
4       A. Sorry, Plaintiff's Exhibit 9.
5       Q. Is it the same e-mail?
6       A. It appears that -- I would have to go
7   through word by word. It appears that it is.
8       Q. Okay. That's fair enough. I'll
9   represent to you that it is.
10      A. Okay.
11      Q. It's the same.
12      One came out of your computer and one
13  came out of our computer.
14      A. Okay.
15      Q. But the text of the e-mail itself is
16  identical. And does that refresh your
17  recollection that on Defendant's Exhibit A, the
18  e-mail that is above your e-mail, is Lionel's
19  response to your e-mail?
20      MR. VARGA: Objection to form.
21      A. Can you rephrase, please?
22      Q. Sure. When you look at Defendant's
23  Exhibit A, now, is the top e-mail from Lionel Flax
24  to you?
25      A. Yes.

Page 65

Werner

1
2       Q. Is it in response to the e-mail that you
3   sent to him that appears immediately below it?
4       A. I -- I don't know. It -- it looks like
5   it could be, but I don't know if it was cut and
6   pasted. What's not clear -- it doesn't seem like
7   it's a string that flows.
8       Q. Well, let's do it this way.
9       A. Okay.
10      Q. Do you see in your e-mail, it's -- you
11  can look at either exhibit, because the e-mail
12  from you is the same on both of them. We've --
13  we've established that. Now, I would like to --
14      MR. VARGA: The body of the language.
15      Q. The body of the e-mail. Yes.
16      I understand that the attachment that is
17  on Plaintiff's Exhibit 9 --
18      MR. VARGA: And also the tag, the date
19  and all that, so if you want to clarify that.
20      MR. VERSFELT: I accept that.
21      Q. The body of the typed text of the e-mail
22  is identical.
23      MR. VARGA: The message.
24      Q. Correct?
25      A. It -- it -- that's what you're saying,

17 (Pages 62 to 65)

Page 66

Werner
1
2  it -- yes, it looks similar. I don't know if it's
3  identical. I haven't matched it --
4    Q.  Mr. Werner, do we have to take time? Do
5  you want to check every word of it? I'll take
6  time, we can take a break.
7    A.  Yeah, if you would like me to.
8    Q.  Fine.
9      (The witness read.)
10   Q.  Are they identical?
11   A.  Yes.
12   Q.  Now, are you familiar with the -- the
13 fact that with e-mails, when an e-mail string
14 prints out, the earliest e-mail appears at the
15 bottom of the printed page, or -- that is, the
16 newest e-mail in a string appears first?
17   A.  Yes. If you're speaking to --
18   Q.  I'm asking in general.
19   A.  Yes, on the screen that's true.
20   Q.  And if you print out what's on the
21 screen it comes out the same.
22   A.  Normally it should.
23   Q.  So with that background of the identical
24 wording of your e-mail and the fact that you
25 understand that with an e-mail string, a more

Page 67

Werner
1
2  recent e-mail prints out higher, or first, then do
3  you understand that the e-mail on the top of
4  Defendant's Exhibit A from Lionel to you is in
5  response to the e-mail that you sent to him?
6    A.  I don't know if it's in response, but it
7  is after my e-mail to him, yes.
8    Q.  Okay. Now, let's look at the sentence
9  in your e-mail that refers to the addendum. It's
10 about six lines down.
11   A.  Okay.
12   Q.  Could you read that sentence for the
13 record, please?
14   A.  On Plaintiff's 9.
15     MR. VARGA:  Which one?
16   Q.  No, on Defendant's -- well, frankly, it
17 could be on either one, because we've established
18 that they're identical, haven't we?
19     MR. VARGA:  But the line is different,
20   because the text on Plaintiff's 9 is wider,
21   so it's less line as opposed to
22   Defendant's A.
23     MR. VERSFELT:  Fair enough.
24   Q.  I'm looking at Defendant's A, and if you
25 want to look at that with me, it will be easier

Page 68

Werner
1
2  for us. But to the extent you want to comfort
3  yourself that the same sentence appears in
4  Plaintiff's Exhibit 9, you may do so. Now, I
5  direct your attention to the sentence that starts,
6  Reference. Can you read that, please?
7    A.  Yes. "The reference to the addendum is
8  the proposal that I had originally sent you, so if
9  you have any question about it, then you can refer
10 to the original proposal."
11   Q.  Okay. Now, could you read the first
12 sentence of Mr. Lionel Flax's e-mail that appears
13 on the top of the page on Defendant's Exhibit A?
14   A.  "Keith, I think you hand-delivered me
15 the proposal."
16   Q.  And what does the next sentence say?
17   A.  "I left it in the office and would like
18 to look at it today."
19   Q.  Okay. And he goes on to say, "When you
20 get this e-mail, could you send it to me
21 electronically," right?
22   A.  Yes.
23   Q.  Now, do you have an understanding of
24 what the proposal is that is referred to in your
25 e-mail?

Page 69

Werner
1
2    A.  An understanding of the exhibit that we
3  saw before?
4    Q.  I want your understanding of what you
5  meant by the word, proposal, in your e-mail.
6    A.  That was the addendum. That's what I
7  understand.
8    Q.  Okay. And looking at Plaintiff's
9  Exhibit 1, can you identify the pages in that
10 that -- if any -- that constitute the proposal?
11   A.  Now, again, we're looking at Plaintiff's
12 1, starting with page 3.
13   Q.  And going to the end?
14   A.  And going to the end.
15   Q.  Fine. That's the proposal, right?
16   A.  That's the addendum, yes.
17   Q.  That's the addendum that is the
18 proposal.
19   A.  That is the addendum that I -- that I
20 referred to as the proposal.
21   Q.  Right. And did you deliver that
22 proposal to Lionel Flax electronically, after he
23 requested it in the e-mail that is at the top of
24 Defendant's Exhibit A?
25   A.  I don't recall.

18 (Pages 66 to 69)

Page 70

Werner

1
2  Q. Okay. Let me put before you a -- I'll
3  have the court reporter please mark as Defendant's
4  Exhibit B.
5      (Document with Bates numbers KP 0031
6      through 0041 was marked Defendant's Exhibit B
7      for identification, as of this date.)
8      (Discussion off the record.)
9  Q. Mr. Werner, I've had the court reporter
10 mark an exhibit, Defendant's Exhibit B, and place
11 it in front of you. Have you had a chance to look
12 that over?
13 A. No.
14 Q. Well, please do so.
15     (The witness read.)
16 MR. VARGA: Also, for the record,
17 Defendant's B is also KP 0031 through 0041.
18 KP 0041.
19 MR. VERSFELT: Agreed.
20 A. Okay.
21 Q. Okay? You've had a chance to review it?
22 A. Yes.
23 Q. So you can see that this appears to be
24 another e-mail string, right?
25 A. It appears to be, yes.

Page 71

Werner

1
2  Q. And this e-mail string -- wait a second.
3     Okay. This e-mail string has the two
4  e-mails that are set forth in Defendant's Exhibit
5  A, plus another one up top. Is that correct?
6  A. Yes.
7  Q. Okay. Now, is the e-mail toward the top
8  dated May 6, at 8:59 p.m., is that an e-mail from
9  you?
10 MR. VARGA: You mean in the middle of
11 the page.
12 Q. Well --
13 A. It's not at the top.
14 Q. Where would you say that? On KP 0031,
15 on the middle of the page.
16 A. It's not at the top. It's almost in the
17 middle. It starts off with forwarded message.
18 Q. Okay. We're talking about the same
19 e-mail. Is that an e-mail from you?
20 A. Yes, it is.
21 Q. And what did you say in it?
22 A. "Here's the original proposal, let me
23 know if you want to get together tomorrow in the
24 city."
25 Q. Right. Now were you -- there is an

Page 72

Werner

1
2  attachment at the very top of the exhibit page, KP
3  0031, a -- an electronic marker for an attachment.
4  Do you see that?
5  A. Yes.
6  Q. And do you see pages KP 0033 to KP 0041?
7  A. Yes.
8  Q. Is that the attachment?
9  A. That's not the attachment.
10 Q. It's not.
11 A. No, it is not.
12    That's not necessarily what I sent.
13 Q. Okay. Tell me what makes you think that
14 you didn't send that e-mail.
15 A. Because the above reference here is from
16 Lionel to Leonard and John Golieb, on October 3,
17 2007. So I -- I do not believe that was my
18 attachment. That's not indicative of what I would
19 have expected to see.
20 Q. Okay. On the very top, you're pointing
21 out that it -- the entire e-mail string was
22 forwarded on October 3, 2007.
23 A. No. I'm not indicating that.
24 Q. What are you indicating?
25 A. I'm indicating up to the point of -- on

Page 73

Werner

1
2  Defendant's Exhibit B, where it says forwarded
3  message, from Keith Werner to Lionel, that's what
4  I agree, that that was a string that originated
5  below that, not above that. It had nothing to do
6  with the above, that I can recall.
7  Q. Oh, okay. Maybe you've clarified
8  your -- the misunderstanding -- the
9  miscommunication between you.
10    Do you agree that the message you sent
11 on May 6, 2007, the message that appears just
12 above the middle of the page, on this exhibit, and
13 that says, here is the original proposal, included
14 an attachment?
15 A. I can't tell, because the -- there is no
16 indication that the attachment is in this e-mail.
17 Q. Okay. Could you look at pages KP 0033
18 through 0041.
19    (The witness read.)
20 Q. Have you reviewed those pages?
21 A. I have.
22 Q. Are those pages the original proposal
23 that you submitted to Kate's, for a shop-in-shop
24 at the Soho store?
25 A. I don't know.

19 (Pages 70 to 73)

Page 74

```
1                   Werner
2        I just don't know.
3        Q.  Okay.  Is there anything about those
4   pages that makes you think they're not the
5   original proposal that you submitted, and that you
6   referred to in the e-mails that we have been
7   looking through in these exhibits?
8        MR. VARGA:  You can take your time to
9   compare the two.
10       A.  Yeah, that's what I want to do.
11       (The witness read.)
12       THE WITNESS:  See, that's different.
13  That's different.  There's a -- grids here.
14  There's no grids here.
15       MR. VARGA:  This -- wait.  Because of
16  the printing.
17       THE WITNESS:  Maybe, but maybe not, I
18  don't know.
19       MR. VARGA:  Forget about the style, just
20  look at the --
21       THE WITNESS:  Content?
22       MR. VARGA:  Right, the substance.
23       A.  Well, in this exhibit, Defendant's
24  Exhibit --
25       MR. VARGA:  This one?
```

Page 75

```
1                   Werner
2        THE WITNESS:  Yeah.
3        A.  -- B, it's unclear as to the -- the
4   numbers in this copy.
5        MR. VARGA:  KP 0040.
6        A.  KP 0040.  I can't determine if some of
7   these numbers are identical to what is in
8   Plaintiff's 1.
9        Q.  And am I correct that what you're saying
10  is the quality of the photocopy is not identical?
11       MR. VARGA:  They're not the best.
12       A.  They're not the best for me to determine
13  if they're identical documents, no.
14       MR. VARGA:  For the record, Mr. Werner
15  previously pointed to the -- the chart in the
16  bottom right corner on KP 0040, and there are
17  several columns depicted in that chart.
18       A.  Was there a question that I missed?
19       Q.  I believe so.  What's your -- what
20  you're saying, then, is that the quality of the
21  photocopy on Defendant's Exhibit A is not the same
22  as the quality of the photocopy on Plaintiff's
23  Exhibit 1.  Is that correct?
24       A.  Yes, it is.
25       Q.  We will use Plaintiff's Exhibit 1.
```

Page 76

```
1                   Werner
2        MR. VARGA:  Here is the last one.
3        THE WITNESS:  Okay.
4        A.  Uh-huh, okay.
5        Q.  May I?
6        A.  Yes.
7        Q.  The quality of the photocopying on
8   this --
9        MR. VARGA:  K -- KP 0041.
10       Q.  -- on KP 0041, looks better on
11  Defendant's Exhibit A than on Plaintiff's
12  Exhibit 1, doesn't it?
13       A.  This looks better -- which is --
14       MR. VARGA:  Plaintiff's 1.
15       A.  Plaintiff's 1.
16       MR. VARGA:  I would have to disagree
17  with that.
18       Q.  Well, I disagree with that, too.  I
19  mean, this Plaintiff's 1 does not clearly show.
20  They are barely visible, the horizontal lines that
21  exist in the chart, whereas Defendant's Exhibit A
22  clearly shows these horizontal lines.
23       A.  But on content, there is missing numbers
24  on Defendant's Exhibit -- KP 0041, and it's hard
25  to determine whether or not those numbers are the
```

Page 77

```
1                   Werner
2   same numbers on Plaintiff's --
3        MR. VARGA:  For the record, again, he
4   was comparing the charts in the far right
5   column, and the -- the bottom portion, right
6   above the Kolo logo on KP 0041.
7        MR. VERSFELT:  Right.
8        Q.  I understand.  Look, I'm not going to
9   dicker over which photocopy is better.  We'll use
10  Plaintiff's 1.  Is that all right with you?  We'll
11  use Plaintiff's Exhibit 1.
12       A.  Yes, that's fine.
13       Q.  Now, you sent the proposal to Lionel
14  Flax on May 6.  Is that correct?
15       A.  According to the e-mail that was shown
16  here --
17       Q.  Yes?  There are -- this --
18       MR. VARGA:  That was that.
19       Q.  The same e-mail has been shown three
20  times.
21       A.  On Defendant's Exhibit A, according to
22  Defendant's Exhibit A -- no, that's not it, sorry.
23  Exhibit B, I did indicate that I had
24  sent it, but I'm not certain that the attachment
25  was sent.
```

20 (Pages 74 to 77)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 78

Werner

1
2  Q.  You sent a proposal to him on May 6.
3  Correct?
4     A.  No.  I'm not certain of that.
5     Q.  Okay.  May I see the e-mails?
6     A.  Yes.
7     Q.  Let me just check here.
8        Okay.  You sent him an e-mail on May 6
9  at 8:59 p.m. that said, Here is the original
10  proposal.  Correct?
11     A.  That's what I wrote in the e-mail, but
12  whether the proposal as an attachment was attached
13  to that e-mail, I do not know.
14     Q.  So it's possible you sent an e-mail that
15  referred to an original proposal that did not have
16  an attachment.  Is that what you're saying?
17     A.  It's possible that the attachment did
18  not go through, yes.
19     Q.  Fair enough.
20        Now that we got that nailed down.  But
21  you intended to send a proposal to Lionel Flax at
22  and about that time, correct?
23     A.  No.  I intended to give him the
24  addendum, which contained the information in the
25  proposal that he was referring to, when he said, I

Page 79

Werner

1
2  left it in the office.
3     Q.  Right.  You intended to send him the
4  addendum that was the proposal.  And can you find
5  on this table, in any of these marked exhibits,
6  the pages that constitute the proposal that you
7  intended to send to him?
8     A.  This Plaintiff's --
9        MR. VARGA:  1.
10     A.  -- 1, page starting at page 3, to the
11  end, is what I would have intended to give him as
12  an addendum to the LOI.
13     Q.  Good.  Thank you.
14     A.  You're welcome.
15     Q.  And did you follow up with him, at or
16  about the time of the first week in May, to
17  determine whether he had received the proposal
18  that you intended to send to him?
19     A.  I don't recall that.
20     Q.  Do you know whether he ever received it?
21     A.  I know that he received it because he
22  referred to it in conversations on the phone.
23     Q.  When were those conversations?
24     A.  Sometime after May 6.
25     Q.  Okay.  How much after?

Page 80

Werner

1
2     A.  I don't recall.  I really don't recall.
3     Q.  Okay.  Now, let me put before you, or
4  let me ask the court reporter now to mark an
5  exhibit as Defendant's Exhibit C.
6        (Document with Bates stamp KP 0042 was
7  marked Defendant's Exhibit C for
8  identification, as of this date.)
9     Q.  So Mr. Werner, we have put before you
10  Defendant's Exhibit C, which is a single-page
11  Bates KP 0042.  Can you tell me what that is, sir?
12     A.  This is an e-mail from myself to Lionel.
13     Q.  When is it dated?
14     A.  It's dated May 8.
15     Q.  And what do you say in the first
16  sentence of that e-mail, sir?
17     A.  "Just checking in with you to see how
18  you are doing with signing the LOI."
19     Q.  Okay.  Now, what was the purpose of your
20  asking after the LOI in that first sentence?
21     A.  The purpose of me asking that was to
22  find out if he's reviewed it and if he's ready to
23  sign it, because he had indicated to me that
24  there's a huge urgency to get the shop-in-shop up
25  and running by June 1.

Page 81

Werner

1
2     Q.  Right, okay.  So you wanted -- you sent
3  it to -- you sent the LOI to him on May 6,
4  correct?
5     A.  I believe that to be true.  I have to
6  look back here on the dates.  There was an
7  attachment here in one of the exhibits that I
8  actually -- I don't see it here.  Here it is, yes,
9  it's May 6.  I sent the letter of intent to him.
10     Q.  Sunday, May 6.
11     A.  Correct.
12     Q.  Correct.  Okay.  So Tuesday, you're
13  asking how he's doing with it, right?
14     A.  Correct.  Tuesday, May 8, yes.
15     Q.  Now, I think this is a Plaintiff's
16  exhibit.
17        MR. VARGA:  Which one is that?  41?
18        MR. VERSFELT:  44, KP 44.  Well, we will
19  do it this way.  We'll mark it.  I'll ask the
20  court reporter to mark as the next exhibit a
21  document Bates-numbered KP 0044.
22        (E-mail string, Bates-numbered KP 0044
23  and 0045, was marked Defendant's Exhibit D
24  for identification, as of this date.)
25        MR. VARGA:  KP 14?

21 (Pages 78 to 81)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 82

Werner

1
2      MS. HARRIS:  44.
3      MR. VARGA:  44.
4      (The witness read.)
5      MS. HARRIS:  This is the signature page,
6  KP 0045.
7      MR. VERSFELT:  What?
8      MS. HARRIS:  The signature page.
9      MR. VERSFELT:  Wait a second.  Let's go
10  back on the record.  We've just determined
11  that KP 0045 appears to be the second page of
12  the string of e-mails that appear in KP 0044.
13      So with Mr. Varga's permission, we're
14  just going to staple those together so that
15  Defendant's Exhibit D consists of a two-page
16  e-mail string Bates-stamped KP 0044 and -45.
17      Let's leave the stapler in here.
18      MR. VARGA:  So it's Defendant's
19  Exhibit D is KP 0044 and KP 0045.
20      MR. VERSFELT:  Correct.
21      Q.  Have you looked that over, Mr. Werner?
22      A.  I have looked it over.  Give me one
23  moment.  Let me just --
24      Q.  Surely.
25      MR. VARGA:  Take your time.

Page 83

Werner

1
2      (The witness read.)
3      A.  Okay.  I've looked it over.
4      Q.  Okay.  So can you tell me what this
5  document is, Defendant's Exhibit D?
6      A.  This appears to be a string of e-mails
7  starting on May 8, where I have asked Lionel -- I
8  was --
9      MR. VARGA:  Read the first sentence, so
10  it identifies --
11      A.  "Just checking in with you to see how
12  you are doing with signing the LOI."
13      And then he proceeded to say, "I just
14  sent this through signed."  And I said, the next
15  e-mail says, "Thank you, Lionel, I will look for
16  it now."  And then he came back, the next e-mail,
17  on May 10, he said, "Did you find it?"
18      MR. VARGA:  Question mark.
19      A.  Question mark.
20      Q.  Did you find it?
21      A.  Yes.
22      Q.  Where is it?
23      A.  I don't know.
24      Q.  What did you do with it?
25      A.  I signed it and I can't determine what

Page 84

Werner

1
2  happened to it.
3      Q.  Now, you were surprised when he signed
4  it, weren't you?
5      A.  No, I was not.
6      Q.  Why not?
7      A.  Because all indications from previous
8  conversations and e-mails told me that he had no
9  problem with the letter of intent.
10      Q.  And what e-mails gave you that
11  suggestion?
12      A.  Starting when?
13      Q.  Did you produce -- did you produce
14  e-mails that give you that impression?
15      MR. VARGA:  Excuse me, counsel, but he
16      was not finished with his answer.
17      Q.  Finish your answer, please.
18      A.  The e-mails I'm referring to was from
19  the time in April, all the way through to May.
20  I'm referring to all of the e-mail communication.
21      Q.  Well, Mr. Werner, you've testified this
22  morning that you did not discuss the shop-in-shop
23  proposal with people at Kate's, that you gave them
24  a written proposal.
25      Now, we've agonized this morning to

Page 85

Werner

1
2  determine what the written proposal is, but I
3  think we're all on the same page that that written
4  proposal is pages 3 through the end of Plaintiff's
5  Exhibit 1, correct?
6      A.  Yes.
7      Q.  Now, is there an e-mail in the period of
8  May 6 when you sent Lionel Flax the LOI, to the
9  period of May 10, when we see this last e-mail on
10  Defendant's Exhibit 10, when you discussed the
11  substance of your proposal with Lionel Flax?
12      A.  Within the e-mail string, there's no
13  indication that we had talked about the substance
14  between this 5/8/07 through 5/10 in that string of
15  e-mails.
16      Q.  Right.  Do you have a string of e-mails
17  in that time period that suggests that you did
18  discuss the substance of the proposal with Lionel
19  Flax in those -- in that period of time?
20      A.  Outside of Exhibit D, Defendant's
21  Exhibit D?
22      Q.  Yes, sir.
23      A.  I would have produced it if I did.
24      Q.  Okay.  I'll ask your counsel, maybe we
25  can take a break.

22 (Pages 82 to 85)

Page 86

Werner

1
2     I would like you to go through your
3     e-mails and identify it, if there is one, any
4     e-mail that suggests you discussed the substance
5     of your proposal with Lionel Flax between the time
6     of May 8, when you sent it -- I'm sorry, May 6,
7     correct that -- May 6, when you sent it to him,
8     when you sent the LOI to him, and May 10, when he
9     asked you, did you find it.
10        A.   Are you only referring to e-mail
11    communication?
12        Q.   You have testified this morning that you
13    did not orally discuss the proposal with him.  So
14    I'm asking for e-mail confirmation, one way or the
15    other --
16        A.   No, you did not ask -- excuse me,
17    counselor, you did not ask me about that.  You
18    asked me about the proposal.
19        Q.   Okay.  Where were you on May 6?
20        A.   Where was I?
21        Q.   Yes.
22        A.   I don't recall where I was.
23        Q.   Didn't you just testify this morning
24    that you were in Hong Kong or maybe Japan.
25        A.   I would have to go back in, to be honest

Page 87

Werner

1
2     with you.  There was a -- an e-mail here.
3         MR. VARGA:  Plaintiff's 9.
4         A.   Uh-huh.
5         But what is your question?
6         Q.   My question is, where were you on or
7     about May 6 of 2007?  Where, physically, were you?
8         A.   It appears that I was outside the
9     country.
10        Q.   Yes, you testified this morning that you
11    were in -- you thought Hong Kong.  First you
12    said --
13        MR. VARGA:  Or Japan.
14        Q.   Remember you said first, I was in Asia.
15    I said, Can you narrow it down?  And you said you
16    thought maybe Hong Kong or maybe Japan, but you
17    were not in this country at that time.  Right?
18        A.   Correct.
19        Q.   And do you recall when you came back?
20        A.   I don't recall the date, no.
21        Q.   Do you recall the e-mail that I've
22    showed you today that said you hoped to get back
23    for the May 7th vendors committee?
24        A.   Yes, I see that.
25        MR. VARGA:  Plaintiff's 9, for the

Page 88

Werner

1
2     record.
3         MR. VERSFELT:  Very good.  Thank you.
4         Q.   Now, I'm asking you, did you have a
5     conversation with Lionel Flax between the time
6     period of May 6 and May 10?  I want to know
7     whether you had an oral conversation with him.
8         A.   I don't recall.
9         Q.   Okay.  Now I will ask you, can you point
10    to any e-mail that you produced, whether in front
11    of you on the table right now, or otherwise, that
12    will confirm that you had any discussions
13    whatsoever with Lionel Flax as to the substance of
14    your proposal during the time period of May 6 to
15    May 10, 2007?
16        MR. VARGA:  Via e-mail.
17        Q.   That's who I've asked.  I think we've
18    just confirmed that he has no recollection of oral
19    discussions.  Now I want to see if there's any
20    e-mail that might possibly refresh your
21    recollection.
22        A.   Yeah.  According to Defendant's
23    Exhibit D, it doesn't appear that way.
24        Q.   I'm asking a broader question.  I agree
25    with you, that none of the exhibits that are in

Page 89

Werner

1
2     front of you --
3         MR. VARGA:  He's asking, basically, if
4     anything on the table --
5         MR. VERSFELT:  Please, I would like to
6     finish.
7         Q.   I'll submit to you, and I think you
8     agree, that none of the exhibits that we have used
9     this morning suggest that you had a conversation
10    with Lionel Flax during the period of May 6 to
11    May 10.
12        What I'm asking you now is, do you have
13    any e-mail that I have not put before you this
14    morning that suggests to you that you had a
15    conversation with Lionel Flax about the substance
16    of your proposal, or the LOI, between May 6 and
17    May 10, 2007?
18        A.   I would have to check my records.  As of
19    right now, I have nothing that would indicate
20    that, but I would have to go and check my records
21    again.
22        Q.   Okay.
23        MR. VERSFELT:  Do you have a set of the
24    documents you produced?
25        MR. VARGA:  Yeah.

23 (Pages 86 to 89)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 90

Werner

1
2    MR. VERSFELT: Okay. Maybe we should
3    take ten minutes and let you look through
4    them.
5    MR. VARGA: Well, I don't know if ten
6    minutes is sufficient.
7    MR. VERSFELT: Well, maybe we should
8    take an hour and a half and let him look
9    through them. I don't care.
10    MR. VARGA: Well -- wait a second.
11    Q. Let me ask it this way -- okay, you want
12 to finish?
13    MR. VARGA: He wants to say something.
14    A. What I would need to do is go and check
15 my e-mails, which I would have to go to my office
16 to do.
17    Q. Why?
18    A. Because that's where my e-mails are.
19    Q. Didn't you produce your e-mails relevant
20 to this case? Didn't you give them to your
21 counsel and have him turn them over to us as the
22 court ordered?
23    Don't we already have those e-mails, Mr.
24 Werner?
25    A. I may have missed an e-mail that you're

Page 91

Werner

1
2 asking for. You're asking me between the 8th and
3 the 10th, so should I -- I'm not agreeing that you
4 have all the e-mails. I'm not agreeing to that.
5 I'm not disagreeing to that. I would have to
6 check.
7    MR. VARGA: Counsel, what -- I
8    understand what you're trying to do. In
9    other words, have him commit that there was
10    nothing between May 6 and May 10.
11    Now, I'm not -- I would certainly follow
12    the same procedure. To the extent you want
13    to give him opportunity to do that, it's fine
14    with me. And then he can give you the
15    response.
16    Q. Let's touch on production of documents.
17    Mr. Werner, you -- first, you attended
18 the deposition of Mr. Lionel Flax yesterday, as
19 the company representative, Kolo's, correct?
20    A. Yes.
21    Q. You were there the whole day, weren't
22 you?
23    A. Yes.
24    Q. You heard all the questions that were
25 asked of him, right?

Page 92

Werner

1
2    A. Yes.
3    Q. You saw the exhibits that your counsel
4 put in front of him of strings of e-mails between
5 May 6 and May 8, didn't you?
6    A. Yes.
7    Q. You knew perfectly well, then, that the
8 period of May 6 to May 8 and the circumstances
9 surrounding Lionel Flax's signing or not signing
10 the LOI is a critical issue in this case, don't
11 you?
12    MR. VARGA: Objection to form.
13    Q. Didn't you?
14    MR. VARGA: Excuse me. I would
15    appreciate if you don't badger him, because
16    that's just -- you know, you're pushing past
17    a certain line that's acceptable. So you can
18    ask one question, you'll let him answer. You
19    don't push in that fashion, because I will
20    have to call the judge on that. That is just
21    improper.
22    So if you keep it one question at a
23    time, give him an opportunity to respond, I
24    have no problem with that. But when you --
25    when you -- when you have a shotgun style of

Page 93

Werner

1
2 repeated questions, that's unacceptable.
3    Q. Mr. Werner, here is one question. You
4 saw the e-mail strings that were used as exhibits
5 by your counsel yesterday in the deposition of
6 Lionel Flax. Correct?
7    A. No, I did not. I followed them to the
8 best of my ability, when you guys were sharing
9 documents. I can't say I followed everything that
10 you were talking about.
11    Q. Well, they're all right there on the
12 table. The Plaintiff's exhibits. Do you want to
13 look through them now to see if there's any e-mail
14 in there that would refresh your recollection as
15 to whether you had a conversation with Lionel Flax
16 on the substance of the LOI, or the proposal,
17 during the period of May 6 to May 10, 2007?
18    A. I -- I would be happy to review them.
19    MR. VARGA: Sure.
20    Q. Let's look at this.
21    MR. VARGA: So, just for the record,
22    let's go in order. Start with Plaintiff's 1,
23    and then we'll continue with Defendant's
24    exhibits. And then you will let us know the
25    response to Mr. Versfelt's question.

24 (Pages 90 to 93)

Page 94

Werner

1
2  Q.  Just put Plaintiff's Exhibit 1, and then
3  2, and then 3, up to 9, in front of the witness.
4  And then if he wishes to look at the Defendant's
5  exhibits, which he's already said this morning do
6  not refresh his recollection, that's fine with me,
7  too.  I don't think it will take that long.
8  They're only nine exhibits.
9      MR. VARGA:  Once you're done with the
10  document, let us know, and then I'll give you
11  the other one.
12      A.  But you're asking whether or not
13  specifically if there was an e-mail exchange of
14  communication between the 8th and the 10th --
15      MR. VARGA:  The 6th and the 10th.
16      A.  Sorry, the 6th and the 10th, that
17  pertained to the substance of either the addendum,
18  proposal, LOI.  And I'm saying, I'll be happy to
19  look at anything you have, but that doesn't
20  exclude that there may be another e-mail that I
21  may or may not have that would indicate, yes,
22  there was a conversation around substance.
23      I don't know exactly what you mean by
24  that, but I have a feeling that you're looking to
25  see if we discussed the details of any one of the

Page 95

Werner

1
2  three references.
3      So, the answer is, I would be happy to
4  look through it.  That doesn't mean that I would
5  agree that that's the only one.  It's a chance
6  that I might have missed an e-mail.
7      MR. VARGA:  All right.  You have
8  Plaintiff's 2 in front of you.
9      THE WITNESS:  Yeah.
10      This is after that.  This is not in the
11  period that counsel is asking.  This is
12  May 12.  So he's asking between the 6th and
13  the 10th.
14      MR. VARGA:  Well --
15      THE WITNESS:  Is that right?
16      MR. VARGA:  For the record, Plaintiff's
17  Exhibit 2 contains several pages, and take a
18  look through all of them just to make sure,
19  because he's asking you a broad question.
20      A.  Okay, I've seen this one.  That one we
21  just discussed, this e-mail string.
22      MR. VARGA:  Page 2, Plaintiff's 2.
23      MR. VERSFELT:  Robert, do you want to go
24  off the record?
25      MR. VARGA:  No.  Let's have it on the

Page 96

Werner

1
2  record so that his answer is on the record.
3  So are you done with Plaintiff's 2?
4      THE WITNESS:  Yes.
5      MR. VARGA:  Okay.  Plaintiff's 3, one
6  page, it's KP 0124.
7      So that you identify it for the record,
8  if there are any dates in the e-mails, you
9  should tell that, too, so that it gives it a
10  reference.
11      A.  So Plaintiff's Exhibit 3 is referring to
12  e-mails in August -- on August 20.  It's not that
13  area.
14      MR. VARGA:  Plaintiff's Exhibit 4, for
15  the record, contains one page.  It's KP 0125.
16      A.  And then, here again, this is an e-mail
17  during August 17 --
18      MR. VARGA:  Let the record reflect that
19  the witness pointed to the bottom half
20  portion of Plaintiff's Exhibit 4.
21      Go ahead.
22      A.  And then, as you go up, this is an
23  e-mail, again, not involving myself.  This is
24  August 17 between Kim and Lionel.  Kim Hassler and
25  Lionel.  And then the final top of the page --

Page 97

Werner

1
2  actually, I can't tell what that is because --
3      MS. HARRIS:  KP 0124 and 125 go
4  together.  We had discussed that yesterday.
5      MR. VARGA:  So Plaintiff's 3 and 4 go
6  together.  So we established yesterday
7  that --
8      A.  So all of those, Plaintiff's Exhibit 3
9  and 4, are e-mails in August.  It's not in the
10  question.
11      MR. VARGA:  Okay.  I'm putting in front
12  of you Plaintiff's Exhibit 5, which contains
13  three pages.  It is marked KP 003, KP 004,
14  and KP 005.
15      A.  Okay.  These are -- this is an e-mail
16  string in March -- on March 30 and 29th.  So
17  again, this is not relative to what the question
18  is.
19      MR. VARGA:  Putting in front of you
20  Plaintiff's Exhibit 6, which contains two
21  pages, KP 006 and KP 007.
22      A.  Okay.  So these -- this is an e-mail
23  string, I guess you'd say, in March, on March 30
24  and April 2.  So again, nothing's in that period.
25      MR. VARGA:  So that was Plaintiff's 6.

25 (Pages 94 to 97)

Page 98

Werner

1
2    Plaintiff's 7, one page, it also contains
3    KP 0011, marking.
4    A.  Okay.  This is an e-mail on April 12,
5    and I think on March 8.  Again, not relevant.
6    MR. VARGA:  Plaintiff's Exhibit 8, one
7    page, also marked KP 0014.
8    A.  Okay.  So this is an e-mail starting on
9    April 20 and ending on April 20.  Again, not
10   between the 6th and the 10th of May.
11   MR. VARGA:  Plaintiff's Exhibit 9
12   contains three pages marked KP 0027, KP 0028,
13   and KP 0029.
14   A.  This is an e-mail starting on Sunday the
15   6th.
16   Q.  To be precise, May 6.
17   A.  Sorry, May 6.  Okay.  And I've read this
18   one, and -- I'm aware of that.
19   MR. VARGA:  Plaintiff's Exhibit 10,
20   one-page document.
21   A.  Okay.  This is not an e-mail and it
22   doesn't relate to counsel's question.
23   MR. VARGA:  What is it?
24   THE WITNESS:  It's a notice of
25   termination.

Page 99

Werner

1
2    MR. VARGA:  So these are plaintiff's
3    exhibits.  And let's take a look at
4    defendant's exhibits.
5    All right.  Let's go in order.
6    Defendant's Exhibit A marked KP 0030.
7    One-page document.
8    A.  This is an e-mail on Sunday, May 6, from
9    me, and one from Lionel.
10   Let me just read this.
11   Yeah.  That's the only reference of what
12   Lionel was asking for.  He was -- intended to read
13   it.  So yeah.
14   MR. VARGA:  We're still on Defendant's
15   Exhibit A.  Now we're moving on to
16   Defendant's B.  So here, as marked today,
17   contains 11 pages, the Defendant's B.  It's
18   marked KP 0031 through KP 0041.
19   Please take a look.
20   A.  This is the same e-mail.  Then there's
21   another e-mail on May 6.
22   MR. VARGA:  To be precise, same e-mail
23   string, or a continuation of the e-mail
24   string.
25   A.  It appears that way, yes, but this --

Page 100

Werner

1
2    this is not -- clearly to me that does not look
3    like a part of the e-mail string, which is the
4    e-mail from Lionel Flax to Leonard and John
5    Golieb.  That is not an e-mail string to me.
6    MR. VARGA:  Okay.
7    Q.  Yes, you testified about that earlier
8    this morning.
9    MR. VARGA:  For the record, the witness
10   was pointing to the message text below what
11   appears to be like a file depiction on the
12   top of Defendant's Exhibit B, the first page,
13   KP 0031, and he specifically was pointing to
14   the language beginning at, "From:  Master
15   file Flax," and there's an e-mail and the
16   date below and the subject, and there's a to
17   line as well.
18   Defendant's C, one-page document,
19   KP 0042.  Please take a look.
20   A.  Okay.  And this was -- yeah, May 8, an
21   e-mail from me to Lionel.  Yes.
22   MR. VARGA:  Defendant's D, two-page
23   document, it's also marked KP 0044 and
24   KP 0045.  Please take a look.
25   A.  And this is the e-mail again on May 8,

Page 101

Werner

1
2    from myself to Lionel, where I was questioning if
3    he has signed the LOI, and then I -- he indicates
4    on Wednesday, May 9, that he just signed it -- I
5    just sent this through signed.
6    And then another e-mail above that on
7    May 10, where I said, "Thank you, Lionel, I will
8    look for it now."  And then he says on May 10,
9    "Did you find it?" right after that.
10   MR. VARGA:  Question mark.
11   A.  Question mark.
12   MR. VARGA:  Is there anything on page 2,
13   the second page, which is KP 0045 --
14   THE WITNESS:  Nothing --
15   MR. VARGA:  -- that would be relevant to
16   your answer?
17   THE WITNESS:  Nothing.  No, it wouldn't
18   be relevant.
19   Q.  Okay.  We've reviewed all of the
20   exhibits from yesterday at the Lionel Flax
21   deposition that you attended, and all of the
22   exhibits that we've used this morning so far.
23   A.  Yes.
24   Q.  And does that -- does that review of
25   those documents refresh your recollection as to

26 (Pages 98 to 101)

Page 102

Werner

1
2  whether or not you had any conversations with
3  Lionel Flax, during the period May 6 to May 10,
4  with regard to the substance of the LOI or the
5  proposal?
6      A.  It does not refresh my memory.
7      Q.  Okay.  For the record, since you,
8  Mr. Werner, have raised the possibility that you
9  might have an e-mail at home or at your office,
10  that you have not yet produced in this action, I
11  want to direct to Mr. Varga, the
12  demand that we receive every e-mail relevant to
13  this action, and that we receive it as soon as
14  possible.
15      I say as soon as possible, Robert,
16  because as you know, we're under time pressures,
17  and as you know, both parties were ordered by the
18  court to produce their e-mails prior to Saturday
19  at noon.  Last Saturday.
20      MR. VARGA:  Correct.  The deadline was
21  last Saturday by noon, and just for the
22  record, I had received the fourth pack, the
23  last package from you, from actually
24  Elizabeth, Sunday afternoon, which was past
25  the deadline.

Page 103

Werner

1
2      MR. VERSFELT:  Yes, indeed.
3      MR. VARGA:  And I don't want to make an
4  issue about it.
5      MR. VERSFELT:  No, I'm not going to make
6  an issue out of it either, but I'm just
7  telling you, I want the record clear that if
8  Mr. Werner had an e-mail that pertains to a
9  communication with anyone at Kate's, I should
10  have had it by Sunday afternoon, when you got
11  our last production, or earlier, and I
12  definitely want it now.
13      MR. VARGA:  Just to clarify, you said
14  all.  All.
15      MR. VERSFELT:  All relating to these
16  shop-in-shop agreement, the proposal, the
17  LOI.  You know perfectly well what I'm
18  talking about.
19      MR. VARGA:  But for now, what he
20  testified to is that --
21      MR. VERSFELT:  What he testified to is
22  on the record.
23      MR. VARGA:  Exactly.  But your question
24  defined the scope between 5/6 and 5/10, and
25  his testimony is basically, I am not a

Page 104

Werner

1
2  hundred percent sure.  I want to confirm that
3  there's nothing else out there, and then I
4  respond.
5      MR. VERSFELT:  No, he did respond.
6      MR. VARGA:  Well, he did respond.
7      MR. VERSFELT:  He said, based on
8  everything he's seen, and based on his
9  recollection as it now stands, he has no
10  recollection of a discussion of the substance
11  of the LOI or the proposal with Lionel Flax,
12  during the period May 6, 2007, to May 10,
13  2007.
14      Q.  Correct?
15      A.  Yes.
16      Q.  Okay.  Okay.
17      MR. VARGA:  So --
18      Q.  Let me --
19      MR. VARGA:  Just for the record, my
20  client will conduct a search to determine if
21  there are any e-mails that were potentially
22  missed between -- in this deadline, between
23  5/6 and 5/10.  Agreed?
24      MR. VERSFELT:  Yes.  And if there are
25  any such e-mails, you will produce them super

Page 105

Werner

1
2  pronto.
3      MR. VARGA:  Agreed.
4      MR. VERSFELT:  Okay.
5      MR. VARGA:  Off the record.
6      MR. VERSFELT:  Off the record.
7      (Discussion off the record.)
8      MR. VERSFELT:  Let me ask the court
9  reporter to mark a single document as an
10  exhibit.  It's Bates-stamped KP 0049, and it
11  will be Defendant's Exhibit E.
12      (E-mail from Mr. Werner to Lionel Flax
13  on May 12, 2007, Bates-numbered KP 0049, was
14  marked Defendant's Exhibit E for
15  identification, as of this date.)
16      (The witness read.)
17      MR. VARGA:  Let us know when --
18      A.  I am.  Yes, I'm ready.
19      Q.  Mr. Werner, can you tell us what this
20  exhibit is?
21      A.  This is an e-mail from myself to Lionel
22  on Saturday, May 12.
23      Q.  And what do you say in your first
24  sentence?
25      A.  "I did receive your faxed LOI."

27 (Pages 102 to 105)

Page 106

Werner

1
2    Q.   Okay.  And what did you receive?
3    A.   I received a faxed LOI.
4    Q.   And what is that?
5        What was that?
6    A.   What do you mean, what was it?  It's a
7   piece of paper that was faxed with a signature on
8   it.
9    Q.   Okay.  What piece of paper?
10    A.   It was a piece of paper -- it was either
11   one document with the signature, or it was the
12   entire LOI.  I don't recall.
13    Q.   The one document, if it was one
14   document, as you referred to, as distinct from the
15   entire LOI, what --
16    A.   It wasn't distinct.  I'm sorry, it was
17   not distinct.  It was the signature page that I
18   remember distinctly.  I don't remember seeing the
19   rest -- or the other two pages of the LOI, or the
20   other page.
21    Q.   So do you remember that it was --
22        MR. VERSFELT:  I'll deal with that.
23        MR. VARGA:  Okay.
24    Q.   Do you remember that it was the
25   signature page?

Page 107

Werner

1
2    A.   Absolutely.
3    Q.   And was it a -- did it have a cover
4   sheet, the fax?
5    A.   I don't remember.
6    Q.   Did it have any indication that it was
7   intended for you, that you recall?
8    A.   I don't remember.
9    Q.   Was it a single page that might have
10   said "To: Keith Werner" on it?
11    A.   I don't remember.  I really don't
12   recall.
13    Q.   Okay.  Was it the To page -- was it both
14   pages of the LOI, do you recall that?
15    A.   I do not recall that.
16    Q.   Okay.  But you recall you got at least
17   one page.
18    A.   I got -- I received a signature from
19   Lionel that day, yes.
20    Q.   And what -- where -- what was the
21   signature on?
22    A.   It was on a signature page.  It was
23   Exhibit -- Plaintiff's Exhibit 1, that.
24    Q.   The -- you're pointing to the second
25   page.

Page 108

Werner

1
2    A.   Second page.
3    Q.   So what you got was -- let me make sure
4   I understand.  You don't recall whether there was
5   a cover page to the fax.
6    A.   Yes.  I do not recall.
7    Q.   Okay.  But whether or not there was a
8   cover page, what you recall getting is that --
9   what is page 2 of Plaintiff's Exhibit 1; is that
10   correct?
11    A.   That's correct, yes.
12    Q.   And you're certain that it had a
13   signature on it?
14    A.   Absolutely.
15    Q.   And that's what you got?
16    A.   That's what I remember.
17    Q.   The page that had a signature on it?
18    A.   I believe that to be true.
19    Q.   And you don't recall receiving the first
20   page of Plaintiff's Exhibit 1.
21    A.   I don't recall.  I'm sorry.
22    Q.   And you don't recall receiving other
23   pages.
24    A.   I don't recall.  I just don't recall how
25   many pages were attached to the -- to the fax that

Page 109

Werner

1
2   I -- I'm referring to.
3    Q.   Okay.  But you do recall that you got
4   one page.
5    A.   I received at least one page with a
6   signature, which is Exhibit-- Plaintiff's Exhibit
7   1, page 2.
8    Q.   Okay.  So you -- you're confident you
9   got that second page of Plaintiff's Exhibit 1, and
10   you're confident that it had a signature on it.
11    A.   Yes.
12    Q.   Where was the signature?
13    A.   Right where it belonged, where the --
14   Kate's Paperie is.
15        MR. VARGA:  For the record, pointing to
16   the bottom portion of -- the bottom signature
17   line on Plaintiff's 1, second page.
18    A.   Correct.
19    Q.   And what -- what signature was it, do
20   you recall?
21    A.   I recall it to be Lionel's.
22    Q.   Did you know what Lionel's signature
23   was?
24    A.   Yes, I did.
25    Q.   How did you know that?

28 (Pages 106 to 109)

Page 110

Werner

1
2     A.  Because I believe he signed a
3  confidentiality agreement before that.
4     Q.  Okay.  So you're confident that Lionel's
5  signature was on it.
6     A.  Yes.
7     Q.  Had Lionel dated it?
8     A.  I don't remember.
9     Q.  Had Lionel signed -- see under the
10  signature line, where it says, "By its"?
11     A.  Yes, he did sign that.  He put -- yeah.
12     Q.  He put what?
13     A.  I believe he put "president," but I'm
14  not sure, but there was something there.
15     Q.  Yes, okay.  And what did your receipt of
16  that page indicate to you?
17     A.  It indicated that he signed the letter
18  of intent.
19     Q.  Okay.  Now, what did you do with that
20  page?
21     A.  I don't recall.
22     MR. VARGA:  Just --
23     Q.  Well --
24     MR. VARGA:  You --
25     MR. VERSFELT:  Is that an objection?

Page 111

Werner

1
2     MR. VARGA:  Yes.  Objection to form.
3     MR. VERSFELT:  Okay.
4     Q.  What did you do with the page that you
5  received?
6     A.  I don't recall, and I would be
7  speculating if --
8     Q.  Well, I don't know as I want you to
9  speculate.
10     MR. VARGA:  No.
11     A.  Okay.
12     Q.  Did you put it in a file?
13     A.  I don't recall.
14     Q.  Did you put it on your desk?
15     A.  I'm sure I put it on my desk.
16     Q.  Did you sign the document yourself?
17     A.  I did sign it.
18     Q.  It wasn't signed when you sent it to
19  Lionel originally, right?
20     A.  It was not.
21     Q.  But once you got Lionel's signature, I
22  take it your testimony is you signed it?
23     A.  Yes.
24     Q.  And did you sign on the same page that
25  you had received back, via fax, from him?

Page 112

Werner

1
2     A.  I -- I think I did, yes.
3     Q.  So --
4     MR. VARGA:  In other words, you're
5  asking the faxed copy?  He signed the faxed
6  copy?
7     MR. VERSFELT:  Yes.  It's in English.
8     Q.  So your testimony is you sign the same
9  page you received back, the page that would have
10  had his faxed signature on it.
11     A.  I believe so.  I'm not totally sure, but
12  I -- yes.
13     Q.  Well, could there be any other page?
14     A.  No, no other page.
15     Q.  So that if you signed a page that had a
16  signature on it, it had to be his faxed signature,
17  didn't it?
18     A.  I don't recall if I signed it in my
19  office, if that's what you're asking, and I
20  received it.
21     Q.  No, it's not what I'm asking.
22     A.  Okay.
23     Q.  I'm asking whether you signed a page
24  that had his signature as a faxed signature.
25     A.  I did sign it, yes.  Whatever I signed

Page 113

Werner

1
2  had his signature on it, that I know.
3     Q.  His faxed signature on it.  We're
4  confirming that, aren't we?
5     A.  Yes, we are.
6     Q.  Okay.  So you received back the page,
7  and it was signed by him in a faxed signature, and
8  you signed it.
9     A.  I believe I did.
10     Q.  Is it possible you didn't sign it?
11     A.  It's not -- it's possible, but I
12  strongly believe that I signed it.
13     Q.  Okay.  Is it possible that you have lost
14  it because you didn't sign it?
15     A.  No.
16     Q.  Okay.  So it's possible that you lost it
17  for some other reason, then.
18     A.  No.
19     MR. VARGA:  Objection.
20     Q.  Where is it, Mr. Werner?  This is a
21  contract that you say you signed.  Where is it?
22     A.  I don't know.
23     Q.  Okay.  Now I want you to speculate.
24     A.  Okay.
25     Q.  Where might you have put it?

29 (Pages 110 to 113)

Page 114

Werner

1
2      A.  I think there was a chance that I
3  brought it down to the Mercer Caf with me to give
4  to Lionel, a copy of that, and for some reason, I
5  can't locate it right now.
6      Q.  Okay.  You brought a copy of the
7  signature page to Lionel --
8      A.  No, I brought the whole LOI.
9      Q.  Oh, the -- the -- the front page as
10 well.
11     A.  Yes.
12     Q.  When you say the whole LOI, you mean the
13 first two pages of Plaintiff's Exhibit 1.
14     A.  I think that's what it was, yes.
15     Q.  Okay.  Fine.  Now, you received from him
16 a single faxed signature.  Correct?
17     A.  No, I'm not saying that.
18     MR. VARGA:  No, he didn't say that.
19     Q.  Well, wait, I'm confused.  What I'm
20 intending to ask is, when Lionel faxed it back to
21 you, you got one page that was -- that had his
22 signature on it; isn't that correct?
23     A.  That's correct.
24     MR. VARGA:  At a minimum, he testified.
25     A.  At a minimum, right.

Page 115

Werner

1
2      MR. VARGA:  He recalls one page at a
3  minimum.  He doesn't know if --
4      MR. VERSFELT:  Oh, oh, I see what you're
5  saying.  No, I understand.  I'm not trying to
6  quibble over that.  I'm trying to say --
7      MR. VARGA:  There was one signature at
8  the time.
9      Q.  He may have faxed you back one page or
10 he may have faxed you the two pages, we don't
11 know.
12     A.  Right.  Right.
13     Q.  That's not the focus of my question.
14 The focus of my question is, the page you got that
15 had a signature on it, his signature, his faxed
16 signature, you then made a copy of.
17     A.  I don't know that.
18     Q.  Well, let me -- well --
19     A.  I do not recall making it.  I --
20     Q.  Tell me what you recall you did with the
21 page that had his faxed signature on it.
22     A.  I remember taking it out of my mailbox,
23 where I received my faxes, putting it on my desk
24 and signing it in preparation for the meeting that
25 we were having the next -- the next day or so.

Page 116

Werner

1
2      Q.  Okay.  And then do you have any
3  recollection whatsoever what happened to it after
4  that?
5      A.  I do not have any --
6      Q.  And I take it you've racked your brain
7  over this.
8      A.  I would have produced it, yes.
9      Q.  I assume you would have produced it as
10 well.  But what my question is really, that you've
11 taken time to think about what you might have done
12 with that document.  Haven't you?
13     A.  Yes, I have.
14     Q.  In the months that have passed since May
15 of 2007.
16     A.  I wouldn't say months, but there's been
17 some time I have been thinking about it, yes.
18     Q.  Well, you thought about it prior to your
19 attorneys filing this lawsuit, didn't you?
20     A.  Yes.
21     Q.  So you thought about it since then on
22 more than one occasion.
23     A.  Yes.
24     Q.  You've thought about what you might have
25 done with it.

Page 117

Werner

1
2      A.  Yes.
3      Q.  And you -- and your testimony is, you
4  don't recall what you did with it.
5      A.  I don't recall.  There's a very strong
6  possibility that I actually brought it to the
7  meeting at the Mercer Caf, and handed in the file,
8  indicating that that's what I -- he was asking me,
9  and I told him I would do that.  I cannot recall
10 if he took the file or took the signed copy that
11 I -- that I signed in that he signed.  I do not
12 recall it, but it's very -- it's a possibility
13 that I brought it there.
14     Q.  Okay.  Let me try and refresh your
15 recollection, then.  This was a lunch at the
16 Mercer Caf,, correct?
17     A.  Yes.
18     Q.  That you're referring to after May 12,
19 when you had received this signed copy.  And who
20 was present at the lunch, sir?
21     A.  Two individuals besides Lionel:
22 Mr. Akira Ito and Mr. Shin Ueno.
23     Q.  Besides Lionel and you.
24     A.  Correct.
25     Q.  So there were four people total present.

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 118

Werner

1
2    A.  Yes.
3    Q.  Do you recall that Lionel arrived late?
4    A.  Yes, I do.
5    Q.  Do you recall then that you and the two
6    Japanese gentlemen -- well, strike that.
7        How much time did you and the Japanese
8    gentlemen spend in the presence of Lionel at that
9    lunch?
10    A.  I really don't know.  An hour.  For
11    lunch, maybe.
12    Q.  What was the topic of discussion at the
13    lunch?
14    A.  Oh, it was general conversation about
15    Ito-Ya, about the history of Kate's.
16    MR. VARGA:  I'm sorry, what was that?
17    A.  Ito-Ya is the retailer, I-T-O Y-A.
18    Q.  Kolo has shop-in-shop arrangements with
19    Ito-Ya.
20    A.  No, they do not.
21    Q.  What is the arrangement that Kolo has
22    with Ito-Ya?
23    A.  We sell our products to them.
24    Q.  For mutual benefit, right?
25    A.  Yes.

Page 119

Werner

1
2    Q.  Okay.
3        Now, let me ask you this, Mr. Werner.
4    You have understood the significance of documents
5    since your days originating mortgages.  You have
6    been a senior executive of Werner & Company, and
7    Kolo, for the better part of a decade, both.
8        Is it your testimony that you would
9    have -- you could have taken your only copy of the
10    LOI and given it away?
11    A.  Is that my testimony?  Is that the
12    question?
13    Q.  Is that your testimony, yes.
14    A.  It's possible that I could have given my
15    only copy out.  It's possible.  It's also possible
16    that I could have lost that.
17    Q.  Where might you have lost it?
18    A.  It could be -- I don't know.  I really
19    don't know.  I -- I truly do not know.
20    Q.  But I take it you have searched your
21    office at Kolo.
22    A.  Yes.
23    Q.  And you've searched your -- whatever
24    area you used for your Werner & Company work,
25    right?

Page 120

Werner

1
2    A.  Correct.
3    Q.  And have you searched your home?
4    A.  I have to some degree, yes.
5    Q.  You've searched wherever you felt you
6    might find it.
7    A.  Yes.
8    Q.  Wherever you felt it possible that you
9    might find it.
10    A.  Uh-huh.  It could have accidentally been
11    thrown out as well.  That's what -- I just cannot
12    figure out why we don't have it.  It's very
13    unusual for us not to have it.
14    Q.  It's very unusual for anyone not to have
15    a document that they consider a binding contract.
16        But you don't have it.  Your testimony
17    is today, you just don't have it, correct?
18    A.  That's correct.
19        (Luncheon recess at 12:46 p.m.)
20
21
22
23
24
25

Page 121

Werner

1
2    AFTERNOON SESSION
3    (1:49 p.m.)
4    KEITH WERNER
5        resumed, having been previously duly
6        sworn by a Notary Public, was
7        examined and testified further
8        as follows:
9    CONTINUED EXAMINATION BY MR. VERSFELT:
10    MR. VERSFELT:  Back on the record.
11    Q.  Mr. Werner, I've put before you the
12    document that was marked yesterday as Plaintiff's
13    Exhibit 1.
14        Now, do I understand your testimony
15    correctly that you do not recall whether or not
16    you prepared this from a preexisting template, or
17    whether your lawyer might have done so?
18    A.  I do not recall it.
19    Q.  So did I accurately reflect your
20    testimony?
21    A.  I think you did.
22    Q.  And is it also your -- accurate for me
23    to say your testimony is -- strike that.
24        Is it also your testimony that if you
25    prepared it, you had your lawyer review it, and if

Page 122

```
1              Werner
2    your lawyer prepared it, you reviewed it?
3        A.  That's correct.
4        Q.  And did you yourself make any changes to
5    the template, or draft, that you received?
6        A.  I don't recall.  That's -- I've no
7    recollection if I did that after he reviewed and
8    sent it back.  I don't recall.
9        Q.  Well, at any time, do you recall any
10   specific changes that you made to an earlier
11   document?
12       A.  No.
13       Q.  Okay.  Well, let's look at the document.
14   I'll direct your attention to the first two pages
15   of Plaintiff's Exhibit 1, the LOI, or letter of
16   intent.
17           Now, looking at the first paragraph,
18   Mr. Werner, do you see in the second sentence --
19   the second line, where it says, "to enter into a
20   contract hereinafter called ('agreement')"?
21       A.  Yes.
22       Q.  To what does the word "agreement" in
23   that parentheses refer?
24           MR. VARGA:  The top of the page.
25           MR. VERSFELT:  Yes, I said.
```

Page 123

```
1              Werner
2        A.  I would presume that it meant that there
3    is an agreement that both parties would end up
4    signing.
5        Q.  And what agreement is that?
6        A.  I don't know.  You mean today, what is
7    it?  Show you what it is?
8        Q.  Well, if you can, what did you mean when
9    you -- what -- what in your mind was meant by the
10   word "agreement" in that second line, on or about
11   May of 2007?
12       A.  It meant that the parties would sign an
13   agreement that reflects the terms and conditions
14   that they both agree to.
15       Q.  That they would sign an agreement
16   that -- to be negotiated?
17       A.  It doesn't say that, but I would presume
18   that that might be what that would refer to, yes.
19       Q.  Okay.  That the parties would negotiate
20   and sign an agreement.
21       A.  Yes.  But it doesn't state, at a later
22   date, so that's what's throwing me off.
23       Q.  Well, what does the word "hereinafter"
24   mean?
25       A.  Here and then thereafter, or after the
```

Page 124

```
1              Werner
2    signing of this.  That's what that would mean to
3    me.
4        Q.  So after the signing of this, there
5    would be an agreement drafted, and signed, to
6    encompass the -- to encompass the terms.
7        A.  Rephrase?
8        Q.  All right.
9            MR. VARGA:  I'm not following.
10       Q.  All right.
11           MR. VARGA:  Ask him instead.
12           MR. VERSFELT:  I'm going to ask him a
13   question.
14           Could I have the question before my last
15   question read back, please.
16           (The record was read back.)
17       Q.  Good.  What did the word "hereinafter"
18   mean to you when you read it in this document, in
19   or about May of 2007?
20       A.  It meant that there would be an
21   agreement that would be provided to both parties
22   to review and sign.
23       Q.  Okay.  And what would that agreement
24   consist of?
25       A.  I don't know.
```

Page 125

```
1              Werner
2        Q.  Okay.  Now I understand.
3            Well, can you look at the last sentence
4    of that same paragraph that I'm going to -- it's
5    the first paragraph.  If I refer to it as the
6    umbrella paragraph, that's the paragraph I mean.
7        A.  Yes.
8            MR. VARGA:  Plaintiff's 1.
9        Q.  Have you ever heard the phrase "umbrella
10   paragraph"?
11       A.  No.
12       Q.  We'll try to call it the first
13   paragraph.  You see the sentence that starts, "It
14   is intended that the parties will enter into a
15   more formal agreement"?
16       A.  Yes.
17       Q.  Okay.  Is the more formal agreement
18   that's referred to in that sentence intended to be
19   the agreement that is in the parenthetical in the
20   sentence before?
21       A.  I -- I don't know.  It may be.  It's
22   possible.  I -- I'm not sure if I could say yes or
23   no, but it's very possible.
24       Q.  Okay.  So let me ask, with specific --
25   strike that.
```

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 126

Werner

1
2       Let me ask particularly with regard to
3   the time frame of May of 2007. In or about early
4   May of 2007, was it your understanding that the
5   agreement that is referred to in the first
6   sentence, with a capital A, is referring to a
7   later, more formal agreement, as referred to in
8   the second sentence of that first paragraph?
9       A.  So your question, to clarify, is, does
10  this word, in quotations --
11      Q.  Agreement.
12      A.  -- "agreement," mean the same thing as
13  formal agreement?
14      Q.  What was your understanding in May of
15  2007, is what I'm asking. Was it your
16  understanding that the word "agreement" there in
17  the first sentence was referring to a more formal
18  agreement in the second sentence?
19      A.  I don't recall. I don't know.
20      Q.  Okay. Now, let me ask this way: Could
21  you look at the paragraph numbered 1. Could you
22  look at the last sentence of that paragraph
23  numbered 1. Maybe, so we're clear, you could read
24  it into the record.
25      A.  "Together with and at the same time as

Page 127

Werner

1
2   this agreement is entered into, the parties will
3   also conclude a rental agreement and Kate's will
4   provide Kolo a consent from the current landlords
5   for such rights to sublease."
6       Q.  Okay. Now, my question to you is, is --
7   strike that.
8       In May of 2007, did you understand that
9   there would be a rental agreement entered into
10  between Kate's and Kolo?
11      A.  No.
12      Q.  Okay. Then can you tell me what is
13  referred to by the words "rental agreement" in
14  that last sentence of paragraph 1?
15      A.  Yeah. So it says, "together with," and
16  at the same time as this agreement is entered, the
17  parties will also conclude a rental agreement. So
18  if I understand your question, did I expect to
19  have a rental agreement?
20      Q.  Well, my question was -- let me try to
21  restate it.
22      In or about May of 2007, what did you
23  intend the term there, "rental agreement," to
24  mean?
25      A.  I don't remember. In fact, as I read

Page 128

Werner

1
2   this, there's language in here that I don't
3   remember putting in, so I don't know.
4       Q.  Okay.
5       A.  Okay?
6       Q.  It may have been put in by your lawyer?
7       A.  Could be, yes.
8       Q.  Was there anyone else at Kolo that
9   worked on the document?
10      A.  No. No. It could have been discussed
11  with our lawyer.
12      Q.  Okay. And I'm not asking about the
13  substance of those discussions. But we have
14  already established, haven't we, that the document
15  that's before you was prepared by Kolo, either
16  Kolo or Kolo's lawyer.
17      A.  Yes.
18      Q.  In collaboration of some sort that you
19  don't recall the details on. So somebody at Kolo
20  put in the words "rental agreement," correct?
21      A.  Or our attorney.
22      Q.  I'm sorry, you are right, or your
23  attorney. And you do not recall what you intended
24  those words to mean at the time you sent this
25  thing to Lionel Flax, right?

Page 129

Werner

1
2       A.  I do not recall.
3       Q.  Okay. Let me ask you this: Does the
4   capital word -- the capitalized A agreement, in
5   the third-to-last line of paragraph 1 of this
6   document, does that word "agreement" mean the same
7   as the word "agreement" in the second line of the
8   first paragraph?
9       A.  I don't know. It's possible. I just
10  don't know.
11      Q.  Okay.
12      A.  I would think that this would be in the
13  same way done in the -- in the document, but I
14  don't know.
15      Q.  Okay.
16      A.  It's ambiguous, to be honest with you.
17  I don't -- I don't know what that means.
18      Q.  Okay. Let me ask the same question with
19  regard to the word "agreement" that is capitalized
20  in paragraph 7 of the document. It's on the
21  second page.
22      My question to you -- do you see that
23  paragraph 7?
24      A.  Yes.
25      Q.  The word "agreement" appears there about

33 (Pages 126 to 129)

Page 130

Werner

1
2    four lines down in the center of the paragraph.
3        A.   Uh-huh.
4        Q.   Your lawyer is pointing to it.
5        MR. VARGA:  Right.
6        Q.   So my question to you, Mr. Werner, is
7    the same.  Does -- was it your understanding in
8    May of 2007 that that word "agreement" with a
9    capital A was intended to mean --
10       A.   No.
11       Sorry.
12       Q.   -- was intended to mean the same as the
13   word "agreement" in the second line of the first
14   paragraph of the document?
15       A.   When I read that, I would describe that
16   to mean this document.  But that's what my --
17   that's -- reading it in this paragraph --
18       Q.   In the paragraph 7.
19       A.   Yes -- would mean that it's this
20   document, to me.
21       Q.   Okay.  So paragraph 7, it's your
22   testimony -- well, it's your testimony that,
23   reading it today, you think that.  Or is it your
24   testimony that back in May of 2007 --
25       A.   Reading it today.

Page 131

Werner

1
2        Q.   Let me ask the same question with
3    respect to back in May of 2007.
4        In May of 2007, did you intend the word
5    "agreement" in that paragraph 7 to be the same as
6    the word "agreement" in the first sentence of the
7    document?
8        A.   I can't -- it says what the intent --
9    what my understanding was at the time in May.  It
10   seems to me that this sentence refers to this
11   document.
12       Q.   Okay.  Why can't you state your --
13       MR. VARGA:  You said this.  You were
14   pointing to paragraph 7?
15       THE WITNESS:  Yes.
16       MR. VERSFELT:  Yes, he was pointing
17   to -- there's no contention there.  He was
18   pointing to paragraph 7.
19       Q.   Why can't you testify as to your
20   understanding of the document in May of 2007?
21       A.   Well, one, I don't remember discussing
22   that with our attorney.
23       And two, I don't -- I don't understand
24   why there's a difference between the quotation,
25   agreement, and this agreement, as -- as it's

Page 132

Werner

1
2    written here.  Today, when I read it, it
3    doesn't -- I can't recall why there is a
4    difference.
5        Q.   Okay.  Now, let me ask about the last
6    word of the document on page 2.  You see just
7    above the Kolo Retail, LLC, signature line --
8        A.   Yes.
9        Q.   -- it has "Agreement" with a capital A.
10       A.   Yes.
11       Q.   Is that intended to be the same document
12   as the agreement that you -- that is referred to
13   with a capital A in paragraph 7, on that same
14   page?
15       A.   When I read this right now, it -- I
16   think it refers to this document --
17       Q.   But you're not sure.
18       A.   -- that also relates to what is being
19   said in paragraph 7.  To me, when I read both of
20   those, it clearly indicates to me that it's this
21   document, not a future document, as opposed to in
22   the first paragraph.
23       But you know, again, there's -- I can't
24   remember what the -- what the distinction is and
25   why it was there.

Page 133

Werner

1
2        Q.   Okay.  Now, the agreement just above the
3    signature line on page 2 is at the end of a
4    sentence.  Can you read that sentence?
5        A.   The end of the signature -- "By signing
6    below, each party agrees and consents to the
7    above-mentioned terms and agrees to act in good
8    faith to complete the negotiations for additional
9    terms which will be set forth in the agreement."
10       Q.   Okay.  Which -- it says "which will be
11   set forth in the agreement," doesn't it?
12       A.   Yes, it does.
13       Q.   And your testimony is that that
14   agreement referred to there is the same as the
15   agreement listed in paragraph 7.  Did I get that
16   correctly?
17       A.   It appears that it's referring to this
18   document in both 7 and this paragraph before the
19   signature line.
20       That's how it's written.  But that's --
21   I don't know what the intent was, but that's
22   how -- that's how I interpret it now.
23       Q.   That's how you read it today?
24       A.   Yes.
25       Q.   And you don't recall what interpretation

34 (Pages 130 to 133)

Page 134

Werner

1
2  you may have put on those terms in May of 2007.
3  Is that correct?
4      A.  Rephrase.  I don't know what your
5  question is.
6      Q.  Okay.  My question is that your
7  testimony, in looking at the document today, is
8  based on your reading of the document today,
9  rather -- is that correct?
10     A.  If your question is, what is the
11 distinction between --
12     MR. VARGA:  That's not the question.
13     A.  I'm sorry.
14     Q.  Let me just try to rephrase it clearly.
15     My question to you, Mr. Werner, is, in
16 looking at the document today and giving your
17 interpretation of it, you're basing your
18 interpretation of the document today on your
19 reading of the document today.
20     A.  That's correct.
21     Q.  And I think -- is your testimony that
22 you have no recollection of what you intended the
23 terms to mean in May of 2007?
24     A.  No, that's not true.
25     Q.  Okay.  Well, tell me what you

Page 135

Werner

1
2  intended --
3      A.  Okay.
4      Q.  -- the....
5      A.  Starting --
6      Q.  In 2007.
7      A.  Starting with which part?  "By signing
8  below, each party agrees"?
9      Q.  Yeah.
10     A.  "By signing below, each party agrees and
11 consents to the above...."
12     (Discussion off the record.)
13     (The witness read.)
14     A.  My recollection when reading this is
15 that there were -- there was a -- additional
16 agreement that would set forth additional terms
17 that this agreement did not necessarily cover.
18 That's what the intent was, as I read it now, and
19 I recall that.  So there were additional terms
20 that were not stated in this document that the
21 parties were going to enter into.
22     Q.  And what were those additional terms?
23     A.  There were just these terms, nothing
24 specific.  It was never discussed at any time what
25 the specific terms were.  It was that if we didn't

Page 136

Werner

1
2  cover additional terms, that we would agree in
3  good faith to enter into a more formal agreement
4  that had additional terms.  That's what I remember
5  now.
6      Q.  Okay.  Okay.
7      MR. VARGA:  Off the record.
8      (Discussion off the record.)
9      Q.  So what's your recollection -- is it
10 fair to say that what you anticipated was that the
11 parties would negotiate additional terms through
12 negotiation?
13     MR. VARGA:  Objection.
14     A.  No.
15     Q.  Well, tell me what your recollection is,
16 Mr. Werner, please.
17     A.  My recollection is that we were willing
18 to address additional terms that they had, or that
19 we might have, to enter into another agreement,
20 that those terms were not in this document.  This
21 allowed us to move forward in -- moving our
22 property into that space.
23     Q.  What space?
24     A.  Into the -- sorry.  Into the 72 Spring
25 Street, Soho store space.

Page 137

Werner

1
2      Q.  Okay.  And if there were other terms
3  that the parties considered significant, either
4  party could raise it, and those terms could be
5  negotiated and put into a subsequent agreement.
6      A.  Yes.  That's true.
7      Q.  Okay.
8      Was any such subsequent agreement ever
9  negotiated?
10     A.  No.  It was my recollection that I was
11 waiting for Kate's to produce any type of document
12 that they felt should -- well, for us to review, I
13 guess, with additional terms.
14     Q.  And how long did you wait?
15     A.  Well, I'm still waiting.
16     Q.  Okay.
17     A.  I don't mean to be, you know, wise guy,
18 but I'm just saying, I'm still waiting.
19     Q.  I didn't take it as a wise guy answer.
20 There -- the -- so the bottom line is, there
21 was -- there has been no subsequent negotiation of
22 additional terms in the year and a half since this
23 LOI was circulating around in May of 2007,
24 correct?
25     A.  That's absolutely correct.  There's no

35 (Pages 134 to 137)

Page 138

Werner

1
2  need for it.
3      MR. VARGA:  Off the record.
4      (Discussion off the record.)
5      MR. VERSFELT:  I think I misspoke just
6  now and said a year and a half, when I really
7  should have said eight months.
8      Q.  But your answer would be the same, eight
9  months or a year and a half.
10      MR. VARGA:  Basically, nothing since --
11  since the -- this was executed, there was no
12  additional terms discussed.
13      A.  There was no additional terms that were
14  discussed.
15      Q.  Okay.  Now, let's look at paragraph 1,
16  again, of this letter of intent.
17      Paragraph 1 refers to an Addendum A.
18  Correct?
19      A.  That's correct.
20      Q.  And what does this paragraph say that
21  that attached Addendum A does?
22      A.  Well, I can read the -- the sentence,
23  "The attachment Addendum A defines the agreed-upon
24  space at the Spring Street store."
25      Q.  Right.  What's the next sentence say?

Page 139

Werner

1
2      A.  "Layout and drawings showing such
3  dedicated spaces attached hereto in Addendum A."
4      Q.  Okay.  So do those two sentences define
5  the space at the Spring Street store that Kolo
6  proposed to take in the shop-in-shop agreement?
7      A.  The Addendum A refers to the space at
8  the Spring Street store, yes.
9      Q.  And just for completeness, I think we've
10  many times established that the third page through
11  the end of this exhibit is the addendum.  Is that
12  correct?
13      A.  Yes, it is.
14      Q.  And so what pages -- could you show me
15  what pages in the addendum show the layout and
16  drawings for the dedicated space in the Spring
17  Street store?
18      A.  It would be 4, 5 and 6.
19      Q.  Yes, okay.
20      Now, is there any similar layout or
21  drawing with regard to space in any other Kate's
22  Paperie location in Plaintiff's Exhibit 1?
23      A.  Not in Plaintiff's Exhibit 1, no.
24      Q.  And same question, except using the
25  term, Addendum A.  So is -- was there in

Page 140

Werner

1
2  Addendum A any layout or drawing for any space,
3  other than the space in the Soho store, the store
4  at Spring Street?
5      A.  Not other than the Soho store.
6      Q.  Okay.
7      A.  Can we take a quick break, real quickly?
8  Just use the restroom?
9      Q.  Sure.
10      (A recess was taken.)
11      Q.  So to confirm, Mr. Werner, there's no --
12  there is no specific location identified by layout
13  or drawing for the Third Avenue Kate's Paperie
14  shop in Plaintiff's Exhibit 1.  Correct?
15      A.  That's correct.
16      Q.  And there is no specific location shown
17  by layout or drawing for the 57th Street Kate's
18  Paperie shop in Exhibit Plaintiff's 1.
19      A.  That's correct.
20      Q.  The only location that is set forth and
21  identified in Plaintiff's Exhibit 1 is the layout
22  for the Spring Street store.
23      MR. VARGA:  Objection to form.
24      Q.  Okay.  I'll try it.
25      MR. VARGA:  Just to clarify, as long as

Page 141

Werner

1
2  you limit it to layout, that the only layout
3  in this document -- because you said
4  information, and that's a -- somewhat
5  confusing, because --
6      MR. VERSFELT:  Fair enough.  If I said
7  information, I misspoke.
8      Q.  The only layout of space set forth in
9  Plaintiff's Exhibit 1 is the diagram and layout
10  pages for the Spring Street store.  Correct?
11      A.  Yes.  The only layout, yes.
12      MR. VARGA:  Is that nearby?
13      THE WITNESS:  Huh-huh.
14      Q.  Okay, let's look at paragraph 3.
15      Paragraph 3.  And it's entitled
16  Commencement.
17      Could you read the first two sentences
18  of that paragraph.
19      A.  "The commencement of the first Kolo
20  Retail store within Kate's store concept will
21  begin on or around June 1, 2007, located on Spring
22  Street.  The other locations, Third Avenue and
23  57th Street, will commence approximately one month
24  thereafter."
25      Q.  So this LOI sets forth a specific date

36 (Pages 138 to 141)

Page 142

Werner

1
2   for commencement of the Kolo Retail store in the
3   Spring Street location, correct?
4       A.   It says that it will commence
5   approximately one month.  Not specifically.
6   Approximately.
7       Q.   Approximately June 1.
8       A.   No.  It says, "will commence
9   approximately one month thereafter."  For the
10  other two stores.
11      MR. VARGA:  No --
12      Q.   My question is for the Spring Street
13  store, does it give a date?
14      A.   Yes, it does.
15      Q.   And it -- the day is defined as on or
16  around June 1, 2007.
17      A.   That's correct.
18      Q.   For the other locations, it does not
19  give a specific date, correct?
20      A.   It does not give a specific date.
21      Q.   Okay.  It says, "approximately one month
22  thereafter."  Correct?
23      A.   Yes.
24      Q.   Could you look at paragraph 5 of the
25  LOI, please.

Page 143

Werner

1
2       What was the -- strike that.
3       What did you intend to convey by
4   paragraph 5?
5       A.   We were working toward a solution that
6   helped Kate's use their current inventory as a
7   starting inventory for any shop-in-shop, so that
8   both companies didn't have to purchase more or too
9   much inventory, and that we would accommodate
10  Kate's by using their inventory and offering them
11  a credit to some -- you know, a credit for that
12  product that they directly bought from Kolo.
13      Q.   Is that what is meant here by the -- the
14  phrase, "Kolo will agree to accept responsibility
15  of the current inventory"?
16      A.   Yes, it is.
17      Q.   That you would provide Kate's with a
18  credit for the inventory that they currently held
19  of Kolo goods.
20      A.   It was implied.
21      Q.   Implied?
22      A.   It -- that's -- when you say credit, we
23  didn't specifically say credit, but that's
24  basically what I would -- I would agree to.
25      And I would have agreed to.

Page 144

Werner

1
2       Q.   And is that a term that you could have
3   worked out with Kate's, subsequently?
4       A.   Easily enough.  That's an acceptable
5   practice.  It's called a return, so that would
6   have been a return back to Kolo, and we would have
7   just basically given them a credit for what they
8   purchased in the past.
9       Q.   I see.  So paragraph 5 does not -- if I
10  understand you correctly, paragraph 5 does not
11  itself provide them with a credit.
12      A.   No.
13      Q.   It -- but I take it your testimony is
14  that it makes clear that the handling of their
15  inventory is a term that can be negotiated between
16  the parties.  Is that correct?
17      A.   I don't know what your question is on
18  that point.
19      Q.   Okay.  Well, I'm just trying to make
20  sure I understand what you've testified about.  I
21  think we're both clear that the word "credit" does
22  not appear in paragraph 5.
23      A.   Yes.
24      Q.   Okay.  And is -- is it your testimony
25  that what was intended by paragraph 5 was that

Page 145

Werner

1
2   Kolo and Kate's would work out in an inventory
3   arrangement that would benefit both parties by not
4   requiring excessive purchases?
5       A.   Yes.  And let me clarify --
6       MR. VARGA:  Objection to form.
7       Go ahead.
8       A.   And let me clarify.  In the last
9   sentence, it does say, "Kolo will issue a credit
10  memo to Kate's for receiving such qualified
11  inventory."  So it was intended to provide them
12  with a credit memo, should we have received a -- a
13  return of that inventory.
14      MR. VARGA:  So to the extent your prior
15  statement that there were -- the word
16  "credit" does not appear is incorrect.  It is
17  in paragraph 5.
18      Q.   Well, let me clarify.  Let me clarify my
19  question.  The word "credit" does not appear with
20  respect to Spring Street location in that
21  paragraph; isn't that right?
22      MR. VARGA:  Objection to form.
23      Q.   Well, if the word "credit" appears in
24  that paragraph, in connection with the Spring
25  Street location, please tell me where it is.

37 (Pages 142 to 145)

Page 146

Werner

2  A.  It says, "Upon commencement of each
3  location, starting with Spring Street location" --
4  **Q.  Right.**
5  A.  -- "Kolo will agree to accept
6  responsibility of the current inventory that
7  Kate's provides to Kolo for that location."
8      So in that case, it did include Spring
9  Street.
10  **Q.  Yes.  Agreed.  That sentence includes**
11  **Spring Street.**
12  A.  "All inventory must be in salable
13  condition when provided by Kate's at the time of
14  commencement for each additional store.  Kolo will
15  issue a credit memo to Kate's for receiving such
16  qualified inventory," for each additional store.
17  **Q.  Right.  So the credit memo is going to**
18  **apply to subsequent stores.**
19  A.  Well, I would -- I would say it included
20  Spring Street.  Why would we not do it -- I'm
21  sorry.
22  **Q.  It doesn't say that explicitly, does it?**
23  A.  I think it does, but that -- I -- I
24  think personally it does.
25  **Q.  Okay.  Can you --**

---

Page 147

Werner

2  A.  It -- starting with Spring Street
3  location.  It --
4  **Q.  Yes.  "Starting with Spring Street**
5  **location, Kolo will agree to accept responsibility**
6  **of the current inventory."  So I take it your**
7  **testimony is that that means that Kolo will issue**
8  **a credit memo for the Spring Street store**
9  **inventory.**
10  A.  Should we have received it.  Yes.
11  Should we have received any inventory.  At the
12  time, there was no inventory.  They agreed that
13  they had no inventory to provide Kolo as a return
14  to be used for Spring Street.  So therefore, there
15  was nothing to provide them with the credit memo
16  in.  That was very clear.
17  **Q.  Okay.  Then looking -- let's move down**
18  **to paragraph 7.**
19  A.  Yes.
20  **Q.  Now, I -- is it the case that Addendum A**
21  **contains profit-and-loss projections and a**
22  **compensation schedule for the Spring Street**
23  **location?**
24      MR. VARGA:  He's referring to Addendum
25  A.

---

Page 148

Werner

2  A.  Yeah.  I just want to see what -- okay.
3  Yes, it does refer to Soho, 72 Spring Street
4  location.
5  **Q.  Yes.  And just to be clear, there is no**
6  **profit and loss projection or compensation**
7  **schedule in Addendum A for the Third Avenue store.**
8  **Correct?**
9  A.  No.  My intent, in providing Kate's this
10  schedule --
11  **Q.  Which schedule?**
12  A.  The Addendum A -- Addendum A.  And what
13  we're saying is Plaintiff's Exhibit 1.
14      MR. VARGA:  Starting at page 3.
15  A.  So from 7 through the end --
16      MR. VARGA:  Just say what the title is.
17  A.  Soho Proposal Basic Terms.  And all the
18  other pages to the end was used for the purpose of
19  the -- to define the terms for those future stores
20  as well.
21  **Q.  Okay.  Let's look at the page that's**
22  **entitled Soho Proposal Basic Terms.**
23  A.  Okay.
24  **Q.  Have you got that?**
25  A.  Yes.

---

Page 149

Werner

2  **Q.  It's the page prior to the one you're**
3  **looking at.**
4      **Soho Proposal Basic Terms.**
5  A.  Uh-huh.
6  **Q.  Now, does Soho refer to the Third Street**
7  **store?**
8  A.  It does.
9  **Q.  It does?**
10  A.  No, I'm sorry.  No, it doesn't.
11  **Q.  Soho does not refer to the Third Street**
12  **store, does it?**
13  A.  No.
14  **Q.  Does Soho refer to the 57th Street**
15  **store?**
16  A.  No.
17  **Q.  Soho refers to the Spring Street store,**
18  **correct?**
19  A.  Yes.
20  **Q.  This is entitled Soho Proposal.**
21  A.  But in this proposal, was also the
22  financial model for future stores.
23  **Q.  I'm looking at the page that says "Soho**
24  **Proposal Basic Terms."  Can you point to any**
25  **reference on that page to the Third Street Store**

---

38 (Pages 146 to 149)

Page 150

Werner

1
2  or the 57th Street store?
3      Third Avenue store or the 57th Street
4  store.
5      (The witness read.)
6      A.  There's no reference to Third or 57th
7  Street stores on this page.
8      Q.  Right.  Just so we're clear, because --
9  I was pointing and your lawyer was pointing,
10 there's no reference to any location other than
11 Soho on this page that's entitled Soho Proposal
12 Basic Terms.  That's correct, right?
13     A.  That's correct.
14     Q.  Okay.  Now, let's turn to the next page.
15 What's the title of that page, sir?
16     A.  Financial Proposal.
17     Q.  Okay.  Can you point to any reference to
18 the Third Avenue location or the 57th Street
19 location on that page?
20     A.  No.
21     Q.  Okay.  So the answer is the same as with
22 the prior page, there's no reference to either of
23 those other stores on that page.
24     A.  Correct.
25     Q.  That page is intended to address the

Page 151

Werner

1
2  Soho location.  Correct?
3      A.  Not necessarily.
4      Q.  Well, what does it say?
5      A.  It doesn't say anything about Soho here,
6  actually.
7      Q.  But it doesn't say anything about the
8  other stores.
9      A.  But that doesn't imply that it meant
10 only the Soho store.
11     Q.  Well, let's look back at paragraph 7 of
12 the letter of intent.
13     Could you read me the third sentence of
14 paragraph 7.
15     A.  Starting with, "The compensation
16 schedule"?
17     Q.  Please, read that sentence and the next
18 sentence, please.
19     A.  "The compensation schedule for Spring
20 Street is also attached hereto in Addendum A.
21 Kolo shall compensate Kate's according to the
22 compensation schedule set forth in Addendum A for
23 the Spring Street location, and according to
24 future addendums for the other locations as they
25 are agreed upon."

Page 152

Werner

1
2      Q.  Correct.  Now, does that refresh your
3  recollection that the financial proposal page that
4  we were looking on -- excuse me, that we were
5  looking at, is a compensation schedule for the
6  Spring Street location?
7      A.  It would appear so.
8      Q.  Thank you.
9      There is -- I apologize if I've already
10 asked you this question, but just so we're clear,
11 that financial proposal page that is in Addendum A
12 does not refer to the Third Avenue location or the
13 57th Street avenue location.
14     A.  It does not.
15     Q.  Okay.
16     And now that you've reviewed
17 paragraph 7, do you agree that paragraph 7
18 explicitly defines Addendum A as containing
19 compensation schedule and a profit and loss
20 protection -- strike that.
21     MR. VARGA:  I was about to ask where did
22 you read that.  So we're on the same page.
23     Q.  Let me ask it this way.  And we now all
24 agree that the compensation schedule contained in
25 Addendum A was addressed to the Spring Street

Page 153

Werner

1
2  store only.
3      A.  It appears that way, yes.
4      Q.  Thank you.
5      And you intended that to be that way in
6  May of 2007, correct?
7      A.  No.
8      Q.  No?
9      A.  I can't say that.
10     Q.  You can't.
11     A.  No, I don't recall that.
12     Q.  Okay.  Well, do you recall that at the
13 time you sent this LOI and Addendum A to Lionel
14 Flax, that you disagreed with the statement in
15 paragraph 7 that the compensation schedule for
16 Spring Street is attached hereto as Addendum A?
17     A.  I do not recall disagreeing to it.
18     Q.  Okay.  Do you have any recollection at
19 all of your thinking at the time you sent the
20 compensation schedule to Lionel Flax in May of
21 2007 that the compensation schedule did not accord
22 with the language of paragraph 7?
23     A.  I -- I don't understand the question.
24     Q.  What don't you understand about it?
25     A.  Can you rephrase that question?

39 (Pages 150 to 153)

Page 154

Werner

1
2  Q. Can you help me with what you don't
3  understand?
4  A. When you said in accord with, tell me
5  again, or --
6  Q. Okay, that's fair. I'll try and use
7  different words.
8      Do you have any recollection in or about
9  May of 2007 that, as you read the draft LOI that
10  you sent to Lionel Flax, that its reference to a
11  compensation schedule for Spring Street was not
12  what was set forth in the financial proposal page
13  of Addendum A?
14      MR. VARGA: Objection to form.
15  A. I recall the compensation schedule in
16  Addendum A to apply to Soho and used as a -- as a
17  basis for future stores.
18  Q. For future negotiations with regard to
19  future stores.
20  A. Future --
21  Q. Is that correct?
22  A. Future stores, yes.
23  Q. To negotiations that would be directed
24  to additional stores.
25  A. Yes. But I wouldn't say negotiations.

Page 155

Werner

1
2  Maybe we're talking semantics, but it was a basis
3  of what we would use to go forward, because the
4  percentage of rent was a factor of what they were
5  paying, and we were using that as a basis to talk
6  about those other stores.
7  Q. Okay.
8  A. Okay?
9      MR. VARGA: Model?
10  A. Model. Yeah, as -- basis, a model. It
11  was exactly that, a model.
12  Q. A model.
13  A. Yeah.
14  Q. To be addressed in connection with the
15  other stores.
16  A. Yes.
17  Q. But the financial proposal page in
18  Addendum A is described in paragraph 7 as the
19  compensation schedule for Spring Street. Correct?
20  A. Yes.
21  Q. Okay.
22      And is it the case that in May of 2007,
23  you anticipated that Kate's and Kolo might agree
24  to future addendums for the other locations.
25  A. Yes.

Page 156

Werner

1
2  Q. Okay. Were future addendums for the
3  other locations ever agreed to?
4  A. No.
5  Q. Okay. Did you anticipate in May of 2007
6  that if future agreement to addendums for other
7  locations could be reached, that those addendums
8  would be attached to an agreement?
9  A. Attached to this agreement.
10  Q. Okay.
11      MR. VARGA: Plaintiff's 1.
12  A. Plaintiff's 1. Yes.
13  Q. So that -- so is it -- was it your
14  understanding in May of 2007 that Addendum A was
15  addressed to the Spring Street store, and Kate's
16  and Kolo might agree to additional addendums that
17  could also be attached?
18  A. That's my recollection, yes.
19  Q. Maybe be called Addendum B and
20  Addendum C and addendum up to Z, but Addendum A
21  was directed to the Spring Street or Soho store.
22  A. No, I'm not saying that, but -- I will
23  say that it was likely that we would use a new
24  addendum should the terms change from this
25  addendum. That I will agree to.

Page 157

Werner

1
2  Q. Okay.
3  A. Okay?
4  Q. And that would -- whether or not the
5  terms would change, would depend on negotiations
6  between Kate's and Kolo.
7  A. It's not so much the negotiations. It
8  was really -- I guess we're saying the same thing,
9  but it was really once we narrowed down the two
10  locations inside those stores, it may change this
11  addendum, yes.
12  Q. Okay. Now, let's look at term.
13  Paragraph 8 on page 2 of this agreement.
14      This exhibit.
15  A. Uh-huh.
16  Q. Could you -- well, review paragraph 8,
17  term, please. I'm going to ask you some questions
18  about it.
19      (The witness read.)
20  A. Okay.
21  Q. According to the words of paragraph 8,
22  if Kolo -- how long could Kolo keep the space at
23  the Soho store, the Spring Street store?
24  A. For three years.
25  Q. Where does it say three years?

40 (Pages 154 to 157)

Page 158

Werner

1
2    A.  Sorry.  In paragraph 8 it does not say
3    three years.
4    Q.  What does it say in paragraph 8?
5    A.  It says, "The term of each sublease will
6    be for one year from the commencement date.  Kolo
7    shall retain the right to renew each sublease for
8    an additional one year, and each year thereafter
9    as it becomes due, by giving 60 days' notice to
10   Kate's prior to termination."
11        So it does indicate that we have the
12   ability to renew for more than one year.
13   Q.  For how many years?  More than one year?
14   A.  For two years.  One -- two more years.
15   Q.  Where does it say that?
16   A.  Retain the right to renew each sublease
17   for an additional one-year period, and each year
18   thereafter.  So the first, the second, and each
19   year thereafter.
20   Q.  Oh, so your reading of the words of
21   paragraph 8 is that Kolo could not stay in that
22   space beyond three years, even if it wanted to.
23   Is that correct?
24   A.  No, I'm not saying that.  Kolo shall
25   retain the right to renew each sublease for an

Page 159

Werner

1
2    additional one year, and each year thereafter as
3    it becomes due, by giving 60-day notice.  It
4    doesn't have a total completion date, a maximum
5    time limit.  It just says, in each year
6    thereafter.
7    Q.  Yeah.  Sometimes it's called an
8    evergreen clause.
9    A.  Yeah.
10   Q.  You understand that term?
11   A.  No.
12   Q.  Okay.  But there is no end date in
13   paragraph 8, is there?
14   A.  There's no specific date, no.
15   Q.  Yeah.  So that if Kolo wanted to stay in
16   the space in the Spring Street store for ten
17   years, and if each year 60 -- it gave at least
18   60-day notice in timely fashion, it could stay,
19   according to the terms of paragraph 8.  Is that
20   correct?
21   A.  And according to the other terms of
22   the -- of this agreement, yes.
23   Q.  Well, what other terms of the agreement?
24   A.  Well, there's other terms here.
25        Well, it also refers to the addendum, so

Page 160

Werner

1
2    you have to bring the addendum into this.
3    Q.  Right.
4        And how would you -- how did you
5    anticipate that that should be done in May of
6    2007?
7    A.  Well, according to the addendum entitled
8    Soho Proposal, it says, in number 2, Lease
9    Options, "Kolo has the right to three one-year
10   options."
11        It also goes to say that we -- in -- in
12   paragraph 3, "Right to terminate," and states that
13   Kolo -- if Kolo continues to pay Kate's, a
14   minimum -- okay, I'll start from the beginning.
15        Paragraph 3, "Right to terminate.
16   Kate's has the right to terminate the agreement
17   after the first year, and each year thereafter,
18   unless Kolo continues to pay Kate a minimum of
19   $140 per square foot plus a 6 percent royalty."
20        So those are the terms I'm referring to,
21   in addition to paragraph 8.
22   Q.  Right.  Those paragraphs 2 and 3 there,
23   on the page that's entitled Soho Proposal Basic
24   Terms, are intended to be a part of the LOI,
25   aren't they?

Page 161

Werner

1
2    A.  They are.
3    Q.  Now -- and it's your understanding that
4    if they are more restricted than the terms in --
5    than the words -- strike that.
6        Let me start over.
7        And is it your understanding that if the
8    basic terms of the Soho Proposal are more
9    restrictive than the words in the first two pages
10   of this exhibit, the LOI, that the more
11   restrictive provision would control?
12   A.  No.
13   Q.  Okay.  Tell me what was your
14   understanding of --
15   A.  I didn't have an understanding until you
16   just raised it right now.  I never thought about
17   it.
18   Q.  You never thought about that.
19   A.  No.
20   Q.  Did you read the addendum at the time
21   that you sent it to Kate's Paperie?
22   A.  Not -- maybe not at the time, but I've
23   read it, yes.
24   Q.  Did you read the addendum at the time
25   you sent the LOI to Kate's Paperie?

41 (Pages 158 to 161)

Page 162

Werner

1
2    A.  I don't recall.
3    Q.  You intended to refer to the addendum in
4    the LOI, correct?
5    A.  Yes.
6    Q.  Did you -- and is it your testimony you
7    just didn't think about whether or not there might
8    be a conflict between the wording of a provision
9    in the LOI and the wording of a similar provision
10   in the addendum?
11   A.  Not until you just brought it up.
12   Q.  So it is your testimony that you just
13   didn't consider that possibility; is that correct?
14   A.  I didn't.  I didn't think about it, no.
15   Q.  Is it your testimony now that you have
16   read -- strike that.
17       MR. VARGA:  We know that by now.  He
18   read it.
19   Q.  Now that you have read it, and now that
20   in this deposition you have thought about it,
21   which should control?
22   A.  I don't know.
23   Q.  Okay.
24   A.  I have no opinion on it, to be honest
25   with you.

Page 163

Werner

1
2    Q.  Okay.
3       MR. VARGA:  I would also object to that,
4    of course, because that calls for a legal
5    conclusion, and that's for the courts to
6    decide.  You know.
7    Q.  Now that you have read it, Mr. Werner,
8    and now that we've discussed it in this deposition
9    and you're aware of the issue, do you have a
10   preference as to which would control?
11   A.  Not yet.
12   Q.  Okay.  Do you have an understanding
13   based on your background as a -- an executive of
14   Kolo, and a workout executive at Werner and Co.,
15   as to what ought to control here?
16   A.  No.  I don't have an understanding.
17   I -- you're asking me to make a judgment call on
18   something that I just -- today, right now, I just
19   have a -- I'd have to get counsel's opinion on it.
20   I'm not an attorney.
21   Q.  Okay.  You don't recall asking your
22   counsel at the time, that is in May of 2007, with
23   regard to any conflicting provisions of the LOI
24   and the addendum, do you?
25   A.  I'm sorry, I don't.  I don't remember

Page 164

Werner

1
2    that.
3    Q.  Okay.
4       (Counsel conferred with his witness.)
5    Q.  Did you have an expectation, in May of
6    2007, as to whether Kate's Paperie would interpret
7    the words of paragraph 8 of the LOI as controlling
8    over the basic terms of the Soho proposal in
9    Addendum A?
10   A.  No.
11       I do not recall thinking about it in
12   that way.
13   Q.  Okay.  Look at the Soho Proposal Basic
14   Terms page, please.  It's in Addendum A.
15       Now, what did you mean when you wrote,
16   "Right to terminate," that paragraph 3?  What did
17   you mean in May of 2007, that that paragraph was
18   supposed to convey?
19   A.  Well, what I recall was the agreement
20   between Lionel and I, was that if things didn't
21   work out based on this financial model, he'd have
22   the right to terminate, unless Kolo was going to
23   pay $140 per square foot plus 6 percent royalty,
24   which at the time he agreed that if you paid that,
25   then there would be no reason for him to

Page 165

Werner

1
2    terminate.  That's the intent of that.  That was
3    an agreement I remember specifically talking to
4    him about.
5    Q.  Okay.  When did you talk to him about
6    it?
7    A.  Oh.  I really don't recall, but it had
8    to be during April, but I'm really not specific.
9    I don't really know.
10   Q.  Okay.  Before you sent this proposal, I
11   take it.
12   A.  I don't know.  I really don't know.  I
13   can't remember.
14   Q.  Where did you get the number 140?
15   A.  Leonard Flax and Lionel Flax.
16   Q.  Okay.  So did that discussion take place
17   in April of 2007, when you walked through the Soho
18   store to look at the possible location for the
19   shop-in-shop?
20   A.  Yes.
21   Q.  And who was present?
22   A.  Lionel Flax, Leonard Flax, and Peter
23   Dunn.  And myself.
24   Q.  The four of you.
25   A.  Yes.

42 (Pages 162 to 165)

Page 166

Werner

1
2    Q.  And that was in April.
3    A.  Yes.
4    Q.  So that was -- does that refresh your
5    recollection that it was before you sent the pages
6    that are the addendum, as a proposal dated
7    April 2007?
8    A.  I don't remember if we had sent this
9    addendum or proposal to them before we met them at
10   the -- at the store.  I just don't remember.
11   Q.  Okay.  So if you sent it before you met
12   them at the store, you came up with the 140.  Is
13   that right?
14   A.  The only way I could have come up with
15   the 140 is based on what they told me their
16   current rental rate was.  That's the only way I
17   could come up with it.  That I know came from the
18   Flaxes.
19   Q.  At this walk-through meeting?
20   A.  I think it was at the walk-through
21   meeting, yes.
22   Q.  So if the 140 came from them at the
23   walk-through meeting, tell me how it could -- the
24   140 could have gotten in here, if you sent the
25   proposal before the walk-through meeting?  I'm

Page 167

Werner

1
2    confused.
3    A.  Yeah.  I don't know if the -- that's
4    what I was saying.  I don't know if this proposal
5    was sent to them before that meeting or after.
6    I'd have to go back and look at my -- the time and
7    dates.
8    It's very possible.  There was a time --
9    Q.  What's very possible?
10   A.  It's very possible that we had that
11   meeting, and this number, $140 per square foot,
12   came from that meeting.  It's very possible.
13   Yup.
14   Q.  I agree that it's possible.  Indeed, if
15   the -- if the number 140 came from them, I think
16   it's probable that the number 140 was discussed
17   before you sent the proposal.
18   A.  No.  That's not what I'm saying, because
19   we have -- we had an ongoing dialogue.  It didn't
20   mean that it came from that meeting.  That's what
21   I'm saying.
22   Q.  Okay.  Okay.
23   Focusing on the walk-through meeting in
24   April, where it was you and Peter Dunn for Kolo,
25   and it was Leonard and Lionel Flax for Kate's, do

Page 168

Werner

1
2    you recall other substantive discussions about the
3    possible shop-in-shop arrangement at that
4    walk-through meeting?
5    A.  After it, or during it?
6    Q.  During it.
7    A.  Subsequent, you used the word.  Can you
8    rephrase that?  I thought you said subsequent.
9    MR. VERSFELT:  Let me have it read back.
10   If it's confusing, I'll rephrase it.
11   (Discussion off the record.)
12   (The record was read back.)
13   A.  There was more discussions than the $140
14   per square foot at that meeting.  We had more
15   discussions involving the shop-in-shop.
16   Q.  What do you recall about those
17   discussions?
18   A.  I remember Leonard discussing his
19   expectations of what the shop-in-shop should be.
20   Q.  And what were those expectations that
21   you recall?
22   A.  I remember him saying that he wanted to
23   see Kate's create more shop-in-shops within that
24   space, and that Kolo would be a nice addition to
25   what he -- what he envisions Kate's will

Page 169

Werner

1
2    eventually evolve to, shop-in-shops.
3    He was very encouraging.  I also
4    remember Lionel being very specific about he
5    was -- he was the person making the decision.  And
6    he referred to his father during that meeting,
7    that he had the decision, and it was not
8    necessarily his father.  That was one thing.
9    In addition, he also referred to how
10   quickly we needed to move in order for this to be
11   ready to be executed, by the time they opened up
12   that store.
13   Q.  Anything else?
14   A.  There was other discussions about where
15   Kate's was going and how they compete with Papyrus
16   at the time, and how Kolo's shop-in-shop would
17   benefit Kate's, by having a Kolo shop-in-shop, and
18   Papyrus across the street wouldn't.
19   We talked about how it was beneficial to
20   Kolo to have the shop-in-shop in Kate's, because
21   of the value that Kolo would receive by having a
22   lot of retailers come through Kolo, and see --
23   sorry, come through Kate's and see Kolo there.
24   That was very significant.  And we agreed to that.
25   So there was a -- sort of a meeting of

Page 170

Werner

1
2 the minds of the mutual benefits of both parties.
3     Q.  And was there a meeting of the minds
4 that if the arrangement wasn't working out, that
5 Kate's would have a right to terminate?
6     A.  We never brought that up, in my
7 recollection, during that meeting.  It never got
8 that far.
9     Q.  Okay.
10     A.  Okay.
11     Q.  But either at that meeting or at some
12 point between that meeting and your submission of
13 the proposal of April 2007, you considered Kate's
14 right to terminate; isn't that right?
15     A.  Yeah.  I don't know how it came about,
16 but yes, of course, because it became -- it was in
17 the document.
18     Q.  Because it's in Addendum A.
19     A.  Yes.
20     Q.  And am I correct that in accordance --
21 strike that.
22     Am I correct that the right to terminate
23 that you outlined in your Soho Proposal Basic
24 Terms would permit Kate the right to terminate the
25 agreement at any year, for as long as it lasted,

Page 171

Werner

1
2 so long as Kolo were not paying Kate's a minimum
3 of $140 per square foot plus 6 percent royalty?
4     A.  I believe that to be true, yeah.
5     Q.  And the basic terms -- well, strike
6 that.
7     There's no right to terminate mentioned
8 in the LOI, is there?
9     A.  Yeah, there is a reference here to
10 termination.  Paragraph 8.
11     MR. VARGA:  Plaintiff's 1.
12     A.  Plaintiff's 1 refers to --
13     Q.  Page 2 of Plaintiff's 1.
14     A.  Yes.  Refers to it.
15     Q.  Where does it refer to it?  Can you read
16 it.
17     A.  Yes.  "Kolo shall retain the right to
18 renew each sublease lease for an additional
19 one-year period, and each year thereafter, as it
20 becomes due, by giving 60-day notice to Kate's
21 prior to the termination date."
22     So that's the reference in terms of
23 termination.
24     Q.  And how was the termination supposed to
25 work under that paragraph 8?

Page 172

Werner

1
2     A.  It was either Kolo or Kate's, had the --
3 had the ability to terminate.  That's my
4 understanding.
5     Q.  Okay.  How would Kate's terminate, as
6 you're saying Kate's had a right to terminate,
7 under that paragraph 8?
8     A.  My understanding --
9     Q.  That's what I'm asking about, your
10 understanding.
11     A.  My understanding would be in the event
12 that any of these other terms in the LOI were not
13 followed by Kolo, that would allow them to
14 terminate.  That's -- that was really my
15 understanding.
16     Q.  Would it allow them to terminate at any
17 time?
18     A.  I don't know, to answer your question.
19 I don't know.  I never thought about it.
20     Q.  There is no cure provision in this LOI,
21 is there?
22     A.  I don't know what you mean by cure.
23     Q.  Okay.  I mean that if one party to the
24 LOI defaults under the terms, there is no
25 provision of the LOI that permits a time period

Page 173

Werner

1
2 for that defaulting party to cure its default.
3     A.  It's not specific in this document.
4     Q.  It's not even general in that document,
5 is it?
6     A.  When I say specific, I don't know if
7 it's implied or not, but it's not specific.
8     Q.  It's -- okay.  You -- it's not explicit,
9 and you don't know whether it's implicit; is that
10 your testimony?
11     A.  I believe that to be true.
12     Q.  And it's not on -- okay.  And -- but
13 your testimony is that Kate's would have a right
14 to terminate the shop-in-shop arrangement if Kolo
15 failed to abide by the terms of the arrangement.
16     A.  LOI plus addendum, yes.
17     Q.  Okay.  The -- by terms of the
18 arrangement, I mean the LOI and the things set
19 forth in the addendum.
20     A.  That's correct.
21     Q.  Okay.  So if Kolo was not complying with
22 the terms, then Kate's could terminate the
23 arrangement.
24     A.  I -- yes.  I guess that would mean it's
25 not explicit.  It doesn't say it, but I would

44 (Pages 170 to 173)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 174

Werner

1
2  venture to say yes, that would be it.
3      Q. And that would be derived from just
4  general attitudes of fundamental fairness, if it
5  isn't set forth in the agreement itself, right?
6      A. If there was something specific that
7  Kolo was not doing that was spelled out in the LOI
8  and the addendum, I would agree that they probably
9  have the right to terminate, yes.
10     Q. And would they have a right to terminate
11  at the time of the default?
12     A. No.
13     Q. When would they have a right to
14  terminate?
15     A. It's unspecified.
16     Q. It doesn't say.
17     A. It does not say.
18     Q. So we don't know when they would have a
19  right to terminate.
20     A. That's right.
21     Q. Now, let's look at paragraph 4 of the
22  basic terms.
23         Could you read that, please.
24         MR. VARGA: Paragraph 4 --
25     Q. Of the basic terms, I'm sorry, of -- let

Page 175

Werner

1
2  me rephrase my question. I'm looking at the page
3  of Addendum A entitled Soho Proposal Basic Terms.
4         MR. VARGA: Thank you.
5      Q. I would like you to look at paragraph 4,
6  please.
7      A. Okay.
8      Q. Could you read it?
9      A. "Kolo will provide Kate's with monthly
10  POS data."
11     Q. Has Kolo provided Kate's with monthly
12  POS data since June 1 of 2007?
13     A. Up until yesterday, I believe we did.
14  According to Lionel's testimony was the first time
15  that I heard that he was unable to go and get the
16  POS, as we arranged for him to do that.
17     Q. Okay.
18     A. Okay?
19         (Counsel conferred with the witness.)
20     A. Yeah. Well, I don't know -- I say never
21  notified.
22     Q. So I take it that, as you sit here
23  today, you have been under the impression that
24  Kate's had been able to receive Kolo's monthly POS
25  data.

Page 176

Werner

1
2      A. Absolutely.
3      Q. And just for the record, what does POS
4  mean?
5      A. Point of sale.
6      Q. That means the point of sale in the Kolo
7  store.
8      A. That's correct.
9      Q. And I take it if Kate's can show you
10  that they're not able to access the monthly POS
11  data, you would take the position that you would
12  fix that.
13     A. If they can't -- if they cannot access
14  the POS data as we have given them in the past, I
15  would absolutely fix it.
16     Q. Okay. And looking at paragraph 5,
17  please --
18     A. Okay.
19     Q. -- it says, Kate's will pay monthly
20  rental payments.
21         MR. VARGA: Kolo.
22     Q. I'm sorry, it says, "Kolo will" Kate --
23  "will pay Kate's monthly rental payments according
24  to the financial proposal enclosed."
25         Did I read that correctly?

Page 177

Werner

1
2      A. Yes.
3      Q. And what's the financial proposal that
4  it refers to?
5      A. Exhibit-- Plaintiff's Exhibit 1.
6      Q. Let me help you. Is it the next page
7  following the basic terms page?
8      A. Yes.
9         MR. VARGA: Just call the title.
10     A. Okay, financial proposal.
11     Q. Financial proposal page. It comes
12  immediately following the basic terms page.
13         And so Kolo, under the basic terms,
14  commits to pay monthly rental payments in
15  accordance with the page that follows. Correct?
16     A. Yes.
17     Q. Okay. And the starting rent per square
18  foot is?
19     A. $75 per square foot.
20     Q. Okay. Is that to be paid monthly?
21     A. Yes.
22     Q. Okay. The starting royalty on the
23  financial proposal. The paragraph 2 on the
24  financial proposal, it says, "Starting royalty,
25  6 percent."

45 (Pages 174 to 177)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue

Page 178

Werner

1
2    A.  Yes.
3    Q.  Is that in -- does that tie in to
4  paragraph 6 on the basic terms page?
5    A.  Yes.
6    Q.  So that the starting royalty is
7  6 percent, according to the basic terms.
8    A.  Yes.
9    Q.  And that's 6 percent of what?  Kolo
10  sales?
11    A.  Net sales.  Net sales, Kolo net sales.
12    Q.  6 percent of Kolo net sales.
13    A.  Yes.
14    Q.  Okay.  Has Kolo been paying a royalty to
15  Kate's?
16    A.  We've been -- we've been escrowing it.
17  We've been giving it to our attorney.
18    Q.  I'm not talking about rent.  I'm talking
19  about royalty.
20    A.  We have, yes.
21    Q.  You've been paying a royalty to your
22  attorney, as best that you know.
23    A.  As best that I know.
24    Q.  Let me put before you as -- let me put
25  before you, Mr. Werner, an exhibit that I believe

Page 179

Werner

1
2  will be Defendant's Exhibit F.  It's a two-page
3  document.
4      (Two-page document was marked
5  Defendant's Exhibit F for identification, as
6  of this date.)
7    Q.  Please take a look at it, so you can
8  tell me what it is.
9    A.  Uh-huh.
10      (The witness read.)
11    A.  Okay.
12    Q.  Okay.  Does this two-page exhibit state
13  what Kolo is paying into escrow with regard to the
14  Spring Street store?
15    A.  It only refers to the monthly rental
16  payments.
17    Q.  Yes.  And do you know why it only refers
18  to the monthly rental payments?
19    A.  I don't know why.
20    Q.  Okay.  Could it be because the only
21  moneys you're paying into escrow are the monthly
22  rental payments?
23    A.  It could be, but I don't think it is.  I
24  don't think our attorney is referring to all
25  payments, but I would have check on that.

Page 180

Werner

1
2    Q.  Well, he refers explicitly to, quote,
3  monthly rental payments for the Spring Street
4  shop, end quote, doesn't he?
5    A.  He does, but he doesn't state that those
6  were the only payments, so I don't know.  I'm just
7  saying, I don't know if he left that out, if there
8  was some type of error on his part.  I don't know
9  if there's been an error on our part.  I'm not
10  sure.
11    Q.  Well, let me ask it this way, just so we
12  don't avoid some huge misunderstanding between our
13  parties.
14      I take it your testimony is, that at the
15  very least, Kolo is obligated to pay 6 percent
16  royalty on net sales at its store in Kate's Soho
17  shop, that it is either paying those royalties to
18  Kate's to this day, or paying those royalties into
19  escrow.
20    A.  It states in the financial proposal that
21  at the net sales of 250,000, that Kolo is
22  required -- up to 449 -- $449,000, Kolo will be
23  paying 6 percent.  It does not state, from the
24  very beginning, that we will pay 6 percent should
25  we not reach -- regardless of us reaching less

Page 181

Werner

1
2  than 250,000.
3    Q.  Okay.  First let me deal with that
4  point.
5    A.  Okay.
6    Q.  Have you met $250,000 in net sales in
7  the Kolo shop in the Soho location?
8    A.  No.
9    Q.  Okay.
10      MR. VARGA:  As of when?
11    Q.  As of today.
12    A.  I don't -- I have to check on that.
13  It's -- it's -- not certain.  Could be pretty
14  close, though.
15    Q.  Okay.  Now let's go back.  If the
16  royalty -- well, this financial proposal does not
17  say, does it, that the royalty rate of 6 percent
18  is to begin only after net sales of $250,001, does
19  it?
20    A.  No.
21    Q.  In fact, it says starting royalty,
22  6 percent, in paragraph 2.
23    A.  I would disagree.  It says royalty
24  increases --
25    Q.  In paragraph 3.

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 182

```
 1              Werner
 2      A.  Right.
 3      Q.  What does paragraph 2 mean?
 4      A.  Paragraph 2 just states the starting
 5  royalty.
 6      Q.  Well --
 7      A.  But it doesn't --
 8      Q.  Go ahead.
 9      A.  It doesn't state when it's calculated.
10      Q.  What does the word "starting" mean to
11  you?
12      A.  When we hit $250,000.
13      Q.  Okay.  Then why are there two
14  paragraphs, a paragraph 2 and then a paragraph 3?
15      A.  I don't know why.
16      Q.  You wrote this, didn't you?
17      A.  I collaborated on it, yes.
18      Q.  Fair enough.  And it does not -- we can
19  agree, can't we, that there is nothing in
20  paragraph 2 that explicitly says that the
21  6 percent royalty doesn't kick in on Dollar 1?
22      A.  It doesn't say whether it does or it
23  doesn't, correct.
24      Q.  Right.  And you wrote it or collaborated
25  on it, and -- and paragraph 2 does use the word
```

Page 183

```
 1              Werner
 2  "starting" in the two-word paragraph, "Starting
 3  royalty," doesn't it?
 4      A.  It's redundant.  It's redundant.
 5      Q.  Which is redundant?
 6      A.  It's redundant from paragraph 2, and in
 7  paragraph 3.
 8      Q.  It's only redundant, sir, if the way you
 9  were interpreting it today is the way that it was
10  intended in May of 2007.  Isn't that right?
11      A.  It's not --
12      Q.  Will you answer that question, please.
13      A.  No.  I was going to ask you to rephrase
14  it, because I don't know what you --
15      Q.  Okay, let me rephrase it this way.  It's
16  not redundant at all, is it, if the starting
17  royalty is supposed to be 6 percent from Dollar 1?
18      A.  If that's when it was -- if that is how
19  you're interpreting it, yes.  I don't believe
20  that's how the parties agreed to it.
21      Q.  How do you know?
22      A.  I know that because of Lionel's request
23  to me in several of the e-mails we saw today, that
24  he was not expecting a royalty during the first
25  months, because we did not hit 250,000.
```

Page 184

```
 1              Werner
 2      Q.  Oh, well, we'll look at those e-mails.
 3      A.  Okay.
 4      Q.  Let me put before you, Mr. Werner, two
 5  exhibits from yesterday's deposition that you
 6  attended.
 7      A.  Uh-huh.
 8      Q.  Plaintiff's Exhibit 3 and Plaintiff's
 9  Exhibit 4.
10      A.  Uh-huh.
11      Q.  Okay.  Let me direct your attention to
12  the e-mail that -- let me use my finger, if I may.
13  Let me point to this e-mail that starts with
14  "Lionel."  It's on Plaintiff's Exhibit 3, that is
15  page KP 0124, just below the word "cool."
16          Okay?
17      A.  Uh-huh.
18      Q.  Now, is it the case that you sent that
19  e-mail that I'm directing your attention to on or
20  about August 20, 2007?
21      A.  It appears I did.
22      Q.  Does that e-mail say anything about your
23  not having to pay royalties until you reach
24  250,000 in sales?
25      A.  It doesn't -- it's not specific.
```

Page 185

```
 1              Werner
 2      Q.  It was when Lionel was asking for
 3  royalties, wasn't it?
 4      A.  Uh-huh.
 5      Q.  And you didn't respond to him saying,
 6  Oh, but Lionel, there -- you've misunderstood, we
 7  don't pay royalties in 250,000 net sales, did you?
 8      A.  I did tell him that, according to the
 9  financial proposal, we had to be at $250,000.
10      Q.  Where did you tell him that?
11      A.  I told him on the phone.
12      Q.  Oh, and here, what did you say here?
13  You want to read it into the record?
14      A.  Sure, I would be happy to read it.
15      Q.  Sure.
16      A.  "You're welcome.  At the end of this
17  month, we will be looking to make a royalty
18  payment according to our recent agreement to pay
19  royalties on a quarterly basis, according to
20  minimum annual sales in the proposal."
21          So based on that, we were going to
22  evaluate it each quarter.  That's my intention in
23  that e-mail.
24      Q.  Okay.  And what did you mean by the
25  phrase "at the end of this month"?  This was
```

47 (Pages 182 to 185)

Page 186

Werner

1
2  August 20, remember.
3      A.  Yes.
4      Q.  Okay.
5      A.  What do you mean?  What -- I'm sorry,
6  rephrase?
7      MR. VERSFELT:  Okay.  Off the record.
8      (Discussion off the record.)
9      Q.  Okay.  You see in that --
10     MR. VARGA:  Just before you have a
11 question.
12     MR. VERSFELT:  Whoa, whoa, whoa.
13 There's a question pending.
14     MR. VARGA:  I'm sorry, I thought there
15 was no question.
16     MR. VERSFELT:  I believe there is.
17 Let's -- I want to make sure.
18     (The record was read back.)
19     Q.  I assume you've read this, Mr. Werner.
20 Your lawyer is telling you to read it?
21     A.  Yeah.
22     Q.  Sure.  My question to you is, in your
23 e-mail of August 20 to Lionel, where you say, "At
24 the end of this month we'll be looking to make a
25 royalty payment," is that because you thought you

Page 187

Werner

1
2  would have 250,000 in net sales before the end of
3  August?
4      A.  It's possible, yes.
5      Q.  You thought that?
6      A.  Yes.
7      Q.  Did you get point of sale data on a
8  weekly basis when you moved into that
9  shop-in-shop?
10     A.  Absolutely.  Daily basis.
11     Q.  So you knew where your sales were.
12     A.  That's correct.
13     Q.  And your sales, you just finished
14 telling me a few minutes ago, may not be at
15 250,000, even now, which is what, six months late?
16     A.  So what you're saying -- what I'm saying
17 is that we were launching the album bar, and that
18 could have increased the sales substantially.
19     Q.  Did you mention the album bar in this?
20     A.  No, I did not.
21     Q.  So, and -- you said you were going to
22 pay royalties on a quarterly basis in accordance
23 with the proposal.  Right?  It's in your e-mail.
24     A.  Yeah.
25     Q.  That's what you wrote.

Page 188

Werner

1
2      A.  Should we be, according to the financial
3  proposal, at $250,000 of sales.
4      Q.  Yeah.  Let's look at the core terms, the
5  immediately preceding page.  When does it say
6  you're supposed to pay royalty payments?  I'll
7  help you, it's in paragraph 6.
8      MR. VARGA:  Which one?
9      Q.  In the basic terms, paragraph 6.
10     A.  "Kolo will pay Kate's monthly royalty
11 payments according to the financial proposal."
12     Q.  Right.
13     A.  Okay.
14     Q.  Monthly, right?
15     A.  Yes.
16     Q.  Okay.
17     A.  But Lionel and I discussed quarterly and
18 so he agreed to it.
19     Q.  Right.  Because he was saying in August,
20 Where is my royalty check?
21     A.  No, he wasn't saying that.  I disagree
22 with you.  That's not what he was saying.  I don't
23 believe he ever stated a reason, a case, any
24 substantial statement that says, You owe me
25 royalty payments.

Page 189

Werner

1
2      Q.  Well, what about an unsubstantial
3  statement, sir?  You're responding to him and
4  saying you expect to pay royalty payments on a
5  quarterly basis.  That would be June, July and
6  August.  Right?  You're telling him on August 20,
7  that you expect to be paying royalty payments
8  soon.
9      Now, I've heard your testimony today --
10 well, let me put that into a question.  Were you
11 telling him on August 20 that you expected to pay
12 royalty payments soon?
13     A.  I was telling him that should we receive
14 sales in the -- in the neighborhood of 250,000 or
15 more, we would do that, yes.  Absolutely.
16     Q.  And you thought that your sales on
17 August 20 had a possibility of reaching 250,000
18 net sales by the end of the quarter.
19     A.  It's possible.
20     Q.  In ten days, when you haven't reached
21 250,000 net sales in the five months since then.
22     A.  I didn't say ten days.  I'll also point
23 out that this was a recent agreement, that he and
24 I came to, on a quarterly basis.  So he was fine
25 with quarterlies.

48 (Pages 186 to 189)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 190

Werner

1
2  Q.  You agreed with him to modify the -- the
3  basic terms of the Soho proposal, didn't you?
4      A.  That was -- that was what he asked me, I
5  agreed to it, yes.  Absolutely.
6      Q.  And there's nothing in the LOI that says
7  it can't be modified by verbal understanding, is
8  there?
9      A.  No.
10     Q.  Do you know what a merger clause is?
11     A.  No.
12     Q.  There's no -- you may feel free to look
13 through the first two pages.  There's nothing in
14 it that says it cannot be modified by the parties,
15 except in a writing.  Is there?
16     A.  Not that I can see, no.
17     Q.  And there's nothing in the proposal, the
18 Addendum A, that says it cannot be modified by the
19 parties; isn't that right?  By mutual agreement.
20     A.  It doesn't say anything like that.
21     Q.  Right.  So at any time, Kate's and Kolo
22 could verbally agree to change the terms of
23 Plaintiff's Exhibit 1; is that correct?
24     A.  We agreed to change --
25     Q.  That's not my question.  I can have it

Page 191

Werner

1
2  read back, but I would like an answer to my
3  question.
4      A.  Read back, please.
5      MR. VERSFELT:  Please.
6      (The record was read back.)
7      A.  I don't know if that's correct.  It
8  doesn't state whether we could or we can't.  It
9  doesn't say.
10     Q.  It doesn't say you can't.
11     A.  And it doesn't say you can.
12     Q.  And you did, with regard to royalty
13 payments.  Isn't that right?
14     A.  We came to an agreement, I think, that
15 agreed to -- to make quarterly royalty payments,
16 yes.
17     Q.  You changed the terms of the --
18     A.  Based on a minimum annual sales as
19 stated in the proposal.  That's what I was saying.
20     Q.  You changed the basic terms of the
21 agreement, from monthly to quarterly --
22     A.  Upon his request, I agreed to make
23 quarterly payments.
24     Q.  Answer my question, please.
25     A.  Yes.

Page 192

Werner

1
2      MR. VARGA:  He did.
3      Q.  Is it correct that you changed the terms
4  of the LOI and the addendum, by mutual agreement
5  with Lionel, subsequent to the execution of the
6  LOI?
7      A.  Yes.
8      Q.  Okay.  And you did so without a writing.
9      A.  No, because there's the writing right
10 there, in e-mail.
11     Q.  No.  That records that you and he --
12     A.  No, that's the writing.  That's the
13 writing.
14     Q.  Okay.  So you could do it by e-mail.  So
15 you could do it by e-mail, right, sir?
16     A.  That's right.
17     Q.  Okay.
18     MR. VARGA:  Just to clarify, you -- you
19 used the word "you changed," but he testified
20 that to -- you mean to ask, you, as in him
21 himself, and nobody else, or including
22 Lionel?  Because it came at Lionel's request.
23     So if -- to the extent you're trying to
24 paint a picture about something else, so I
25 just want to clarify, when you said you

Page 193

Werner

1
2  personally, as opposed to including Lionel.
3      Q.  Who made the agreement to modify the
4  royalty payment schedule from monthly to
5  quarterly?
6      A.  Both Lionel and I.
7      Q.  Thank you.
8      A.  You're welcome.
9      Q.  Now, where was I?
10     Paragraph 7 of the basic terms.  You
11 have the basic terms, okay, paragraph 7.
12     "Kate's will provide" -- could you read
13 it, please.
14     A.  "Kate's will provide Kolo with
15 landlord's consent to the sublease and"
16 non-disturbance -- "and a non-disturbance."
17     Q.  Okay.  Did you ever get a landlord's
18 consent that you saw?
19     A.  Not that I've seen.
20     Q.  Did you ever get a non-disturbance?
21     A.  Not that I've seen.
22     Q.  What did you mean by non-disturbance?
23     A.  I don't know.  That's what I got from
24 our attorney.  He told me to make sure it's in
25 there.

Elisa Dreier Reporting Corp.  (212) 557-5558

Page 194

Werner

2   Q. Okay. So now we're looking -- I would
3 like to direct your attention to the financial
4 proposal page.
5     I think we went over the first couple
6 paragraph. The starting rent per square foot, you
7 testified, was $75 per month.
8   A. Yes.
9   Q. Okay. The starting royalty, I
10 understand your testimony is, you believed at the
11 time it meant, once net sales got above 250,000,
12 you would owe 6 percent.
13   A. I believe that to be true.
14   Q. Yes. And once net sales got to $650,000
15 and higher, you would pay 11 percent royalty; is
16 that correct?
17     Your lawyer is putting another exhibit
18 in front of you.
19     MR. VARGA: Plaintiff's 4.
20   Q. Okay. Now, I've directed his attention
21 to the financial proposal that is in
22 Plaintiff's 1, so I would like you to focus your
23 attention on that page, Mr. Werner, please.
24     Okay?
25   A. Go ahead.

Page 195

Werner

2   Q. Okay. Now, what would the royalty be --
3 rate be, as set forth in paragraph 3, of the
4 financial proposal for sales of $651,000?
5   A. 11 percent.
6   Q. Now let's look at the rent increases
7 that are set forth.
8     Does paragraph 4, entitled Rent
9 Increases, set forth a graduated scale of
10 increasing rent based on net sale volumes that
11 increase?
12   A. Yes.
13   Q. And does it get as high as $140 per
14 square foot monthly?
15   A. No.
16   Q. Why not?
17   A. I don't know why.
18   Q. Okay. It goes up -- just so we're
19 clear, it starts at $75 per square foot, monthly,
20 and goes up to $135 per square foot per month.
21   A. Uh-huh.
22   Q. And then it stops. You have no
23 recollection as to why 140 isn't included there?
24   A. I have no recollection why.
25   Q. Okay. Do you think it was included --

Page 196

Werner

2 sorry.
3     MR. VERSFELT: Let the record reflect
4   that counsel is conferring with the witness.
5   Q. Are you finished conferring with your
6 counsel, Mr. Werner?
7   A. Yeah. You have to clarify whether the
8 per square foot is by per month or per year. We
9 anticipated it to be per year.
10   Q. Well, Mr. Werner, I know you just
11 finished discussing this issue with your counsel,
12 and I know your counsel put Plaintiff's Exhibit --
13     MR. VARGA: 4.
14   Q. -- 4, in front of you, and pointed to
15 the e-mail that he wanted you to read.
16     But sir, you have testified several
17 times this morning, not just now, but earlier,
18 before lunch, that you believed at the time it was
19 75 square foot per month.
20   A. No, I did not. Absolutely did not.
21   Q. Can we just rely on the transcript on
22 that?
23   A. No, we cannot. I'll clarify it again,
24 there's no way that I would have agreed, and
25 should I have agreed, the market rent is not $140

Page 197

Werner

2 per square foot per month.
3   Q. Okay, let me ask it this way.
4   A. Sure.
5   Q. Can you find on the financial proposal
6 page, which you and your lawyer wrote, can you
7 find the words "per year" on that?
8   A. Nor do --
9   Q. Can you find --
10   A. No.
11   Q. Yes or no?
12   A. No.
13   Q. No. Can you find the word "annually"?
14   A. No.
15   Q. Can you find any word on there to
16 indicate that the dollar amounts given for rent
17 are other than monthly?
18   A. Doesn't state.
19   Q. It doesn't. Okay.
20     Now turn back to the prior page, please.
21 The Soho Proposal Basic Terms.
22     Now, could you read me paragraph 5.
23   A. "Kolo will pay Kate's monthly rental
24 payments according to the financial proposal
25 enclosed."

50 (Pages 194 to 197)

Werner

1
2    Q.  Does that say monthly?
3        A.  It says monthly rental payments.  It
4    doesn't say per square foot per month.  That's a
5    major difference.
6        Q.  It does say monthly rental payments,
7    does it?
8        A.  It says monthly rental payments.
9        Q.  And then when you turn the page, it
10   says, "The starting rent per square foot is $75."
11       A.  But there's no relevance to that.
12   Absolutely no relevance.  No one in their right
13   mind would pay $75 per month at the present time
14   the market rent as stated by your client was $140
15   per year.  Per square foot.
16           And I would ask that your client clarify
17   that, because that's what I agreed to and that's
18   what they agreed to.
19       Q.  Well, Mr. Werner, you wrote this.  You
20   and your lawyer wrote this.  Right?
21       A.  Go ahead.
22       Q.  Yes or no?
23       A.  We drafted it.
24       Q.  You and your lawyer prepared this Soho
25   Proposal Basic Terms and the financial proposal

Werner

1
2    page.  Correct?
3        A.  Yes.
4        Q.  And you sent it to Kate's, correct?
5        A.  Yes.
6        Q.  All right.  And you -- and Kate's didn't
7    write it, right?
8           Kate's didn't write the starting rent
9    per square foot, paragraph 1, on your financial
10   proposal, did it?
11       A.  They didn't write anything.  They didn't
12   change anything.
13       Q.  They didn't.
14       A.  We didn't change anything.
15       Q.  That's right.
16       A.  And that's what they will agree to, that
17   was $140 per square foot per year.  I can tell you
18   with definitively that's what we agreed to.
19       Q.  I'm not talking about the $140 per
20   square foot in the termination provision.  I'm
21   talking about 75 per square foot in the financial
22   proposal, paragraph 1.
23       A.  Per year.
24       Q.  So your testimony, now that you've
25   discussed it with your counsel, is that those are

Werner

1
2    per year numbers.
3        A.  $75 per year, per square foot, was the
4    factor that we used to arrange for the monthly
5    payment.  That's what we agreed to, that's what
6    we've been paying, from June till the time up
7    until, you know, whatever the -- our attorney
8    said.
9        Q.  Yeah.
10       A.  Yeah.
11       Q.  And you saw the e-mail yesterday where
12   Lionel Flax said, That seems way off, didn't you?
13       A.  I don't recall that.  Maybe you want to
14   show me that.
15       Q.  Sure.
16           MR. VARGA:  You're referring to
17   Plaintiff's 4, or which one is it?
18           MR. VERSFELT:  I don't know.  You've got
19   them over there.
20           MR. VARGA:  Because Plaintiff's 4 talks
21   about --
22           MR. VERSFELT:  Well, this -- let me see
23   if this is the one.
24           MR. VARGA:  That way off language?  I
25   don't know.  I don't recall the way off

Werner

1
2    language.  I think that was his
3    characterization.
4           MR. VERSFELT:  No, here it is.
5        Q.  Allow me.  He said, "Entirely off."
6           The rent check that he received was
7    entirely off.
8        A.  Uh-huh.
9           MR. VARGA:  Would you read it, please.
10   Plaintiff's 4.
11       A.  Sure.
12           "Can you let me know how you're deriving
13   at that number?  It seems entirely off in terms of
14   dollars per square foot."
15       Q.  Right.  Now --
16       A.  And I clarified it.
17       Q.  Yes, you responded, I know.  And you may
18   feel free to read the rest of the e-mail string,
19   which we went over yesterday in the deposition of
20   Mr. Flax.
21           MR. VARGA:  So go ahead.  Read it.
22       Q.  Let me know when you've read it.
23       A.  I understood this to be an agreed-upon
24   amount.  I was not involved in the discussions
25   regarding rent.

Page 202

Werner

```
1              Werner
2       MR. VARGA:  Just for the record, please
3   identify --
4       A.  This is an e-mail from Kim Hassler to
5   Lionel.
6       Q.  Right.
7       A.  And then above that, I wrote:  Kim and
8   Lionel, the base rent is determined at $75 per
9   square foot, at $450.  450 square feet.  It would
10  come to 33,750 per year, and 2,812.5 per month.
11      I don't see any discrepancy in that.
12      MR. VARGA:  Please finish the e-mail.
13  Plaintiff's 4.
14      A.  Okay.  Then -- Lionel writes, "Okay, I
15  understand.  I guess what threw me was the fact
16  that the first check was substantially higher than
17  the second.  I forgot the first was for two
18  months.  Thank you most kindly."
19      We were in agreement --
20      Q.  And we got Lionel's testimony on that
21  same exhibit yesterday.
22      A.  We were in agreement that it was a per
23  square foot per year factor that was in the
24  proposal.
25      Q.  How do you know that?
```

Page 203

Werner

```
1              Werner
2       A.  Because he stated it there.
3       Q.  In August.
4       A.  He stated it there, and he stated it --
5       Q.  In August.  Right?
6       A.  Yeah, right there.
7       Q.  Exhibit -- Plaintiff's Exhibit 4, I
8   believe it's August.  If I may, let me just check
9   the dates.
10      Yeah, we're talking August 17, and -- I
11  guess the entire string is on August 17.
12      MR. VARGA:  It's on Plaintiff's 3, the
13  bottom message, which is connected with
14  Plaintiff's 4.
15      Q.  So on August 20.  The entire string is
16  August 17 and August 20.
17      So August 17 and August 20, he clarified
18  that.  Is that your testimony?
19      A.  Yeah.  There was no discussion after
20  that.
21      Q.  There was no discussion before that.
22      A.  There wasn't anything after that,
23  either.
24      Q.  Okay.  So it was clarified on August 20,
25  or thereabouts.
```

Page 204

Werner

```
1              Werner
2       A.  Yeah.
3       Q.  Is that right?
4       A.  That's right.
5       Q.  Is that another modification to the
6   agreement?
7       A.  No.
8       Q.  It's not.
9       A.  No.
10      Q.  But it's a clarification, you concede.
11      A.  Absolutely.
12      Q.  Now, what dollar sales would Kolo have
13  to have in the Soho street store to pay $140 per
14  square foot --
15      A.  It wasn't specified.
16      Q.  -- in rent?
17      It wasn't specified.  It's in the
18  proposal.
19      A.  It's not in the proposal.
20      Q.  So that -- we don't know.
21      A.  Right.
22      Q.  Okay.  But at least we know it has to be
23  more than 750,000.
24      A.  Not necessarily.
25      MR. VARGA:  I'm sorry, why did you get
```

Page 205

Werner

```
1              Werner
2   750?
3       Q.  Well, I'm looking at the rent increases
4   schedule under the financial proposal page.  You
5   see how the rent increases there go from $75 per
6   square foot up to 135.
7       A.  Yes.
8       Q.  140 is higher than 135.
9       A.  Yes.
10      Q.  Can you tell me how -- well, so I'm
11  assuming, and I make clear, it's only an
12  assumption, that the net sales of Kolo, to meet
13  the rent increase of 140 square foot, would have
14  to be higher than 750,000 per year.
15      Is that a fair interpretation of this
16  schedule that you and your lawyer prepared?
17      A.  With the exception that Kolo renews
18  going forward, we said that we would bring it up
19  to 140, despite the sales.
20      Q.  So that when the one-year renewal
21  rate -- date approaches here this spring, you're
22  either going to make your payment of 140 per
23  square foot --
24      A.  Per year.
25      Q.  -- or Kate's can terminate it.
```

52 (Pages 202 to 205)

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 206

Werner

2  A.  Plus 6 percent.
3  Q.  Right.  So you're going to pay 140 per
4  square foot, plus 6 percent, regardless of your
5  level of sales, or regardless of the rental owed
6  according to the financial proposal, or Kate's has
7  the option of terminating your lease, your
8  arrangement.  Strike that.
9      Or Kate has the option of terminating
10  the arrangement.
11  A.  Yes.
12      MR. VERSFELT:  Could I have the question
13  and answer read back.  I just want to make
14  sure that -- just want to make sure that it
15  flowed smoothly.
16      (The record was read back.)
17      MR. VERSFELT:  Please strike the whole
18  question, because I don't think it flows.
19      MR. VARGA:  Well --
20      MR. VERSFELT:  I move to strike.  I'll
21  restate it.
22      MR. VARGA:  It's not on the record that
23  he moved to strike.
24      MR. VERSFELT:  Pardon?
25      MR. VARGA:  I don't know if you have the

Page 207

Werner

2  ability to simply have that deleted.
3      MR. VERSFELT:  I'm going to restate it.
4  It's going to be different, and it's going to
5  take out my little addendum in the middle.
6      MR. VARGA:  Right.
7  Q.  So Mr. Werner, if -- if there is a lease
8  under the terms of Plaintiff's Exhibit 1, then
9  when May 31 of this year rolls around, Kolo is
10  going to have paid $140 per square foot, plus
11  6 percent royalty, or Kate's will have the
12  authority to terminate the arrangement.  Is that
13  correct?
14  A.  You're not being specific.  It's $140
15  per square foot, per year, plus 6 percent.  That's
16  what we would -- we will do.  Once you -- income.
17      MR. VARGA:  Well, his question was, if
18  you don't -- if you don't do those, what's
19  going to happen?  Am I in --
20      MR. VERSFELT:  Yeah.
21      MR. VARGA:  If you --
22  Q.  And you agreed, you will either do that,
23  or Kate's has the authority to terminate --
24  A.  Has the right to terminate.
25  Q.  Has the right to terminate.

Page 208

Werner

2  A.  That's right.
3      Are we clear about the $140 per square
4  foot per year?
5  Q.  Oh, no, on the 140?  We're not clear
6  about the dollar numbers on the square foot.  No,
7  not at all.  I mean, we had testimony yesterday,
8  and then we had testimony today, that was all
9  consistent, and now we've had some inconsistent
10  testimony, and a few, in the last half hour.
11      But we'll just have to agree to disagree
12  on that.
13      (A recess was taken.)
14  Q.  Mr. Werner, let's finish up with
15  Plaintiff's Exhibit 1.
16      Looking at the page that's entitled
17  Financial Forecast.  I think it's the third page
18  from the back.  Right?  You have it, right?
19      MR. VARGA:  Yeah.  The one that reads on
20  top, Financial Forecast.
21  Q.  And it sets forth escalations -- well,
22  tell me what this page sets forth.
23  A.  This is a schedule that shows, as
24  revenue increases, so does rent per square foot,
25  per year, and so does royalty per year.

Page 209

Werner

2  Q.  Okay.  Does it say -- does it say --
3  well, in May of 2007, what did you think the
4  sales, annual retail sales, of the Kolo
5  shop-in-shop would be after a year, say?
6  A.  What did I think?
7  Q.  Yeah.  What did you expect that
8  shop-in-shop was going to do in sales once it got
9  established?
10  A.  Within 12 months we were expecting to do
11  250,000.  That was the whole reason why Kate's
12  wanted us to do that, because they had never
13  received revenues from Kolo in retail sales more
14  than $150,000.
15  Q.  So $250,000 in retail sales, in the Kolo
16  shop-in-shop, was going to be a success, by your
17  thinking.
18  A.  Success?  I don't think that I would
19  describe it or define it as a success, no.
20  Q.  Well, you just told me you expected it
21  was going to be $250,000 in annual retail sales.
22  A.  But that doesn't mean it's a success.
23  Q.  Okay.  Where -- let me ask it this way:
24  If you hoped at the end of a year you would have
25  250,000 in retail sales, why did you have five

53 (Pages 206 to 209)

Page 210

Werner

1
2  annual retail sales numbers on this financial
3  forecast that are all significantly higher than
4  $250,000?
5      A.  I don't understand your question.
6      Q.  Okay.  If you hoped after a year that
7  the annual retail sales of the shop-in-shop might
8  hit 250,000, why did you start with 250,000 on
9  this financial forecast, and run this financial
10 forecast up to 350, then 450, then 550, then 650
11 and then $750,000?
12     A.  Because that was minimum that we agreed
13 to between the two companies, that we minimally
14 had to do.
15     Q.  You mean if you don't do $250,000 in
16 retail sales in the first year, then what happens?
17     A.  Then both parties probably wouldn't
18 expect to move forward, or we would reevaluate the
19 shop-in-shop concept.
20     Q.  So if -- well, where in Plaintiff's
21 Exhibit 1 does it say that?
22     A.  It doesn't.
23     Q.  It doesn't.  But your understanding of
24 the arrangement was that that was a part of the
25 thinking of both parties.

Page 211

Werner

1
2      A.  That was what I would say was the
3  thinking of both parties, yes.
4      Q.  Yeah.  So that the -- the parties could
5  get together as you approached one year in the
6  space, and if the financial forecast number was
7  not -- or -- strike that.
8          So the parties could get together, as
9  you approached a year in the space, and they could
10 decide whether or not the arrangement was
11 financially beneficial --
12     A.  No.  That's not what I'm saying.
13     Q.  Then tell me again what you meant by
14 your prior answer.
15     A.  What I meant by my prior answer was that
16 both parties wanted to see the shop-in-shop
17 minimally do 250,000.  But it had no -- it had no
18 bearing on whether or not they had the right to
19 terminate or we had the right to terminate.
20         It was an expectation, where both
21 parties said, We'd be happy -- both of us would be
22 happy if we started at 250 and moved it up.
23 Anything less than that would be less desirable.
24     Q.  Yes.  And anything less than that would
25 trigger Kate's Paperie's right to terminate,

Page 212

Werner

1
2  wouldn't it?
3      A.  No.
4      Q.  Well, let's look back at the core terms
5  page again.
6      A.  Uh-huh.
7          MR. VARGA:  Which one?  Basic terms.
8      Q.  The basic terms page for the Soho
9  proposal, paragraph 3.
10         Your testimony today is that the
11 6 percent royalty doesn't kick in until you have
12 250,000 in sales, correct?
13     A.  That's correct.
14     Q.  In annual sales.
15     A.  That's correct.
16     Q.  And yet the -- and -- strike that.
17         And the right to terminate provision
18 says that you have to pay a minimum rental, plus
19 6 percent royalty, correct?
20     A.  Yes.
21     Q.  Okay.  If you're not paying a 6 percent
22 royalty, does Kate's Paperie have a right to
23 terminate whatever the arrangement is?
24     A.  According to this paragraph 3, they --
25 if we do not pay $140 per square foot year, plus

Page 213

Werner

1
2  6 percent annual royalty, then they have the right
3  to terminate.
4      Q.  Okay.  What would the 6 percent annual
5  royalty be paid on?
6      A.  On the sales.  On the net sales.
7      Q.  On what --
8      A.  Any net sales.
9      Q.  Any net sales.  Okay.
10     A.  Yes.
11     Q.  So that for purposes of this
12 right-to-terminate provision, the calculation to
13 be done at the end of the -- or near the end of
14 the first year, would be to calculate $140 per
15 square foot rental, plus 6 percent royalty, on all
16 the sales from Dollar 1, and if Kolo didn't pay
17 that, then Kate's would have a right to terminate.
18 Is that correct?
19     A.  You -- you should rephrase that, because
20 I don't know what you mean by Dollar 1.
21     Q.  Okay.  What I mean by Dollar 1 is --
22         MR. VARGA:  You also used "all."
23         MR. VERSFELT:  Fine.
24     Q.  There are -- as I understand it, and I
25 think our -- your testimony today is -- confirmed

54 (Pages 210 to 213)

Lisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 214

Werner

1
2  this, there are two components in terms of dollars
3  to the right to terminate, as you set forth on the
4  basic terms page of the Soho proposal that is
5  Addendum A. Okay? Two components.
6      A.  Uh-huh.
7      Q.  The first component is, $140 per square
8  foot.
9      A.  Annual per square foot.
10     Q.  For purposes of this question, I'm not
11 going to argue with you. It's -- it's annual per
12 square foot this afternoon to you, so that's fine
13 with me.
14     And the other component is 6 percent
15 royalty.
16     A.  Annual -- 6 percent on the sales in the
17 one year, yes.
18     Q.  Okay. Now, when 6 percent royalty paid
19 on your sales during that year.
20     A.  That's correct.
21     Q.  Okay. That's what I meant by Dollar 1.
22     A.  Okay.
23     Q.  It's 6 percent royalty. If you have
24 only $60,000 of sales that year, the royalty
25 required to avoid the right to terminate is

Page 215

Werner

1
2  6 percent of that 60,000 net sales.
3      A.  Yes.
4      Q.  Okay. And if it were a hundred thousand
5  dollars net sales, it would be 6 percent of that
6  hundred thousand dollars net sales.
7      A.  Yes.
8      Q.  And it were $249,000 net sales, it would
9  be 6 percent of that.
10     A.  Yes.
11     Q.  So that's what I meant by, from first
12 dollar.
13     So that even if the financial proposal
14 says that somebody's percent rate kicks in at 250
15 to 449 --
16     A.  Uh-huh.
17     Q.  -- then Kolo has to pay 6 percent on the
18 dollars below 250,000 to avoid its right to
19 terminate.
20     A.  I agree with that.
21     Q.  Okay.
22     I agree, you agree.
23     A.  We finally agree.
24     Q.  Now, who at Kolo would know whether or
25 not you have paid any royalties to Kate's Paperie

Page 216

Werner

1
2  since May of 2007?
3      A.  Our accounts payable department.
4      Q.  And who might that be?
5      A.  Our accounts payable administrator is
6  Nyiesha Carrington. And Kim Hassler would also
7  probably know.
8      MR. VARGA:  What was the last name,
9  Carrington?
10     A.  C-A-R --
11     Q.  C-A-R-R-I-N-G-T-O-N?
12     A.  Yes.
13     Q.  And is it your understanding,
14 Mr. Werner, that the rent checks that are being
15 paid in escrow, pursuant to the letter that is
16 Defendant's Exhibit F, continue to be paid in
17 escrow?
18     A.  It's my understanding, yes. That's what
19 my direction was to my staff.
20     Q.  Okay.
21     And do you know whether rent checks --
22 do you know whether a rental payment, defined
23 however you want to define it, was paid between
24 August of 2007 and November of 2007?
25     A.  I don't -- I don't know for sure.

Page 217

Werner

1
2  I would have check my records.
3      Q.  Who would know?
4      A.  Our accounting department.
5      Q.  Would be the same ladies that you just
6  gave us?
7      A.  Yes.
8      Q.  Nyiesha Carrington and Kim Hassler?
9      A.  Yes.
10     Q.  But without checking with them, your
11 testimony today, based on your understanding at
12 this time, is that rental payments are being paid
13 into escrow, and that the sales of Kolo -- Kolo
14 net sales in your shop-in-shop, are not yet to a
15 level requiring a payment of royalties. Is that
16 correct?
17     A.  I don't know. I don't know. I have to
18 look at the sales. I don't know.
19     Q.  You don't know whether the sales are yet
20 at 250.
21     A.  That's correct.
22     Q.  Okay. But when they get to 250, you're
23 going to pay royalties; is that your --
24     A.  I would intend to pay it, yes.
25     Q.  All right.

55 (Pages 214 to 217)

Page 218

Werner

1
2      A.  251 -- or 250, sorry.  250.
3          MR. VARGA:  To be precise, 250,000.
4      A.  $250,000, right.  Yes.
5      Q.  Are there any other instances,
6  Mr. Werner, where communication between Kolo and
7  Kate's, since May of 2007, has in your mind
8  modified the terms of Plaintiff's Exhibit 1?
9      A.  No.  Not that I can recall.
10     Q.  Might there be some?
11     A.  Of course there may.  I don't recall any
12 other discussion that we had that modified the
13 agreement.
14     Q.  Okay.  Okay.
15         MR. VERSFELT:  Let's go off the record.
16         (A recess was taken.)
17     Q.  Mr. Werner, I finished my questioning of
18 you at this time.
19     A.  Thank you.
20     Q.  Thank you.
21         MR. VARGA:  Thank you.  Let me just....
22 EXAMINATION BY MR. VARGA:
23         MR. VARGA:  Why don't we mark this as
24 Plaintiff's -- what was the last one, from
25 yesterday?

Page 219

Werner

1
2          MR. VERSFELT:  9.  Oops, no, here was a
3  10.
4          MR. VARGA:  So it's going to be
5  Plaintiff's 11 of today's date.
6          THE WITNESS:  Can I talk to you for a
7  second?
8          MR. VARGA:  Sure.
9          (Discussion off the record.)
10         MR. VARGA:  Mr. Werner has a very good
11 point, that based on Mr. Flax's testimony
12 yesterday, it appears to be an issue whether
13 Kate's is no longer able to access, what is
14 it, POS data.
15         So this is the first notice that he
16 indicated today that it ever happened.
17     Q.  Could you tell us if you ever received
18 notice from Kate's --
19     A.  No.
20     Q.  Hold on, let me finish the question.
21         If you ever received from Kate's that
22 they were not able to access the POS data?
23     A.  No.  That was the first time yesterday
24 that I heard, from anyone, that they were unable
25 to receive POS data.

Page 220

Werner

1
2          MR. VARGA:  All right.  So now that he
3  has notice, are you willing to -- and if
4  that's Kate's position, that they have no
5  access, then are you requesting that Kolo
6  provide access to that information?  Because
7  he's willing to do that.
8          MR. VERSFELT:  Oh, absolutely.  And I
9  believe that Mr. Werner has already said he's
10 willing to do that.  I don't think there's
11 any misunderstanding on that.
12         MR. VARGA:  We just want to make sure
13 that it's on the record, that to the extent
14 it's Kate's position that they're willing to
15 access information --
16     Q.  And I don't know what you have to do to
17 access that information.  Is that like password
18 protected?
19     A.  I don't know what's the problem, to be
20 honest with you.  It was the first time yesterday,
21 so it could be something in the system.  So I
22 don't know.  I know my staff has been posting it
23 inside the Internet.  I don't know what's wrong
24 with their user number, name and password, but I
25 can certainly check.

Page 221

Werner

1
2          In good faith, I'm absolutely willing to
3  do that.
4          I would also like to request a contact
5  person to rely on certain requests from Kate's,
6  because I understand from Lionel Flax yesterday,
7  he no longer works for them.
8          MR. VARGA:  So --
9          MR. VERSFELT:  That's fair.
10         MR. VARGA:  So I guess you will provide
11 somebody's contract information to me, and
12 then I'll relay it over to Mr. Werner.
13         MR. VERSFELT:  I guess I will.  I'll be
14 happy to do that.
15         MR. VARGA:  All right.  Let me just
16 address this.  Let's mark this Plaintiff's
17 11.
18         (Lease between Kate's and Propeller
19 Company, LLC, Bates-numbered KP 0089 through
20 KP 0118, was marked Plaintiff's Exhibit 11
21 for identification, as of this date.)
22     Q.  Mr. Werner, we have marked what is
23 called Plaintiff's Exhibit 11 of today's date,
24 which is -- we kept the numbers in continuous
25 basis.  We finished yesterday with Plaintiff's

Page 222

Werner

1
2      Exhibit 10, so we're using 11 today.
3          So this is just for the record, that we
4      have no ten other prior exhibits today that we
5      marked, as this is the first one.
6          I want you to take a look at Plaintiff's
7      Exhibit 11, and tell me if you recognize this
8      document.
9          MR. VARGA: Just for the record,
10     Plaintiff's Exhibit 11 is also marked KP 0089
11     through KP 0118.
12         A.  Are you asking if I've ever seen that?
13         Q.  Just take a look, and tell us if you
14     recognize this document in the first place.
15         A.  I recognize it's a lease between Kate's
16     and Propeller Company, LLC.  Yeah, I recognize it,
17     that it's a lease.
18         Q.  Have you ever seen this before?
19         A.  No.
20         Q.  By the way, you should flip through it
21     just to make sure your statement is correct,
22     because you just looked at the first two pages.
23         A.  Yeah. It's hard to read the print, the
24     small print, but yes.
25         Oh, actually --

Page 223

Werner

1
2          (The witness read.)
3          A.  Okay.
4          Q.  Is your answer still the same?
5          A.  I have never seen that document.
6          Q.  I represent to you that this document
7      was produced to us by Kate's Paperie's attorneys,
8      and that's why it contains the KP marking on it,
9      89 through 118.
10         MR. VERSFELT: And you need not be the
11     only one to make that representation.  I
12     could make the same representation.  We
13     produced it, sure.
14         Q.  Now, I want you to take a look at
15     KP 0095, and can you tell me if there's indication
16     for -- you know, the -- what appears to be like an
17     annual rental rate for this particular lease.
18     That's Plaintiff's Exhibit 11.
19         A.  Yes.  The annual rental rates are stated
20     in Schedule A, starting in 12/1/05 through
21     11/30/2015, and it states an annual rental rate,
22     in dollars, starting with $687,150, annual rate.
23     Rental rate.  And then it states a monthly rate of
24     $557,262.50 per month.
25         Q.  Okay.  So in this -- just to be clear,

Page 224

Werner

1
2      it says, commencing 12/01/2005 through 11/30/06,
3      the annual rental rate that you just read pertains
4      to that period, correct?
5          A.  That's correct.
6          Q.  And then in the following period, which
7      is 12/1/06 through 11/30/07, what is the annual
8      rental rate for that?
9          A.  The annual rental rate is $687,150.
10     687,150.
11     Per year.  Annual rental rate.
12         Q.  And a monthly?
13         A.  And the monthly rate is $57,262.50 per
14     month.
15         Q.  Now, do you have an understanding of
16     approximately, or even if you don't, specifically,
17     how many square feet there are in Kate's Paperie
18     store at Spring Street location?
19         A.  I think there's between -- my
20     understanding from speaking to Lionel, there was
21     between 5- and 6,000 square feet, something like
22     that.
23         Q.  Okay.  Now, if -- would you take the
24     calculator, please, and if you divide this total
25     that you mentioned, 687,150, by --

Page 225

Werner

1
2          A.  6,000 square feet.
3          Q.  By 6,000 square feet?
4          A.  Would be $114 per square foot per year.
5      $114.53, to be exact, per square foot per year.
6          Q.  Per year.  And that's not per month.
7          A.  It is not per month.
8          MR. VERSFELT: Wait, what's not per
9      month?
10         MR. VARGA: The $114.52, that's not a
11     per month rate, but it's a per year rate.
12         Q.  Is that your testimony?
13         A.  That's correct.  That's my testimony.
14         Q.  Would you have ever agreed to pay either
15     $75 or $140, per square foot, per month, for the
16     shop-in-shop arrangement?
17         A.  Absolutely not.
18         Q.  Why not?
19         A.  Because there is no -- there's -- I
20     don't even think there's a market rent in the
21     world that's equal to that, on an annualized
22     basis.
23         Q.  What do you mean by that?
24         A.  What I mean is if you take $75 per
25     square foot times 12 --

Page 226

Werner

1          Werner
2      **Q.  Let's do the math.**
3      A.  That would be $900 annually, per square
4  foot, $900 per square foot per year.  I'm not even
5  sure there's a market in the world that has that
6  much.
7      **Q.  All right.  Now, what was the size of**
8  **the space -- what is the size of the space that**
9  **Kolo has occupied, even currently, within Kate's**
10  **at Spring Street?**
11     A.  Approximately 450 square feet.
12     **Q.  How much is that, if you multiply that**
13  **with the 900?**
14     A.  That would be $405,000.
15     **Q.  Per year?**
16     A.  Per year.
17     **Q.  For 450 square feet.**
18     A.  Yes.
19     **Q.  And how much is 450 square feet of the**
20  **total approximate 6,000 square feet, percentage**
21  **wise?**
22     A.  It's 7-1/2 percent.
23      MR. VERSFELT:  Could you compute that
24  with 5,000 square feet, too?
25      MR. VARGA:  Sure.

Page 227

Werner

1          Werner
2      THE WITNESS:  It's 9 percent.
3      MR. VERSFELT:  Okay.
4     **Q.  So in essence, would you have paid for**
5  **9 percent of the property, 400 -- what was it,**
6  **$5,000?  Would you have ever agreed to that, if**
7  **that was intended by parties?**
8     A.  Would I have paid --
9      MR. VERSFELT:  Objection to form.
10    A.  Would I have paid $450,000 for 9 percent
11  of the total space?  Absolutely not.
12     **Q.  Yeah.  Okay.**
13     A.  No way.
14     **Q.  Was there a -- ever a discussion that --**
15  **that included something like that, that you would**
16  **pay upwards to $450,000, or whatever the exact**
17  **amount is, per year, for 450 square feet space**
18  **within Kate's Paperie?**
19     A.  No, absolutely not.
20     **Q.  The -- was it your understanding, prior**
21  **to the execution of the LOI by Lionel Flax, that**
22  **they had no -- no such expectation of you, of**
23  **Kolo?**
24     A.  They had absolutely no expectation to
25  pay 70 -- $75 per square foot per month, at all.

Page 228

Werner

1          Werner
2  Period.
3     **Q.  Thank you.**
4      MR. VERSFELT:  Okay.
5  EXAMINATION BY MR. VERSFELT:
6      MR. VERSFELT:  Could I have the
7  calculator, please?
8     **Q.  How much would $75 per square foot be,**
9  **per month, on your 450 square feet?  Do you know?**
10    **I mean, could you do the math?**
11    A.  75 -- approximately $405,000.
12    **Q.  No.  I didn't say per year.  Per month.**
13     MR. VARGA:  Per month.  He said per
14  month.
15    A.  Sorry.  $33,750.
16    **Q.  Okay.  Now, your lawyer, Mr. Werner, put**
17  **before you Plaintiff's Exhibit --**
18     MR. VARGA:  11.
19    **Q.  -- 11.  And he directed your attention**
20  **to the page within it, that is Bates-stamped**
21  **KP 0095.**
22    **And he had you read from that page**
23  **the -- what I think is a Schedule A.  Could you**
24  **find that page for me?  0095.**
25    **Okay.  And he had you read from the --**

Page 229

Werner

1          Werner
2  **several of the entries on that page, that are all**
3  **drafted to set forth an annual rental rate and a**
4  **rental per month.  Correct?**
5     A.  That's correct.
6     **Q.  Each one of those entries says, annual**
7  **rental rate of a dollar amount, and so many**
8  **dollars per month.  Right?**
9     A.  That's correct.
10    **Q.  Each of those entries makes absolutely**
11  **clear what dollars are annual dollars and what**
12  **dollars are monthly dollars, don't they?**
13    A.  They specifically say annual rate,
14  rental rate, in dollars, and they specifically say
15  monthly numbers per month.
16    **Q.  Right.  They are -- and each of those**
17  **entries is explicit in defining the annual dollar**
18  **rate and the monthly dollar rate, correct?**
19    A.  I don't know about explicit.  It states
20  it.
21    **Q.  It states it explicitly, doesn't it?**
22    A.  I don't know.
23    **Q.  Does it use the words "annual" and**
24  **"monthly" in every one of the ten entries on that**
25  **page?**

58 (Pages 226 to 229)

Page 230

Werner

1
2      A.  Actually, it's not consistent,
3  counselor.
4      Q.  Does it use the word "annual" and "per
5  month" in every entry on that page?
6      A.  In every entry, it states an annual
7  rental rate in dollars, and then it says, in
8  writing, and then it says, in dollars per month.
9  So it's not explicit in -- in its entirety.
10     Q.  Now, let's look at the Soho Proposal
11 Basic Terms page in the Addendum A of Plaintiff's
12 Exhibit 1, please.
13         Now, direct your attention to
14 paragraph --
15         MR. VARGA:  Not with this one.  This
16 one.  Basic terms?
17     Q.  Basic terms.  Directing your attention
18 to paragraph 5.  Does paragraph 5 say anything
19 about annual rent?
20     A.  No.
21     Q.  Okay.  Does it speak explicitly of,
22 quote, monthly rental payments, end quote?
23     A.  It explicitly states that we will --
24 that Kolo will pay Kate's monthly rental payments.
25     Q.  Thank you.  Now, could you turn the

Page 231

Werner

1
2  page.  I would like to direct your attention to
3  the financial proposal page that follows the basic
4  terms page.
5         In paragraph 1, where it says, "Starting
6  rent per square foot -- $75."  You see that?
7      A.  Yes.
8      Q.  Does it say "annual rent"?
9      A.  No.
10     Q.  Now, let's look at paragraph 4, where it
11 says, "Rent increases," and has the schedule of
12 square footage payments for levels of net sales.
13         My question to you, sir, is, anywhere in
14 that paragraph 4, does it say, annual rental rate?
15     A.  It does not.
16     Q.  Okay.  Thank you.
17         MR. VARGA:  All right, let me just
18 clarify something.
19 EXAMINATION BY MR. VARGA:
20     Q.  Paragraph 4, same page, the --
21 Plaintiff's 1 entitled Financial Proposal,
22 would -- would Kolo been -- would it have been
23 possible for Kolo to reach $250,000 sales in one
24 month?
25     A.  No.

Page 232

Werner

1
2      Q.  How about $350,000 in a month?
3      A.  Absolutely not.
4      Q.  How about $450,000 a month?
5      A.  No.
6      Q.  How about $550,000 a month?
7      A.  No.
8      Q.  How about $650,000 a month?
9      A.  No.
10     Q.  How about $750,000 a month?
11     A.  Absolutely not.
12     Q.  So why would these, in the column
13 indicating the net sales, and $250,000 and 350-,
14 et cetera, tied with these increases in the square
15 footage?
16     A.  That was -- that was an annual number
17 for sales and per square foot.
18     Q.  And did the Flaxes understand this to be
19 on an annual basis or a monthly basis?
20     A.  Absolutely.  Yes.
21     Q.  Which one?
22     A.  They -- they understood it to be annual.
23     Q.  Did they ever communicate to you, prior
24 to signing the LOI, that they had an expectation
25 that Kolo would reach, let's say at a minimum,

Page 233

Werner

1
2  $250,000 each month?
3      A.  No.
4          MR. VERSFELT:  I object to form.
5      A.  No.
6  EXAMINATION BY MR. VERSFELT:
7      Q.  Mr. Werner, your counsel's questions
8  were just now phrased in terms of Kate's Paperie.
9  I want to ask you in terms of Lionel Flax.  Right?
10         What's the basis for your assertion that
11 Lionel Flax understood the numbers for rent in the
12 financial proposal to be annual numbers?
13     A.  Rephrase that.
14     Q.  Okay.  What is your basis for your
15 testimony asserting that Lionel Flax understood
16 the $75 per square foot number on the financial
17 proposal page of Addendum A, as an annual number?
18     A.  With all the conversations that we've
19 had leading up to this, e-mails, e-mail
20 communication, he always indicated that he
21 understood that the annual sales numbers that were
22 in here also corresponded to the rent per square
23 foot per year.
24     Q.  And the e-mail that you're referring to
25 in your answer is the e-mail that we looked at

59 (Pages 230 to 233)

Page 234

Werner

1
2  today in August of 2007 --
3      A.  No, that's not what I'm referring to.
4      Q.  Do you have another e-mail?
5      A.  Yes.  There's a few of them, actually.
6  I think there's one in particular, I know of.
7      I would have to look through it.
8      It's the one that he -- Lionel refers to
9  this as being the benefits to Kolo when he's
10  speaking to his staff member.  And he's --
11      MR. VARGA:  I think we had that marked.
12      A.  And he specifically says....
13      Q.  Let's look at that.
14      MR. VARGA:  We had that marked.
15      MR. VERSFELT:  All the plaintiff's
16  exhibits are there.
17      MR. VARGA:  Off the record.
18      (Discussion off the record.)
19      A.  Lionel is explaining the benefits.
20  Essentially, they will pay 8 to 9 percent of our
21  rent in three of our stores, minimum.
22      MR. VARGA:  Just for the record, we
23  didn't mark this yet, but we will mark it.
24  This is it?
25      THE WITNESS:  That's one of them.  I

Page 236

Werner

1
2      Q.  Let's finish this one, first.  So I'm
3  handing you Plaintiff's 12.  Can you tell me what
4  this is?
5      A.  This is an e-mail that was sent from
6  Lionel to Zama, who is a staff member of Kate's,
7  whereby he describes the benefits and his
8  understanding of Kolo -- of what benefits Kolo
9  could contribute to Kate's.
10      Q.  What's the date of this e-mail?
11      A.  April 20, 2007.  And he indicates,
12  starting with the first benefit, Essentially,
13  they, being Kolo, will pay 8 to 9 percent of our
14  rent in three of our stores, minimum.
15      Q.  Do you -- what do you read that to mean?
16      A.  I read that to mean that he expected the
17  rental rate to be 8 -- equal to the equivalent of
18  what he was paying his landlord per square foot
19  per year, where Kolo would pick up 8 to 9 percent
20  of that.
21      Q.  And would this be consistent, if -- if,
22  let's say, he meant to -- whoever wrote the
23  e-mail, meant to say 8 to 9 percent monthly?
24      Would that be consistent with that, 8
25  to -- would that be consistent with -- having the

Page 235

Werner

1
2  think there's others out there, but I can't
3  remember exactly which one.
4      MR. VARGA:  This is my version.  Doesn't
5  have the Bates stamp.  So this is
6  Plaintiff's 12.
7      (E-mail dated April 20, 2007, from
8  Lionel to Zama was marked Plaintiff's Exhibit
9  12 for identification, as of this date.)
10      MR. VERSFELT:  May I look at it?  Thank
11  you.
12      MR. VARGA:  It's in the first batch I
13  produced.
14      MR. VERSFELT:  Oh, yeah, I know.  I've
15  seen it.
16      MR. VARGA:  Just to pinpoint the
17  location, I had produced four batches, and it
18  was in the first batch.
19      THE WITNESS:  Can I see that?
20      MR. VARGA:  Yeah, sure.
21  EXAMINATION BY MR. VARGA:
22      MR. VARGA:  Okay.  For the record, we
23  have marked Plaintiff's Exhibit 12 of today's
24  date, a four-page document.
25      A.  Well, no.

Page 237

Werner

1
2  $75 would be consistent with 8 to 9 percent of the
3  rent?
4      A.  Not per month.
5      Q.  Monthly rent?
6      A.  No, no.
7      Q.  Okay.
8      A.  It would not.
9      Q.  Would it be consistent with their yearly
10  rent?
11      A.  Yes.  It would be consistent with their
12  yearly rent.
13      Q.  Okay.
14      MR. VERSFELT:  Are you passing the
15  witness?
16      MR. VARGA:  Yeah.  Go ahead.
17  EXAMINATION BY MR. VERSFELT:
18      Q.  Mr. Werner, was the faxed message that
19  was contained in Plaintiff's Exhibit 12 sent to
20  you at the time?
21      MR. VARGA:  E-mail.  You said fax.
22      Q.  I'm sorry, let me correct myself.
23      Was the e-mail message that's in
24  Plaintiff's Exhibit 12 sent to you at the time it
25  was generated?

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017

Page 238

Werner

1
2     A. I believe it -- I believe I received
3     this, yes.
4     Q. It's -- could you find your e-mail
5     address on there?
6     A. Yes. Actually, it was forwarded to me
7     by Peter Dunn. So he must have received it and
8     forwarded it to me.
9     Q. And when did Peter Dunn forward that?
10    A. Oh. January 16, 2008.
11    Q. Right, in connection with this
12    litigation.
13    A. Yes, but let me -- excuse me, counsel.
14    Q. Surely, look it over, because my
15    question to you is, did you ever see it before
16    your preparation for your deposition.
17    A. Yes, I did see it, actually. I did see
18    it. And I need to check my e-mail, because I
19    remember seeing that, and I responded back, after
20    he sent this to me, with another e-mail.
21    Q. You, Mr. Dunn?
22    A. No, Lionel Flax.
23    Q. Okay.
24    MR. VARGA: Hold on, so -- off the
25    record.

Page 239

Werner

1
2     MR. VERSFELT: Wait. Why is this off
3     the record?
4     MR. VARGA: All right.
5     Off the record, let me just say
6     something.
7     (Discussion off the record.)
8     Q. Mr. Werner, do you know what the total
9     rent paid by Kate's Paperie is for all of their
10    stores in Manhattan?
11    A. Do I know?
12    Q. Yes, do you know?
13    A. No, I don't exactly know. No.
14    Q. Did you know then?
15    A. I had an idea, yes.
16    Q. Do you know -- did you know then that a
17    calculation of $33,000 per month is 9 percent of
18    their total rent for all their stores?
19    A. Did I know then?
20    Q. Yes.
21    A. The answer is yes, I approximated that,
22    yes.
23    Q. So $33,000 --
24    A. Per year.
25    Q. Per month. Is their --

Page 240

Werner

1
2     A. No, not saying.
3     Q. Okay. Let me ask the question so we're
4     both clear on it. Did you know what their monthly
5     rent totaled for all of their stores?
6     A. Their monthly rent, no. I did not.
7     Q. All right.
8     MR. VERSFELT: I'm done.
9     MR. VARGA: All right. We're done.
10    MR. VERSFELT: Are we all done? We're
11    done.
12    (Discussion off the record.)
13    MR. VARGA: We're back on the record.
14    Just to reflect the off-the-record
15    conversation concerning the production of
16    these transcripts, both plaintiff's
17    transcript and defendant's transcript,
18    plaintiff agrees to produce the transcript of
19    Mr. Lionel by --
20    MR. VERSFELT: Mr. Lionel Flax.
21    MR. VARGA: Mr. Lionel Flax, by
22    8:00 p.m. tonight, so that I have time to get
23    back to my office, because I --
24    MR. VERSFELT: You just told me that
25    your secretary is prepared to send it off to

Page 241

Werner

1
2     me.
3     MR. VARGA: Right. If she's going to
4     get it by 5:00, so then by 6:00 p.m., as will
5     counsel have the same option, by tomorrow, he
6     will produce me a PDF version of the
7     deposition transcript of today's deposition
8     by 6:00 p.m.
9     So again, to recap, plaintiff will
10    produce Lionel Flax's deposition transcript
11    by 6:00 p.m. today, and defendant will
12    produce deposition transcript of Mr. Werner's
13    deposition by 6:00 p.m. tomorrow, so that the
14    parties can act on executing the transcript.
15    Is that fair?
16    MR. VERSFELT: That sounded right to me.
17    MR. VARGA: Okay, great. Thank you.
18    (Time noted: 4:46 p.m.)
19
20
21
22
23
24
25

61 (Pages 238 to 241)

Page 242

1
2
3    A C K N O W L E D G E M E N T
4  STATE OF NEW YORK    )
                        ) Ss.:
5  COUNTY OF NEW YORK  )
6
7       I, KEITH WERNER, hereby certify, I have read
8  the transcript of my testimony taken under oath in
9  my deposition of February 12, 2008; that the
10  transcript is a true, complete and correct record
11  of what was asked, answered and said during this
12  deposition, and that the answers on the record as
13  given by me are true and correct.
14
15
      _____
16  KEITH WERNER
17  Subscribed and sworn to
18  before me on this _____ day
19  of _____, 2008.
20
21
      _____
22       NOTARY PUBLIC
23
24
25

Page 243

1
2       C E R T I F I C A T E
3
4  STATE OF NEW YORK    )
                        ) Ss.:
5  COUNTY OF NEW YORK  )
6
7       I JEFFREY BENZ, a Certified Realtime
8  Reporter, Registered Merit Reporter and Notary
9  Public within and for the State of New York, do
10  hereby certify:
11       That the witness whose examination is
12  hereinbefore set forth was duly sworn by me and
13  that this transcript of such examination is a true
14  record of the testimony given by such witness.
15       I further certify that I am not related to
16  any of the parties to this action by blood or
17  marriage and that I am in no way interested in the
18  outcome of this matter.
19       IN WITNESS WHEREOF, I have hereunto set my
20  hand this 13th day of February, 2008.
21
22
      _____
23  JEFFREY BENZ, CRR, RMR
24
25

Page 244

1
2              INDEX
3  KEITH WERNER
4    Examination by:              Page
5       MR. VERSFELT         4, 228, 233, 237
6       MR. VARGA            218, 231, 235
7
8           EXHIBITS
9  Number   Description           Page
10  Defendant's
11  A  E-mail exchange between Mr. Werner    62
       and Lionel Flax, with Bates number
       KP 0030
12
13  B  Document with Bates numbers KP        70
       0031 through 0041
14
    C  Document with Bates stamp KP 0042     80
15
    D  E-mail string, Bates-numbered KP      81
16     0044 and 0045
17  E  E-mail from Mr. Werner to Lionel     105
       Flax on May 12, 2007,
18     Bates-numbered KP 0049
19  F  Two-page document                    179
20
21  Plaintiff's
22  11  Lease between Kate's and Propeller   221
        Company, LLC, Bates-numbered KP
23      0089 through KP 0118
24  12  E-mail dated April 20, 2007, from    235
        Lionel to Zama
25

Elisa Dreier Reporting Corp. (212) 557-5558
780 Third Avenue, New York, NY 10017

**A**
abide 173:15
ability 93:8 158:12
    172:3 207:2
able 175:24 176:10
    219:13,22
about 13:10,23
    21:24 23:9,14,18
    23:18 25:3,4
    26:15,18 31:3
    37:3 40:7 43:2,8
    45:3,4,6,15 48:11
    49:8 51:25 52:2
    61:5 67:10 68:9
    71:18 74:3,19
    78:22 79:16 85:13
    86:17,18 87:7
    89:15 93:10 100:7
    103:4,18 116:11
    116:17,18,21,24
    118:14,15 123:10
    124:19 126:3
    127:22 128:12
    129:25 132:5
    144:20 151:5,7
    152:21 153:24
    154:8 155:6
    157:18 161:16,18
    162:7,14,20
    164:11 165:4,5
    168:2,16 169:4,14
    169:19 170:15
    172:9,19 178:18
    178:19 184:20,22
    189:2 192:24
    199:19,21 200:21
    208:3,6 229:19
    230:19 232:2,4,6
    232:8,10
above 64:18 72:15
    73:5,6,12 77:6
    101:6 132:7 133:2
    135:11 194:11
    202:7
above-mentioned
    133:7
absolutely 18:8
    107:2 108:14
    137:25 176:2,15
    187:10 189:15
    190:5 196:20
    198:12 204:11
    220:8 221:2
    225:17 227:11,19
    227:24 229:10
    232:3,11,20
accept 65:20 143:14
    146:5 147:5

acceptable 92:17
    144:4
access 176:10,13
    219:13,22 220:5,6
    220:15,17
accessories 41:14
    41:15
accidentally 120:10
accommodate 143:9
accord 153:21
    154:4
accordance 170:20
    177:15 187:22
according 62:7
    77:15,21 88:22
    151:21,23 157:21
    159:19,21 160:7
    175:14 176:23
    178:7 185:8,18,19
    188:2,11 197:24
    206:6 212:24
accountant 42:9
accounting 30:21
    30:22 217:4
accounts 216:3,5
accurate 121:22
accurately 121:19
achieve 39:25 40:2
Acquiring 55:20
acquisitions 55:19
across 169:18
act 133:7 241:14
action 37:18,20
    102:10,13 243:16
activities 6:19
actually 12:19 15:4
    15:10 28:3 29:3
    39:19 44:4 81:8
    97:2 102:23 117:6
    151:6 222:25
    230:2 234:5 238:6
    238:17
added 59:11
addendum 67:9
    68:7 69:6,16,17
    69:19 78:24 79:4
    79:12 94:17
    138:17,21,23
    139:3,7,11,15,25
    140:2 147:20,24
    148:7,12,12
    151:20,22 152:11
    152:18,25 153:13
    153:16 154:13,16
    155:18 156:14,19
    156:20,20,20,24
    156:25 157:11
    159:25 160:2,7

161:20,24 162:3
    162:10 163:24
    164:9,14 166:6,9
    170:18 173:16,19
    174:8 175:3
    190:18 192:4
    207:5 214:5
    230:11 233:17
addendums 151:24
    155:24 156:2,6,7
    156:16
addition 10:11
    160:21 168:24
    169:9
additional 133:8
    135:15,16,19,22
    136:2,4,11,18
    137:13,22 138:12
    138:13 146:14,16
    154:24 156:16
    158:8,17 159:2
    171:18
address 4:11,14,17
    136:18 150:25
    221:16 238:5
addressed 152:25
    155:14 156:15
administer 3:11
administrator
    216:5
advanced 16:5
advice 60:10
affairs 29:17
after 9:16 11:16
    16:23,23,25 21:17
    37:22 45:11 54:24
    67:7 69:22 79:24
    79:25 80:20 95:10
    101:9 116:3
    117:18 122:7
    123:25 124:4
    160:17 167:5
    168:5 181:18
    203:19,22 209:5
    210:6 238:19
afternoon 102:24
    103:10 214:12
again 19:8 28:16
    39:16,19 51:24
    55:22 58:11 69:11
    77:3 89:21 96:16
    96:23 97:17,24
    98:5,9 100:25
    132:23 138:16
    154:5 196:23
    211:13 212:5
    241:9
ago 187:14

agonized 84:25
agree 40:3 73:4,10
    88:24 89:8 95:5
    123:14 136:2
    143:14,24 146:5
    147:5 152:17,24
    155:23 156:16,25
    167:14 174:8
    182:19 190:22
    199:16 208:11
    215:20,22,22,23
agreed 3:2,6,9
    70:19 104:23
    105:3 143:25
    146:10 147:12
    151:25 156:3
    164:24 169:24
    183:20 188:18
    190:2,5,24 191:15
    191:22 196:24,25
    198:17,18 199:18
    200:5 207:22
    210:12 225:14
    227:6
agreed-upon
    138:23 201:23
agreeing 91:3,4
agreement 34:5,12
    34:14 103:16
    110:3 122:20,22
    123:3,5,10,13,15
    123:20 124:5,21
    124:23 125:15,17
    125:19 126:5,7,11
    126:12,13,16,18
    127:2,3,9,13,16
    127:17,19,23
    128:20 129:4,6,7
    129:19,25 130:8
    130:13 131:5,6,25
    131:25 132:9,12
    133:2,9,11,14,15
    135:16,17 136:3
    136:19 137:5,8
    139:6 156:6,8,9
    157:13 159:22,23
    160:16 164:19
    165:3 170:25
    174:5 185:18
    189:23 190:19
    191:14,21 192:4
    193:3 202:19,22
    204:6 218:13
agrees 133:6,7
    135:8,10 240:18
ahead 32:13 96:21
    145:7 182:8
    194:25 198:21

201:21 237:16
Akira 117:22
album 187:17,19
albums 41:13
allocated 29:17
allocation 30:17,20
    201:5
allow 172:13,16
    201:5
allowed 136:21
almost 18:10 25:10
    71:16
already 13:3 43:15
    48:22 90:23 94:5
    128:14 152:9
    220:9
Althea 27:18
altogether 5:6
alumni 8:16
always 14:20 31:21
    47:14 61:13
    233:20
ambiguous 129:16
America 5:14,19
amount 40:4 201:24
    227:17 229:7
amounts 197:16
analysis 16:5
Angeles 17:4 19:3
    21:19 28:18
announced 44:25
annual 185:20
    191:18 209:4,21
    210:2,7 212:14
    213:2,4 214:9,11
    214:16 223:17,19
    223:21,22 224:3,7
    224:9,11 229:3,6
    229:11,13,17,23
    230:4,6,19 231:8
    231:14 232:16,19
    232:22 233:12,17
    233:21
annualized 225:21
annually 197:13
    226:3
another 18:19
    27:13 57:24 58:7
    70:24 71:5 94:20
    99:21 101:6
    136:19 194:17
    204:5 234:4
    238:20
answer 12:16 60:20
    84:16,17 92:18
    95:3 96:2 101:16
    137:19 138:8
    150:21 172:18
    183:12 191:2,24

Page 246

206:13 211:14,15
223:4 233:25
239:21
answered 242:11
answers 242:12
anticipate 156:5
160:5
anticipated 136:10
155:23 196:9
anyone 47:24 103:9
120:14 128:8
219:24
anything 5:13 53:3
58:10 74:3 89:4
94:19 101:12
151:5,7 169:13
184:22 190:20
199:11,12,14
203:22 211:23,24
230:18
anywhere 231:13
Aparo 54:13,16
56:14,14 57:5,9
57:17 58:3 59:5
apart 39:15 45:8
apologize 152:9
appear 82:12 88:23
144:22 145:16,19
152:7
appears 54:5 63:6,8
63:20,21 64:6,7
65:3 66:14,16
68:3,12 70:23,25
73:11 82:11 83:6
87:8 99:25 100:11
129:25 133:17
145:23 153:3
184:21 219:12
223:16
applications 20:24
20:25
applied 30:20 57:21
apply 146:18
154:16
appreciate 92:15
approached 211:5,9
approaches 205:21
approximate
226:20
approximated
239:21
approximately 6:23
7:2,15 9:13 10:7
11:9 18:11 30:14
35:24 38:9 40:14
41:4,6 50:16,16
50:24,25 141:23
142:5,6,7,9,21

224:16 226:11
228:11
April 17:2 18:11
39:12,13,21 40:23
41:18 46:8,9,10
46:16,18 47:22
48:2,8 50:15,19
50:20,25 84:19
97:24 98:4,9,9
165:8,17 166:2,7
167:24 170:13
235:7 236:11
244:24
area 96:13 119:24
argue 214:11
armed 14:17 15:16
around 15:18 22:8
23:20 33:6 94:22
137:23 141:21
142:16 207:9
arrange 200:4
arranged 175:16
arrangement 47:12
118:21 145:3
168:3 170:4
173:14,15,18,23
206:8,10 207:12
210:24 211:10
212:23 225:16
arrangements
118:18
arrived 118:3
arriving 52:4
art 14:3
Asia 52:7,8 87:14
asked 40:22 83:7
86:9,18 88:17
91:25 152:10
190:4 242:11
asking 13:10 23:9
24:22 26:19 30:12
49:16,25 66:18
80:20,21 81:13
86:14 88:4,24
89:3,12 91:2,2
94:12 95:11,12,19
99:12 112:5,19,21
112:23 117:8
126:15 128:12
163:17,21 172:9
185:2 222:12
asserting 233:15
assertion 233:10
assets 22:7,9,11
23:7,17 24:21,23
24:23 25:5,9
assisted 32:20
associate's 11:6,25

assume 16:6 33:2
116:9 186:19
assuming 205:11
assumption 205:12
Asylum 4:12
attached 21:15
78:12 108:25
138:21 139:3
151:20 153:16
156:8,9,17
attachment 51:15
51:15,18 65:16
72:2,3,8,9,18
73:14,16 77:24
78:12,16,17 81:7
138:23
attended 41:22 42:3
42:4 91:17 101:21
184:6
attention 68:5
122:14 184:11,19
194:3,20,23
228:19 230:13,17
231:2
attitudes 174:4
Attmore 54:19
attorney 36:18
43:10,12,16,19,19
43:20,21 44:10
54:8,9 57:5 58:24
61:3 102:11
128:21,23 131:22
163:20 178:17,22
179:24 193:24
200:7
attorneys 2:4,9 3:3
116:19 223:7
attorney's 36:18
54:11
August 96:12,12,17
96:24 97:9 184:20
186:2,23 187:3
188:19 189:6,6,11
189:17 203:3,5,8
203:10,11,15,16
203:16,17,17,24
216:24 234:2
authority 207:12,23
authorized 3:11
avenue 2:4,9 140:13
141:22 148:7
150:3,18 152:12
152:13
avoid 180:12
214:25 215:18
award 34:5
aware 6:18 17:22
98:18 163:9

away 119:10
A-L-T-H-E-A
27:19
A-P-A-R-O 54:15
a.m 1:15

B

B 70:4,6,10,17 73:2
75:3 77:23 99:16
99:17 100:12
156:19 244:13
back 8:16 20:20
34:23,24 52:5
59:19 60:17 81:6
82:10 83:16 86:25
87:19,22 111:25
112:9 113:6
114:20 115:9
121:10 122:8
124:15,16 130:24
131:3 144:6
151:11 167:6
168:9,12 181:15
186:18 191:2,4,6
197:20 206:13,16
208:18 212:4
238:19 240:13,23
background 4:10
15:16 46:6 66:23
163:13
badger 92:15
balance 40:5
balances 40:6,8
banking 17:5,6
bankrupt 44:6
bankruptcy 36:18
43:18,21 44:4,8
bar 187:17,19
Barbara 9:22,24,25
10:5,22 11:3,16
11:25
barely 76:20
Barreiro 42:6
Barreiro's 42:11
base 202:8
based 104:7,8 134:8
163:13 164:21
166:15 185:21
191:18 195:10
217:11 219:11
basic 148:17,22
149:4,24 150:12
160:23 161:8
164:8,13 170:23
171:5 174:22,25
175:3 177:7,12,13
178:4,7 188:9
190:3 191:20

193:10,11 197:21
198:25 212:7,8
214:4 230:11,16
230:17 231:3
basically 89:3
103:25 138:10
143:24 144:7
basing 134:17
basis 154:17 155:2
155:5,10 185:19
187:8,10,22 189:5
189:24 221:25
225:22 232:19,19
233:10,14
batch 235:12,18
batches 235:17
Bates 62:21 63:2
70:5 80:6,11
235:5 244:11,13
244:14
Bates-numbered
81:21,22 105:13
221:19 244:15,18
244:22
Bates-stamped
82:16 105:10
228:20
bearing 211:18
became 31:9,13,14
170:16
become 35:7
becomes 158:9
159:3 171:20
before 1:15 3:11,13
7:21 15:3 31:9
42:14 43:19 44:20
44:21 47:20 49:2
51:7 55:20 62:24
63:15 69:3 70:2
80:3,9 89:13
110:3 121:11
124:14 125:20
128:15 133:18
165:10 166:5,9,11
166:25 167:5,17
178:24,25 184:4
186:10 187:2
196:18 203:21
222:18 228:17
238:15 242:18
began 39:19
begin 141:21
181:18
beginning 15:18
23:9,11,12 27:5
29:6 51:16 100:14
160:14 180:24
beginnings 46:6

**behalf** 44:2
**behind** 59:25
**being** 34:2 35:14
  132:18 169:4
  207:14 216:14
  217:12 234:9
  236:13
**believe** 11:4,23 12:3
  12:25 14:13 27:9
  30:18 32:15 33:25
  34:12,18 35:2,8
  35:16 36:22 41:23
  44:25 45:18 47:19
  51:17 52:9 53:6
  72:17 75:19 81:5
  108:18 110:2,13
  112:11 113:9,12
  171:4 173:11
  175:13 178:25
  183:19 186:16
  188:23 194:13
  203:8 220:9 238:2
  238:2
**believed** 194:10
  196:18
**belonged** 109:13
**below** 63:7 65:3
  73:5 100:10,16
  133:6 135:8,10
  184:15 215:18
**beneficial** 169:19
  211:11
**benefit** 118:24
  145:3 169:17
  236:12
**benefits** 170:2
  234:9,19 236:7,8
**benz** 1:15 4:4 243:7
  243:23
**besides** 117:21,23
**best** 75:11,12 93:8
  178:22,23
**better** 76:10,13
  77:9 119:7
**between** 3:3 16:12
  27:15 33:13 38:7
  39:13,17 41:23
  46:17 62:20 73:9
  85:14 86:5 88:5
  89:16 91:2,10
  92:4 94:14 95:12
  96:24 98:10
  103:24 104:22,22
  127:10 131:24
  134:11 144:15
  157:6 162:8
  164:20 170:12
  180:12 210:13

216:23 218:6
  221:18 222:15
  224:19,21 244:11
  244:22
**beyond** 158:22
**big** 39:17
**binding** 100:15
**birth** 8:21
**bit** 21:24
**blood** 243:16
**body** 63:21,25
  65:14,15,21
**books** 41:13
**both** 32:10 65:12
  102:17 107:13
  119:7 123:3,14
  124:21 132:19
  133:18 143:8
  144:21 145:3
  170:2 193:6
  210:17,25 211:3
  211:16,20,21
  240:4,16
**bottom** 63:11 66:15
  75:16 77:5 96:19
  109:16,16 137:20
  203:13
**bought** 143:12
**boxes** 41:13,13
**brain** 116:6
**break** 47:20 66:6
  85:25 140:7
**brief** 8:5
**briefly** 16:4
**bring** 160:2 205:18
**broad** 95:19
**broader** 88:24
**brought** 29:3,7
  114:3,6,8 117:6
  117:13 162:11
  170:6
**Brown** 27:19
**business** 4:10,14,17
  10:14,17,19 11:10
  13:16 29:17 45:23
  55:19
**businesses** 22:13

**C**
**C** 2:2 80:5,7,10
  100:18 156:20
  242:3 243:2,2
  244:14
**Caf** 114:3 117:7,16
**calculate** 213:14
**calculated** 182:9
**calculation** 213:12
  239:17

**calculator** 224:24
  228:7
**California** 9:7,8
**call** 52:24 92:20
  125:12 163:17
  177:9
**called** 4:3 11:5
  53:24 59:20 60:17
  61:9 122:20 144:5
  156:19 159:7
  221:23
**calls** 163:4
**came** 27:13 33:5
  48:17 56:13,14
  64:12,13 83:16
  87:19 166:12,17
  166:22 167:12,15
  167:20 170:15
  189:24 191:14
  192:22
**capacity** 22:21,22
**capital** 126:6 129:4
  130:9 132:9,13
**capitalized** 129:4
  129:19
**care** 90:9
**careful** 21:5
**Carrington** 216:6,9
  217:8
**case** 90:20 92:10
  146:8 147:20
  155:22 184:18
  188:23
**center** 130:2
**CEO** 31:10,13,16
  31:19
**ceremony** 14:21
  15:3,9
**certain** 54:23 77:24
  78:4 92:17 108:12
  181:13 221:5
**certainly** 60:22 61:8
  91:11 220:25
**Certified** 1:15
  243:7
**certify** 242:7 243:10
  243:15
**cetera** 232:14
**chance** 60:12 70:11
  70:21 95:5 114:2
**change** 53:3 61:13
  61:14 156:24
  157:5,10 190:22
  190:24 199:12,14
**changed** 26:21
  59:13 191:17,20
  192:3,19
**changes** 122:4,10

**characterization**
  201:3
**chart** 75:15,17
  76:21
**charts** 77:4
**check** 66:5 78:7
  89:18,20 90:14
  91:6 179:25
  181:12 188:20
  201:6 202:16
  203:8 217:2
  220:25 238:18
**checking** 80:17
  83:11 217:10
**checks** 216:14,21
**chief** 31:7
**chronology** 14:25
  15:15
**circulating** 137:23
**circumstances** 92:8
**city** 28:10 71:24
**Civ** 1:6
**clarification** 24:22
  204:10
**clarified** 73:7
  201:16 203:17,24
**clarify** 14:18,20
  17:25 28:12 29:24
  54:21 65:19
  103:13 126:9
  140:25 145:5,8,18
  145:18 192:18,25
  196:7,23 198:16
  231:18
**class** 8:11,18
**clause** 159:8 190:10
**clear** 40:21 65:6
  103:7 126:23
  144:14,21 147:16
  148:5 150:8
  152:10 195:19
  205:11 208:3,5
  223:25 229:11
  240:4
**clearly** 76:19,22
  100:2 132:20
  134:14
**client** 22:14 32:9,9
  32:13,17 44:2
  104:20 198:14,16
**close** 181:14
**CM** 1:6
**Co** 163:14
**collaborated** 59:7,9
  182:17,24
**collaboration**
  128:18
**college** 8:19 9:19,21

9:24 10:6,22 11:3
  11:17
**column** 77:5 232:12
**columns** 75:17
**come** 36:8 45:3
  46:10 166:14,17
  169:22,23 202:10
**comes** 66:21 177:11
**comfort** 68:2
**commence** 141:23
  142:4,8
**commencement**
  141:16,19 142:2
  146:2,14 158:6
**commencing** 1:14
  224:2
**comments** 61:10
**commit** 91:9
**commits** 177:14
**committee** 38:2,4
  38:10,20,25 39:7
  39:8,10,15,24
  40:3,12 41:18,25
  42:5 45:9,12,12
  87:23
**communicate**
  232:23
**communication**
  84:20 86:11 94:14
  103:9 218:6
  233:20
**companies** 5:4 39:5
  39:6 143:8 210:13
**company** 4:18,23
  5:18 17:5,7,9
  18:19,20 21:4,22
  21:23,24,25 22:4
  22:5,6,15,17,23
  22:25 23:17,22,25
  24:2,5,7 26:6 27:5
  27:11,14,20,25
  28:4,13,13 29:11
  29:14,17 30:7
  31:17,22,25 32:7
  32:19 33:5,15,24
  42:11,24 44:23
  46:5 55:20 57:3,6
  57:12 61:6 91:19
  119:6,24 221:19
  222:16 244:22
**compare** 74:9
**comparing** 63:11
  77:4
**compensate** 151:21
**compensation**
  147:22 148:6
  151:15,19,22
  152:5,19,24

Page 248

153:15,20,21
154:11,15 155:19
compete 169:15
complete 10:8 133:8
242:10
completeness 139:9
completion 159:4
complying 173:21
component 18:7
214:7,14
components 214:2,5
compute 226:23
computer 64:12,13
concede 204:10
concept 29:4 141:20
210:19
concern 32:14
concerning 240:15
conclude 127:3,17
conclusion 163:5
condition 146:13
conditions 49:13
123:13
conduct 104:20
conference 42:2
conferred 164:4
175:19
conferring 196:4,5
confident 109:8,10
110:4
confidentiality
32:12 110:3
confirm 50:13
88:12 104:2
140:11
confirmation 86:14
confirmed 88:18
213:25
confirming 113:4
conflict 162:8
conflicting 163:23
confused 114:19
167:2
confusing 141:5
168:10
connected 203:13
Connecticut 4:13
27:22 32:23,24,25
54:17
connection 16:18
17:11,16 19:16,25
33:16,23 37:21
56:4 57:11 145:24
155:14 238:11
consent 127:4
193:15,18
consents 133:6
135:11

consider 53:13
61:13 120:15
162:13
considered 60:15
61:12 137:3
170:13
consist 124:24
consistent 208:9
230:2 236:21,24
236:25 237:2,9,11
consists 82:15
constitute 49:6
50:14 69:10 79:6
consumers 5:16
contact 221:4
contained 78:24
152:24 237:19
containing 152:18
contains 50:8 95:17
96:15 97:12,20
98:2,12 99:17
147:21 223:8
content 74:21 76:23
contention 131:17
continuation 99:23
continue 15:19,20
93:23 216:16
CONTINUED
121:9
continues 160:13,18
continuing 15:25
16:14
continuous 221:24
contract 19:20
20:18 26:2,2
33:21,25 34:14
113:21 120:15
122:20 221:11
contracts 25:11,14
25:20,22
contribute 236:9
control 161:11
162:21 163:10,15
controlling 164:7
conversation 48:16
88:5,7 89:9,15
93:15 94:22
118:14 240:15
conversations 79:22
79:23 84:8 102:2
233:18
convey 143:3
164:18
cool 184:15
copy 75:4 112:5,6
114:4,6 115:16
117:10,19 119:9
119:15

core 188:4 212:4
corner 75:16
corners 41:15
correction 51:3
correctly 47:19
121:15 133:16
144:10 176:25
corresponded
233:22
corresponds 56:20
Cort 17:10,18 18:5
18:9,14 19:10,23
20:4,6
counsel 60:11 84:15
85:24 90:21 91:7
92:3 93:5 95:11
163:22 164:4
175:19 196:4,6,11
196:12 199:25
238:13 241:5
counselor 86:17
230:3
counsel's 98:22
163:19 233:7
country 87:9,17
COUNTY 242:5
243:5
couple 194:5
course 10:21 11:10
11:11,13,14 13:10
13:24 14:3,4,19
15:23 16:8,18
37:18,20 60:3
163:4 170:16
218:11
courses 10:11,12,14
13:11,15,16,20
14:22
court 1:2 3:13 70:3
70:9 80:4 81:20
90:22 102:18
105:8
courts 163:5
cover 107:3 108:5,8
135:17 136:2
create 168:23
credit 11:24 12:4
143:11,11,18,22
143:23 144:7,11
144:21 145:9,12
145:16,19,23
146:15,17 147:8
147:15
creditor 36:24
52:13
creditors 36:23
38:9
cribbed 58:6,11

critical 18:6 92:10
CRR 243:23
cure 172:20,22
173:2
current 127:4 143:6
143:15 146:6
147:6 166:16
currently 26:19
30:12 31:7 143:18
226:9
customer 35:6,7,9
35:12,14,23
cut 58:12 65:5
cutting 58:16
cut-and-paste 59:17
C-A-R 216:10
C-A-R-R-I-N-G-...
216:11
C-O-R-T 17:10

_____

**D**

D 81:23 82:15,19
83:5 85:20,21
88:23 100:22
242:3 244:15
Daily 187:10
data 175:10,12,25
176:11,14 187:7
219:14,22,25
date 7:16 8:21
23:19 35:17 38:6
50:18,24 62:8,23
65:18 70:7 80:8
81:24 87:20
100:16 105:15
123:22 141:25
142:13,19,20
158:6 159:4,12,14
171:21 179:6
205:21 219:5
221:21,23 235:9
235:24 236:10
dated 71:8 80:13,14
110:7 166:6 235:7
244:24
dates 12:21 46:19
50:17 81:6 96:8
167:7 203:9
DAVID 2:11
day 45:14 51:24
91:21 107:19
115:25 142:15
180:18 242:18
243:20
days 119:5 158:9
189:20,22
day-to-day 24:18
deadline 102:20,25

104:22
deal 106:22 181:3
dealing 14:5
decade 119:7
December 14:23
decide 163:6 211:10
decision 15:11
25:24 169:5,7
dedicated 139:3,16
default 173:2
174:11
defaulting 173:2
defaults 172:24
defendant 1:8,12
2:9 241:11
defendant's 62:19
62:22,25 63:12,19
64:17,22 67:4,16
67:22,24 68:13
69:24 70:3,6,10
70:17 71:4 73:2
74:23 75:21 76:11
76:21,24 77:21,22
80:5,7,10 81:23
82:15,18 83:5
85:10,20 88:22
93:23 94:4 99:4,6
99:14,16,17
100:12,18,22
105:11,14 179:2,5
216:16 240:17
244:10
define 61:15 139:4
148:19 209:19
216:23
defined 103:24
142:15 216:22
defines 138:23
152:18
defining 229:17
definitely 103:12
definitively 199:18
degree 11:2,5,25
13:4 14:10,17,24
15:2,8,12,17 43:5
120:4
deleted 207:2
deliver 69:21
demand 102:12
department 216:3
217:4
depend 157:5
depicted 75:17
depiction 100:11
deposition 1:11
3:10 49:4 60:20
91:18 93:5 101:21
162:20 163:8

184:5 201:19
238:16 241:7,7,10
241:12,13 242:9
242:12
derived 56:3 174:3
deriving 201:12
derogatory 58:10
describe 16:4 32:8
49:10,12 130:15
209:19
described 49:21
155:18
describes 236:7
Description 244:9
desirable 211:23
desk 111:14,15
115:23
despite 205:19
details 94:25 128:19
determine 75:6,12
76:25 79:17 83:25
85:2 104:20
determined 82:10
202:8
develop 32:22
developing 32:20
diagram 48:21
141:9
dialogue 167:19
dicker 77:9
difference 43:22
131:24 132:4
198:5
different 67:19
74:12,13 154:7
207:4
difficulties 36:9
37:6,21
dinner 45:17,19
46:2
direct 5:16 35:25
68:5 102:11
122:14 184:11
194:3 230:13
231:2
directed 154:23
156:21 194:20
228:19
directing 184:19
230:17
direction 216:19
directly 5:19 34:2
41:8 143:12
disagree 76:16,18
181:23 188:21
208:11
disagreed 153:14
disagreeing 91:5

153:17
disclosing 32:12
discrepancy 202:11
discuss 61:21 84:22
85:18 86:13
discussed 85:10
86:4 94:25 95:21
97:4 128:10
135:24 138:12,14
163:8 167:16
188:17 199:25
discussing 45:6
49:13 131:21
168:18 196:11
discussion 46:2 70:8
104:10 105:7
118:12 135:12
136:8 138:4
165:16 168:11
186:8 203:19,21
218:12 219:9
227:14 234:18
239:7 240:12
discussions 35:4
88:12,19 128:13
168:2,13,15,17
169:14 201:24
distinct 106:14,16
106:17
distinction 28:7,8,9
132:24 134:11
distinctly 106:18
distributed 34:3
distributor 35:21
36:5
district 1:2,2 28:10
divide 30:15 224:24
document 19:21
34:4,8,9 49:3,6
51:8,10 53:5,7,17
53:21 55:2,3,4,9
57:20 58:6 61:9
61:14,20 62:25
63:3 70:5 80:6
81:21 83:5 94:10
98:20 99:7 100:18
100:23 105:9
106:11,13,14
111:16 116:12
120:15 121:12
122:11,13 124:18
128:9,14 129:6,13
129:20 130:14,16
130:20 131:7,11
131:20 132:6,11
132:16,21,21
133:18 134:7,8,16
134:18,19 135:20

136:20 137:11
141:3 170:17
173:3,4 179:3,4
222:8,14 223:5,6
235:24 244:13,14
244:19
documentation
20:6 34:10
documents 19:25
20:8,11,14,21
75:13 89:24 91:16
93:9 101:25 119:4
doing 9:15 19:6
48:22 80:18 81:13
83:12 174:7
dollar 23:7 24:20
40:7 182:21
183:17 197:16
204:12 208:6
213:16,20,21
214:21 215:12
229:7,17,18
dollars 201:14
214:2 215:5,6,18
223:22 229:8,11
229:11,12,12,14
230:7,8
done 19:9 41:25
58:15 94:9 96:3
116:11,25 121:17
129:13 160:5
213:13 240:8,9,10
240:11
down 46:15 67:10
78:20 87:15 114:3
130:2 147:17
157:9
downtown 28:10
draft 52:19,22,24
53:4,13,24 54:4
55:8 56:19 57:11
57:16 58:15 59:20
59:22,25 60:15,17
60:22 61:9,14,19
62:2,6,9 122:5
154:9
drafted 54:23 57:10
57:14 124:5
198:23 229:3
drawing 139:21
140:2,13,17
drawings 139:2,16
due 158:9 159:3
171:20
duly 4:4 121:5
243:12
Dunn 29:9 31:3,17
31:21 38:22 39:7

165:23 167:24
237:7,9,21
Dunn's 31:5
during 9:15 41:17
88:14 89:10 93:17
96:17 102:3
104:12 165:8
168:5,6 169:6
170:7 183:24
214:19 242:11

E

E 2:2,2 105:11,14
121:2,2 242:3,3,3
243:2,2 244:17
each 45:21 133:6
135:8,10 146:2,14
146:16 158:5,7,8
158:16,17,18,25
159:2,5,17 160:17
171:18,19 185:22
229:6,10,16 233:2
earlier 100:7
103:11 122:10
196:17
earliest 66:14
early 14:11 126:3
easier 67:25
Easily 144:4
education 11:18
13:14 15:20,25
educational 15:16
16:15,19
effect 3:12
eight 138:7,8
either 5:3 56:13
65:11 67:17 94:17
103:6 106:10
128:15 137:3
150:22 170:11
172:2 180:17
203:23 205:22
207:22 225:14
electronic 72:3
electronically 68:21
69:22
elizabeth 2:12
102:24
ELLIS 2:8
employed 7:21
employees 22:15
24:7 27:16
employment 7:11
enclosed 52:19
176:24 197:25
encompass 124:6,6
encouraging 169:3
end 14:23 49:23

50:10,13 69:13,14
79:11 85:4 123:3
133:3,5 139:11
148:15,18 159:12
180:4 185:16,25
186:24 187:2
189:18 209:24
213:13,13 230:22
ending 98:9
English 112:7
enough 27:17 33:15
52:12 64:8 67:23
78:19 141:6 144:4
182:18
enter 122:19 125:14
135:21 136:3,19
entered 127:2,9,16
enterprises 5:5
entire 50:2,8 72:21
106:12,15 203:11
203:15
entirely 201:5,7,13
entirety 230:9
entities 30:2,8
entitled 141:15
148:22 149:20
150:11 160:7,23
175:3 195:8
208:16 231:21
entity 6:12
entries 229:2,6,10
229:17,24
entry 230:5,6
envisions 168:25
equal 225:21
236:17
equivalent 49:20
236:17
error 180:8,9
escalations 208:21
escrow 179:13,21
180:19 216:15,17
217:13
escrowing 178:16
ESQ 2:6,11,12
essence 227:4
Essentially 234:20
236:12
established 65:13
67:17 97:6 128:14
139:10 209:9
estate 22:7,12 24:20
25:12
et 232:14
evaluate 39:23
185:22
even 61:19 158:22
173:4 187:15

Page 250

| | | | | |
|---|---|---|---|---|
| 215:13 224:16<br>225:20 226:4,9<br>**evening** 45:15,16<br>**event** 172:11<br>**events** 8:16<br>**eventually** 169:2<br>**ever** 16:18 44:20<br>53:21 79:20 125:9<br>137:8 156:3<br>188:23 193:17,20<br>219:16,17,21<br>222:12,18 225:14<br>227:6,14 232:23<br>238:15<br>**evergreen** 159:8<br>**every** 60:20 66:5<br>102:12 229:24<br>230:5,6<br>**everything** 93:9<br>104:8<br>**evolve** 169:2<br>**exact** 35:17 38:6<br>225:5 227:16<br>**exactly** 14:24 48:24<br>94:23 103:23<br>155:11 235:3<br>239:13<br>**examination** 4:8<br>121:9 218:22<br>228:5 231:19<br>233:6 235:21<br>237:17 243:11,13<br>244:4<br>**examined** 4:6 121:7<br>**except** 3:7 139:24<br>190:15<br>**exception** 205:17<br>**excessive** 145:4<br>**exchange** 62:20<br>94:13 244:11<br>**exclude** 94:20<br>**excuse** 84:15 86:16<br>92:14 152:4<br>238:13<br>**executed** 26:2<br>138:11 169:11<br>**executing** 241:14<br>**execution** 192:5<br>227:21<br>**executive** 8:4 15:25<br>31:7,13 119:6<br>163:13,14<br>**exhibits** 46:24<br>62:14 74:7 79:5<br>81:7 88:25 89:8<br>92:3 93:4,12,24<br>94:5,8 99:3,4<br>101:20,22 184:5 | 222:4 234:16<br>244:8<br>**exist** 76:21<br>**expect** 53:14 127:18<br>189:4,7 209:7<br>210:18<br>**expectation** 164:5<br>211:20 227:22,24<br>232:24<br>**expectations** 168:19<br>168:20<br>**expected** 53:12<br>72:19 189:11<br>209:20 236:16<br>**expecting** 183:24<br>209:10<br>**experience** 46:4<br>**Explain** 43:24<br>**explaining** 234:19<br>**explicit** 173:8,25<br>229:17,19 230:9<br>**explicitly** 146:22<br>152:18 180:2<br>182:20 229:21<br>230:21,23<br>**extent** 32:11 55:21<br>68:2 91:12 145:14<br>192:23 220:13<br>**extra** 12:18 30:19<br>**e-mails** 66:13 71:4<br>74:6 78:5 82:12<br>83:6 84:8,10,14<br>84:18 85:15,16<br>86:3 90:15,18,19<br>90:23 91:4 92:4<br>96:8,12 97:9<br>102:18 104:21,25<br>183:23 184:2<br>233:19<br><br>**F**<br>**F** 121:2 179:2,5<br>216:16 243:2<br>244:19<br>**fact** 66:13,24<br>127:25 181:21<br>202:15<br>**factor** 155:4 200:4<br>202:23<br>**failed** 173:15<br>**fair** 27:17 31:2<br>33:15 52:12 56:2<br>61:18 64:8 67:23<br>78:19 136:10<br>141:6 154:6<br>182:18 205:15<br>221:9 241:15<br>**fairness** 174:4 | **faith** 133:8 136:3<br>221:2<br>**fall** 9:16<br>**familiar** 66:12<br>**family** 5:5 32:18,21<br>33:3<br>**family-owned** 32:19<br>**Fannie** 17:23<br>**far** 36:4,7 77:4<br>101:22 170:8<br>**fashion** 92:19<br>159:18<br>**father** 169:6,8<br>**fax** 107:4 108:5,25<br>111:25 237:21<br>**faxed** 105:25 106:3<br>106:7 112:5,5,10<br>112:16,24 113:3,7<br>114:16,20 115:9<br>115:10,15,21<br>237:18<br>**faxes** 115:23<br>**February** 1:14<br>36:10 37:4,22<br>38:7 41:24 242:9<br>243:20<br>**federal** 17:15,23<br>**feel** 26:21 190:12<br>201:18<br>**feeling** 94:24<br>**feet** 202:9 224:17<br>224:21 225:2,3<br>226:11,17,19,20<br>226:24 227:17<br>228:9<br>**fell** 39:14<br>**felt** 60:24 120:5,8<br>137:12<br>**few** 187:14 208:10<br>234:5<br>**figure** 120:12<br>**file** 21:2,5,10 44:2<br>55:6,9 100:11,15<br>111:12 117:7,10<br>**filing** 3:4 116:19<br>**final** 51:19 53:5,7<br>96:25<br>**finally** 215:23<br>**financial** 16:5 17:10<br>17:18 18:6,9,14<br>19:10,23 20:4,6<br>30:25 36:9 37:6<br>37:21 149:22<br>150:16 152:3,11<br>154:12 155:17<br>164:21 176:24<br>177:3,10,11,23,24<br>180:20 181:16 | 185:9 188:2,11<br>194:3,21 195:4<br>197:5,24 198:25<br>199:9,21 205:4<br>206:6 208:17,20<br>210:2,9,9 211:6<br>215:13 231:3,21<br>233:12,16<br>**financially** 211:11<br>**find** 52:19 79:4<br>80:22 83:17,20<br>86:9 101:19 116:20<br>120:9 197:5,7,9<br>197:13,15 228:24<br>228:4<br>**fine** 51:2 60:14 66:8<br>69:15 77:12 91:13<br>94:6 114:15<br>189:24 213:23<br>214:12<br>**finger** 184:12<br>**finish** 40:18 84:17<br>89:6 90:12 202:12<br>208:14 219:20<br>236:2<br>**finished** 14:22 15:4<br>84:16 187:13<br>196:5,11 218:17<br>221:25<br>**firm** 54:18<br>**first** 4:3 6:10 23:11<br>28:12,25 34:19<br>36:8 37:4 48:13<br>51:14 53:17,19,20<br>62:8 63:14 66:16<br>67:2 68:11 79:16<br>80:15,20 83:9<br>87:11,14 91:17<br>100:12 105:23<br>108:19 114:13<br>122:14,17 125:5<br>125:12 126:5,8,17<br>129:8 130:13<br>131:6 132:22<br>141:17,19 158:18<br>160:17 161:9<br>175:14 181:3<br>183:24 190:13<br>194:5 202:16,17<br>210:16 213:14<br>214:7 215:11<br>219:15,23 220:20<br>222:5,14,22<br>235:12,18 236:2<br>236:12<br>**five** 189:21 209:25<br>**fix** 176:12,15<br>**Flaherty** 54:19 | **Flax** 42:6,7,7 43:2<br>44:17,20 51:4<br>52:22 60:4 62:10<br>62:21 64:23 69:22<br>77:14 78:21 85:8<br>85:11,19 86:5<br>88:5,13 89:10,15<br>91:18 93:6,15<br>100:4,15 101:20<br>102:3 104:11<br>105:12 128:25<br>153:14,20 154:10<br>165:15,15,22,22<br>167:25 200:12<br>201:20 221:6<br>227:21 233:9,11<br>233:15 238:22<br>240:20,21 244:11<br>244:17<br>**Flaxes** 166:18<br>232:18<br>**Flax's** 68:12 92:9<br>219:11 241:10<br>**flip** 222:20<br>**flowed** 206:15<br>**flows** 65:7 206:18<br>**focus** 46:9 115:13<br>115:14 194:22<br>**Focusing** 167:23<br>**follow** 79:15 91:11<br>**followed** 93:7,9<br>172:13<br>**following** 124:9<br>177:7,12 224:6<br>**follows** 4:7 121:8<br>177:15 231:3<br>**foot** 160:19 164:23<br>167:11 168:14<br>171:3 177:18,19<br>194:6 195:14,19<br>195:20 196:8,19<br>197:2 198:4,10,15<br>199:9,17,20,21<br>200:3 201:14<br>202:9,23 204:14<br>205:6,13,23 206:4<br>207:10,15 208:4,6<br>208:24 212:25<br>213:15 214:8,9,12<br>225:4,5,15,25<br>226:4,4 227:25<br>228:8 231:6<br>232:17 233:16,23<br>236:18<br>**footage** 231:12<br>232:15<br>**force** 3:12<br>**forecast** 208:17,20 |

210:3,9,10 211:6
**forget** 42:8 74:19
**forgot** 202:17
**form** 3:7 12:15
   17:20 19:17 20:13
   22:2 46:23 55:7,8
   55:9,12,17,23
   56:2,5 57:10
   58:16 59:17 64:20
   92:12 111:2
   140:23 145:6,22
   154:14 227:9
   233:4
**formal** 37:10
   125:15,17 126:7
   126:13,17 136:3
**formally** 36:10,13
   36:14 37:4
**forms** 17:23 58:16
**forth** 41:16 71:4
   133:9,11 135:16
   140:20 141:8,25
   151:22 154:12
   173:19 174:5
   195:3,7,9 208:21
   208:22 214:3
   229:3 243:12
**forward** 136:21
   155:3 205:18
   210:18 238:9
**forwarded** 71:17
   72:22 73:2 238:6
   238:8
**found** 28:4
**founded** 31:3
**four** 7:14,15 117:25
   130:2 165:24
   235:17
**fourth** 37:7 102:22
**four-page** 235:24
**four-year** 10:23
**frame** 23:23 33:10
   126:3
**frankly** 67:16
**Fred** 18:21,23,25
   20:16 21:17,18
**free** 26:21 190:12
   201:18
**frequently** 39:18,20
**freshman** 11:21
**from** 7:16 8:7,19
   9:16 11:2 12:13
   13:4 14:10 15:17
   21:21 23:25 24:2
   35:25 37:17 41:8
   42:3 45:8,8,20
   47:24 48:5 50:3
   51:14 56:13,14

58:6,7,17 63:7,8,9
   64:23 65:12 67:4
   71:8,19 72:15
   73:3 80:12 84:7
   84:18 99:8,9
   100:4,14,21 101:2
   101:20 102:23,23
   105:12,21 106:14
   107:18 111:25
   114:15 121:16
   127:4 143:12
   148:15 156:24
   158:6 160:14
   166:17,22 167:12
   167:15,20 174:3
   180:23 183:6,17
   184:5 191:21
   193:4,23 200:6
   202:4 205:5
   208:18 209:13
   213:16 215:11
   218:24 219:18,21
   219:24 221:5,6
   224:20 228:22,25
   235:7 236:5
   244:17,24
**front** 70:11 88:10
   89:2 92:4 94:3
   95:8 97:11,19
   114:9 194:18
   196:14
**full** 9:23
**full-time** 16:22
**fundamental** 174:4
**further** 3:6,9 121:7
   243:15
**future** 132:21
   148:19 149:22
   151:24 154:17,18
   154:19,20,22
   155:24 156:2,6
**F-R-E-D** 18:23

**G**

**G** 242:3
**GATES** 2:8
**gave** 54:24 55:2,3,4
   84:10,23 159:17
   217:6
**general** 13:14,15
   66:18 118:14
   173:4 174:4
**generated** 58:14
   237:25
**gentleman's** 42:8
**gentlemen** 118:6,8
**getting** 108:8
**Ginnie** 17:23

**give** 8:5 15:8,12
   23:6 33:10 60:20
   78:23 79:11 82:22
   84:14 90:20 91:13
   91:14 92:23 94:10
   114:3 142:13,19
   142:20
**given** 39:23 57:19
   59:10,11,15,16
   60:11 119:10,14
   144:7 176:14
   197:16 242:13
   243:14
**gives** 96:9
**giving** 53:2 134:16
   158:9 159:3
   171:20 178:17
**go** 8:16 9:4,19 15:22
   20:19 21:21 32:13
   33:2 41:14 47:16
   64:6 78:18 82:9
   86:2,25 89:20
   90:14,15 93:22
   95:23 96:21,22
   97:3,5 99:5 145:7
   155:3 167:6
   175:15 181:15
   182:8 194:25
   198:21 201:21
   205:5 218:15
   237:16
**goes** 68:19 160:11
   195:18,20
**going** 5:15 26:16
   26:20 59:19 69:13
   69:14 77:8 82:14
   103:5 124:12
   125:4 135:21
   146:17 157:17
   164:22 169:15
   183:13 185:21
   187:21 205:18,22
   206:3 207:3,4,4
   207:10,19 209:8
   209:16,21 214:11
   217:23 219:4
   241:3
**goldberg** 1:12 2:3
**Golieb** 42:7 43:8,10
   44:9,12 72:16
   100:5
**good** 79:13 88:3
   124:17 133:7
   136:3 219:10
   221:2
**goods** 41:7,10
   143:19
**gotten** 55:5 57:18

166:24
**graduated** 8:7,11
   8:19 9:14 12:18
   14:15 195:9
**graduation** 9:16
   15:3
**great** 241:17
**grids** 74:13,14
**grow** 9:8
**guess** 41:14 61:11
   97:23 137:13
   157:8 173:24
   202:15 203:11
   221:10,13
**guy** 137:17,19
**guys** 93:8

**H**

**half** 90:8 96:19
   137:22 138:6,9
   208:10
**Hamilton** 2:4
**hand** 243:20
**handed** 117:7
**handing** 236:3
**handling** 144:14
**hand-delivered**
   68:14
**happen** 207:19
**happened** 84:2
   116:3 219:16
**happens** 210:16
**happy** 93:18 94:18
   95:3 185:14
   211:21,22 221:14
**hard** 76:24 222:23
**HARRIS** 2:12 82:2
   82:5,8 97:3
**Hartford** 4:12
   27:24 28:2,6,9,11
   28:14,21
**Harvard** 15:24
**Hassler** 96:24 202:4
   216:6 217:8
**having** 4:3 58:18
   62:5 115:25 121:5
   169:17,21 184:23
   236:25
**headquartered**
   27:23
**hear** 34:19 35:3
   36:8,13 37:5
**heard** 36:10 37:3
   91:24 125:9
   175:15 189:9
   219:24
**held** 143:18
**help** 154:2 177:6

188:7
**helped** 143:6
**her** 44:2
**hereinafter** 122:20
   123:23 124:17
**hereinbefore**
   243:12
**hereto** 139:3 151:20
   153:16
**hereunto** 243:19
**high** 9:4,14,17
   195:13
**higher** 67:2 194:15
   202:16 205:8,14
   210:3
**Hills** 9:6
**him** 26:9,11 29:25
   53:2,10,14 54:24
   55:3,4 59:12,15
   59:16 60:11 65:3
   67:5,7 78:2,8,23
   79:3,7,11,15,18
   81:3,9 86:7,8,13
   88:7 90:8,21 91:9
   91:13,25 92:4,15
   92:18,23 111:25
   113:7 114:15
   117:9 124:11,12
   164:25 165:4,5
   168:22 175:16
   185:5,8,10,11
   189:3,6,11,13
   190:2 192:20
**himself** 60:10
   192:21
**hired** 18:18
**history** 16:22
   118:15
**hit** 182:12 183:25
   210:8
**Hold** 219:20 238:24
**home** 102:9 120:3
**honest** 56:6 60:16
   60:18,19 86:25
   129:16 162:24
   220:20
**Hong** 52:9,9,11
   86:24 87:11,16
**hope** 60:19
**hoped** 87:22 209:24
   210:6
**horizontal** 76:20,22
**hour** 90:8 118:10
   208:10
**Howard** 9:6
**huge** 80:24 180:12
**Huh-huh** 141:13
**hundred** 5:22 25:10

Page 252

104:2 215:4,6

**I**

idea 23:6 43:7,9
  48:19 239:15
identical 64:16
  65:22 66:3,10,23
  67:18 75:7,10,13
identification 62:23
  70:7 80:8 81:24
  105:15 179:5
  221:21 235:9
identified 35:5
  140:12,21
identifies 83:10
identify 26:9,11,18
  69:9 86:3 96:7
  202:3
immediately 9:16
  9:19 65:3 177:12
  188:5
implicit 173:9
implied 143:20,21
  173:7
imply 151:9
important 21:10
  25:22
impression 84:14
  175:23
improper 92:21
inception 7:12,17
include 22:12 146:8
included 50:4 73:13
  146:19 195:23,25
  227:15
includes 51:13
  146:10
including 60:24
  192:21 193:2
income 207:16
inconsistent 208:9
incorporate 48:20
incorporated 7:17
  7:22 27:21
incorporation 7:16
incorrect 145:16
increase 195:11
  205:13
increased 187:18
increases 181:24
  195:6,9 205:3,5
  208:24 231:11
  232:14
increasing 195:10
indeed 103:2
  167:14
index 1:5 244:2
indicate 77:23

89:19 94:21
  110:16 158:11
  197:16
indicated 48:21
  80:23 110:17
  219:16 233:20
indicates 101:3
  132:20 236:11
indicating 53:4
  72:23,24,25 117:8
  232:13
indication 73:16
  85:13 107:6
  223:15
indications 84:7
indicative 72:18
individuals 45:8
  117:21
informally 37:5
information 78:24
  141:4,7 220:6,15
  220:17 221:11
initiatives 16:15
inside 157:10
  220:23
instances 218:5
instead 124:11
instill 20:11
institution 10:23,23
  16:19
intend 60:4 127:23
  131:4 143:3
  217:24
intended 78:21,23
  79:3,7,11,18
  99:12 107:7
  125:14,18 128:23
  130:9,12 132:11
  134:22 135:2
  144:25 145:11
  150:25 153:5
  160:24 162:3
  183:10 227:7
intending 114:20
intent 51:16,17,19
  52:20,22,25 54:4
  55:18 56:7,12,20
  56:21 57:10,11,17
  58:15,17 59:20
  60:23 62:10 81:9
  84:9 110:18
  122:16 131:8
  133:21 135:18
  138:16 148:9
  151:12 165:2
intention 185:22
intentionally 30:5
interest 43:6 55:20

interested 48:22
  243:17
interests 44:13 46:4
international 5:9,11
  5:12,13 6:11,15
  6:19 30:19
Internet 220:23
interpret 133:22
  164:6
interpretation
  133:25 134:17,18
  205:15
interpreting 183:9
  183:19
inventory 143:6,7,9
  143:10,15,18
  144:15 145:2,11
  145:13 146:6,12
  146:16 147:6,9,11
  147:12,13
invite 61:10
involved 14:4 20:22
  21:7 22:8 32:20
  35:4 42:23 43:3,4
  201:24
involvement 43:7
  44:23 46:5
involving 96:23
  168:15
issue 92:10 103:4,6
  145:9 146:15
  147:7 163:9
  196:11 219:12
issues 30:25,25
  32:12
iteration 53:17
iterations 4:23
Ito 117:22
Ito-Ya 118:15,17,19
  118:22
I-T-O 118:17

**J**

January 4:15 7:9
  16:23 37:8 238:10
Japan 52:10 86:24
  87:13,16
Japanese 118:6,7
jeffrey 1:15 4:4
  243:7,23
job 16:23 18:18
Joe 42:6,6,11
John 1:13 42:7 43:8
  44:9,12 72:16
  100:4
judge 92:20
judgment 163:17
July 189:5

June 80:25 141:21
  142:7,16 175:12
  189:5 200:6
junior 12:7

**K**

K 76:9 242:3
Kate 160:18 170:24
  176:22 206:9
keep 20:20 21:5
  55:9 92:22 157:22
keeping 20:11
  21:15
keith 1:11 4:2 68:14
  73:3 107:10 121:4
  242:7,16 244:3
kept 27:2 34:10
  221:24
kick 182:21 212:11
kicks 215:14
Kim 96:24,24 202:4
  202:7 216:6 217:8
kindly 202:18
KIRKPATRICK
  2:8
knew 42:16,23 43:4
  43:11,16 44:12
  92:7 187:11
knowledge 41:25
Kolo's 35:7,10,12
  35:15,24 36:6,24
  41:5 47:24 91:19
  128:16 169:16
  175:24
Kong 52:9,10,11
  86:24 87:11,16
KP 51:19 54:5,5
  62:21 63:2,16,17
  70:5,17,18 71:14
  72:2,6,6 73:17
  75:5,6,16 76:9,10
  76:24 77:6 80:6
  80:11 81:18,21,22
  81:25 82:6,11,12
  82:16,19,19 96:6
  96:15 97:3,13,13
  97:14,21,21 98:3
  98:7,12,12,13
  99:6,18,18 100:13
  100:19,23,24
  101:13 105:10,13
  184:15 221:19,20
  222:10,11 223:8
  223:15 228:21
  244:12,13,14,15
  244:18,22,23

**L**

L 242:3
ladies 217:5
landlord 236:18
landlords 127:4
landlord's 193:15
  193:17
language 58:25
  65:14 100:14
  128:2 153:22
  200:24 201:2
larger 25:19
last 12:19 18:23
  32:5,17 76:2 85:9
  102:19,21,23
  103:11 124:14
  125:3 126:22
  127:14 132:5
  145:8 208:10
  216:8 218:24
lasted 170:25
last-minute 15:11
late 118:3 187:15
later 20:19 21:6
  123:21 126:7
latter 9:11 33:14
launching 187:17
law 10:17,19 11:10
lawsuit 116:19
lawyer 60:25
  121:17,25 122:2
  128:6,11,16 130:4
  150:9 186:20
  194:17 197:6
  198:20,24 205:16
  228:16
layout 139:2,15,20
  140:2,12,17,21
  141:2,2,8,9,11
leading 37:10
  233:19
learn 28:25 29:3
lease 160:8 171:18
  206:7 207:7
  221:18 222:15,17
  223:17 244:22
least 107:16 109:5
  159:17 180:15
  204:22
leave 18:14 23:22
  82:17
left 27:10 68:17
  79:2 180:7
legal 163:4
lending 17:13
Leonard 42:6 43:2
  43:3 48:18 72:16
  100:4 165:15,22
  167:25 168:18

less 14:25 21:20
29:19 67:21
180:25 211:23,23
211:24
let 14:19 22:3 46:8
49:2 51:7 55:22
57:8 63:14,15
70:2 71:22 78:7
80:3,4 82:23 90:3
90:8,11 92:18
93:24 94:10 96:18
99:10 104:18
105:8,17 108:3
115:18 117:14
119:3 125:24
126:2,20 127:20
129:3,18 131:2
132:5 134:14
145:5,8,18,18
152:23 161:6
168:9 174:25
177:6 178:24,24
180:11 181:3
183:15 184:4,11
184:12,13 189:10
196:3 197:3
200:22 201:1,22
203:8 209:23
218:21 219:20
221:15 231:17
237:22 238:13
239:5 240:3
letter 51:16,17,19
52:20,22,25 54:4
56:7,12,20,20
57:10,11,16 58:15
59:20 60:23 62:9
81:9 84:9 110:17
122:15 138:16
151:12 216:15
letters 55:18 58:16
let's 4:9 47:16 51:21
65:8 67:8 82:9,17
91:16 93:20,22
95:25 99:3,5
122:13 138:15
141:14 147:17
148:21 150:14
151:11 157:12
174:21 181:15
186:17 188:4
195:6 208:14
212:4 218:15
221:16 226:2
230:10 231:10
232:25 234:13
236:2,22
level 206:5 217:15

levels 231:12
Lexington 2:9
like 16:13 26:23
32:8 41:15 53:23
65:4,6,13 66:7
68:17 86:2 89:5
100:3,11 175:5
190:20 191:2
194:3,22 220:17
221:4 223:16
224:21 227:15
231:2
likely 156:23
limit 141:2 159:5
line 41:15 67:19,21
92:17 100:17
109:17 110:10
122:19 123:10
129:5,7 130:13
132:7 133:3,19
137:20
lines 67:10 76:20,22
130:2
Lionel's 64:18
109:21,22 110:4
111:21 175:14
183:22 192:22
202:20
listed 133:15
litigation 238:12
little 11:24 51:3
207:5
live 28:24
living 32:20
LLC 1:3 4:20 5:8,8
5:15,17,18,20,20
5:25 6:5,16,17,22
7:8,11,20,21,24
8:3 29:2 30:11
31:3 32:18 33:16
34:2,6,10 132:7
221:19 222:16
244:22
LLCs 5:5
LLP 2:3,8
loan 18:7
loans 17:8,12,17
19:25 20:5,6,12
locate 114:5
located 9:25 18:25
141:21
location 139:22
140:12,16,20
142:3 145:20,25
146:3,3,7 147:3,5
147:23 148:4
150:10,18,19
151:2,23 152:6,12

152:13 165:18
181:7 224:18
235:17
locations 141:22
142:18 151:24
155:24 156:3,7
157:10
LOCKHART 2:8
logo 77:6
LOI 79:12 80:18,20
81:3 83:12 85:8
86:8 89:16 92:10
93:16 94:18 101:3
102:4 103:17
104:11 105:25
106:3,12,15,19
107:14 114:8,12
119:10 122:15
137:23 141:25
142:25 153:13
154:9 160:24
161:10,25 162:4,9
163:23 164:7
171:8 172:12,20
172:24,25 173:16
173:18 174:7
190:6 192:4,6
227:21 232:24
London 12:20,24
13:3,23
long 6:21 7:7,24
10:5 16:8 18:9
21:18 94:7 137:14
140:25 157:22
170:25 171:2
longer 219:13 221:7
look 51:21 58:20
64:22 65:11 67:8
67:25 68:18 70:11
73:17 74:20 77:8
81:6 83:15 90:3,8
93:13,20 94:4,19
95:4,18 99:3,19
100:2,19,24 101:8
122:13 125:3
126:21,22 138:15
141:14 142:24
148:21 151:11
157:12 164:13
165:18 167:6
174:21 175:5
179:7 184:2 188:4
190:12 195:6
212:4 217:18
222:6,13 223:14
230:10 231:10
234:7,13 235:10
238:14

looked 55:2 82:21
82:22 83:3 222:22
233:25
looking 51:11 56:8
67:24 69:8,11
74:7 94:24 122:17
134:7,16 147:17
149:3,23 152:4,5
175:2 176:16
185:17 186:24
194:2 205:3
208:16
looks 53:23 65:4
66:2 76:10,13
Los 17:4 19:3 21:19
28:18
lose 20:14
loss 148:6 152:19
lost 113:13,16
119:16,17
lot 169:22
Lowell 42:7 45:10
lower 63:19
ltd 1:7 5:9,11 6:11
6:15,19
lunch 117:15,20
118:9,11,13
196:18
Luncheon 120:19
L.A 19:4

M
M 2:12 242:3
made 46:10,20 47:8
47:20 48:6 50:6
115:16 122:10
193:3
Mae 17:23,23
mailbox 115:22
major 8:25 198:5
majoring 10:3
make 45:22 47:5,18
47:24 60:11 95:18
103:3,5 108:3
122:4 144:19
163:17 185:17
186:17,24 191:15
191:22 193:24
205:11,22 206:13
206:14 220:12
222:21 223:11,12
makes 72:13 74:4
144:14 229:10
making 115:19
169:5
manage 15:6 24:18
managed 22:7
24:23 25:4,9

management 23:17
24:21 42:24 43:5
managing 23:8
25:12
Manhattan 239:10
many 5:4 22:15
24:7 38:9 108:25
139:10 158:13
224:17 229:17
March 38:7 39:13
39:21 40:23 41:17
41:24 97:16,16,23
97:23 98:5
Marilyn 36:16,17
37:17 42:7 43:15
44:5
mark 62:18,19 70:3
70:10 80:4 81:19
81:20 83:18,19
101:10,11 105:9
218:23 221:16
234:23,23
marked 49:3 51:8
62:17,22,25 70:6
79:5 80:7 81:23
97:13 98:7,12
99:6,16,18 100:23
105:14 121:12
179:4 221:20,22
222:5,10 234:11
234:14 235:8,23
marker 72:3
market 29:4 196:25
198:14 225:20
226:5
marketing 10:20
11:13 13:20 29:5
29:7
marking 98:3 223:8
marriage 243:17
Massachusetts 8:8
9:2 11:20 12:2,7
12:10 13:4,7,17
13:18 14:11 15:18
Master 100:14
matched 66:3
math 226:2 228:10
matter 243:18
maximum 159:4
maybe 16:25 37:8
38:11 39:12 63:10
73:7 74:17,17
85:24 86:24 87:16
87:16 90:2,7
118:11 126:23
155:2 156:19
161:22 200:13
mean 8:14 19:20

Page 254

30:6 35:25 36:14
42:19 45:14 48:5
58:10 59:8,15
60:7 71:10 76:19
94:23 95:4 106:6
114:12 123:6,8,24
124:2,18 125:6
126:12 127:24
128:24 129:6
130:9,12,16,19
134:23 137:17
164:15,17 167:20
172:22,23 173:18
173:24 176:4
182:3,10 185:24
186:5 192:20
193:22 208:7
209:22 210:15
213:20,21 225:23
225:24 228:10
236:15,16
**means** 129:17 147:7
176:6
**meant** 38:15 40:22
69:5 123:2,9,12
124:20 143:13
151:9 194:11
211:13,15 214:21
215:11 236:22,23
**meet** 39:10,16
205:12
**meeting** 39:18,20
41:19,21 42:4,15
44:25 45:7,12,20
45:23 48:14 52:13
115:24 117:7
166:19,21,23,25
167:5,11,12,20,23
168:4,14 169:6,25
170:3,7,11,12
**meetings** 39:14,22
41:20,24
**member** 234:10
236:6
**memo** 145:10,12
146:15,17 147:8
147:15
**memory** 102:6
**mention** 187:19
**mentioned** 25:8,18
43:15,18 44:17
171:7 224:25
**Mercer** 114:3 117:7
117:16
**merger** 190:10
**Merit** 1:16 243:8
**message** 65:23
71:17 73:3,10,11

100:10 203:13
237:18,23
**met** 44:20 45:10
48:18 166:9,11
181:6
**metal** 14:5
**metallurgy** 14:4
**mid** 6:25
**middle** 71:10,15,17
73:12 207:5
**might** 10:20 20:19
37:5 55:16 57:19
58:15 88:20 95:6
102:9 107:9
113:25 116:11,24
119:17 120:6,9
121:17 123:18
136:19 155:23
156:16 162:7
210:7 216:4
218:10
**million** 23:15,16
25:3,7 40:16,17
41:4
**mind** 59:23 123:9
198:13 218:7
**minds** 170:2,3
**minimally** 210:13
211:17
**minimum** 114:24,25
115:3 160:14,18
171:2 185:20
191:18 210:12
212:18 232:25
234:21 236:14
**minutes** 90:3,6
187:14
**miscommunication**
73:9
**missed** 75:18 90:25
95:6 104:22
**missing** 76:23
**misspoke** 138:5
141:7
**mistake** 50:6
**misunderstanding**
73:8 180:12
220:11
**misunderstood**
185:6
**model** 149:22 155:9
155:10,10,11,12
164:21
**modification** 204:5
**modified** 190:7,14
190:18 218:8,12
**modify** 190:2 193:3
**moment** 82:23

**Monday** 52:14
**moneys** 179:21
**month** 141:23 142:5
142:9,21 185:17
185:25 186:24
194:7 195:20
196:8,19 197:2
198:4,13 202:10
223:24 224:14
225:6,7,9,11,15
227:25 228:9,12
228:13,14 229:4,8
229:15 230:5,8
231:24 232:2,4,6
232:8,10 233:2
237:4 239:17,25
**monthly** 175:9,11
175:24 176:10,19
176:23 177:14,20
179:15,18,21
180:3 188:10,14
191:21 193:4
195:14,19 197:17
197:23 198:2,3,6
198:8 200:4
223:23 224:12,13
229:12,15,18,24
230:22,24 232:19
236:23 237:5
240:4,6
**months** 17:2 116:14
116:16 138:7,9
183:25 187:15
189:21 202:18
209:10
**Moonrise** 32:17
33:16
**more** 14:25 25:22
30:8 39:18,20
46:15 66:25
116:22 125:15,17
126:7,17 136:3
143:8 158:12,13
158:14 161:4,8,10
168:13,14,23
189:15 204:23
209:13
**morning** 56:12
84:22,25 86:12,23
87:10 89:9,14
94:5 100:8 101:22
196:17
**mortgage** 17:5,6,12
17:13,17 18:7
19:7,20,21,21
20:12,19 21:2,5
21:10,11
**mortgages** 17:24

19:13,16 20:23
21:5 119:5
**most** 202:18
**mostly** 22:7,12,24
39:11
**mother** 46:6
**move** 46:8 136:21
147:17 169:10
206:20 210:18
**moved** 28:21 187:8
206:23 211:22
**moving** 99:15
136:21
**much** 14:8 30:10
41:5 79:25 118:7
143:9 157:7 226:6
226:12,19 228:8
**multiply** 226:12
**must** 38:6 146:12
238:7
**mutual** 118:24
170:2 190:19
192:4
**myself** 24:11 63:7,9
80:12 96:23 101:2
105:21 165:23
237:22
**M''s** 27:8

**N**

N 2:2 121:2,2,2
242:3,3
**nailed** 78:20
**name** 9:23 17:9
18:23 21:23 22:4
26:23,24 27:18
32:9 36:17 42:9
54:11 216:8
220:24
**narrow** 46:15 87:15
**narrowed** 157:9
**natural** 53:15,16
**near** 213:13
**nearby** 141:12
**necessarily** 8:13,14
25:21,23 55:14,15
57:2 61:2,15
72:12 135:17
151:3 169:8
204:24
**need** 61:22 90:14
138:2 223:10
238:18
**needed** 39:16 53:3
169:10
**negotiate** 25:16,19
123:19 136:11
**negotiated** 25:14,25

123:16 137:5,9
144:15
**negotiating** 25:17
**negotiation** 136:12
137:21
**negotiations** 133:8
154:18,23,25
157:5,7
**neighborhood**
23:14 189:14
**net** 178:11,11,11,12
180:16,21 181:6
181:18 185:7
187:2 189:18,21
194:11,14 195:10
205:12 213:6,8,9
215:2,5,6,8
217:14 231:12
232:13
**never** 47:8 61:11
135:24 161:16,18
170:6,7 172:19
175:20 209:12
223:5
**new** 1:2,13,13,17
2:5,10,10 4:5
14:17 48:19
156:23 242:4,5
243:4,5,9
**newest** 66:16
**next** 43:11 52:16,17
68:16 81:20 83:14
83:16 115:25,25
138:25 150:14
151:17 177:6
**nice** 168:24
**nine** 94:8
**nobody** 192:21
**none** 88:25 89:8
**nonperforming**
22:9,10
**non-disturbance**
193:16,16,20,22
**noon** 102:19,21
**Normally** 66:22
**North** 5:13,19
**notary** 1:16 4:4
121:6 242:22
243:8
**noted** 241:18
**nothing** 39:15 58:18
73:5 89:19 91:10
101:14,17 104:3
135:23 138:10
147:15 182:19
190:6,13,17
**nothing's** 97:24
**notice** 36:15,21

37:11,17,17 98:24
158:9 159:3,18
171:20 219:15,18
220:3
**notified** 175:21
**November** 216:24
**number** 49:19
62:21 63:2 160:8
165:14 167:11,15
167:16 201:13
211:6 220:24
232:16 233:16,17
244:9,11
**numbered** 126:21
126:23
**numbers** 70:5 75:4
75:7 76:23,25
77:2 200:2 208:6
210:2 221:24
229:15 233:11,12
233:21 244:13
**Nyiesha** 216:6
217:8

---

**O**

**O** 121:2,2,2 242:3
**oath** 3:12 242:8
**object** 163:3 233:4
**objection** 12:15
17:20 19:17 20:13
22:2 33:7 56:5
58:8 64:20 92:12
110:25 111:2
113:19 136:13
140:23 145:6,22
154:14 227:9
**objections** 3:7
**obligated** 180:15
**obtained** 58:17
**obviously** 43:4
**occasion** 116:22
**occupied** 226:9
**occurred** 12:23
**October** 72:16,22
**off** 12:21 47:16 70:8
71:17 95:24 105:5
105:6,7 123:22
135:12 136:7,8
138:3,4 168:11
186:7,8 200:12,24
200:25 201:5,7,13
218:15 219:9
234:17,18 238:24
239:2,5,7 240:12
240:25
**offered** 18:18
**offering** 143:10
**office** 55:10 68:17

79:2 90:15 102:9
112:19 119:21
240:23
**officer** 3:11 31:8,22
**offices** 1:12
**off-the-record**
240:14
**often** 39:10,11
**oh** 22:24 51:5 73:7
114:9 115:4,4
118:14 158:20
165:7 184:2 185:6
185:12 208:5
220:8 222:25
235:14 238:10
**once** 37:16 94:9
111:21 157:9
194:11,14 207:16
209:8
**one** 11:14,24 16:9
22:20 24:9,11
30:8 31:6 38:13
41:21 42:8 44:3
46:24 56:3 62:14
63:21,22 64:12,12
67:15,17 71:5
74:25 76:2 81:7
81:17 82:22 86:3
86:14 92:18,22
93:3 94:11,25
95:5,20,20 96:5
96:15 98:2,6,18
99:9 106:11,13,13
107:17 109:4,5
114:21 115:2,7,9
116:22 131:21
141:23 142:5,9,21
149:2 158:6,8,12
158:13,14 159:2
169:8 172:23
188:8 198:12
200:17,23 208:19
211:5 212:7
214:17 218:24
222:5 223:11
229:6,24 230:15
230:16 231:23
232:21 234:6,8,25
235:3 236:2
**ones** 10:16
**one-page** 98:20
99:7 100:18
**one-semester** 11:11
**one-year** 158:17
160:9 171:19
205:20
**ongoing** 167:19
**only** 16:9 32:13

41:21 53:19 86:10
94:8 95:5 99:11
119:9,15 140:20
141:2,8,11 151:10
153:2 166:14,16
179:15,17,20
180:6 181:18
183:8 205:11
214:24 223:11
**Oops** 219:2
**open** 28:2
**opened** 21:22 22:17
23:2 27:25 28:13
28:13 169:11
**operating** 34:12,14
**operations** 5:11
6:18 24:18
**opinion** 162:24
163:19
**opportunity** 53:2
61:14,21 91:13
92:23
**opposed** 44:2 67:21
132:21 193:2
**option** 206:7,9
241:5
**options** 160:9,10
**oral** 46:21 47:3,5,8
88:7,18
**orally** 86:13
**order** 1:14 93:22
99:5 169:10
**ordered** 90:22
102:17
**organization** 19:24
49:14
**original** 55:2,3,4
59:10,12,12,14,15
68:10 71:22 73:13
73:22 74:5 78:9
78:15
**originally** 28:2 68:8
111:19
**Originate** 17:8 59:6
**originated** 17:17
20:2,5,12 58:3,5
73:4
**originating** 17:11
19:8 119:5
**origination** 20:23
**other** 4:22,22 16:14
22:13,20,22 24:11
24:15,17 26:8,12
26:16,17 27:3,16
30:15,23 41:24
45:21 47:6 48:20
51:24 55:18 56:8
86:15 91:9 94:11

106:19,20 108:22
112:4,13,14
113:17 137:2
139:21 140:3,5
141:22 142:10,18
148:18 150:10,23
151:8,24 155:6,15
155:24 156:3,6
159:21,23,24
168:2 169:14
172:12 197:17
214:14 218:5,12
222:4
**others** 235:2
**otherwise** 88:11
**ought** 163:15
**out** 36:15,21,22
64:12,13 66:14,20
66:21 67:2 72:21
80:22 103:6 104:3
115:22 119:15
120:11,12 144:3
145:2 164:21
170:4 174:7 180:7
189:23 207:5
235:2
**outcome** 243:18
**outlined** 170:23
**outside** 5:13 43:6
85:20 87:8
**outstanding** 40:6,8
**over** 39:11 56:3
70:12 77:9 82:21
82:22 83:3 90:21
115:6 116:7 161:6
164:8 194:5
200:19 201:19
221:12 238:14
**owe** 41:5 188:24
194:12
**owed** 41:4 206:5
**own** 5:20 21:22
**owned** 6:16
**ownership** 5:22
6:14 43:6
**owns** 6:15
**O'Connell** 54:19

---

**P**

**P** 2:2,2
**pack** 102:22
**package** 102:23
**pages** 49:6,10,12,15
49:17,18 50:13
54:5 69:9 72:6
73:17,20,22 74:4
79:6 85:4 95:17
97:13,21 98:12

99:17 106:19
107:14 108:23,25
114:13 115:10
122:14 139:14,15
141:10 148:18
161:9 166:5
190:13 222:22
**paid** 164:24 177:20
207:10 213:5
214:18 215:25
216:15,16,23
217:12 227:4,8,10
239:9
**paint** 192:24
**paper** 47:14 106:7,9
106:10
**paperie** 1:7 34:20
36:9 37:5,22
109:14 139:22
140:13,18 161:21
161:25 164:6
212:22 215:25
224:17 227:18
233:8 239:9
**Paperie's** 211:25
223:7
**paperwork** 17:13
17:16 18:2,6
19:13,16 21:15
26:4
**Papyrus** 169:15,18
**paragraphs** 160:22
182:14
**Pardon** 26:10
206:24
**parent** 5:18 6:6
**parentheses** 122:23
**parenthetical**
125:19
**part** 9:10,11 14:11
19:15 20:25 21:10
33:14 37:18 100:3
119:7 135:7
160:24 180:8,9
210:24
**participate** 37:25
**particular** 22:10
52:8 61:25 223:17
234:6
**particularly** 126:2
**parties** 3:3 20:19
25:12 26:3 34:5
102:17 123:3,12
123:19 124:21
125:14 127:2,17
135:21 136:11
137:3 144:16
145:3 170:2

Page 256

180:13 183:20
190:14,19 210:17
210:25 211:3,4,8
211:16,21 227:7
241:14 243:16
**Partly** 9:9
**party** 57:24 58:7
133:6 135:8,10
137:4 172:23
173:2
**passed** 116:14
**passing** 237:14
**password** 220:17,24
**past** 55:13,23 92:16
102:24 144:8
176:14
**paste** 58:12
**pasted** 65:6
**pasting** 58:16
**Paul** 54:13,16 56:13
56:14 57:5,9,17
58:3 59:5
**pay** 160:13,18
164:23 176:19,23
177:14 180:15,24
184:23 185:7,18
187:22 188:6,10
189:4,11 194:15
197:23 198:13
204:13 206:3
212:18,25 213:16
215:17 217:23,24
225:14 227:16,25
230:24 234:20
236:13
**payable** 216:3,5
**paying** 37:14 155:5
171:2 178:14,21
179:13,21 180:17
180:18,23 189:7
200:6 212:21
236:18
**payment** 185:18
186:25 193:4
200:5 205:22
216:22 217:15
**payments** 40:5
176:20,23 177:14
179:16,18,22,25
180:3,6 188:6,11
188:25 189:4,7,12
191:13,15,23
197:24 198:3,6,8
217:12 230:22,24
231:12
**payoff** 40:4
**PDF** 241:6
**pending** 186:13

**people** 84:23 117:25
**percent** 5:22 25:10
29:19 30:6,14,16
30:16,18,19 33:20
33:24 34:6 104:2
160:19 164:23
171:3 177:25
178:7,9,12 180:15
180:23,24 181:17
181:22 182:21
183:17 194:12,15
195:5 206:2,4
207:11,15 212:11
212:19,21 213:2,4
213:15 214:14,16
214:18,23 215:2,5
215:9,14,17
226:22 227:2,5,10
234:20 236:13,19
236:23 237:2
239:17
**percentage** 33:19
155:4 226:20
**perfectly** 92:7
103:17
**performance** 30:25
**perhaps** 29:25
**period** 25:8 41:17
46:9 48:6 85:7,9
85:17,19 88:6,14
89:10 92:8 93:17
95:11 97:24 102:3
104:12 158:17
171:19 172:25
224:4,6 228:2
**permission** 82:13
**permit** 170:24
**permits** 172:25
**person** 22:20,22
24:12,15,17 25:17
26:8,12,16,17,22
26:23 27:3,13,14
27:18 169:5 221:5
**personally** 146:24
193:2
**pertained** 94:17
**pertains** 103:8
224:3
**Peter** 29:9 31:3,5,16
31:21 38:22 39:2
39:7 48:18 165:22
167:24 238:7,9
**petition** 44:2
**phone** 39:12 42:2
79:22 185:11
**photo** 41:13,13,15
**photocopy** 75:10,21
75:22 77:9

**photocopying** 76:7
**phrase** 125:9
143:14 185:25
**phrased** 53:15
233:8
**physically** 87:7
**pick** 236:19
**picture** 192:24
**piece** 106:7,9,10
**pinpoint** 235:16
**place** 70:10 165:16
222:14
**Plains** 2:5
**plaintiff** 1:4 2:4
240:18 241:9
**plan** 29:4,5,7 52:13
**please** 8:6 21:24
22:4 43:24 51:22
52:18,19 54:14
62:19 64:21 67:13
68:6 70:3,14
84:17 89:5 99:19
100:19,24 124:15
136:16 142:25
145:25 151:17,18
157:17 164:14
174:23 175:6
176:17 179:7
183:12 191:4,5,24
193:13 194:23
197:20 201:9
202:2,12 206:17
224:24 228:7
230:12
**plus** 71:5 160:19
164:23 171:3
173:16 206:2,4
207:10,15 212:18
212:25 213:15
**point** 23:10 27:10
72:25 88:9 144:18
149:24 150:17
170:12 176:5,6
181:4 184:13
187:7 189:22
219:11
**pointed** 75:15 96:19
196:14
**pointing** 72:20
100:10,13 107:24
109:15 130:4
131:14,16,18
150:9,9
**policies** 20:7,10
**portion** 77:5 96:20
109:16
**POS** 175:10,16,24
176:3,10,14

219:14,22,25
**position** 5:24 6:5,11
6:18 8:2 31:5
42:17,18 176:11
220:4,14
**possibility** 102:8
117:6,12 162:13
189:17
**possible** 48:5 57:8
58:19 78:14,17
102:14,15 113:10
113:11,13,16
119:14,15,15
120:8 125:22,23
129:9 165:18
167:8,9,10,12,14
168:3 187:4
189:19 231:23
**possibly** 57:4 88:20
**posting** 220:22
**potentially** 104:21
**Potter** 27:5,6,7,10
**practice** 54:16
144:5
**preceded** 48:14
**preceding** 188:5
**precise** 98:16 99:22
218:3
**predominantly**
32:19
**preexisting** 121:16
**preference** 163:10
**preparation** 115:24
238:16
**prepared** 54:9
57:16 121:16,25
122:2 128:15
198:24 205:16
240:25
**presence** 118:8
**present** 41:19 48:15
117:20,25 165:21
198:13
**presentation** 47:5,9
**preservation** 19:24
**president** 6:4,9,17
6:21 7:7 8:4 23:5
24:13 29:11,13
31:11,12,13 34
32:2 45:2 110:13
**pressures** 102:16
**PRESTON** 2:8
**presume** 123:2,17
**pretty** 181:13
**previous** 41:23 84:7
**previously** 75:15
121:5
**principal** 24:4

**print** 66:20 222:23
222:24
**printed** 66:15
**printing** 74:16
**prints** 66:14 67:2
**prior** 28:18 31:16
33:7 47:21,25
48:7 56:4,21,24
57:11 58:17 59:17
102:18 116:18
145:14 149:2
150:22 158:10
171:21 197:20
211:14,15 222:4
227:20 232:23
**probable** 167:16
**probably** 55:6 59:7
174:8 210:17
216:7
**problem** 84:9 92:24
220:19
**procedure** 91:12
**proceeded** 48:24
83:13
**processing** 21:8
**produce** 84:13,13
90:19 102:18
104:25 137:11
240:18 241:6,10
241:12
**produced** 85:23
88:10 89:24
102:10 116:8,9
223:7,13 235:13
235:17
**product** 41:15
143:12
**production** 91:16
103:11 240:15
**products** 35:19,21
36:5 118:23
**profit** 148:6 152:19
**profit-and-loss**
147:21
**program** 16:2,6
**project** 32:20,21
**projection** 148:6
**projections** 147:21
**pronto** 105:2
**Propeller** 221:18
222:16 244:22
**properties** 24:19
**property** 136:22
227:5
**proportion** 25:8
29:16
**proposed** 139:6
**protected** 220:18

protection 152:20
provide 127:4
  143:17 144:11
  145:11 147:13,15
  175:9 193:12,14
  220:6 221:10
provided 124:21
  146:13 175:11
provides 146:7
providing 148:9
provision 161:11
  162:8,9 172:20,25
  199:20 212:17
  213:12
provisions 163:23
psychology 9:3 10:4
  10:12 13:8,14
  14:2
public 1:17 4:5
  121:6 242:22
  243:9
purchase 36:5
  143:8
purchased 41:8
  144:8
purchases 145:4
purchasing 35:18
  35:20,25
purpose 39:21
  45:19 80:19,21
  148:18
purposes 30:21,22
  30:23 213:11
  214:10
pursuant 1:13
  33:21 216:15
push 92:19
pushed 20:5
pushing 92:16
put 49:2 51:7 59:2
  62:24 63:14,15
  70:2 80:3,9 89:13
  92:4 94:2 110:11
  110:12,13 111:12
  111:14,15 113:25
  121:11 128:6,20
  134:2 137:5
  178:24,24 184:4
  189:10 196:12
  228:16
putting 97:11,19
  115:23 128:3
  194:17
P-O-T-T-E-R 27:7
p.m 71:8 78:9
  120:19 121:3
  240:22 241:4,8,11
  241:13,18

POS 175:12

          Q

qualified 145:10
  146:16
qualifying 17:24
quality 75:10,20,22
  76:7
quarter 37:7,8
  185:22 189:18
quarterlies 189:25
quarterly 185:19
  187:22 188:17
  189:5,24 191:15
  191:21,23 193:5
question 3:7 15:19
  26:14 33:8 34:22
  40:23,25 43:11
  49:5,17 56:9,11
  68:9 75:18 83:18
  83:19 87:5,6
  88:24 92:18,22
  93:3,25 95:19
  97:10,17 98:22
  101:10,11 103:23
  115:13,14 116:10
  119:12 124:13,14
  124:15 126:9
  127:6,18,20
  129:18,22 130:6
  131:2 134:5,6,10
  134:12,15 139:24
  142:12 144:17
  145:19 152:10
  153:23,25 172:18
  175:2 183:12
  186:11,13,15,22
  189:10 190:25
  191:3,24 206:12
  206:18 207:17
  210:5 214:10
  219:20 231:13
  238:15 240:3
questioning 101:2
  218:17
questions 4:10
  91:24 93:2 157:17
  233:7
quibble 115:6
quick 140:7
quickly 140:7
  169:10
quotation 131:24
quotations 126:10
quote 80:2,4
  230:22,22

          R

R 2:2 121:2 243:2
racked 116:6
raise 137:4
raised 102:8 161:16
rate 166:16 181:17
  195:3 205:21
  215:14 223:17,21
  223:22,23,23
  224:3,8,9,11,13
  225:11,11 229:3,7
  229:13,14,18,18
  230:7 231:14
  236:17
rates 223:19
rather 134:9
reach 180:25
  184:23 231:23
  232:25
reached 23:16
  156:7 189:20
reaching 180:25
  189:17
read 34:23,24 52:18
  54:24 58:23 66:9
  67:12 68:6,11
  70:15 73:19 74:11
  82:4 83:2,9 98:17
  99:10,12 105:16
  124:15,16,18
  126:23 127:25
  130:15 132:2,15
  132:19 133:4,23
  135:13,18 138:22
  141:17 150:5
  151:13,17 152:22
  154:9 157:19
  161:20,23,24
  162:16,18,19
  163:7 168:9,12
  171:15 174:23
  175:8 176:25
  179:10 185:13,14
  186:18,19,20
  191:2,4,6 193:12
  196:15 197:22
  201:9,18,21,22
  206:13,16 222:23
  223:2 224:3
  228:22,25 236:15
  236:16 242:7
reading 130:17,23
  130:25 134:8,19
  135:14 158:20
reads 208:19
ready 80:22 105:18
  169:11
real 22:7,12 24:20
  25:12 140:7

really 8:18,20 54:24
  61:12 80:2 107:11
  116:10 118:10
  119:18 138:6
  157:8,9 165:7,8,9
  165:12 172:14
Realtime 1:15 243:7
realtor 18:24,25
  20:16 21:4,17,18
Realtors 18:21
reason 28:23
  113:17 114:4
  164:25 188:23
  209:11
recall 9:18 14:8,24
  16:13 40:7 42:4
  45:25 47:13 48:11
  51:24 55:16,22
  57:9,13 58:2
  59:25 69:25 73:6
  79:19 80:2,2
  86:22 87:19,20,21
  88:8 106:12 107:7
  107:12,14,15,16
  108:4,6,8,19,21
  108:22,24,24
  109:3,20,21
  110:21 111:6,13
  112:18 115:19,20
  117:4,5,9,12
  118:3,5 121:15,18
  122:6,8,9 126:19
  128:19,23 129:2
  132:3 133:25
  135:19 153:11,12
  153:17 154:15
  162:2 163:21
  164:11,19 165:7
  168:2,16,21
  200:13,25 218:9
  218:11
recalls 115:2
recap 241:9
receipt 61:20
  110:15
receive 102:12,13
  105:25 106:2
  169:21 175:24
  189:13 219:25
received 79:17,20
  79:21 102:22
  106:3 107:18
  109:5 111:5,25
  112:9,20 113:6
  114:15 115:23
  117:19 122:5
  145:12 147:10,11
  201:6 209:13

  219:17,21 238:2,7
receiving 60:10
  108:19,22 145:10
  146:15
recent 67:2 185:18
  189:23
recess 47:17 120:19
  140:10 208:13
  218:16
recognize 222:7,14
  222:15,16
recollection 14:14
  50:23 64:17 88:18
  88:21 93:14 94:6
  101:25 104:9,10
  116:3 117:15
  122:7 134:22
  135:14 136:9,15
  136:17 137:10
  152:3 153:18
  154:8 156:18
  166:5 170:7
  195:23,24
record 14:19 29:23
  34:24 47:16 67:13
  70:8,16 75:14
  77:3 82:10 88:2
  93:21 95:16,24
  96:2,2,7,15,18
  100:9 102:7,22
  103:7,22 104:19
  105:5,6,7 109:15
  121:10 124:16
  126:24 135:12
  136:7,8 138:3,4
  168:11,12 176:3
  185:13 186:7,8,18
  191:6 196:3 202:2
  206:16,22 218:15
  219:9 220:13
  222:3,9 234:17,18
  234:22 235:22
  238:25 239:3,5,7
  240:12,13 242:10
  242:12 243:14
records 89:18,20
  192:11 217:2
reduced 40:4
redundant 183:4,4
  183:5,6,8,16
reevaluate 210:18
refer 7:18 68:9
  122:23 123:18
  125:5 148:3 149:6
  149:11,14 152:12
  162:3 171:15
reference 68:6,7
  72:15 96:10 99:11

Page 258

149:25 150:6,10
150:17,22 154:10
171:9,22
references 95:2
referred 21:6 68:24
69:20 74:6 78:15
79:22 106:14
125:18 126:5,7
127:13 132:12
133:14 169:6,9
referring 20:24
26:12 27:2 39:4
50:17 78:25 84:18
84:20 86:10 96:11
109:2 117:18
126:6,17 133:17
147:24 160:20
179:24 200:16
233:24 234:3
refers 67:9 131:10
132:16 138:17
139:7 149:17
159:25 171:12,14
177:4 179:15,17
180:2 234:8
reflect 61:12 96:18
121:19 196:3
240:14
reflecting 34:4
reflects 123:13
refresh 64:16 88:20
93:14 94:6 101:25
102:6 117:14
152:2 166:4
refreshes 14:14
regard 6:10 46:11
47:11 55:15 102:4
126:2 129:19
139:21 154:18
163:23 179:13
191:12
regarding 201:25
regardless 180:25
206:4,5
Registered 1:16
243:8
relate 98:22
related 22:13
243:15
relates 132:18
relating 103:15
relationship 25:24
relative 97:17
relay 221:12
relevance 198:11,12
relevant 90:19 98:5
101:15,18 102:12
rely 196:21 221:5

remain 32:2
remember 8:15,18
8:21 36:16 41:22
54:25 58:20 62:5
87:14 106:18,18
106:21,24 107:5,8
107:11 108:16
110:8 115:22
127:25 128:3
131:21 132:24
136:4 163:25
165:3,13 166:8,10
168:18,22 169:4
186:2 235:3
238:19
renew 158:7,12,16
158:25 171:18
renewal 205:20
renews 205:17
rent 155:4 177:17
178:18 194:6
195:6,8,10 196:25
197:16 198:10,14
199:8 201:6,25
202:8 204:16
205:3,5,13 208:24
216:14,21 225:20
230:19 231:6,8,11
233:11,22 234:21
236:14 237:3,5,10
237:12 239:9,18
240:5,6
rental 127:3,9,13,17
127:19,23 128:20
166:16 176:20,23
177:14 179:15,18
179:22 180:3
197:23 198:3,6,8
206:5 212:18
213:15 216:22
217:12 223:17,19
223:21,23 224:3,8
224:9,11 229:3,4
229:7,14 230:7,22
230:24 231:14
236:17
repeated 93:2
rephrase 4:24 17:14
20:3 22:3 58:9
64:21 124:7 134:4
134:14 153:25
168:8,10 175:2
183:13,15 186:6
213:19 233:13
reporter 1:16,16
70:3,9 80:4 81:20
105:9 243:8,8
represent 44:6 64:9

223:6
representation
223:11,12
representative
38:18,19 91:19
representatives
38:25 41:19
represented 38:10
39:8 44:13
representing 36:17
43:10,12
request 183:22
191:22 192:22
221:4
requested 48:15,25
52:23 69:23
requesting 220:5
requests 221:5
required 180:22
214:25
requirement 14:6,7
requirements 13:14
17:13,16 18:3
19:12,24
requiring 145:4
217:15
reserved 3:8
respect 19:12 20:11
131:3 145:20
respective 3:3
respond 92:23
104:4,5,6 185:5
responded 201:17
238:19
responding 189:3
response 64:19 65:2
67:5,6 91:15
93:25
responsibilities
42:21
responsibility 30:24
143:14 146:6
147:5
rest 29:20,24
106:19 201:18
restate 127:21
206:21 207:3
restricted 161:4
restrictive 161:9,11
restroom 140:8
resumed 121:5
retail 4:20 5:8,15,16
5:20,25 6:22 7:3,5
7:11,22 30:19
132:7 141:20
142:2 209:4,13,15
209:21,25 210:2,7
210:16

retailer 118:17
retailers 5:13,19
169:22
retain 158:7,16,25
171:17
retained 26:6
return 144:5,6
145:13 147:13
revenue 208:24
revenues 209:13
review 53:3 55:3
57:18 60:6,7,9,13
60:23 61:3,21
70:21 93:18
101:24 121:25
124:22 137:12
157:16
reviewed 56:13,15
73:20 80:22
101:19 122:2,7
152:16
rights 127:5
right-to-terminate
213:12
rigorous 16:6
RMR 243:23
robert 2:6 95:23
102:15
role 42:11
rolls 207:9
royalties 180:17,18
184:23 185:3,7,19
187:22 215:25
217:15,23
royalty 160:19
164:23 171:3
177:22,24 178:6
178:14,19,21
180:16 181:16,17
181:21,23 182:5
182:21 183:3,17
183:24 185:17
186:25 188:6,10
188:20,25 189:4,7
189:12 191:12,15
193:4 194:9,15
195:2 207:11
208:25 212:11,19
212:22 213:2,5,15
214:15,18,23,24
run 210:9
running 80:25

S
S 2:2,11 121:2,2,2
salable 146:12
sale 176:5,6 187:7
195:10

sales 22:24 24:15
178:10,11,11,11
178:12 180:16,21
181:6,18 184:24
185:7,20 187:2,11
187:13,18 188:3
189:14,16,18,21
191:18 194:11,14
195:4 204:12
205:12,19 206:5
209:4,4,8,13,15
209:21,25 210:2,7
210:16 212:12,14
213:6,6,8,9,16
214:16,19,24
215:2,5,6,8
217:13,14,18,19
231:12,23 232:13
232:17 233:21
salespeople 35:5
salesperson 25:18
same 3:4,12 19:9
20:15 63:19 64:5
64:11 65:12 66:21
68:3 71:18 75:21
77:2,19 85:3
91:12 99:20,22
111:24 112:8
125:4 126:12,25
127:16 129:6,13
129:18 130:7,12
131:2,5 132:11,13
133:14 138:8
139:24 150:21
152:22 157:8
202:21 217:5
223:4,12 231:20
241:5
Sands 18:21,25
20:16 21:17,18
Santa 9:22,24,25
10:5,22 11:3,16
11:25
Saturday 102:18,19
102:21 105:22
saw 46:24 69:3 92:3
93:4 183:23
193:18 200:11
saying 39:2 65:25
75:9,20 78:16
94:18 114:17
115:5 137:18
148:13 156:22
157:8 158:24
167:4,18,21
168:22 172:6
180:7 185:5
187:16,16 188:19

188:21,22 189:4
191:19 211:12
240:2
says 73:2,13 83:15
101:8 110:10
122:19 127:15
131:8 133:10
142:4,8,21 146:2
149:23 158:5
159:5 160:8
176:19,22 177:24
181:21,23 182:20
188:24 190:6,14
190:18 198:3,8,10
212:18 215:14
224:2 229:6 230:7
230:8 231:5,11
234:12
scale 195:9
schedule 147:22
148:7,10,11
151:16,19,22
152:5,19,24
153:15,20,21
154:11,15 155:19
193:4 205:4,16
208:23 223:20
228:23 231:11
school 9:4,14,17
schooling 8:6
science 14:7
scope 5:10 103:24
screen 66:19,21
sealing 3:4
search 104:20
searched 119:20,23
120:3,5
second 27:14 51:16
71:2 82:9,11
90:10 101:13
107:24 108:2
109:9,17 122:18
122:19 123:10
126:8,18 129:7,21
130:13 158:18
202:17 219:7
secretary 240:25
see 6:17 20:20
43:21 52:12 60:24
63:18 65:10 70:23
72:4,6,19 74:12
78:5 80:17 81:8
83:11 85:9 87:24
88:19 93:13 94:25
110:9 115:4
122:18 125:13
129:22 132:6
144:9 148:2

168:23 169:22,23
186:9 190:16
200:22 202:11
205:5 211:16
231:6 235:19
238:15,17,17
seeing 106:18
238:19
seem 65:6
seems 63:25 131:10
200:12 201:13
seen 53:17,21 95:20
104:8 193:19,21
222:12,18 223:5
235:15
segalla 1:12 2:3
sell 41:10 118:23
selling 41:11
sells 5:12,16,19
semantics 155:2
semester 11:14
12:18,19,23 16:9
send 61:19 68:20
72:14 78:21 79:3
79:7,18 240:25
sending 48:24 52:21
senior 31:21 119:6
sent 36:15,21,22
50:14,23 53:10
60:22 61:8 65:3
67:5 68:8 72:12
73:10 77:13,24,25
78:2,8,14 81:2,3,9
83:14 85:8 86:6,7
86:8 101:5 111:18
122:8 128:24
153:13,19 154:10
161:21,25 165:10
166:5,8,11,24
167:5,17 184:18
199:4 236:5
237:19,24 238:20
sentence 40:19
52:16,17 67:8,12
68:3,5,12,16
80:16,20 83:9
105:24 122:18
125:3,13,18,20
126:6,8,17,18,22
127:14 131:6,10
133:4,4 138:22,25
145:9 146:10
151:13,17,18
sentences 139:4
141:17
separate 23:25 24:2
September 12:13,14
12:25 16:23 35:16

35:24 39:17
served 38:20
set 38:5 71:4 89:23
133:9,11 135:16
140:20 141:8
151:22 154:12
173:18 174:5
195:3,7,9 214:3
229:3 243:12,19
sets 141:25 208:21
208:22
seven 38:12,25 39:3
39:6
seventh 49:24
several 27:16 75:17
95:17 183:23
196:16 229:2
shares 34:2
sharing 93:8
sheet 107:4
Shin 117:22
shop 140:14,18
180:4,17 181:7
shops 46:12 47:12
shop-in-shop 48:17
55:15 73:23 80:24
84:22 103:16
118:18 139:6
143:7 165:19
168:3,15,19
169:16,17,20
173:14 187:9
209:5,8,16 210:7
210:19 211:16
217:14 225:16
shop-in-shops
48:20,22 168:23
169:2
shorten 63:10
shotgun 92:25
show 76:19 123:7
139:14,15 176:9
200:14
showed 48:18 87:22
showing 139:2
shown 77:15,19
140:16
shows 76:22 208:23
sign 53:10 80:23
110:11 111:16,17
111:24 112:8,25
113:10,14 123:12
123:15,20 124:22
signature 82:5,8
106:7,11,17,25
107:18,21,22
108:13,17 109:6
109.10,12,16,19

109:22 110:5,10
111:21 112:10,16
112:16,24,24
113:2,3,7 114:7
114:16,22 115:7
115:15,15,16,21
132:7 133:3,5,19
signed 3:10,12
83:14,25 84:3
101:3,4,5 110:2,9
110:17 111:18,22
112:5,15,18,23,25
113:7,8,12,21
117:10,11,11,19
124:5
significance 21:14
59:24 61:25 62:6
119:4
significant 61:12
137:3 169:24
significantly 210:3
signing 20:22 80:18
83:12 92:9,9
115:24 123:4
124:2,4 133:5
135:7,10 232:24
similar 19:11,12,15
55:6,8,13,17,23
57:10 64:2 66:2
139:20 162:9
Simon 36:19 37:17
42:8 43:15 44:5
simply 207:2
since 4:15 7:12,25
16:15 35:10 102:7
116:14,21 119:5
137:22 138:10,11
175:12 189:21
216:2 218:7
single 105:9 107:9
114:16
single-page 80:10
sir 31:4 33:18 80:11
80:16 85:22
117:20 150:15
183:8 189:3
192:15 196:16
231:13
sit 61:24 175:22
situation 32:6 57:21
situations 55:24
six 38:11,24 39:2,6
67:10 187:15
size 25:21 226:7,8
sketch 8:6
slow 37:14
small 222:24
smoothly 206:15

Soho 73:24 136:25
140:3,5 148:3,17
148:22 149:4,6,11
149:14,17,20,23
150:11,11 151:2,5
151:10 154:16
156:21 157:23
160:8,23 161:8
164:8,13 165:17
170:23 175:3
180:16 181:7
190:3 197:21
198:24 204:13
212:8 214:4
230:10
solution 143:5
some 4:9 27:10 40:4
43:5 59:13 75:6
113:17 114:4
116:17 120:4
128:18 143:11
157:17 170:11
180:8,12 208:9
218:10
somebody 128:19
somebody's 215:14
221:11
someone 48:5 57:19
57:22 60:22 61:8
61:19
something 14:18,20
16:13 51:6 54:21
55:21 90:13
110:14 163:18
174:6 192:24
220:21 224:21
227:15 231:18
239:6
sometime 16:12
18:13 33:13 35:2
35:16 37:7 39:13
41:23 46:17 79:24
Sometimes 159:7
somewhat 141:4
somewhere 17:2
23:14,21 37:9
soon 102:13,15
189:8,12
sophomore 11:22
11:23
sorry 5:2 7:3 10:18
16:13,23 20:3
24:11 32:18 34:21
36:12,16 40:16
49:19 50:3,6,7
51:5,23 52:9 58:4
62:5 63:9,23 64:4
77:22 86:6 94:16

Page 260

98:17 106:16
108:21 118:16
128:22 130:11
134:13 136:24
146:21 149:10
158:2 163:25
169:23 174:25
176:22 186:5,14
196:2 204:25
218:2 228:15
237:22
sort 128:18 169:25
sorts 41:10
sounded 241:16
SOUTHERN 1:2
space 136:22,23,25
  138:24 139:5,7,16
  139:21 140:2,3
  141:8 157:22
  158:22 159:16
  168:24 211:6,9
  226:8,8 227:11,17
spaces 139:3
span 39:17
speak 15:3 230:21
speaking 45:15
  66:17 224:20
  234:10
specific 7:16 122:10
  125:24 135:24,25
  140:12,16 141:25
  142:19,20 159:14
  165:8 169:4 173:3
  173:6,7 174:6
  184:25 207:14
specifically 13:11
  46:15 94:13
  100:13 142:5
  143:23 165:3
  224:16 229:13,14
  234:12
specified 204:15,17
speculate 111:9
  113:23
speculating 111:7
spell 18:22 54:14
spelled 174:7
spend 118:8
spent 12:9 29:16
  30:7,7,10
spot 52:8
spring 136:24
  138:24 139:5,8,16
  140:4,22 141:10
  141:21 142:3,12
  145:20,24 146:3,8
  146:11,20 147:2,4
  147:8,14,22 148:3

149:17 151:19,23
152:6,25 153:16
154:11 155:19
156:15,21 157:23
159:16 179:14
180:3 205:21
224:18 226:10
square 160:19
  164:23 167:11
  168:14 171:3
  177:17,19 194:6
  195:14,19,20
  196:8,19 197:2
  198:4,10,15 199:9
  199:17,20,21
  200:3 201:14
  202:9,9,23 204:14
  205:6,13,23 206:4
  207:10,15 208:3,6
  208:24 212:25
  213:15 214:7,9,12
  224:17,21 225:2,3
  225:4,5,15,25
  226:3,4,11,17,19
  226:20,24 227:17
  227:25 228:8,9
  231:6,12 232:14
  232:17 233:16,22
  236:18
Ss 242:4 243:4
staff 216:19 220:22
  234:10 236:6
stake 33:16
stamp 80:6 235:5
  244:14
standpoint 45:20
stands 104:9
staple 82:14
stapler 82:17
start 4:9 7:10 8:2
  11:21 16:22 93:22
  160:14 161:6
  210:8
started 12:6 35:23
  46:7 211:22
starting 63:7 69:12
  79:10 83:7 84:12
  98:8,14 135:5,7
  143:7 146:3 147:2
  147:4 148:14
  151:15 177:17,22
  177:24 178:6
  181:21 182:4,10
  183:2,2,16 194:6
  194:9 198:10
  199:8 223:20,22
  231:5 236:12
starts 68:5 71:17

125:13 184:13
195:19
state 1:17 4:5
  123:21 131:12
  179:12 180:5,23
  182:9 191:8
  197:18 242:4
  243:4,9
stated 135:20
  188:23 191:19
  198:14 203:2,4,4
  223:19
statement 145:15
  153:14 188:24
  189:3 222:21
states 1:2 160:12
  180:20 182:4
  223:21,23 229:19
  229:21 230:6,23
statistics 13:13
stay 158:21 159:15
  159:18
still 19:4 24:4,13,15
  29:10,11,13 32:2
  99:14 137:15,18
  223:4
stint 11:16
STIPULATED 3:2
  3:6,9
stop 35:14
stopped 35:25
  39:13
stops 195:22
store 48:19 73:24
  136:25 138:24
  139:5,8,17 140:3
  140:3,5,22 141:10
  141:20,20 142:2
  142:13 146:14,16
  147:8 148:7 149:7
  149:12,15,17,25
  150:2,3,4 151:10
  153:2 156:15,21
  157:23,23 159:16
  165:18 166:10,12
  169:12 176:7
  179:14 180:16
  204:13 224:18
stores 142:10
  146:18 148:19
  149:22 150:7,23
  151:8 154:17,19
  154:22,24 155:6
  155:15 157:10
  234:21 236:14
  239:10,18 240:5
street 1:13 4:12
  136:25 138:24

139:5,8,17 140:4
140:17,22 141:10
141:22,23 142:3
142:12 145:20,25
146:3,9,11,20
147:2,4,8,14,22
148:3 149:6,11,14
149:17,25 150:2,3
150:7,18 151:20
151:23 152:6,13
152:25 153:16
154:11 155:19
156:15,21 157:23
159:16 169:18
179:14 180:3
204:13 224:18
226:10
strike 38:19 41:3
  45:4 57:14 118:6
  121:23 125:25
  127:7 143:2
  152:20 161:5
  162:16 170:21
  171:5 206:8,17,20
  206:23 211:7
  212:16
string 65:7 66:13,16
  66:25 70:24 71:2
  71:3 72:21 73:4
  81:22 82:12,16
  83:6 85:12,14,16
  95:21 97:16,23
  99:23,24 100:3,5
  201:18 203:11,15
  244:15
strings 92:4 93:4
strong 117:5
strongly 113:12
structure 6:14
study 10:8 13:6,24
  16:8
studying 14:2
style 74:19 92:25
sub 6:16
subject 100:16
sublease 127:5
  158:5,7,16,25
  171:18 193:15
submission 47:25
  170:12
submit 89:7
submitted 47:22
  49:7 57:17 73:23
  74:5
submitting 48:7,12
Subscribed 242:17
subsequent 41:24
  137:5,8,21 146:18

168:7,8 192:5
subsequently 45:11
  45:13 48:23 144:3
subsidiary 19:7
substance 45:25
  74:22 85:11,13,18
  86:4 88:13 89:15
  93:16 94:17,22
  102:4 104:10
  128:13
substantial 188:24
substantially
  187:18 202:16
substantive 168:2
suburbs 28:11
success 209:16,18
  209:19,22
sufficient 90:6
suggest 37:17 89:9
suggestion 84:11
suggests 85:17 86:4
  89:14
summer 14:21
Sunday 62:10 81:10
  98:14 99:8 102:24
  103:10
super 104:25
supposed 164:18
  171:24 183:17
  188:6
sure 8:11 10:25
  16:11 33:14 35:17
  38:12 47:18 53:23
  58:25 59:3 60:11
  64:22 93:19 95:18
  104:2 108:3
  110:14 111:15
  112:11 125:22
  132:17 140:9
  144:20 180:10
  185:14,15 186:17
  186:22 193:24
  197:4 200:15
  201:11 206:14,14
  216:25 219:8
  220:12 222:21
  223:13 226:5,25
  235:20
Surely 82:24 238:14
surprised 84:3
surrounding 92:9
sworn 3:10,13 4:4
  121:6 242:17
  243:12
system 220:21
S-A-N-D-S 18:24

T

T 121:2 242:3 243:2
243:2
**table** 79:5 88:11
89:4 93:12
**Taft** 9:6
**tag** 65:18
**take** 10:11,14 14:3
14:3 33:15,19
37:20 46:23 57:25
58:14 61:20 66:4
66:5,6 74:8 82:25
85:25 90:3,8 94:7
95:17 99:3,19
100:19,24 111:22
116:6 119:20
137:19 139:6
140:7 144:13
147:6 165:11,16
175:22 176:9,11
179:7 180:14
207:5 222:6,13
223:14 224:23
225:24
**taken** 1:11 13:13
15:23,23 47:17
116:11 119:9
140:10 208:13
218:16 242:8
**taking** 33:24 115:22
**talk** 51:23,25 155:5
165:5 219:6
**talked** 85:13 169:19
**talking** 26:17 51:25
61:5 71:18 93:10
103:18 155:2
165:3 178:18,18
199:19,21 203:10
**talks** 200:20
**Tammy** 27:5,8,10
**target** 35:5
**taught** 16:18
**tell** 21:24 22:4
26:21 28:4 38:4
48:11 51:12 58:23
63:5 72:13 73:15
80:11 83:4 96:9
97:2 105:19
115:20 127:12
134:25 136:15
145:25 154:4
161:13 166:23
179:8 185:8,10
199:17 205:10
208:22 211:13
219:17 222:7,13
223:15 236:3
**telling** 103:7 186:20
187:14 189:6,11

189:13
**template** 121:16
122:5
**ten** 90:3,5 159:16
189:20,22 222:4
229:24
**term** 127:23 139:25
144:2,15 157:12
157:17 158:5
159:10
**terminate** 160:12
160:15,16 164:16
164:22 165:2
170:5,14,22,24
171:7 172:3,5,6
172:14,16 173:14
173:22 174:9,10
174:14,19 205:25
207:12,23,24,25
211:19,19,25
212:17,23 213:3
213:17 214:3,25
215:19
**terminating** 206:7,9
**termination** 98:25
158:10 171:10,21
171:23,24 199:20
**terms** 12:13 16:17
16:21 20:20 49:12
50:4,8 123:13
124:6 133:7,9
134:2,23 135:16
135:19,22,23,25
136:2,4,11,18,20
137:2,4,13,22
138:12,13 148:17
148:19,22 149:4
149:24 150:12
156:24 157:5
159:19,21,23,24
160:20,24 161:4,8
164:8,14 170:24
171:5,22 172:12
172:24 173:15,17
173:22 174:22,25
175:3 177:7,12,13
178:4,7 188:4,9
190:3,22 191:17
191:20 192:3
193:10,11 197:21
198:25 201:13
207:8 212:4,7,8
214:2,4 218:8
230:11,16,17
231:4 233:8,9
**testified** 4:6 47:20
49:8 56:11,19
84:21 86:12 87:10

100:7 103:20,21
114:24 121:7
144:20 192:19
194:7 196:16
**testify** 86:23 131:19
**testimony** 35:19
50:22 58:2,22
62:2 103:25
111:22 112:8
117:3 119:8,11,13
120:16 121:14,20
121:23,24 130:22
130:22,24 133:13
134:7,21 144:13
144:24 147:7
162:6,12,15
173:10,13 175:14
180:14 189:9
194:10 199:24
202:20 203:18
208:7,8,10 212:10
213:25 217:11
219:11 225:12,13
233:15 242:8
243:14
**text** 64:15 65:21
67:20 100:10
**thank** 32:16 34:25
36:20 50:5 79:13
83:15 88:3 101:7
152:8 153:4 175:4
193:7 202:18
218:19,20,21
228:3 230:25
231:16 235:10
241:17
**their** 19:7 46:4,4,5
46:6 48:19 102:18
143:6,10 144:14
166:15 198:12
220:24 237:9,11
239:9,18,18,25
240:4,5,6
**thereabouts** 203:25
**thing** 126:12 128:25
157:8 169:8
**things** 59:13 63:10
164:20 173:18
**think** 7:14 8:10
10:21,24,25 11:6
12:17 15:10 16:25
23:20 26:24 28:17
29:5 32:17 33:12
37:7,15 46:3,18
52:10 53:22,22
54:25 56:10 59:2
59:6,24 61:25
68:14 72:13 74:4

81:15 85:3 88:17
89:7 94:7 98:5
112:2 114:2,14
116:11 121:21
129:12 130:23
132:16 134:21
138:5 139:9
144:21 146:23,24
162:7,14 166:20
167:15 179:23,24
191:14 194:5
195:25 201:2
206:18 208:17
209:3,6,18 213:25
220:10 224:19
225:20 228:23
234:6,11 235:2
**thinking** 12:17
58:24 60:16
116:17 153:19
164:11 209:17
210:25 211:3
**third** 25:11 49:21
49:23 51:18
139:10 140:13
141:22 148:7
149:6,11,25 150:3
150:6,18 151:13
152:12 208:17
**third-party** 24:23
24:23 25:4,9
**third-to-last** 129:5
**though** 181:14
**thought** 60:9 87:11
87:16 116:18,21
116:24 161:16,18
162:20 168:8
172:19 186:14,25
187:5 189:16
**thousand** 215:4,6
**three** 5:6 17:2 30:2
39:12,14 77:19
95:2 97:13 98:12
157:24,25 158:3
158:22 160:9
234:21 236:14
**threw** 202:15
**through** 7:2 9:13
14:21 15:16 20:5
33:13 35:21 36:5
46:18 50:3,6,10
50:13 64:7 70:6
70:17 73:18 74:7
78:18 83:14 84:19
85:4,14 86:2 90:3
90:9 93:13 95:4
95:18 99:18 101:5
136:11 139:10

148:15 165:17
169:22,23 190:13
221:19 222:11,20
223:9,20 224:2,7
234:7 244:13,23
**throughout** 26:20
**throwing** 12:20
123:22
**thrown** 120:11
**tie** 178:3
**tied** 232:14
**till** 18:12 39:16
61:11 200:6
**time** 3:8 4:11 18:15
18:16 22:16 23:8
23:10,18,23 29:10
29:16,19 30:6,21
33:10 35:3,19
36:25 37:14 39:17
39:18 40:9,21,23
43:12 44:21,23
45:2,3,4,4,5,6
46:9,10,22 47:3,6
48:6 56:3 66:4,6
74:8 78:22 79:16
82:25 84:19 85:17
85:19 86:5 87:17
88:5,14 92:23
102:16 115:8
116:11,17 118:7
122:9 126:3,25
127:16 128:24
131:9 135:24
146:13 147:12
153:13,19 159:5
161:20,22,24
163:22 164:24
167:6,8 169:11,16
172:17,25 174:11
175:14 190:21
194:11 196:18
198:13 200:6
217:12 218:18
219:23 220:20
237:20,24 240:22
241:18
**timely** 159:18
**times** 22:13 25:15
39:12 61:2,4
77:20 139:10
196:17 225:25
**title** 22:25 42:19
148:16 150:15
177:9
**today** 7:2 24:21
29:14 61:11 68:18
87:22 99:16

Page 262

120:17 123:6
130:23,25 132:2
133:23 134:7,8,16
134:18,19 163:18
175:23 181:11
183:9,23 189:9
208:8 212:10
213:25 217:11
219:16 222:2,4
234:2 241:11
**today's** 219:5
221:23 235:23
241:7
**together** 71:23
82:14 97:4,6
126:25 127:15
211:5,8
**told** 84:8 117:9
166:15 185:11
193:24 209:20
240:24
**tomorrow** 71:23
241:5,13
**tonight** 240:22
**top** 64:23 67:3
68:13 69:23 71:5
71:7,13,16 72:2
72:20 96:25
100:12 122:24
208:20
**topic** 118:12
**total** 24:24,25 25:2
40:10 117:25
159:4 224:24
226:20 227:11
239:8,18
**totaled** 240:5
**totally** 112:11
**touch** 91:16
**toward** 40:5 71:7
143:5
**transaction** 56:9,24
57:24
**transactions** 55:19
56:4,22,25 57:3
57:12 58:18
**transcript** 196:21
240:17,17,18
241:7,10,12,14
242:8,10 243:13
**transcripts** 240:16
**trial** 3:8
**trigger** 211:25
**true** 12:8 20:16
35:20 53:8 66:19
81:5 108:18
134:24 137:6
171:4 173:11

194:13 242:10,13
243:13
**truly** 119:19
**try** 58:11 117:14
125:12 127:20
134:14 140:24
154:6
**trying** 32:22 91:8
115:5,6 144:19
192:23
**Tuesday** 81:12,14
**turn** 33:5 90:21
150:14 197:20
198:9 230:25
**turning** 22:8
**turn-around** 32:2,6
**two** 6:23 10:7,8
12:3,4,9 18:10
22:18 24:11 27:8
30:2 39:2,12,14
45:14 71:3 74:9
97:20 106:19
114:13 115:10
117:21 118:5
122:14 131:23
139:4 141:17
142:10 157:9
158:14,14 161:9
182:13 184:4
190:13 202:17
210:13 214:2,5
222:22
**two-page** 82:15
100:22 179:2,4,12
244:19
**two-word** 183:2
**two-year** 10:23,24
10:25 11:16
**type** 19:9 40:4
56:20 137:11
180:8
**typed** 60:2 65:21
**types** 22:10
**typically** 25:20

**U**

**Ueno** 117:22
**Uh-huh** 7:6 28:22
44:19 53:25 54:10
76:4 87:4 120:10
130:3 149:5
157:15 179:9
184:7,10,17 185:4
195:21 201:8
212:6 214:6
215:16
**ultimately** 23:13
**umbrella** 125:6,9

**unable** 51:23,25
175:15 219:24
**unacceptable** 93:2
**unclear** 75:3
**under** 23:17 24:21
102:16 110:9
171:25 172:7,24
175:23 177:13
205:4 207:8 242:8
**understand** 5:2
47:19 60:12 61:10
65:16 66:25 67:3
69:7 77:8 91:8
108:4 115:5
121:14 125:2
127:8,18 131:23
144:10,20 153:23
153:24 154:3
159:10 194:10
202:15 210:5
213:24 221:6
232:18
**understanding**
19:15 42:10,13
43:25 44:5,9,22
68:23 69:2,4
126:4,14,16 130:7
131:9,20 156:14
161:3,7,14,15
163:12,16 172:4,8
172:10,11,15
190:7 210:23
216:13,18 217:11
224:15,20 227:20
236:8
**understood** 18:5
21:9,14 40:25
119:4 201:23
232:22 233:11,15
233:21
**underwrite** 17:8
**underwriting** 17:12
21:4
**underwrote** 17:17
**UNITED** 1:2
**Units** 40:15
**University** 8:7,25
11:20,25 12:7,9
12:20,23 13:3,4,7
13:17,18,23 14:11
15:17
**unless** 160:18
164:22
**unspecified** 174:15
**unsubstantial** 189:2
**until** 161:15 162:11
175:13 184:23
200:7 212:11

**unusual** 120:13,14
**upwards** 227:16
**urgency** 80:24
**use** 30:17 75:25
77:9,11 140:8
143:6 154:6 155:3
156:23 182:25
184:12 229:23
230:4
**used** 30:5 55:12,16
55:18 56:8,21
89:8 93:4 101:22
119:24 147:14
148:18 154:16
168:7 192:19
200:4 213:22
**user** 220:24
**using** 55:22 57:20
62:6 139:24
143:10 155:5
222:2
**U.S** 52:5

**V**

**v** 1:5
**value** 23:7 24:20
40:7 169:21
**Varga's** 82:13
**vendor** 37:25 38:4
38:20,25 39:7,8
39:10 40:3 41:18
42:5 45:8,11
**vendors** 38:10
87:23
**venture** 174:2
**verbal** 190:7
**verbally** 190:22
**versfelt** 2:11 4:8 7:5
26:10,14 30:4
34:23 40:20,22
51:5 58:13 62:14
62:18 63:17 65:20
67:23 70:19 77:7
81:18 82:7,9,20
88:3 89:5,23 90:2
90:7 95:23 103:2
103:5,15,21 104:5
104:7,24 105:4,6
105:8 106:22
110:25 111:3
112:7 115:4 121:9
121:10 122:25
124:12 131:16
138:5 141:6 168:9
186:7,12,16 191:5
196:3 200:18,22
201:4 206:12,17
206:20,24 207:3

207:20 213:23
218:15 219:2
220:8 221:9,13
223:10 225:8
226:23 227:3,9
228:4,5,6 233:4,6
234:15 235:10,14
237:14,17 239:2
240:8,10,20,24
241:16 244:5
**Versfelt's** 93:25
**version** 53:20 235:4
241:6
**versus** 59:6
**very** 19:11 72:2,20
88:3 117:5,12
120:12,14 125:23
147:16 167:8,9,10
167:12 169:3,4,24
180:15,24 219:10
**via** 41:25 88:16
111:25
**vice** 8:4 31:13
**visible** 76:20
**volumes** 195:10

**W**

**W** 242:3
**wait** 71:2 74:15
82:9 90:10 114:19
137:14 225:8
239:2
**waiting** 137:11,15
137:18
**waived** 3:5
**walked** 42:14
165:17
**walk-through**
166:19,20,23,25
167:23 168:4
**want** 16:11 18:10
20:19 38:11 39:16
46:9,17 47:18
49:19 54:21 65:19
66:5 67:25 68:2
69:4 71:23 74:10
88:6,19 90:11
91:12 93:12 95:23
102:11 103:3,7,12
104:2 111:8
113:23 148:2
185:13 186:17
192:25 200:13
206:13,14 216:23
220:12 222:6
223:14 233:9
**wanted** 28:24 40:2
81:2 158:22

Page 263

159:15 168:22
196:15 209:12
211:16
**wants** 26:24 90:13
**wasn't** 21:7 47:3
53:5 59:23 106:16
111:18 170:4
185:3 188:21
203:22 204:15,17
**way** 48:16 49:21
53:15,16 57:9
65:8 81:19 84:19
86:14 88:23 90:11
99:25 126:20
129:13 152:23
153:3,5 164:12
166:14,16 180:11
183:8,9,15 196:24
197:3 200:12,24
200:25 209:23
222:20 227:13
243:17
**Weathersfield**
32:25
**Wednesday** 101:4
**week** 79:16
**weekend** 52:5
**weekends** 37:10
**weekly** 187:8
**weeks** 37:22
**welcome** 79:14
185:16 193:8
**well** 8:16 11:15
21:18 26:20 30:24
33:2,25 35:4,9
37:13 38:24 40:2
43:25 44:18 47:16
51:13 57:8 58:10
62:18 65:8 67:16
70:14 71:12 74:23
76:18 81:18 84:21
90:5,7,10 92:7
93:11 95:14
100:17 103:17
104:6 110:23
111:8 112:13
114:10,19 115:18
115:18 116:10,18
118:6 120:11
122:9,13 123:8,23
125:3 127:20
130:22 131:21
134:25 136:15
137:12,15 138:22
144:19 145:18,23
146:19 148:20
151:4,11 153:12
157:16 159:23,24

159:25 160:7
164:19 171:5
175:20 180:2,11
181:16 182:6
184:2 189:2,10
196:10 198:19
200:22 205:3,10
206:19 207:17
208:21 209:3,20
210:20 212:4
235:25
**went** 11:20 13:2
14:21 34:2 39:11
54:25 62:10 194:5
201:19
**weren't** 84:4 91:21
**Werner's** 241:12
**West** 28:6,11,14,21
**we'll** 47:2 62:18
77:9,10 81:19
93:23 125:12
184:2 186:24
208:11
**we're** 15:15 56:8
69:11 71:18 82:13
85:3 99:14,15
102:16 113:3
126:23 144:21
148:13 150:8
152:10,22 155:2
157:8 194:2
195:18 203:10
208:5 222:2 240:3
240:9,10,13
**we've** 26:17 27:15
45:6 65:12,13
67:17 82:10 84:25
88:17 101:19,22
139:9 163:8
178:16,16,17
200:6 208:9
233:18
**whatsoever** 88:13
116:3
**WHEREOF** 243:19
**while** 13:16,20,25
17:18 18:5 19:6
20:4
**White** 2:5
**whoa** 186:12,12,12
**whole** 91:21 114:8
114:12 206:17
209:11
**wholly** 6:16
**wider** 67:20
**William** 9:6
**willing** 136:17
220:3,7,10,14

221:2
**wise** 137:17,19
226:21
**wishes** 94:4
**witness** 4:3 10:19
14:6 15:5 27:7,9
32:15 66:9 70:15
73:19 74:11,12,17
74:21 75:2 76:3
82:4 83:2 94:3
95:9,15 96:4,19
98:24 100:9
101:14,17 105:16
131:15 135:13
141:13 150:5
157:19 164:4
175:19 179:10
196:4 219:6 223:2
227:2 234:25
235:19 237:15
243:11,14,19
**woman** 27:4
**Woodland** 9:6
**word** 58:11 59:25
61:12 62:2,6 64:7
64:7 66:5 69:5
122:22 123:10,23
124:17 126:10,16
129:4,6,7,19,25
130:8,13 131:4,6
132:6 144:21
145:15,19,23
168:7 182:10,25
184:15 192:19
197:13,15 230:4
**wording** 66:24
162:8,9
**words** 57:18 91:9
112:4 127:13
128:20,24 154:7
157:21 158:20
161:5,9 164:7
197:7 229:23
**work** 16:21 17:12
17:15 18:2 19:9
32:3 41:14 119:24
145:2 164:21
171:25
**worked** 19:7 27:4
32:6 128:9 144:3
**working** 16:22 17:4
143:5 170:4
**workout** 33:17 40:5
43:16,19,20
163:14
**works** 221:7
**world** 225:21 226:5
**wouldn't** 44:3

101:17 116:16
154:25 169:18
210:17 212:2
**write** 54:2,3,4 199:7
199:8,11
**writes** 202:14
**writing** 33:23
190:15 192:8,9,12
192:13 230:8
**written** 47:21 48:7
48:12 84:24 85:2
85:3 132:2 133:20
**wrong** 220:23
**wrote** 52:6 58:21,24
59:5,5,6 78:11
164:15 182:16,24
187:25 197:6
198:19,20 202:7
236:22

**X**

**x** 1:3,8

**Y**

**yeah** 4:25 15:5,5
16:7 19:5 27:9
34:16 53:6,24
63:10 66:7 74:10
75:2 88:22 89:25
95:9 99:11,13
100:20 110:11
127:15 135:9
148:2 155:10,13
159:7,9,15 167:3
170:15 171:4,9
175:20 186:21
187:24 188:4
196:7 200:9,10
203:6,10,19 204:2
207:20 208:19
209:7 211:4
222:16,23 227:12
235:14,20 237:16
**year** 6:25 8:9 11:24
12:12 21:20 28:16
36:11 137:22
138:6,9 158:6,8,8
158:12,13,17,19
159:2,2,5,17
160:17,17 170:25
171:19 196:8,9
197:7 198:15
199:17,23 200:2,3
202:10,23 205:14
205:24 207:9,15
208:4,25,25 209:5
209:24 210:6,16
211:5,9 212:25

213:14 214:17,19
214:24 224:11
225:4,5,6,11
226:4,15,16
227:17 228:12
233:23 236:19
239:24
**yearly** 237:9,12
**years** 6:23,24 7:14
7:15 9:12 10:7,8
12:3,4,9 18:10
157:24,25 158:3
158:13,14,14,22
159:17
**yesterday** 46:25
49:4,22 51:8
91:18 93:5 97:4,6
101:20 121:12
175:13 200:11
201:19 202:21
208:7 218:25
219:12,23 220:20
221:6,25
**yesterday's** 184:5
**york** 1:2,13,13,17
2:5,10,10 4:6
242:4,5 243:4,5,9
**Yup** 167:13
**Y-A** 118:17

**Z**

**Z** 156:20
**Zama** 235:8 236:6
244:24
**zero** 23:12 25:6

**$**

**$114** 225:4
**$114.52** 225:10
**$114.53** 225:5
**$135** 195:20
**$140** 160:19 164:23
167:11 168:13
171:3 195:13
196:25 198:14
199:17,19 204:13
207:10,14 208:3
212:25 213:14
214:7 225:15
**$150,000** 209:14
**$249,000** 215:8
**$250,000** 181:6
182:12 185:9
188:3 209:15,21
210:4,15 218:4
231:23 232:13
233:2
**$250,001** 181:18

Page 264

---

$30,000 41:6
$33,000 239:17,23
$33,750 228:15
$350,000 232:2
$405,000 226:14
  228:11
$449,000 180:22
$450 202:9
$450,000 227:10,16
  232:4
$5,000 227:6
$550,000 232:6
$557,262.50 223:24
$57,262.50 224:13
$60,000 214:24
$650,000 194:14
  232:8
$651,000 195:4
$687,150 223:22
$687.150 224:9
$75 177:19 194:7
  195:19 198:10,13
  200:3 202:8 205:5
  225:15,24 227:25
  228:8 231:6
  233:16 237:2
$750,000 210:11
  232:10
$900 226:3,4

_____ 0 _____
0011 98:3
0014 98:7
0027 63:16 98:12
0028 54:5 98:12
0029 51:20 54:5
  98:13
003 97:13
0030 62:21 63:2,17
  99:6 244:12
0031 70:5,17 71:14
  72:3 99:18 100:13
  244:13
0033 72:6 73:17
004 97:13
0040 75:5,6,16
0041 70:6,17,18
  72:6 73:18 76:9
  76:10,24 77:6
  99:18 244:13
0042 80:6,11 100:19
  244:14
0044 81:21,22 82:12
  82:16,19 100:23
  244:16
0045 81:23 82:6,11
  82:19 100:24
  101:13 244:16

0049 105:10,13
  244:18
005 97:14
006 97:21
007 97:21
0089 221:19 222:10
  244:23
0095 223:15 228:21
  228:24
0118 221:20 222:11
  244:23
0124 96:6 97:3
  184:15
0125 96:15
07 1:6

_____ 1 _____
1 7:9 49:4 50:12
  69:9,12 75:8,23
  75:25 76:12,14,15
  76:19 77:10,11
  79:9,10 80:25
  85:5 93:22 94:2
  107:23 108:9,20
  109:7,9,17 114:13
  121:13 122:15
  125:8 126:21,23
  127:14 129:5
  138:15,17 139:22
  139:23 140:14,18
  140:21 141:9,21
  142:7,16 148:13
  156:11,12 171:11
  171:12,13 175:12
  177:5 182:21
  183:17 190:23
  194:22 199:9,22
  207:8 208:15
  210:21 213:16,20
  213:21 214:21
  218:8 230:12
  231:5,21
1.9 40:14 41:3,4
1:49 121:3
10 30:15 50:6,7
  83:17 85:9,10
  86:8 88:6,15
  89:11,17 91:10
  93:17 98:19 101:7
  101:8 102:3
  104:12 219:3
  222:2
10th 91:3 94:14,15
  94:16 95:13 98:10
10:10 1:14
10022-6030 2:10
105 244:17
10601-1717 2:5

10653 1:6
11 50:7,8 99:17
  194:15 195:5
  219:5 221:17,20
  221:23 222:2,7,10
  223:18 228:18,19
  244:22
11/30/06 224:2
11/30/07 224:7
11/30/2015 223:21
111 1:12
118 223:9
12 1:14 95:12 98:4
  105:13,22 117:18
  209:10 225:25
  235:6,9,23 236:3
  237:19,24 242:9
  244:17,24
12/01/2005 224:2
12/1/05 223:20
12/1/06 224:7
12:46 120:19
125 97:3
13th 243:20
135 205:6,8
14 81:25
140 165:14 166:12
  166:15,22,24
  167:15,16 195:23
  205:8,13,19,22
  206:3 208:5
16 238:10
17 96:17,24 203:10
  203:11,16,17
170 2:4
179 244:19
1977 9:13
1980 9:14
1982 9:13 11:8
1984 14:22 15:9
1985 8:10 12:25
  14:12,15,23 15:19
  16:24
1986 17:2
1988 19:2
1989 16:12 28:17
1990 16:12
1994 23:20,23 25:7
1995 23:23
1997 33:13
1998 7:25 29:5,6
  31:3 33:13
1999 35:2,8

_____ 2 _____
2 30:19 94:3 95:8,17
  95:22,22 96:3
  97:24 101:12

108:9 109:7 132:6
133:3 157:13
160:8,22 171:13
177:23 181:22
182:3,4,14,20,25
183:6
2,812.5 202:10
20 96:12 98:9,9
  184:20 186:2,23
  189:6,11,17
  203:15,16,17,24
  235:7 236:11
  244:24
20th 46:18
2000 6:25
2006 6:25 37:8
2007 4:15 35:17,24
  36:12 37:4,8,23
  38:8 40:24 41:18
  46:9,16 48:8
  50:15,20 72:17,22
  73:11 87:7 88:15
  89:17 93:17
  104:12,13 105:13
  116:15 123:11
  124:19 126:3,4,15
  127:8,22 130:8,24
  131:3,4,20 134:2
  134:23 135:6
  137:23 141:21
  142:16 153:6,21
  154:9 155:22
  156:5,14 160:6
  163:22 164:6,17
  165:17 166:7
  170:13 175:12
  183:10 184:20
  209:3 216:2,24,24
  218:7 234:2 235:7
  236:11 244:17,24
2008 1:14 7:9
  238:10 242:9,19
  243:20
218 244:6
221 244:22
228 244:5
231 244:6
233 244:5
235 244:6,24
237 244:5
241 4:12
250 211:22 215:14
  217:20,22 218:2,2
250,000 180:21
  181:2 183:25
  184:24 185:7
  187:2,15 189:14
  189:17,21 194:11

209:11,25 210:8,8
211:17 212:12
215:18 218:3
251 218:2
29th 97:16

_____ 3 _____
3 49:22 50:3,6,7,7
  50:10,13,18 69:12
  72:16,22 79:10
  85:4 94:3 96:5,11
  97:5,8 141:14,15
  148:14 160:12,15
  160:22 164:16
  181:25 182:14
  183:7 184:8,14
  195:3 203:12
  212:9,24
30 33:20,24 34:6
  62:14 97:16,23
31 207:9
33,750 202:10
350 210:10 232:13

_____ 4 _____
4 25:3 50:7 96:14,20
  97:5,9 139:18
  174:21,24 175:5
  184:9 194:19
  195:8 196:13,14
  200:17,20 201:10
  202:13 203:7,14
  231:10,14,20
  244:5
4:46 241:18
400 227:5
41 81:17
44 81:18,18 82:2,3
449 180:22 215:15
45 82:16
450 202:9 210:10
  226:11,17,19
  227:17 228:9

_____ 5 _____
5 23:14,16 25:7
  29:19 50:7 97:12
  139:18 142:24
  143:4 144:9,10,22
  144:25 145:17
  176:16 197:22
  224:21 230:18,18
5th 46:18
5,000 226:24
5/10 85:14 103:24
  104:23
5/6 103:24 104:23
5/8.07 85:14

**5:00** 241:4
**550** 210:10
**57th** 140:17 141:23
  149:14 150:2,3,6
  150:18 152:13
**599** 2:9

**6**

**6** 50:7 62:10 71:8
  73:11 77:14 78:2
  78:8 79:24 81:3,9
  81:10 85:8 86:6,7
  86:19 87:7 88:6
  88:14 89:10,16
  91:10 92:5,8
  93:17 97:20,25
  98:16,17 99:8,21
  102:3 104:12
  139:18 160:19
  164:23 171:3
  177:25 178:4,7,9
  178:12 180:15,23
  180:24 181:17,22
  182:21 183:17
  188:7,9 194:12
  206:2,4 207:11,15
  212:11,19,21
  213:2,4,15 214:14
  214:16,18,23
  215:2,5,9,17
**6th** 94:15,16 95:12
  98:10,15
**6,000** 224:21 225:2
  225:3 226:20
**6:00** 241:4,8,11,13
**60** 158:9 159:17
**60,000** 215:2
**60-day** 159:3,18
  171:20
**62** 244:11
**650** 210:10
**687,150** 224:10,25

**7**

**7** 23:15,16 25:7
  49:24 50:3,7
  52:14 98:2 129:20
  129:23 130:18,21
  131:5,14,18
  132:13,19 133:15
  133:18 147:18
  148:15 151:11,14
  152:17,17 153:15
  153:22 155:18
  193:10,11
**7th** 87:23
**7-1/2** 226:22
**70** 227:25 244:13

**72** 136:24 148:3
**75** 196:19 199:21
  228:11
**750** 205:2
**750,000** 204:23
  205:14

**8**

**8** 30:18 50:7 80:14
  81:14 83:7 86:6
  92:5,8 98:5,6
  100:20,25 157:13
  157:16,21 158:2,4
  158:21 159:13,19
  160:21 164:7
  171:10,25 172:7
  234:20 236:13,17
  236:19,23,24
  237:2
**8th** 91:2 94:14
**8:00** 240:22
**8:59** 71:8 78:9
**80** 244:14
**81** 244:15
**82** 12:13
**83** 12:14,14
**84** 12:14
**86** 18:11
**88** 18:13
**89** 223:9

**9**

**9** 50:7 51:9,13 62:9
  63:13,15,20 64:2
  64:3,4 65:17
  67:14,20 68:4
  87:3,25 94:3
  98:11 101:4 219:2
  227:2,5,10 234:20
  236:13,19,23
  237:2 239:17
**9/13/62** 8:24
**90** 30:14
**900** 226:13
**95** 23:20 25:7 30:6
  30:16
**96** 33:14

# EXHIBIT I

ORIGINAL

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -x

KOLO, LLC,

               Plaintiff,

     -against-         CASE NO:

                  07-CIV-10653

KATE'S PAPERIE, LTD,

               Defendant.

- - - - - - - - - - - - - - - - - - -x

              February 11, 2008

              10:17 a.m.

DEPOSITION of LIONEL FLAX, a witness on behalf of the Defendant herein, taken pursuant to Court Order, and held at the offices of Kirkpatrick & Lockhart Preston Gates Ellis, LLP, 599 Lexington Avenue, New York, New York, before Mary T. Slavik, RPR, a Certified Court Reporter and Notary Public of the State of New York.



DALCO Reporting, Inc.
court reporting • legal video • videoconferencing
170 Hamilton Avenue, White Plains, NY 10601
914.684.9009  Fax 914.684.6561  212.679.6095
800.DAL.8779  dalcoreporting.com

LIONEL FLAX

85

1        Q.   Still the second page.

2        A.   "Did you find it?"

3        Q.   And that is dated May 10th, 2007?

4        A.   Yes.  Okay.  I'm following you.

5        Q.   Now, if you flip to the first page.

6        A.   Okay.  Exhibit 2, the first page with the

7    sticker, yes.

8        Q.   If you look down three inches roughly from

9    the top, you will see it starts, message, Keith Werner

10   wrote, "Hi, Lionel, I did receive your faxed LOI," do

11   you have that?

12       A.   Yes, that is what he wrote.

13       Q.   Right.  And now if you sent -- do you have

14   any doubt at this point now that you read that he

15   responded to you, yes, I did receive your faxed LOI,

16   at this point, do you have any doubt that you signed

17   any other document other than the LOI?

18       A.   I don't see here that he specifically says, I

19   signed the LOI.

20       Q.   Okay.  But earlier, page two.

21       A.   Okay.

22       Q.   You say on May 9th, 2007, page two, "I just

23   sent this through signed," and you indicated to me

24   earlier that you sent it through via fax, through fax;



LIONEL FLAX

86

1   correct?

2      A.  Correct.

3      Q.  And then he says on the first page, "that I

4   did receive your faxed LOI."  At this point, now you

5   read this sentence or even now or when you read it

6   back whenever in May 2007 --

7      A.  Yes.

8      Q.  -- did you have any doubt that you signed

9   some other document other than the letter of intent?

10      A.  Considering I never have seen a signed copy

11   of the letter of intent by both of us, I do have some

12   doubt, but it's very possible I could have sent him a

13   signed one.

14      Q.  Okay.

15      A.  But if I did, it was a letter of intent.  I

16   was simply acknowledging, if you will, his RFP or

17   request for proposal which was a way to begin the

18   discussions to enter into something later.  So it is

19   possible.

20      Q.  You mean like something later, a formal

21   agreement later; right?

22      A.  Yeah.

23      Q.  Okay.  So, Mr. Werner states on page one,

24   5/12/07, so after he says, "I did receive your faxed



LIONEL FLAX

87

1    LOI, thank you very much," then he says, "I will bring

2    the copy of the signed one to you on Tuesday."

3         Do you know if there was any kind of meeting

4    between you and Mr. Werner on whatever Tuesday he is

5    referring to?

6         A.    On the Tuesday he was referring to Mr. Werner

7    was entertaining two very prominent business clients

8    of his from Japan.  We were in the basement of a

9    crowded fancy restaurant.  I believe I was running

10   late, and I do not recall him bringing or giving me a

11   signed copy of anything.  He says here he intends to,

12   but I don't recall ever getting that.  And, the fact

13   that he had two clients who had been successful with

14   the shop-in-shop model, indicated to me that he was

15   still selling and promoting the idea, and I didn't

16   receive a signed copy by both of us, no.

17        Q.    But you attended that meeting on Tuesday that

18   he is referring to; correct?

19        A.    I attended, yes, I was there, I met them for

20   lunch.

21        Q.    And what was the location?

22        A.    The Mercer Cafe or Mercury Cafe.

23        Q.    Now, when you responded on the top of

24   Plaintiff's 2, "yes, we are making some progress, I



LIONEL FLAX

88

1    think, can we meet at the MC at 1:30 p.m.," when you

2    say MC, is that the cafe you just mentioned earlier?

3        A.    Yes, but what -- this is May 12, what

4    proceeds it, this might not even be the same strand.

5    I don't understand the question.

6        Q.    My question is simply when you say in your

7    e-mail, can we meet at the MC at 1:30 p.m., right, you

8    wrote that?

9        A.    Yes, that's right because he had previously

10   told me that, you know, we're going to have lunch with

11   the guys at the cafe, yes.

12       Q.    And that is basically the message below, his

13   message dated May 12, 2007, where it says, "I thought

14   we could meet around 1 p.m. at the Mercer Cafe for

15   lunch if that is okay with you"?

16       A.    Yes.

17       Q.    So you read that?

18       Q.    And then you responded with the message above

19   that says, "can we meet at the MC at 1:30 p.m."

20       A.    Correct.

21       Q.    All right.  Now, at that point when you

22   responded, "can we meet at the MC at 1:30 p.m.," by

23   the time you read that statement when he says, "I did

24   receive your faxed LOI," right?



LIONEL FLAX

89

1          MR. VERSFELT:  Can I have that question read

2      back?

3

4          (Requested question was read back by the

5      court reporter.)

6

7      A.    The question is?

8      Q.    The question is basically when you wrote in

9  response to Mr. Werner's e-mail, "can we meet at the

10  MC at 1:30 p.m.," by that time when you wrote this

11  message you already read his message below?

12      A.    Yes, seemingly, but there is kind of a non

13  sequitur there.

14      Q.    I understand, but apparently you're

15  responding to his meeting request?

16      A.    Yeah, I'm responding to his meeting request

17  and we meet.

18      Q.    Do you have a recollection of reading when he

19  states, "I did receive your faxed LOI"?

20      A.    Yes.

21      Q.    And did you have any reason to question why

22  he wrote that?

23          In other words, did you have any reason to

24  question that he was referring to a document that you



LIONEL FLAX

90

1       don't know about?

2           A.   No, but, no.

3           Q.   No question at all?

4           A.   Well, it's not clear that I, a; signed it.

5       It's very possible in my busy world that I faxed it

6       and forgot to sign it.  "I did receive your faxed

7       LOI," he is saying he received something, that is what

8       he is saying.

9           Q.   Right.  He doesn't say he received something,

10      he says, "I did receive your faxed LOI," he doesn't

11      say just something?

12          A.   Okay.  All right.  Okay.

13          Q.   Now, you said earlier that it's possible that

14      you signed something else.  If that's possible, would

15      he have sent you that statement, "I did receive your

16      faxed LOI"?

17          A.   I can't read his mind.

18          Q.   But did you have any conversation with

19      Mr. Werner or anybody from KOLO after May 9th 2007

20      that you sent a wrong document to KOLO, that you sent

21      the wrong signed document to KOLO?

22              MR. VERSFELT:  I object to the form.  This

23          exhibit is what you refer to as the LOI.

24              MR. VARGA:  Yeah.



LIONEL FLAX

91

1          MR. VERSFELT:  It's 12 pages long.

2          MR. VARGA:  Yes.

3          MR. VERSFELT:  Now, the issue here is not who

4     sent what e-mail to whom, but what was meant by

5     the term LOI in each of those e-mails.  That's

6     the issue.  So I think you're badgering the

7     witness trying to say, well, did you send this

8     e-mail after this e-mail.  Of course the e-mail

9     record is clear, it's incomplete in this exhibit

10    but it's clear.

11       Q.   But my question is different.  My question is

12    after May 9th, 2007, did anybody from KOLO ever tell

13    you you sent them a wrong document signed?

14       A.   Not that I can recall.  I never saw a signed

15    copy by both parties of what Mr. Werner calls a draft

16    of a proposal and here it refers to as the LOI.  I

17    have never seen that.

18       Q.   You've never seen one signed by both parties?

19       A.   Signed by myself or by him.  It's clear that

20    I might have signed it, but I don't have it, and I

21    certainly don't have one that both of us signed, and

22    I've never seen one that both of us signed.

23       Q.   Okay.  That's fair.

24          MR. VARGA:  Should we take a lunch break



LIONEL FLAX

92

1        now?

2               MR. VERSFELT:   Sure.

3

4               (A lunch break was had at 12:53 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



LIONEL FLAX

93

1              A F T E R N O O N   S E S S I O N

2

3              MR. VARGA:  We're back on.

4

5    BY MR. VARGA:

6         Q.   Mr. Flax, we're back on the record.  We just

7    had our lunch; I just want to remind you that

8    you're still under oath --

9         A.   Okay.

10        Q.   -- as we continue with the deposition.

11             Before we were talking about the letter of

12   intent, the two pages, which are Plaintiff's 1.

13             MR. VERSFELT:  For the record, the two pages

14        are the first two pages of Plaintiff's 1.

15             MR. VARGA:  That's what I said.

16        A.   The LOI is the first two pages; right?

17        Q.   Yes, we made that clear on the record.

18             Now, do you remember when you received these

19   two pages, the letter of intent, Plaintiff's 1?

20        A.   Haven't we gone over that?

21        Q.   I don't know, did I ask that?

22             MR. VERSFELT:  Yes, but I have no problem

23        with him answering again to get us going.

24        A.   Ready?



LIONEL FLAX

94

1    Q.   Yes.

2    A.   My recollection is that I received the LOI at

3    either the end of April or beginning of May.

4    Q.   I apologize, I did ask that.

5         That was hand-delivered by Mr. Werner;

6    correct?

7    A.   Yes.

8    Q.   From the time you received it up until June

9    1st, 2007, did you at any time indicate your

10   dissatisfaction with any of the terms contained

11   therein to Mr. Werner or anybody at KOLO?

12   A.   We never got into any formal or informal

13   conversations that continue -- that would continue

14   moving towards an agreement.  So I do not believe I

15   did.

16   Q.   So there were no counterproposals to any of

17   the terms that were set forth in the two pages of the

18   LOI in Plaintiff's 1; correct?

19   A.   There was never a follow-up discussion about

20   taking what the LOI stated and to turn it into a

21   formal agreement.

22   Q.   That is not what I asked.

23   A.   Okay.  Can you please repeat the question?

24   Q.   I understand what you're saying so far that



LIONEL FLAX

95

1    you intend to -- actually Kate's intended to have a

2    formal agreement later on.  What I'm focusing on right

3    now is these two pages, and my question is specific.

4         At any time between late April I believe or

5    early May, whenever you received it, up until June 1st,

6    2007, did you ever say to Mr. Werner or anybody else

7    from KOLO that you're not in agreement with any of the

8    proposed terms therein?

9         A.   No.

10        Q.   Did there come a time that KOLO moved into

11   the Spring Street location?

12        A.   Yes.

13        Q.   When did that happen?

14        A.   That happened, I believe, around Memorial Day

15   weekend and the time leading up to June 1st.

16        Q.   Would it be one week or more before June 1st

17   2007, that KOLO moved in roughly?

18        A.   Roughly more.

19        Q.   More than one week?

20        A.   Two weeks, I would say roughly.

21        Q.   Okay.  Did KOLO open a store so it was fully

22   functional at the Spring Street location beginning

23   June 1st, 2007?

24        A.   The store was functional except for the fact

