UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KOLO RETAIL, LLC,

        Plaintiff,                       07 CIV. 10653

  -against-

KATE'S PAPERIE, LTD.,                 **JUDGE:  McMAHON**

        Defendant.

---

### AFFIRMATION IN FURTHER SUPPORT OF ORDER FOR PRELIMINARY INJUNCTION AGAINST DEFENDANT

ROBERT VARGA, an attorney duly admitted to practice law before the Courts of the State of New York and before this Court, affirms the following under the penalties of perjury:

1.    I am associated with the law firm of GOLDBERG SEGALLA LLP, attorneys for Plaintiff, Kolo Retail, LLC, and as such, I am fully familiar with the facts and circumstances surrounding this action.

2.    I submit this Affirmation in Further Support of an Order for Preliminary Injunction against Defendant to enjoin the enforcement of the Notice of Termination, which seeks to terminate Kolo's tenancy at the premises located at 72 Spring Street, New York, New York.

3.    The relevant facts are set forth in the Declaration of Keith Werner, dated January 31, 2008, which was submitted as part of the Order to Show Cause application.

4.    The deposition of Lionel Flax of Kate's Paperie, dated February 11, 2007, is attached as Exhibit "A," including the marked deposition exhibits, which are attached under Ex. "A"(1) through "A"(10).

5.    The deposition of Keith Werner of Kolo, dated February 12, 2007, is attached as Exhibit "B," including the marked deposition exhibits, which are attached under Ex. "B"(1) through "B"(8).

6.    Kolo respectfully submits the Proposed Findings of Fact and Conclusions of Law in further support of the instant motion.

For all of the reasons set forth in the aforementioned documents and the previously submitted motion papers, Plaintiff respectfully requests that the Order for Preliminary Injunction be granted in its entirety.

Dated: White Plains, New York
　　　　February 15, 2008

Respectfully submitted,

By: _____
　　　　Frank J. Ciano, Esq. (FJC – 4981)
　　　　Robert Varga, Esq. (RV – 0636)
　　　　GOLDBERG SEGALLA LLP
　　　　**ATTORNEYS FOR PLAINTIFF**
　　　　**KOLO RETAIL, LLC**
　　　　170 Hamilton Avenue, Suite 203
　　　　White Plains, New York 10601
　　　　Tel: (914) 798-5410
　　　　Fax: (914) 798-5401
　　　　fciano@goldbergsegalla.com
　　　　rvarga@goldbergsegalla.com

101148.1

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KOLO RETAIL, LLC,

                    Plaintiff,                            07 CIV. 10653

   -against-

KATE'S PAPERIE, LTD.,                        **JUDGE: McMAHON**

                    Defendant.

### DESCRIPTION OF EXHIBIT "A" FILED IN HARD COPY

Plaintiff Kolo Retail, LLC's Exhibit A to its Affirmation in Further Support of Order for Preliminary Injunction is the **deposition transcript of LIONEL FLAX taken on February 11, 2008.**

This document/Exhibit has been filed with the Court's permission on paper. Hard copy is available in the Court's file in the Clerk's office.


PLAINTIFF'S
EXHIBIT
1
MS  2/11/08

Letter of Intent

between

**Kate's Paperie LTD and Affiliates.,**

hereinafter named "Kate's"
and

**Kolo Retail, LLC,**

hereafter named "Kolo"

The following confirms the understanding for which the parties have agreed to in principal to enter into a contract hereinafter called ("Agreement") for Kolo to lease retail space from Kate's Paperie, LLC and to operate a retail store within each of three Kate's stores.  It is intended that the parties will enter into a more formal agreement on the following terms of the contract within a reasonable time.

1.  **Locations and Demised Premises** - Kate's commits to Kolo to provide rental space in the following three of it's Manhattan, NY locations; Spring Street,  3rd Avenue, and 57th Street.  Kolo Retail, LLC is hereby committing to displaying and selling products only within the dedicated space. The size of each location shall vary between 250 square feet to 450 square feet. The attached Addendum (A) defines the agreed upon space at the Spring Street Store.  Layout and drawings showing such dedicated space is attached hereto in Addendum (A). Together with and at the same time as this Agreement is entered into, the parties will also conclude a rental agreement, and Kate's will provide Kolo a consent from the current landlord(s) for such rights to sub-lease.

2.  **Fixtures, Furnishings & Equipment** - Fixtures, furnishings and equipment such as displays, computers, tables, etc. shall be completely provided by  and owned by Kolo.  Other improvements or build out shall be discussed and agreed upon between the parties at a later date.

3.  **Commencement -** The commencement of the first Kolo retail store within the Kate's store concept will begin on or around June 1, 2007 located on Spring Street.   The other locations, 3rd Avenue and 57th Street, will commence approximately one month thereafter.    Both parties shall begin discussions to come to a mutual agreement to the specific locations for the 3rd Avenue and 57th Street locations by June 1, 2007.  Notwithstanding the above, should both parties fail to mutually agree to the locations of the other Kate's stores then Kolo shall have the right to terminate the Agreement, vacating the Spring Street location, by giving a 30 day notice to Kate's.

4.  **Staff and Payroll Expenses -** Kolo shall provide its own representatives, employees and staff to operate each store within Kate's store.  Both parties have agreed that in the event it becomes necessary to utilize Kate's staff, whether on a part-time or full-time basis, Kolo shall reimburse Kate's for any payroll expenses.

5. **Inventory** - Upon commencement of each location, starting with the Spring Street location, Kolo will agree to accept responsibility of the current inventory that Kate's provides to Kolo for that location. All inventory must be in saleable condition when provided by Kate's. At the time of commencement, for each additional store, Kolo will issue a credit memo to Kate's for receiving such qualified inventory.

6. **Insurance** - Kolo will agree to insure all contents inside the demised premises.

7. **Compensation** - Each location shall have its own profit and loss projections and compensation schedule which will describe the amount to be paid to Kate's. It is agreed that each compensation schedule will be attached as an additional addendum and made apart of the Agreement. The compensation schedule for Spring Street is also attached hereto in Addendum (A). Kolo shall compensate Kate's according to the compensation schedule set forth in Addendum (A) for the Spring Street location and according to future addendums for the other locations as they are agreed upon. Each location shall have its own projections and compensation schedule which shall describe the amount to be paid to Kate's. It is agreed that each compensation schedule will be attached as an additional addendum and made apart of the Agreement. Compensation to Kate's will be in the form of base rental income plus an additional royalty income which formula is also set forth in the compensation schedule and attached to the Agreement.

8. **Term** - The term of each sub-lease will be for one year from the commencement date. Kolo shall retain the right to renew each sub-lease for an additional one year period, and each year thereafter as it becomes due by giving 60 day notice to Kate's prior to the termination date.

9. **Confidentiality** - Both parties agree to keep all information about the terms of this Agreement confidential. Both parties also acknowledge that they have signed a Mutual Confidentiality Agreement prior to entering into this Agreement stating to keep all information confidential.

By signing below each party agrees and conscents to the above mention terms and agrees to act in good faith to complete the negotiations for addtional terms which will be set forth in the Agreement.

**Kolo Retail, LLC**

_____

By it's                                                    Date

**Kate's Paperie LTD and Affilitates**

_____

By it's                                                    Date





**Kolo Store at the new SOHO location**

April 2007



SOHO floor plan







# SOHO Proposal (Basic Terms)

1. Lease Term – One Year

2. Lease Options – Kolo has the right to (3) One Year Options.

3. Right to Terminate – Kate's has the right to terminate the agreement after the first year, and each year thereafter, unless Kolo continues to pay Kate's a minimum of $140/Per Square Foot plus 6% Royalty.

4. Kolo will provide Kate's with monthly POS Data.

5. Kolo will pay Kate's monthly rental payments according to the financial prosposal enclosed.

6. Kolo will pay Kate's monthly royalty payments according to the financial proposal enclosed.

7. Kate's will provide Kolo with landlord's consent to the sub-lease and a non-disturbance.

KOLO

KOLO

# Financial Proposal

1. Starting Rent Per Square Foot - $75.00

2. Starting Royalty - 6%

3. Royalty Increases – Royalties increase according to the following revenue schedule;
   Net Sales of $250,000 to $449,000 – 6%
   Net Sales of $450,000 to $649,000 – 10%
   Net Sales of $$650,00 and up – 11%

4. Rent Increases – Rent increases according to the following revenue schedule;
   Net Sales of $250,000 – $75/Sq.Ft.
   Net Sales of $350,000 – $79/Sq.Ft.
   Net Sales of $450,000 – $83/Sq.Ft.
   Net Sales of $550,000 – $90/Sq.Ft.
   Net Sales of $650,000 – $100/Sq.Ft.
   Net Sales of $750,000 – $135/Sq.Ft.

# Financial Forecast

## Escalations

| | $250,000 | $350,000 | $450,000 | $550,000 | $650,000 | $750,000 |
|---|---|---|---|---|---|---|
| Annual Retail Sales | | | | | | |
| Sales/sq. ft | $556 | $778 | $1,000 | $1,222 | $1,444 | $1,667 |
| Rent/Sq.Ft. | $75 | $79 | $83 | $90 | $100 | $135 |
| Royalty | 6% | 6% | 10% | 10% | 11% | 11% |

KOLO

# Comparison of Kate's profitability under the existing vs. new model



| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | $ 155,000 | $ 250,000 | $ 350,000 | $ 450,000 | $ 550,000 | $ 650,000 | $ 750,000 | | | |
| Net Sales | $ 150,350 | $ 242,500 | $ 339,500 | $ 436,500 | $ 533,500 | $ 630,500 | $ 727,500 | 97% | |
| Gross Margin | $ 78,182 | $ 126,100 | $ 176,540 | $ 226,980 | $ 277,420 | $ 327,860 | $ 378,300 | 52% | |
| **Operating Expenses** | | | | | | | | | |
| Store Operating Expenses | $ 48,112 | $ 77,600 | $ 108,640 | $ 139,680 | $ 170,720 | $ 201,760 | $ 232,800 | 32% | |
| Corporate Overhead | $ 16,539 | $ 26,675 | $ 37,345 | $ 48,015 | $ 58,685 | $ 69,355 | $ 80,025 | 11% | |
| **Total Operating Expenses** | $ 64,651 | $ 104,275 | $ 145,985 | $ 187,695 | $ 229,405 | $ 271,115 | $ 312,825 | 43% | |
| EBITDA | $ 13,532 | $ 21,825 | $ 30,555 | $ 39,285 | $ 48,015 | $ 56,745 | $ 65,475 | 9% | |
| Depreciation & Amortization | $ 3,007 | $ 4,850 | $ 6,790 | $ 8,730 | $ 10,670 | $ 12,610 | $ 14,550 | 2% | |
| EBIT | $ 10,525 | $ 16,975 | $ 23,765 | $ 30,555 | $ 37,345 | $ 44,135 | $ 50,925 | 7% | |
| Other Income and Expenses | $ 4,511 | $ 7,275 | $ 10,185 | $ 13,095 | $ 16,005 | $ 18,915 | $ 21,825 | 3% | |
| Net Income | $ 6,014 | $ 9,700 | $ 13,580 | $ 17,460 | $ 21,340 | $ 25,220 | $ 29,100 | 4% | |
| Future Net Income | $ (6,014) | $ (14,187) | $ (6,680) | $ 18,372 | $ 31,363 | $ 51,568 | $ 78,288 | | |
| Difference | $ (6,014) | $ (23,887) | $ (20,260) | $ 912 | $ 10,023 | $ 26,648 | $ 49,188 | | |
| Future Net Income % | | 4% | | 4% | 6% | 8% | 11% | |

# Comparative analysis of net income projections

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Annual Retail Sales | $250,000 | $ 350,000 | $ 450,000 | $ 550,000 | $ 650,000 | $ 750,000 | | |
| Annual Net Retail Sales | $242,500 | $ 339,500 | $ 436,500 | $ 533,500 | $ 630,500 | $ 727,500 | | |
| | | | | | | | | |
| Kates Total Revenues (Roy. & Rent) | $48,300 | $55,808 | $80,859 | $93,850 | $114,355 | $140,775 | | |
| Kates Operating Expenses | $62,487 | $62,487 | $62,487 | $62,487 | $62,487 | $62,487 | | |
| **Kates Net Operating Income** | **-$14,187** | **-$6,680** | **$18,372** | **$31,363** | **$51,868** | **$78,288** | | |
| Kolo Gross Profit | $126,382 | $176,935 | $210,028 | $256,701 | $297,069 | $342,771 | | |
| Kolo Operating Expenses | $151,703 | $167,455 | $183,292 | $200,648 | $219,213 | $249,028 | | |
| **Kolo Net Income** | **-$33,654** | **$1,146** | **$18,402** | **$47,719** | **$69,522** | **$85,410** | | |



KOLO

PLAINTIFF'S
EXHIBIT
2
2/1/08    ms

**Robert Varga**

**From:** Lionel Flax [lionel.flax@gmail.com]
**Sent:** Saturday, May 12, 2007 7:15 PM
**To:** kw@kolo-usa.com
**Subject:** Re:

Yes we are making some progress I think.  can we meet at the MC at 1:30pm?  Let me know if
this is problematic.

On 5/12/07, Keith Werner <kkw@kolo-usa.com> wrote:
>
>
>
> Hi Lionel,
>
> I did received your faxed LOI. Thank you very much. I will bring a
> copy of the signed one to you on Tuesday. I thought we could meet
> around 1pm at
the
> Mercer Café for lunch if that is ok with you ? Remember we will be
> meeting with Akira Ito - President of Ito-Ya Japan and Shin Ueno -
> Senior Manager
of
> Sourcing Exports.
>
> Did you get any where with the issue of the leases today. I could not
> get
a
> hold of John Scholte. But I will try him on Monday.
>
> Regards,
>
> Keith Werner
> Executive Vice President
> KOLO, LLC.
>  kkw@kolo-usa.com
>  860-547-0367 Ext 222
>  860-547-0598 FAX
>  www.kolo.com
>
>
>


--
Lionel Flax
Chief Executive Officer
Kate's Paperie
646-352-1297

**Robert Varga**

| | |
|---|---|
| **From:** | Lionel Flax [lionel.flax@gmail.com] |
| **Sent:** | Thursday, May 10, 2007 1:50 PM |
| **To:** | kw@kolo-usa.com |
| **Subject:** | Re: |

Did u find it?

On 5/10/07, Keith Werner <kkw@kolo-usa.com> wrote:
> Thank you Lionel ! I will look for it now.
>
> Keith
>
> -----Original Message-----
> From: Lionel Flax [mailto:lionel.flax@gmail.com]
> Sent: Wednesday, May 09, 2007 2:36 PM
> To: kw@kolo-usa.com
> Subject: Re:
>
> I just sent this through signed.
>
> On 5/8/07, Keith Werner <kkw@kolo-usa.com> wrote:
> >
> >
> >
> > Hi Lionel,
> >
> > Just checking in with you to see how you are doing with signing the
> > LOI. I am going to be putting my staff together with Zelma to
> > coordinate the setup of the shop in shop.  We are planning on
> > sending a team down next week for the show and I thought we could
> > get everyone together at that time to go over the setup. I will also
> > be having my inventory management team touch base with the Kate's
> > person in charge of purchasing Kolo so we can begin to transition
> > the inventory for the new store.  Could you please let me know who
> > that person would be and
how
> to contact them as soon as possible.
> >
> > Talk to you soon.
> >
> >
> > Keith Werner
> > Executive Vice President
> > KOLO, LLC.
> >  kkw@kolo-usa.com
> >  860-547-0367 Ext 222
> >  860-547-0598 FAX
> >  www.kolo.com
> >
> >
> >
>
>
> --
> Lionel Flax
> Chief Executive Officer
> Kate's Paperie
> 646-352-1297
>
>

1

--
Lionel Flax
Chief Executive Officer
Kate's Paperie
646-352-1297

```
---------- Forwarded message ----------
From: master file flax <lionel.flax@gmail.com>
Date: Aug 20, 2007 2:17 PM
Subject: Re: Rent Payments
To: kw@kolo-usa.com
```

Cool!!


On 8/20/07, Keith Werner <kkw@kolo-usa.com> wrote:

> Lionel,
>
> Your Welcome ! At the end of this month we will be looking to make a royalty payment according to our recent agreement to pay royalties on a quarterly basis according to the minimum annual sales in the proposal.
>
> Thanks,
>
> KEITH WERNER
> EXECUTIVE VICE PRESIDENT | KOLO, LLC
> 241 Asylum Street | Hartford, CT 06103 | 860.547.0367 x222
> http://www.kolo.com/http://www.kolo.com/ <http://www.kolo.com/http://www.kolo.com/>

---

```
From: master file flax [mailto:lionel.flax@gmail.com]
Sent: Monday, August 20, 2007 1:49 PM
To: kw@kolo-usa.com
```

1

PLAINTIFF'S
EXHIBIT
3
9/1/08 123

KP 0124

Subject: Re: Rent Payments


OK, I understand.  I guess what threw me was the fact that the first check was substantially higher than the second.  I forgot the first was for two months.

Thank you most kindly,


On 8/17/07, Keith Werner <kkw@kolo-usa.com> wrote:

Kim and Lionel,

The base rent is determined at $75/sqft at 450 sqft it would come to $33,750 per year and $2812.5 per month.

Regards,

KEITH WERNER
EXECUTIVE VICE PRESIDENT | KOLO, LLC
241 Asylum Street | Hartford, CT 06103 | 860.547.0367 x222
http://www.kolo.com/http://www.kolo.com/
<http://www.kolo.com/http://www.kolo.com/>

-----Original Message-----
From: Kimberly Hassler [mailto: kah@kolo-usa.com <mailto:kah@kolo-usa.com> ]
Sent: Friday, August 17, 2007 6:39 PM
To: 'master file flax'; 'Keith Werner'
Subject: RE: Rent Payments


I understood this to be an agreed upon amount.  I was not involved in the discussions regarding rent but I am sure Keith could answer your question.

-Kim


-----Original Message-----
From: master file flax [mailto: lionel.flax@gmail.com <mailto:lionel.flax@gmail.com> ]
Sent: Friday, August 17, 2007 6:28 PM
To: kah@kolo-usa.com
Subject: Re: Rent Payments

On 8/17/07, Kimberly Hassler <kah@kolo-usa.com> wrote:

>Can you let me know how you are derriving at that number?  It seems entirely off, in terms of dollars per square foot.
>
>
>
> Hi, Lionel.
>
>
>
> Keith asked me to let you know about our rent payments to you:
>
>
>
> June & July rent - paid check #1551, $5, 625.00, check cleared our bank
> 7/18/07
>
>
>
> August rent - paid check #1560, $2,812.50, check cleared our bank

2

PLAINTIFF'S
EXHIBIT
4
8/11/08  ms



Kate´s Paperie 1
LAYOUT.pdf (9...

From: Lionel Flax <lionel.flax@gmail.com>
Date: Fri, 30 Mar 2007 16:05:53 -0400
Subject: Re: automated response
To: pgd@kolo-usa.com

No worries.  We just wanted to see if you guys wanted to meet at the rest.  instead.

Last night was an excllent start to a very worthy endeavor.  I felt very positive about
Kieth, he is on point, just like the rest of your team.

Here are some Soho floor plans.  I'll get the others to you monday.  I bet you can guess
today was somewhat busy here.

I look forward to next steps!!!!!!!!

On 3/30/07, Peter Dunn <pgd@kolo-usa.com> wrote:
> Hi Lionel,
>
> Sorry I missed your email last night. It was nice spending time with
> you and Lowell last night over dinner. I really enjoyed our
> conversation and I really respect how you and your family are
> including the vendor community in turn around.
>
> Hopefully you see that Keith and I truly want to be a major part of
> your new vision for Kate's. I am very excited about our plans. Look
> forward to our next discussions.
>
>
> Best regards,
>
> Peter
>
> -----Original Message-----
> From: Lionel Flax [mailto:lionel.flax@gmail.com]
> Sent: Thursday, March 29, 2007 5:15 PM
> To: pgd@kolo-usa.com
> Subject: Re: automated response
>
> Peter, if you get this before 5:35, call 646-352-1297.  If not, no worries.
>
> On 3/8/07, Peter Dunn <pgd@kolo-usa.com> wrote:
> > Thank you for your email. I am out of the office until Monday, March
> > 12th
> attending the PMA show and unable to get emails regularly. I will
> respond to your email as soon as possible.
> >
> > Thank you for your patience.
> >
> > Peter Dunn


PLAINTIFF'S
EXHIBIT
5
2/11/08  ms

KP 0003

```
> >
>
>
> --
> Lionel Flax
> Director of Leadership and Development Flax Art Supply Company
> 646-352-1297
>
>


--
Lionel Flax
Director of Leadership and Development
Flax Art Supply Company
646-352-1297
```

KP 0004



KP 0005

LAYOUT 1



PLAINTIFF'S EXHIBIT
6
2/1/08 MS

From: "Barreiro, Joe" <JBarreiro@katespaperie.com>
Date: Mon, 2 Apr 2007 07:32:13 -0500
Subject: RE:
To: "Flax, Lowell" <flax9@aol.com>, "Flax, Leonard"
<lflax@katespaperie.com>, "Flax, Lionel" <lionel.flax@gmail.com>, "Barreiro, Joe"
<JBarreiro@katespaperie.com>, "Pauly, Julie"
<jpauly@katespaperie.com>, "Bricker, Kristin"
<KBricker@katespaperie.com>

Before we look at possible downsides , how about providing the details of the deal ? How
much square footage ? How is the square footage computed ?
Does it include aisle space ? How much are they paying in rent ? Is there a trial period
after which we can back out ? Are we obligated to give window display space ? Is the deal
for one store or all ? How do we separate internet or nonstore sales ? Do they provide the
staff for this boutique or do we ? Is that staff multi dimensional ( can they help
customers in other parts of the store )? Do they report to our manager ? How are they
being compensated as opposed to our staff ? How much of our sales info do we provide to
Kolo and how will the replenishment be handled ( from Kolo , from MacPhersons ) ? Do we
receive it into our inventory ? Who checks it in, our people or theirs ?
                    I think the prospect has merit and should be discussed
but as is the usually the case "the devil is in the details "      Joe
----

From: flax9@aol.com [mailto:flax9@aol.com]
Sent: Friday, March 30, 2007 11:48 AM
To: lflax@katespaperie.com; lionel.flax@gmail.com; jbarreiro@katespaperie.com;
JPauly@katespaperie.com; KBricker@katespaperie.com
Subject:


            Hi,
            last night Lionel and I had a very good dinner meeting with Peter and
Keith from Kolo. They are willing to pay the rent on a store-in-store. We would not have
to buy merchandise and we would share in the sales. Much of what thery say makes a lot of
sense to us and for Kate's. We feel their proposal has a lot of merit without much risk
for us. Here is some of our reasoning:

                                          Since we know we will sell Kolo, as do
our competitors, we want to be the best possible.
Partnering with them gives us many benefits:


comprehensive and best looking selection of Kolo.                -We will have the most


                                          -The onus of maximizing
sales PSF is on them, and believe me, they have the analysis to know what is realistic
based on historical figures in similar situations. It is the equivalent of having a more
sophisticated, accurate, auto-replenishment that will take the burden off of Kate's.


                                          -Since they would be paying
for their space, it is safe to assume that they are confident in what they can do and will
do all they can to make it succeed. This is major.

                                          -Since they would be paying
for their space, it alleviates some rent on our part.

1                                          **KP 0006**

buy merchandise, it frees up cash flow flow.                    -Since we wouldn't have to

managing their inventory, it frees up the buyer's time as well as inventory control.                    -Since they would be

alleviation, increased sales, and increased efficiencies makes sense for Kate's.                    -The combination of rent

chance to increase sales in an eroding category.                    -This gives us a risk-free

-The direction that they are moving in, longer term, has an interactive element that include printing kiosks where people can customize their albums. They are embracing the digital age, and trying to make it work for them. This could put us at the forefront of the digital age as it relates to photo albums. Why run from it? The digital age is here to stay.

from them to other areas.                    -We can apply what we learn

Some people seem very skeptical of this, and I can't for the life of me figure out why. They're not trying to stick us with a bunch of crap-they want us to succeed and even exceed. They are dedicated to making it happen in a realistic way.They're willing to PAY for our shared success.  It is an opportunity for both parties.

I am having a lot of trouble understanding what the percieved downside of this would be. What risk is there, besides the risk of improvement in an already existing vendor? These guys are not used-car salesmen looking to 'move inventory'. They have a plan and model, and it has worked for them where people have been willing to listen.

Please let me know what you see as the downside in this scenario, if you see any.

    Thanks,

        Lowell

_____
AOL now offers free email to everyone.  Find out more about what's free from AOL at AOL.com.

2

KP 0007

From: Lionel Flax <lionel.flax@gmail.com>
Date: Thu, 12 Apr 2007 19:04:23 -0700
Subject: Re: automated response
To: pgd@kolo-usa.com

All set with the Siho Corner.  Let me know what to do, and get me the LOI.  I am meeting
with Zama again tomorrow, and again on Mon.  Let me know what to instruct.

I will call you tomorrow.  Or call me.

Please forward to Keith, I do not have his email

On 3/8/07, Peter Dunn <pgd@kolo-usa.com> wrote:
> Thank you for your email. I am out of the office until Monday, March 12th attending the
PMA show and unable to get emails regularly. I will respond to your email as soon as
possible.
>
> Thank you for your patience.
>
> Peter Dunn
>


--
Lionel Flax
Director of Leadership and Development
Flax Art Supply Company
646-352-1297



PLAINTIFF'S EXHIBIT

**KP 0011**

1

From: Peter Dunn <pgd@kolo-usa.com>
Date: Fri, 20 Apr 2007 19:43:01 -0400
Subject: RE: Kates
To: Lionel Flax <lionel.flax@gmail.com>, kkw@kolo-usa.com

Hi Lionel,

Great to hear that everyone is on-board and excited. We are excited too!

Regarding the meeting, Keith suggested we make it Tuesday at 11:00 am your time, 11:00 pm
our time. There is vendor committee meeting (conference call) at 10:00 am on Tuesday. That
way, Keith can give you an update on that meeting as well.

We will call you on the 646.352.1297 number. Talk to you then.

Best regards,

Peter

-----Original Message-----
From: Lionel Flax [mailto:lionel.flax@gmail.com]
Sent: Friday, April 20, 2007 6:46 PM
To: kkw@kolo-usa.com; pgd@kolo-usa.com
Subject: Kates

Let me know what time, I don't care what time it is my time works for you two, for a call.
I resolved all issues on our end and we are ready to go!! Everybody is on-board and
extremely excited about this new development.

Warmly
--
Lionel Flax
Chief Executive Officer
Kate's Paperie
646-352-1297



**KP 0014**

1



Kates Letter of
Intent 4-07 (3...

From: Keith Werner <kkw@kolo-usa.com>
Date: Sun, 6 May 2007 08:09:42 -0400
Subject:
To: Lionel Flax <lionel.flax@gmail.com>

Hi Lionel,

Sorry we were unable to talk again the other day.  I will be arriving back to the US this
weekend and plan to be at the creditors meeting on Monday, 5/7.  Also, enclosed please
find a draft of the letter of intent. Sorry for the delay as you can imagine my schedule
has been extremely busy.  Please review it and let me know if we are on the same page.
The reference to the addendum is the proposal that I had originally sent you so if you
have any question about it then you can refer to the original proposal.  We are full steam
ahead for getting everything ready for Spring in June.  I will try calling you over the
weekend. Maybe we can get together after the meeting on Monday ?

Best regards,


Keith Werner
Executive Vice President
KOLO, LLC.
kkw@kolo-usa.com
860-547-0367 Ext 222
860-547-0598 FAX
www.kolo.com



KP 0027

1

Letter of Intent

between

**Kate's Paperie LTD and Affiliates.,**

hereinafter named "Kate's"
and

**Kolo Retail, LLC,**

hereafter named "Kolo"

The following confirms the understanding for which the parties have agreed to in principal to enter into a contract hereinafter called ("Agreement") for Kolo to lease retail space from Kate's Paperie, LLC and to operate a retail store within each of three Kate's stores. It is intended that the parties will enter into a more formal agreement on the following terms of the contract within a reasonable time.

1. **Locations and Demised Premises -** Kate's commits to Kolo to provide rental space in the following three of it's Manhattan, NY locations; Spring Street, 3rd Avenue, and 57th Street. Kolo Retail, LLC is hereby committing to displaying and selling products only within the dedicated space. The size of each location shall vary between 250 square feet to 450 square feet. The attached Addendum (A) defines the agreed upon space at the Spring Street Store. Layout and drawings showing such dedicated space is attached hereto in Addendum (A). Together with and at the same time as this Agreement is entered into, the parties will also conclude a rental agreement, and Kate's will provide Kolo a consent from the current landlord(s) for such rights to sub-lease.

2. **Fixtures, Furnishings & Equipment -** Fixtures, furnishings and equipment such as displays, computers, tables, etc. shall be completely provided by and owned by Kolo. Other improvements or build out shall be discussed and agreed upon between the parties at a later date.

3. **Commencement -** The commencement of the first Kolo retail store within the Kate's store concept will begin on or around June 1, 2007 located on Spring Street. The other locations, 3rd Avenue and 57th Street, will commence approximately one month thereafter. Both parties shall begin discussions to come to a mutual agreement to the specific locations for the 3rd Avenue and 57th Street locations by June 1, 2007. Notwithstanding the above, should both parties fail to mutually agree to the locations of the other Kate's stores then Kolo shall have the right to terminate the Agreement, vacating the Spring Street location, by giving a 30 day notice to Kate's.

4. **Staff and Payroll Expenses -** Kolo shall provide its own representatives, employees and staff to operate each store within Kate's store. Both parties have agreed that in the event it becomes necessary to utilize Kate's staff, whether on a part-time or full-time basis, Kolo shall reimburse Kate's for any payroll expenses.

**KP 0028**

5. **Inventory -** Upon commencement of each location, starting with the Spring Street location, Kolo will agree to accept responsibility of the current inventory that Kate's provides to Kolo for that location. All inventory must be in saleable condition when provided by Kate's. At the time of commencement, for each additional store, Kolo will issue a credit memo to Kate's for receiving such qualified inventory.

6. **Insurance -** Kolo will agree to insure all contents inside the demised premises.

7. **Compensation -** Each location shall have its own profit and loss projections and compensation schedule which will describe the amount to be paid to Kate's. It is agreed that each compensation schedule will be attached as an additional addendum and made apart of the Agreement. The compensation schedule for Spring Street is also attached hereto in Addendum (A). Kolo shall compensate Kate's according to the compensation schedule set forth in Addendum (A) for the Spring Street location and according to future addendums for the other locations as they are agreed upon. Each location shall have its own projections and compensation schedule which shall describe the amount to be paid to Kate's. It is agreed that each compensation schedule will be attached as an additional addendum and made apart of the Agreement. Compensation to Kate's will be in the form of base rental income plus an additional royalty income which formula is also set forth in the compensation schedule and attached to the Agreement.

8. **Term -** The term of each sub-lease will be for one year from the commencement date. Kolo shall retain the right to renew each sub-lease for an additional one year period, and each year thereafter as it becomes due by giving 60 day notice to Kate's prior to the termination date.

9. **Confidentiality -** Both parties agree to keep all information about the terms of this Agreement confidential. Both parties also acknowledge that they have signed a Mutual Confidentiality Agreement prior to entering into this Agreement stating to keep all information confidential.

By signing below each party agrees and conscents to the above mention terms and agrees to act in good faith to complete the negotiations for addtional terms which will be set forth in the Agreement.

Kolo Retail, LLC

_____          _____
By it's                                                        Date

Kate's Paperie LTD and Affilitates

_____          _____
By it's                                                        Date

KP 0029

## NOTICE OF TERMINATION

TO:    Kolo Retail, LLC
       72 Spring Street
       New York, New York 10001

PLEASE TAKE NOTICE that the undersigned Lessee Entitled to Possession (by assignment) of Stores 1 & 2 and part of the Basement in the building known as and located at 72 Spring Street, New York, New York, (the "Premises") hereby elects to terminate, as of January 31, 2008, any possessory or occupancy interest, claimed right of possession, subtenancy at will, monthly subtenancy, or any other tenancy or subtenancy you may have or claim to have pursuant to which you are occupying approximately 375 square feet of the Premises; and to terminate any possessory or occupancy interests, claimed rights of possession, and/or tenancies or subtenancies of all those claiming under you with respect to the occupancy of any portion of the Premises.

TAKE FURTHER NOTICE you must vacate and surrender the Premises on or before January 31, 2008. Should you fail to vacate and surrender the Premises on or before January 31, 2008, the undersigned will institute summary proceedings pursuant to statute to evict you.

Dated: New York, New York
       December 20, 2007

                                    K.P., LLC

                                    By: _Curts Cooke_____
                                        Curts Cooke, Authorized Agent

                                    LESSEE ENTITLED to POSSESSION
                                    (by assignment)
                                    460 West 34th Street, 3rd Floor
                                    New York, New York 10001

cc:    KOLO RETAIL, LLC
       241 Asylum Street
       Hartford, CT 06103

       KOLO RETAIL, LLC
       c/o O'Connell, Flaherty & Attmore, L.L.C.
       280 Trumbull Street
       Hartford, CT 06103



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KOLO RETAIL, LLC,

                    Plaintiff,                                    07 CIV. 10653

     -against-

KATE'S PAPERIE, LTD.,                                  **JUDGE:  McMAHON**

                    Defendant.

---

### DESCRIPTION OF EXHIBIT "B" FILED IN HARD COPY

Plaintiff Kolo Retail, LLC's Exhibit A to its Affirmation in Further Support of Order for Preliminary Injunction is the **deposition transcript of KEITH WERNER taken on February 12, 2008.**

This document/Exhibit has been filed with the Court's permission on paper.  Hard copy is available in the Court's file in the Clerk's office.

From: Lionel Flax <lionel.flax@gmail.com>
Date: Sun, 6 May 2007 14:07:46 -0500
Subject: KAte's proposal
To: kw@kolo-usa.com

Keith, I think you hand delivred me the proposal.  I left it in the office and would like
to look at it today.  If you get this please send it to me electronically.
Regards

On 5/6/07, Keith Werner <kkw@kolo-usa.com> wrote:
> Hi Lionel,
>
> Sorry we were unable to talk again the other day.  I will be arriving
> back to the US this weekend and plan to be at the creditors meeting on
> Monday, 5/7.  Also, enclosed please find a draft of the letter of
> intent. Sorry for the delay as you can imagine my schedule has been
> extremely busy.  Please review it and let me know if we are on the
> same page.  The reference to the addendum is the proposal that I had
> originally sent you so if you have any question about it then you can
> refer to the original proposal.  We are full steam ahead for getting
> everything ready for Spring in June.  I will try calling you over the
> weekend. Maybe we can get together after the meeting on Monday ?
>
> Best regards,
>
>
> Keith Werner
> Executive Vice President
> KOLO, LLC.
> kkw@kolo-usa.com
> 860-547-0367 Ext 222
> 860-547-0598 FAX
> www.kolo.com
>
>
>
>
>

--
Lionel Flax
Chief Executive Officer
Kate's Paperie
646-352-1297

KP 0030



Kates_V4.ppt (582
KB)

From: master file flax <lionel.flax@gmail.com>
Date: Wed, 3 Oct 2007 20:30:25 -0400
Subject: Fwd: KAte's proposal
To: "Flax, Leonard" <lflax@katespaperie.com>, "John A. Golieb"
<jag@mggpclaw.com>

---------- Forwarded message ----------
From: Keith Werner <kkw@kolo-usa.com>
Date: May 6, 2007 8:59 PM
Subject: RE: KAte's proposal
To: Lionel Flax <lionel.flax@gmail.com>

Hi Lionel,

Here is the original proposal. Let me know if you want to get together tommorrow in the
City.

Thanks,

Keith




-----Original Message-----
From: Lionel Flax [mailto:lionel.flax@gmail.com]
Sent: Sunday, May 06, 2007 3:08 PM
To: kw@kolo-usa.com
Subject: KAte's proposal

Keith, I think you hand delivred me the proposal.  I left it in the office and would like
to look at it today.  If you get this please send it to me electronically.
Regards

On 5/6/07, Keith Werner <kkw@kolo-usa.com> wrote:
> Hi Lionel,
>
> Sorry we were unable to talk again the other day.  I will be arriving
> back to the US this weekend and plan to be at the creditors meeting on
> Monday, 5/7.  Also, enclosed please find a draft of the letter of
> intent. Sorry for the delay as you can imagine my schedule has been
> extremely busy.  Please review it and let me know if we are on the
> same page.  The reference to the addendum is the proposal that I had
> originally sent you so if you have any question about it then you can
> refer to the original proposal.  We are full steam ahead for getting
> everything ready for Spring in June.  I will try calling you over the

1

KP 0031

```
> weekend. Maybe we can get together after the meeting on Monday ?
>
> Best regards,
>
>
> Keith Werner
> Executive Vice President
> KOLO, LLC.
> kkw@kolo-usa.com
> 860-547-0367 Ext 222
> 860-547-0598 FAX
> www.kolo.com
>
>
>
>
>


--
Lionel Flax
Chief Executive Officer
Kate's Paperie
646-352-1297
```

2

KP 0032



KP 0033

**Kolo Store at the new SOHO location**

April 2007





SOHO floor plan



KP 0034



KP 0035



KP 0036

KO

KP 0037

# SOHO Proposal (Basic Terms)

1. Lease Term – One Year

2. Lease Options – Kolo has the right to (3) One Year Options.

3. Right to Terminate – Kate's has the right to terminate the agreement after the first year, and each year thereafter, unless Kolo continues to pay Kate's a minimum of $140/Per Square Foot plus 6% Royalty.

4. Kolo will provide Kate's with monthly POS Data.

5. Kolo will pay Kate's monthly rental payments according to the financial prosposal enclosed.

6. Kolo will pay Kate's monthly royalty payments according to the financial proposal enclosed.

7. Kate's will provide Kolo with landlord's consent to the sub-lease and a non-disturbance.

**Financial Proposal**

1. Starting Rent Per Square Foot - $75.00

2. Starting Royalty - 6%

3. Royalty Increases – Royalties increase
   according to the following revenue schedule;
   Net Sales of $250,000 to $449,000 – 6%
   Net Sales of $450,000 to $649,000 – 10%
   Net Sales of $$650,00 and up – 11%

4. Rent Increases – Rent increases according to
   the following revenue schedule;
   Net Sales of $250,000 – $75/Sq.Ft.
   Net Sales of $350,000 – $79/Sq.Ft.
   Net Sales of $450,000 – $83/Sq.Ft.
   Net Sales of $550,000 – $90/Sq.Ft.
   Net Sales of $650,000 – $100/Sq.Ft.
   Net Sales of $750,000 – $135/Sq.Ft.

KP 0038

# Financial Forecast

## Escalations

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Annual Retail Sales | | $250,000 | $350,000 | $450,000 | $550,000 | $650,000 | $750,000 |
| Sales/sq. ft | | $556 | $778 | $1,000 | $1,222 | $1,444 | $1,667 |
| Rent/Sq.Ft. | | $75 | $79 | $83 | $90 | $100 | $135 |
| Royalty | | 6% | 6% | 10% | 10% | 11% | 11% |

KP 0039



# Comparison of Kate's profitability under the existing vs. new model

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | |
| Net Sales | $155,000 | $250,000 | $350,000 | 450,000 | 550,000 | 650,000 | 750,000 | |
| Gross Margin | $150,350 | $242,500 | $339,500 | 436,500 | 533,500 | 630,500 | 727,500 | 97% |
| | $78,182 | $126,100 | $176,540 | 226,980 | 277,420 | 327,860 | 378,300 | 52% |
| **Operating Expenses** | | | | | | | | |
| Store Operating Expenses | $48,112 | $77,600 | $108,640 | 139,680 | 176,720 | 201,760 | 232,800 | 32% |
| Corporate Overhead | $16,539 | $26,675 | $37,345 | 48,015 | 59,685 | 69,355 | 80,025 | 11% |
| Total Operating Expenses | $64,651 | $104,275 | $145,985 | 187,695 | 229,405 | 271,115 | 312,825 | 43% |
| | | | | | | | | |
| EBITDA | $13,532 | $21,825 | $30,555 | 39,285 | 48,015 | 56,745 | 65,475 | 9% |
| Depreciation & Amortization | $3,007 | $4,850 | $6,790 | 8,730 | 10,670 | 12,610 | 14,550 | 2% |
| EBIT | $10,525 | $16,975 | $23,765 | 30,555 | 37,345 | 44,135 | 50,925 | 7% |
| Other Income and Expenses | $4,511 | $7,275 | $10,185 | 13,095 | 16,005 | 18,915 | 21,825 | 3% |
| Net Income | $6,014 | $9,700 | $13,580 | 17,460 | 21,340 | 25,220 | 29,100 | 4% |
| Future Net Income | $(6,014) | $(14,187) | $(6,680) | 18,372 | 31,363 | 51,868 | 78,288 | |
| Difference | | $(23,887) | $(20,260) | 912 | 10,023 | 26,648 | 49,188 | |
| Future Net Income % | | | | 4% | 6% | 8% | 11% | |

KP 0040

# Comparative analysis of net income projections

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Annual Retail Sales | $250,000 | $ 350,000 | $ 450,000 | $ 550,000 | $ 650,000 | $ 750,000 | |
| Annual Net Retail Sales | $242,500 | $ 339,500 | $ 436,500 | $ 533,500 | $ 630,500 | $ 727,500 | |
| | | | | | | | |
| Kates Total Revenues (Roy. & Rent) | $48,300 | $55,808 | $80,859 | $93,850 | $114,355 | $140,775 | |
| Kates Operating Expenses | $62,487 | $62,487 | $62,487 | $62,487 | $62,487 | $62,487 | |
| Kates Net Operating Income | -$14,187 | -$6,680 | $18,372 | $31,363 | $51,868 | $78,288 | |
| Kolo Gross Profit | $126,382 | $176,935 | $210,028 | $256,701 | $297,069 | $342,771 | |
| Kolo Operating Expenses | $151,703 | $167,455 | $183,292 | $200,648 | $219,213 | $249,028 | |
| Kolo Net Income | -$33,654 | $1,146 | $18,402 | $47,719 | $69,522 | $85,410 | |



KP 0041

From: Keith Werner <kkw@kolo-usa.com>
Date: Tue, 8 May 2007 21:11:14 -0400
Subject:
To: Lionel Flax <lionel.flax@gmail.com>

Hi Lionel,

Just checking in with you to see how you are doing with signing the LOI. I am going to be putting my staff together with Zelma to coordinate the setup of the shop in shop.  We are planning on sending a team down next week for the show and I thought we could get everyone together at that time to go over the setup. I will also be having my inventory management team touch base with the Kate's person in charge of purchasing Kolo so we can begin to transition the inventory for the new store.  Could you please let me know who that person would be and how to contact them as soon as possible.

Talk to you soon.


Keith Werner
Executive Vice President
KOLO, LLC.
kkw@kolo-usa.com
860-547-0367 Ext 222
860-547-0598 FAX
www.kolo.com

KP 0042

From: Lionel Flax <lionel.flax@gmail.com>
Date: Thu, 10 May 2007 13:50:26 -0400
Subject: Re:
To: kw@kolo-usa.com

Did u find it?

On 5/10/07, Keith Werner <kkw@kolo-usa.com> wrote:
> Thank you Lionel ! I will look for it now.
>
> Keith
>
> -----Original Message-----
> From: Lionel Flax [mailto:lionel.flax@gmail.com]
> Sent: Wednesday, May 09, 2007 2:36 PM
> To: kw@kolo-usa.com
> Subject: Re:
>
> I just sent this through signed.
>
> On 5/8/07, Keith Werner <kkw@kolo-usa.com> wrote:
> >
> >
> > Hi Lionel,
> >
> > Just checking in with you to see how you are doing with signing the
> > LOI. I am going to be putting my staff together with Zelma to
> > coordinate the setup of the shop in shop.  We are planning on
> > sending a team down next week for the show and I thought we could
> > get everyone together at that time to go over the setup. I will also
> > be having my inventory management team touch base with the Kate's
> > person in charge of purchasing Kolo so we can begin to transition
> > the inventory for the new store.  Could you please let me know who
> > that person would be and how
> to contact them as soon as possible.
> >
> > Talk to you soon.
> >
> >
> > Keith Werner
> > Executive Vice President
> > KOLO, LLC.
> >  kkw@kolo-usa.com
> >  860-547-0367 Ext 222
> >  860-547-0598 FAX
> >  www.kolo.com
> >
> >
> >
>
>
> --
> Lionel Flax
> Chief Executive Officer
> Kate's Paperie

**KP 0044**

```
> 646-352-1297
>
>


--
Lionel Flax
Chief Executive Officer
Kate's Paperie
646-352-1297
```

KP 0045

From: Keith Werner <kkw@kolo-usa.com>
Date: Sat, 12 May 2007 03:36:50 -0400
Subject:
To: Lionel Flax <lionel.flax@gmail.com>

Hi Lionel,

I did received your faxed LOI. Thank you very much. I will bring a copy of the signed one
to you on Tuesday. I thought we could meet around 1pm at the Mercer Café for lunch if that
is ok with you ? Remember we will be meeting with Akira Ito - President of Ito-Ya Japan
and Shin Ueno - Senior Manager of Sourcing Exports.

Did you get any where with the issue of the leases today. I could not get a hold of John
Scholte. But I will try him on Monday.

Regards,

Keith Werner
Executive Vice President
KOLO, LLC.
kkw@kolo-usa.com
860-547-0367 Ext 222
860-547-0598 FAX
www.kolo.com

1

**KP 0049**

**Plaintiff is not in possession of Defendant's Deposition Exhibit "F."**

**STANDARD FORM OF STORE LEASE**
The Real Estate Board of New York, Inc.

2/94-A

Agreement of Lease, made as of this 13th day of Sept., 2005 ,between
Spring Street Co. LLC c/o The Propeller Co. LLC, 15 Maiden Lane, Suite 1300, NY NY 10038

party of the first part, hereinafter referred to as OWNER, and Kate's Paperie, Ltd., 460 W. 34th Street
Third Floor, NY NY 10001

party of the second part, hereinafter referred to as TENANT.

Witnesseth: Owner hereby leases to Tenant and Tenant hereby hires from Owner Stores 142 and part
basement

in the building known as 72 Spring Street
in the Borough of Manhattan , City of New York, for the term of Ten (10) Years

(or until such term shall sooner cease and expire as hereinafter provided) to commence on the
1st day of December, 2005*
30th day of November, 2015 , and to end on the
both dates inclusive, at an annual rental rate of *Dates subject to adjustment based upon possession

SEE ATTACHED SCHEDULE A

which Tenant agrees to pay in lawful money of the United States which shall be legal tender in payment of all debts and dues,
public and private, at the time of payment, in equal monthly installments in advance on the first day of each month during said
term, at the office of Owner or such other place as Owner may designate, without any set off or deduction whatsoever, except
that Tenant shall pay the first monthly installment(s) on the execution hereof (unless this lease be a renewal).

In the event that, at the commencement of the term of this lease, or thereafter, Tenant shall be in default in the payment
of rent to Owner pursuant to the terms of another lease with Owner or with Owner's predecessor in interest, Owner may at
Owner's option and without notice to Tenant add the amount of such arrears to any monthly installment of rent payable hereunder
and the same shall be payable to Owner as additional rent.

The parties hereto, for themselves, their heirs, distributees, executors, administrators, legal representatives,
successors and assigns, hereby covenant as follows:

**Rent:** 1. Tenant shall pay the rent as above and as hereinafter provided.

**Occupancy:** 2. Tenant shall use and occupy demised premises for See Use Paragraph #77

and for no other purpose. Tenant shall at all times conduct its business in a high grade and reputable manner, shall not violate Article 37 hereof,
and shall keep show windows and signs in a neat and clean condition.



*The interlineated numbers refer to what provisions which are keyed to*
*Schedule A attached hereto*

Page 1 of 6

PLAINTIFF'S
EXHIBIT
4
2/12/08
PENGAD 800-631-6989

Printed using pcFORMation™ Software, v. 4/98, 609-987-2107

pcFORMation™
W10-3265
09/19/05

KP 0089

or permit any act or thing to be done in or to the demised premises which is contrary to law, or which will invalidate or be in conflict with public liability, fire or other policies of insurance at any time carried by or for the benefit of Owner. Tenant shall pay all costs, expenses, fines, penalties or damages, which may be imposed upon Owner by reason of Tenant's failure to comply with the provisions of this article. If the fire insurance rate shall, at the beginning of the lease or at any time thereafter, be higher than it otherwise would be, then Tenant shall reimburse Owner, as additional rent hereunder, for that portion of all fire insurance premiums thereafter paid by Owner which shall have been charged because of such failure by Tenant, to comply with the terms of this article. In any action or proceeding wherein Owner and Tenant are parties, a schedule or "make-up" of rate for the building or demised premises issued by a body making fire insurance rates applicable to said premises shall be conclusive evidence of the facts therein stated and of the several items and charges in the fire insurance rate then applicable to said premises.

**Subordination:** 7. This lease is subject and subordinate to all ground or underlying leases and to all mortgages which may now or hereafter affect such leases or the real property of which demised premises are a part and to all renewals, modifications, consolidations, replacements and extensions of any such underlying leases and mortgages. This clause shall be self-operative and no further instrument of subordination shall be required by any ground or underlying lessor or by any mortgagee, affecting any lease or the real property of which the demised premises are a part. In confirmation of such subordination, Tenant shall from time to time execute promptly any certificate that Owner may request.

**Tenant's Liability Insurance Property Loss, Damage, Indemnity:** 8. Owner or its agents shall not be liable for any damage to property of Tenant or of others entrusted to employees of the building, nor for loss of or damage to any property of Tenant by theft or otherwise, nor for any injury or damage to persons or property resulting from any cause of whatsoever nature, unless caused by or due to the negligence of Owner, its agents, servants or employees. Owner or its agents will not be liable for any such damage caused by other tenants or persons in, upon or about said building or caused by operations in construction of any private, public or quasi public work. Tenant agrees, at Tenant's sole cost and expense, to maintain general public liability insurance in standard form in favor of Owner and Tenant against claims for bodily injury or death or property damage occurring in or, upon the demised premises, effective from the date Tenant enters into possession and during the term of this lease. Such insurance shall be in an amount and with carriers acceptable to the Owner. Such policy or policies shall be delivered to the Owner. On Tenant's default in obtaining or delivering any such policy or policies or failure to pay the charges therefor, Owner may secure or pay the charges for any such policy or policies and charge the Tenant as additional rent therefor. Tenant shall indemnify and save harmless Owner against and from all liabilities, obligations, damages, penalties, claims, costs and expenses for which Owner shall not be reimbursed by insurance, including reasonable attorneys fees, paid, suffered or incurred as a result of any breach by Tenant, Tenant's agent, contractors, employees, invitees, or licensees, of any covenant on condition of this lease, or the carelessness, negligence or improper conduct of the Tenant, Tenant's agents, contractors, employees, invitees or licensees. Tenant's liability under this lease extends to the acts and omissions of any subtenant, and any agent, contractor, employee, invitee or licensee of any subtenant. In case any action or proceeding is brought against Owner by reason of any such claim, Tenant, upon written notice from Owner, will, at Tenant's expense, resist or defend such action or proceeding by counsel approved by Owner in writing, such approval not to be unreasonably withheld.

**Destruction, Fire, and Other Casualty:** 9. (a) If the demised premises or any part thereof shall be damaged by fire or other casualty, Tenant shall give immediate notice thereof to Owner and this lease shall continue in full force and effect except as hereinafter set forth. (b) If the demised premises are partially damaged or rendered partially unusable by fire or other casualty, the damages thereto shall be repaired by and at the expense of Owner and the rent and other items of additional rent, until such repair shall be substantially completed, shall be apportioned from the day following the casualty according to the part of the premises which is usable (c) If the demised premises are totally damaged or rendered wholly unusable by fire or other casualty, then the rent and other items of additional rent as hereinafter expressly provided shall be proportionally paid up to the time of the casualty and thenceforth shall cease until the date when the premises shall have been repaired and restored by Owner (or sooner reoccupied in part by Tenant then rent shall be apportioned as provided in subsection (b) above), subject to Owner's right to elect not to restore the same as hereinafter provided; (d) If the demised premises are rendered wholly unusable or (whether or not the demised premises are damaged in whole or in part) if the building shall be so damaged that Owner shall decide to demolish it or to rebuild it, then, in any of such events, Owner may elect to terminate this lease by written notice to Tenant given within ninety (90) days after such fire or casualty, or 30 days after adjustment of the insurance claim for such fire or casualty, whichever is sooner, specifying a date for the expiration of the lease, which date shall not be more than 60 days after the giving of such notice, and upon the date specified in such notice the term of this lease shall expire as fully and completely as if such date were the date set forth above for the termination of this lease and Tenant shall forthwith quit, surrender and vacate the premises without prejudice however, to Owner's rights and remedies against Tenant under the lease provisions in effect prior to such termination, and any rent owing shall be paid up to such date and any payments of rent made by Tenant which were on account of any period subsequent to such date shall be returned to Tenant. Unless Owner shall serve a termination notice as provided for herein, Owner shall make the repairs and restorations under the conditions of (b) and (c) hereof, with all reasonable expedition subject to delays due to adjustment of insurance claims, labor troubles and causes beyond Owner's control. After any such casualty, Tenant shall cooperate with Owner's restoration by removing from the premises as promptly as reasonably possible, all of Tenant's salvageable inventory and movable equipment, furniture, and other property. Tenant's liability for rent shall resume five (5) days after written notice from Owner that the premises are substantially ready for Tenant's occupancy. (e) Nothing contained hereinabove shall relieve Tenant from liability that may exist as a result of damage from fire or other casualty. Notwithstanding the foregoing, including Owner's obligation to restore under subparagraph (b) above, each party shall

Rider to be added if necessary.

Printed using pcFORMation™ Software, v. 4/84, 408-947-2107

look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty, and to the extent that such insurance is in force and collectible and to the extent permitted by law, Owner and Tenant each hereby releases and waives all right of recovery with respect to subparagraphs (b), (d) and (e) above, against the other or any one claiming through or under each of them by way of subrogation or otherwise. The release and waiver herein referred to shall be deemed to include any loss or damage to the demised premises and/or to any personal property, equipment, trade fixtures, goods and merchandise located therein. The foregoing release and waiver shall be in force only if both releasors' insurance policies contain a clause providing that such a release or waiver shall not invalidate the insurance. Tenant acknowledges that Owner will not carry insurance on Tenant's furniture and/or furnishings or any fixtures or equipment, improvements, or appurtenances removable by Tenant and agrees that Owner will not be obligated to repair any damage thereto or replace the same. (f) Tenant hereby waives the provisions of Section 227 of the Real Property Law and agrees that the provisions of this article shall govern and control in lieu thereof.

**Eminent Domain:** 10. If the whole or any part of the demised premises shall be acquired or condemned by Eminent Domain for any public or quasi public use or purpose, then and in that event, the term of this lease shall cease and terminate from the date of title vesting in such proceeding and Tenant shall have no claim for the value of any unexpired term of said lease. Tenant shall have the right to make an independent claim to the condemning authority for the value of Tenant's moving expenses and personal property, trade fixtures and equipment, provided Tenant is entitled pursuant to the terms of the lease to remove such property, trade fixtures and equipment at the end of the term and provided further such claim does not reduce Owner's award.

**Assignment, Mortgage, Etc.:** 11. Tenant, for itself, its heirs, distributees, executors, administrators, legal representatives, successors and assigns expressly covenants that it shall not assign, mortgage or encumber this agreement, nor underlet, or suffer or permit the demised premises or any part thereof to be used by others, without the prior written consent of Owner in each instance. Transfer of the majority of the stock of a corporate tenant or the majority partnership interest of a partnership tenant shall be deemed an assignment. If this lease be assigned, or if the demised premises or any part thereof be underlet or occupied by anybody other than Tenant, Owner may, after default by Tenant, collect rent from the assignee, under-tenant or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, underletting, occupancy or collection shall be deemed a waiver of the covenant, or the acceptance of the assignee, under-tenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained. The consent by Owner to an assignment or underletting shall not in any way be construed to relieve Tenant from obtaining the express consent in writing of Owner to any further assignment or underletting.

**Electric Current:** 12. Rates and conditions in respect to submetering or rent inclusion, as the case may be, to be added in RIDER attached hereto. Tenant covenants and agrees that at all times its use of electric current shall not exceed the capacity of existing feeders to the building or the risers or wiring installation and Tenant may not use any electrical equipment which, in Owner's opinion, reasonably exercised, will overload such installations or interfere with the use thereof by other tenants of the building. The change at any time of the character of electric service shall in no way make Owner liable or responsible to Tenant, for any loss, damages or expenses which Tenant may sustain.

**Access to Premises:** 13. Owner or Owner's agents shall have the right (but shall not be obligated) to enter the demised premises in any emergency at any time, and at other reasonable times to examine the same and to make such repairs, replacements and improvements as Owner may deem necessary and reasonably desirable to any portion of the building or which Owner may elect to perform, in the premises, following Tenant's failure to make repairs or perform any work which Tenant is obligated to perform under this lease, or for the purpose of complying with laws, regulations and other directions of governmental authorities. Tenant shall permit Owner to use and maintain and replace pipes and conduits in and through the demised premises and to erect new pipes and conduits therein, provided they are concealed within the walls, floors or ceiling, wherever practicable. Owner may, during the progress of any work in the demised premises, take all necessary materials and equipment into said premises without the same constituting an eviction nor shall the Tenant be entitled to any abatement of rent while such work is in progress nor to any damages by reason of loss or interruption of business or otherwise. Throughout the term Owner shall have the right to enter the demised premises at reasonable hours for the purpose of showing the same to prospective purchasers or mortgagees of the building, and during the last six months of the term for the purpose of showing the same to prospective tenants and may, during said six months period, place upon the demised premises the usual notices "To Let" and "For Sale" which notices Tenant shall permit to remain thereon without molestation. If Tenant is not present to open and permit an entry into the demised premises, Owner or Owner's agents may enter the same whenever such entry may be necessary or permissible by master key or forcibly and provided reasonable care is exercised to safeguard Tenant's property, such entry shall not render Owner or its agents liable therefor, nor in any event shall the obligations of Tenant hereunder be affected. If during the last month of term Tenant shall have removed all or substantially all of Tenant's property therefrom, Owner may immediately enter, alter, renovate or redecorate the demised premises without limitation or abatement of rent, or incurring liability to Tenant for any compensation and such act shall have no effect on this lease or Tenant's obligations hereunder. Owner shall have the right at any time, without the same constituting an eviction and without incurring liability to Tenant therefor to change the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairs, toilets, or other public parts of the building and to change the name, number or designation by which the building may be known.

**Vault, Vault Space, Area:** 14. No vaults, vault space or area, whether or not enclosed or covered, not within the property line of the building is leased hereunder, anything contained in this lease or indicated on any sketch, blue print or plan, or anything contained elsewhere in this lease to the contrary notwithstanding. Owner makes no representation as to the location of the property line of the

pcFORMation™
M10 - 3265
09/19/05

KP 0090

building. All vaults and vault space and such areas not within the property line of the building, which Tenant may be permitted to use and/ or occupy, it to be used and/or occupied under a revocable license, and if any such license be revoked, or if the amount of such space or area be diminished or required by any federal, state or municipal authority or public utility, Owner shall not be subject to any liability nor shall Tenant be entitled to any compensation or diminution or abatement of rent, nor shall such revocation, diminution or requisition be deemed constructive or actual eviction. Any tax, fee or charge of municipal authorities for such vault or area shall be paid by Tenant.

**Occupancy:** 15. Tenant will not at any time use or occupy the demised premises in violation of Articles 2 or 37 hereof, or of the certificate of occupancy issued for the building of which the demised premises are a part. Tenant has inspected the premises and accepts them as is, subject to the riders annexed hereto with respect to Owner's work, if any. In any event, Owner makes no representation as to the condition of the premises and Tenant agrees to accept the same subject to violations whether or not of record. (23)

**Bankruptcy:** 16. (a) Anything elsewhere in this lease to the contrary notwithstanding, this lease may be cancelled by Landlord by the sending of a written notice to Tenant within a reasonable time after the happening of any one or more of the following events: (1) the commencement of a case in bankruptcy or under the laws of any state naming Tenant as the debtor; or (2) the making by Tenant of an assignment or any other arrangement for the benefit of creditors under any state statute. Neither Tenant nor any person claiming through or under Tenant, or by reason of any statute or order of court, shall thereafter be entitled to possession of the premises demised but shall forthwith quit and surrender the premises. If this lease shall be assigned in accordance with its terms, the provisions of this Article 16 shall be applicable only to the party then owning Tenant's interest in this lease.

(b) It is stipulated and agreed that in the event of the termination of this lease pursuant to (a) hereof, Owner shall forthwith, notwithstanding any other provisions of this lease to the contrary, be entitled to recover from Tenant as and for liquidated damages an amount equal to the difference between the rent reserved hereunder for the unexpired portion of the term demised and the fair and reasonable rental value of the demised premises for the same period. In the computation of such damages the difference between any installment of rent becoming due hereunder after the date of termination and the fair and reasonable rental value of the demised premises for the period for which such installment was payable shall be discounted to the date of termination at the rate of four per cent (4%) per annum. If such premises or any part thereof be re-let by the Owner for the unexpired term of said lease, or any part thereof, before presentation of proof of such liquidated damages to any court, commission or tribunal, the amount of rent reserved upon such re-letting shall be deemed to be the fair and reasonable rental value for the part or the whole of the premises so re-let during the term of the re-letting. Nothing herein contained shall limit or prejudice the right of the Owner to prove for and obtain as liquidated damages by reason of such termination, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved, whether or not such amount be greater, equal to, or less than the amount of the difference referred to above.

**Default:** 17. (1) If Tenant defaults in fulfilling any of the covenants of this lease other than the covenants for the payment of rent or additional rent; or if the demised premises become vacant or deserted; or if any execution or attachment shall be issued against Tenant or any of Tenant's property whereupon the demised premises shall be taken or occupied by someone other than Tenant; or if this lease be rejected under Section 365 of Title II of the U.S. Code (Bankruptcy Code); or if Tenant shall fail to move into or take possession of the premises within thirty (30) days after the commencement of the term of this lease, of which fact Owner shall be the sole judge; then, in any one or more of such events, upon Owner serving a written fifteen (15) days notice upon Tenant specifying the nature of said default and upon the expiration of said fifteen (15) days, if Tenant shall have failed to comply with or remedy such default, or if the said default or omission complained of shall be of a nature that the same cannot be completely cured or remedied within said fifteen (15) day period, and if Tenant shall not have diligently commenced curing such default within such fifteen (15) day period, and shall not thereafter with reasonable diligence and in good faith proceed to remedy or cure such default, then Owner may serve a written five (5) days notice of cancellation of this lease upon Tenant, and upon the expiration of said five (5) days, this lease and the term thereunder shall end and expire as fully and completely as if the expiration of such five (5) day period were the day herein definitely fixed for the end and expiration of this lease and the term thereof and Tenant shall then quit and surrender the demised premises to Owner but Tenant shall remain liable as hereinafter provided.

(2) If the notice provided for in (1) hereof shall have been given, and the term shall expire as aforesaid; or if Tenant shall make default in the payment of the rent reserved herein or any item of additional rent herein mentioned or any part of either or in making any other payment herein required, then and in any of such events Owner may without notice, re-enter the demised premises either by force or otherwise, and dispossess Tenant by summary proceedings or otherwise, and the legal representative of Tenant or other occupant of demised premises and remove their effect and hold the premises as if this lease had not been made, and Tenant hereby waives the service of notice of intention to re-enter or to institute legal proceedings to that end.

**Remedies of** 18. In case of any such default, re-entry, expiration
**Owner and** and/or dispossess by summary proceedings or other-
**Waiver of** wise, (a) the rent, and additional rent, shall become
**Redemption:** due thereupon and be paid up to the time of such re-entry, dispossess and/or expiration. (b) Owner may re-let the premises or any part or parts thereof, either in the name of Owner or otherwise, for a term or terms, which may at Owner's option be less than or exceed the period which would otherwise have constituted the balance of the term of this lease and may grant concessions or free rent or charge a higher rental than that in this lease, and/or (c) Tenant or the legal representatives of Tenant shall also pay Owner as liquidated damages for the failure of Tenant to observe and perform said Tenant's covenants herein contained, any deficiency between the rent hereby reserved and/or covenanted to be paid and the net amount, if any, of the rents collected on account of the subsequent lease or leases of the demised premises for each month of the period which would otherwise have constituted the balance of

the term of this lease. The failure of Owner to re-let the premises or any part or parts thereof shall not release or affect Tenant's liability for damages. In computing such liquidated damages there shall be added to the said deficiency such expenses as Owner may incur in connection with re-letting, such as legal expenses, reasonable attorneys' fees, brokerage, advertising and for keeping the demised premises in good order or for preparing the same for re-letting. Any such liquidated damages shall be paid in monthly installments by Tenant on the rent day specified in this lease. Owner, in putting the demised premises in good order or preparing the same for re-rental may, at Owner's option, make such alterations, repairs, replacements, and/or decorations in the demised premises as Owner, in Owner's sole judgment, considers advisable and necessary for the purpose of re-letting the demised premises, and the making of such alterations, repairs, replacements, and/or decorations shall not operate or be construed to release Tenant from liability. Owner shall in no event be liable in any way whatsoever for failure to re-let the demised premises, or in the event that the demised premises are re-let, for failure to collect the rent thereof under such re-letting, and in no event shall Tenant be entitled to receive any excess, if any, of such net rent collected over the aggregate of the rents payable by Tenant to Owner hereunder. In the event of a breach or threatened breach by Tenant or any of the covenants or provisions hereof, Owner shall have the right of injunction and the right to invoke any remedy allowed at law or in equity as if re-entry, summary proceedings and other remedies were not herein provided for. Mention in this lease of any particular remedy, shall not preclude Owner from any other remedy, in law or in equity. Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws. (17)

**Fees and** 19. If Tenant shall default in the observance or
**Expenses:** performance of any term or covenant on Tenant's part to be observed or performed under or by virtue of any of the terms or provisions in any article of this lease, after notice if required and upon expiration of any applicable grace period if any, (except in an emergency), then, unless otherwise provided elsewhere in this lease, Owner may immediately or at any time thereafter and without notice perform the obligation of Tenant thereunder, and if Owner, in connection therewith or in connection with any default by Tenant in the covenant to pay rent hereunder, makes any expenditures or incurs any obligations for the payment of money, including but not limited to reasonable attorney's fees, in instituting, prosecuting or defending any action or proceeding and prevails in any such action or proceeding, such sums so paid or obligations incurred with interest and costs shall be deemed to be additional rent hereunder and shall be paid by Tenant to Owner within ten (10) days of rendition of any bill or statement to Tenant therefor, and if Tenant's lease term shall have expired at the time of making of such expenditures or incurring of such obligations, such sums shall be recoverable by Owner as damages. (24)

**No Repre-** 20. Neither Owner nor Owner's agent have made
**sentations by** any representations or promises with respect to the
**Owner:** physical condition of the building, the land upon which it is erected or the demised premises, the rents, leases, expenses of operation, or any other matter or thing affecting or related to the premises except as herein expressly set forth and no rights, easements or licenses are acquired by Tenant by implication or otherwise except as expressly set forth in the provisions of this lease. Tenant has inspected the building and the demised premises and is thoroughly acquainted with their condition, and agrees to take the same "as is" and acknowledges that the taking of possession of the demised premises by Tenant shall be conclusive evidence that the said premises and the building of which the same form a part were in good and satisfactory condition at the time such possession was so taken, except as to latent defects. All understandings and agreements heretofore made between the parties hereto are merged in this contract, which alone fully and completely expresses the agreement between Owner and Tenant and any executory agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of it in whole or in part, unless such executory agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought. (45)

**End of** 21. Upon the expiration or other termination of the
**Term:** term of this lease, Tenant shall quit and surrender to Owner the demised premises, broom clean, in good order and condition, ordinary wear excepted, and Tenant shall remove all its property. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of this lease. If the last day of the term of this lease or any renewal thereof, falls on Sunday, this lease shall expire at noon on the preceding Saturday unless it be a legal holiday in which case it shall expire at noon on the preceding business day.

**Quiet** 22. Owner covenants and agrees with Tenant that
**Enjoyment:** upon Tenant paying the rent and additional rent and observing and performing all the terms, covenants and conditions, on Tenant's part to be observed and performed, Tenant may peaceably and quietly enjoy the premises hereby demised, subject, nevertheless, to the terms and conditions of this lease including, but not limited to, Article 33 hereof and to the ground leases, underlying leases and mortgages hereinbefore mentioned.

**Failure to** 23. If Owner is unable to give possession of the
**Give** demised premises on the date of the commencement
**Possession:** of the term hereof, because of the holding-over or retention of possession of any tenant, undertenant or occupants, or if the premises are located in a building being constructed, because such building has not been sufficiently completed to make the premises ready for occupancy or because of the fact that a certificate of occupancy has not been procured or for any other reason, Owner shall not be subject to any liability for failure to give possession on said date and the validity of the lease shall not be impaired under such circumstances, nor shall the same be construed in any way to extend the term of this lease, but the rent payable hereunder shall be abated (provided Tenant is not responsible for the inability to obtain possession or complete construction) until after Owner shall have given Tenant written notice that Owner is able to deliver possession in the condition required by this lease. If permission is given to Tenant to enter into the possession of the demised premises or to occupy premises other than the demised premises prior to the date specified as the commencement of the term of this lease, Tenant covenants and agrees that such possession and/or occupancy shall be deemed to be under all the terms, covenants, conditions and provisions of this lease except the obligation to pay the fixed annual rent set forth in page

Printed using pcFORMation™ Software, v. 4/96, 438-947-2107

pcFORMation™
W10–3265
09/19705

KP 0091

one of this lease. The provisions of this article are intended to constitute "an express provision to the contrary" within the meaning of Section 223-c of the New York Real Property Law.

**No Waiver:** 14. The failure of Owner to seek redress for violation of, or to insist upon the strict performance of any covenant or condition of this lease or of any of the Rules or Regulations set forth or hereafter adopted by Owner, shall not prevent a subsequent act which would have originally constituted a violation from having all the force and effect of an original violation. The receipt by Owner of rent and/or additional rent with knowledge of the breach of any covenant of this lease shall not be deemed a waiver of such breach and no provision of this lease shall be deemed to have been waived by Owner unless such waiver be in writing signed by Owner. No payment by Tenant or receipt by Owner of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement of any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Owner may accept such check or payment without prejudice to Owner's right to recover the balance of such rent or pursue any other remedy in this lease provided. No act or thing done by Owner or Owner's agents during the term hereby demised shall be deemed an acceptance of a surrender of said premises and no agreement to accept such surrender shall be valid unless in writing signed by Owner. The employees of Owner or Owner's agent shall have any power to accept the keys of said premises prior to the termination of the lease and the delivery of keys to any such agent or employee shall not operate as a termination of the lease or a surrender of the premises.

**Waiver of Trial by Jury:** 15. It is mutually agreed by and between Owner and Tenant that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matters whatsoever arising out of or in any way connected with this lease, the relationship of Owner and Tenant, Tenant's use of or occupancy of said premises, and any emergency statutory or any other statutory remedy. It is further mutually agreed that in the event Owner commences any proceeding or action for possession including a summary proceeding for possession of the premises, Tenant will not interpose any counterclaim of whatever nature or description in any such proceeding, including a counterclaim under Article 4 except for statutory mandatory counterclaims.

**Inability to Perform:** 26. This lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in no way be affected, impaired or excused because Owner is unable to fulfill any of its obligations under this lease or to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repair, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment, fixtures or other materials if Owner is prevented or delayed from so doing by reason of strikes or labor troubles, government preemption or restrictions or by reason of any rule, order or regulation of any department or subdivision thereof of any government agency or by reason of the conditions of which have been or are affected, either, directly or indirectly, by war or other emergency, or when, in the judgement of Owner, temporary interruption of such services is necessary by reason of accident, mechanical breakdown, or to make repairs, alterations or improvements.

**Bills and Notices:** 27. Except as otherwise in this lease provided, a bill, statement, notice or communication which Owner may desire or be required to give to Tenant, shall be deemed sufficiently given or rendered if, in writing, delivered to Tenant personally or sent by registered or certified mail addressed to Tenant at the building of which the demised premises form a part or at the last known residence address or business address of Tenant or left at any of the aforesaid premises addressed to Tenant, and the time of the rendition of such bill or statement and of the giving of such notice or communication shall be deemed to be the time when the same is delivered to Tenant, mailed, or left at the premises as herein provided. Any notice by Tenant to Owner must be served by registered or certified mail addressed to Owner at the address first hereinabove given or at such other address as Owner shall designate by written notice.

**Water Charges:** 28. If Tenant requires, uses or consumes water for any purpose in addition to ordinary lavatory purposes (of which fact Tenant constitutes Owner to be the sole judge) Owner may install a water meter and thereby measure Tenant's water consumption for all purposes. Tenant shall pay Owner for the cost of the meter and the cost of the installation thereof and throughout the duration of Tenant's occupancy Tenant shall keep said meter and installation equipment in good working order and repair at Tenant's own cost and expense. Tenant agrees to pay for water consumed, as shown on said meter as and when bills are rendered, Tenant covenants and agrees to pay the sewer rent, charge or any other tax, rent, levy or charge which now or hereafter is assessed, imposed or a lien upon the demised premises or the realty of which they are part pursuant to law, order or regulation made or issued in connection with the use, consumption, maintenance or supply of water, water system or sewage or sewage connection or system. The bill rendered by Owner shall be payable by Tenant as additional rent. If the building or the demised premises or any part thereof be supplied with water through a meter through which is also supplied to other premises Tenant shall pay to Owner as additional rent, on the first day of each month, $_____ (% of the total meter charges, as Tenant's portion. Independently of and in addition to any of the remedies reserved to Owner hereinabove or elsewhere in this lease, Owner may sue for and collect any monies to be paid by Tenant or paid by Owner for any of the reasons or purposes hereinbefore set forth.

**Sprinklers:** 29. Anything elsewhere in this lease to the contrary notwithstanding, if the New York Board of Fire Underwriters or the Insurance Services Office or any bureau, department or official of the federal, state or city government require or recommend the installation of a sprinkler system or that any changes, modifications, alterations, or additional sprinkler heads or other equipment be made or supplied in an existing sprinkler system by reason of Tenant's business, or the location of partitions, trade fixtures, or other contents of the demised premises, or for any other reason, or if any such sprinkler system

installations, changes, modifications, alterations, additional sprinkler heads or other such equipment, become necessary to prevent the imposition of a penalty or charge against the full allowance for a sprinkler system in the fire insurance rate set by any said Exchange or by any fire insurance company. Tenant shall, at Tenant's expense, promptly make such sprinkler system installations, changes, modifications, alterations, and supply additional sprinkler heads or other equipment as required whether the work involved shall be structural or non-structural in nature. Tenant shall pay to Owner as additional rent the sum of $_____50.00_____, on the first day of each month during the term of this lease, as Tenant's portion of the contract price for sprinkler supervisory service.

**Elevators, Heat, Cleaning:** 30. As long as Tenant is not in default under any of the covenants of this lease beyond the applicable grace period provided in this lease for the curing of such defaults, Owner shall, if and insofar as existing facilities permit furnish heat to the demised premises, when and as required by law, on business days from 8:00 a.m. to 6:00 p.m. and on Saturdays from 8:00 a.m. to 1:00 p.m. Tenant shall at Tenant's expense, keep demised premises clean and in order, to the satisfaction of Owner, and if demised premises are situated on the street floor, Tenant shall, at Tenant's own expense, make all repairs and replacements to the sidewalks and curbs adjacent thereto, and keep said sidewalks and curbs free from snow, ice, dirt and rubbish. Tenant shall pay to Owner the cost of removal of any of Tenant's refuse and rubbish from the building. Bills for the same shall be rendered by Owner to Tenant at such times as Owner may elect and shall be due and payable when rendered, and the amount of such bills shall be deemed to be, and be paid as, additional rent. Tenant shall, however, have the option of independently contracting for the removal of such rubbish and refuse in the event that Tenant does not wish to have same done by employees of Owner. Under such circumstances, however, the removal of such refuse and rubbish by others shall be subject to such rules and regulations as, in the judgment of Owner, are necessary for the proper operation of the building.

**Security:** 31. Tenant has deposited with Owner the sum of $1347,575 as security for the faithful performance and observance by Tenant of the terms, provisions and conditions of this lease; it is agreed that in the event Tenant defaults in respect of any of the terms, provisions and conditions of this lease, including, but not limited to, the payment of rent and additional rent, Owner may use, apply or retain the whole or any part of the security so deposited to the extent required for the payment of any rent and additional rent or any other sum as to which Tenant is in default or for any sum which Owner may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this lease, including but not limited to, any damages or deficiency in the re-letting of the premises, whether such damages or deficiency accrued before or after summary proceedings or other re-entry by Owner. In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this lease, the security shall be returned to Tenant after the date fixed as the end of the Lease and after delivery of entire possession of the demised premises to Owner. In the event of a sale of the land and building or leasing of the building, of which the demised premises form a part, Owner shall have the right to transfer the security to the vendee or lessee and Owner shall thereupon be released by Tenant from all liability for the return of such security, and Tenant agrees to look to the new Owner solely for the return of said security and it is agreed that the provisions hereof shall apply to every transfer or assignment made of the security to a new Owner. Tenant further covenants that it will not assign or encumber or attempt to assign or encumber the monies deposited herein as security and that neither Owner nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.

**Captions:** 32. The Captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this lease nor the intent of any provision thereof.

**Definitions:** 33. The term "Owner" as used in this lease means only the Owner, or the mortgagee in possession, for the time being of the land and building (or the Owner of a lease of the building or of the land and building) of which the demised premises form a part, so that in the event of any sale or sales of said land and building, or of said lease, or in the event of a lease of said building, or of the land and building, the said Owner shall be and hereby is entirely freed and relieved of all covenants and obligations of Owner hereunder, and it shall be deemed and construed without further agreement between the parties or their successors in interest, or between the parties and the purchaser, at any such sale, or the said lease of the building, or of the land and building, that the purchaser of the lease of the building has assumed and agreed to carry out any and all covenants and obligations of Owner hereunder. The words "re-enter" and "re-entry" as used in this lease are not restricted to their technical legal meaning. The term "business days" as used in this lease shall exclude Saturdays, Sundays and all days designated as holidays by the applicable building service union employees service contract or by the applicable Operating Engineers contract with respect to HVAC service. Wherever it is expressly provided in this lease that consent shall not be unreasonably withheld, such consent shall not be unreasonably delayed.

**Adjacent Excavation, Shoring:** 34. If an excavation shall be made upon land adjacent to the demised premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter upon the demised premises for the purpose of doing such work as said person shall deem necessary to preserve the wall or the building of which demised premises form a part from injury or damage and to support the same by proper foundations without any claim for damages or indemnity against Owner, or diminution or abatement of rent.

**Rules and Regulations:** 35. Tenant and Tenant's servants, employees, agents, visitors, and licensees shall observe faithfully, and comply strictly with the Rules and Regulations and such other and further reasonable Rules and Regulations as Owner or Owner's agents may from time to time adopt. Notice of any additional rules or regulations shall be given in such manner as Owner may elect. In case Tenant disputes the reasonableness of any additional Rule or Regulation hereafter made or adopted by Owner or Owner's agents, the

pcFORMation™
M10-3265
09/19/05

KP 0092

parties hereto agree to submit the question of the reasonableness of such Rule or Regulation for decision to the New York office of the American Arbitration Association, whose determination shall be final and conclusive upon the parties hereto.  The right to dispute the reasonableness of any additional Rule or Regulation upon Tenant's part shall be deemed waived unless the same shall be asserted by service of a notice, in writing upon Owner within fifteen (15) days after the giving of notice thereof.  Nothing in this lease contained shall be construed to impose upon Owner any duty or obligation to enforce the Rules and Regulations or terms, covenants or conditions in any other lease, as against any other tenant and Owner shall not be liable to Tenant for violation of the same by any other tenant, its servants, employees, agents, visitors or licensees.

*Glass:*    36.  Owner shall replace, at the expense of Tenant, any and all plate and other glass damaged or broken from any cause whatsoever in and about the demised premises.  Owner may insure, and keep insured, at Tenant's expense, all plate and other glass in the demised premises for and in the name of Owner.  Bills for the premiums therefor shall be rendered by Owner to Tenant at such times as Owner may elect, and shall be due from, and payable by, Tenant when rendered, and the amount thereof shall be deemed to be, and be paid as, additional rent.

*Pornography:*    37. Tenant agrees that the value of the demised pre-*Uses Prohibited:*   mises and the reputation of the Owner will be seriously injured if the premises are used for any obscene or pornographic purposes or any sort of commercial sex establishment.  Tenant agrees that Tenant will not bring or permit any obscene or pornographic material on the premises, and shall not permit or conduct any obscene, nude, or semi-nude live performances on the premises, nor permit use of the premises for nude modeling, rap sessions, or as a so called rubber goods shops, or as a sex club of any sort, or as a "massage parlor." Tenant agrees further that Tenant will not permit any of these uses by any sublessee or assignee of the premises.  This Article

shall directly bind any successors in interest to the Tenant.  Tenant agrees that if at any time Tenant violates any of the provisions of this Article, such violation shall be deemed a breach of a substantial obligation of the terms of this lease and objectionable conduct.  Pornographic material is defined for purposes of this Article as any written or pictorial manner with prurient appeal or any objects of instrument that are primarily concerned with sexual or prurient sexual activity.  Obscene material is defined here as it is in Penal law §235.00.

*Estoppel*    38. Tenant, at any time, and from time to time, upon *Certificate:*    at least 10 days prior notice by Owner, shall execute, acknowledge and deliver to Owner, and/or to any other person, firm or corporation specified by Owner, a statement certifying that this lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), stating the dates which the rent and additional rent have been paid, and stating whether or not there exists any defaults by Owner under this lease, and, if so, specifying each such default.

*Successors*    39. The covenants, conditions and agreements *and Assigns:*    contained in this lease shall bind and inure to the benefit of Owner and Tenant and their respective heirs, distributees, executors, administrators, successors, and except as otherwise provided in this lease, their assigns.  Tenant shall look only to Owner's estate and interest in the land and building for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) against Owner in the event of any default by Owner hereunder, and no other property or assets of such Owner (or any partner, member, officer or director thereof, disclosed or undisclosed), shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this lease, the relationship of Owner and Tenant hereunder, or Tenant's use and occupancy of the demised premises.

**In Witness Whereof,** Owner and Tenant have respectively signed and sealed this lease as of the day and year first above written.    Paragraphs 40 to 83 are a part of this lease.

Witness for Owner:

.................................

.................................

Witness for Tenant:

.................................

.................................

LANDLORD: SPRING STREET CO., LLC C/O THE PROPELLER GROUP

BY: .................................

TENANT: KATE'S PAPERIE LTD.

BY: .................................

## ACKNOWLEDGEMENTS

CORPORATE OWNER
STATE OF NEW YORK,    ss.:
County of

On this        day of                , 19
before me personally came
to me known, who being by me duly sworn, did depose and say that
he resides in
that he is the
of
the corporation described in and which executed the foregoing instrument, as OWNER; that he knows the seal of said corporation; the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation, and that he signed his name thereto by like order.

CORPORATE TENANT
STATE OF NEW YORK,    ss.:
County of

On this        day of                , 19
before me personally came
to me known, who being by me duly sworn, did depose and say that
he resides in
that he is the
of
the corporation described in and which executed the foregoing instrument, as TENANT; that he knows the seal of said corporation; the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation, and that he signed his name thereto by like order.

INDIVIDUAL OWNER
STATE OF NEW YORK,    ss.:
County of

On this        day of                , 19
before me personally came
to be known and known to me to be the individual
described in and who, as OWNER, executed the foregoing instrument and acknowledged to me that                he
executed the same.

INDIVIDUAL TENANT
STATE OF NEW YORK,    ss.:
County of

On this        day of                , 19
before me personally came
to be known and known to me to be the individual
described in and who, as TENANT, executed the foregoing instrument and acknowledged to me that                he
executed the same.

Printed using pcFORMation™ Software, v. 4/96, 408-947-2107

pcFORMation™
W1G-3265
09/19/05

KP 0093

## GUARANTY

The undersigned Guarantor guarantees to Owner, Owner's successors and assigns, the full performance and observance of all the agreements to be performed and observed by Tenant in the attached Lease, including the "Rules and Regulations" as therein provided, without requiring any notice to Guarantor of nonpayment, or nonperformance, or proof, or notice of demand, to hold the undersigned responsible under this guaranty, all of which the undersigned hereby expressly waives and expressly agrees that the legality of this agreement and the agreements of this Guarantor under this agreement shall be ended, or changed by reason of the claims to Owner against Tenant of any of the rights or remedies given to Owner as agreed in the attached Lease. The Guarantor further agrees that this guaranty shall remain and continue in full force and effect as to any renewal, change or extension of the Lease. As a further inducement to Owner to make the Lease Owner and Guarantor agree that in any action or proceeding brought by either Owner or the Guarantor against the other on any matters concerning the Lease or of this guaranty that Owner and the undersigned shall and do wave trial by jury.

Dated: _____ 19____

_____
Guarantor

_____
Witness

Guarantor's Residence

_____

Business Address

_____

Firm Name

STATE OF NEW YORK }  ss.:
COUNTY OF

On this _____ day of _____ 19____ , before me, personally came _____ to me known and known to me to be the individual described in, and who executed the foregoing Guaranty and acknowledged to me that he executed the same.

_____
Notary

 **IMPORTANT - PLEASE READ** 

### RULES AND REGULATIONS ATTACHED TO AND MADE A PART OF THIS LEASE IN ACCORDANCE WITH ARTICLE 35.

1. The sidewalks, entrances, driveways, passages, courts, elevators, vestibules, stairways, corridors or halls shall not be obstructed or encumbered by any Tenant or used for any purpose other than for ingress to and egress from the demised premises and for delivery of merchandise and equipment in a prompt and efficient manner using elevators and passageways designated for such delivery by Owner. There shall not be used in any space, or in the public hall of the building, either by any tenant or by jobbers, or others in the delivery or receipt of merchandise, any hand trucks except those equipped with rubber tires and safeguards.

2. If the premises are situated on the ground floor of the building, Tenant thereof shall further, at Tenant's expense, keep the sidewalks and curb in front of said premises clean and free from ice, snow, etc.

3. The water and wash closets and plumbing fixtures shall not be used for any purposes other than those for which they were designed or constructed.

4. Tenant shall not use, keep or permit to be used or kept any foul or noxious gas or substance in the demised premises, or permit or suffer the demised premises to be occupied or used in a manner offensive or objectionable to Owner or other occupants of the building by reason of noise, odors and/or vibrations or interfere in any way with other Tenants or those having business therein.

5. No sign, advertisement, notice or other lettering shall be exhibited, inscribed, painted or affixed by any Tenant on any part of the outside of the demised premises or the building or on the inside of the demised premises if the same is visible from the outside of the premises without the prior written consent of Owner, except that the name of Tenant may appear on the entrance door of the premises. In the event of the violation of the foregoing by any Tenant, Owner may remove same without any liability and may charge the expense incurred by such removal to Tenant or Tenants violating this rule. Signs on interior doors and directory tablet shall be inscribed, painted or affixed for such Tenant by Owner at the expense of such Tenant, and shall be of a size, color and style acceptable to Owner.

6. No Tenant shall mark, paint, drill into, or in any way deface any part of the demised premises or the building of which they form a part. No boring, cutting or stringing of wires shall be permitted, except with the prior written consent of Owner, and as Owner may direct. No Tenant shall lay linoleum, or other similar floor covering, so that the same shall come in direct contact with the floor of the demised premises, and, if linoleum or other similar floor covering is desired to be used an interlining of builder's deadening felt shall be first affixed to the floor, by a paste or other material, soluble in water, the use of cement or other similar adhesive material being expressly prohibited.

7. Freight, furniture, business equipment, merchandise and bulky matter of any description shall be delivered to and removed from the premises only on the freight elevators and through the service entrances and corridors, and only during hours and in a manner approved by Owner. Owner reserves the right to inspect all freight to be brought into the building and to exclude from the building all freight which violates any of these Rules and Regulations or the lease of which these Rules and Regulations are a part.

8. Owner reserves the right to exclude from the building between the hours of 6 P.M. and 8 A.M. and at all hours on Sundays, and holidays all persons who do not present a pass to the building signed by Owner. Owner will furnish passes to persons for whom any Tenant requests same in writing. Each Tenant shall be responsible for all persons for whom he requests such pass and shall be liable to Owner for all acts of such persons.

9. Owner shall have the right to prohibit any advertising by any Tenant which, in Owner's opinion, tends to impair the reputation of Owner or its desirability as a building for stores or offices, and upon written notice from Owner, Tenant shall refrain from or discontinue such advertising.

10. Tenant shall not bring or permit to be brought or kept in or on the demised premises, any inflammable, combustible, or explosive, or hazardous fluid, material, chemical or substance, or cause or permit any odors of cooking or other processes, or any unusual or other objectionable odors to permeate in or emanate from the demised premises.

11. Tenant shall not place a load on any floor of the demised premises exceeding the floor load per square foot area which it was designed to carry and which is allowed by law. Owner reserves the right to prescribe the weight and position of all safes, business machines and mechanical equipment. Such installations shall be placed and maintained by Tenant at Tenant's expense in settings sufficient in Owner's judgement to absorb and prevent vibration, noise and annoyance.

12. Refuse and Trash - Tenant covenants and agrees, at its sole cost and expense, to comply with all present and future laws, orders and regulations of all state, federal, municipal and local governments, departments, commissions and boards regarding the collection, sorting, separation and recycling of waste products, garbage, refuse and trash. Tenant shall pay all costs, expenses, fines, penalties or damages that may be imposed on Owner or Tenant by reason of Tenant's failure to comply with the provisions of this Building Rule 12, and, at Tenant's sole cost and expense, shall indemnify, defend and hold Owner harmless (including reasonable legal fees and expenses) from and against any actions, claims and suits arising from such non-compliance, utilizing counsel reasonably satisfactory to Owner.

Address

Premises

TO

### STANDARD FORM OF

## Store Lease

The Real Estate Board of New York, Inc.
© Copyright 1994. All rights Reserved.
Reproduction in whole or in part prohibited.

Dated _____ 19____

Rent Per Year

Rent Per Month

Term

From

To

Drawn by ..................................

Checked by ...............................

Entered by ................................

Approved by ..............................

Page 6 of 6

Printed using pcFORMation™ Software, v. 4/96, 408-947-2107

pcFORMation™
W10−3265
09/19/05

KP 0094

To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

## SCHEDULE A
## DATES SUBJECT TO ADJUSTMENT BASED UPON POSSESSION

Commencing 12/1/05 through 11/30/06 at the annual rental rate of $687,150.00 (SIX HUNDRED EIGHTY SEVEN THOUSAND ONE HUNDRED & FIFTY) DOLLARS; $57,262.50 per month;

Commencing 12/1/06 through 11/30/07 at the annual rental rate of $687,150.00 (SIX HUNDRED EIGHTY SEVEN THOUSAND ONE HUNDRED & FIFTY) DOLLARS; $57,262.50 per month;

Commencing 12/1/07 through 11/30/08 at the annual rental rate of $687,150.00 (SIX HUNDRED EIGHTY SEVEN THOUSAND ONE HUNDRED & FIFTY) DOLLARS; $57,262.50 per month;

Commencing 12/1/08 through 11/30/09 at the annual rental rate of $755,865.00 (SEVEN HUNDRED FIFTY FIVE THOUSAND EIGHT HUNDRED & SIXTY FIVE) DOLLARS; $62,988.75 per month;

Commencing 12/1/09 through 11/30/10 at the annual rental rate of $755,865.00 (SEVEN HUNDRED FIFTY FIVE THOUSAND EIGHT HUNDRED & SIXTY FIVE) DOLLARS; $62,988.75 per month;

Commencing 12/1/10 through 11/30/11 at the annual rental rate of $755,865.00 (SEVEN HUNDRED FIFTY FIVE THOUSAND EIGHT HUNDRED & SIXTY FIVE) DOLLARS; $62,988.75 per month;

Commencing 12/1/11 through 11/30/12 at the annual rental rate of $831,451.00 (EIGHT HUNDRED THIRTY ONE THOUSAND FOUR HUNDRED & FIFTY ONE) DOLLARS; $69,287.58 per month;

Commencing 12/1/12 through 11/30/13 at the annual rental rate of $831,451.00 (EIGHT HUNDRED THIRTY ONE THOUSAND FOUR HUNDRED & FIFTY ONE) DOLLARS; $69,287.58 per month;

Commencing 12/1/13 through 11/30/14 at the annual rental rate of $831,451.00 (EIGHT HUNDRED THIRTY ONE THOUSAND FOUR HUNDRED & FIFTY ONE) DOLLARS; $69,287.58 per month;

Commencing 12/1/14 through 11/30/15 at the annual rental rate of $914,596.00 (NINE HUNDRED FOURTEEN THOUSAND FIVE HUNDRED & NINETY SIX) DOLLARS; $76,216.33 per month;

and subject to other charges as set forth in this lease.

KP 0095

1

To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

### 40.    REAL ESTATE TAXES

The Tenant agrees to pay as additional rent 16.67% of any and all increases in Real Estate Taxes assessed and levied against the property above the taxes for the year 7/1/06 to 6/30/07 (herein-after referred to as the "Tax Base Year") for the building known as 72 Spring Street, Borough of Manhattan, City and State of New York, referred to as Block 482, Lot 16, of which the demised premises form a part, or whatever it shall be reduced to as a result of certiorari proceedings presently pending as well as any special assessment imposed upon the demised premises for any purpose whatsoever including sewer rents, rates or charges, or any other governmental charges whether general or special, ordinary or extraordinary, foreseen or unforeseen, which may be levied or assessed upon or with respect to all or any part of the Real Property by the City or County of New York or any other taxing authority in each and every year during the term of this lease or any renewals thereof, whether the increase in taxation results from a higher tax rate or an increase in the assessed valuation of the property or both, such payments shall be appropriately prorated during the first and last years of the term of this lease. Such additional rental shall be paid to the Landlord within thirty (30) days after rendition of a bill for same (which may be an estimate with respect to any such notice due prior to the rendition of final bills by the City), but not earlier than thirty (30) days prior to the date on which the taxes for which the additional rent is paid are payable to the tax authority . If Tenant made a payment to Landlord based on an estimate and the amount of the final bill is different from the estimate on which Tenant's payment was based, then any subsequent payment of such additional rent shall be appropriately adjusted or if no further payments are due hereunder (i) in the event of an overpayment by Tenant, Landlord shall refund the amount of the overpayment to Tenant, or (ii) in the event of an underpayment by Tenant, Tenant shall pay Landlord the amount of the underpayment. If at any time during the term the methods of taxation prevailing at the date hereof shall be altered so that in lieu of or as an addition to or as a substitute for the whole or any part of the taxes, assessments, levies, impositions or charges now levied, assessed or imposed on all or any part of the Real Property, there shall be levied, assessed or imposed (a) a tax, assessment, levy, imposition or charge based on the rents received therefrom whether or not wholly or partially as a capital levy or otherwise, or (b) a tax, assessment, levy, imposition, or charge measured by or based in whole or in part upon all or any part of the Real Property and imposed upon Landlord, or (c) a license fee measured by the rent payable by Tenant to Landlord, or (d) any other tax, levy, imposition, charge or license fee however described or imposed, then all such taxes, assessments, levies, impositions, charges or license fees or the part thereof so measured or based, shall be deemed the Real Estate Taxes referred to in this article.

Tenant may not obtain all or any portion of the benefits which may accrue to the Landlord from any reduction in the assessed valuation below the "Tax Base Year" and/or any reduction Real Estate Tax rates as imposed by the City of New York. Only the Landlord shall be eligible to institute tax reduction or other proceeding and obtain a rebate for periods during which Tenant paid his share of increases, Landlord shall in that event, after deducting his expenses, in connection therewith, return to Tenant his pro rata share of such rebate.

### 41.    ELECTRICITY

The Tenant shall obtain and pay for Tenant's entire separate supply of electric current by direct application to and arrangement with the utility company servicing the building and for the installation of all meter(s) and electrical equipment as may be necessary in connection therewith (all of which shall be at Tenant's sole cost and expense) and Landlord shall permit its wires and conduits to the extent available and safely capable to be used for such purpose. Landlord represents that there is currently a meter at the Demised Premises. Tenant covenants and agrees, however, that all times its installations and use of electricity shall never exceed the capacity of existing feeders to the buildings or the risers or wiring installation. Any riser or risers or feeders or service to supply Tenant's electrical requirements, upon written request of Tenant, will be installed by Landlord, at the sole cost and expense of Tenant, if, in Landlord's sole judgment, the same are necessary and will not cause permanent damage or injury to the building or demised

2

To be attached to and form a part of Lease dated February ___ , 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

premises or cause or create a dangerous or hazardous conditions or entail excessive or unreasonable alterations, repairs or expense or interfere with disturb other tenants or occupants. In addition to the installation of such riser or risers, Landlord will also, at the sole cost and expense of Tenant, install all other equipment proper and necessary in connection therewith subject to the aforesaid terms and conditions. In addition and notwithstanding anything to the contrary contained in this article, Landlord at anytime during the term of this Lease on not less than thirty (30) days' prior written notice to Tenant may require Tenant to purchase electricity from the Landlord or from a meter company designated by Landlord upon the terms of such submetering clause that may then be currently used by Landlord in the Building of which the demised Tenant premises form a part. If Landlord shall elect to have Tenant purchase electricity directly from Landlord or Landlord's designated meter company as aforesaid, then Landlord at Landlord's sole cost and expense (but with Tenant's reasonable cooperation) shall perform all wiring as may be necessary to have Tenant's electrical consumption measured by submeters provided by Landlord at Landlord's sole cost and expense, provided the same does not increase Tenant's direct cost for electricity.

42.    SUBLETTING & ASSIGNMENT

Except as may otherwise be provided herein, Tenant will not by operation of law or otherwise, assign, mortgage or encumber this lease, nor sublet or permit the Demised Premises or any part thereof to be used by others, without Landlord's prior written consent in each instance, which consent shall not be unreasonably withheld or delayed.

If Tenant wishes to sublet or assign the Demised Premises it shall first notify Landlord of such intent in writing, which notice shall contain an intended start date of such sublet or assignment (the "Intended Start Date"). Upon the receipt of such notice of intent from Tenant, Landlord shall have the right to terminate the Lease by notice given within thirty (30) days thereafter effective on the Intended Start Date or such other date as the parties may agree (the "Termination Date"). If Landlord does not so elect to terminate the Lease, Tenant may proceed with the subletting or assignment, subject to Landlord's consent as set forth herein, without any further right by Landlord to terminate the Lease.

In the event Landlord shall exercise such option to terminate the lease, this lease shall expire on the Termination Date as if that date had been originally fixed as the expiration date of the term herein granted and Tenant shall surrender possession of the entire Demised Premises on the Termination Date in accordance with the provisions of this lease.

If the Landlord shall not exercise its option to terminate in accordance with the above, Tenant may pursue a sublet or assignment. Once Tenant has a sublet or assignment transaction in place Tenant shall request Landlord's consent which request shall be made in writing and shall include, the following information:

(1) the name of the proposed subtenant;
(2) the terms and conditions of the subletting;
(3) the nature and character of the business of the proposed subtenant;
(4) banking, financial and other credit information relating to the proposed subtenant reasonably sufficient to enable Landlord to determine the financial responsibility of said proposed subtenant.

Landlord's consent to such request shall not be unreasonably withheld, but only on condition:

(1) that the subletting is for the entire Demised Premises only;
(2) that the subletting shall be to a tenant whose occupancy will be in keeping with the dignity and character of the then use and occupancy of the Building by other tenants and whose occupancy will not be more objectionable or more hazardous than that of Tenant herein. Any subletting shall only be to a high level retail use no less a level

3

KP 0097

To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

than Tenant and no less a well designed and presented store. No food, discount or outlets etc. shall be permitted.

(3) that subletting shall not be to any tenant, subtenant or assignee of any premises in the Building of which the Demised Premises form a part provided Landlord then has comparable space;

(4) that the subletting shall not be publicly advertised at less than the then fair market value;

(5) that the financial responsibility of the subtenant is reasonably satisfactory to the Landlord;

(6) that tenant not be in default under the terms of this lease.

(7) that Landlord and Tenant share 50% of all profits and considerations net of reasonable brokerage commissions, if any, and such costs as are directly incurred by Tenant in connection with such subletting, including, attorneys' fees reasonably incurred by Tenant, but specifically excluding any costs related to improvements or alterations of the Demised Premises.

If the Demised Premises shall be sublet or occupied by any persons other than Tenant, Landlord may, after default by Tenant, collect rent from the subtenant or occupant and apply the net amount collected to the rent herein reserved, but no such subletting, occupancy or collection of rent shall be deemed a waiver of the covenants in this Paragraph, nor shall it be deemed acceptance of the subtenant or occupant as a tenant, or release of Tenant from the full performance by Tenant of all the terms, covenants and conditions of this lease. The consent by Landlord to a subletting shall not relieve Tenant from obtaining the express consent in writing of Landlord to any further subletting.

In the event Tenant claims that Landlord's consent is unreasonably withheld or delayed, Tenant agrees that Tenant's sole remedy will be an action for declaratory judgment, and that if successful therein, Tenant waives and shall not be entitled to damages.

Notwithstanding any provision to the contrary contained in this Lease, this Lease may be assigned, or the Demised Premises may be sublet, in whole or in part, without the consent of Landlord, to a corporation or other entity into or with which Tenant may be merged or consolidated or to any corporations or other entity which shall be an affiliate, subsidiary, parent or successor of Tenant, or of a corporation or other entity into or with which Tenant may be merged or consolidated. Under no circumstances shall a sale or other transfer of a majority interest in the common stock or other form of equity ownership of Tenant be deemed an assignment pursuant to the terms and provisions of this Lease, provided that the transfer is a bona fide sale or transfer not merely for the purpose of transferring the leasehold estate created hereby."

The conditions set forth herein for Landlord's consent to a sublet of the Demised Premises shall apply equally to the consent, if required, to an assignment of the Lease by Tenant."

43.    PROPER USAGE

- For the purpose of this clause the demised premises in the lease, shall include, in addition to the entranceway and interior, the area within the building line.

- Tenant shall allow no excessive noise in or out of its premises. No amplified sound system, radio, or television may be heard outside the store. No speakers, bullhorns, barkers, hawkers will be permitted outside the store.

- No merchandise may be displayed or sold outside of the enclosing walls of the store or entranceway thereof. No merchandise may be displayed or sold on the sidewalk in front of the store. No space in the entranceway or within the building line may be sublet to anyone. No window may be removed to sell any merchandise to the street. Tenant shall not give permission to anyone to use the outside of the premises. These are conditions

4

KP 0098



To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

precedent to this lease and any default shall be a material default under this lease and said default shall be cancelable on 24 hours notice.

- No pinball or video games may be installed.

- The name, address and telephone number of the private carter servicing a store shall be furnished to Landlord. No trash, bags, boxes or any other type of waste materials to be picked up by a private carter may be left out on either Spring or Crosby Streets between the hours of 8 am and 6 pm.

- No flags, banners or other materials may be hung across the Street.

44.   HOLDOVER
In the event the Tenant fails to surrender possession of the demised premises after the expiration of the term of this lease, the parties agree that Tenant shall thereafter pay to the Landlord on the first day of each month, as liquidated damages, an amount equal to two times the monthly installment of the rent payable by Tenant during the last year of the term of this lease. The parties further agree that Landlord's acceptance of said liquidated damages shall not be exclusive of any other rights and remedies which Landlord may possess by virtue of the terms of this lease or otherwise, but shall be considered in addition thereto.

45.   HOLIDAYS
For the purpose of paragraph 30 and the remaining terms of this lease and the rules and regulations thereunder, all Local 32B Union holidays shall be deemed not to be business days. The building and the services provided herein will be on a holiday schedule on all said holidays and not on a business day. The above does not represent that the building is a 32B building or other union building.

46.   LATE PAYMENTS
If any installment of rent or additional rent due hereunder is not paid on or before the tenth day of the month during which such installment is due, Tenant shall pay Landlord as an additional rent, on or before the first day of the following month, .08 cents for each dollar so overdue in order to defray Landlord's administrative and other costs in connection with such late payment.

47.   EXECUTION AND DELIVERY OF LEASE
Submission by Landlord of the within lease for review and execution by Tenant shall confer no rights nor impose any obligation on either party unless and until both Landlord and Tenant shall have executed this Lease and duplicate originals thereof shall have been delivered to the respective parties hereto and all required sums of money have been received and cleared.

48.   PLUMBING, DRAINS, WASTE, DUCTS & SEWER PIPES
Any ducts or pipes belonging to the building shall remain including the ducts and vents ventilating Landlord's basement. Tenant shall be responsible to see that ducts and pipes do not become stopped up because of its usage. Tenant at its own cost and expense shall be responsible for the maintenance, repair and replacement of any plumbing to the bathrooms and all other plumbing in the demised premises.

49.   PAYMENT OF REPAIRS
If Tenant fails, after reasonable notice, to properly repair or service its premises, Landlord may make the repairs and charge the Tenant the cost of same which must be paid within three (3) days as additional rent.

50.   CONDITION OF PREMISES
The Landlord makes no representations or warranties as to the condition of the herein described premises or whether it is suitable for the use demised. It is understood that the Tenant is renting

5

KP 0099

To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

the premises and shall, at his own cost and expense, make all repairs both inside and outside, interior and exterior including but not limited to the plumbing and heating system.

51.    INTENTIONALLY OMITTED

52.    SIGNS

Provided the signage is in keeping and relates to the other signage used by Landlord for the building, the Tenant is hereby given the privilege of placing a sign in front of the demised premises and inside provided that the Tenant first submits working drawings thereof for Landlord's prior written approval and provided that the said signs are not a nuisance or hazard and do not obstruct any other Tenant and in Landlord's reasonable opinion is in keeping with Landlord's building signage. All of Tenant's signage shall be professionally prepared and in no event shall Tenant tape or otherwise affix any handwritten signs to the glass of the windows of the Premises. Tenant shall at its own cost and expense maintain and keep in repair said signs at the Tenant's risk and expense, including all permits and fees. Landlord hereby approves the sign and signage as shown on Exhibit A annexed hereto and made part hereof.

53.    ACCESS TO BUILDING FROM THE DEMISED PREMISES:

Tenant shall be responsible that there be no access from its demised premises to the general building area and basement, including but not limited to the back door to Tenant's freight area and basement. Tenant shall not use the Spring Street or Crosby Street freight elevators or lobbies at any time, all deliveries and access shall be through Tenant's front door only. Tenant shall be responsible at its own cost and expense to alarm any doors with access to the general building area and basement and to ensure that any doors are not used as access to the building.

54.    INDEMNIFICATION

Tenant shall indemnify and save Landlord harmless from and against any and all claims, demand, judgments, actions, damages, expenses and costs whatsoever (including Landlord's reasonable counsel fees) arising from the conduct or management of or from any work or thing whatsoever done in or about the demised premises or any part thereof or from any act or negligence of Tenant and any property of any person or persons occurring in, on or about the demised premises other than from the acts or negligence of Landlord, its representatives, agents or employees from and after the date of commencement of the term. In case any action or proceeding is brought against Landlord by reason of any of the above, Landlord shall give written notice thereof to Tenant and Tenant shall resist or defend the same, Landlord may do so or settle or compromise the same and in such event Tenant shall pay to Landlord as additional rent hereunder all payments made by and expenses and counsel fees of Landlord.

55.    CERTIFICATES, LICENSES & PERMITS

Tenant shall obtain all necessary licenses, permits, certificates, etc., required or necessary in the conduct of Tenant's business in the demised premises at Tenant's own cost and expense from governmental authorities having jurisdiction to issue same and Tenant shall not fail or neglect to obtain any such licenses, certificates of health, etc., which may be required by Tenant to operate and conduct Tenant's business in the demised premises. Tenant is responsible for all licenses, permits, and fees including air conditioning, fire dept. refrigeration, heating, signs, etc. Landlord at its option can pay same and bill Tenant said sum as an additional rent.

56.    RENT CONCESSION

Provided Tenant is not then in default on any payments, terms or conditions of this lease, Landlord shall grant Tenant a credit of $57,262.50 per month for the period December 1, 2005 through May 31, 2006 only .

57.    INTENTIONALLY OMITTED

6

KP 0100

To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

## 58.    WINDOW DECORATION

Tenant's store is important to the Landlord in connection with the appearance of the entire building.   Tenant shall make sure that the window to the street shall be unobstructed and decorated with appropriate and high class displays to Landlord's reasonable satisfaction.  Neither window shall be blocked off with racks or shelving, trade fixtures or any other obstruction.

## 59.    BROKER

Tenant and Landlord covenant and represent that they have  dealt with no broker in connection with the within lease transaction or at the demised premise other than John Brod of PBS Realty Advisors and Joanne Podell of Cushman & Wakefield and the parties agree to hold each other harmless from any claims resulting from a breach of the foregoing representations.  Tenant shall have no obligation to make payment to the aforesaid broker(s) on account of such commission or fees unless Tenant by separate agreement has undertaken to do so.

## 60.    NO RESIDENTIAL USE OF DEMISED PREMISES

It is an express condition of this Lease that the demised premises be used for commercial purposes only.  In no event may the demised premises be used for residential purposes and Tenant covenants and agrees to use the demised premises only for commercial purposes specified in article 2 hereof.

## 61.    LIMITATION OF LANDLORD'S LIABILITY

If Landlord or any successor in interest of Landlord be an individual, joint venture, tenancy in common, co-partnership, unincorporated association, or other unincorporated aggregate of individuals, then anything elsewhere in this Lease to the contrary notwithstanding.  Tenant shall look solely to the estate and property of such unincorporated Landlord in the land and building and proceeds thereof and, where expressly so provided in this Lease, to offset against the rents payable under this Lease, for the satisfaction of Tenant's remedies for the collection a judgement (or other judicial process) requiring the payment of money by Landlord in the event of any default by Landlord hereunder and no other property or assets of such unincorporated Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies.

## 62.    DEMISED PREMISES - "AS IS"

Tenant agrees to accept the demised premises in its present condition, subject to completion of a skylight at the Demised Premises by Landlord and not to require Landlord to do any work, other than the skylight completion, painting or make any improvements during the term of this lease.

## 63.    GATES

If Tenant elects to have or has a gate in front of Tenant's demised area it will be at Tenant's own cost and expense and must be of open grill.  Tenant shall be totally responsible for all maintenance, repairs and replacement to the gate.

## 64.    NO REPRESENTATIONS

Landlord makes no representations as to the suitability, feasibility, or legality of the use of the demised premises for any particular purpose(s).  The Tenant agrees and undertakes to do, at its own cost and expense, any and all things necessary to enable the Tenant to legally operate at the demised premises.  The Tenant agrees to maintain and operate the premises and all business conducted thereat in accordance with and in compliance with all laws, rules, orders, regulations or ordinances of each and every governmental department, agency, unit and/or bureau having jurisdiction over the premises or any business operated thereat.

In the event that any department of the City of State of New York shall hereafter at any time contend and/or declare by notice, violation, order or in any other manner whatsoever that the

7

**KP 0101**

To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

premises hereby demised are used for a purpose which is in violation of an existing certificate of occupancy, Tenant shall, upon ten (10) days written notice from Landlord, immediately discontinue such use of said premises. Failure by Tenant to discontinue such use after such notice shall be considered a default in the fulfillment of a covenant of this lease and Landlord shall have the right to terminate this lease immediately, and in addition thereto shall have the right to exercise any and all rights and privileges and remedies given to Landlord by and pursuant to applicable provisions herein. The statement in this lease of the nature of the business to be conducted by Tenant in the demised premises shall not be deemed or construed to constitute a representation or guaranty by Landlord that such business may be conducted in the demised premises or is lawful or permissible under the certificate of occupancy issued for the building of which the demised premises form a part or of the demised premises itself, or is otherwise permitted by law. If alterations, additions or changes, including but not limited to a sprinkler system, are needed or required to permit lawful conduct and operation of Tenant's business or to comply with the certificate of occupancy, the same shall be made by and at the sole expense of the Tenant.

## 65.  ALTERATIONS; LIENS; TENANT'S FIXTURES

Except as otherwise set forth in Section 3 hereof, Tenant shall prepare the demised Premises for Tenant's initial occupancy thereof in accordance with the plans and specifications to be provided as described below. Tenant shall make no Alterations in or to the Demised Premises, including but not limited removal or installation of partitions, doors, electrical installations, plumbing installations, water coolers, heating, ventilating and air conditioning or cooling systems, units or parts thereof or other apparatus of like or other nature, whether structural or non-structural, without Landlord's prior written consent, which consent shall not be unreasonably delayed, withheld or conditioned. It shall be Tenant's responsibility and obligation to ensure that all Alterations: (i) shall be made at Tenant's sole expense and at such times and in such manner as Landlord may from time to time designate (including rules governing Alterations as Landlord may from time to time make provided under Article 3), (ii) shall comply with all Laws and Ordinances (including the Americans with Disabilities Act of 1990, NYC Local Laws No.5 of 1973, No.16 of 1984 and No. 58 of 1988, each as amended from time to time, and all Laws and Ordinances then in effect relating to asbestos) and all orders, rules and regulations of Insurance Boards, (iii) shall be performed with due diligence and in a good and workmanlike manner using good quality materials at least equal to the original construction of the Building, and (iv) shall not affect the appearance of the Building, it being Landlord's intention to keep the exterior appearance of the Building reasonably uniform (and, in pursuance thereof, Landlord shall have the right to approve the appearance of all such Alterations including ceiling heights, draperies, lighting, signs and other decorations). In order to ensure, maintain and control the quality and standards of materials and workmanship in and affecting the security of the Building, including the Demised Premises, Tenant acknowledges that it is reasonable to require Tenant and Tenant hereby covenants and agrees to use only contractors first approved in writing by Landlord.

A.    Prior to commencing the performance of any Alterations, Tenant shall furnish to the Landlord:

(i) Plans and specifications (to be prepared by and at the sole cost and expense of Tenant), in detail, of such proposed Alterations, and Tenant shall not commence the performance thereof unless and until Landlord has given written consent to said plans and specifications.

(ii) A certificate evidencing that Tenant (or Tenant's contractors) has (have) procured and paid for worker's compensation insurance covering all persons employed in connection with the work who might assert claims for death or bodily injury against Overlandlord, Landlord, Tenant, the Land and/or the Building.

(iii) Such additional personal injury and property damage insurance (over and above the insurance required to be carried by Tenant pursuant to the terms of this lease and builder's risk, fire and other casualty insurance as Landlord may reasonably require in connection with the work to be done for Tenant;

(iv) Such permits, authorizations or consents as may be required by any applicable Laws and Ordinances, all of which shall be obtained at Tenant's expense; provided however, that

8

KP 0102



To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

Landlord shall cooperate with any reasonable request of Tenant, at Tenant's cost, to obtain such permits, authorizations or consents, and no plans, specifications or applications shall be filed by Tenant with any governmental authority without first obtaining Landlord's written consent thereto.

B.   In the event that Landlord shall submit the plans and specifications referred to in clause (i) above to Landlord's architects and/or engineers for review, Tenant shall reimburse Landlord as additional rent for Landlord's out-of-pocket expenses of such review within ten (10) days after written notice to Tenant of the amount of such expense. Notwithstanding the foregoing, Tenant shall not be required to pay any fees to Landlord with respect to the review of any mechanical, electrical, plumbing or structural plans and specifications of Tenant that shall have been prepared by Landlord's approved consulting mechanical, electrical, plumbing or structural engineer, as the case may be.

66.    RUBBISH REMOVAL/SUPPLIES/DELIVERIES

Tenant shall, at Tenant's expense, keep the Demised Premises clean, neat, tidy and in order, to the reasonable satisfaction of Landlord. Tenant shall, at Tenant's sole cost and expense, remove all refuse and rubbish from the Demised Premises on a daily basis, subject to such rules and regulations as, in the reasonable judgement of Landlord, are necessary for such proper operation of the Building. Tenant covenants and agrees that all refuse, garbage and swill be kept in proper containers securely covered until removed from the demised premises so as to prevent escape of objectionable fumes and odors and the spread of vermin. Tenant shall cause all rubbish to be stored in the Demised Premises until removal for carter pick-up.   If Tenant shall fail to so maintain the Demised Premises to the reasonable satisfaction of Landlord, then Landlord shall have the right, on notice to Tenant and at Tenant's sole cost and expense, to enter into the Demised Premises for the express purpose of rectifying the condition thereof and restoring the Demised Premised to the condition and appearance required hereunder.   In order to ensure effective security in the Building, Tenant acknowledges the reasonableness of Landlord's right at its option to designate a party to be so employed by Tenant and to act as cleaning contractor for any cleaning and rubbish removal, so long as such party is a reputable person that charges no more than the rates in effect for comparable services in similar type buildings.   Landlord expressly reserves the right to exclude from the Building any person attempting to perform any such work or furnish any of such services without Landlord's prior written approval or not so designated by Landlord.

Tenant agrees that no supplies or deliveries, nor any of Tenant's refuse or rubbish, shall be kept or permitted to be kept in any area outside of the Demised Premises, including, without limitation, on the sidewalks in front of the Demised Premises or in the lobby of the Building. Tenant acknowledges that Tenant shall have no right to utilize any portion of the Building other than the Demised Premises for any business purposes. Garbage must be picked up by the carter on Crosby Street in an area designated by Landlord and no rubbish shall be left up on Spring Street.

67.    STOREFRONT

Tenant shall, at its own cost and expense, clean the interior and exterior of the storefront, windows and doors (including the frames thereof) of the Demised Premises at least on a bi-weekly basis and will not permit, suffer or allow the same to be cleaned in violation of any law or ordinance or of any rule, order or regulation of any governmental authority having jurisdiction thereover. Tenant shall maintain the metal work contained in the storefront and doors of the Demised Premises in good, first class condition, free of dents and chipping, at all times during the Term. Tenant acknowledges that the appearance of the storefront of the Demised Premises is of utmost importance to Landlord, and agrees to employ  a metal maintenance contractor, reasonably acceptable to Landlord, to provide regular metal maintenance. If replacement of the storefront becomes necessary it will be at Tenant's own cost and expense.

68.    EXTERMINATION

Tenant covenants that Tenant shall, at its own cost and expense, keep the Demised Premises free and clear of rats, mice, insects and other vermin. In furtherance thereof, Tenant shall employ an

9

KP 0103

To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC
C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE,
LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW
YORK, NEW YORK

exterminator who will utilize a "state of the art" method for the prevention of any infestation by,
and extermination of, said animals and insects. Tenant must contract for a minimum of one visits
per month by said exterminator.  If, in Landlord's sole judgement, Tenant shall fail to
satisfactorily carry out the provisions of this paragraph, Landlord may, but shall not be obligated
to, employ and exterminator service and the cost and expense incurred by Landlord for such
exterminator service shall be repaid to Landlord by Tenant, on demand, and such amounts so
repayable shall be considered additional rent.

69.    EQUIPMENT/APPLIANCES
Tenant, at its own cost and expense, shall install and maintain all equipment and appliances (as
installed or to be installed) as may be required by and otherwise fully comply with, all applicable
Laws and Ordinances (including but not limited to all rules and regulations promulgated by the
New York City Fire Department, the New York City Department of Health, the New York Board
of Fire Underwriters and Fire Insurance Rating Organization) and as required by Landlord's
insurers, including but not limited to, fire alarm, sprinkler system, smoke alarm, fire extinguisher
appliances and other systems.

70.    SIDEWALKS
Tenant shall keep the sidewalks and curbs which are adjacent to the Demised Premises free from
dirt, rubbish, ice and snow, to the reasonable satisfaction of Landlord, and in furtherance thereof,
Tenant shall sweep as required by the City Law and keep the first (18) inches of the street
adjacent to such curbs (or a greater portion of the street, if any Laws and Ordinances require
same of an abutting property owner) free from dirt and rubbish.  Tenant shall not place any
placards or other advertising on any sidewalks in front of the Demised Premises or Building.
Tenant shall be responsible for any and all violations issued in connection with Sanitation,
E.P.A., or any other agency for debris, rubbish, snow, ice, etc. on sidewalk.  If Landlord elects to
pay these directly, they shall be deemed as additional rent owed by Tenant.

71.    SKYLIGHTS
Tenant shall, at its own cost and expense, maintain, repair and replace skylights.  Prior to the
commencement date Landlord shall complete the replacement of a skylight and Landlord hereby
represents that said the skylight is free of any leaks. Tenant understands that Landlord will be
completing the skylight work during Tenant's construction and that there shall be no abatement
of rent to Tenant for such.

72.    WINDOWS
Tenant shall, at its own cost and expense, maintain, repair and replace windows in the rear of the
demised premises.  Landlord is hereby making Tenant aware that these windows may need to be
replaced.

73.    TELEPHONE
Tenant may not install a public telephone in or upon the demised premises or building.

74.    BASEMENT
Landlord makes no representations or promises as to dampness or wetness in the basement and
should Tenant choose to store goods in the basement he shall use pallets.  Tenant shall use
basement at its own risk and Landlord is not responsible for any damage whatsoever.

Tenant is aware that there are plumbing and electric lines in Tenant's basement space connected
to the lobby of the building.  Landlord shall have access to said area at reasonable times and
upon reasonable prior notice (to the extent practically possible) to read meters and shall also
have the right to utilize ceiling space and other space as Landlord may reasonably need in the
basement for running pipes provided that it does so (both as to manner of installation and
location) so as to minimize interruption of Tenant's business and its use and enjoyment of the
Demised Premises.  In addition, Landlord shall have access through Tenant's demised premises
to Landlord's vault area. The vault area is reserved for Landlord's sole use.

10

KP 0104



To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

75.  AIR CONDITIONING
Landlord makes no representations as to the air conditioning servicing the demised premises if any. Tenant has the use thereof and is totally responsible at its own cost and expense for all repairs, maintenance and replacement thereof. Tenant shall be responsible for the cost and expense of any and all permits and fees, including the annual equipment use permit fee. The air conditioning unit(s) and/or their replacements shall remain the property of Landlord at the end of the term of this lease.

76.  GRAFFITI
Tenant at own cost and expense shall be responsible to remove any graffiti which may occur outside of its demised premises within three (3) business days.

77.  AUTHORIZED USE
Tenant shall use the demised premises for retail sale and distribution, and storage incident to same, of paper, paper related products, art supplies, furniture and related items, including, but not limited to:

Roll Paper
Sheet Paper
Wall Paper
Cut Paper
Printing
Stationery
Writing Instruments
Greeting Cards
Ribbon
Writing Accessories
Writing Furniture
Storage Products
Storage Furniture
Photo Albums
Journals
Diaries
Blank Books
Books
Lamps
Boxes
Felt Pens & Markers
Soaps
Candles
Paper Plates
Paper Napkins
Picture Frames
Carrying Cases
Brief Cases
Desk Accessories
Rubber Stamps
Calendars
Custom Picture Framing

In the event of a sublet of the Demised Premises or an assignment of the Lease, the use of the demised premises may be broader than the foregoing subject to the provisions of Article 42 of this Lease.

78.  OPERATION OF BUSINESS
The Tenant covenants and agrees to operate and conduct its business at the demised premises in such manner so as not to permit unpleasant odors or excessive noise to emanate therefrom.

11

KP 0105

To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

Tenant further agrees that the business to be conducted in the demised premises by Tenant shall, during the term of this lease, be conducted in a high class manner consistent and in keeping with the character of the building of which the demised premises form a part.

79.    PRODUCT DEBRIS
       Tenant is responsible for wrappers and debris from sale of its product anywhere in front of the building 72 Spring Street a/k/a 65 Crosby Street.

80.    EXTENSION OPTION

A.    Subject to the provisions of Paragraph E hereof, Tenant shall have the right to extend the term of this Lease for one (1) additional term of five (5) years commencing on the day following the Expiration Date (hereinafter called the "Commencement Date of the extension Term") (such additional term is hereinafter called the "Extension Term") provided that:

1.    Tenant shall give Landlord notice (hereinafter called the "Extension Notice") of its election to extend the Term of this Lease at least twelve (12) months, prior to the Expiration Date, and

2.    Tenant is not in default (after the expiration of applicable grace periods, if any) under this Lease as of the time of the giving of the Extension Notice and the Commencement Date of the extension term.

3.    Tenant shall be in actual physical occupancy of not less than 100% of the rentable area of the Demised Premises.

B.    The Fixed Rent payable by Tenant to Landlord during the Extension Term shall be a sum equal to the fair market rent for the Demised Premises as determined as of the date occurring six (6) months prior to the Commencement Date of the Extension Term (such date is hereinafter called the "Determination Date" and which determination shall be made within a reasonable period of time after the occurrence of the Determination Date pursuant to the provisions of Paragraph C hereof, but such Fixed Rent shall in no event be less than the Fixed Rent and additional rent (i.e., not less than Tenant's fully escalated rent) in effect under this Lease for the last month of the Term (without giving effect to any temporary abatement of Fixed Rent under the provisions of, Article 9 or any other Article of this Lease). In determining the fair market rent, the provisions of Article 40 of this lease shall remain in effect during the Extension Term with the same base year as set forth therein.

C.    1.    Landlord and Tenant shall endeavor to agree as to the amount of the fair market rent for the Demised Premises pursuant to the provisions of Paragraph B hereof, during the thirty (30) day period following the determination Date.  In the event that Landlord and Tenant cannot agree as to the amount of the fair market rent within such thirty (30) day period following the Determination Date, then Landlord or Tenant may initiate the appraisal process provided for herein by giving notice to that effect to the other, and the party so initiating the appraisal process (such party hereinafter called the "Initiating Party") shall specify in such notice the name and address of the person designated to act as an arbitrator on its behalf.  Within thirty (30) days after the designation of such arbitrator, the other party (hereinafter called the "Other Party") shall give notice to the Initiating Party specifying the name and address of the person designated to act as an arbitrator on its behalf.  If the Other Party fails to notify the Initiating Party of the appointment of its arbitrator within the time above specified, then the appointment of the second arbitrator shall be made in the same manner as hereinafter provided for the appointment of a third arbitrator in a case where the two arbitrators appointed hereunder and the parties are unable to agree upon such appointment.  The two arbitrators so chosen shall meet within ten (10) days after the second arbitrator is appointed and if, within sixty (60) days after the second arbitrator is appointed, the two arbitrators shall not agree, they shall together appoint a third arbitrator.  In the event if their being unable to agree upon such appointment within eighty (80) days after the appointment of the second arbitrator, the third arbitrator shall be selected by the parties themselves if they can agree thereon within a further period if fifteen (15) days.  If the parties do not so agree, then either party, on behalf of both and on notice to the other may request such appointment by the American Arbitration Association (or organization successor thereto) in New York City in accordance wit its rules then prevailing.

12



To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

2. Each party shall pay the fees and expenses of the one of the two original arbitrators appointed by or for such party, and the fees and expenses of the third arbitrator and all other expenses (not including the attorneys fees, witness fees and similar expenses of the parties which shall be borne separately by each of the parties) of the arbitration shall be borne by the parties equally.

3. The majority of the arbitrators shall determine the fair market rent of the Demised Premises and render a written certified report of their determination to both Landlord and tenant within sixty (60) days of the appointment if the first two arbitrators or sixty (60) days from the appointment of the third arbitrator if such third arbitrator is appointed pursuant to this Paragraph; and the fair market rent, so determined, shall be applied to determine the Fixed Rent pursuant to Paragraph B hereof.

4. Each of the arbitrators selected as herein provided shall have at least ten (10) years experience in the leasing and renting of retail space in in the Soho area of the Borough of Manhattan.

5. If Landlord notifies Tenant that the Fixed Rent for the Extension term shall be equal to the Fixed Rent and additional rent in effect under this Lease for the last month of the Term (without giving effect to any temporary abatement thereof), then the provisions of Subsection 1 of this Paragraph C shall be in applicable and have no force or effect.

6. In the event Landlord or Tenant initiates the appraisal process and as of the Commencement Date of the Extension Term the amount of the fair market rent has not been determined, Tenant shall continue to pay the fixed rent and additional rent in effect under this Lese for the last month of the Term and when such determination has been made, an appropriate retroactive adjustment shall be made as of the Commencement Date of the extension Term.

D.    Except as provided in Paragraphs a and B hereof, Tenant's occupancy of the Demised Premises during the Extension Term shall be on the same terms and conditions as are in effect immediately prior to the expiration of the initial term of this Lease, provided, however, Tenant shall have no further right to extend the term of this Lease pursuant to this Article.

E.    If Tenant does not send the extension Notice pursuant to the provisions of Paragraph A hereof, this Article 80 shall have no force or effect and shall be deemed deleted from this Lease.

F.    If this Lease is renewed for the Extension Term, then Landlord or tenant can request the other party hereto to execute an instrument in form for recording setting forth the exercise of Tenant's right to extend the Term of this Lease and the last day of the Extension Term.

G.    If Tenant exercises its right to extend the Term of this Lease for the Extension Term pursuant to this Article 80, the phrases "the term of this Lease" or "the term hereof" as used in this Lease, shall be construed to include, when practicable, the Extension Term.

81.    <u>LANDLORD'S RIGHT TO CANCEL</u>

As a material inducement to Landlord to execute and deliver this Lease to Tenant, Tenant hereby agrees that Landlord shall have the option (hereinafter referred to as the "Cancellation option"), exercisable at Landlord's sole discretion, to cancel this Lease effective 11/30/15 or anytime thereafter, as hereinafter provided in the event that the Landlord intends to (a) either demolish or substantially renovate the Building or change the use of the Building for any reason whatsoever, (b) the land and/or Building shall hereinafter be involved in an assemblage, regardless of whether or not such assemblage shall occur as a result of Landlord acquiring a fee or other interest in other land(s) or building(s) or a third party acquiring Landlord's land or building or (c) use the Premises for the Building's access needs or rights of way for neighboring buildings. If Landlord shall desire to exercise the Cancellation Option, Landlord shall send written notice thereof (hereinafter referred to as the "Cancellation Date") on or before November 30, 2014.

The notice shall be substantially as follows:

13

KP 0107



To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

"Please be advised that the undersigned Landlord hereby intends to (INSERT REASON). Pursuant to Article # ___ of the lease for the premises you occupy at 72 Spring Street, NY NY, Landlord hereby elects to terminate your lease as of November 30, 2015."

In the event the Landlord shall send the Cancellation Notice to Tenant as hereinbefore provided, the term hereof shall cease and expire as of the Cancellation Date as if such date were expressly set forth herein as the Expiration Date, and the Tenant shall quit and surrender the premises on or before Cancellation Date, and the Landlord shall immediately be entitled to the recovery of the possession of the demised premises in the manner herein provided; and the Tenant shall on demand execute and deliver to the Landlord a written surrender in recordable form.

Tenant hereby acknowledges its understanding that Landlord will suffer great and irreparable damage, the extent of which is now and will be in the future impossible to quantify, in the event that Tenant shall fail to vacate and surrender the Premises to Landlord as hereinbefore provided in the event that Landlord shall duly exercise the Cancellation Option. In view thereof, the parties hereto agree that, in the event the Premises shall not be vacated and surrendered to Landlord for any reason whatsoever on or before the closed of business on the Cancellation Date, Landlord shall have the following remedies in addition to any other remedies available to Landlord at law or in equity, which remedies Landlord may exercise independently, in any sequence, or cumulatively at Landlord's sole election:

(i)     demised premises and to cause a warrant to be issued thereon without a stay of execution, and Tenant hereby consents to the entering of such an order and the issuance of such a warrant and hereby waives all rights that it may have to contest the same or to assert a claim for any damages whatsoever that it may sustain or for any award or compensation to which it may otherwise be entitled by reason thereof; and

(ii)    to require Tenant to pay the sum of Three Thousand ($3,000.00) Dollars a day from and after the day nest succeeding the Cancellation Date to and including the day upon which the demised premises is finally vacated and surrendered to Landlord, representing liquidated damages that Tenant acknowledges Landlord will sustain as a result of Landlord's not obtaining possession thereof upon the Cancellation Date.

LANDLORD: SPRING STREET COMPANY LLC
C/O THE PROPELLER COMPANY LLC

TENANT: KATE'S PAPERIE, LTD.

BY:_____

BY:_____

14

KP 0108

To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

## LIMITED GUARANTY

FOR VALUE RECEIVED and as consideration for the letting referred to herein and an inducement to Landlord to enter into such letting with Tenant, the undersigned Guarantor hereby guarantees to Landlord under the annexed Lease, its successors and assigns, the timely and complete performance by Tenant of the obligations of Tenant to which reference is herein made. The following are the obligations to which reference is made:

1.    Under all circumstances, including Tenant's default,  the Landlord shall receive:

A.    Only to the extent Tenant continues to occupy and do business at the Demised Premises, full payment of the Minimum Rent and Additional Rents accruing on or before the Surrender Date, as defined hereinafter; it being specifically agreed that if Tenant delivers its keys for the Demised Premises, together with all amounts due through such Surrender Date under the Lease (without giving effect to any accelerations clauses) by certified check, then in such event any and all personal liability hereunder shall cease to accrue.

Notwithstanding any language to the contrary in any notice provision provided in the lease, the performance and payments called for hereunder shall become due and payable to Landlord without any notice whatsoever to Tenant.

Subject to the provision found at 1.A hereof it is specifically understood that this Guaranty shall continue in full force and effect and shall not be affected by any subletting, renewal modification and/or extension of the Lease, without the necessity for any notice to the Guarantor of any such assignment, subletting, renewal, modification or extension.

It is understood that the security will be held until the end of the term and Tenant cannot offset any arrear until then.

Notwithstanding anything contained in this Limited Guaranty to the contrary, the undersigned's liability hereunder shall be limited to all Rent and additional Rents that remain unpaid for all periods through and including the Surrender Date, as defined hereinafter.  The term Surrender Date shall mean the date upon which Tenant and each of Tenant's subtenants (and any other person claiming through or under the Tenant) surrender the Demised Premises to Landlord.

_____
Signature of Guarantor

LEONARD  FLAX
_____
Print Name of Guarantor

_____
Address of Guarantor

15

KP 0109

To be attached to and form a part of Lease dated February _15_ 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

STATE OF NEW YORK )

COUNTY OF New York )                    ss:

On this _15_ day of _Feb_ , 200_6_, before me personally came _Leonard Flax_ to me know, and known to me to be the individual described in and who executed the foregoing instrument and acknowledged to me that he executed the same.

_Marilyn Vaughn_

MARILYN VAUGHN
NOTARY PUBLIC, State of New York
No. 01VA5062781
Qualified in Nassau County
Certified in New York County
Commission Expires Dec. 4, 2006

16

KP 0110

To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

## STANDARD STORE INSURANCE LEASE CLAUSES
(Indemnity/Hold Harmless/Waiver/Insurance/Misc.)

1.0    Indemnity & Hold Harmless

    1.1    To the fullest extent permitted by law, Tenant agrees to indemnify and save Landlord , its agents, employees and servants harmless from all claims (including costs and expenses of defending against such claims) arising or alleged to arise from injury or death to any person or damage to property of any person or entity occurring during the term of this Lease, in the  leased premises, common areas or areas around the building related to Tenant's use of the Demised Premises.

    1.2    Tenant agrees that any building employee, to whom any property shall be entrusted by or on behalf of Tenant, shall be acting as Tenant's agent with respect to such property and neither Landlord, nor Landlord's agents, employees or contractors, shall be liable for any loss of or damage to any such property.

2.0    Subrogation Waiver

    2.1    In the event that either Tenant or Landlord sustain a loss by fire or other casualty and such loss is caused in whole, or in part, by acts or omissions of the other party, it's agents, employees, or servants, then the party sustaining the loss agrees, to the extent that the party sustaining such loss is compensated for such loss by insurance, that party shall waive all rights of recovery against the other party or the agents, employees, or servants of the other party; and no third party shall have any right of recovery, by way of subrogation or assignment or otherwise, provided the foregoing waiver of subrogation does not invalidate Tenant's insurance coverage.

3.0    Insurance        Tenant shall, at its own cost and expense, procure and maintain throughout the term of this lease, the following forms of insurance:

    3.1    Comprehensive General Liability Insurance, including Products, Completed Operations, and Contractual Liability coverage (covering the liability of the Tenant to the Landlord by virtue of the indemnification agreement in this Lease), covering bodily injury, and property damage liability, personal injury and advertising liability, fire legal liability, all in connection with the use and occupancy of or the condition of the leased premises, the building or the related common areas, in amounts not less than:

        $5,000,000 general aggregate per location
        $5,000,000 per occurrence for bodily injury & property damage
        $5,000,000 personal & advertising injury
        $1,000,000 fire legal liability

The above limits can be provided by the combination of General Liability coverage and Umbrella Liability Coverage.

    3.1.1    The Landlord reserves the right to request, from time to time, that the above limits be increased by reasonable amounts, depending upon circumstances and what is reasonable.
    3.1.2    With respect to the above insurance;
    3.1.2a    The Landlord shall receive, at least ten days prior to inception, a certificate indicating the aforesaid coverage and including the Landlord as additional insured.  Such certificate is to contain provisions that obligate the insurer to notify Landlord, thirty days in advance, in the event of cancellation, non-renewal or material change of the coverage.
    3.1.2b    Such insurance is to be written by an insurance company or companies satisfactory to Landlord and with a Best's rating of at least A-, X.

    3.2    "All Risk" property insurance, including the perils of sprinkler leakage, water damage, flood, burglary and collapse, covering the property of Tenant, including improvements and betterment's installed, paid for or purchased by Tenant, in an amount equivalent to the insurable value of said property, defined as the "cost to replace or reconstruct new without deduction for physical depreciation".

    3.2.1    With respect to the above insurance;

    3.2.1a    The Landlord shall received, at least ten days prior to inception, a certificate indicating the aforesaid coverage and including the Landlord as additional insured, as respects the improvements and betterment's.  Such certificate is to contain provisions that obligate the insurer to notify Landlord, thirty days sin advance, in the event of cancellation, non-renewal or material change of the coverage.

17

KP 0111

To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

3.2.1b   Such insurance is to be written by an insurance company or companies satisfactory to Landlord and with a Best's rating of at least A-, X.

3.3   'All Risk" business interruption or earnings insurance, including the perils of sprinkler leakage, water damage, flood, burglary and collapse, to cover the loss of gross profits and continuing expenses during the period of partial or total shutdown of Tenants business.

3.3.1a   The Landlord shall receive, at least ten days prior to inception, a certificate indicating the aforesaid coverage.  Such certificate is to contain provisions that obligate the insurer to notify Landlord, thirty days in advance, in the event of cancellation, non-renewal or material change of the coverage.

3.4   If Tenant shall fail to comply with any or all of the foregoing insurance requirements, Landlord shall have the right, but not the obligation, upon 10 day prior written notice to Tenant, to purchase the above insurance for the interest of Tenant and/or Landlord and Tenant shall pay for the cost of such insurance in the form of additional rent.

4.0   Contractors, Installers, Vendor Requirements

4.1   If CONTRACTORS are introduced to the building and approved it will be subject to receipt of certificates of insurance evidencing Worker's Compensation insurance, and Comprehensive General Liability Insurance.  Such certificates are to contain provisions that obligate the insurer to notify Landlord, ten days in advance, in the event of cancellation, or material change of the coverage.

4.2   The General Liability Insurance is to be written with at least a $2,000,000 limit per location for bodily injury, personal injury and property damage liability, including products and/or completed operations coverage, and shall include Landlord as additional insured.

5.0   General Contractor (GC) or Construction (CM) Requirements

5.1   If CONTRACTORS are introduced to the building and approved it will be subject to compliance with such reasonable requirements as Landlord might impose.

LANDLORD:  SPRING STREET COMPANY LLC
C/O THE PROPELLER COMPANY LLC

BY: _____

TENANT:  KATE'S PAPERIE, LTD.

BY: _____

18

KP 0112

To be attached to and form a part of Lease dated February ___, 2006 between SPRING STREET COMPANY LLC C/O THE PROPELLER COMPANY LLC AS MANAGING AGENT as LANDLORD and KATE'S PAPERIE, LTD. as TENANT for STORES 1 & 2 AND BASEMENT in the building known as 72 SPRING STREET, NEW YORK, NEW YORK

EXHIBIT 1

1.0    Indemnification

To the fullest extent permitted by law, General Contractor or Construction Manager, all to be referenced as "GC/CM" agrees to indemnify and hold harmless Owner, Owner's Managing Agent and their respective Affiliates, Officers, Partners, Agents, Employees, Servants and Assignees, all to be referenced as "OWNER" and TENANT, from and against all liability, claims and demands on account of injury to persons, including death resulting therefrom, and damage to property arising out of the performance, or lack of performance, of the Agreement by "GC/CM" and their Contractors and Contractor's Sub-Contractors, their respective Employees and Agents, all to be referenced as

1.1    "CONTRACTORS", and damage to property of "GC/CM" or CONTRACTORS" of "GC/CM" shall at it's own expense, defend any and all actions at law brought against "OWNER" based thereon and shall pay all attorney's fees and all other expenses and promptly discharge any judgments arising therefrom.

2.0    Insurance

2.1    "GC/CM" shall secure, and keep in full force and effect, and shall cause it's "CONTRACTORS" to secure, and keep in full force and effect through out the term of the project at _____, on behalf of _____ (TENANT), the following coverage at "GC/CM" sole cost and expense. Such insurance shall be primary, notwithstanding any other insurance that might be in effect for the indemnities.

(a)    Commercial General Liability Insurance, including Contractual Liability (to specifically include coverage for the indemnification clause of this agreement), Products & Completed Operations Liability (including XCU coverage), Broad Form Property Damage, Personal Injury Liability and Advertising Injury Liability, written on an occurrence form, with combined bodily injury and property damage limits of liability of no less than $5,000,000 per occurrence, $5,000,000 per location general aggregate, $5,000,000 Personal & Advertising Injury and $5,000,000 Products and Completed Operations liability with an aggregate limit per project. The limits of liability can be provided in a combination of a Comprehensive General Liability policy and an Umbrella Liability policy, which is written on a no less than follow form basis. (Lower limits may be required for certain contractors or their sub-contractors for less hazardous operations)

(b)    Worker's Compensation Insurance providing statutory benefits for "GC/CM" employees and Employer's Liability coverage in an amount that is no less than $500,000;

(c)    (OPTIONAL, IF APPLICABLE TO GC/CM OR CONTRACTORS WORK) Automobile Liability Insurance, including owned, non-owned and hired car liability insurance for combined limits of liability of $65,000,000 per occurrence. The limits of liability can be provided in a combination of an Automobile Liability policy and an Umbrella Liability policy, which is written on a no less than follow form basis.

2.2    All required insurance policies and bonds shall be maintained with insurance companies licensed within the state that work is being performed and holding an AM Best rating of no less than A-, VIII. Said policies shall contain a provision that the coverage will not be cancelled, non-renewed or materially changed, until at least thirty days prior written notice has been provided to Owner and Managing Agent.

2.3    "GC/CM" agrees to have included in each of the above policies, and shall cause its CONTRACTORS to have included in each of the above policies, except Workers Compensation, a waiver of the insurer's right of subrogation against "OWNER".

2.4    Owner, Owner's Agent _____ and _____ along with their subsidiaries and affiliated entities, now or hereafter formed, all as their interest may appear, and such other parties in interest as Owner or Agent may designate in writing from time to time ("OWNER") shall be named as additional insured except with respect to Workers Compensation and Contractors Property Insurance.

2.5    Certificates in the customary form, i.e. Accord 27, evidencing all terms of this Section of the Agreement, shall be delivered to the Owner or Managing Agent, or their agent, simultaneously with the execution of this Agreement. Similar certificates shall be delivered evidencing the renewal or replacement of such insurance, at least ten days prior to the effective date of such renewal or change of insurer.

19

KP 0113

**SCHEDULE A**

**INSERT PROVISIONS**

1.   "structural"

2.   ", which shall not be unreasonably delayed, withheld or conditioned"

3.   ", which approval shall not be unreasonably delayed, withheld or conditioned; provided, however, that Tenant shall not be required to obtain Owner's consent to any cosmetic or decorative changes or alterations or additions which are non-structural and do not adversely affect any building systems"

4.   "reasonably"

5.   "after Tenant receives notice thereof"

6.   "As to any alteration allowed to be made by Tenant pursuant to this lease, Tenant shall not be required to remove such alterations at or prior to the expiration of the term of this lease, except as otherwise required by Landlord at the time of approval of such alteration. Tenant may attach and affix trade fixtures to the demised premises, and all of Tenant's trade fixtures even though so attached and affixed, may be freely removed by Tenant at any time during the term of this lease and shall in any event be removed at the end of the term if so required by Landlord at the end of the term of the Lease, but all damage to the demised premises caused by such removal shall be repaired by Tenant."

"Landlord hereby approves the plans for initial alterations to be performed by Tenant in the Demised Premises prior to Tenant's initial occupancy, which are attached hereto as Exhibit B."

7.   "In no case, however, shall Tenant be obliged to repair damage resulting from any act, omission or negligence of Owner, Owner's agents or employees."

8.   Intentionally omitted.

9.   Intentionally omitted.

10.   "particular"

11.   "by anyone under Tenant's control

12.   "as a direct result of Tenant's particular manner of use of the demised



KP 0114

premises"

13.  Intentionally omitted.

14.  Intentionally omitted.

15.  Intentionally omitted.

16.  Intentionally omitted.

17.  Intentionally omitted.

18.  Intentionally omitted.

19.  Intentionally omitted.

20.  "upon reasonable notice to Tenant (which notice may be given orally), with a minimum of inconvenience to Tenant to the extent practical,"

21.  "provided that Owner uses all reasonable efforts to minimize interference with Tenant's use and occupancy of the demised premises and its access thereto."

22.  "Owner shall, except in an emergency, give Tenant reasonable advance notice of any intended entry into the demised premises. Owner shall use all reasonable efforts to perform all work or other business in the demised premises in a manner designed to minimize interference with Tenant's normal business operations. Upon the completion of such work, the usable area of any floor of the demised premises shall not have been materially reduced unless specifically required by law and Owner shall restore the portions of the demised premises affected by such work to the conditions they were in immediately prior to the performance of such work."

23.  "Tenant may use and shall have access to the demised premises twenty-four hours per day, every day of the year. Owner represents that the copy of the Certificate of Occupancy for the Building annexed hereto is true and correct and in full force and effect."

24.  Intentionally omitted.

25.  "twenty (20)"

26.  "after ten (10) days' written notice to Tenant from Owner stating that such payment is past due, which notice does not affect Owner's obligations with respect to the giving of any statutory 3-day notice"

27.  "reasonable"

2

KP 0115

28.   Intentionally omitted.

29.   "; upon the expiration of fifteen (15) days' notice to Tenant and Tenant's failure to cure such default or to commence curing such default if such default is of a nature that it cannot be completely cured within such fifteen (15) day period,"

30.   "and damage that Owner is obligated to repair pursuant to the other provisions of this Lease"

31.   "or Tenant"

32.   "return receipt requested"

33.   "given the earlier of receipt and five (5) business days after mailing. Copies of any default notice sent to Tenant shall be sent in like manner to Muchnick, Golieb & Golieb, P.C., 200 Park Avenue South, Suite 1700, New York, NY 10003: Attention: John A. Golieb, Esq.

34.   Intentionally omitted.

35.   "; provided that if such rent, charge, tax or levy applies to more than the Demised Premises, (i) Tenant shall only pay its pro rata share thereof based on actual relative usage and (ii) Tenant shall not pay any water or sewer charges on the basis of frontage in which case the same are included as part of the real estate taxes pursuant to Article 40."

36.   "$171,787.50 and shall deposit an additional sum of $171,787.50 with Owner on or before June 1, 2006, so that the aggregate amount deposited with Owner on June 1, 2006 is $343,575, which is collectible as additional rent. Tenant is not entitled to any interest on security.

37.   "promptly"

38.   "provided the new Owner assumed in writing the obligation to return said security to the Tenant."

38(a)   Notwithstanding anything stated in this Article 31 above, at Tenant's option, the security deposit, or any portion thereof, may be in the form of an unconditional, clean and irrevocable letter of credit issued by, and drawable upon, any commercial bank with offices in the City of New York having a net worth of not less than $500,000,000 (the "Issuing Bank") in a form satisfactory to Landlord (the "Letter of Credit"). The Letter of Credit shall (i) name the Landlord as beneficiary, (ii) permit multiple drawings, (iii) be fully transferable by Landlord without the payment of any fees or charges by Landlord, and (iv) either (A) expire on the date which is at least 30 days after the last date of the Term or (B)

3

KP 0116

be automatically self-renewing, without amendment, until the date which is at least 30 days after the last day of the Term. If upon any transfer of the Letter of Credit, any fees or charges shall be so imposed, then such fees or charges shall be payable solely by Tenant. If the Letter of Credit is not renewed at least 30 days prior to the expiration thereof or if Tenant holds over in the Demised Premises after the expiration or earlier termination of this Lease, Landlord may draw upon the Letter of Credit and hold the proceeds thereof as security for the performance of Tenant's obligation under this Lease.

39.   "which rules and regulations shall be consistent with the provisions of this lease and be promulgated and enforced on a nondiscriminatory basis as to Tenant. Owner agrees that if Owner promulgates new rules and regulations which require Owner's consent to an act of Tenant, Owner's consent will not be unreasonably withheld or delayed."

40.   "thirty (30)"

41.   "Not more frequent than once a year, Owner, upon at least 10 days prior notice by Tenant, shall execute, acknowledge and deliver to Tenant, and/or to any other person, firm or corporation specified by Tenant, a statement certifying that this lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), stating the dates which the rent and additional rent have been paid, and stating whether or not there exists any defaults by Tenant under this lease, and, if so, specifying each such default."

4

KP 0117

This Agreement, made as of this 8th day of February, 2007
Between Spring Street Co. LLC c/o The Propeller Co. LLC, 15 Maiden Lane, New York, NY, as Landlord,

and Kate's Paperie, Ltd., as Tenant,

Witnesseth that, and in consideration of the sum of One Dollar, it is mutually covenanted and agreed between the parties hereto, that the Lease dated September 13, 2005 for Stores 1 and 2 and part basement

in the building known as 72 Spring Street

In the Borough of Manhattan, City of New York, is hereby modified

whereby

Provided that Tenant is not in default on any payments, terms or conditions of its lease, Tenant shall be given a repayable credit against base rent only in the amount of $20,000.00 per month for the period February 1, 2007 through April 30, 2007 only and pursuant to the paragraph below. This credit shall be repaid to Landlord, billed and collectible as additional rent, beginning May 1, 2007 at the rate of $5,0000.00 per month through and including April 31, 2008. All other payments, terms, clauses, conditions, escalations, original base years and covenants contained in said lease shall continue applicable except as hereto modified.

These modifications, with respect to credits to Tenant only, are granted to Tenant, provided Tenant is not in default on any payments, terms or conditions of lease. If Tenant does default on any future payments, terms or conditions, this modification with respect to credits to Tenant only, shall become null and void and of no further effect and without notice of any kind to Tenant, all past, present and future credits shall be deemed cancelled becoming null and void and of no further effect and all sums previously credited to the account of the Tenant shall become due and owing and collectible as additional rent. The parties do hereby reaffirm that all rent and additional rent payments required by the terms of the lease between them and any modifications thereto are due by the 1st of each and every month. If payment is not received by the 10th day of that month by Landlord, Tenant shall be considered in default.

The failure by Landlord to exercise or enforce any right it may have under the terms of the lease between the parties or any modifications thereto shall not constitute a waiver by Landlord to that right or any other right accorded to Landlord by the Lease or any modification thereto.

As evidenced by his signature below, the Limited Guaranty of Leonard Flax shall remain in full force and effect and further, Leonard Flax personally guaranty's the $60,000.00 repayable credit.

IN WITNESS WHEREOF, the parties hereto have executed, or caused to be executed, these presents by the properly authorized parties and the appropriate seals thereto duly affixed, the day and year first above written.

LANDLORD: SPRING STREET CO. LLC          TENANT: KATE'S PAPERIE,LTD.
         C/O THE PROPELLER CO. LLC

BY:_____          BY: _____

                             LIMITED GUARANTOR:    LEONARD FLAX

                             BY:_____

                             PERSONAL GUARANTOR:   LEONARD FLAX

                             BY:_____

                             HOME ADDRESS: 112 E 74
                             _____ NY NY 10021

                             SOCIAL SECURITY #: 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

**KP 0118**

## Robert Varga

**From:** Keith Werner [kkw@kolo-usa.com]
**Sent:** Friday, February 08, 2008 1:54 PM
**To:** Robert Varga
**Subject:** FW: Kolo

This is the email that states that I have experience turning around companies.

Regards,

KEITH WERNER
PRESIDENT | KOLO, LLC
241 Asylum Street | Hartford, CT 06103 | 860.547.0367 x222 http://www.kolo.com/

-----Original Message-----
From: Peter Dunn [mailto:pgd@kolo-usa.com]
Sent: Wednesday, January 16, 2008 9:13 PM
To: kkw@kolo-usa.com
Subject: FW: Kolo

-----Original Message-----
From: Lionel Flax [mailto:lionel.flax@gmail.com]
Sent: Friday, April 20, 2007 9:26 AM
To: Eng, Zama
Subject: Kolo

Dear Zama,

        I thought long and often about the Kolo situation last night.  I need to
be perfectly honest with you.  I have been the one and only person who
between march 7th and until this moday who has had the lovely responsibility
of personally interfacing with, pacifiy, bearing the brunt of their
frustration, learning and developing a compounded comprehensive financial
statement and compilation  (No, Joe ar Leonard cannot work in Excel nor do
they read financal statement)  Defending this plan and orally to the vendor
group, communicating to company personnel, receiving resignation notices, I
could go on and on.  What I am trying to say, is that I have shouldered,
with next to no guidance, help, support or even any thanks from Joe or
Leonard, not to metion I was cleaning up a financial mess I did not cause.

I have done this willingly, relentlessly, with the highest level of dignity
that these people, court vendors, so they  say, have ever witnessed.  I ran
from no-one, called back everyone, and in the process of doing so, really
was able to keep Kate's while lacking credit, highly creditable.

We both know that Leonard and Joe's painful inability to generate a common
and unified vision that was know and shared by all is the tap root if this
company's problems.  That is why now, as CEO, it is up to me to change that.
We are not going to wait for Joe to come back, for Leonard to make up his
mind and more.

I am now the lead person of this company, and I am not playing their little
games that have driven off countless talented people, driven away financial
opportunity.  I am no going to allow this factionalized dynamic exist any
longer.  I am not going to be rendered ineffective by past dysfunctional



1

dynamics that paralyzed this company for years.

Since December 15th I have been doing a lot of "dirty jobs," at Kate's, picking up the crap left behind by everyone from Mark Lilian, to Jodi Sanderman, to Hans, to Earl, to Ignacio, to Ron Redford.......this has been no fun.

What has been fun, and what has driven me has been that I have never given up HOPE.   Hope that you and me could really make Kate's magical, Hope that we can make thee new Store like the original 13th street store in terms of  what it means to those who work and shop there.  I want to break boundaries again.  And sitting around waing for Joe and Leonard to agree on something doen't' work.

The excitement that I have generated internally and the best opportunity I have been able to create and the best way I have been able to find that will get the company healthier faster is the Kolo deal.

The benefits are:

1.  Essentially they will pay 8-9% of our rent in three of our stores, minimum.  As we do certain sales benchmarks, they will pay close to double the rent that they initially will.  This is a huge saving that translates to positive cash flow

2.  The interactive photo bar will generate buzz both long and short term, and will show the world that "Kate's is still on top of its game," and not only that, but we will reinvent the photo album business.

3.  Kieth from Kolo is one of the chair people on the Vendor Committee.  He also used to specialise for 9 years as an "out of court" specialist, doing for other companies what Kate's is experiencing, while we are using a lawyer.  He would not make a suggestion or propose a deal that will not help us in many ways.  He and Peter haven been very supportive and have coached me through some very depressing days.  Regardless of your personal and historical feelings about them, they are savvy business people, they test all their products with Kodak, Apple, and other major players.  They are willing to invest substancially in a company In financial distress, that is how much they believe in you and me.

4.  They will pay 8% of payroll in each location

5.  They will not require us to ties up one penny in cash flow om merchandise, or in handling goods, or in even warehousing them, not to mention managing the inventory in each location.

Plus, they will pay us a Royalty not only on the Album sales, but on the wide variety of digital printing, custom photo albums for individual and large sale use, and they will get people across the "threshold" of the store which will grow our sales in other areas.

We need this deal, not only in realty, but to demonstrate to the Creditors Committee that we are taking smart, proactive, and potential steps towards health, which this deal most certainly is.

We need to show the committee, a new voice and face of leadership. Most of the questions that came up at the meeting were addressed at Leonard and Joe about how they plan to reduce their role as decision makers in the company.  The committee was  told that it would be me at the helm from now on.

To not get the deal with Kolo done, for what ever reason, Window space or otherwise, will demonstrate that I am not the lead person of final decision maker.  It will frustrate the hell out of the Kolo people, and I will be personally devastated, as the chances of an exciting and expedient turn-around will be cut down.

Collaborative partnerships are the trend in retail.  We cannot afford very literally, to jeopardise this deal, based on the fact that Joe wanted to put greeting cards in the window.  This deal trumps Joe's or Leonard's personal feelings about this that or the other thing.  This is a business decision, and I cannot, with a pure heart and the best interest of the company at heart, let the old way of making decision, or not making decision, )(Joe vs. Leonard) interfere with my turnaround plan, of which you are the number one person.  Joe and Leonard have done enough non-decision making.

As CEO it is in the best interest of the company to make the deal with Kolo happen.  I do not care about Leonard or Joe's "feelings" right now.  They don't even read balance sheets, they both just do what they want without thinking of how the part relates to the whole, they just either act or dont act.

Those days are over.

I beg you and ask you most kindly to give the Kolo people the space that I had agreed they could have in Soho.  Forget about Leonard and Joe for a minute and together, lets you, me and Kolo do do something magical, cutting edge, and proactive to save what you and I treasure dearly.  Kate's Paperie.

I know you have been given whiplash by the back and fourths with the Spring Street Project, as well as many others over the years.  This is the end of those days.  I have staked my reputation on this and I am not going to let either of them disrupt or interrupt my turn-around plan for this business. I need your support, and gravely fear that if we do not respect Kolo's desire to inhabit the space by the window in Soho, that they will pull out, I will be totally crushed, and my role as CEO will be compromised, diminished, disregarded, both internally and to our vendors if I cannot pull this off.

Loosing this deal would devastate me, and believe or not right now, I cannot risk that happening.

Please consider all of the above.  Especially as Keith gaciously told Loius and my that Kolo would pay for the refinishing of the back wall of their area.

Please help me actualize my vision.  Please do not put in in the middle of Joe and Leonard as they are no longer in charge.  At the end of the day I am accountable to the many people we owe money, and the person who is our greatest creditor is Leonard.  As in addion to his equity ownership, he stands to loose the close to 1 million dollars in personal loans he has made the company, and Sam Flax stands to loose another 600,000.  He also personally guaranteed the Soho lease.

We need this deal to survive.  Please help me make it happen and please do not let the window issue become a deal breaker, as I fear already it has become one.  Please speak to Peter and lets get this done.  if we keep wavering, as we have for the last 10 years, we will wake up with less than we have right now, which is . . . . . . . . . .

We need this deal to thrive, survive, and the Soho window will generate so much press if utilize it in a totally progressive, interactive and fashion forward way.

Kindly help me pull this off.  Please talk to Peter and or Keith and lets roll this out.  The thought of missing the boat on this cannot even be a tthought right now.  We need to look forward, no back, and we cannot wait for the two-heraded moster of Joe and Leonard to start meddling even further.  When I see you later, I will show you the historical figures that will demonstrate why this deal makes sense based on the trends of whoto album sales, the damage to sales a mismanaged inventory has had, and how many solutions this deal provides us with.

We cannot afford to split hairs over space and loose the financial upsides.

Kindly help me make this deal on whattever terms have to be made.

Most respectfully,

--
Lionel Flax
Chief Executive Officer
Kate's Paperie
646-352-1297

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KOLO RETAIL, LLC,

                    Plaintiff,                                      07 CIV. 10653

    -against-

KATE'S PAPERIE, LTD.,                                  **JUDGE:  McMAHON**

                    Defendant.

---

## STATEMENT EXPLAINING DELAY IN ELECTRONIC COURT FILING

Plaintiff Kolo Retail, LLC began attempts to file its Affirmation in Further Support of Order for Preliminary Injunction and Proposed Findings of Fact and Conclusions of Law at 8:00am on February 15, 2008.  Efforts continued until 11:00 am at which time, believing the Court's ECF System was down, we appeared at the US District Court for the Southern District of New York in White Plains in order to file the above referenced pleadings in hard copy in order to meet the Court's deadline of 12:00 pm.

We were advised by the Clerk of the Court that we were required to file these pleadings via ECF, with the exception of certain exhibits.  Plaintiff was prevented from filing the enclosed pleadings before the Court's deadline of 12:00 pm due to continued computer issues at Goldberg Segalla's White Plains office.  As soon as these computer issues were resolved at 4:30 pm we immediately began filing the required pleadings.

Pursuant to the SDNY's "Guidelines for Electronic Court Filing" and the SDNY's website "Service Alert" we are herewith submitting this Statement explaining the delay in electronic court filing.