UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KOLO RETAIL, LLC,

                    Plaintiff,                          07 CIV. 10653

  -against-

KATE'S PAPERIE, LTD.,                        **JUDGE: McMAHON**

                    Defendant.

---

## PLAINTIFF'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Plaintiff, KOLO RETAIL, LLC (hereinafter "Kolo") respectfully submits the following findings of essential facts established by the evidence and reaches the following conclusions of law:

### PRELIMINARY STATEMENT

Kolo is seeking to enjoin Defendant, Kate's Paperie, from enforcing the Notice of Termination of Kolo's tenancy at the premises located at 72 Spring Street, New York, New York. Kolo is currently occupying the subject premises pursuant to a Shop-in-Shop Letter of Intent ("Shop-in-Shop LOI"), which provides for a one year lease term renewable at Kolo's option for additional terms. Essentially, the Shop-in-Shop arrangement is a retail store within a retail store, wherein Kolo is occupying a portion of Kate's Paperie's retail store similarly to Starbucks operating a business within Barnes & Nobles.

## FINDINGS OF FACT

I.   THE SHOP-IN-SHOP LOI CREATED
     A LANDLORD-TENANT RELATIONSHIP

   A.    Formation of the Shop-in-Shop LOI

   1.    Kolo's main line of business is selling specialty photo albums and accessories.

   2.    Kate's main line of business is selling paper related products.    See Flax Deposition at Ex. "A" at p. 34.

   3.    In January 2007 and prior thereto Kolo and Kate's had a business relationship in that Kate's was selling Kolo products within its stores.

   4.    Subsequently, the parties considered the possibility of a Shop-in-Shop arrangement whereby Kolo would operate its own store within Kate's Paperie's store.

   5.    As early as March 30, 2007, Mr. Lionel Flax[1] of Kate's Paperie sent Mr. Peter Dunn of Kolo a sketch of the Spring Street store layout and he indicated that he was very optimistic about the "very worthy endeavor." See Flax Deposition at Ex. "A" at p. 162.

   6.    Kate's Paperie internally discussed the ups and downs of the possible Shop-in-Shop arrangement with Kolo in emails dated March 30, 2007 by Lowell Flax and email dated April 2, 2007, by Joe Barreiro.  See Flax Deposition at Ex. "A" at p. 166 and Ex. "A"(6).

   7.    Mr. Lowell Flax (Mr. Lionel Flax's brother) outlines what he perceived as "benefits" that Kate's Paperie would receive from the Shop-in-Shop arrangement, including alleviating rental payment, share in the sales, merchandise inventory, cash flow, increased sales to Kate's, increased efficiency, and "[w]e can apply what we learn from them to other areas." See Flax Deposition at Ex. "A"(6).

---

[1] Unless stated otherwise, the use of "Mr. Flax" refers to Lionel Flax and not his brother Lowell Flax or his father Leonard Flax.

8.    The Shop-in-Shop arrangement was especially beneficial to Kate's Paperie because "the company was on the verge of bankruptcy." See Flax Deposition at Ex. "A" at p. 61.

9.    The Shop-in-Shop arrangement was also beneficial to Kate's Paperie because Kolo would inventory the store themselves so Kate's Paperie did not have to "put cash flow" into Kolo's "product line." See Flax Deposition at Ex. "A" at p. 61.

10.    Kate's Paperie recognized that the Shop-in-Shop arrangement was something "very attractive and trendy and new." See Flax Deposition at Ex. "A" at p. 61.

11.    Further, Mr. Flax also recognized that the Shop-in-Shop arrangement would mutually benefit both parties. See Flax Deposition at Ex. "A" at p. 62.

12.    In an email dated April 12, 2007, Mr. Flax stated to Peter Dunn of Kolo that "[a]ll set with the Siho [sic] Corner. Let me know what to do, and **get me the LOI.**" See Flax Deposition at Ex. "A"(7) (emphasis added).

13.    When Mr. Flax stated "get me the LOI," he was referring to the Shop-in-Shop LOI. See Flax Deposition at Ex. "A" at p. 178.

14.    At all relevant times, Mr. Lionel Flax acted in his capacity as the *de facto* Chief Executive Officer of Kate's Paperie in connection with the Shop-in-Shop LOI. See Flax Deposition at Ex. "A" at p. 20-21.

15.    Mr. Flax had the authority to enter into a binding Shop-in-Shop arrangement with Kolo. See Flax Deposition at Ex. "A" at p. 20-21, 29-30.

16.    Sometime in mid April, 2007, at Mr. Flax's request, Mr. Werner submitted to Mr. Flax a written proposal set forth on pages 3 through 11 of Plaintiff's Deposition Exhibit "1" (see

Flax Deposition at Ex. "A"(1)), which is identified as Addendum "A" to the Shop-in-Shop LOI. See Werner Deposition at Ex. "B" at p. 46-50.

17.    Again at Mr. Flax's request, in an email dated May 6, 2007, Mr. Werner forwarded an electronic copy of the proposal (a/k/a Addendum "A") to Mr. Flax. See Werner Deposition at Ex. "B"(2).

18.    By email dated May 6, 2007, Mr. Werner provided to Mr. Flax the subject LOI. See Flax Deposition at Ex. "A"(9).

19.    Based on the above-mentioned two separate emails, the Shop-in-Shop LOI was comprised of the two (2) pages identified as the "Letter of Intent" and the proposal submitted by Mr. Werner that was incorporated into the LOI as Addendum "A," which contains nine (9) pages. See Flax Deposition at Ex. "A"(1).

20.    The Shop-in-Shop LOI, which is marked as Plaintiff's Deposition Ex. "1" was the only version and was never modified. See Flax Deposition at Ex. "A" at p. 80, 184.

21.    On or about May 9, 2007, Mr. Flax executed the Shop-in-Shop LOI and faxed it to Mr. Werner, thereby accepting the terms contained therein. See Flax Deposition at Ex. "A" at p. 91, 193; Flax Deposition at Ex. "A"(2).

22.    In addition to the deposition tesatimony during which Mr. Flax admitted signing the Shop-in-Shop LOI, Mr. Flax's execution of the Shop-in-Shop LOI is sufficiently corroborated through his emails dated May 9, 10, and 12, 2007. See Flax Deposition at Ex. "A"(2).

23.    Specifically, Mr. Flax stated in his email dated May 9, 2007 "I just sent this through signed," which was in response to Mr. Werner's prior email dated May 8, 2007 in which

4

he stated "Just checking in with you to see how you are doing with signing the LOI." See Flax Deposition at Ex. "A"(2).

24.     Subsequently, on May 10, 2007 Mr. Werner emailed Mr. Flax that "Thank you Lionel! I will look for it now" to which Mr. Flax responded again "Did u find it?" See Flax Deposition at Ex. "A"(2).

25.     In an email dated May 12, 2007, Mr. Werner wrote to Mr. Flax that "I did received [sic] your faxed LOI. Thank you very much. I will bring a copy of the signed one to you on Tuesday." See Flax Deposition at Ex. "A"(2).

26.     Mr. Werner testified that he received Mr. Flax's signed Shop-in-Shop LOI and distinctly recalls seeing the signature page with Mr. Flax's signature on the appropriate signature line of the LOI. See Werner Deposition at Ex. "B" at p. 108-10.

27.     Mr. Werner had no reason to doubt that the signature he received from Mr. Flax was not Mr. Flax's signature. See Werner Deposition at Ex. "B" at p. 109-10.

28.     As such, Mr. Werner signed the Shop-in-Shop LOI on or about May 12, 2007. See Flax Deposition at Ex. "A"(2).

29.     Mr. Werner testified that it was his intention to deliver a fully executed Shop-in-Shop LOI to Mr. Flax at the meeting at Mercer Café, as stated in his email dated May 12, 2007. See Flax Deposition at Ex. "A"(2); Werner Deposition at Ex. "B" at p. 117.

30.     However, the fully executed Shop-in-Shop LOI subsequently went missing and Mr. Werner does not know whether he delivered the original signed Shop-in-Shop LOI to Mr. Flax or it was lost in his office. See Werner Deposition at Ex. "B" at p. 115-17.

31.     There is no record evidence to suggest that Mr. Werner intentionally lost the signed Shop-in-Shop LOI.

32.    It is evident from the evidence that there was only one version of the LOI (which contains two pages) and the Addendum "A," which contains the Powerpoint presentation. See Flax Deposition at Ex. "A" at p. 47-48, 54.

33.    There is no evidence to suggest that either Mr. Werner or Mr. Flax made any modifications to the Shop-in-Shop LOI, which is attached to the Flax Deposition at Ex. "A"(1). See Flax Deposition at Ex. "A" at p. 184.

34.    Further, Mr. Flax never indicated to Mr. Werner or any person at Kolo that he disagreed with the terms of the LOI prior to signing it. See Flax Deposition at Ex. "A" at p. 95.

35.    Accordingly, the loss of the executed Shop-in-Shop LOI does not benefit Kolo or prejudice Kate's Paperie.    Mr. Flax acknowledged signing the Shop-in-Shop LOI and acknowledged its contents.

36.    This conclusion is supported by the actions of the parties in response to the executed Shop-in-Shop LOI, which required the opening of the Kolo shop within Kate's Paperie's shop located at 72 Spring Street on or about June 1, 2007.

37.    The parties admit that Kolo moved into the premises located at 72 Spring Street sometime prior to June 1, 2007 and officially opened for business as of that date.

38.    The parties also admit that Kolo has been in continuous possession of approximately 450 square feet of the premises since it moved in prior to June 1, 2007.

**B.    The Subject Premises**

39.    Kate's Paperie leased the premises located 72 Spring Street from Spring Street Co. LLC, beginning on December 1, 2005 through November 30, 2015. See Werner Deposition at Ex. "B"(8).

40.    Between January and June 2007, the subject store was vacant.    See Flax Deposition at Ex. "A" at p. 42-43.

41.    About two weeks prior to June 1, 2007, Kolo moved into the subject premises with Kate's Paperie's permission. See Flax Deposition at Ex. "A" at p. 95, 192.

42.    To this day, Kolo is occupying about 450 square feet of Kate's Paperie's store at 72 Spring Street. See Flax Deposition at Ex. "A" at p. 97.

43.    As of June 1, 2007, Kate's Paperie commenced operating within this store as a "Paperie" store. See Flax Deposition at Ex. "A" at p. 42.

44.    At the same time, as of June 1, 2007, Kolo also commenced its operations within Kate's Paperie's store. See Flax Deposition at Ex. "A" at p. 95-96, 100.

45.    Kate's Paperie accepted monthly rental payments from Kolo.    See Flax Deposition at Ex. "A" at p. 107-08.

46.    Pursuant to the Shop-in-Shop LOI, Kolo paid rent for the 450 square feet space at the rate of $75 per square foot per year, which amounted to $33,750 per year and $2,812.50 per month, which Mr. Flax accepted. See Flax Deposition at Ex. "A" at p. 156-58.

47.    Additionally, once the net sales of Kolo reached $250,000, Kolo would pay a royalty payment of 6% to Kate's Paperie. See Werner Deposition at Ex. "B" at p. 180-82.

## II.    KOLO SATISFIES THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION UNDER RULE 65

### A.    Kolo Would Sustain Immediate And Irreparable Injury

48.    Mr. Werner sets forth in his declaration that immediate and irreparable harm will result to Kolo's business, by damage to its good will, reputation, and loss of customers if the Order requested herein is denied. See Werner Decl. at ¶13.

49.    Additionally, Kolo's right to renew the lease term for two additional one year terms would also be effected, if not eliminated.

50.    Moreover, Kolo's right to seek the enforcement of the Shop-in-Shop LOI, including specific performance, would be severely impeded if the Order is not granted herein.

51.    Losing a viable location such as the Spring Street location, as admitted by Kate's Paperie, is irreplaceable, given that real estate is considered unique and the harm to Kolo under the circumstances would go far beyond compensatory damages. See Werner Decl. at ¶14, 20.

52.    Mr. Flax agreed that the portion of the store where Kolo operates is "prime real estate, in a trendy neighborhood." See Flax Deposition at Ex. "A" at p. 131.

53.    Mr. Flax called the Spring Street location a "1B" and "tier 2 location" from a business point of view to do sales. See Flax Deposition at Ex. "A" at p. 132-33.

54.    Mr. Flax indicated that "Soho used to be more of an artist community, but now it's more designers, architects, fashion people. . . It's a creative, trendy neighborhood, yes" and these customers are interested in the type of products that Kate's Paperie and Kolo are selling. See Flax Deposition at Ex. "A" at p. 135.

55.    Further, the brand visibility and recognition created by the Spring Street location is invaluable and it is not translatable into sales dollars and cents. See Werner Decl. at ¶14.

56.     Kolo has a legitimate interest in protecting its presence in the Soho market and its absence would result in lost customers, undermine customer confidence in the company and the brand, and Kolo's good will would proportionately diminish.

57.     Gaining visibility and maintaining a presence in a highly competitive market reinforces the image and good will of a company.

58.     If this were not the case, then finding gas stations at all four corners of an intersection or finding multiple banks within one city block would not be a common occurrence.

59.     The same way gas stations and banks seek visibility, which is its own form of marketing as well, Kolo is seeking the same in order to further establish its name, brand and good will.

60.     Kolo is facing the loss of visibility and reduced market share in the Soho market that is a hub of specialty customers that are the core customer base of Kolo's business.

61.     Mr. Flax admitted that Kolo's photo albums are unique because of the "brand recognition" that it is sold at Barnes and Nobles and "people know the name." See Flax Deposition at Ex. "A" at p. 37.

62.     By being evicted from the premises, customers seeing Kolo's items one day but not the next will inevitably turn to other retailers while wondering whatever happened to Kolo at that location.

63.     This type of absence from the market after Kolo has enjoyed a positive presence and established steady growth in sales would clearly undermine customer confidence in the Kolo brand and products. See Werner Decl. at ¶14.

64.     Additionally, the interruption of the availability of Kolo products at the Spring Street location, where there is a hub of specialty customers can negatively effect Kolo's good will, even if the interruption is brief. See Werner Decl. at ¶14.

65.     Based on the above, Kolo has demonstrated immediate and irreparable harm.

### B.     Kolo Would Likely Succeed On The Merits

66.     There is good cause to believe that Kolo will ultimately succeed in establishing that Kate's Paperie wrongfully breached the Shop-in-Shop LOI by serving the Notice of Termination upon Kolo without setting forth any grounds therein.

67.     As such, since Kolo has the right to renew under the Shop-in-Shop LOI for two (2) additional one (1) year terms, Kolo will likely succeed in obtaining specific performance from Kate's Paperie to keep the tenancy until such time as the sub-lease expires.

### 1.     Breach Of Contract

68.     The Shop-in-Shop LOI specifically provides that Kolo's terms is for one year, beginning from June 1, 2007 through May 31, 2008.

69.     Further, Kolo has the right to renew the sub-lease for two (2) additional one (1) year terms beyond the initial one (1) year term.

70.     The sub-lease has not yet expired and the time to seek renewal of the sub-lease has not yet passed.

71.     However, since Kate's Paperie served a Notice of Termination of the sub-lease before the expiration of the sub-lease, it is interfering with Kolo's right of occupancy and right to renew.

72.     Accordingly, Kolo would be entitled to specific performance against Kate's Paperie to preserve Kolo's right to occupancy and renew.

73.     Kolo stands ready willing and able to continue its occupancy until the expiration of the sub-lease on May 31, 2008 and timely exercise its right to renew as per the Shop-in-Shop LOI. See Werner Decl. at ¶15.

74.     Based on the above, Kolo would likely succeed against Kate's Paperie on the merits in obtaining specific performance and in addition or alternatively money damages for breach of the Shop-in-Shop LOI.


### 2.     Breach Of Covenant Of Good Faith And Fair Dealing

75.     Plaintiff has a meritorious claim for breach of covenant of fair dealing and good faith.

76.     Kate's Paperie is seeking the termination of the Shop-in-Shop LOI and Kolo's tenancy at the Spring Street location without stating a reason at all.

77.     Kate's Paperie is threatening Kolo with eviction proceedings if the premises are not vacated on or before January 31, 2008.

78.     Kate's Paperie served its Notice of Termination on or after December 20, 2007, after the commencement of this action against it.

79.     Given that it states no reason for the termination, it certainly raises issues concerning Kate's Paperie's conduct, including whether it is seeking the termination in bad faith.

80.     Since on or about June 1, 2007, Kolo has been in continuous possession of a portion of the premises and operated its retail store within Kate's Paperie's retail store.

81.    By seeking the termination of the sub-lease, Kate's Paperie is effectively depriving Kolo of the fruits of its labor in this Shop-in-Shop arrangement because Kolo will no longer have a business presence and visibility in Soho at the Spring Street location, which is a hub of specialty customers to whom Kolo markets its products.

82.    Based on the above, Kolo demonstrated that it would likely prevail on the merits under this claim.

### C.    Balance of Hardships Tips In Kolo's Favor

83.    Weighing the hardships and considering Kolo's likelihood of ultimate success, granting the Order requested herein is appropriate.

84.    Kolo's resulting harm would far outweigh any prejudice or harm to Kate's Paperie.

85.    Kate's Paperie agreed to the occupancy of its retail store by Kolo and has benefited from the Shop-in-Shop relationship due to the specialty products offered by Kolo, which attracted customers to Kate's Paperie's products as well.  See Werner Decl. at ¶19.

86.    Further, Kate's Paperie admitted to many benefits that the Shop-in-Shop arrangement offers to it.

87.    Kate's Paperie has not shown any appreciable harm that weighs against issuing the preliminary injunction.

88.    Certainly, Kate's Paperie made no showing that the space that is currently occupied by Kolo is needed for a particular purpose, which, if not surrendered, would result in great harm to its business.

89.    If permitted to evict Kolo, Kate's Paperie would simply reoccupy the space previously occupied by Kolo, which would entail a financially insignificant cost.

90.    Additionally, Kate's Paperie would suffer no financial loss as a result of continued dealings with Kolo through the Shop-in-Shop arrangement because Kate's Paperie would benefit from Kolo's presence by attracting business through Kolo's products in the store and thereby increasing its own revenues as projected in the financial forecast attached to the Shop-in-Shop LOI.

91.    Therefore, no measurable harm would result to Kate's Paperie and, as such, the equities tip decidedly in Kolo's favor.

## CONCLUSIONS OF LAW

### I.    THE SHOP-IN-SHOP LOI CREATED A LANDLORD-TENANT RELATIONSHIP

1.    Although the parties cannot locate a signed copy of the Shop-in-Shop LOI, there is sufficient evidence in the record to establish the existence of a valid sub-lease for a portion of the premises at 72 Spring Street, New York, New York.

2.    Based on the submitted evidence, both parties executed the Shop-in-Shop LOI.

3.    Mr. Flax admitted to executing the Shop-in-Shop LOI during his deposition and in several emails circulated between the parties.

4.    Mr. Flax's email acknowledgements constitute electronic signature, which is enforceable against Kate's Paperie.

5.    Both New York and federal statutes governing electronic signature recognize the validity and enforceability of electronic signatures. *On Line Power Technologies, Inc. v. Square D Co.*, 2004 WL 1171405 (S.D.N.Y. 2004)(J. McMahon).

6.    Both parties acknowledge that there was only one version of the Shop-in-Shop LOI and the Addendum "A" thereto and these documents were not modified prior to execution.

7.    Further, both parties acknowledged and adopted the contents of the Shop-in-Shop LOI.

8.    According to the Shop-in-Shop LOI, the term of the lease is for one year, commencing on June 1, 2007 through May 31, 2008, with the right to renew with 60 days notice to Kate's Paperie prior to the termination of the sub-lease.

9.    The parties agreed that Kolo would occupy approximately 450 square feet within Kate's Paperie's store.

10.    The rent was determined at $75 per square foot per year, which is payable in monthly installments to Kate's Paperie.

11.    The annual rent was calculated at $33,750.00, which resulted in a monthly rental payment of $2,812.50.

12.    Kate's Paperie's assertion that the $75 per square foot rent was agreed to be paid on a monthly basis is without merit.

13.    The $75 per foot per month for the 450 square feet would yield an unconscionable amount because Kolo would be paying $405,000 of rent for less than 10% of the approximately 6,000 square feet that Kate's Paperie is leasing when Kate's Paperie is paying the total of $687,150.00 for the entire 6,000 square feet. Also, such an interpretation is against the weight of

the evidence. See Werner Deposition at Ex. "B" at p. 224-225; Werner Deposition at Ex. "B"(8).

14.    Additionally, the parties agreed that Kolo would pay a 6 % royalty upon reaching $250,000 of net sales and an increased royalty rate if net sales exceed the $250,000 as stated in the Shop-in-Shop LOI Addendum "A."

15.    Based on the above, a landlord-tenant relationship existed between Kolo and Kate's Paperie as of June 1, 2007.

16.    There is no evidence to indicate that Kolo's tenancy terminated prior to this date.

17.    The sub-lease is to terminate on May 31, 2008 but Kolo indicated that it wishes to exercise its right to renew as set forth in the Shop-in-Shop LOI.

18.    Kate's Paperie served a Notice of Termination upon Kolo to terminate the tenancy as of January 31, 2008.

19.    The Notice of Termination does not set forth any grounds upon which the termination is based.

20.    Accordingly, since there is a valid sub-lease between the parties, Kate's Paperie cannot unilaterally terminate the tenancy without complying with the statutory requirements set forth in NY RPAPL §711.


II.    **KOLO SATISFIES THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION UNDER RULE 65**

21.    To obtain a preliminary injunction, the moving party has the burden of demonstrating: "(1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the

merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." *Forest City Daly Housing, Inc. v. Town of N. Hempstead*, 175 F.3d 144, 149 (2d Cir. 1999).

22.    The issuance of a preliminary injunction is proper where plaintiff shows a need for immediate relief to avoid irreparable injury and to preserve the *status quo* pending resolution of the merits of the case.

23.    Kolo meets the criteria necessary for a preliminary injunction in that Kolo has established that it will be irreparably harmed and a substantial, and indeed overwhelming, likelihood of success on the merits because the enforcement of the Notice of Termination and maintenance of the summary proceedings in New York City Civil Court, Landlord Tenant Division, would (a) impermissibly interfere with Kolo's lawful possession of the portion of the store located at 72 Spring Street, New York, New York and would (b) effectively eliminate Kolo's right to renew, which is embodied in the Shop-in-Shop LOI.

24.    The preliminary injunction is necessary to prevent irreparable harm to Kolo's business and possessory rights in the subject premises.

### A.    Kolo Would Sustain Immediate And Irreparable Injury

25.    To establish irreparable harm, Kolo must demonstrate "'an injury that is neither remote nor speculative, but actual and imminent.'" *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) (*quoting Consolidated Brands, Inc. v. Mondi*, 638 F.Supp. 152, 155 (E.D.N.Y. 1986)). Additionally, the injury must also be "one requiring a remedy of more than mere money damages." *Id.*

26.     Based on the above standards, courts have found irreparable harm where a party is threatened with the loss of business or the loss of good will and customers. *See Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995); *Interphoto Corp. v. Minolta Corp.*, 417 F.2d 621, 622 (2d Cir. 1969) (concluding that loss of goodwill is incalculable).

27.     Further, harm to a company's good will is not compensable. *See Ivy Mar Co. v. C.R. Seasons, Ltd.*, 907 F.Supp. 547, 565 (E.D.N.Y.1995) ("Numerous courts have held that harm to a company's operations, reputation, good will or customer relations is irreparable because money damages cannot provide adequate compensation for such injuries."); *Ecolab, Inc. v. Paolo*, 753 F.Supp. 1100, 1110 (E.D.N.Y.1991) ("Loss of good will constitutes irreparable harm which cannot be compensated by money damages."); *Freedom Holdings Inc. v. Spitzer*, 408 F.3d 112, 114-15 (2d Cir.2005) ("[a]n anticipated loss of market share growth may suffice as an irreparable harm").

28.     Also, a potential loss of market advantage can qualify as irreparable harm. *See Muze v. Digital On-Demand, Inc.*, 123 F.Supp.2d 118, 131 (S.D.N.Y. 2000).

29.     Both lost good will and customer confusion can establish the irreparable injury necessary for injunctive relief. *See Adirondack Appliance Repair, Inc. v. Adirondack Appliance Parts, Inc.*, 148 A.D.2d 796, 538 N.Y.S.2d 118 (3d Dept. 1989).

30.     Irreparable injury is also established where a potential tenant shows that a location is "uniquely suited to its needs in terms of size and location." *Workbench, Inc. v. Syblin Realty Corp.*, 140 A.D.2d 693, 528 N.Y.S.2d 888, 891 (2d Dep't 1988).

31.     In *Dunkin' Donuts Inc. v. Dowco, Inc.*, 1998 WL 160823 (N.D.N.Y. 1998), the Court found that plaintiff established the element of irreparable harm because it had a legitimate

interest in protecting its presence in the Dryden market, consumer confusion was likely, and plaintiff risked losing its good will in the relevant market.

32.    In this case, Mr. Werner sets forth in his declaration that immediate and irreparable harm will result to Kolo's business, by damage to its good will, reputation, and loss of customers if the Order requested herein is denied. See Werner Decl. at ¶13.

33.    Additionally, Kolo's right to renew the lease term for two additional one year terms would also be effected, if not eliminated.

34.    Moreover, Kolo's right to seek the enforcement of the Shop-in-Shop LOI, including specific performance, would be severely impeded if the Order is not granted herein.

35.    Losing a viable location such as the Spring Street location is irreplaceable, given that real estate is considered unique and the harm to Kolo under the circumstances would go far beyond compensatory damages. See Werner Decl. at ¶14, 20.

36.    Further, the brand visibility and recognition created by the Spring Street location is invaluable and it is not translatable into sales dollars and cents. See Werner Decl. at ¶14.

37.    As in *Dunkin' Donuts*, *supra*, Kolo has a legitimate interest in protecting its presence in the Soho market and its absence would result in lost customers, undermine customer confidence in the company and the brand, and Kolo's good will would proportionately diminish.

38.    Gaining visibility and maintaining a presence in a highly competitive market reinforces the image and good will of a company.

39.    Kolo is seeking the same in order to further establish its name, brand and good will.

40.    In *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27 (2d Cir. 1995), the Second Circuit considered the circumstances under which the loss of a single product

line could constitute irreparable harm for purposes of a preliminary injunction. The Court explained that, in the typical situation where money damages can be readily calculated, there is usually no irreparable harm. However, if the calculation of damages would be speculative, or if the discontinuance of the product would result in the discontinuance of the business, preliminary injunctive relief may be appropriate. This rule is necessary to avoid the unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at a trial on the merits with the rule that damages must be based on more than speculation.

41.    The concerns articulated by the Second Circuit in *Doherty* are very much concerns in this case.

42.    Although Kolo is not faced with losing a product line as in *Doherty*, it faces the loss of visibility and reduced market share in the Soho market that is a hub of specialty customers that are the core customer base of Kolo's business.

43.    By being evicted from the premises, customers seeing Kolo's items one day but not the next will inevitably turn to other retailers while wondering whatever happened to Kolo at that location.

44.    This type of absence from the market after Kolo has enjoyed a positive presence and established steady growth in sales would clearly undermine customer confidence in the Kolo brand and products. See Werner Decl. at ¶14.

45.    Additionally, the interruption of the availability of Kolo products at the Spring Street location, where there is a hub of specialty customers can negatively effect Kolo's good will, even if the interruption is brief. See Werner Decl. at ¶14; *see also, Reuters Ltd. v. United*

*Press Intern, Inc.,* 903 F.2d 904, 908 (2d. Cir. 1990) ("interruption however short the time in a newspaper's coverage of the news causes it to lose readership").

46.    Accordingly, it would be impossible to quantify the damages done to Kolo's business in monetary terms.

47.    The injunction will prevent irreparable harm to Kolo and will cause no appreciable injury or harm to Kate's Paperie.

48.    Based on the above, Kolo has demonstrated immediate and irreparable harm.

### B.    Kolo Would Likely Succeed On The Merits

49.    To satisfy its burden of showing likelihood of success on the merits, Kolo "need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *overruled on unrelated grounds, O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400 (1987).

50.    There is good cause to believe that Kolo will ultimately succeed in establishing that Kate's Paperie wrongfully breached the Shop-in-Shop LOI and, as a result, is required to specifically perform and provide retail spaces for Kolo's use at the 3rd Avenue and the 57th Street store locations.

51.    Further, as relevant to the Spring Street location, there is good cause to believe that Kolo will ultimately succeed in establishing that Kate's Paperie breached the Shop-in-Shop LOI and that the Notice of Termination was wrongfully issued.

52.    As such, since Kolo has the right to renew under the Shop-in-Shop LOI for two (2) additional one (1) year terms, Kolo will likely succeed in obtaining specific performance from Kate's Paperie to keep the tenancy until such time as the sub-lease expires.

### 1.    Breach Of Contract

53.    The Shop-in-Shop specifically sets forth Kolo's right to renew the sub-lease.

54.    Accordingly, the right to renew the lease is governed by the terms of the agreement. *See Dime Sav. Bank of N.Y. v. Montague St. Realty Assoc.*, 90 N.Y.2d 539, 664 N.Y.S.2d 246, 686 N.E.2d 1340 (1997).

55.    Where the original lease includes an option to renew, the exercise of it by the tenant does not create a new lease; rather it is a prolongation of the original agreement for a further period. Once the option is exercised, the original lease is deemed a unitary one for the extended term and a new lease is not necessary. *See Masset v. Ruh*, 235 N.Y. 462, 464, 139 N.E. 574 (1923).

56.    In this case, the Shop-in-Shop LOI specifically provides Kolo the right to renew the sub-lease for two (2) additional one (1) year terms beyond the initial one (1) year term.

57.    The time to seek renewal of the sub-lease has not passed.

58.    However, since Kate's Paperie served a Notice of Termination of the sub-lease, it is interfering with Kolo's right of occupancy and right to renew.

59.    Accordingly, Kolo would be entitled to specific performance against Kate's Paperie to preserve Kolo's right to occupy the premises and the right to renew the sub-lease.

60.    Based on the above, Kolo would likely succeed against Kate's Paperie on the merits in obtaining specific performance and in addition or alternatively money damages for breach of the Shop-in-Shop LOI.

## 2.    Breach Of Covenant Of Good Faith And Fair Dealing

61.    A covenant of good faith and fair dealing is implied in all contracts. *See Nat'l. Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir.2004).  "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131 (2002) (citations and internal quotation marks omitted). This duty goes beyond the mere words of a contract to encompass "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *511 West 232nd Owners Corp.*, 98 N.Y.2d at 153 (*quoting Rowe v. Great Atl. and Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978)).

62.    Plaintiff has a meritorious claim for breach of covenant of fair dealing and good faith.

63.    Kate's Paperie is seeking the termination of the Shop-in-Shop LOI and Kolo's tenancy at the Spring Street location without stating a reason at all.

64.    However, since there is a landlord-tenant relationship between the parties, Kate's Paperie must follow the requirements set forth in NY RPAPL §711 in order to properly terminate the tenancy.

65.    Since Kate's Paperie did not even attempt to comply with NY RPAPL §711 by setting forth the appropriate grounds of terminating the sub-lease, Kate's Paperie has breached the covenant of good faith and fair dealing between the partiers.

66.    By seeking the termination of the sub-lease, Kate's Paperie is effectively depriving Kolo of the fruits of its labor in this Shop-in-Shop arrangement because Kolo will no longer have a business presence and visibility in Soho at the Spring Street location, which is a hub of specialty customers to whom Kolo markets its products.

67.    Based on the above, Kolo demonstrated that it would likely prevail on the merits under this claim.

### C.    Balance of Hardships Tips In Kolo's Favor

68.    Weighing the hardships and considering Kolo's likelihood of ultimate success, granting the Order requested herein is appropriate.

69.    The evidence indicates that Kolo's resulting harm would far outweigh any prejudice or harm to Kate's Paperie.

70.    Kate's Paperie agreed to the occupancy of its retail store by Kolo and has benefited from the Shop-in-Shop relationship.

71.    The record is replete with many admissions by Kate's Paperie that the Shop-in-Shop arrangement offers many benefits to them, such as alleviating cash flow problems, inventory, etc.

72.    In comparison, the injury that Kolo will suffer as a result of the continued prosecution of the summary proceedings in Landlord Tenant Court far outweighs any possible harm to Kate's Paperie if the injunction is not issued.

73.    Therefore, no appreciable harm would result to Kate's Paperie and, as such, the equities tip decidedly in Kolo's favor.

Dated: White Plains, New York
       February 15, 2008

Respectfully submitted,

By:_____
      Frank J. Ciano, Esq. (FJC – 4981)
      Robert Varga, Esq. (RV – 0636)
      **GOLDBERG SEGALLA LLP**
      **ATTORNEYS FOR PLAINTIFF**
      **KOLO RETAIL, LLC**
      170 Hamilton Avenue, Suite 203
      White Plains, New York 10601
      Tel: (914) 798-5410
      Fax: (914) 798-5401
      fciano@goldbergsegalla.com
      rvarga@goldbergsegalla.com

101029.1